Rodney W. Ott (AZ# 016686)
Coree E. Neumeyer (AZ# 025787)
QUARLES & BRADY LLP
One Renaissance Square
Two North Central Avenue
Phoenix, AZ 85004-2391
(602) 229-5200
Rodney.Ott@quarles.com
Coree.Neumeyer@quarles.com

Lee H. Rubin (CA# 141331)*
MAYER BROWN LLP
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
(650) 331-2000
lrubin@mayerbrown.com

Courtney Hostetler (MA# 683307)*
John Bonifaz (MA# 562478)*
Ben Clements (MA# 555082)*
FREE SPEECH FOR PEOPLE
1320 Centre Street, Suite 405
Newton, MA 02459
(617) 249-3015
jbonifaz@freespeechforpeople.org
chostetler@freespeechforpeople.org
bclements@freespeechforpeople.org

*Motions for Pro Hac Vice Forthcoming*

*Additional counsel listed on last page*

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Mi Familia Vota; Arizona Coalition for Change; Living United for Change in Arizona; and League of Conservation Voters, Inc. d/b/a Chispa AZ,<br><br>        Plaintiffs,<br><br>    v.<br><br>Katie Hobbs, in her official capacity as Arizona Secretary of State; Mark Brnovich, in his official capacity as Arizona Attorney General; and the County Recorder Defendants, Apache County Recorder Larry Noble; Cochise County Recorder David W. Stevens; Coconino County Recorder Patty Hansen; Gila County Recorder Sadie Jo Bingham; Graham | Case No. _____<br><br>**COMPLAINT** |

County Recorder Wendy John; Greenlee
County Recorder Sharie Milheiro; La Paz
County Recorder Richard Garcia; Maricopa
County Recorder Stephen Richer; Mohave
County Recorder Kristi Blair; Navajo
County Recorder Michael Sample; Pima
County Recorder Gabriella Cázares-Kelly;
Pinal County Recorder Virginia Ross;
Santa Cruz County Recorder Suzanne
Sainz; Yavapai County Recorder Leslie M.
Hoffman; and Yuma County Recorder
Robyn S. Pouquette, in their official
capacities,

                    Defendants.

Plaintiffs Mi Familia Vota, Arizona Coalition for Change, Living United for Change in Arizona, and League of Conservation Voters, Inc. d/b/a Chispa AZ file this Complaint against Defendants Arizona Secretary of State Katie Hobbs, Arizona Attorney General Mark Brnovich, and the County Recorder Defendants.

All Defendants are named in their official capacities.

## **PRELIMINARY STATEMENT**

1.      This lawsuit concerns two changes to Arizona's early-voting system enacted in the wake of the 2020 election and designed to make it harder for Arizonans—especially Arizonans of color—to vote. The first is Senate Bill 1485 (the "Voter Purge Law"), which will purge voters from Arizona's popular permanent early voting list if the voters do not cast a mail-in ballot in two consecutive election cycles. The second is Senate Bill 1003 (the "Cure Period Law"), which requires voters who submit early ballots without a signature to "cure" those ballots by 7:00 PM on Election Day—which will be practically impossible for many voters—even though signatures that are alleged to be "inconsistent" with the signature on the voter's registration record may be cured up to five business days after an election.

1

2.     The Voter Purge Law and the Cure Period Law violate the right of *all* Arizonans to vote. Neither law responds to any genuine shortcoming in Arizona's election system or furthers any valid state interest. Rather, the laws reflect baseless accusations of improprieties in the 2020 general election. Because the laws burden the exercise of the right to vote and are not justified by "legitima[te]" state interests that "make it necessary to burden" voters' rights, *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983), both laws violate the First and Fourteenth Amendments to the U.S. Constitution.

3.     The Voter Purge Law and the Cure Period Law also unlawfully discriminate against voters of color. The laws will have a severe and disproportionate impact on voters of color in Arizona, especially Native American, Latino, and Black voters. That discriminatory effect was intentional. It is no coincidence that the Arizona legislature enacted these changes only after an election in which (1) for the first time in recent memory, the presidential candidate preferred by Arizona voters of color won; and (2) voters of color increasingly used early voting—the target of the new laws—to exercise their right to vote. As Arizona's chief election official, Defendant Katie Hobbs, has stated, these and other vote-restriction bills considered by the Arizona legislature were "designed to depress turnout of minority and lower-income voters."[1] The Voter Purge Law and the Cure Period Law are simply the latest iteration in a pattern of intentional and systemic discrimination directed at voters of color in Arizona going back decades. Both laws violate Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments, which prohibit the denial or abridgement of the right to vote on account of race or color.

4.     Plaintiffs bring this action to obtain a judgment declaring the Voter Purge Law and Cure Period Law illegal and unenforceable and to prevent Defendants from implementing the Voter Purge Law and Cure Period Law in future elections.

---

[1] Katie Hobbs, *I'm Leading the Fight for Voting Rights in Arizona. We Need the Senate to Step Up, Now.*, Wash. Post (June 14, 2021, 7:00 AM), https://www.washingtonpost.com/opinions/2021/06/14/arizona-secretary-state-voting/.

## JURISDICTION AND VENUE

5.     Plaintiffs bring this action pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of their rights under the First, Fourteenth, and Fifteenth Amendments to the U.S. Constitution and the Voting Rights Act of 1965.

6.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, because the matters in controversy arise under the Constitution and laws of the United States, and pursuant to 28 U.S.C. §§ 1343(a)(4) and 1357, because this lawsuit seeks to enforce the right of citizens of the United States to vote in Arizona.

7.     This Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

8.     Venue in this district is proper under 28 U.S.C. § 1391 because the Defendants reside in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

### A.     Plaintiffs

9.     Living United for Change in Arizona ("LUCHA") is a non-profit, membership-based organization led by community members fighting for social, racial, and economic justice. In advance of the 2020 election, LUCHA organized in-person and virtual voter registration drives and educated voters about important deadlines, how voters could protect their right to vote, and issues and candidates on the ballot. LUCHA also reached out to thousands of voters to encourage them to vote, including by registering for Arizona's permanent early voting list.

10.     LUCHA plans to organize the same activities for future elections. However, as a result of the Voter Purge Law and Cure Period Law, Plaintiff LUCHA must divert money, personnel, time and resources away from other activities. Specifically, LUCHA must divert scarce resources toward efforts to ensure that voters, particularly those of color and those who are low income, can navigate the restrictions the Voter Purge Law and Cure

Period Law impose on their right to vote. LUCHA will spend more time training volunteers who can educate voters about these new laws, create additional digital voter education campaigns to combat misinformation about these laws, and dedicate additional support to ballot curing efforts. In addition, LUCHA will have to do additional outreach to Spanish-speaking, tribal, and rural communities in order to ensure that these efforts are effective. LUCHA needs additional funding in order to accomplish these tasks and thus is diverting scarce resources to fundraising efforts. These diversions have already occurred and will continue to occur until the 2022 election and beyond.

11. In addition, the Voter Purge Law and Cure Period Law will negatively affect LUCHA's more than 93,000 members, many of whom are people of color and low income. LUCHA's members also include students and the elderly. For those members for whom LUCHA has data, more than 80% are early voters.

