1   Elisabeth C. Frost*                    Ben Stafford*
2   John M. Geise*                         **ELIAS LAW GROUP LLP**
    Joseph N. Posimato*                    1700 Seventh Ave, Suite 2100
3   Tyler L. Bishop*                       Seattle, WA 98101
                                           Phone: (206) 656-0176
4   **ELIAS LAW GROUP LLP**                bstafford@elias.law
    10 G Street NE, Suite 600
5   Washington, DC 20002
    Phone: (202) 968-4513
6   Facsimile: (202) 968-4498
7   efrost@elias.law
    jgeise@elias.law
8   jposimato@elias.law
9   tbishop@elias.law

10  Roy Herrera (Bar No. 032901)
11  Daniel A. Arellano (Bar. No. 032304)
    **BALLARD SPAHR LLP**
12  1 East Washington Street, Suite 2300
13  Phoenix, Arizona 85004-2555
    Telephone: (602) 798-5400
14  Facsimile: (602) 798-5595
15  HerreraR@ballardspahr.com
    ArellanoD@ballardsparhr.com
16

17  *Attorneys for Proposed Intervenors*
    *\*Pro Hac Vice Applications to be filed*

18
19              **UNITED STATES DISTRICT COURT**
                   **DISTRICT OF ARIZONA**
20

21  Mi Familia Vota, Arizona Coalition for          Case No. 21-CV-01423-DWL
    Change, Living United for Change in Arizona,
22  and League of Conservation Voters, Inc. d/b/a
    Chispa AZ,                                       **DSCC'S AND DCCC'S**
23                                                   **[PROPOSED] COMPLAINT IN**
                        Plaintiffs,                  **INTERVENTION**
24

25      and

26  DSCC, and DCCC,

27
                        [Proposed] Plaintiff-
28                      Intervenors,

v.

Katie Hobbs, in her official capacity as
Arizona Secretary of State, Mark Brnovich,
in his official capacity as Arizona Attorney
General, and the County Recorder Defendants,
Apache County Recorder Larry Noble,
Cochise County Recorder David W. Stevens,
Coconino County Recorder Patty Hansen, Gila
County Recorder Sadie Jo Bingham, Graham
County Recorder Wendy John, Greenlee
County Recorder Sharie Milheiro, La Paz
County Recorder Richard Garcia, Maricopa
County Recorder Stephen Richer, Mohave
County Recorder Kristi Blair; Navajo County
Recorder Michael Sample, Pima County
Recorder Gabriella Cázares-Kelly, Pinal
County Recorder Virginia Ross, Santa Cruz
County Recorder Suzanne Sainz, Yavapai
County Recorder Leslie M. Hoffman, and
Yuma County Recorder Robyn S. Pouquette,
in their official capacities,

Defendants.

Plaintiffs, DSCC and DCCC, by and through their undersigned attorneys, file this Complaint for Injunctive and Declaratory Relief against Defendant Katie Hobbs, in her official capacity as the Secretary of State of Arizona, and the above captioned County Recorder Defendants, each named in their official capacities. In support, DSCC and DCCC allege the following:

## NATURE OF THE CASE

1.      This is an action brought under the U.S. Constitution and the Voting Rights Act of 1965 to vindicate and safeguard the fundamental right to vote. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are

illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). In this action, Plaintiffs challenge two of the newest efforts to undermine that most precious right: Arizona's recently enacted S.B. 1003 and S.B. 1485—both enacted with discriminatory purpose in violation of the Voting Rights Act and the Fourteenth and Fifteenth Amendments, and which severely burden the right to vote and threaten to disenfranchise countless eligible, lawful voters in violation of the First and Fourteenth Amendments.

2.     The new challenged laws impose burdensome and unjustifiable restrictions on early mail voting in Arizona that can only be rationally explained as a retributory and discriminatory response to record turnout, particularly among voters of color, and their support for Democratic candidates, in 2020. Arizona has long induced its voters to exercise their right to vote using the state's early voting by mail system, reducing in-person voting opportunities as more voters were convinced to participate in the franchise using a mail ballot, including in particular by signing up for the state's permanent early voting list ("PEVL"). There have been no serious or credible allegations that Arizona's election system resulted in anything but secure, accurate, and reliable results. State officials and courts have repeatedly rejected baseless claims to the contrary. However, as Arizona's electorate has become more diverse, and more Latinx and Native American voters in particular have sought to exercise their right to the franchise, there has been a marked effort by Republicans in Arizona to restrict the franchise and impose unjustifiable impediments to the right to vote.

3.     In 2020, a record 3.4 million voters, or 80 percent of the state's registered voters, cast a ballot in the general election. In comparison, in both 2012 and 2016, about 74 percent voted. Turnout in 2020 increased most greatly in areas heavily populated by the state's communities of color. For example, while turnout statewide increased by a little over 5 percentage points compared to 2016 and 2012, several precincts in South Phoenix, home to large numbers of Black and Latinx residents, saw increases in turnout of about 10 percent, and large precincts on the state's Native American reservations saw increases of

3

about 12-13 percent. Even with these increases, though, turnout among the state's minority voters remains significantly suppressed; for example, turnout on reservations in 2020 was around 65 percent, compared to nearly 80 percent statewide.

4. This progress in increasing turnout was facilitated by the state's early voting by mail system. Since 1991, Arizonans have had a right to vote by mail, and voters may sign up to receive a mail ballot for any reason. *See* A.R.S. § 16-541. Since 2007, voters have also been able to sign up for the PEVL, through which they can automatically receive a mail ballot in every election without having to make repetitive requests. *Id.* § 16-544(A). In 2020, 88 percent of voters used Arizona's early voting system to cast their ballots, a record. But, even before the pandemic, early voting had grown to be the most common form of voting in the state. In 2016, over 2 million—or about 75 percent of voters—used early voting. Even in 2008, more than a million voters, or close to half, used early voting. As more voters have turned to early voting by mail, Arizona's in-person voting facilities and opportunities have decreased.

5. In other words, even before the pandemic, Arizona's voting system was oriented toward supporting and facilitating early mail voters. It was well-tested and well-established. Governor Doug Ducey and Secretary Hobbs have each repeatedly assured the public and the nation that Arizona's 2020 election was secure and fraud-free, and that the results should be trusted. As Governor Ducey explained, in dismissing attacks on the integrity of the 2020 election: "We've been doing early voting since 1992," and claims about problems with the system or the election were unfounded. Despite these assurances, multiple lawsuits and contests brought by the Republican Party, former President Donald Trump's campaign, and their supporters have sought to cast doubt on the outcome of the election. Arizona's state and federal courts responded by rejecting those suits and repudiated their champions for their striking lack of evidence. For example, in a case brought by the state Republican Party to challenge the legitimacy of Maricopa County's audit, the Superior Court ordered the party to pay attorney's fees to the Secretary of State under A.R.S. § 12-349 because the lawsuit was "groundless," brought in "bad faith," and

served only to "cast false shadows on the election's legitimacy." *Arizona Republican Party v. Fontes*, No. CV-2021014553, Order (Mar. 12, 2021).

