**MARK BRNOVICH**
**ATTORNEY GENERAL**
Joseph A. Kanefield (No. 15838)
*Chief Deputy & Chief of Staff*
Brunn ("Beau") W. Roysden III (No. 28698)
*Division Chief*
Drew C. Ensign (No. 25463)
*Deputy Solicitor General*
Robert J. Makar (No. 33579)
*Assistant Attorney General*
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-5200
Drew.Ensign@azag.gov

*Attorneys for State of Arizona*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Mi Familia Vota, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>Katie Hobbs, et al.,<br><br>Defendants. | Case No: 2:21-cv-01423-DWL<br><br>**CORRECTED ATTORNEY GENERAL'S CONSOLIDATED MOTION TO DISMISS PLAINTIFFS' AND INTERVENOR-PLAINTIFFS' COMPLAINTS UNDER RULES 12(B)(1) AND 12(B)(6)** |

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iv

INTRODUCTION ........ 1

BACKGROUND ........ 4

LEGAL STANDARD ........ 6

ARGUMENT ........ 7

I. SOME OF PLAINTIFFS' CLAIMS ARE NON-JUSTICIABLE ........ 7

A. Plaintiffs Intentional Discrimination Challenges To S.B. 1003 Fail Because Plaintiffs Cannot Establish Redressability ........ 7

1. Pre-Existing, Unchallenged Laws Preclude Post-Election Curing Of Non-Signatures ........ 7

2. Because Plaintiffs Do Not Challenge The Preexisting Laws, They Lack Article III Standing ........ 8

3. Plaintiffs Have Alleged Injury-in-Fact With Respect To Their *Anderson-Burdick* Facial Challenge To Poll-Close Deadline 9

II. THIS COURT SHOULD STAY PLAINTIFFS' *ANDERSON-BURDICK* CHALLENGES TO SB 1003 ........ 10

III. PLAINTIFFS' INTENTIONAL DISCRIMINATION CLAIMS FAIL ........ 11

A. Plaintiffs Improperly Conflate The Results And Intents Test ........ 11

B. Plaintiffs' Allegations Are Insufficient To Defeat The Presumption Of Good Faith ........ 12

IV. PLAINTIFFS' *ANDERSON-BURDICK* CHALLENGES TO THE PERIODIC VOTING REQUIREMENT FAIL ........ 15

A. Overview Of The *Anderson-Burdick* Framework ........ 16

B. Plaintiffs Have No Right To Vote By Mail At All—Let Alone Remain On An EVL Despite Chronic Non-Voting ........ 16

C. The Burden Imposed Is Minimal ........ 17

D. The State's Important Interest Are Sufficient To Sustain S.B. 1485 ..... 19

E. Plaintiffs Have Not Satisfied The Requirements For Facial Claims ..... 21

CONCLUSION ..... 22

# TABLE OF AUTHORITIES

## Cases


*Abbott v. Perez*,
138 S. Ct. 2305 (2018)........................................................................................ 12, 14

*ADP v. Hobbs*,
976 F.3d 1081 (9th Cir. 2020) ........................................................................... 4, 10

*Angle v. Miller*,
673 F.3d 1122 (9th Cir. 2012) ............................................................................... 16

*Arizona Democratic Party v. Hobbs*,
No. 20-16759 (9th Cir.) ........................................................................................... 4

*Arizonans for Fair Elections v. Hobbs*,
454 F. Supp. 3d 910 (D. Ariz. 2020) ....................................................................... 8

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................... 7, 12, 13, 18

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..................................................................................... 7, 13, 20

*Brnovich v. DNC*,
141 S. Ct. 2321 (2021)............................................................ 2, 3, 4, 11, 14, 15, 18, 21

*Christensen v. Harris Cty.*,
529 U.S. 576 (2000) ................................................................................................. 8

*City of Mobile v. Bolden*,
446 U.S. 55 (1980) ................................................................................................. 14

*Colwell v. Dep't of Health & Hum. Servs.*,
558 F.3d 1112 (9th Cir. 2009) ................................................................................. 7

*Comm. to Impose Term Limits (etc.) v. Ohio Ballot Bd.*,
885 F.3d 443 (6th Cir. 2018) ................................................................................. 15

*Common Cause/Ga. v. Billups*,
554 F.3d 1340 (11th Cir. 2009) ............................................................................. 19

*Crawford v. Marion Cty. Election Bd.*,
553 U.S. 181 (2008) ........................................................................................ 17, 19

*Davis v. Bandemer*,
478 U.S. 109 (1986) ............................................................................................... 11

*DNC v. Hobbs*,
948 F.3d 989 (9th Cir. 2020) ................................................................................. 11

*Dudum v. Arntz*,
640 F.3d 1098 (9th Cir. 2011) ........................................................................ 16, 18

*Flemming v. Nestor*,
363 U.S. 603 (1960) ............ 12

*Frank v. Walker*,
768 F.3d 744 (7th Cir. 2014) ............ 19

*Free Speech Coal., Inc. v. Att'y Gen. U.S.*,
974 F.3d 408 (3d Cir. 2020) ............ 10

*Fusilier v. Landry*,
963 F.3d 447 (5th Cir. 2020) ............ 12

*Greater Birmingham Ministries v. Sec'y of State for State of Alabama*,
992 F.3d 1299 (11th Cir. 2021) ............ 14, 19

*Hunter v. Underwood*,
471 U.S. 222 (1985) ............ 11

*Husted v. A. Philip Randolph Inst.*,
138 S. Ct. 1833 (2018) ............ 21

*Jennings v. Rodriguez*,
138 S. Ct. 830 (2018) ............ 8

*Lemons v. Bradbury*,
538 F.3d 1098 (9th Cir. 2008) ............ 19

*Lewis v. Ascension Par. Sch. Bd.*,
662 F.3d 343 (5th Cir. 2011) ............ 12

*M.S. v. Brown*,
902 F.3d 1076 (9th Cir. 2018) ............ 6, 9

*Mays v. LaRose*,
951 F.3d 775 (6th Cir. 2020) ............ 16, 18, 19

*McDonald v. Bd. of Election Comm'rs of Chicago*,
394 U.S. 802 (1969) ............ 16

*Mi Familia Vota v. Hobbs*,
977 F.3d 948 (9th Cir. 2020) ............ 4

*N. Carolina State Conf. of the NAACP v. Raymond*,
981 F.3d 295 (4th Cir. 2020) ............ 14, 15

*Nader v. Brewer*,
531 F.3d 1028 (9th Cir. 2008) ............ 16

*Nuclear Info. & Res. Serv. v. Nuclear Regul. Comm'n*,
457 F.3d 941 (9th Cir. 2006) ............ 8