12. League of Conservation Voters, Inc. d/b/a Chispa AZ ("Chispa AZ") organizes voter education and political participation programs in Arizona. Over the last five years, Chispa AZ has built up a network of approximately 20,000 members and volunteers in Arizona. Chispa AZ's mission is to increase political participation among Latinos and low-income communities of color in Arizona to achieve climate justice, community health, and more robust environmental protection. Chispa AZ educates voters, registers voters, helps voters sign up for Arizona's permanent early voting list, and protects the rights of voters on election day.

13. As a result of the Voter Purge Law and Cure Period Law, Chispa AZ must divert money, personnel, time and resources away from its planned activities. Specifically, Chispa AZ must divert scarce resources away from voter registration and engagement activities toward efforts to ensure that voters, particularly those of color and those who are low income, can navigate the restrictions the Voter Purge Law and Cure Period Law impose on their right to vote. Chispa AZ expects to spend more time on get-out-the vote efforts and assisting voters to re-enroll on the early voting list, and also must dedicate more resources to ballot curing and organizing education campaigns about the new laws. This

will require hiring more staff, organizing more training for staff, and spending additional money on education campaigns.

14. In addition, the Voter Purge Law and Cure Period Law will negatively affect Chispa AZ's members and volunteers, many of whom are Latino or from other communities of color.

15. Plaintiff Mi Familia Vota ("MFV") is a national, non-profit civic engagement organization with a mission of uniting Latino, immigrant, and allied communities to promote social and economic justice through increased civic participation by encouraging leadership development, citizenship, issue organizing, and non-partisan voter registration and participation. MFV encourages voter registration and participation, and has challenged voter suppression around the nation. It has operations in six states, including Arizona, where it is headquartered. MFV has more than 14,000 members in Arizona.

16. In advance of the 2020 election, MFV organized voter registration drives, conducted get-out-the-vote activities, and helped Arizonans cure deficiencies in their ballots. More than 90% of the individuals MFV helped register to vote in Arizona signed up for the permanent early voting list. MFV also conducted voter education campaigns and provided other voter assistance, including driving voters to polling locations.

17. MFV plans to organize the same activities for future elections. However, as a result of the Voter Purge Law and Cure Period Law, MFV must divert money, personnel, time, and resources away from other programming in order to dedicate more resources toward efforts to ensure that voters, particularly those of color and those who are low income, can navigate the restrictions the Voter Purge Law and Cure Period Law impose on their right to vote. MFV is not only planning to hire additional staff to educate voters about the new restrictions, MFV is also considering how to develop public service announcements in Spanish-language media concerning the changes.

18. In addition, the Voter Purge Law and Cure Period Law will negatively affect MFV's members, many of whom are Latino or from other communities of color.

19.     Plaintiff Arizona Coalition for Change ("AZC4C") is a non-profit organization with a mission to empower everyday people to transform their communities by building civic power, just and equitable schools, and safer neighborhoods. AZC4C's civic engagement team's primary mission is to register people to vote. In the past, its goal was to sign up as many people for Arizona's permanent early voting list as possible and part of its voter education has included informing voters that signing up for that list meant that voters would be on it "forever." AZC4C also conducts get-out-the-vote campaigns, voter education programs, and trainings that teach Arizonans how to advocate for issues at the local, state, and federal levels.

20.     As a result of the Voter Purge Law and Cure Period Law, Plaintiff AZC4C must divert money, personnel, time, and resources away from other programming in order to dedicate more resources toward efforts to ensure that voters, particularly those of color and those who are low income, can navigate the restrictions the Voter Purge Law and Cure Period Law impose on their right to vote. In addition to dedicating more staff and resources to its existing voter education resources, AZC4C is starting programs to help voters cure deficiencies in their ballots and to encourage voters to re-register for the permanent early voting list if they are purged from it. AZC4C is also organizing new voter education and get-out-the-vote campaigns targeted at local elections.

**B.     State Defendants**

21.     Defendant Katie Hobbs is the Arizona Secretary of State and the chief election officer of Arizona. The Secretary of State is responsible for overseeing and administering elections in the State. Ariz. Const. art. V; Ariz. Rev. Stat. § 16-142(A). Secretary Hobbs has the authority to promulgate rules and procedures for elections, including rules and regulations pertaining to voter registration. Ariz. Rev. Stat. §§ 16-452(A) & 16-168(J).

22.     Secretary Hobbs is sued in her official capacity. She is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law.

23.     Defendant Mark Brnovich is the Arizona Attorney General and the chief legal officer of Arizona. Ariz. Rev. Stat. § 41-192(A). The Attorney General is authorized to enforce Arizona's election laws "[i]n any election for state office, members of the legislature, justices of the supreme court, judges of the court of appeals or statewide initiative or referendum . . . through civil and criminal actions." Ariz. Rev. Stat. § 16-1021.

24.     Attorney General Brnovich is sued in his official capacity. He is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law.

**C.     County Recorder Defendants**

25.     The Voter Purge Law, SB 1485, makes county recorders responsible for removing voters from the permanent early voting list. Ariz. Rev. Stat. § 16-168(K). The below defendants (the "County Recorder Defendants") are each sued in their official capacities, and each is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law.

26.     Defendant Larry Noble is the duly elected Apache County Recorder.

27.     Defendant David W. Stevens is the duly elected Cochise County Recorder.

28.     Defendant Patty Hansen is the duly elected Coconino County Recorder.

29.     Defendant Sadie Jo Bingham is the duly elected Gila County Recorder.

30.     Defendant Wendy John is the duly elected Graham County Recorder.

31.     Defendant Sharie Milheiro is the duly elected Greenlee County Recorder.

32.     Defendant Richard Garcia is the duly elected La Paz County Recorder.

33.     Defendant Stephen Richer is the duly elected Maricopa County Recorder.

34.     Defendant Kristi Blair is the duly elected Mohave County Recorder.

35.     Defendant Michael Sample is the duly elected Navajo County Recorder.

36.     Defendant Gabriella Cázares-Kelly is the duly elected Pima County Recorder.

37.     Defendant Virginia Ross is the duly elected Pinal County Recorder.

38.     Defendant Suzanne Sainz is the duly elected Santa Cruz County Recorder.

39.     Defendant Leslie M. Hoffman is the duly elected Yavapai County Recorder.

1    40.    Defendant Robyn S. Pouquette is the duly elected Yuma County Recorder.

2                                            **FACTS**

3    **I.    Arizona's Early Voting System.**

4    41.    Arizona's early voting system includes both in-person voting before Election

5    Day and voting by mail. The system is enormously popular.

6    42.    Since 1991, any eligible Arizona voter has been able to participate in early

7    voting. 1991 Ariz. Legis. Serv. Ch. 308 (H.B. 2392); Ariz. Rev. Stat. § 16-541. In 2007,

8    the state created the permanent early voting list to expand opportunities for Arizonans to

9    take advantage of early voting. 2007 Ariz. Legis. Serv. Ch. 183 (H.B. 2106); Ariz. Rev.

10   Stat. § 16-544.

11   43.    If a voter is not on the permanent early voting list and wishes to vote early

12   by mail, the voter must request a mail ballot—called an early ballot—before each election.