6. The Republican majority in the Legislature responded by doubling down. Rather than celebrating the historic turnout in 2020, or working to ensure that all of Arizona's voters (including the Latinx and Native American voters who turned out in record numbers in 2020) retained full and fair access to the franchise, the Legislature weaponized conspiracy theories and baseless claims of fraud (often dressed up in a vague and bald claim that election "integrity" was at stake), through needless and restrictive election legislation designed to suppress voting. After several election bills that would have made it harder to vote were introduced during the spring, the majority in May finally coalesced around two proposals, S.B. 1003 and S.B. 1485, which target access to the state's immensely popular early voting by mail system.

7. S.B. 1003, signed by the Governor on May 7, prohibits voters whose mail ballots are flagged for rejection based on a missing signature from curing that deficiency after 7 p.m. on Election Day (the "Cure Period Law"), denying them the same opportunity to cure an identity-related deficiency that is granted to Arizona voters whose ballots are flagged for a mismatched signature, or who forget to bring an acceptable form of voter identification with them to the polls when they vote in person. Both of the latter groups are entitled to a five-day post-election cure period. *See* A.R.S. §§ 16-550(A), 16-579(A). In passing S.B. 1003, the Legislature explicitly approved and codified a mismatched cure period previously imposed by the Arizona Attorney General, which a federal district court judge had found unconstitutional.

8. S.B. 1485, signed by the Governor on May 11, does away with the state's immensely popular PEVL—which the new legislation rebrands as the Active Early Voting List ("AEVL")— by requiring election officials to purge from the list any voter who has not voted an early ballot "for two consecutive election cycles" (the "Voter Purge Law"). The law requires only that the counties mail a notice to such voters, and if they do not respond in writing within 90 days, they will no longer receive a mail ballot before future

5

elections. The law applies to a voter who has not cast such a ballot even if the voter has voted in person on election day within the two-cycle period.

9. Republicans forced the Cure Period Law and Voter Purge Law (together, the "Challenged Provisions") through the Legislature over intense opposition from the public, whose pleas about the devastating impact the laws will have—in particular, on communities of color in the state—were ignored.

10. As manifested by state officials' full-throated defense of Arizona's election system in the immediate aftermath of the November 2020 election, as well as multiple court decisions related to the same, there are no state interests, much less compelling ones, to justify the new imposition of these unjustifiable and disparate burdens, which embody purposeful discrimination against voters of color in the state. For these reasons and those detailed below, Plaintiffs respectfully request a declaration that the Voter Purge Law and the Cure Period Law are each unconstitutional and an order enjoining their enforcement.

## JURISDICTION AND VENUE

11. Plaintiffs bring this action pursuant to 42 U.S.C. §§ 1983 and 1988 to redress the deprivation of rights under the color of state law of their rights under the First, Fourteenth, and Fifteenth Amendments to the U.S. Constitution, and the Voting Rights Act of 1965.

12. This Court has subject matter jurisdiction to hear Plaintiffs' claims pursuant to 28 US.C. §§ 1331, 1343, and 1357.

13. This Court has jurisdiction over the Secretary of State, as she is sued in her official capacity as an elected official in Arizona. Further, the Secretary works and resides in the State of Arizona.

14. This Court has jurisdiction over the Attorney General, as he is sued in his official capacity as an elected official in Arizona. Further, the Attorney General works and resides in the State of Arizona.

15. This Court has jurisdiction over the County Recorder Defendants, as they are sued in their official capacities as elected officials in Arizona, and they work or reside in

Arizona.

16.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district and in this division.

17.     This Court has the authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202. Further, this Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure.

**PARTIES**

18.     Plaintiff DSCC, or Democratic Senatorial Campaign Committee, is the national senatorial committee of the Democratic Party, as defined by 52 U.S.C. § 30101(14). Its mission is to elect Democratic candidates to the U.S. Senate, including in Arizona. DSCC works to accomplish its mission by, among other things, making expenditures for, and contributions to, Democratic candidates for U.S. Senate, including in Arizona. It also assists state parties, including in Arizona, by providing financial support to support coordinated campaign activities that further shared interest in electing Democratic candidates for U.S. Senate. In 2020, DSCC made contributions and expenditures in the tens of millions of dollars to mobilize and persuade voters to support Democratic Senate candidates, including in Arizona. DSCC intends to do the same in future elections in the state. DSCC brings this claim on its own behalf, as well on behalf of its members and constituents.

19.     Plaintiff DCCC, or Democratic Congressional Campaign Committee, is the national congressional committee of the Democratic Party, as defined by 52 U.S.C. § 30101(14). Its mission is to elect Democratic candidates to the U.S. House of Representatives from across the United States, including from Arizona's nine congressional districts. DCCC works to accomplish its mission by, among other things, assisting state parties throughout the country, including in Arizona. In 2020, DCCC made contributions and expenditures in the millions of dollars to persuade and mobilize voters

to support Democratic congressional candidates, including in Arizona. DCCC intends to do the same in future elections in the state. DCCC brings this claim on its own behalf, as well as on behalf of its member and constituents.

20.     The Voter Purge Law directly harms DSCC and DCCC. It is inevitable that Democrats and those who would vote for Democrats, including the members and constituents of DSCC and DCCC, will be removed from the PEVL through the operation of the Voter Purge Law: In 2020 alone, nearly 75 percent of the 3.4 million votes submitted were ballots from voters on the PEVL. Moreover, voters who are removed from PEVL under the new law are more likely to be Latinx, Native American, or Black, and such voters are more likely to support Democratic candidates in Arizona. To combat the burdens imposed by the law on their members and constituents, DSCC and DCCC will each have to expend and divert significant funds and resources they would otherwise devote to locating, contacting, persuading, and mobilizing voters in Arizona and elsewhere. As a result, the Voter Purge Law frustrates each of DSCC's and DCCC's missions of electing Democratic candidates to the U.S. Senate and U.S. House in Arizona and across the United States.

21.     DSCC and DCCC are further directly harmed by the Voter Purge Law because it threatens their competitive interests in Arizona elections. Voters removed from the PEVL by the Voter Purge Law are more likely to be Democratic voters, and their removal and inability to vote without additional burden will make it harder for DSCC, DCCC, and candidates supported by both committees to compete in elections in Arizona.

22.     DSCC's and DCCC's members and constituents are directly harmed by the Voter Purge Law. Given that Democratic Party voters make up a third of the registered voters in Arizona, and that more than three-quarters of registered voters in the state rely on the PEVL to receive their ballots, it is virtually certain that some number of DSCC's and DCCC's members and constituents are to be purged from the list simply for not voting early for two cycles.