*Ohio Democratic Party v. Husted*,
834 F.3d 620 (6th Cir. 2016) ............ 19

*Pers. Adm'r of Massachusetts v. Feeney*,
442 U.S. 256 (1979) ............ 12

*Prete v. Bradbury*,
438 F.3d 949 (9th Cir. 2006) ........ 16, 19, 20

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) ........ 21

*Renne v. Geary*,
501 U.S. 312 (1991) ........ 8

*Short v. Brown*,
893 F.3d 671 (9th Cir. 2018) ........ 17

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) ........ 8

*Timmons v. Twin Cities Area New Party*,
520 U.S. 351 (1997) ........ 16

*United States v. Coleman*,
24 F.3d 37 (9th Cir. 1994) ........ 3, 12

*United States v. O'Brien*,
391 U.S. 367 (1968) ........ 15

*United States v. Salerno*,
481 U.S. 739 (1987) ........ 10, 22

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) ........ 12, 13

*Washington State Grange v. Washington State Republican Party*,
552 U.S. 442 (2008) ........ 22

*Winter v. NRDC*,
555 U.S. 7 (2008) ........ 1

*Yazzie v. Hobbs*,
977 F.3d 964 (9th Cir. 2020) ........ 8

**Statutes**

52 U.S.C. §21083 ........ 21

52 U.S.C. §10301 ........ 11

A.R.S. §16-542 ........ 4

A.R.S. §16-544 ........ 5, 6

A.R.S. §16-548 ........ 6, 7, 8

A.R.S. §16-552 ........ 7, 8

**Other Authorities**

1918 Ariz. Session Laws Ch. 11, §§6-7 ........ 4, 12

1991 Ariz. Sess. Laws Ch. 308 §6 ........................................................ 5
2007 Ariz. Sess. Laws Ch. 183 §3 ........................................................ 5
2019 Ariz. Legis. Serv. Ch. 39 §2 (S.B. 1054) ........................................ 5
2021 Ariz. Legis. Serv. Ch. 343 §2 (S.B. 1003) ...................................... 5
2021 Ariz. Legis. Serv. Ch. 359 §6 (S.B. 1485) ...................................... 6

## INTRODUCTION

This suit embodies three unfortunate trends in election law. *First*, it is part of the unwarranted targeting of Arizona with a multitude of election suits, even though Arizona operates one of the most open and generous voting systems in the United States. Notably, of the 32 states that use signatures as the primary method of authenticating mail-in ballots, 12 do not permit curing of non-signatures whatsoever—unlike Arizona, which (like Georgia, Michigan, and Massachusetts) permits curing until polls close ("Poll-Close Deadline"). *See* Appendix. But Plaintiffs[1] have not sued any of those 12 states regarding non-signature curing. Similarly, the existence of an Early Voter List ("EVL"), which automatically sends mail-in ballots for all eligible elections, *at all* is a uniquely generous feature of Arizona law: 30 states offer no such convenience to voters *whatsoever*, and ten limit their EVLs either to voters with disabilities and/or those over the age of 64. *See id.* But Plaintiffs have not challenged any of those 30 states' *complete absence* of an EVL, but instead have sued Arizona because it modestly conditions continued presence on its EVL with a requirement that voters either vote in a federal or municipal election once every four years or respond to a notice.

Plaintiffs would not dream of bringing equivalent challenges to states dominated by Democratic officials even though the vast majority of those states have *far more onerous* election laws. But once again for Arizona, "no good deed goes unpunished." *Winter v. NRDC*, 555 U.S. 7, 31 (2008). Arizona's relative generosity has once again been rewarded by yet another suit by Democratic organizations and their aligned groups.

Nor do Democratic legislators elsewhere in the U.S. have much discernable sympathy for Plaintiffs' cries of "Unconstitutional Disenfranchisement!" here. Those Democratic legislators could readily pass laws enacting the policies Plaintiffs that seek to impose here by litigation. They overwhelmingly and tellingly don't. In Plaintiffs' apparent views—as now revealed by multiple election cycles of litigation—the laws at issue here

[1] As used herein, "Plaintiffs" refers to all Plaintiffs, while "Original Plaintiffs" or "Mi Familia" refers to the Plaintiffs that originally filed this action, while "Intervenor Plaintiffs" refers to DSCC and DCCC, which subsequently intervened. The Attorney General is generally referred herein as the "State."

only “unconstitutionally disenfranchise” voters of swing or red states, not blue states. Plaintiffs’ selective and hypocritical invocations of the Constitution and the Voting Rights Act should therefore be considered in this context. These are not high-minded attempts to protect the rights of voters everywhere, but rather political-motivated attempts to seize small partisan gains *only* where Plaintiffs sense potential electoral advantage.

*Second*, this suit continues Plaintiffs’ propensity for suing over even the tiniest of burdens in voting. “[E]very voting rule imposes a burden of some sort.” *Brnovich v. DNC*, 141 S. Ct. 2321, 2338 (2021). And the burdens at issue here are truly miniscule: For the signature requirement, it is merely the burden of (1) signing once, where prominently indicated, sometime within roughly a month, or, failing that, (2) curing the failure to do so by election day, with the active (and mandatory) assistance of voting officials. For the EVL Periodic Voting Requirement it is either (1) simply voting in a federal or municipal election by mail-in ballot once every four years *or*, failing that, (2) responding affirmatively to a notice inquiring whether the voter wishes to remain on the EVL *or*, failing that, (3) re-registering for the EVL, either online or by mail, following removal. And even if voters fail to take *any* of those three minimally burdensome actions, they *still* can always vote in person (either early or on election day) or request a mail-in ballot for an individual election. Plaintiffs’ contentions that these minimal burdens are unconstitutionally burdensome both violates controlling precedent and reflects an attempted infantilization of voters that this Court should reject.

*Third*, Plaintiffs’ suit embodies the modern trend of castigating all policies that groups dislike as irredeemably “racist,” even though they have strong race-neutral rationales and there is scant evidence of animus. Plaintiffs’ have not even plausibly alleged cognizable discriminatory intent here, and not even dogs could discern the whistles that Plaintiffs purported to perceive. Moreover, their instant theories directly violate the Supreme Court’s recent decision in *Brnovich v. DNC*, as well as the presumption of good faith that federal courts accord to state legislators. Plaintiffs’ extensive discursions into ancient history and the election audit, which is irrelevant here, do not overcome that

presumption of good faith.

But Plaintiffs' problems do not end—or even begin—there. As a threshold matter, some of their claims lack subject matter jurisdiction. In particular, most of Plaintiffs' challenges to the Signature Requirement of S.B. 1003 are not redressable under Article III because the pre-existing laws also impose the same requirement and are not challenged by Plaintiffs. Similarly, Plaintiffs lack standing to assert any as-applied challenges because they have joined no voters and challenged no particular applications of the laws being challenged.