13   The voter's request must be received by the county recorder no later than 5:00 PM on the

14   eleventh day preceding the election. Ariz. Rev. Stat. § 16-542(E). However, voters who

15   join the permanent early voting list are automatically sent an early ballot no later than the

16   first day of the 27-day early voting period. Ariz. Rev. Stat. § 16-544. Voters may return

17   their early ballots by mail postage-free; in person at a polling place, voting center or

18   election official's office; or by putting the ballot in a dropbox if a dropbox is provided by

19   their county. Ariz. Rev. Stat. § 16-548.

20   44.    Over time, the percentage of voters using the early voting system has steadily

21   increased. According to the Secretary of State's Office, approximately 60% of Arizona

22   voters voted by mail in 2010; approximately 66% of Arizona voters voted by mail in 2012;

23   and approximately 80% of Arizona voters voted by mail in 2016.[2]

24   45.    The 2020 election saw even greater use of early voting, in part because the

25   COVID-19 pandemic made many Arizonans cautious about waiting in line to vote. In 2020,

26   2.5 million Arizonans voted by mail or early in-person. In total, over 900,000 more early

27   votes were cast by Arizona voters in 2020 than in 2016.

28

---

[2] All voting figures relate to general elections unless otherwise indicated.

46.     Voters of color were disproportionately likely to be new voters in 2020 and were also disproportionately likely to be new *early* voters in 2020. These voters' percentage of new early voters in the 2020 election exceeded their share of all registered voters, demonstrating that voters in these groups disproportionately relied on early voting in the 2020 election.

47.     The Arizona Secretary of State's website proclaims that "Arizona has a proud history of secure and reliable voting by mail."[3] In the nearly three decades it has existed, there have been no examples of widespread election fraud in connection with Arizona's vote-by-mail system.

## II.     Baseless Efforts To Undermine Voter Confidence in the 2020 Election.

48.     The 2020 election showcased the resiliency of American electoral systems. Arizona was no exception. Despite the unprecedented challenges posed by the pandemic, overall voter turnout surged to over 3.4 million, nearly 80% of registered Arizona voters. 750,000 more Arizona voters cast a ballot in 2020 than in 2016. Turnout as a percentage of Arizona's total voting age population was 59%, nearly ten percentage points higher than the rate during the 2016 presidential election.

49.     In the 2020 election, Arizonans of color were able to elect their candidates of choice for President and Vice President. 59% of voters of color voted for Joe Biden and Kamala Harris, including 61% of Latinos. Eighty percent of votes cast in the Arizona portion of the Navajo Nation and Hopi Reservation were for the Biden-Harris ticket.

50.     The ability of Arizonans of color to elect their candidates of choice has increased in recent years because Arizonans of color have increased as a proportion of Arizona's population. Since 1990, Arizona's Latino population has nearly doubled as a proportion of Arizona's population. According to the 1990 census, Latinos were 18.8% of the Arizona population. According to the 2020 census, Latinos made up 30.7% of Arizona's population. Similarly, Black Arizonans' share of Arizona's population increased

---

[3] *Voting by Mail: How to Get a Ballot-by-*Mail, Ariz. Sec'y of State, https://azsos.gov/votebymail.

from 3% in 1990 to 6.2% in 2020. And Asian Arizonans' share of Arizona's population increased from 1.4% to 4.9%.

51.    The historic turnout in 2020 ought to have been cause for celebration. However, some officials in Arizona and around the country chose instead to weaponize these figures, spreading false and discredited theories that the 2020 elections were affected by widespread voter fraud.

52.    Election officials in Arizona roundly discredited allegations of fraud.[4] Clint Hickman, the chair of the Maricopa County Board of Supervisors, sent a letter to all Maricopa County voters outlining the "proper steps [that had] been taken to ensure a full and accurate count of all votes" and confirming that "there is no evidence of fraud or misconduct or malfunction."[5]

53.    Governor Ducey also defended the election results, explaining in a series of tweets that he had "bragged about [Arizona's election system] quite a bit, including in the Oval Office."[6] In an August 2020 meeting at the White House with President Trump, Governor Ducey stated that it would be "difficult, if not impossible to cheat" in Arizona's elections.[7]

54.    National officials repeatedly declared that the 2020 elections were safe and secure. A joint statement by the Election Infrastructure Government Coordinating Council and Election Infrastructure Sector Coordinating Council called the 2020 election "the most

---

[4] Corasaniti et al., *The Times Called Officials in Every State: No Evidence of Voter Fraud*, N.Y. Times (Nov. 19, 2020), https://nyti.ms/3baEnJN.

[5] Clint Hickman, *Letter to Voters*, Maricopa County Board of Supervisors, https://www.maricopa.gov/DocumentCenter/View/64676/PR69-11-17-20-Letter-to-Voters.

[6] Doug Ducey (@DougDucey), Twitter (Nov. 30, 2020 8:48 PM), https://twitter.com/dougducey/status/1333603735855976450.

[7] *President Trump Meeting with Arizona Governor*, CSPAN (Aug. 5, 2020), https://www.c-span.org/video/?474543-1/president-trump-meeting-arizona-governor.

secure in American history."[8] FBI Director Christopher Wray testified to Congress that "[w]e have not seen, historically, any kind of coordinated national voter fraud effort in a major election, whether it's by mail or otherwise."[9]

55. Allegations of fraud in the 2020 general election have also been decisively rejected in the courts. Judge Humetewa described allegations that Arizona's election process and results were "riddled with fraud" as "sorely wanting of relevant or reliable evidence." *Bowyer v. Ducey*, No. CV-20-02321-PHX-DJH, 2020 WL 7238261, at *1 (D. Ariz. Dec. 9, 2020). The Arizona Supreme Court, in a different lawsuit, concluded that the election challengers failed to present "any evidence" of "misconduct" or "illegal votes" or to "establish any degree of fraud or a sufficient error rate that would undermine the certainty of the election results." *Ward v. Jackson*, No. CV-20-0343-AP/EL, 2020 WL 8617817, at *2 (Ariz. Dec. 8, 2020), *cert. denied*, No. 20-809, 2021 WL 666437 (U.S. Feb. 22, 2021).

56. These determinations echo findings by many other courts in response to lawsuits claiming fraud or irregularities in the 2020 presidential election. *See, e.g.*, *Donald J. Trump for President, Inc. v. Sec'y of Pa.*, 830 F. App'x 377, 381 (3d Cir. 2020) ("[C]alling an election unfair does not make it so. Charges require specific allegations and then proof. We have neither here."); *Law v. Whitmer*, 477 P.3d 1124, 2020 WL 7240299, at *10 (Nev. Dec. 8, 2020) ("the Court finds that there is no credible or reliable evidence that the 2020 General Election in Nevada was affected by fraud"). No court has found any credible evidence to support the assertions of fraud.

[8] *Joint Statement From Elections Infrastructure Government Coordinating Council & The Election Infrastructure Sector Coordinating Executive Committees,* Cybersecurity & Infrastructure Security Agency (Nov. 12, 2020), https://www.cisa.gov/news/2020/11/12/joint-statement-elections-infrastructure-government-coordinating-council-election.

[9] *Wray: FBI Has Not Seen Any Kind of Coordinated National Voter Fraud in a Major Election* by Mail, NBC News (Sept. 24, 2020), https://www.nbcnews.com/video/wray-fbi-has-not-seen-any-kind-of-coordinated-national-voter-fraud-in-a-major-election-by-mail-92470853970.