23.     DSCC's and DCCC's members were further harmed because the Arizona

8

State Legislature acted with the discriminatory purpose in eliminating the PEVL and replacing it with a system it knew would severely and disproportionately affect voters of color—including Latinx, Native American, and Black voters. Voters in these groups are each substantially more likely to be members of or support DSCC and DCCC candidates than they are any other political party. For example, in the 2020 election, nearly 60 percent of voters of color in Arizona voted for President Joe Biden and Vice President Kamala Harris. Among Native Americans, support for Democrats was over twenty points higher, and included a turnout surge that exceeded the President's margin of victory in Arizona.

24.     The Cure Period Law also directly harms DSCC and DCCC. It is inevitable that Democrats or those who would support Democratic candidates will not have their vote counted as a result of the law's burdensome and inconsistent restriction precluding voters submitting mail in ballots missing signatures from utilizing the same five-day post-election period to "cure" that deficiency as provided other voters with perceived identity defects related to their ballots. Not only is this disparate treatment "unreasonable," as a court in this district found after careful consideration of the Attorney General's arguments in favor of it in a lawsuit in 2020, it guarantees that some voters whose ballots are not received by elections officials until close to or on Election Day (often due to no fault of the voter) are provided no cure opportunity at all. If this unjustifiable restriction were to survive, DSCC and DCCC each would have to expend and divert additional funds and resources on efforts to educate voters and assist voters whose ballots are missing a signature in curing the ballot (assuming their ballot is received and flagged for rejection in time to do so) and avoiding disenfranchisement before the truncated deadline. These are resources DSCC and DCCC each would expend on other programs or activities in Arizona and elsewhere. This frustrates DSCC's and DCCC's mission of, and efforts in, electing Democratic candidates to the U.S. Senate and U.S. House in Arizona and nationwide.

25.     DSCC and DCCC are further directly harmed by the Cure Period Law because it harms their competitive interests in Arizona elections. It is inevitable that DSCC and DCCC will be unable to assist some voters who they otherwise could have helped to

9

cure their ballots, and the disenfranchisement of their voters will make it harder for DSCC, DCCC, and candidates supported by both committees to compete in elections in Arizona.

26.     DSCC's and DCCC's members and constituents are directly harmed by the Cure Period Law. Given that Democratic Party voters make up nearly a third of the registered voters in Arizona and nearly 40 percent of the state's mail voters, and given that thousands of Arizonans' mail ballots were rejected in recent elections due to a missing signature, including in 2020, it is certain that some of DSCC's and DCCC's members and constituents have been harmed by the failure to provide a cure period and that more are poised to be in future elections. DSCC's and DCCC's members and constituents therefore continue to face a threat of having their vote denied due to the Cure Period Law.

27.     Defendant Katie Hobbs is the Secretary of State for the State of Arizona and is the Chief Elections Officer for Arizona. A.R.S. § 16-142. As Arizona's Chief Elections Officer, the Secretary is responsible for carrying out the state's election laws and overseeing the voting process—and is empowered with broad authority to carry out that responsibility. She is also responsible for prescribing rules related to procedures for, among other things, mail ballots, which are set forth in the Arizona Election Procedures Manual ("EPM"). A.R.S. § 16-452. The Secretary is sued in her official capacity for actions taken under color of state law.

28.     Defendant Mark Brnovich is the Attorney General of Arizona and the state's chief legal officer. A.R.S. § 41-192. The Attorney General is authorized to enforce Arizona's election laws in "any election for state office, members of the legislature, justices of the supreme court, judges of the court of appeals or statewide initiative or referendum . . . through civil and criminal actions." A.R.S. § 16-1021. The Attorney General is sued in his official capacity for actions taken under color of state law.

29.     Defendant Larry Noble is the Apache County Recorder and is named as a defendant in this action solely in his official capacity.

30.     Defendant David W. Stevens is the Cochise County Recorder and is named as a defendant in this action solely in his official capacity.

31. Defendant Patty Hansen is the Coconino County Recorder and is named as a defendant in this action solely in her official capacity.

32. Defendant Sadie Jo Bingham is the Gila County Recorder and is named as a defendant in this action solely in her official capacity.

33. Defendant Wendy John is the Graham County Recorder and is named as a defendant in this action solely in her official capacity.

34. Defendant Sharie Milheiro is the Greenlee County Recorder and is named as a defendant in this action solely in her official capacity.

35. Defendant Richard Garcia is the La Paz County Recorder and is named as a defendant in this action solely in his official capacity.

36. Defendant Stephen Richer is the Maricopa County Recorder and is named as a defendant in this action solely in his official capacity.

37. Defendant Kristi Blair is the Mohave County Recorder and is named as a defendant in this action solely in her official capacity.

38. Defendant Michael Sample is the Navajo County Recorder and is named as a defendant in this action solely in his official capacity.

39. Defendant Gabriella Cázares-Kelly is the Pima County Recorder and is named as a defendant in this action solely in her official capacity.

40. Defendant Virginia Ross is the Pinal County Recorder and is named as a defendant in this action solely in her official capacity.

41. Defendant Suzanne Sainz is the Santa Cruz County Recorder and is named as a defendant in this action solely in her official capacity.

42. Defendant Leslie M. Hoffman is the Yavapai County Recorder and is named as a defendant in this action solely in her official capacity.

43. Defendant Robyn S. Pouquette is the Yuma County Recorder and is named as a defendant in this action solely in her official capacity.

## STATEMENT OF FACTS

**A. Arizona voters rely on the state's early voting system.**

11

44.     Early mail voting is immensely popular in Arizona, and for years, the vast majority of voters have relied on it to cast their ballot. Eligible voters in Arizona since 1991 have been able to vote early by mail without a reason or "excuse" for doing so. *See* A.R.S. § 16-541. Reliance on early mail voting has steadily grown ever since. In 2008, over one million, or around half of registered voters, used early mail voting. In 2016, over 2 million voters, or about 75 percent of voters who participated in the election, used early mail voting. And in 2020, nearly three million voters, or about 88 percent, used early mail voting.

45.     In 2007, Arizona established the PEVL to ensure that voters who rely on early mail voting receive their ballot without having to repeatedly request it for each election. If a voter is not on the PEVL and wishes to vote early by mail, the voter must request a ballot before the election. *See* A.R.S. § 16-542(E). Voters who join the PEVL are automatically sent an early mail ballot no later than the first day of the 27-day early voting period. *Id.* § 16-544.

46.     To maintain the PEVL, Arizona law has long required the counties to follow certain procedures to regularly verify voters' addresses and desire to remain on the list, and to ensure that voters whose registrations are moved to "inactive" status are removed. *See* A.R.S. §16-544. In fact, prior to each election, county recorders must mail a notice to all voters on the PEVL. "The notice shall include the dates of the elections that are the subject of the notice, the dates that the voter's ballot is expected to be mailed and the address where the ballot will be mailed," and provide the voter a means to update their address and the opportunity to decline to receive a mail ballot for the upcoming election. *Id.* § 16-544(D). If the notice is returned undeliverable, the county recorder must send a follow up notice, and if the voter "does not complete and return a new registration form with current information to the county recorder or make changes to the elector's voter registration information that is maintained online within thirty-five days, the elector's registration status shall be changed from active to inactive." *Id.* §§ 16-544(E), 16-166(A). If at any point a voter's registration becomes inactive or is cancelled, or if the voter asks to be

removed, the voter is removed from the PEVL. *Id.* § 16-544(H).