As to Plaintiffs' VRA claims, it is well-established that a Section 2 violation can only established by either of two *distinct* tests: (1) the discriminatory intent test *or* (2) the results tests, which analyzes disparate impacts. *See*, *e.g.*, *Brnovich*, 141 S. Ct. at 2336-43, 2348-50. But Plaintiffs' VRA claims here improperly attempt to conflate and combine the two tests. Plaintiffs' claims thus repeatedly rely on purported disparate impacts, Mi Familia Complaint ¶¶ 3, 46, 67-68, 75-77, 80—but Plaintiffs do not even *argue* that these disparate impacts alone could satisfy the results test.

Instead, Plaintiffs allege the Legislature was allegedly aware of disparate impacts that themselves do not violate the VRA and enacted SB 1003 and 1485 anyway. In Plaintiffs' apparent view, that alone constitutes discriminatory intent—without the need to bother with proof. That is simply not the law: "awareness of consequences [*i.e.*, disparate impacts] alone does not establish discriminatory intent." *United States v. Coleman*, 24 F.3d 37, 39 (9th Cir. 1994). But that is largely all that Plaintiffs offer, with a few completely conclusory allegations of unlawful animus sprinkled in. *See*, *e.g.*, Mi Familia Complaint ¶¶67-68, 145.

To the extent that Plaintiffs offer anything beyond disparate impacts, it is minimal and insufficient to plausibly allege discriminatory intent. The Original Plaintiffs' Complaint, for example, uses the statement of a *single* legislator as evidence of discriminatory animus. *See id.* ¶¶ 67-68. That statement has nothing to do with race at all. It is certainly less relevant evidence than the purportedly "'racially-tinged' video" at issue

in *Brnovich*—which did not suffice. 141 S. Ct. at 2349-50. But even were that single statement the dog whistle that Plaintiffs claim, Plaintiffs' attempt to extrapolate discriminatory intent of the entire legislature from the statement of a one of its members is precisely the sort of "'cat's paw' theory" that the Supreme Court squarely held "has no application to legislative bodies." *Id.* at 2350.

In addition, as the State has already explained, Plaintiffs' *Anderson-Burdick*/unconstitutional burden challenge to the Poll-Close deadline should be stayed pending the Ninth Circuit's decision in *Arizona Democratic Party v. Hobbs*, No. 20-16759 (9th Cir.). And their *Anderson-Burdick* challenge to the Periodic Voting Requirement fails because the burdens imposed are exceedingly small, and justified by the State's interests in reducing administrative costs and securing its elections.

For all of these reasons, this Court should dismiss Plaintiffs' Complaints.

## BACKGROUND

***Voting in Arizona.*** Arizona is a leader among states in making it easy for its citizens to cast votes. *See*, *e.g.*, *Brnovich*, 141 S. Ct. at 2330 ("Arizona law generally makes it very easy to vote."). Arizona does so through a variety of means, including (1) online registration, (2) not requiring any excuse to obtain an absentee/mail-in ballot, (3) making it easy to sign up for automatic mailing of ballots for all eligible elections, (4) pre-paying postage, (5) maintaining polling places despite high vote-by-mail usage, (6) placing voting drop boxes in areas with limited mail service, and (7) requiring nothing more than a timely signature to vote by mail (unlike other states that require witnesses or notarization). *Id.* at 2344, 2346; *Mi Familia Vota v. Hobbs*, 977 F.3d 948, 952 (9th Cir. 2020) ("Registration could be accomplished online or by mail."); A.R.S. § 16-542 (postage pre-paid); *ADP v. Hobbs ("Hobbs I")*, 976 F.3d 1081, 1085-86 (9th Cir. 2020) (describing signature requirement).

That last requirement is directly at issue here.

***Absentee/Mail-In Balloting.*** For most of its history as a state (all but 1912-17) Arizona has permitted absentee balloting. *See* 1918 Ariz. Session Laws Ch. 11, §§6-7.

During the entirety of that time, *i.e.*, 1918-2021, Arizona has (1) always required a signature to cast a vote by mail/absentee and (2) never permitted "curing" of non-signatures after election day.

***Signature Mismatches.*** In 2019, the Arizona Legislature enacted a bill that permits curing of signature mismatches up to 5 business days after the relevant election. *See* 2019 Ariz. Legis. Serv. Ch. 39 §2 (S.B. 1054). The statute did not provide an equivalent cure period for non-signatures. *Id.*

Although Arizona law does not permit post-election curing of non-signatures, it does permit curing up until polls close. *See* Judicial Notice Request Ex. 1 at 68-69. Its Election Procedure Manual affirmatively mandates that county recorders take affirmative efforts to facilitate such curing. *Id.*

The Arizona Legislature codified the prohibition on post-election curing of non-signatures expressly in 2021 in S.B. 1003. *See* 2021 Ariz. Legis. Serv. Ch. 343 §2 (S.B. 1003) (amending A.R.S. §16-550(A)). As explained below (and previously in *Hobbs I*), that was already Arizona law based on the interaction on two mail-in ballot statutes. *Infra* at 7-8.

***Early Voting List.*** In 1991, Arizona's Legislature expanded its voting procedures to allow any qualified elector—not just those that met certain enumerated criteria—to participate in early voting via an absentee ballot without requiring an excuse. 1991 Ariz. Sess. Laws Ch. 308 §6. In 2007, the Legislature created the "permanent early voting list," (PEVL) on which any voter may request to be added to receive an early, mail-in ballot for all eligible elections. 2007 Ariz. Sess. Laws Ch. 183 §3. Arizona is one of five states that has such a list available for all voters. *See* Appendix. In addition, five other states conduct elections entirely by mail. *See id.*

Inclusion on Arizona's EVL is not automatic; instead, the voter must make a written request to be included. *Id.* Similarly, voters on the list may specifically request to be removed from it. A.R.S. §16-544(I). Voters on the list receive a ballot by mail no later than 27 days before election day, and may return their early ballot either by mail or by dropping

the completed ballot off at a polling location. A.R.S. §16-548.