57. Ten of Arizona's 15 counties completed hand counts of a sample of ballots to confirm the accuracy of the vote tabulation equipment. Each confirmed the accuracy of the results. In January 2021, the Maricopa County Elections Department hired two independent auditing firms to conduct a field audit and forensic audit of the county's tabulation system and equipment, which found no evidence of inaccuracies or malicious malware or hardware installed on voting systems or equipment.

58. In an effort to bolster false and discredited claims of fraud, and provide a veneer of legitimacy for its discriminatory voter suppression efforts, the Arizona Senate hired a Florida corporation called Cyber Ninjas, Inc. to conduct an "audit" of the 2020 election results in Maricopa County.

59. Cyber Ninjas has no experience auditing elections.

60. In addition, the founder of Cyber Ninjas, Doug Logan, is a committed adherent to false theories that widespread fraud somehow cost former President Trump the 2020 election.[10]

61. Motivated by false conspiracy theories, auditors reportedly scanned ballots with UV lights and inspected ballots for traces of bamboo to determine if they were imported from Asia.

62. The Maricopa County Board of Supervisors called the audit a "sham" and a "con," contending that it is "encouraging our citizens to distrust elections, which weakens our democratic republic."[11] A Republican legislator who initially supported the audit said: "It makes us look like idiots . . . [.] Looking back, I didn't think it would be this ridiculous.

---

[10] Marc Caputo, *'Never Heard of Them': Arizona GOP Audit Firm Unknown Even in Home State*, Politico (Apr. 26, 2021, 7:29 PM), https://www.politico.com/news/2021/04/26/republicans-arizona-vote-audit-florida-484737.

[11] Rosalind S. Helderman, *'Our democracy is imperiled': GOP-dominated Maricopa County board of supervisors calls Arizona recount a sham*, Wash. Post (May 17, 2021, 7:42 PM), https://www.washingtonpost.com/politics/maricopa-county-2020-audit/2021/05/17/28292932-b74a-11eb-a6b1-81296da0339b_story.html.

It's embarrassing to be a state senator at this point."[12] Even the Arizona Senate's designated liaison to Cyber Ninjas, former Arizona Secretary Ken Bennett, has grown frustrated with the audit because he is being "kept out of critical aspects along the way that make the audit legitimate and have integrity when we produce the final report . . . and unfortunately there have been too many of those situations."[13]

63. According to Secretary Hobbs, during this so-called "audit," the auditors left open security gates, left unattended confidential manuals, and ignored a series of quality-control measures.[14] Pens with blue and black ink, which are prohibited by law from being near ballots so that they are not altered, were found on the counting floor.[15] At the same time, reporters and independent observers were limited in their ability to watch the auditors' work, contrary to the public process required by law for recounts in Arizona.

**III.    Arizona Uses False Allegations of Voter Fraud To Enact Measures To Burden the Voting Rights of Arizonans.**

64. The false and cynical attacks on the 2020 election in Arizona and other states have not just baselessly undermined confidence in the results of that election. They have also provided cover for widespread discriminatory restrictions on voting rights in future election cycles.

65. According to NYU School of Law's Brennan Center for Justice, by July 14, 2021, legislators across the country had introduced more than 400 bills containing

---

[12] Michael Wines, *In Arizona, a Troubled Voting Review Plods on as Questions Mount*, N.Y. Times (May 9, 2021), https://www.nytimes.com/2021/05/09/us/arizona-vote-count-republicans.html.

[13] James T. Harris, Chat About the Conservative Circus w/ James T. Harris Ken Bennett discusses possibly stepping down from the AZ Election Audit (July 26, 2021), https://www.iheart.com/podcast/960-conservative-circus-w-jame-28823469/episode/ken-bennett-discusses-possibly-stepping-down-85192822/?autoplay=true.

[14] *See* Arizona Secretary of State, *Coliseum Observer Notes*, https://azsos.gov/about-office/media-center/documents/coliseum-observer-notes-2021 (last visited July 28, 2021).

[15] *Id.*

provisions that would make it harder for Americans to register, stay on the rolls, or cast a ballot compared to existing state laws.[16] This is a dramatic increase from prior years.

66.     Arizona legislators have used unsubstantiated and unfounded allegations of widespread voter fraud to attempt to justify restrictions on mail-in voting, even while acknowledging there is no evidence of *actual* fraud to justify the laws. No legislator has identified any instance of voter fraud in Arizona in connection with a mail-in ballot. After six months of official audits and reviews by county election officials and courts, there is no evidence of widespread voter fraud that undermined the integrity of Arizona's 2020 election.

67.     Arizona legislators enacted the laws with full knowledge that they will burden voters of color and for the purpose of disproportionately impacting voters of color and suppressing voter turnout among communities of color. Legislators opposed to the laws described over and over during debates how the Voter Purge Law and Cure Period Law would result in fewer citizens of color voting. But the bills' proponents made clear that reducing the number of citizens of color who vote is in fact the purpose of these laws. For example, Representative John Kavanagh, former President Pro Tempore of the Arizona Senate, attempted to justify bills to limit early voting by asserting that certain Arizonans should not be voting because they are not of the right "quality." In March 2021, he stated that like-minded legislators "don't mind putting security measures in that won't let everybody vote — but everybody shouldn't be voting," and that "[q]uantity [of votes] is important, but we have to look at the quality of votes, as well."[17]

---

[16] *Voting Laws Roundup: July 2021*, Brennan Center for Justice (July 22, 2021), https://www.brennancenter.org/our-work/research-reports/voting-laws-roundup-july-2021.

[17] Timothy Bella, *A GOP Lawmaker Says the 'Quality' of a Vote Matters. Critics Say That's 'Straight out of Jim Crow'*, Wash. Post, (Mar. 13, 2021), https://www.washingtonpost.com/politics/2021/03/13/arizona-quality-votes-kavanagh/.

68.     The Arizona legislature ultimately acted to improve the "quality" of the Arizona electorate by enacting two bills—the Voter Purge Law and the Cure Period Law—that the legislature knew would, and intended to, disproportionately impact voters of color.

**A.      SB 1485 – The Voter Purge Law.**

69.     A majority of Arizona voters have opted to join the permanent early voting list. Approximately 3.2 million voters were on the permanent early voting list as of April 2021. Over two million of the 2.6 million registered voters in Maricopa County—Arizona's largest county—are on the permanent early voting list.

70.     As explained above, voters on the permanent early voting list receive a ballot in the mail prior to each election, sent no later than the first day of the 27-day early voting period, without having to request a ballot for each individual election. Between 2012 and 2020, the vast majority of voters on the permanent early voting list voted, and they did so at a higher rate than those voters not on the permanent early voting list.

71.     Pursuant to SB 1485, however, the permanent early voting list will no longer be "permanent." Instead, election officials will be required to routinely purge any voter from the newly designated "active early voting list" who has not voted an early ballot in two consecutive election cycles.

72.     Specifically, the Voter Purge Law provides that county recorders "shall remove a voter from the active early voting list" if:

1. The county recorder . . . complies with Subsection M of this Section[, and]

2. The voter fails to vote using an early ballot in all of the following elections for two consecutive election cycles:

(a) a regular primary and regular general election for which there was a federal race on the ballot.