47. The vast majority of Arizona voters rely on the PEVL system to exercise their right to vote. According to the Secretary of State, in 2020, around 80 percent of Arizona voters who participated in that election used the PEVL to vote, and at least 75 percent of all registered voters are on the list. Nationally, the share of voters who cast their ballot by mail is around 21 percent.

48. The ever-increasing reliance on early voting by mail in Arizona has led to a corresponding decrease in the availability of in-person voting options. In fact, one study found that the state has had the "most widespread reduction" in polling places of any state over the last decade; the state now has 320 fewer polling places than it did in 2012. While Arizona's inducement of voters to use early voting by mail has helped to make voting more accessible in the state generally and has helped counties preserve resources, fewer polling places translates to more difficulties for those who must vote in person. This is especially true in rural places and on the state's tribal lands, where voters must travel long distances to their polling place and where public transportation is not available.[1]

49. Arizona imposes certain procedures that are meant to enable elections officials to verify the identification of the voter casting the ballot; that is, to confirm that the ballot is cast by the voter to whom it was sent. Maricopa and Pima counties—the state's two largest counties—imprint each mail-in ballot envelope with an Intelligent Mail Barcode linked to a specific voter, a system which allows the counties to confirm that the person voting is the same person who requested the mail-in ballot envelope. Additionally, the state has implemented a tracking system in which voters can determine if and when their mail ballot was been sent, received, and counted by the county recorder.[2]

50. When mail ballots are returned to elections officials, the signature on an

---

[1] Democracy Diverted: Polling Place Closures and the Right to Vote (Sept. 2019), civilrightsdocs.info/pdf/reports/Democracy-Diverted.pdf.

[2] Arizona Voter Information Portal, Ariz. Sec'y of State (last visited Sept. 17, 2021), https://my.arizona.vote/AbsenteeTracker.aspx.

affidavit that must be submitted with the ballot is reviewed by the "county recorder or other officer in charge of elections" who "shall compare the signatures thereon with the signature of the elector on the elector's registration record." A.R.S. § 16-550(A).

51.     In 2019, A.R.S. § 16-550 was amended to explicitly establish a cure period when a voter's ballot was flagged for rejection due to a perceived mismatch between the signature on the ballot and the signature on file for the voter. The statute provides that, "[i]f the signature is inconsistent with the elector's signature on the elector's registration record, the county recorder or other officer in charge of elections shall make reasonable efforts to contact the voter, advise the voter of the inconsistent signature, and allow the voter to correct or the county to confirm the inconsistent signature." *Id.* Of particular relevance to this litigation, the law also affirmatively provided for a five-day post election cure period for voters whose ballots were deemed to have a mismatched signature: "The county recorder or other officer in charge of elections shall allow signatures to be corrected not later than the fifth business day after a primary, general or special election that includes a federal office or the third business day after any other election." *Id.*

52.     This is the same timeframe permitted voters who vote in person but fail to provide an acceptable form of identification to cure that identity-related deficiency and have their ballot counted. Under both A.R.S. § 16-579(A)(2) and the EPM, when a voter does not provide an ID at the polls, they must be issued a conditional provisional ballot, which are counted if the voter presents "an acceptable form of identification to the County Recorder by 5:00 p.m. on the 5th business day following a primary, general, or special election that includes an election for a federal office, or by 5:00 p.m. on the 3rd business day following any other election."[3]

53.     The 2019 law was silent as to whether ballots flagged for rejection because of a *missing* signature were subject to the same post-election cure period. To ensure

---

[3]  2019 Election Procedures Manual, Ariz. Sec'y of State (Dec. 2019), https://azsos.gov/sites/default/files/2019_ELECTIONS_PROCEDURES_MANUAL_APPROVED.pdf.

uniformity in the treatment ballots flagged for rejection due to an identity-related deficiency, to avoid disenfranchisement of otherwise eligible voters, and to avoid confusion among voters and elections officials as to what ballots could be cured and in what timeframe, the Secretary in 2019 drafted the EPM to include a provision that would bring the cure period for missing signature ballots into line with that for mismatched signatures and no-ID in-person voters. The county recorders largely agreed with this approach.

54. However, the Attorney General objected to the Secretary's guidance, and because the EPM requires the Attorney General's approval to go into effect, A.R.S. 16-452(B), the Secretary ultimately issued a version of the EPM that provided that, when a ballot without a signature is received, the County Recorder need only make a "reasonable and meaningful attempt to contact the voter" and explain that the missing signature can be cured "before 7:00pm on Election Day."[4]

55. Arizona is the only state in the country that imposes an inconsistent cure period for voters, allowing mismatched and no-ID voters to cure for a period post-election, but forbidding the same of missing-signature voters. Florida used to provide inconsistent cure periods for missing and mismatched signatures, but that statute was enjoined as unconstitutional in 2016, *Fla. Democratic Party v. Detzner*, No. 4:16CV607-MW/CAS, 2016 WL 6090943, at *1 (N.D. Fla. Oct. 16, 2016), and the Florida legislature subsequently amended the law.

56. Concerned about the disenfranchisement that would result if lawful voters were denied the same opportunity to cure guaranteed these other voters, DSCC, along with the Arizona Democratic Party ("ADP"), filed an action in this Court in June 2020 challenging the mismatched cure process for voters with identity-related deficiencies.

57. That case alleged that the process imposed an undue burden on the right to vote in violation of the First and Fourteenth Amendments, and separately violated the

---

[4] *Id*.

15

procedural due process guarantees of the Fourteenth Amendment. *See* Compl., *ADP v. Hobbs*, No. 20-cv-1143-DLR, Dkt. No. 1 (D. Ariz. June 10, 2020).

58.     The matter was assigned to Judge Douglas L. Rayes who, after careful consideration of the evidence and arguments presented to him, issued a permanent injunction forbidding the Secretary and county recorder defendants from rejecting missing signature ballots without similarly allowing them a five-day post-election opportunity to cure their ballots. *ADP v. Hobbs*, 485 F. Supp. 3d 1073, 1081 (D. Ariz. 2020).

59.     The Attorney General, Republican National Committee ("RNC"), and Arizona Republican Party all sought and were granted intervention as defendants in that case. Those intervenors appealed Judge Rayes' decision to the Ninth Circuit where, in the weeks before the November election, a motions panel granted a stay of the order pending resolution of the appeal, relying in large part on jurisprudence that cautions federal courts against issuing rulings that change elections procedures on the eve of an election. *ADP v. Hobbs*, 976 F.3d 1081, 1085 (9th Cir. 2020). That appeal has since been submitted on the merits and remains pending awaiting a decision.