***EVL Periodic Voting Requirement.*** In an effort to maintain an accurate list of those electors utilizing the early ballots to participate in the state and federal political process and reduce costs, the 2021 Legislature passed Senate Bill 1485. That statute amended the permanent early voting list by renaming it the "active early voting list," and adding the Periodic Voting Requirement. *See* 2021 Ariz. Legis. Serv. Ch. 359 §6 (S.B. 1485) (amending A.R.S. §16-544)

That requirement generally requires voters to either (1) vote by mail in one federal or municipal election (primary or general) every four years, or (2) respond to a notice asking whether they wish to remain on the EVL. *See id.* That requirement is enforced by the county recorders, who must provide notice after sufficient non-voting in the prior four years. *Id.* The law provides the notified voters 90 days within which to confirm their desire to remain on the EVL in writing. *Id.* Failure to do so results in the removal of that voter from the EVL and, consequently, from receiving an early ballot automatically for each election. *Id.*

If voters are removed from the EVL under the Periodic Voting Requirement, they are still registered to vote and may do so either in person or by using one of the many available ways to request a mail-in ballot for a particular election. *See, e.g.,* Arizona Secretary of State, *Voting by Mail: How to Get a Ballot-by-Mail*, https://azsos.gov/votebymail (explaining the four options to get a one-time mail-in-ballot; (1) online request, (2) calling county recorder; (3) submitting a written form; and (4) sending an e-mail to county recorder). They also may simply request to be put back on the EVL, in the same manner that they initially requested inclusion. A.R.S. §16-544(b).

## LEGAL STANDARD

Plaintiffs' claims should be dismissed for lack of jurisdiction and/or for the failure to state a claim. Federal courts may only entertain cases and controversies. *See, e.g.*, *M.S. v. Brown*, 902 F.3d 1076, 1082 (9th Cir. 2018). Accordingly, to establish jurisdiction, plaintiffs must demonstrate a personal stake in the outcome. "The burden of establishing

ripeness and standing rests on the party asserting the claim." *Colwell v. Dep't of Health & Hum. Servs.*, 558 F.3d 1112, 1121 (9th Cir. 2009).

On a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). A complaint must contain "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal" conduct. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

## ARGUMENT

## I. SOME OF PLAINTIFFS' CLAIMS ARE NON-JUSTICIABLE

Here, Plaintiffs lack standing to challenge the Poll-Close Deadline of SB 1003 because they cannot show redressability in light of the background, unchallenged statutes. In addition, Plaintiffs lack standing to assert any as-applied challenges, as they do not even allege that any specific voter has suffered a deprivation from either challenged law and have failed to join any individual voters.

### A. Plaintiffs Intentional Discrimination Challenges To S.B. 1003 Fail Because Plaintiffs Cannot Establish Redressability

#### 1. Pre-Existing, Unchallenged Laws Preclude Post-Election Curing Of Non-Signatures

Prior to S.B. 1003 passing, preexisting Arizona statutory law affirmatively precluded counting mail-in ballots not signed or cured by poll-close time, thereby barring a post-election cure period. This result flows inexorably from the interaction of two statutes. First, A.R.S. §16-548(A) requires that a ballot affidavit "must be received … [by] 7:00 p.m. on election day." Second, A.R.S. §16-552(B) provides that "[i]f the affidavit is insufficient, the vote shall not be allowed."

The combination of these two provisions means that ballots must have arrived with their respective ballot affidavits by poll-close time, and that if they are not sufficient *then*, the vote accordingly "shall not be allowed." A.R.S. §16-552(B).

This conclusion is further underscored by the canon of *expressio unius*. When the Arizona Legislature expressly provided a post-election cure period for signature

mismatches in 2019, but not non-signatures, that omission is presumptively intentional and should be given effect. *See*, *e.g.*, *Christensen v. Harris Cty.*, 529 U.S. 576, 583 (2000) ("When a statute limits a thing to be done in a particular mode, it includes a negative of any other mode." (cleaned up)); *Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018).

Notably, the State raised this precise argument in *Hobbs I*. *See* Doc. 58-2 at 60-62, 58-5 at 29-30. In response, the *Hobbs I* plaintiffs (Intervenor-Plaintiffs here) offered no response at all, thereby conceding the issue. *See generally* Doc. 58-4.

### 2. Because Plaintiffs Do Not Challenge The Preexisting Laws, They Lack Article III Standing

Because unchallenged Arizona laws preclude post-election curing of non-signatures, Plaintiffs cannot satisfy Article III's redressability requirement. *See*, *e.g.*, *Nuclear Info. & Res. Serv. v. Nuclear Regul. Comm'n*, 457 F.3d 941, 955 (9th Cir. 2006) (redressability was lacking because a holding setting aside an NEPA regulation would not remedy plaintiffs' injury where plaintiffs did not challenge another identical regulation); *see also Renne v. Geary*, 501 U.S. 312, 319 (1991) (doubting that the alleged injury could be redressed because "[a] separate California statute, the constitutionality of which was not litigated in this case" provided similar restrictions); *Arizonans for Fair Elections v. Hobbs*, 454 F. Supp. 3d 910, 917-19 (D. Ariz. 2020) (holding that plaintiffs' failure to challenge parallel constitutional requirement created fatal redressability issue).

Even if S.B. 1003 were struck down in its entirety, A.R.S. §16-548(A) and §16-552(B) would still preclude any post-election curing. And Plaintiffs do not even *allege* that either of those laws were enacted with discriminatory intent.

Because Plaintiffs' alleged injury is the inability to cure non-signatures after election day, and even granting their requested relief as to S.B. 1003 *in its entirety* would not allow them to do so, Plaintiffs cannot satisfy their burden to establish redressability. "'Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court.'" *Yazzie v. Hobbs*, 977 F.3d 964, 967 (9th Cir. 2020) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) (alteration omitted)).

Moreover, even aside from A.R.S. §16-548(A) and §16-552(B), Plaintiffs' intentional discrimination claims suffer from a more fundamental defect: in the 103 years that Arizona has permitted voting by mail, it has *always* required signatures and *never* permitted the absence of a signature to be cured after polls close. Neither the Reconstruction Amendments nor the VRA can conjure a law providing for such curing out of existence: "The *absence* of a law … has never been held to constitute a 'substantive result' subject to judicial review." *M.S.*, 902 F.3d at 1087. That is because "structural constitutional limits prevent federal courts from ordering government officials to enact or implement a bill that has not completed a lawfully prescribed legislative process." *Id.*

This is particularly true as there is nothing inherently discriminatory about denying an opportunity to cure non-signatures after polls close, or indeed at all, where it applies to all voters equally. Notably, states such as Connecticut, New Mexico, and Delaware do not permit *any* curing of deficiencies, and states including Massachusetts (like Arizona) limit non-signature curing to when polls close. Plaintiffs do not contend that *any* of these states are engaged in unconstitutional discrimination, nor have they sued them. Nothing about the equal protection components of the Fourteenth or Fifteenth Amendments or the VRA imposes an affirmative mandate of post-election curing.

Ultimately, because post-election curing would require some affirmative creation of new law that Arizona has *never* had, this Court could strike down S.B. 1003 and *every* other Arizona election law as unlawfully discriminatory and it still would not lead to creation of any post-election curing or redress any injury that Plaintiffs suffer from the absence of such curing. There is no pre-existing law to revert to that would permit such curing. As a result, Plaintiffs lack Article III standing to assert their claims under the VRA, and Fourteenth and Fifteenth Amendments.