(b) a city or town candidate primary or first election and a city or town candidate second, general or runoff election.

Ariz. Rev. Stat § 16-544(K). Subsection M, in turn, provides that:

If a voter fails to vote an early ballot for two consecutive election cycles (a four-year period), their county recorder will mail them a notice asking if they want to continue receiving an early ballot in each election. If the voter does not provide written confirmation, within 90 days of the notice being sent, that they wish to continue receiving an early ballot, they will no longer automatically receive an early ballot before each election.

73.     By purging voters from the permanent early voting list based merely on a putative failure to vote an early ballot in two election cycles, the Voter Purge Law imposes a severe burden on Arizona voters attempting to exercise their right to vote, particularly the elderly, indigent Arizonans, students, and people of color.

74.     Purges of voter registration lists are often haphazard and incorrectly purge voters. A 2008 study by the Brennan Center for Justice found that purges often rely on error-ridden lists and that there is a substantial risk of manipulated purges.[18]

75.     Voter purges also disproportionately affect minority and vulnerable groups. A 2006 study by the Pew Research Center found that Black and Hispanic Americans are more likely to be intermittent or rare voters compared to white voters.[19] Lower income Americans are similarly more likely to be intermittent or rare voters.[20]

76.     Current estimates are that 125,000 to 150,000 voters will be removed from the permanent early voting list if SB 1485 is allowed to take effect. Had this law been enacted in 2019—and therefore been in effect in 2020—approximately 126,000 voters who ultimately voted would have been removed from the list. Even more voters would have been purged from the list had this law been enacted in 2015 or 2017: more than 200,000 voters would have been removed from the early voting list.

77.     Voters of color will be disproportionately purged as a result of the Voter Purge Law. It is estimated that, while white Arizonans are 71% of all registered voters,

[18] Myrna Pérez, *Voter Purges*, Brennan Center For Justice (2008), https://www.brennancenter.org/sites/default/files/2019-08/Report_Voter-Purges-2008.pdf.

[19] *Who Votes, Who Doesn't and Why*, Pew Research Center (October 18, 2006), https://www.pewresearch.org/politics/2006/10/18/who-votes-who-doesnt-and-why/.

[20] *Id.*

only 54% of voters removed from the permanent early voting list would be white. By contrast, Latinos are 19% of registered voters, but would be 33% of removals; Black Arizonans are 4% of registered voters but would be 5% of removals; and Native Americans are .9% of registered voters, but would be 1.3% of removals. Indeed, of the eight legislative districts in Arizona with the highest numbers of voters likely to be removed from the permanent early voting list, seven are districts in which voters of color are the majority of voters.

78.    The fact that election officials must provide voters with notice before purging them from the early voting list will not alleviate the burden that the purging process will place on voters—particularly voters from marginalized groups, voters of color, and the elderly or disabled.

79.    Voters who lack residential mail service will find it challenging to receive and then return the notice in the limited 90-day window they are given. These voters know to expect and watch for their ballots ahead of an election. They do not expect—and may not timely receive or be able to timely respond to—a notice alerting them to the fact that they have been removed from the early voting list.

80.    In addition, voters who will need to have the notice translated—who are disproportionately people of color—will be less able to understand and respond to the notice from the county recorder. Unlike with their ballot, which such voters expect to be mailed and therefore can plan to have translated, many such voters will not expect a notice and so will not understand the need to read the notice, much less have it translated. By the time they realize that they have not received a ballot, these voters may have missed the deadline to request a ballot by mail.

81.    Voters must respond in writing to the notice and return it to the county recorder or other officer in charge of elections. Ariz. Rev. Stat. § 16-544(L). This places a further burden on voters with limited funds to purchase postage, limited mobility, or other limited access to a post office or election office. The options for returning this notice are

more limited than the options made available for voters who are returning their ballots, who often have access to special election offices or drop boxes.

82. Lack of infrastructure and limited access to post offices and drop boxes already make it difficult for many voters of color to vote by mail. These burdens make it more likely that such voters will be struck from the early voting list, creating new, unconstitutional, and unlawful burdens on their right to vote.

83. If a voter is removed from the early voting list, the voter can vote in person, but doing so can be burdensome—which is likely why 80% of Arizonans have chosen alternative voting methods in recent elections. At least one in five people over 70 in the United States, for example, do not drive. In addition, people of color are less likely to have reliable access to vehicles and are more likely to hold jobs with less flexible or inflexible hours that make it more difficult for them to travel to vote in person. For the same reasons, it is particularly challenging for people of color to carve out sufficient time to wait in long lines to vote, as occurred during the 2016 primary in Maricopa County.

84. Accordingly, the Voter Purge Law will disproportionately burden voters of color, as well as elderly and disabled voters. Those voters will be more likely to be purged from the early voting list, face disproportionate challenges in getting back on the early voting list, and experience disproportionate burdens in voting in person.

**B.    SB 1003 – The Cure Period Law.**

85. Early vote ballots must be accompanied by a signed affidavit. Ariz. Rev. Stat. § 16-548(A). Every election, elections officials receive some ballots with unsigned affidavits and some with signatures that appear not to match voter registration records. In August 2019, the Arizona legislature amended the election code to provide voters up to five days after a federal election to cure mismatched signatures. *See* 2019 Ariz. Legis. Serv. Ch. 39 (S.B. 1054); Ariz. Rev. Stat. § 16-550(A) (allowing a voter to cure an "inconsistent" signature up to five business days after a federal election). However, the 2019 law did not

address missing signatures.[21]

86. The Cure Period Law further modifies Ariz. Rev. Stat. § 16-550(A) by requiring voters to cure unsigned ballot affidavits by 7:00 pm on Election Day. Specifically, the law adds the following underlined language to the statute:

> If the signature is inconsistent with the elector's signature on the elector's registration record, the county recorder . . . Shall allow signatures to be corrected not later than the fifth business day after a primary, general or special election that includes a federal office or the third business day after any other election. If the signature is missing, the county recorder … shall … allow the elector to add the elector's signature not later than 7:00 p.m. on election day.

87. Mail-in ballots may be received up to 7:00 pm on Election Day. Ariz. Rev. Stat. § 16-548(A). This means that, under the new law, voters whose mail-in ballots are delivered to election officials on or near Election Day will not be given timely notice of the alleged signature deficiency, and therefore will have no meaningful opportunity, or no opportunity at all, to cure their ballots if they forgot to sign, or did not know they needed to sign, the affidavit and the envelope.

88. Even for ballots that are received by election officials well in advance of election day, the Cure Period Law only requires a county recorder or other official in charge of elections to make "reasonable efforts to contact the elector, advise the elector of the missing signature and allow the elector to add the elector's signature not later than 7:00

---

[21] Before the 2020 election, the Arizona Secretary of State wanted to issue guidance that missing signatures could be cured on the same timeline as mismatched signatures—until 5:00 pm on the fifth business day after the election. The Arizona Attorney General blocked this, so the Arizona Secretary of State issued guidance that missing signatures would have to be cured by 7:00 pm on election day. *2019 Election Procedures Manual*, Arizona Secretary of State (Dec. 2019), https://azsos.gov/sites/default/files/2019_ELECTIONS_PROCEDURES_MANUAL_APPROVED.pdf. In September 2020, a district court enjoined that rule, finding that it unconstitutionally burdened Arizonans' right to vote, and directed Arizona to permit curing of unsigned ballots until 5:00 pm on the fifth business day after the election. *Arizona Democratic Party v. Hobbs*, 485 F. Supp. 3d 1073, 1082 (D. Ariz. 2020). The Ninth Circuit stayed the injunction pending appeal. *Arizona Democratic Party v. Hobbs*, 976 F.3d 1081, 1087 (9th Cir. 2020). A merits panel heard oral argument on July 7, 2021. *See* Case No. 20-16759 (9th Cir.).