**B.  The 2020 election in Arizona was secure and accurate.**

60.     Despite the significant challenges presented by the COVID-19 pandemic, Arizona voters turned out in record-setting numbers in 2020. More than 3.4 million of the state's 4.3 million voters, or 79.9 percent, cast a ballot. This compares to 74 percent in 2016, 74.2 percent in 2012, 74.3 percent in 2008, and 77.7 percent in 2004, and 71.8 percent in 2000.[5]

61.     The security and accuracy of the 2020 election results have been confirmed and re-confirmed by county and state election officials, as well as the courts.

62.     County election officials have confirmed and scrutinized the results. For example, after the election, pursuant to A.R.S. § 16-602, ten of the state's fifteen counties

---

[5] Voter Registration and Historical Election Data, Ariz. Sec'y of State (last visited Sept. 13, 2021), https://azsos.gov/elections/voter-registration-historical-election-data.

performed a hand count of sample ballots to test the equipment, each confirming the election's initial results.

63.     Clint Hickman, the chair of the Maricopa County Board of Supervisors, confirmed that "there is no evidence of fraud or misconduct or malfunction" in a letter that was sent to all Maricopa County voters.[6]

64.     In February 2021, the Maricopa County Elections Department further confirmed its results, hiring two auditing firms to conduct audits of the county's tabulation system and equipment, which found no evidence of inaccuracies or improprieties.[7]

65.     State officials have likewise confirmed the results and publicly and definitively declared their accuracy. Arizona law requires the Secretary, in the Governor's presence, to certify the statewide canvass. *See* A.R.S. § 16-648. On November 30, 2020, Secretary of State Katie Hobbs, in the presence of Governor Ducey, did so. The Governor himself further confirmed and defended the accuracy of the results through his social media accounts and in a meeting at the White House with former President Trump.

66.     Additionally, multiple lawsuits that were filed in the aftermath of the election seeking to overturn its results only served to further confirm that the election was secure. For example, in *Bowyer v. Ducey*, various Republican officials filed a lawsuit seeking decertification of the election based on, among other things, allegations of improprieties in signature matching. The court dismissed the suit on multiple grounds, including a lack of any evidence. 506 F. Supp. 3d 699, 722 (D. Ariz. Dec. 9, 2020).

67.     Similarly, in *Ward v. Jackson*, the Arizona Supreme Court concluded that the Republican challenger failed to "establish any degree of fraud or a sufficient error rate that would undermine the certainty of the election results." No. CV-20-0343-AP/EL, 2020

---

[6] Clint Hickman, Letter to Maricopa County Voters, Maricopa Cty Bd. of Supervisors (Nov. 17, 2020), https://www.maricopa.gov/DocumentCenter/View/64676/PR69-11-17-20-Letter-to-Voters.

[7] Auditing Elections Equipment in Maricopa County, Maricopa County Government (Feb. 23, 2021), https://maricopacountyaz.medium.com/auditing-elections-equipment-in-maricopa-county-3955445c1712.

WL 8617817, at *2 (Ariz. Dec. 8, 2020), *cert. denied*, No. 20-809, 2021 WL 666437 (U.S. Feb. 22, 2021).

68.     Nevertheless, fact-free conspiracy theories have continued to percolate and efforts to undermine confidence in the elections process have continued to brew. In particular, these same baseless and repeatedly disproven "concerns" have continued to animate claims of fraud pushed by many Republican officials in the state.

69.     Of particular note is an unprecedented effort to discredit the 2020 election results and locate *some* evidence of fraud, that was launched by Republican Senators in the Spring of 2021, who insisted on conducting another third-party "audit" of the 2020 election.

70.     The Senate passed over experienced election auditors in favor of engaging a corporation based in Florida called "Cyber Ninjas," which has no experience in the field.

71.     To make matters worse, Cyber Ninjas' founder and the leader of the audit, Doug Logan, has propagated false allegations and demonstrably false conspiracy theories about how former President Trump in fact won the election.

72.     Even some Republican officials and legislators who initially supported the effort have since come to recognize that the audit itself is a "sham," a "con," "ridiculous," and lacks "integrity."[8]

73.     Most recently, the current Maricopa County Auditor Stephen Richer, a Republican who delivered the Republican Party one of its few wins in Arizona in 2020 when he unseated a Democratic incumbent, released a heavily footnoted letter that sums it up quite succinctly.

74.     Richer wrote: Arizona's 2020 election wasn't "stolen." "Governor Doug Ducey agrees. Former Republican Jan Brewer agrees. Republican Arizona Attorney General Mark Brnovich agrees, and his office has an election integrity unit that presumably

---

[8] John Bowden, *GOP-Led Maricopa County Board Decries Election Recount as a 'Sham'*, Hill (May 17, 2021), https://thehill.com/homenews/state-watch/554016-gop-led-maricopa-county-board-decries-election-recount-at-sham.

18

receives all evidence of widespread fraud. Former Republican Recorder Helen Purcell agrees. Election directors in every other Arizona county agree. Former President Trump's Department of Justice agrees, including former U.S. Attorney General Bill Barr and former acting Attorney General Jeff Rosen. Trump's former director of the Cybersecurity and Infrastructure Agency, Chris Krebs, agrees. The attorney for the Trump campaign in Arizona agrees; it was he who responsibly said in court, 'we are not alleging fraud.' Even Sidney Powell herself—progenitor of so much of the Stop the Steal movement—now says that 'no reasonable person' should believe the election was stolen." And that's not it: also in agreement that the election was not stolen or impeded by fraud are "the 14 courts who heard eight (8!) complaints" all of which failed.[9]

75.     In sum, after 10 months of repeated (and repeatedly fruitless) efforts to identify any evidence that Arizona's system is prone to cheating, or that the 2020 election was tainted with impropriety, there remains no evidence of significant or widespread voter fraud in Arizona.

76.     Nevertheless, the same free-floating and repeatedly debunked contentions that Arizona's elections are insecure, plagued by fraud, or somehow lacking "integrity" lives on, and laid the foundation for the new voting restrictions that the Legislature has enacted into Arizona law.

### C. Arizona enacted the burdensome Cure Period and Voter Purge laws without any justification; they are pretexts for suppressing minority voting strength.

77.     When the 2021 legislative session began, Republicans in the Legislature moved quickly to introduce several bills to severely restrict access to the franchise in Arizona.

78.     After introducing more than two dozen election bills that would have made it harder to vote throughout the spring, the Republican majority in May finally coalesced

---

[9] Stephen Richer, *Dear Arizona Republicans: Let's Do This Right* (Aug. 19, 2021), https://recorder.maricopa.gov/pdf/Dear%20Arizona%20Republicans_August%202021.pdf.

around the two bills at issue here, both of which target access to the immensely popular early voting by mail system.

79.     **The Cure Period Law.** S.B. 1003 modifies a provision of the early voting cure period law, which as noted above, was revised in 2019 to explicitly provide a post-election cure period for ballots with mismatched signatures.

80.     Over the objection of the Secretary and county elections officials, the Arizona Attorney General had insisted that the same post-election cure period be denied to voters whose ballots are flagged for rejection because the affidavit is missing a signature.