### 3. Plaintiffs Have Alleged Injury-in-Fact With Respect To Their *Anderson-Burdick* Facial Challenge To Poll-Close Deadline

The State agrees that Intervenor-Plaintiffs have adequately alleged standing with respect to their facial *Anderson-Burdick* challenge to Poll-Close Deadline for non-

signature curing. Because that claim asserts that the *absence* of any law providing post-election curing inherently violates the Constitution, the State does not contest redressability on that claim.

### B. Plaintiffs Lack Standing To Assert Any As-Applied Challenges

Plaintiffs notably do not include any individual voters and also do not make any allegations about any individual applications of the challenged laws. Nor are such individual applications even conceivable for the Periodic Voting Requirement, since *no one* has not received an early ballot or been removed from the EVL as a result of it yet.

It is unclear whether Plaintiffs are even attempting to assert any as-applied challenges, or merely facial ones alone. Their Complaints are unclear on this point: neither uses the terms "facial" or "as applied" at all; nor do they even *allege* that there are "no set of circumstances exists under which the Act[s] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

Notably, in the *ADP v. Hobbs* case, plaintiffs there (Intervenor Plaintiffs here) conceded that their "claims [we]re facial in nature." Doc. 58-2 at 58. To the extent that either set of Plaintiffs here might be attempting to assert as-applied challenges here, however, they lack standing to do so. *See Free Speech Coal., Inc. v. Att'y Gen. U.S.*, 974 F.3d 408, 421-22 (3d Cir. 2020).

## II. THIS COURT SHOULD STAY PLAINTIFFS' *ANDERSON-BURDICK* CHALLENGES TO SB 1003

As the State has requested, *see* Doc. 58, Plaintiffs' *Anderson-Burdick* claims against the Poll-Close Deadline should be stayed pending the Ninth Circuit's resolution of *ADP v. Hobbs*, as that decision will control the resolution of those claims. But if those claims are not stayed, they fail in any event because the Ninth Circuit has already determined that the Poll-Close Deadline provision imposes "at most, a minimal" burden on the right to vote and that it "reasonably advances [the State's] important regulatory interests," *Hobbs I*, 976 F.3d at 1085-86, and for the reasons explained in the State's briefing in *Hobbs I*. *See* Docs. 58-2, 58-4. at 60-62, 58-5.

## III. PLAINTIFFS' INTENTIONAL DISCRIMINATION CLAIMS FAIL

Plaintiffs claim intentional discrimination in the enactment of both provisions under both the Voting Rights Act Section 2 and the Equal Protection Clause. These intentional discrimination claims require proof of both an intent to discriminate and actual discriminatory effect. *Davis v. Bandemer*, 478 U.S. 109, 127 (1986). Once racial discrimination is shown to have been a "substantial" factor behind the law, the burden shifts to the state to show that the law would have been enacted anyway. *See Hunter v. Underwood*, 471 U.S. 222, 228 (1985).

Here, Plaintiffs' allegations fall short of plausibly establishing discriminatory intent, especially when considered against the background of the strong presumption of good faith for state legislatures, and so should be dismissed.

### A. Plaintiffs Improperly Conflate The Results And Intents Test

Section 2 of the Voting Rights Act states that "No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied…which results in a denial or abridgement of the right of any citizen…to vote on account of race or color." 52 U.S.C. §10301. A violation of Section 2 may be shown under either the results test or the intent test. *See DNC v. Hobbs*, 948 F.3d 989, 1011 (9th Cir.), *rev'd on other grounds by Brnovich v DNC*, 141 S. Ct. 2321 (2020).

Plaintiffs do not allege that either challenged provision violates the "results test" under Section 2. As the Supreme Court explained in *Brnovich*, Section 2 is violated where, in considering the "totality of the circumstances," the political process is not "equally open" to minority and non-minority groups. 141 S. Ct. at 2337. Plaintiffs do not explain how the Signature Requirement and the EVL Periodic Voting Requirement, both of which impose no more than a "mere inconvenience," violate the results test. *Id.* at 2338.

Instead, Plaintiffs solely claim that both requirements were "adopted for the purpose of denying voters of color full and equal access." Mi Familia Complaint ¶144; DSCC Complaint ¶141. While Plaintiffs repeatedly attempt to assert that this discriminatory purpose exists by means of alleging disparate impacts, this improperly

conflates the two distinct Section 2 inquiries. Instead, the "[p]roof of racially discriminatory *intent or purpose* is required," not proof of discriminatory impact, to establish purposeful discrimination. *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

Thus, establishing intentional discrimination requires more than "awareness of consequences," and instead requires that the "state legislature, selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979). *See also Iqbal*, 556 U.S. at 676 (affirming motion to dismiss for failing to adequately plead discriminatory purpose, observing that "[u]nder extant precedent purposeful discrimination requires more than intent as volition or intent as awareness of consequences." (cleaned up)). Thus, "awareness of consequences [*i.e.*, disparate impacts] alone does not establish discriminatory intent." *Coleman*, 24 F.3d at 39; *accord Lewis v. Ascension Par. Sch. Bd.*, 662 F.3d 343, 349 (5th Cir. 2011) ("A discriminatory purpose, however, requires more than a mere awareness of consequences." (cleaned up)).

Because Plaintiffs' Complaints rely almost exclusively on mere "awareness" of disparate impacts, they have failed to plead a cognizable intentional discrimination claim.

### B. Plaintiffs' Allegations Are Insufficient To Defeat The Presumption Of Good Faith

"Whenever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018). Although legislative decisions are not immune from review, courts *must* afford state legislatures a presumption of good faith. *Id.* at 2324; *Fusilier v. Landry*, 963 F.3d 447, 464 (5th Cir. 2020). "Only the clearest proof could suffice to establish the unconstitutionality of a statute on [the] ground [of improper legislative motive.]" *Flemming v. Nestor*, 363 U.S. 603, 617 (1960). In satisfying that burden, Plaintiffs may put forward both direct and circumstantial evidence of illegitimate intent. *Abbott*, 138 S. Ct. at 2327. In terms of circumstantial evidence, the court could consider: (1) historical

background; (2) the specific sequence of events leading to the law's enactment, including any departures from the normal legislative process; (3) the law's legislative history; and (4) whether the law "bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 265-69.

Plaintiffs say a lot in their complaints, but virtually nothing they say bears meaningfully on the key question to their case—whether the legislature had an illegitimate intent that motivated its enactment of the two statutes in question. Instead, they fail to even acknowledge the existence of the presumption of good faith and put forward allegations which are directed toward showing that 1) there was historical discrimination in Arizona and 2) one or two legislators said things that purportedly indicate an illegitimate purpose, and 3) the challenged provisions may have a discriminatory effect. But even when taken as true, these allegations fall far short of being able to establish plausibly that the legislature had an improper motive, given the existence of several possible non-discriminatory justifications for the provisions. *See Iqbal*, 556 U.S. at 680-81 (claim of racial discrimination not adequately plead where allegations recite in a conclusory manner the elements of the claim and allege a mere knowledge of disparate impact, "given more likely explanations"); *Twombly*, 550 U.S. at 556-57 (allegations of parallel conduct and conclusory assertion of agreement not enough to show antitrust violation when parallel conduct could "just as well be independent action").