P.M. on election day." Ariz. Rev. Stat. § 16-550(A). The law does not specify what "reasonable efforts" must be made, how the voter will be contacted, or how much notice a voter must be given of an alleged missing signature.

89.     And even if a voter receives notice, to cure the ballot, a voter must travel in person to the location where their ballots are held to add their signature. No provision in the law provides alternatives for voters who cannot reasonably travel to the place where their ballots are held. Voters who have to travel significant distances to the county recorder's office or who are unable to travel will face an arbitrary and unconstitutional burden in curing their ballots, and may effectively be deprived of an opportunity to cure their ballots.

90.     The burdens of the Cure Period Law are especially severe for people of color, non-English speakers, disabled voters, and voters who live on reservations.

91.     Arizona election officials already deprive many Native American voters who live on reservations of reasonable access to polling places and election offices. Lack of access to post offices and street addresses slow the process by which they obtain and submit ballots, and would similarly slow the process by which they receive notice of deficiencies.

92.     Black and Latino voters are also burdened by lack of reasonable access to polling places and election offices. Many such voters live in neighborhoods with unequal and insufficient infrastructure, including limited access to public transportation and few election offices. People of color are nearly twice as likely to lack access to a car than white Americans. In Maricopa County, for example, voters in neighborhoods with high concentrations of Black and Latino voters would have to travel up to two hours *one way* by public transportation in order to provide a missing signature. It would cost voters between $7 and $19.50 each way to take a taxi to the election office. In Yuma County, neighborhoods with high concentrations of Black and Latino voters are between 25 and 90 minutes away from election offices by car, and a cab could cost nearly $75.

93.     Lack of language access substantially increases the likelihood that voters will miss the signature requirement, and be unaware of the need for curing. Language barriers also make it more challenging for these voters to understand any notice given to them of the ballot's deficiency, communicate with elections officials, or learn what they need to do to cure their ballots. No provision in the Cure Period Law provides for notice to be given in a language spoken by the voter.

94.     Finally, Arizonans with disabilities will be harmed by SB 1003. Disabled voters often struggle to access public transportation. Voters who are unable to provide a physical signature, or whose marks are not recognized as a signature, risk having their ballots discarded without sufficient time to cure their ballots.

95.     Moreover, the differential treatment of unsigned versus mismatched mail-in ballots that SB 1003 dictates is irrational. Both mismatched and missing signatures pose the same problem: election officials are unable to verify that the person who submitted the ballot is eligible to do so without receiving additional information. Discriminating against unsigned ballots does not prevent election fraud or otherwise protect the integrity of the election. There is no evidence, for example, that anyone has tried to defraud an election through the submission of unsigned mail-in ballots at all, much less that unsigned mail-in ballots pose a unique fraud threat that is not posed by ballots with mismatched signatures. Further, the fact that Arizona allows mismatched signatures to be cured after election day shows that the state does not believe that counting all mail-in ballots by election day is necessary to preserve the integrity of the election and demonstrates that SB 1003 advances no legitimate state interest.

96.     Allowing post-election curing of unsigned mail-in ballots would not pose any administrative or financial burdens on election officials. Indeed, in other litigation, Defendant Hobbs—Arizona's primary election official—has stated that there is no reason to distinguish unsigned and mismatched mail-in ballots, noting that Arizona could easily allow unsigned ballots to be cured during a five-day post-election cure period because Arizona already allows such a cure period for other voter identification issues.

**IV.  Arizona's History of Discrimination and Voter Suppression.**

97.    The Voter Purge Law and Cure Period Law are the latest iteration of Arizona's long history of discrimination against Latino, Native American, and Black people, which continues to hinder these groups' ability to vote and participate fully in the democratic process. The Voter Purge Law and Cure Period Law build upon and exacerbate this history of discrimination.

98.    Indigenous communities have called present-day Arizona their home for 12,000 years. European settlers began moving to the area in the 1500s. The United States acquired the land under the terms of the 1848 Treaty of Guadalupe Hidalgo between the United States and Mexico, and the 1853 Gadsden Purchase, again between United States and Mexico. Indigenous nations had no say over the transfer of their own lands.

99.    After the United States gained ownership over the area now known as Arizona, the United States subjected Native Americans to brutal violence in an effort to drive them from the territory or to confine them on reservations. By the 1880s, Native Americans in Arizona were largely confined to reservations. Today, there are 22 federally recognized tribes residing in Arizona.

**A.    Arizona's History of Discrimination in Voting.**

100.    In 1909, Arizona's territorial legislature imposed an English language literacy test as a prerequisite to voter registration in an attempt to prevent Latino citizens from voting. When Congress passed a law the next year authorizing Arizona to draft a state constitution as a prelude to statehood, the law prohibited Arizona from using its literacy test as an eligibility requirement to vote on the proposed constitution.

101.    But Arizona flouted that law. Once it achieved statehood in 1912, the legislature re-imposed an English literacy test for voting. Arizona's literacy test was not repealed until 1972—two years after an amendment to the Voting Rights Act banned literacy tests nationwide.

102.    Arizona prohibited Native Americans from voting long after it became a state. Though the 1924 federal Indian Citizenship Act declared all Native Americans

citizens of the United States and their states of residence, the Arizona Supreme Court held in 1928 that Native Americans were categorically ineligible to vote in Arizona. *Porter v. Hall*, 34 Ariz. 308, 332 (Ariz. 1928). It was not until 1948 that the Arizona Supreme Court recognized Native American Arizonans' right to vote. *Harrison v. Laveen*, 67 Ariz. 337, 349 (1948).

103.    Notwithstanding the decision in *Harrison v. Laveen*, Arizona's literacy test led to the disenfranchisement of between 80 and 90% of the newly enfranchised Native American citizens as of 1948. By the 1960s, the literacy test was still being used to deny access to the polls to about half of Native American citizens eligible to vote in Arizona. County officials also applied the literacy test discriminatorily to prevent eligible Latino and Black citizens from voting.

104.    Native American, Latino, and Black voters in Arizona who managed to register to vote in spite of discrimination at the point of registration also faced voter intimidation operations and other measures to stop them from voting.