81.     S.B. 1003 makes this differential treatment of voters a provision in Arizona statutory law, such that A.R.S. § 16-550(A) now provides:

> If the signature is inconsistent with the elector's signature on the elector's registration record, the county recorder . . . shall allow signatures to be corrected not later than the fifth business day after a primary, general or special election that includes a federal office or the third business day after any other election. *If the signature is missing, the county recorder . . . shall . . . allow the elector to add the elector's signature not later than 7:00 p.m. on election day.*

82.     This law will directly result in disenfranchisement. Indeed, in recent general elections a significant number of mail ballots have been rejected for missing signatures. From 2008 to 2020, for example, at least 20,347 ballots were rejected due to a missing signature.[10]

83.     Moreover, election officials may receive ballots up to the same deadline as the missing signature cure deadline—7 p.m. on election day—so voters whose ballots arrive in the final days of the election, in full compliance of Arizona law, are denied a cure period altogether if their ballot is flagged for rejection due to a missing signature. History shows that, every election, lawful voters' ballots are among this number, often due to mail delays entirely outside their control.

---

[10] *See* U.S. Election Assistance Commission, Surveys and Data (last visited Sept. 13, 2021), https://www.eac.gov/research-and-data/datasets-codebooks-and-surveys.

84.     The lack of an adequate cure period for missing signature voters stands in stark contrast to the process available not just to voters whose ballots are flagged for rejection due to a supposed signature "mismatch," but also to voters who neglect to bring acceptable identification with them to the polls when they vote in person, even on election day. Those voters are given the same five-day post-election cure period as voters whose ballots are flagged for rejection due to a perceived mis-matched signature. A.R.S. §§ 16-550(A), 16-579(A).

85.     Additionally, the law does not specify what "reasonable efforts" to "contact the elector" means, or how the voters must be contacted, creating further and disparate burdens throughout the state and likely disenfranchisement for voters who are given less or no notice of their missing signature.

86.     As Judge Rayes found, after careful consideration of the evidence presented to him in *ADP v. Hobbs*, this system is unconstitutional; indeed, the Attorney General failed to prove that it reasonably served any of the state interests that he claimed justified it. *ADP*, 485 F. Supp. 3d at 1091.

87.     To the contrary, Judge Rayes found that the mismatched cure period actually undermined the state's interests in the orderly administration of elections and promoting voter participation in elections. *Id.* at 1090-92.

88.     The Republican-controlled Legislature ignored these findings and enacted legislation that would codify the practice struck down in *ADP v. Hobbs*. It is no coincidence that it did so in the aftermath of the 2020 election, in which record turnout among minority voters in particular propelled the Democratic presidential and senate candidates to victory.

89.     **The Voter Purge Law**. As noted above, prior to S.B. 1485, voters on the PEVL received a ballot no later than the first day of the early voting period without having to request a ballot for each individual election.

90.     The new law, which redesignates the list with the misnomer the "active" early voting list ("AEVL"), to be codified at A.R.S. § 16-544(K)-(M), provides that county recorders "shall remove" voters from the AEVL if they fail "to vote using an early ballot"

21

for two consecutive election cycles (a four-year period) and do not respond within 90 days in writing to a notice prescribed by the law, which county recorders must now send to all voters who did not vote using an early ballot during that period.

91.     To avoid removal under S.B. 1485, voters "shall do both of the following": (1) "confirm in writing the voter's desire to remain on the active early voting list," and (2) "return the completed notice to the county recorder or other officer in charge of elections within ninety days after the notice is sent to the voter. The notice shall be signed by the voter and shall contain the voter's address and date of birth."

92.     Under the law, a voter will be removed from the AEVL *even if they vote in person on election day* during the two-cycle period. As such, the list requires the purging from the active voter list of active voters.

93.     Indeed, a voter could face removal from the list even if they consistently voted in each of the elections over the prior two cycles, simply because in those elections they opted to do so in person. And the onus is on the voter to be on the lookout for and respond to inquiries by elections officials in order to safeguard that right, despite their continued active engagement in Arizona's elections.

94.     The Voter Purge Law does little more than create more needless correspondence between the county recorders and voters. As discussed above, Arizona already requires the counties to perpetually mail notices to voters to determine whether their registration status should remain active and whether voters who are on the PEVL would like to remain on the list. *See* A.R.S. § 16-544(E)-(H). Any time a voter's registration is moved to inactive, or if the voter would like to be removed, they are taken off of the list. *Id.* There is no evidence that these maintenance protocols left the PEVL overinflated or created other problems. Yet, under S.B. 1485, voters who opted to vote to in person or did not vote in two cycles will be subject to yet another round of notices. Some voters, especially those who have responded to a previous notice to update their address or provide other information, will inevitably disregard the PEVL purge notice and will be caught off guard when they fail to receive their ballot for the next election.

22

95.     It is by now well known that purges of voter lists are prone to disproportionately improperly removing lawful and qualified minority voters from the voting rolls. There is no reason to anticipate that this law will be any different. To the contrary, as reflected in early assessments reported by Mi Familia Vota, the same will be true here.

96.     Other voters from vulnerable populations, such as low-income voters and voters experiencing poverty, are also more likely to be removed because they are more likely to vote intermittently.

97.     The Voter Purge Law also particularly threatens harm to voters who live on the state's tribal lands. Such a voter who discovers that they were purged from the AEVL too late in the election cycle to address the problem and timely receive an early ballot is likely to face substantial and often insurmountable hurdles in attempting to vote in person, including but not limited to transportation accessibility issues, and extraordinarily long distances to travel.

98.     Young voters are also particularly at risk as a result of the Voter Purge Law. Younger individuals, such as college students, tend to move around more often and vote less consistently, putting them at greater risk of being removed under the provision—and not receiving any notice that may be issued. They are also more likely to be outside of the county in which they would be permitted to vote in person by the time they realize that they will not be receiving a mail ballot and thus less likely to be able to exercise their right to vote by appearing in person to cast their ballot.

99.     For these voters and many others, the requirement that county recorders send a notice requirement does not ameliorate the inevitable and unjustifiable burdens of the Voter Purge Law. For example, voters from low-income backgrounds who are already at greater risk of being removed often lack stable housing and are unable to receive their mail on a consistent basis. Others, such as those on the state's tribal reservations, who lack residential mail service and often have to drive long distances to pick up their mail (a trip that many do not make regularly) may find it challenging to receive and respond to the

notice within the statutory period.

100.    Moreover, the Voter Purge Law is to take effect even as opportunities to vote in person diminish in Arizona. As explained above, the state's successful efforts to induce voters to rely on the permanent early voting system has directly led to a decrease in the number of and availability of polling place locations throughout the state. As a result, voters who must vote in person because the state purges them from the AEVL will face an even harder time exercising their right to vote.

101.    **State Interests**. The two new restrictive measures were passed with no colorable explanation, let alone justification.