None of Plaintiffs' allegations suffice to establish the necessary context to plausibly infer discriminatory motive. First, both Plaintiffs spend an inordinate amount of time on historical background and on disputes over the 2020 election results and the resulting aftermath. *See* Mi Familia Complaint ¶¶48-64; 97-126; DSCC Complaint ¶¶60-76; 121. But Plaintiffs do not (and could not) connect this history to the challenged provisions or the process of enacting them. *See Arlington Heights*, 429 U.S. at 267 (historical background "*of the decision* is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes" (emphasis added)). And Courts have routinely rejected the idea that historical discrimination alone—even at a far greater level

than ever present in Arizona—can overcome the presumption of good faith. *See, e.g.*, *Abbott*, 138 S. Ct. at 2324 ("The allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination.").[2] Put simply, "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Abbott*, 138 S. Ct. at 2324 (quoting *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980)).

The second category of allegations made by the Plaintiffs concern a pair of statements by legislators tangentially related to the provisions and completely unrelated to racial discrimination. First, both Complaints cite a statement by Representative John Kavanaugh—in an interview to CNN, not in the record for either of the challenged provisions—that "we have to look at the quality of votes." Mi Familia Complaint ¶67; DSCC Complaint ¶116. The DNC Plaintiffs also highlight a statement by Representative Travis Graham allegedly calling for people who impugned the motives of members not to be allowed to speak. DSCC Complaint ¶114.

On their face, neither of these statements even contains a suggestion of discriminatory purpose. In fact, a straightforward reading of Representative Kavanaugh's statement suggests a non-racially discriminatory motive—the lawmaker went on to say that the problem he was speaking about was a lack of informed voters. *See* Joe Dana, *Arizona State Representative raises eyebrows with 'quality' voting comments*, 12News.com (Mar. 12, 2021). Even assuming that *anything* regarding race can be extrapolated from these statements, they fall far short of the "'racially-tinged' video" at issue in *Brnovich*—which itself was insufficient to establish discriminatory animus. 141 S. Ct. at 2349-50.

Moreover, even if these statements could be construed to suggest a discriminatory purpose, Plaintiffs' reliance on them is merely an attempt to apply the "cat's paw" theory

---

[2] *See also Greater Birmingham Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299, 1325 (11th Cir. 2021) ("[I]t cannot be that Alabama's history bans its legislature from ever enacting otherwise constitutional laws about voting."); *N. Carolina State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 298 (4th Cir. 2020) ("A legislature's past acts do not condemn the acts of a later legislature, which we must presume acts in good faith.")

that the Supreme Court expressly and emphatically rejected in *Brnovich*. *See* 141 S. Ct. at 2350. As the Supreme Court explained, "the 'cat's paw' theory has no application to legislative bodies. The theory rests on the agency relationship that exists between an employer and supervisor, but the legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents." *Id.*

Similarly, here, it is irrelevant what Representative Kavanaugh may have said in an interview to CNN, because the question is not the purpose of Representative Kavanaugh but the purpose of the legislature as a whole. And as to that purpose, Plaintiffs offer essentially nothing. *See also Raymond*, 981 F.3d at 307 (district court erred by relying on "comments of a few individual legislators" and "comments made by the bill's opponents"); *see also United States v. O'Brien*, 391 U.S. 367, 384 (1968) (courts generally should not invalidate laws "on the basis of what fewer than a handful of Congressmen said about it").

Finally, Plaintiffs attempt to establish discriminatory purpose by alleging that the purposes of the challenged provisions do not justify the alleged disparate impacts they impose on minorities. But, as explained above, this improperly conflates the results and intent tests under Section 2. Furthermore, as explained in the *Anderson-Burdick* analyses, Plaintiffs radically misstate and underestimate the purposes of the laws and overstate their burdens. Once those purposes are properly considered, Plaintiffs attempt to infer discriminatory purpose necessarily falls flat.

## IV. PLAINTIFFS' *ANDERSON-BURDICK* CHALLENGES TO THE PERIODIC VOTING REQUIREMENT FAIL

"Although the *Anderson-Burdick* test can at times be fact intensive," dismissal is appropriate "where the plaintiffs' arguments fail[] as a matter of law." *Comm. to Impose Term Limits (etc.) v. Ohio Ballot Bd.*, 885 F.3d 443, 448 (6th Cir. 2018). Plaintiffs' challenge to the Periodic Voting Requirement fail as a matter of law here because the burden imposed is minimal at most, and the requirement reasonably advances the State's important interests.

### A. Overview Of The *Anderson-Burdick* Framework

Challenges to electoral statutes and regulations that allege an unconstitutional burden are governed by the *Anderson-Burdick* framework. That framework recognizes that "'States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder.'" *Prete v. Bradbury*, 438 F.3d 949, 961 (9th Cir. 2006) (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)).

Under the *Anderson-Burdick* framework, "an election regulation that imposes a severe burden is subject to strict scrutiny." *Nader v. Brewer*, 531 F.3d 1028, 1035 (9th Cir. 2008). In contrast, "'*Lesser burdens* trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions."' *Angle v. Miller*, 673 F.3d 1122, 1132 (9th Cir. 2012) (quoting *Prete*, 438 F.3d at 961) (cleaned up). Notably, "voting regulations are rarely subjected to strict scrutiny." *Dudum v. Arntz*, 640 F.3d 1098, 1106 (9th Cir. 2011) Moreover, "Elaborate, empirical verification of weightiness is not required." *Timmons*, 520 U.S. at 352.

### B. Plaintiffs Have No Right To Vote By Mail At All—Let Alone Remain On An EVL Despite Chronic Non-Voting

In evaluating the burden imposed by the Periodic Voting Requirement, it is useful to consider how it relates to other asserted rights/non-rights, and how it is necessarily subsidiary to them.

As an initial matter, "there is no constitutional right to an absentee ballot" at all. *Mays v. LaRose*, 951 F.3d 775, 792 (6th Cir. 2020) (citing *McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 807-09 (1969)). But Plaintiffs' asserted right here necessarily depends on having such a general right to vote by mail. Similarly, it appears that no court has ever held that the Constitution requires States to establish permanent vote-by-mail lists. Such a holding would be surprising to say the least: the laws of 40 states would likely violate any such putative right.