105.    On election day 1964, for example, Arizona Republicans repeatedly and baselessly challenged voters' right to vote, particularly the right of voters of color to vote, at the polls. According to one election expert: "The approach was simple: to challenge voters, especially voters of color, at the polls throughout the country on a variety of specious pretexts. If the challenge did not work outright—that is, if the voter was not prevented from casting a ballot (provisional ballots were not in widespread use at this time)—the challenge would still slow down the voting process, create long lines at the polls, and likely discourage some voters who could not wait or did not want to go through the hassle they were seeing other voters endure."[22]

106.    In 1970, the Arizona legislature purged the voter rolls of all voters and required all citizens to re-register to vote. Many Latino voters, in particular, did not

---

[22] Tova Andrea Wang, *The Politics of Voter Suppression: Defending and Expanding Americans' Right to Vote* 44-45 (2012).

understand that they needed to re-register to vote in the 1970 election and did not do so. In that election, Democrat Raul Castro narrowly lost the governor's race despite receiving 90% of the Latino vote.[23]

107.    In 1975, Congress amended the Voting Rights Act and made all Arizona jurisdictions subject to the statute's "preclearance" requirement. On multiple occasions thereafter, the DOJ refused to preclear changes in voting procedures because they had the purpose or effect of discriminating against voters of color in Arizona.

108.    During the 1980s and 1990s, the Arizona legislature continued to implement and attempt to implement discriminatory voting laws. In just those two decades, the DOJ issued 17 preclearance objections to proposed changes in Arizona election procedures, concluding that the changes had the purpose or effect of discriminating against Arizona's Native American and/or Latino voters.

109.    Native American, Latino, and Black voters have continued to face discrimination during registration and voting in Arizona in recent years. During the presidential primary election in 2016, voters in Maricopa County—a county in which more than 45% of the population is people of color— endured lines of up to five hours to vote after county officials cut polling locations by 85% compared to the 2008 presidential primary.

110.    The polling locations were also unevenly distributed throughout the county. In Phoenix, where a majority of voters are people of color, there was one polling location for every 108,000 residents, while in Cave Creek/Carefree, a predominantly white community, there was one polling location for every 8,500 residents and in Peoria, also predominantly white, there was one polling location for every 54,000 residents.[24] Phoenix

---

[23] F. Chris Garcis & Rudolph O. de la Garza, *The Chicano Political Experience* 105 (1977).

[24] *Request for U.S. Department of Justice Investigation Into Disparate Distribution of Polling Locations in Maricopa County*, City of Phoenix Office of the Mayor, 1, (Mar. 23, 2016), http://content.12news.com/document_dev/2016/03/23/mayor-greg-stanton-letter-to-doj_1141486_ver1.0.pdf.

Mayor Greg Stanton stated that Arizona citizens had been subject to "consistent activity that has created a culture of voter disenfranchisement."[25]

111.    Arizona has also imposed additional burdens on Spanish-speaking Arizonans trying to exercise their right to vote. In 2012, the official Spanish-language pamphlet in Maricopa County stated that the November 6 election would be held on November 8. Four years later, in 2016, Spanish-language ballots in Maricopa County provided an incorrect translation of a ballot proposition.

**B.      Arizona's History of Other Systemic Discrimination.**

112.    Discrimination in housing, education, employment, health, criminal justice, and other areas has interfered with the ability of people of color in Arizona to participate in the political process.

113.    For decades, segregated education was widespread throughout Arizona, and sanctioned by both the courts and the state legislature. Spanish-speaking students were directly targeted for segregation based on their language. Black students were segregated from white students. Native Americans remained segregated because they attended schools on reservations.

114.    Even where schools were not segregated, Arizona restricted bilingual education, mandating English-only education in public schools as early as 1919. Many of these English-only restrictions remain in effect today. In 2000, Arizona banned bilingual education. In addition to Arizona's formal prohibitions on bilingual education, it has a long record of failing to provide adequate funding to its English Language Learning program.

115.    Arizona's legacy of discrimination in education continues to this day. White Arizonans are more likely than Latino, Native American, and Black Arizonans to graduate from high school, and nearly three times more likely to have a bachelor's degree than Latino and Native American Arizonans.

---

[25] *Id.* at 2.

116.     After World War II, Phoenix placed Latino veterans in housing units separate from white Arizonans. Latino people were not permitted to use the same theaters, swimming pools, parks, or restaurants as whites.

117.     As a result of this historical and ongoing systemic racism and discrimination, people of color in Arizona are more likely to experience poverty than their white counterparts, with all the corresponding burdens that impoverishment imposes on political participation. In Arizona, 34% percent of Native Americans, 19% of Black people, and 19% of Hispanic people, live below the poverty line, compared to only 9% of white people. According to the 2019 American Community Survey 1-Year Estimates, the unemployment rate for Latino, Native American, and Black people in Arizona was likewise higher than for white people.

118.     Homeownership and housing stability vary widely by race and reflect both historical and continuing discrimination. According to a report from the Arizona Department of Housing, in 2017, home ownership by people of color was substantially lower than home ownership by white Arizonans. For example, outside of Maricopa and Pima counties, 73% of white non-Hispanic Arizonans own a home, but only 60% of white Hispanic people, 51% of Native American people, and 33% of Black people do. The same trend held in Maricopa and Pima counties.

119.     As of 2017, Latino, Native American, and Black people in Arizona all ranked below white people in relative healthiness, with both Native Americans and Black people having the poorest rank of overall health status. People of color have lower life expectancies than white people in Arizona. In 2017, the absolute majority of deaths of Native American (54.9%) and Black (48.5%) residents of Arizona occurred before the age of 65 years, compared to 20.9% among non-Hispanic whites.

120.     Latino, Native American, and Black people are also overrepresented in

Arizona jails in comparison to the total population.[26]

**C.     The Effects on Voting of Arizona's History of Discrimination.**

121.    Due in significant part to its legacy of discrimination, the rate of voting by voters of color in Arizona is one of the lowest in the country.

122.    Though the National Congress of American Indians estimates that the voter turnout rate among Native Americans nationwide is one to ten percentage points lower than that of other racial and ethnic groups,[27] turnout among Arizona's Native Americans voters is even lower. In the 2020 election, turnout of Arizona's Native American voters who live on reservations was approximately 15 percentage points below the statewide voter turnout average. In 2016, it was more than 20 percentage points lower.

123.    In the 2012 presidential election, 40.4% of Arizona's Latino citizens and 46% of Arizona's Black citizens turned out to vote, compared to 62.4% of Arizona's non-Hispanic white citizens.[28]

124.    In November 2016, nearly 75% of white citizens were registered to vote in Arizona, while only 57% of Latino citizens were registered to vote. In the 2016 general election, more than 68% of non-Hispanic white citizens voted, while only 50.9% of Black citizens and 47.4% of Latino citizens voted.

125.    In both the 2012 and 2016 elections, voters of colors voted for a presidential candidate who did not win the state. In 2020, as described *supra* in Paragraph 49, 61% of Latino voters in Arizona voted for presidential candidate Joe Biden, compared with 46%

---

[26]*Arizona's Imprisonment Crisis: The Cost To Communities*, FWD.us, https://36shgf3jsufe2xojr925ehv6-wpengine.netdna-ssl.com/wp-content/uploads/2018/11/PART-2-AZ-REPORT-summary-1.pdf.

[27] *Every Native Vote Counts: Fast* Facts, National congress of American Indians (2020), http://www.nativevote.org/wp-content/uploads/2020/05/2020-Native-Vote-Infographic.pdf.

[28] *Table 4b.  Reported Voting and Registration, by Sex, Race and Hispanic Origin, for States: November 2012*, United States Census Bureau, https://www2.census.gov/programs-surveys/cps/tables/p20/568/table04b.xls.

of white voters. Eighty percent of votes cast in the Arizona portion of the Navajo Nation and Hopi Reservation were for Joe Biden.