102.    In fact, no legislator identified a single instance of voter fraud or impropriety in Arizona related to mail-in early voting ballots that would precipitate the need for the changes at issue.

103.    Nor can the Voter Purge Law or the Cure Period Law be credibly justified as a cost-saving measure.

104.    The Voter Purge Law requires counties to implement a new system to track and mail additional notices, which will impose further and new costs upon the counties.

105.    And, with respect to the Cure Period Law, it would impose little to no administrative burden to extend the same cure period that already exists for mismatched signatures and missing voter identification for in-person voters to voters who submit a ballot affidavit with a missing signature. Indeed, this was the testimony of state and county elections officials in *ADP v. Hobbs*.

106.    In other words, both revisions to the law impose additional burdens on elections officials, rather than relieve them.

107.    Contemporary statements by legislative leaders further demonstrate the pretextual nature of the proffered "justifications" for the restrictive measures challenged here.

108.    For example, the President Pro Tempore of the Arizona Senate Vince Leach stated that the bill does not remove "voters" but just removes people who have "elected not

24

to participate" or are "dead." But this was at the time—and remains—demonstrably false: voters whose registrations go inactive are already removed from PEVL in its prior iteration.

109.    As described, the only "activity" that the new law recognizes is early voting; as designed, it will purge even undeniably active voters, who simply change their method of voting to in-person voting for two election cycles.

110.    In fact, analysis shows that and nearly *130,000 Arizonans*, if not more, who *voted* in 2020 would have been removed from the early voting list if the Voter Purge Bill had become law prior to that election.

111.    Several additional facts surrounding the enactment of the Voter Purge Law and the Cure Period Law supply ample context of the discriminatory motivations at play.

112.    At various points throughout final consideration of the bills, Republican legislators failed entirely to rebut arguments about the racially discriminatory effects of the bills.

113.    Instead, when concerns were raised about the discriminatory impacts of the bills, Republican legislators tried to *silence* discussion about those discriminatory impacts altogether, using procedural measures to attempt to prevent other members of the Legislature from even referring to race or racially based motives.

114.    For example, after Reginald Bolding, a Black State Representative and minority leader of the House, said in a speech on the House floor that it would be harder for "independent voters, seniors, Native Americans, Black, brown and low income people to vote" under the Voter Purge Law, Republican Representative Travis Grantham, called a point-of-order, stating, "I feel personally that motives were [attributed to] members, including myself with regards to colored people, Black people, whatever people this individual wants to single out and their ability to vote . . . I think he should be sat down and he shouldn't be allowed to speak."[11]

---

[11] Sanya Mansoor, *Arizona Just Became the Latest State to Approve Mail Voting Restrictions. Here's What to Know*, Time (May 11, 2021), https://time.com/6047696/arizona-mail-voting-restrictions/.

115. Legislators and other supporters of the new measures have also consistently used pretextual language that has historically been associated with intentionally racially discriminatory voting and election measures.

116. For example, Representative John Kavanagh, the chairman of the Government and Elections Committee in the House, revealed the true intent of the laws – i.e., to keep certain Arizonans from voting – when he declared that, "everybody shouldn't be voting." He added: "Quantity is important, but we have to look at the quality of votes, as well."[12]

117. The broader context of these "reforms" and the doubts and conspiracy theories that animated them cannot be ignored. The legislature expressed a need to ensure a better "quality" of voters immediately after a historic election in which voters of color were able to elect their favored candidates to statewide office.

118. Voters in Arizona continue to face discrimination on a daily basis, including during the voting process. As State Senator Martin Quezada has stated, many voters used PEVL precisely because when they vote in person, they face "flat out discrimination at the polling place."[13]

119. Arizona lawmakers also passed the new laws despite the devastating impact they knew the legislation would have on voters who live on the state's Native American reservations and in other extremely remote areas.

120. As explained, the laws will cause more voters to have to present in person, either to cast a ballot in lieu of a PEVL ballot that they never received, or to cure a missing

---

[12] Timothy Bella, *A GOP Lawmaker Says the 'Quality' of a Vote Matters. Critics Say That's 'Straight Out of Jim Crow.'*, Wash. Post (Mar. 13, 2021), https://www.washingtonpost.com/politics/2021/03/13/arizona-quality-votes-kavanagh/.

[13] Andrew Oxford, *Republicans in Arizona Legislature Advance Bill to Remove Some From Early Voter List*, Ariz. Repub. (Jan. 21, 2021), https://www.azcentral.com/story/news/politics/legislature/2021/01/21/bill-remove-some-permanent-early-voting-list-arizona-advances/6665628002/.

signature by election day. Yet, just to get to their polling place, voters who live on reservations must travel long distances in some of the "most remote, challenging, and sparsely populated terrain in the country."[14] The population density on the Navajo Nation is 6.3 individuals per square mile, compared to the statewide population density of 56.3.[15] No public transportation exists on the state's reservations and in other remote areas, creating significant obstacles for these voters to exercise their right to vote; many, each year, are unfortunately disenfranchised.[16]

121.    Additional factors stemming from Arizona's long history of discrimination against Native Americans make access to voting in person even more difficult for those who live on the state's reservations. For example, extreme poverty on the state's reservations and other socioeconomic factors exacerbate the difficulty obtaining reliable transportation to far off polling locations. One-third of people on the Navajo Nation live in poverty, and only four percent have a college degree.[17] Despite the Native American community's repeated efforts to achieve change through the political process, these suppressive realities remain for precisely the Arizonans who are most harshly targeted and impacted by the challenged provisions.

**CLAIMS FOR RELIEF**

**COUNT ONE**

**(Unjustifiable Burden on the Right to Vote in Violation of the**

---

[14] *Addressing the Urgent Needs of our Tribal Communities: Hearing Before the Comm. on Energy and Commerce*, 116th Cong. (2020) (testimony of Jonathan Nez, Navajo Nation President).

[15] Navajo Div. of Health, *Navajo Population Profile* (Dec. 2013), https://www.nec.navajo-nsn.gov/Portals/0/Reports/NN2010PopulationProfile.pdf.

[16] Sydney Page, *Getting To the Polls Can Be Hard in Navajo Nation. This Woman Is Leading Voters on Horseback*, Wash. Post (Nov. 2, 2020), https://www.washingtonpost.com/lifestyle/2020/11/02/navajo-nation-horse-vote-polls-election/.

[17] Arizona Rural Policy Institute, *Demographic Analysis of the Navajo Nation Using 2010 Census and 2010 American Community Survey Estimates* 25 tbl. 10 (2010), https://gotr.azgovernor.gov/sites/default/files/navajo_nation_0.pdf.

**First and Fourteenth Amendments)**

122.    Plaintiffs reallege and incorporate by reference all prior paragraphs, as if fully set forth herein.

123.    A court considering a challenge to a state election law must carefully balance the character and magnitude of injury to the First and Fourteenth Amendment rights that the Plaintiff seeks to vindicate against the justifications put forward by the state for the burdens imposed by the rule. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

124.    "However slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) (quotations marks omitted).