Plaintiffs' asserted right is thus doubly subsidiary to asserted rights that the

Constitution does not protect: without a right to vote by mail, and to do so by being on an EVL in the first place, it is difficult to understand how anyone could have a constitutional right to *remain* on an EVL notwithstanding chronic non-voting. To the extent that Plaintiffs are arguing that the Periodic Voting Requirement imposes unconstitutional burdens their right to vote by mail, they have *at least* a distinctly uphill climb.

### C. The Burden Imposed Is Minimal

To the extent that Plaintiffs' claim is cognizable at all, it is subject to "less exacting review" because the burden imposed by the Periodic Voting Requirement is minimal.

#### 1. The Actual Burden Imposed Is Truly Minimal

Voters can comply with the requirement in one of two ways: (1) they can either return a mail-in ballot once every four years in an election with a federal or municipal candidate race, or (2) respond favorably to a mailed notice asking if they wish to remain on the EVL. Voters need not even vote in any actual races, since there is no such requirement and actual ballots are anonymous/secret. Finally, even if voters are removed from the EVL due to the Periodic Voting Requirement, they can easily place themselves back on the list by using recorders' websites or returning a form by mail.

None of this is remotely burdensome. The burden is notably less than in *Short v. Brown*, 893 F.3d 671 (9th Cir. 2018). There, the Ninth Circuit considered a challenge to California law in which voters in some counties had to request mail-in ballots while others did not. It explained that "[t]o the extent that having to register to receive a mailed ballot could be viewed as a burden, *it is an extremely small one*, and certainly not one that demands serious constitutional scrutiny." *Id.* at 677 (emphasis added). *Short* thus compels a conclusion that the burden at issue here is minimal at most.

Similarly, the burden here is much smaller than in *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008). There, the Supreme Court explained that the "inconvenience of making a trip to the BMV, gathering the required documents, and posing for a photograph *surely does not qualify as a substantial burden* on the right to vote." *Crawford*, 553 U.S. at 198 (emphasis added) (plurality opinion); *accord id.* at 204 (Scalia, J., concurring joined

by Thomas and Alito, JJ.) ("[T]he burden at issue is minimal and justified"). The burden is even smaller here.

In addition, two other factors further diminish the applicable burden here. *First*, the relevant burden must be evaluated in context and "considering all available opportunities to vote." *Mays*, 951 F.3d at 785. As explained above, Arizona is a clear leader in *removing* burdens to voting. *Supra* at 4; *Brnovich*, 141 S. Ct. at 2330. The minimal nature of the burden thus becomes even more apparent when viewed in that context.

*Second*, the Acts are completely neutral in character. The Ninth Circuit has "repeatedly upheld as 'not severe' restrictions that are generally applicable, even-handed, [and] politically neutral." *Dudum*, 640 F.3d at 1106 (cleaned up). SB 1485 does just that: it applies to *all* voters equally, regardless of race, sex, age, or party.

**2. Arizona Law Is Far More Generous Than Most Other States**

The minuteness of the burden is also apparent when Arizona's laws are place in the context of other state laws. As set forth in the State's request to take judicial notice and in the Appendix below, only five states have a permanent vote-by-mail list and another five conduct elections entirely by mail. *See* Judicial Notice Request; Appendix. Another ten have an EVL that is confined purely to voters over 64 or those with disabilities. *Id.* A full thirty states have no EVL for anyone.

In that posture, Plaintiffs' conclusory contention (Complaint ¶132) that the Periodic Voting Requirement "severely burden Arizona's voters" can be readily rejected. *See Iqbal*, 556 U.S. at 681 ("bare assertions" of elements of the claim are "conclusory and not entitled to be assumed true"). Whatever burden the Periodic Voting Requirement imposes on voters to *remain* on the EVL is far less than those States that do not offer *any* EVL *at all*. Indeed, if Arizona's EVL and Periodic Voting Requirement were on imposed on States like New York or Delaware, it would represent a *substantial reform significantly increasing the convenience of voting*. But rather than suing those States (or having Intervenor-Plaintiffs' state legislative officials simply enact them through lawmaking), Plaintiffs now bizarrely contend that the modest conditioning of remaining on the EVL by

the Periodic Voting Requirement somehow imposes an unconstitutionally severe burden that not maintaining *any* EVL *at all* does not.

That fails as a matter of logic and common sense—and does not lack for hypocrisy. By having an EVL available to all voters—even if modestly limited by the Periodic Voting Requirement—Arizona has removed burdens on its voters that the vast majority of states continue to impose on theirs. That underscores the *de minimis* burden here, which is resolvable now in a motion to dismiss.

### D. The State's Important Interest Are Sufficient To Sustain S.B. 1485

Because the Acts do not impose a "severe burden" under the *Anderson-Burdick* framework, this Court's inquiry into the constitutionality of the Act "is limited to whether the chosen method is reasonably related to [an] important regulatory interest." *Prete*, 438 F.3d at 971. *Anderson/Burdick* treats the State's interests as a "legislative fact." *Frank v. Walker*, 768 F.3d 744, 750 (7th Cir. 2014). States need not submit "any record evidence in support of" their interests. *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1353 (11th Cir. 2009); *Greater Birmingham*, 992 F.3d at 1334. States can rely on "post hoc rationalizations," can "come up with [their] justifications at any time," and have no "limit[s]" on the type of "record [they] can build in order to justify a burden placed on the right to vote." *Mays*, 951 F.3d at 789. Here, the State's interests in reducing administrative burdens and in securing its elections easily satisfies this standard.

#### 1. Reducing Administrative Burdens And Costs

The State has an important interest in reducing the administrative burdens in administering elections. *Ohio Democratic Party v. Husted*, 834 F.3d 620, 635 (6th Cir. 2016) (recognizing that "easing administrative burdens … undoubtedly [furthers] 'important regulatory interests'") (quoting *Crawford*, 553 U.S. at 194-96); *Lemons v. Bradbury*, 538 F.3d 1098, 1104-05 (9th Cir. 2008) (recognizing "administrative burden" as important interest).

The simple fact is that printing and sending ballots costs money—substantial money. For example, Maricopa County alone spent over $4.96 million on printing and

mailing early ballots for the 2020 general election (excluding Covid-19 specific additional costs). *See* Judicial Notice Request Ex. 2 at 51. That translates to roughly $2-3 per ballot. That notably exceeds the County's *entire staffing budget* for that election, which was only $3.35 million. *Id.*

Given these substantial costs, the State could reasonably determine that continuing to print and send ballots to voters that are chronically not voting them is a waste of taxpayer funds. The Constitution does not command such waste.

The State could further reasonably determine voters chronically failing to use the mailed ballot should only be sent mail-in ballots upon request. Or the voter could simply request to be put back on the EVL if they developed an interest in voting more frequently than their prior sporadic or non-existent voting.