126.    As the foregoing history demonstrates, voter suppression is not a one-off event in Arizona. Rather, Arizona has consistently engaged in practices intended to suppress the vote of marginalized groups. The Voter Purge Law and Cure Period Law are the latest iteration of those efforts, and will exacerbate the burdens placed on voters of color in Arizona.

<h2 align="center">CLAIMS FOR RELIEF</h2>

<h2 align="center">FIRST CAUSE OF ACTION</h2>

<h3 align="center">First and Fourteenth Amendments</h3>

<h3 align="center">U.S. Const. Amend. I and XIV, 42 U.S.C. § 1983; 28 U.S.C. §§ 2201, 2202</h3>

<h3 align="center">Undue Burden on the Right to Vote</h3>

127.    Plaintiffs reallege and incorporate by reference all prior paragraphs, as if fully set forth herein.

128.    The Due Process Clause of the Fourteenth Amendment of the U.S. Constitution provides that "[n]o State shall . . . deprive any person of life, liberty or property, without due process of the law."

129.    The First Amendment, which is applicable to states via the Fourteenth Amendment, prohibits "abridging the freedom of speech." The First Amendment protects the right of Arizonans to vote for candidates of their choosing.

130.    A court considering a challenge to an election law must carefully balance the character and magnitude of injury to the First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against the justifications put forward by the state for the burdens imposed by the law. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

131.    "However slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) (quotation marks omitted). Where the restrictions are severe, they must be "justified by a

narrowly drawn state interest of compelling importance." *Id.* at 190 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)).

132.    The Voter Purge Law and Cure Period Law, individually and collectively, severely burden Arizona's voters through each individual restriction and through the cumulative effect of the suppressive measures which impose barriers to voting.

133.    No state interest justifies these restrictions. Improving the "quality" of people who are able to vote in elections is not a legitimate state interest. Nor does the state have a legitimate interest in discouraging or burdening voting by particular groups of Arizonans who used early voting and mail voting in substantially increased numbers during the 2020 election.

134.    Even if the enactment of the Voter Purge Law and Cure Period Law were motivated by a genuine concern about election fraud—and thus the expression of such concern was not simply pretext to justify disadvantaging Native American, Latino, Black, and other voters in disadvantaged groups—that concern is entitled to no weight here. These burdensome measures would not address genuine concerns about election fraud in Arizona because there is no evidence that these voting restrictions prevent any actual election fraud.

135.    Further, the restrictions imposed by the Voter Purge Law and Cure Period Law are arbitrary and there is no rational justification for such restrictions.

## SECOND CAUSE OF ACTION

### Fourteenth and Fifteenth Amendments

### U.S. Const. Amend. XIV; 42 U.S.C. § 1983; 28 U.S.C. §§ 2201, 2202

### Discriminatory Purpose

136.    Plaintiffs reallege and incorporate by reference all prior paragraphs, as if fully set forth herein.

137.    The Fourteenth Amendment provides: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

138.     Section 1 of the Fifteenth Amendment provides: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."

139.     Voting laws enacted with discriminatory intent violate both the Fourteenth and Fifteenth Amendments. Discriminatory intent may be established by proof that Defendants used race as a motivating factor in their decisions. *Vill. Of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

140.     The Voter Purge Law and Cure Period Law, individually and collectively, violate the Fourteenth and Fifteenth Amendments because they were adopted for the purpose of denying voters of color full and equal access to the political process. As discussed above, the Arizona legislature enacted the Voter Purge Law and Cure Period Law, which specifically target voting methods that voters of color used in increasing numbers in the most recent election to exercise their right to vote, for the purpose of reducing the number of citizens of color who vote.

141.     Arizona's long history and ongoing record of racial discrimination in the context of voting and more generally, the known and anticipated discriminatory impact of the Voter Purge Law and Cure Period Law, the sequence of events which resulted in their enactment, and the absence of evidence to support their supposed justifications, further demonstrate that there is a discriminatory purpose in violation of the Fourteenth and Fifteenth Amendments.

### THIRD CAUSE OF ACTION

**Voting Rights Act § 2**

**52 U.S.C. § 10301 et seq.; 42 U.S.C. § 1983; 28 U.S.C. §§ 2201, 2202**

**Intentional Racial Discrimination**

142.     Plaintiffs reallege and incorporate by reference all prior paragraphs, as if fully set forth herein.

143.     Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, prohibits the

enforcement of any voting qualification or prerequisite to voting or any standard, practice, or procedure that has either the purpose or the result of denying or abridging the right to vote on account of race, color, or membership in a language minority group.

144.    The Voter Purge Law and Cure Period Law, individually and collectively, violate Section 2 of the Voting Rights Act because they were adopted for the purpose of denying voters of color full and equal access to the political process. As discussed above, the Arizona legislature enacted the Voter Purge Law and Cure Period Law, which specifically target voting methods that voters of color used in increasing numbers in the most recent election to exercise their right to vote, for the purpose of reducing the number of citizens of color who vote.

145.    Arizona's long history and ongoing record of racial discrimination in the context of voting and more generally, the known and anticipated discriminatory impact of the Voter Purge Law and Cure Period Law, the sequence of events which resulted in their enactment, and the absence of evidence to support their supposed justifications, further demonstrate that there is a discriminatory purpose in violation of the Voting Rights Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court:

a.      Declare that the Voter Purge Law and Cure Period Law violate the First, Fourteenth, and Fifteenth Amendments and Section 2 of the Voting Rights Act;

b.      Enjoin Defendants, along with their respective agents, officers, employees, and successors, from enforcing the Voter Purge Law and Cure Period Law;

c.      Award Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and any other applicable law;

d.      Retain jurisdiction to ensure ongoing compliance with the foregoing orders; and

e.      Grant such other and further relief that this Court deems just and proper.

Dated: August 17, 2021

Lee H. Rubin (CA# 141331)*
MAYER BROWN LLP
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
(650) 331-2000
lrubin@mayerbrown.com

Gary A. Isaac (IL# 6192407)*
Daniel T. Fenske (IL# 6296360)*
Jed W. Glickstein (IL# 6315387)*
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600
dfenske@mayerbrown.com
gisaac@mayerbrown.com
jglickstein@mayerbrown.com

Rachel J. Lamorte (NY# 5380019)*
(Not admitted in DC; supervised by DC Bar member)
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 362-3000
rlamorte@mayerbrown.com

s/Rodney W. Ott

Rodney W. Ott (AZ# 016686)
Coree E. Neumeyer (AZ# 025787)
QUARLES & BRADY LLP
One Renaissance Square
Two North Central Avenue
Phoenix, AZ 85004-2391
(602) 229-5200
Rodney.Ott@quarles.com
Coree.Neumeyer@quarles.com

Courtney Hostetler (MA# 683307)*
John Bonifaz* (MA# 562478)*
Ben Clements* (MA# 555082)*
FREE SPEECH FOR PEOPLE
1320 Centre Street, Suite 405
Newton, MA 02459
(617) 249-3015
chostetler@freespeechforpeople.org
jbonifaz@freespeechforpeople.org
bclements@freespeechforpeople.org

*Motions for Pro Hac Vice Forthcoming*

*Attorneys for Plaintiffs*