125.    The Voter Purge Law imposes a disparate and unjustifiable burden on the right to vote. Under the Voter Purge Law, voters who simply fail to vote or decide not to vote using an early mail in ballot in two elections, will be removed from the system upon which they rely to receive their ballot. Voters of color in Arizona will disproportionately be purged from that system and are more likely to face more significant barriers in attempting to remedy improper removal, including by responding to notices of removal in time, and successfully locating and accessing a location for in-person voting to exercise their right to vote.

126.    There is no state interest, much less one that can justify the burdens imposed on voters by this discriminatory and burdensome system of removals. Every ballot submitted and counted in every election is checked by election officials and confirmed in subsequent verification measures. Moreover, the existing PEVL system already had an effective mechanism for removing inactive voters from its ambit. Under that system, the state already mailed notices to every PEVL voter in advance to ensure that their address remains accurate, and voters were immediately removed any time their registration status

goes inactive. There is simply no evidence to suggest the discriminatory new purge provisions are necessary.

127. The Voter Purge Law's true objective is to add hurdles for lawful voters; hurdles that will be disproportionately placed before Arizona's voters of color, thereby severely and disparately burdening their ability to participate in Arizona elections.

128. The Cure Period Law also imposes a disparate and unjustifiable burden— disenfranchisement—on the right to vote. Although voters who submit a mail ballot with a missing signature or fail to present identification while voting in person have five days after the election to cure that identity-related deficiency and save their ballot from rejection, voters who leave off a signature are disenfranchised by the Law at 7 p.m. on election day.

129. There is no state interest supporting the Cure Period Law, much less one that can justify this discriminatory and burdensome system and its injuries to lawful Arizona voters.

130. Indeed, the Secretary and county election officials almost uniformly advocated for and support a consistent cure period that gives missing signature voters the same opportunities to cure as other voters whose ballots are flagged for rejection due to identity-verification related deficiencies.

131. The mismatched and inconsistent cure period undermines the integrity of the state's elections; it does not promote it. To the extent any interest exists, it certainly cannot justify disenfranchisement.

## COUNT TWO

### (Intentional Racial Discrimination in Violation of Section 2 of the Voting Rights Act, 51 U.S.C. § 10301, *et seq.*)

132. Plaintiffs reallege and incorporate by reference all prior paragraphs, as if fully set forth herein.

133. Section 2 of the Voting Rights Act prohibits vote denial: the use of voting laws, policies, or practices, such as mail ballot procedures or qualifications, that deny, abridge or otherwise limit voters access or increase their burden to exercise the right to

29

vote. 52 U.S.C. 10301.

134. Section 2 is violated where the election law or practice being challenged has either a discriminatory purpose or a discriminatory effect. *See Thornburg v. Gingles*, 478 U.S. 30, 35 (1986).

135. Discriminatory purpose may be established by proof that the defendants used race as a motivating factor in their decisions. *Vill. Of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Even where challenged legislation appears neutral on its face, discriminatory intent may be inferred by analyzing the context in which the challenged provisions were enacted, and by reviewing the challenged provisions' disproportionate racial impact. *See id.* at 266-68.

136. Here, the evidence shows a discriminatory purpose in the passage of the Voter Purge Law and the Cure Period Law. Contemporary statements during the legislative session and during consideration of the bills demonstrate racial pretext. Discrimination in voting persists to this day, and the state's minority population turnout remains comparatively suppressed. And the bills were passed after the 2020 election demonstrated record turnout among the state's minority population, and in the face of clear evidence the bills disproportionately harm and disenfranchise precisely those groups.

## COUNT THREE

**(Discriminatory Purpose in Violation of the
Fourteenth and Fifteenth Amendments)**

137. Plaintiffs reallege and incorporate by reference all prior paragraphs, as if fully set forth herein.

138. The Fourteenth Amendment provides that no state "shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; no shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction equal protection of the laws."

139. The Fifteenth Amendment provides that the "right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on

30

account of race, color, or previous condition of servitude."

140.  Discriminatory intent may be established by proof that the defendants used race as a motivating factor in their decisions. *Vill. Of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Even where challenged legislation appears neutral on its face, discriminatory intent may be inferred by analyzing the context in which the challenged provisions were enacted, and by reviewing the challenged provisions' disproportionate racial impact. *See id.* at 266-68.

141.  All of the relevant indicia demonstrate discriminatory purpose in the passage of the Voter Purge Law and the Cure Period Law. Contemporary statements during the legislative session and during consideration of the bills demonstrate racial pretext. Discrimination in voting persists to this day, and the state's minority population turnout remains comparatively suppressed. And the bills were passed after the 2020 election demonstrated record turnout among the state's minority population, and in the face of clear evidence the bills disproportionately harm and disenfranchise precisely those groups.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter the following judgment:

A.  Declare that the Voter Purge Law (S.B. 1485) violates the First, Fourteenth, and Fifteenth Amendments, as well as Section 2 of the Voting Rights Act;

B.  Declare that the Cure Period Law (S.B. 1003) violates the First, Fourteenth, and Fifteenth Amendments, as well as Section 2 of the Voting Rights Act;

C.  Enjoin Defendants, along with their respective agents, officers, employees, and successors from enforcing the Voter Purge Law;

D.  Enjoin Defendants, along with their respective agents, officers, employees, and successors from enforcing the Cure Period Law;

E.  Award Plaintiffs their costs, expenses, and reasonable attorneys fees, pursuant to 42 U.S.C. 1988, and any other applicable law;

F.  Grant such other and further relief as the Court deems just and proper.

31

Dated: September 24, 2021                    Respectfully Submitted,

                                             /s/ Daniel A. Arellano
                                             Roy Herrera (Bar No. 032901)
                                             Daniel A. Arellano (Bar. No. 032304)
                                             **BALLARD SPAHR LLP**
                                             1 East Washington Street, Suite 2300
                                             Phoenix, Arizona 85004-2555
                                             Telephone: (602) 798-5400
                                             Facsimile: (602) 798-5595
                                             HerreraR@ballardsparhr.com
                                             ArellanoD@ballardsparhr.com

                                             Elisabeth C. Frost*
                                             John M. Geise*
                                             Joseph N. Posimato*
                                             Tyler L. Bishop*
                                             **ELIAS LAW GROUP LLP**
                                             10 G Street NE, Suite 600
                                             Washington, DC 20002
                                             Phone: (202) 968-4513
                                             Facsimile: (202) 968-4498
                                             efrost@elias.law
                                             jgeise@elias.law
                                             jpasimato@elias.law
                                             tbishop@elias.law

                                             Ben Stafford*
                                             **ELIAS LAW GROUP LLP**
                                             1700 Seventh Ave, Suite 2100
                                             Seattle, WA 98101
                                             Phone: (206) 656-0176
                                             bstafford@elias.law

                                             *Attorneys for Proposed Intervenors*
                                             *\*Pro Hac Vice Applications to be filed*