Notably, numerous States appear to have concluded that the cost of having *any* EVL is unwarranted. Arizona's far-more restrained approach of simply reducing ballot printing/mailing costs vis-à-vis voters who do not vote by mail even as sporadically as once every four years is thus "reasonably related to [the State's] important regulatory interest" in reducing administrative costs. *Prete*, 438 F.3d at 971.

Plaintiffs' only allegation bearing on cost appears to contend that SB 1485 will somehow impose additional costs, as it will require counties to "implement a new system to track and mail additional notices." *See* DSCC Complaint at ¶ 104. This allegation is patently implausible—the cost of mailing a single notice is plainly less than the cost of mailing ballots in perpetuity to habitual non-voters. Plaintiffs' own allegations assert that fewer ballots will be mailed (as many as 130,000, *see* DSCC Complaint at ¶ 110) as a result of the EVL Periodic Voting Requirement. Given the costs of those ballots, Plaintiffs' allegations about increased cost "stop[] short of the line between possibility and plausibility." *Twombly*, 550 U.S. at 546.

**2. Securing Elections**

States have an "important regulatory interest in preventing fraud and its appearances in its electoral processes." *Id.* at 969. Indeed, that this interest is not merely

important, but outright *compelling*. *See Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) ("'A State indisputably has a compelling interest in preserving the integrity of its election process.'"). Indeed, Congress has affirmatively mandated that States make "a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters" precisely for this reason. 52 U.S.C. § 21083(a)(4)(a).

The Supreme Court considered a challenge to a National Voter Registration Act Ohio law with important similarities to SB 1485 in *Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833 (2018). As with SB 1485, it involved removal from a list/roll based on non-voting and non-response to notices. *Id.* at 1840-41. Unlike here, however, Ohio *outright removed those voters' registrations*, rather than merely taking them off an EVL. *Id.*

In evaluating Ohio's interests, the Court explained that Congress and Ohio had reasonably found that there was "probative value [in] a registrant's failure to send back a return card" that the voter had in fact moved. *Id.* at 1846. Indeed, "Congress's judgment [was] that the failure to send back the card, coupled with the failure to vote during the period covering the next two general federal elections, is significant evidence that the addressee has moved." *Id.* at 1848. Similarly, the Ohio Legislature "thought that nonvoting for two years was sufficiently correlated with a change of residence to justify sending a return card." *Id.* at 1847.

Like Congress and Ohio, Arizona can reasonably conclude that failure to vote in a 4-year period and non-response to a notice is substantial evidence that a voter no longer lives at that address. There is an obvious election integrity concern with sending a ballot to an address where the voter no longer resides—and *someone else* likely does. Ballots sent to locations where voters are distinctly unlikely to reside anymore present a particularly acute risk of fraud on top of already "real risk [of fraud] that accompanies mail-in voting." *Brnovich*, 141 S. Ct. at 2348.

### E. Plaintiffs Have Not Satisfied The Requirements For Facial Claims

Plaintiffs' challenge is *necessarily* facial in nature, as they do not challenge any particular application of the Acts—or indeed join any voters at all. *Supra* at 10. But facial

challenges "are disfavored for several reasons," including that they "often rest on speculation," "run contrary to the fundamental principle of judicial restraint," and "threaten to short circuit the democratic process." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450-51 (2008). For that reason, facial challenges fail unless "no set of circumstances exists under which [challenged law] would be valid." *Salerno*, 481 U.S. at 745.

Here there are obvious circumstances where Plaintiffs' theories fail even under their own terms. For example, suppose a voter signed up for the EVL in 2007 shortly after Arizona created it, and suppose further that this voter has not voted in a single federal or municipal election since then—now at least 14 in all, and perhaps as many as 30[3]—and also does not respond to future notices and continues not to vote. Surely, Arizona can remove *that* voter from the EVL without violating the Constitution.

If so, that example necessarily means that "circumstances exist[] under which [SB 1485] would be valid." *Id.* And, to the extent that Plaintiffs disagree, their position would thus necessarily have to be that the Constitution prohibits removing voters from an EVL *ever* based on non-voting/non-response. But the Constitution does not demand that States create EVLs *at all*, let alone make membership on those lists continue *in perpetuity* no matter how many ballots go unvoted and notices ignored. No case has ever held anything remotely of the sort, and there is no reason for this to be the first.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' and Intervenor-Plaintiffs' Complaints should be dismissed.

[3] The City of Tucson, for example, holds municipal elections in odd-numbered years, and some municipalities hold run-off elections.

Respectfully submitted this 24th day of November, 2021.

MARK BRNOVICH
ATTORNEY GENERAL

By: s/ Drew C. Ensign
Joseph A. Kanefield (No. 15838)
*Chief Deputy & Chief of Staff*
Brunn ("Beau") W. Roysden III (No. 28698)
*Solicitor General*
Drew C. Ensign (No. 25463)
*Deputy Solicitor General*
Robert J. Makar (No. 33579)
*Assistant Attorney General*
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-5200
Drew.Ensign@azag.gov

*Attorneys for Mark Brnovich, Arizona Attorney General*

# Appendix

## Table 1. Non-Signature Curing Procedures By States




Sources: State's Request To Take Judicial Notice (filed currently) and https://ballotpedia.org/Cure_period_for_absentee_and_mail-in_ballots

# Table 2. Are Ballot Deficiencies Curable? (By State)[4]



■ Yes ■ No

Source: https://ballotpedia.org/Cure_period_for_absentee_and_mail-in_ballots (Since this table was generated, Kansas and New York have also permitted signature curing).

[4] New York and Kansas have subsequently amended their laws to permit curing.

# Table 3. Early Voting Lists By State




Sources: State's Request To Take Judicial Notice (filed currently); https://www.ncsl.org/research/elections-and-campaigns/vopp-table-3-states-with-permanent-absentee-voting-for-all-voters-voters-with-permanent-disabilities-and-or-senior-voters.aspx; and https://www.ncsl.org/research/elections-and-campaigns/vopp-table-18-states-with-all-mail-elections.aspx

**LOCAL RULE 12.1 CERTIFICATION**

Pursuant to Local Rule 12.1, I certify that before filing the instant motion I contacted opposing counsel on November 11, and informed them of the State's intention to file seek dismissal of the Complaints of both Original Plaintiffs and Intervenor-Plaintiffs. Counsel for both sets of Plaintiffs have indicated that they do not intend to amend their Complaints.

s/ Drew C. Ensign
Drew C. Ensign
*Counsel for Mark Brnovich, Arizona Attorney General*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of November, 2021, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for Filing, which will send notice of such filing to all registered CM/ECF users.

s/ Drew C. Ensign
Drew C. Ensign
*Counsel for Mark Brnovich, Arizona Attorney General*