Lauren Elliott Stine (AZ #025083)
Coree E. Neumeyer (AZ# 025787)
QUARLES & BRADY LLP
One Renaissance Square
Two North Central Avenue
Phoenix, AZ 85004-2391
(602) 229-5200
Rodney.Ott@quarles.com
Coree.Neumeyer@quarles.com

Lee H. Rubin (Admitted PHV)
MAYER BROWN LLP
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
(650) 331-2000
lrubin@mayerbrown.com

Courtney Hostetler (Admitted PHV)
John Bonifaz (Admitted PHV)
Ben Clements (Admitted PHV)
FREE SPEECH FOR PEOPLE
1320 Centre Street, Suite 405
Newton, MA 02459
(617) 249-3015
jbonifaz@freespeechforpeople.org
chostetler@freespeechforpeople.org
bclements@freespeechforpeople.org

*Additional counsel listed on last page*

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Mi Familia Vota; et al.,<br><br>              Plaintiffs,<br><br>      and<br><br>DSCC and DCCC,<br><br>              Plaintiff-Intervenors,<br><br>      v.<br><br>Katie Hobbs, in her official capacity as Arizona Secretary of State; et al.,<br><br>              Defendants,<br><br>      and<br><br>RNC and NRSC,<br><br>              Defendant-Intervenors. | Case No. CV-21-01423-DWL<br><br>**PLAINTIFFS' OPPOSITION TO THE ATTORNEY GENERAL'S CORRECTED CONSOLIDATED MOTION TO DISMISS PLAINTIFFS' AND INTERVENOR-PLAINTIFFS' COMPLAINTS UNDER RULE 12(B)(1) AND 12(B)(6)** |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 2

I.  Early Voting In Arizona .......................................................................................... 2

II.  The 2020 Election And Enactment Of SB 1485 And SB 1003 .............................. 2

III.  The Current Litigation ........................................................................................... 3

LEGAL STANDARD .................................................................................................... 4

ARGUMENT ................................................................................................................. 5

I.  Plaintiffs Adequately Plead Their Intentional Discrimination Claims ................... 5

    A.  The Complaint Satisfies *Arlington Heights* .................................................. 5

        1.  Impact of the Laws ............................................................................... 6

        2.  Legislative History & Contemporaneous Statements ........................... 7

        3.  Precipitating Events and Departures From Practice ............................. 8

        4.  History of Discrimination ..................................................................... 9

    B.  The Attorney General Identifies No Basis For Dismissal ............................... 9

II.  Plaintiffs Adequately Plead Their *Anderson/Burdick* Claims .......................... 13

    A.  Plaintiffs State A Claim As To SB 1485 ...................................................... 14

        1.  The Court cannot resolve this claim on the pleadings ........................ 14

            a.  SB 1485's burdens are substantial .............................................. 14

            b.  The State's asserted interests are insufficient ............................. 16

            c.  *Hobbs* does not support dismissal .............................................. 17

        2.  The Attorney General's other two arguments are meritless ................ 17

            a.  That SB 1485 involves absentee ballots is irrelevant ................. 17

            b.  *Washington State Grange* is inapposite ..................................... 18

    B.  Plaintiffs State A Claim As To SB 1003 ...................................................... 19

III.  The Attorney General's Standing Arguments As To SB 1003 Are Meritless ................. 20

    A.  A Favorable Ruling Will Redress The Harm Of Racial Discrimination ............ 21

    B.  The Attorney General Misinterprets State Law ............................................ 22

CONCLUSION ............................................................................................................ 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez,*
   138 S. Ct. 2305 (2018)..........................................................................................11

*Anderson v. Celebrezze,*
   460 U.S. 780 (1983)..............................................................................................13

*Arce v. Douglas,*
   793 F.3d 968 (9th Cir. 2015) ...............................................................7, 10, 11, 12

*Ariz. Democratic Party v. Hobbs,*
   18 F.4th 1179 (9th Cir. 2021) ......................................................................... *passim*

*Ariz. Green Party v. Reagan,*
   838 F.3d 983 (9th Cir. 2016) ...........................................................................14, 15

*Arizonans for Fair Elections v. Hobbs,*
   454 F. Supp. 3d 910 (D. Ariz. 2020) ....................................................................22

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)................................................................................................4

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris,*
   729 F.3d 937 (9th Cir. 2013) .................................................................................23

*Ave. 6E Invs., LLC v. City of Yuma, Ariz.,*
   818 F.3d 493 (9th Cir. 2016) ..........................................................................5, 6, 7

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007)............................................................................................4, 5

*Brnovich v. Democratic Nat'l Comm.,*
   141 S. Ct. 2321 (2021)...............................................................................6, 12, 16

*Burdick v. Takushi,*
   504 U.S. 428 (1992)..............................................................................................13

*Pub. Integrity All., Inc. v. City of Tucson,*
   836 F.3d 1019 (9th Cir. 2016) ...............................................................................15

*Carrington v. Rash,*
   380 U.S. 89 (1965)................................................................................................16

*Citizens United v. Fed. Election Comm'n,*
   558 U.S. 310 (2010)..............................................................................................20

PLAINTIFFS' OPPOSITION TO THE ATTORNEY GENERAL'S MOTION TO DISMISS

*City of Richmond v. United States,*
    422 U.S. 358 (1975)......................................................................................21

*City of S. Miami v. DeSantis,*
    508 F. Supp. 3d 1209 (S.D. Fla. 2020) ........................................................10

*Comm. to Impose Term Limits (etc.) v. Ohio Ballots Bd.,*
    885 F.3d 443 (6th Cir. 2018) .......................................................................14

*Common Cause/Ga. v. Billups,*
    554 F.3d 1340 (11th Cir. 2009) ...................................................................16

*Crawford v. Marion County Election Board,*
    553 U.S. 181 (2008)...............................................................................15, 16

*Dudum v. Arntz,*
    640 F.3d 1098 (9th Cir. 2011) .....................................................................15

*E.C. Garcia & Co. v. Ariz. State Dep't of Revenue,*
    875 P.2d 169 (Ariz. Ct. App. 1993)............................................................23

*Ellis v. Costco Wholesale Corp.,*
    657 F.3d 970 (9th Cir. 2011) .......................................................................23

*Fish v. Schwab,*
    957 F.3d 1105 (10th Cir. 2020) ..............................................................16, 17

*Flemming v. Nestor,*
    363 U.S. 603 (1960)......................................................................................11

*Flores v. Pierce,*
    617 F.2d 1386 (9th Cir. 1980) .......................................................................8

*Frank v. Walker,*
    768 F.3d 744 (7th Cir. 2014) .......................................................................16

*Fusilier v. Landry,*
    963 F.3d 447 (5th Cir. 2020) .......................................................................11

*Greater Birmingham Ministries v. Sec'y of State for State of Alabama,*
    992 F.3d 1299 (11th Cir. 2021) ...................................................................16

*Harman v. Forsennius,*
    380 U.S. 528 (1965)......................................................................................16

*Hunt v. Cromartie,*
    526 U.S. 541 (1999)......................................................................................11

*Husted v. A. Philip Randolph Inst.,*
    138 S. Ct. 1833 (2018)..................................................................................17

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ........................................................................5, 9, 11

*League of Women Voters of Fla., Inc. v. Lee*,
    2021 WL 4962099 (N.D. Fla. Oct. 8, 2021) ........................................................18

*Lemons v. Bradbury*,
    538 F.3d 1098 (9th Cir. 2008) ............................................................................16

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992).............................................................................................20

*Maynard v. City of San Jose*,
    37 F.3d 1396 (9th Cir. 1994) ................................................................................5

*Mays v. LaRose*,
    951 F.3d 775 (6th Cir. 2020) ..............................................................................16

*McDonald v. Bd. of Election Commr's of Chi.*,
    394 U.S. 802 (1969).......................................................................................17, 18

*N.C. State Conf. of NAACP v. McCrory*,
    831 F.3d 204 (4th Cir. 2016) ......................................................................9, 21, 22

*N.C. State Conf. of the NAACP v. Raymond*,
    981 F.3d 295 (4th Cir. 2020) ..............................................................................12

*Nuclear Info. & Res. Serv. v. Nuclear Regul. Comm'n*,
    457 F.3d 941 (9th Cir. 2006) ..............................................................................21

*O'Brien v. Skinner*,
    414 U.S. 524 (1974).............................................................................................18

*Obama for Am. v. Husted*,
    697 F.3d 423 (6th Cir. 2012) ...................................................................15, 17, 18

*Ohio Democratic Party v. Husted*,
    834 F.3d 620 (6th Cir. 2016) ..............................................................................16

*Pac. Shores Props., LLC v. City of Newport Beach*,
    730 F.3d 1142 (9th Cir. 2013) ............................................................................12

*Pers. Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979).............................................................................................10

*Powers v. Ohio*,
    499 U.S. 400 (1991).............................................................................................21

*Prete v. Bradbury*,
    438 F.3d 949 (9th Cir. 2006) ..............................................................................16

PLAINTIFFS' OPPOSITION TO THE ATTORNEY GENERAL'S MOTION TO DISMISS

*Price v. N.Y. State Bd. of Elections*,
   540 F.3d 101 (2d Cir. 2008)....................................................................................18

*Purcell v. Gonzalez*,
   549 U.S. 1 (2006)..................................................................................................16

*Reeves v. Sanderson Plumbing Prods., Inc.*,
   530 U.S. 133 (2000)...............................................................................................9

*Renne v. Geary*,
   501 U.S. 312 (1991)..............................................................................................21

*Rotter v. Coconino Cnty.*,
   818 P.2d 704 (Ariz. 1991) ....................................................................................23

*Short v. Brown*,
   893 F.3d 671 (9th Cir. 2018) ................................................................................15

*Simon v. Eastern Ky. Welfare Rights Org.*,
   426 U.S. 26 (1976)................................................................................................20

*Smith v. Town of Clarkton*,
   682 F.2d 1055 (4th Cir. 1982) ..............................................................................11

*Soltysik v. Padilla*,
   910 F.3d 438 (9th Cir. 2018) ...................................................................14, 15, 16

*Terry v. Adams*,
   345 U.S. 461 (1953)..............................................................................................21

*United States v. Georgia*,
   2021 WL 5833000 (N.D. Ga. Dec. 9, 2001)..............................................6, 11, 12

*United States v. O'Brien*,
   391 U.S. 367 (1968)..............................................................................................12

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977).......................................................................................*passim*

*Washington State Grange v. Washington State Republican Party*,
   552 U.S. 442 (2008).........................................................................................18, 19

*Washington v. Davis*,
   426 U.S. 229 (1976)........................................................................................6, 10

*Washington v. Seattle Sch. Dist. No. 1*,
   458 U.S. 457 (1982)..............................................................................................21

**Statutes**

A.R.S. § 16-452 ........................................................................................................23

A.R.S. § 16-548 ........................................................................................................22

A.R.S. § 16-550 ........................................................................................................22

A.R.S. § 16-551 ........................................................................................................22

A.R.S. § 16-552 ........................................................................................................22

Voting Rights Act § 2 (52 U.S.C. § 10301) ..........................................................5, 12

**Other Authorities**

Summary of Updates, 2021 EPM (Rev. Oct. 1, 2021),
    https://azsos.gov/node/1015 ...............................................................................23

**INTRODUCTION**

This lawsuit challenges two laws enacted by the Arizona legislature in the wake of the 2020 election that are designed to make it harder for Arizonans, especially Arizonans of color, to vote. The first law (SB 1485) eliminates Arizona's Permanent Early Voting List by purging certain voters—who will disproportionately be voters of color—from the List if they do not cast an early ballot in two consecutive election cycles. The second law (SB 1003) requires that unsigned early ballots be cured by election night, a requirement that the legislature understood would be more burdensome for minority voters than white voters.

The Complaint offers concrete factual allegations showing that the legislature enacted both SB 1003 and SB 1485 with discriminatory purpose, violating the Voting Rights Act, the Fourteenth Amendment, and the Fifteenth Amendment. The Complaint also contains specific allegations describing how the laws unduly burden the rights of all Arizonans to vote, as guaranteed by the First and Fourteenth Amendments. The Attorney General's motion to dismiss offers no serious response to these allegations. ECF No. 76 ("AG Br.").[1] Instead, the Attorney General tries to distract the Court by talking about voting laws in other states and by offering his own view of the facts. But at the pleading stage, the Attorney General's spin on the facts is irrelevant. The question is simply whether, drawing all inferences in Plaintiffs' favor, the Complaint states a plausible claim for relief. As shown below, the Complaint plainly does so.

***First***, Plaintiffs have adequately pled intentional discrimination claims under the Voting Rights Act and the Constitution. The Supreme Court's decision in *Arlington Heights* remains the governing standard, and the Complaint more than meets it. Indeed, the Attorney General argues otherwise only by ignoring most of the Complaint's allegations and many of the *Arlington Heights* factors, and by asking this Court to draw inferences in the State's favor, which the Court cannot do at this stage.

***Second***, Plaintiffs have adequately pled *Anderson-Burdick* claims. SB 1485 and SB

---

[1] The Republican intervenors have joined the Attorney General's motion. ECF No. 77.

PLAINTIFFS' OPPOSITION TO THE ATTORNEY GENERAL'S MOTION TO DISMISS

1003 not only substantially burden the right to vote, but those burdens fall heaviest on voters of color. Given the allegations of discriminatory intent and impact and of the cumulative burden of the laws, the laws at issue here must survive more searching judicial scrutiny than the ballot-curing deadline the Ninth Circuit recently sustained in *Hobbs*.

**Finally**, the Attorney General's standing challenge, as to SB 1003 only, is meritless. Accordingly, the Court should deny the motion to dismiss in full.

BACKGROUND

## I.    Early Voting in Arizona

For decades, Arizona's voters have been able to take advantage of Arizona's early vote-by-mail system. Since 1991, any eligible Arizona voter has been able to participate in early voting. ECF No. 1 ("Compl.") ¶ 42. In 2007, the state created the Permanent Early Voting List ("EVL"), under which voters sign up to automatically receive by mail an early ballot in advance of each election. *Id.* ¶¶ 42-43. Early voting has been enormously popular with Arizonans. For example, in 2012, approximately 66% of Arizona voters voted by mail. *Id.* ¶ 44. Between 2012 and 2020, the majority of voters on the EVL voted, and they did so at a higher rate than voters not on the EVL. *Id.* ¶ 70; *see also* ECF No. 55 ("Interv. Compl.") ¶¶ 4, 47-48.[2]

The 2020 election saw an explosion of early voting, particularly among voters of color. *See* Compl. ¶¶ 45-46; Interv. Compl. ¶ 4. Voters of color were disproportionately likely to be not just new voters, but new *early* voters. Compl. ¶ 46. Indeed, minority voters' reliance on early voting in 2020 may well have tipped the presidential election, as Arizona awarded its electoral votes to the candidate preferred by the majority of minority voters for the first time since 1996. *Id.* ¶¶ 49, 125; *see also* Interv. Compl. ¶¶ 2-3, 23, 117.

## II.    The 2020 Election And Enactment Of SB 1485 And SB 1003

Instead of building on the success of the 2020 election in Arizona, the Arizona

---

[2] The Attorney General treats Plaintiffs' and the Plaintiff-Intervenors' complaints as materially indistinguishable, AG Br. 1 n.1, and the arguments in this brief apply equally to the Plaintiff-Intervenors' complaint. For the Court's convenience, this brief adds parallel citations to their complaint where appropriate.

PLAINTIFFS' OPPOSITION TO THE ATTORNEY GENERAL'S MOTION TO DISMISS

legislature moved to restrict voter participation under the guise of combatting voter fraud. Indeed, no legislator identified any instance of voter fraud in connection with early voting, let alone widespread fraud that would undermine the integrity of the election or its results. Compl. ¶ 66. Multiple officials, including Governor Doug Ducey and Maricopa County Board of Supervisors Chair Clint Hickman, have discredited allegations of systematic voter fraud. *Id.* ¶¶ 52-57; *see also* Interv. Compl. ¶¶ 61-76. But these false and cynical attacks have provided the pretext for the legislature's enactment of discriminatory restrictions on the right to vote that will affect voters as soon as the next election.

The first new restriction, SB 1485, will purge from Arizona's formerly permanent EVL anyone who does not cast a mail-in ballot in two consecutive election cycles. Compl. ¶¶ 69-84. About 125,000 to 150,000 voters will be removed from the EVL as a result. *Id.* ¶ 76. Voters of color will be disproportionately purged, and the legislative districts most impacted will be majority-minority districts. *Id.* ¶ 77. Though officials must provide notice before purging a voter, that is cold comfort for those voters with unreliable mail service, those who need the notice translated, those who otherwise will face difficulties with responding to the notice or remaining on the EVL, or those for whom in-person voting is a substantial burden—again, disproportionately minority voters. *Id.* ¶¶ 78-84; *see also* Interv. Compl. ¶¶ 23, 95-97.

The second newly enacted restriction, SB 1003, requires that voters who submit mail-in ballots without a signature cure the ballots by 7:00 p.m. on election day. Compl. ¶¶ 85-96. Again, this law will impact voters of color most significantly. These voters disproportionately lack reasonable access to polling places and election offices and face language barriers that make it challenging for them to understand curing notices, and may not receive timely notice at all. *Id.* ¶¶ 90-93. Legislators knew that both SB 1485 and SB 1003 would disproportionately impact minority voters and intended the laws to do so. *Id.* ¶ 67; *see also* Interv. Compl. ¶¶ 111-19.

**III.   The Current Litigation**

Plaintiffs are four organizations engaged in civic advocacy in Arizona: (1) Living

United for Change in Arizona is a membership-based organization led by community members fighting for social, racial, and economic justice; (2) Chispa AZ organizes voter education and political participation programs in Arizona; (3) Mi Familia Vota is a civic engagement organization with 14,000 Arizona members and the mission of uniting Latino, immigrant, and allied communities to promote social and economic justice; and (4) Arizona Coalition for Change is an organization with the mission of empowering everyday people to transform their communities by building civic power, just and equitable schools, and safer neighborhoods. Compl. ¶¶ 9, 12, 15, 19.[3] Each organization and its members are harmed by SB 1485 and SB 1003 and have brought suit to remedy that harm. *Id.* ¶¶ 9-20.

Plaintiffs' Complaint brings two categories of claims. First, it alleges that the Arizona legislature adopted SB 1485 and SB 1003 for the purpose of burdening the voting rights of minority voters in violation of the Voting Rights Act and the Fourteenth and Fifteenth Amendments. *Id.* ¶¶ 136-45. Second, it alleges that those laws unconstitutionally burden the right to vote under the Supreme Court's *Anderson-Burdick* framework. *Id.* ¶¶ 127-35. After Plaintiffs filed their Complaint, certain Republican Party organizations moved to intervene in defense of those laws. ECF No. 28. The DSCC and DCCC then intervened, bringing the same basic claims that Plaintiffs brought. ECF Nos. 50, 55.

### LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" meaning that the complaint must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plausibility test "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that

---

[3] The suggestion that Plaintiffs somehow fail to state claims in *this* state because they have not challenged laws in *other* states, *see* AG Br. 1-2, 9, makes no sense, particularly given that three of the Plaintiffs are entirely Arizona-oriented (Compl. ¶¶ 9, 12, 19) and do not operate in the states referenced by the Attorney General.

PLAINTIFFS' OPPOSITION TO THE ATTORNEY GENERAL'S MOTION TO DISMISS

discovery will reveal evidence of illegal" conduct. *Twombly*, 550 U.S. at 556. In deciding a motion to dismiss, the Court may not resolve factual disputes and "must draw all reasonable inferences in favor of the plaintiff." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018).

## ARGUMENT

## I. Plaintiffs Adequately Plead Their Intentional Discrimination Claims

### A. The Complaint Satisfies *Arlington Heights*.

The Complaint alleges that, when enacting SB 1485 and SB 1003, the Arizona legislature purposefully discriminated against voters of color in violation of Section 2 of the Voting Rights Act, the Fourteenth Amendment, and the Fifteenth Amendment. To state such claims, a plaintiff need not allege that racial animus was the *sole* purpose of the law. It suffices if "a discriminatory purpose [was] a motivating factor in the decision." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 265-66 (1977); *see also Ave. 6E Invs., LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 503-09 (9th Cir. 2016). In other words, Plaintiffs need only plead that the defendants "acted at least in part because of" discriminatory animus. *Maynard v. City of San Jose*, 37 F.3d 1396, 1404 (9th Cir. 1994). That makes sense, as "[r]arely can it be said" that a legislature "made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one." *Arlington Heights*, 429 U.S. at 265.

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266. Courts must consider: (1) the "impact of the official action," including "whether it bears more heavily on one race than another," (2) "[t]he historical background of the decision . . . , particularly if it reveals a series of official actions taken for invidious purposes," (3) the "specific sequence of events leading up to the challenged decision," which "may shed some light on the decisionmaker's purposes," (4) whether the challenged decision departs, either procedurally or substantively, from normal legislative practices, and (5) "legislative or administrative history . . . , especially where there are

PLAINTIFFS' OPPOSITION TO THE ATTORNEY GENERAL'S MOTION TO DISMISS

contemporary statements by members of the decisionmaking body." *Id.* at 266-68 (cleaned up); *see also Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349 (2021) (reaffirming the *Arlington Heights* test). The Complaint adequately alleges facts that touch on each of the *Arlington Heights* factors, thus plausibly alleging that invidious discrimination was a motivating factor in the enactment of SB 1485 and SB 1003. Indeed, in a similar case concerning newly enacted Georgia voting laws, the district court recently denied a motion to dismiss because the complaint's allegations were "consistent with the *Arlington Heights* factors and otherwise bear on the issue of intentional discrimination." *United States v. Georgia*, 2021 WL 5833000, at *4 (N.D. Ga. Dec. 9, 2001).

### 1.     Impact of the Law*s*

"[D]iscriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *Washington v. Davis*, 426 U.S. 229, 242 (1976). The Complaint is replete with factual allegations that SB 1485 and SB 1003 were enacted with full knowledge that they would "bear[] more heavily" on voters of color than white voters. For example, it is estimated that "while white Arizonans are 71% of all registered voters, only 54% of voters removed from the [EVL] would be white," while the number of Latino, Black and Native American removals from the EVL will far exceed their share of registered voters. Compl. ¶ 77. The disparity as to Latinos—the largest Arizona minority group—is particularly striking. "Latinos are 19% of registered voters, but would be 33% of removals." *Id.* The Complaint further notes that "of the eight legislative districts in Arizona with the highest numbers of voters likely to be removed from the [EVL], seven are districts in which voters of color are the majority of voters." *Id.* And while voters removed from the EVL can still vote in person, AG Br. 2, the Attorney General ignores the allegations that doing so poses unique burdens on minority voters, too. Compl. ¶¶ 83, 91; *see also* Interv. Compl. ¶¶ 97, 120-21.[4] These well-pled allegations give rise to an inference of discriminatory intent. *See*

---

[4] Plaintiffs need not show that *all* voting options were denied to minority groups to plead intentional discrimination. *Cf. Ave. 6E Invs.*, 818 F.3d at 509 (plaintiffs "need not

1    *Ave. 6E Invs.,* 818 F.3d at 507-08 ("The complaint's statistics on the disparate impact

2    caused by the decision and the historical background of the decision also tend to make the

3    disparate-treatment claims plausible."); *Arce v. Douglas*, 793 F.3d 968, 978 (9th Cir. 2015)

4    (denying summary judgment given evidence of a "disproportionate impact").

5         A similar analysis applies to SB 1003. The Complaint alleges that SB 1003's

6    election-day ballot curing requirement will have a substantial, disparate impact on voters

7    of color, who disproportionately must rely upon public transportation to travel to, or live

8    on remote reservations long distances from, the polls. Compl. ¶¶ 90-94; *see also* Interv.

9    Compl. ¶¶ 120-21. The Attorney General does not dispute the Complaint's allegations that

10   this rule will disproportionately impact minority voters.

11                    **2.      Legislative History & Contemporaneous Statements**

12        The background to SB 1485 and SB 1003 further support an inference of

13   discrimination. The Complaint alleges far more than mere "awareness" of these impacts.

14   AG Br. 3, 12. To the contrary, the Complaint alleges that "Arizona legislators enacted the

15   laws with full knowledge that they will burden voters of color and for the purpose of

16   disproportionately impacting voters of color and suppressing voter turnout among

17   communities of color." Compl. ¶ 67.

18        For example, the Complaint alleges that after opponents of the laws repeatedly noted

19   the discriminatory impact the laws would have, proponents of the legislation "made clear

20   that reducing the number of citizens of color who vote is in fact the purpose of these laws,"

21   with one legislator contending that "'everybody shouldn't be voting,'" and that "'[q]uantity

22   [of votes] is important, but we have to look at the quality of votes, as well.'" *Id.* (quoting

23   statement of Rep. Kavanagh, the chairman of the Government and Elections Committee in

24   the Arizona House); *see also* Interv. Compl. ¶¶ 112-17 (describing similar statements).

25   Defendant Hobbs—the State's chief election officer—has recognized that SB 1485 and SB

26   1003 were part of a series of bills that were "'designed to depress turnout of minority and

27   demonstrate a complete absence of desired housing for Hispanics to prevail; discriminatory

28   zoning practices violate the FHA even if they only contribute to making unavailable or
     denying housing to protected individuals") (cleaned up).

**PLAINTIFFS' OPPOSITION TO THE ATTORNEY GENERAL'S MOTION TO DISMISS**

1    lower-income voters.'" Compl. ¶ 3.

2              **3.    Precipitating Events and Departures From Practice**

3         Both "[t]he specific sequence of events leading up to the challenged decision" and

4    any substantive or procedural departures from the normal legislative process may also

5    "shed . . . light" on the decisionmaker's purposes in cases alleging discriminatory intent.

6    *Arlington Heights,* 429 U.S. at 267. Here, the history of SB 1485 and SB 1003's enactment

7    strongly supports the conclusion that the election-integrity rationales used to justify the

8    laws were a pretext for discrimination. Compl. ¶¶ 48-68, Interv. Compl. ¶¶ 60-78, 111-117.

9         First, the timing of the legislature's new-found concern for limiting early voting

10   points to an invidious purpose. In the five presidential elections from 2000 through 2016,

11   the candidate favored by the majority of white voters won Arizona's presidential electors

12   while the use of early voting simultaneously increased among the Arizona electorate. There

13   was no effort by Arizona legislators to curtail early voting after those elections. The 2020

14   election was different. Compl. ¶¶ 45-46. "It is no coincidence that the Arizona legislature

15   enacted these changes only after an election in which (1) for the first time in recent memory,

16   the presidential candidate preferred by Arizona voters of color won; and (2) voters of color

17   increasingly used early voting—the target of the new laws—to exercise their right to vote."

18   *Id.* ¶ 3; *see also* Interv. Compl. ¶¶ 6, 88. That the Arizona legislature acted to curtail early

19   voting only after an election in which the candidate preferred by minority voters won,

20   where that same legislature took no similar steps when the candidate preferred by white

21   voters was successful, raises an inference that the legislature was seeking to reduce

22   minority voters' electoral strength. *See Flores v. Pierce*, 617 F.2d 1386, 1390 (9th Cir.

23   1980) (that the "city council had never issued protests against liquor license applications . . .

24   before the case in question" "point[ed] toward discriminatory intent").

25        Second, although "Arizona legislators have used unsubstantiated and unfounded

26   allegations of widespread voter fraud to attempt to justify restrictions on mail-in voting,"

27   proponents of SB 1485 and SB 1003 have not identified any instances of voter fraud that

28   either law would have prevented. Compl. ¶ 66. Further, the two laws were enacted at the

**PLAINTIFFS' OPPOSITION TO THE ATTORNEY GENERAL'S MOTION TO DISMISS**

same time as the bizarre "audit" conducted by the Cyber Ninjas organization—an audit ordered by members of the Arizona legislature, many of whom were backers of SB 1485 and SB 1003. *Id.* ¶¶ 58-63. That audit was designed "to bolster false and discredited claims of fraud, and provide a veneer of legitimacy for [the legislature's] discriminatory voter suppression efforts." *Id.* ¶ 58. Particularly because all reasonable inferences must be drawn in Plaintiffs' favor, *Khoja*, 899 F.3d at 1003, these allegations provide further support for the inference that SB 1485 and SB 1003 were enacted for a discriminatory purpose. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.").

### 4.    History of Discrimination

"The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267; *see also N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 223-24 (4th Cir. 2016) ("A historical pattern of laws producing discriminatory results provides important context for determining" if a law was enacted "with discriminatory purpose."). The Complaint here details Arizona's long and sordid history of discrimination, especially as to voting. Compl. ¶¶ 97-126; Interv. Compl. ¶ 118, 120-21. And this is not just from the distant past. The Complaint describes discrimination against minority voters in both the 2012 and 2016 elections. Compl. ¶¶ 109-11. "Due in significant part to its legacy of discrimination, the rate of voting by voters of color in Arizona is one of the lowest in the country." *Id.* ¶ 121. Thus, as the Complaint alleges, SB 1485 and SB 1003 "are simply the latest iteration in a pattern of intentional and systemic discrimination directed at voters of color in Arizona going back decades." *Id.* ¶ 3.

### B.    The Attorney General Identifies No Basis For Dismissal.

In moving to dismiss the intentional discrimination claims, the Attorney General *acknowledges* the allegations showing that "there was historical discrimination in Arizona," that "legislators said things that purportedly indicate an illegitimate purpose,"

and that "the challenged provisions may have a discriminatory effect." AG Br. 13. Despite these concessions, the Attorney General argues that the Complaint fails to plausibly allege a claim for discriminatory purpose. He is wrong.

*First*, the Attorney General claims that Plaintiffs have "improperly attempt[ed] to conflate" Sections 2's intentional-discrimination and results-test prongs. AG Br. 3, 11-12. But *Arlington Heights* makes clear that disproportionate impact is relevant to assessing legislative intent, as such an effect is almost always an "important starting point" for ferreting out discriminatory purpose. *Arlington Heights*, 429 U.S. at 266; *see also Arce*, 793 F.3d at 978. Evidence of discriminatory impact can, with other evidence, raise a "strong inference that the adverse effects were desired," and not merely coincidental side-effects. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 n.25 (1979). To the extent the Attorney General contends that allegations of discriminatory effects have no place in an intentional discrimination case, that argument runs headlong into binding Supreme Court precedent. *See* Statement of Interest of the United States 7-12, ECF No. 78.

*Second*, when the Attorney General does address the other *Arlington Heights* factors, he essentially asks the Court to disregard them. For example, the Attorney General complains that the Complaint does not tie Arizona's long history of discrimination or the context of the 2020 election to the particular laws at issue. AG Br. 13. This ignores the specific allegations in the Complaint, which explains Arizona's history of discrimination against minority voters, notes recent examples, and explains how the 2020 election gave the legislature reason to continue that practice by targeting early voting by minority groups. Compl. ¶¶ 3, 45-46, 76-77, 90-93, 97-126; Interv. Compl. ¶¶ 88, 99-100, 111-21.

*Third*, the Attorney General is wrong that the supposed "presumption of good faith" warrants dismissal. AG Br. 12-15. Assessing legislative intent is a fact-intensive inquiry that can rarely be decided on the pleadings.[5] None of the cases the Attorney General cites

---

[5] *See Davis*, 426 U.S. at 242 ("an invidious discriminatory purpose may often be inferred from the totality of the relevant facts"); *City of S. Miami v. DeSantis*, 508 F. Supp. 3d 1209, 1227 (S.D. Fla. 2020) (denying *summary judgment* because "the *Arlington Heights*

1   regarding giving legislatures the benefit of the doubt were decided at the motion to dismiss

2   stage.[6] Were the law otherwise, no plaintiff could state an intentional discrimination claim

3   in which legislators were smart enough not to announce their discriminatory animus.[7] Put

4   simply, the presumption of good faith is "not a shield that requires automatic dismissal of

5   discrimination claims at the pleading stage." *Georgia*, 2021 WL 5833000, at *4 n.4.

6       **Fourth**, the Attorney General is wrong that the Court should disregard the

7   allegations of contemporaneous statements by legislators regarding the laws. AG Br. 14-

8   15. His argument flies in the face of *Arlington Heights*, which makes clear that such

9   statements are relevant in assessing discriminatory intent. 429 U.S. at 268 (court must

10  consider "contemporary statements by members of the decisionmaking body"). Here, Rep.

11  Kavanagh's statement that voter restriction bills were intended to limit voting to voters of

12  a particular "quality" both suggests a discriminatory purpose and gives the lie to the notion

13  that the legislature was *really* concerned about election integrity. Compl. ¶ 67.

14      The Attorney General also suggests that Rep. Kavanagh clarified that he was

15  concerned only with reducing voting by the uninformed, not minorities. AG Br. 14. It is

16  hardly surprising that a legislator caught making a discriminatory statement would pass it

17  off as something else. *See Arce*, 793 F.3d at 978 ("officials acting in their official capacities

18  seldom, if ever, announce on the record that they are pursuing a particular course of action

19  because of their desire to discriminate against a racial minority"). But more to the point,

20  the Court cannot credit that explanation at the pleading stage, where all inferences must be

21  drawn in *Plaintiffs'* favor. *Khoja*, 899 F.3d at 1003.

22

23  framework suggests an in-depth, highly factual inquiry into the purported discriminatory
    legislative intent after a thorough examination of the various factors").

24  [6] *Abbott v. Perez*, 138 S. Ct. 2305 (2018) (trial); *Fusilier v. Landry*, 963 F.3d 447 (5th Cir.

25  2020) (trial); *Flemming v. Nestor*, 363 U.S. 603 (1960) (summary judgment).

26  [7] *See Hunt v. Cromartie*, 526 U.S. 541, 553 (1999) (because "[o]utright admissions of
    impermissible racial motivation are infrequent[,] . . . plaintiffs often must rely upon other
    evidence"); *Smith v. Town of Clarkton*, 682 F.2d 1055, 1064 (4th Cir. 1982) ("Even

27  individuals acting from invidious motivations realize the unattractiveness of their

28  prejudices when faced with their perpetuation in the public record.").

In asking this Court to disregard these statements, the Attorney General relies on cases at the preliminary injunction or trial stage. AG Br. 14-15.[8] But in none of these cases were courts considering the plausibility of the complaint's allegations. In particular, while in *Brnovich* the Supreme Court rejected the court of appeals' use of a "cat's paw" theory to override the district court's "interpretation of the evidence" after trial, 141 S. Ct. at 2349-2350, the Supreme Court nowhere suggested that statements of individual legislators can be disregarded at the motion to dismiss stage. To the contrary, the Supreme Court approved of the use of *Arlington Heights*'s "familiar approach" for assessing discriminatory intent, *id*. at 2349, in which the "contemporary statements by members of the decisionmaking body" are indisputably relevant. *Arlington Heights*, 429 U.S. at 268; *see also Georgia*, 2021 WL 5833000, at *5 (rejecting a similar argument as to *Brnovich*).

Even when applying *Arlington Heights* at the summary judgment stage, the Ninth Circuit instructs that "the plaintiff need provide very little" evidence of discriminatory intent to "raise a genuine issue of fact; any indication of discriminatory motive may suffice to raise a question that can only be resolved by a fact-finder." *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1159 (9th Cir. 2013) (cleaned up); *see also Arce*, 793 F.3d at 978 (denying summary judgment even where "the legislative history contains only a few snippets of overtly discriminatory expression"). The Court should be even more wary of disposing of plausible allegations of discriminatory intent at the pleading stage.

\*\*\*

In sum, the Complaint plausibly alleges that the Arizona legislature enacted SB 1485 and SB 1003 for the purpose of reducing voting by citizens of color. As the United States concluded in its Statement of Interest, Plaintiffs "have pled plausible claims of purposeful discrimination under Section 2" and the Attorney General's "motion to dismiss proffers a superficial gloss on intentional discrimination standards and fails to credit or assess correctly the full range of relevant facts alleged." ECF No. 78 at 2. Plaintiffs are

---

[8] *See Brnovich*, 141 S. Ct. 2321 (trial); *United States v. O'Brien*, 391 U.S. 367 (1968) (trial); *N.C. State Conf. of the NAACP v. Raymond,* 981 F.3d 295 (4th Cir. 2020) (preliminary injunction).

PLAINTIFFS' OPPOSITION TO THE ATTORNEY GENERAL'S MOTION TO DISMISS

1    entitled to discovery on their intentional discrimination claims.

2    **II.     Plaintiffs Adequately Plead Their *Anderson/Burdick* Claims**

3        The Complaint also states claims under the *Anderson-Burdick* framework. In
4    *Anderson v. Celebrezze*, 460 U.S. 780 (1983), the Supreme Court explained that all laws
5    that restrict the fundamental right to vote are subject to constitutional scrutiny. There is no
6    "litmus-paper test" that "separate[s] valid from invalid restrictions." *Id*. at 789. Instead, a
7    court should consider the "character and magnitude of the asserted injury" to the right to
8    vote, "identify and evaluate the precise interests put forward by the State" to justify that
9    burden, and determine not only "the legitimacy and strength of each of those interests," but
10   also "the extent to which those interests make it necessary to burden the plaintiff's rights."
11   *Id*. A court employs a sliding-scale analysis depending on the degree to which the
12   challenged law burdens the right to vote. *Id*.; *see also Burdick v. Takushi*, 504 U.S. 428,
13   434 (1992). Laws burdening particular groups of voters more than others are subject to
14   heightened scrutiny. *See Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1190 (9th Cir.
15   2021) (discriminatory impacts "implicat[e] heightened constitutional concerns").

16       Plaintiffs state a claim as to both SB 1485 and SB 1003 under these principles. The
17   Complaint alleges that SB 1485 and SB 1003, alone and together, substantially burden the
18   rights of Arizona voters and voters of color in particular. Compl. ¶¶ 132-35. As alleged in
19   the Complaint, SB 1485 will result in hundreds of thousands of removals from the EVL
20   that will disproportionately affect voters of color, and SB 1003 will disenfranchise
21   numerous voters, with the heaviest burden borne by minority voters. And the provisions
22   that supposedly mitigate the laws' impact—a mailed notice, the ability to cure a ballot in
23   person by election day, or the option to vote in person rather than by mail—do not diminish
24   the disproportionate burden on minority voters. *See supra* at 3, 6; Compl. ¶¶ 76-84.

25       The State's asserted interests do not justify these burdens. To the contrary, the
26   principal interest put forth to justify the restrictions—a purported concern for election
27   "integrity"—is a fiction. There is no evidence that either SB 1485 or SB 1003 will address
28   genuine election integrity concerns, much less that any such effect outweighs the burden

they place on the right to vote. *Id*. ¶¶ 51-57, 66-67, 96. And assertions of administrative cost savings are plainly insufficient at the pleading stage, particularly given the heightened scrutiny applied to voting laws with a discriminatory impact on specific groups of voters.

## A.      Plaintiffs State A Claim As To SB 1485.

The Attorney General cites one decision dismissing an *Anderson-Burdick* claim on the pleadings: an inapposite out-of-circuit case challenging an Ohio single-subject ballot initiative process. *See* AG Br. 15 (quoting *Comm. to Impose Term Limits (etc.) v. Ohio Ballots Bd.*, 885 F.3d 443 (6th Cir. 2018)). As the Ninth Circuit has explained, however, the *Anderson-Burdick* test "rests on the specific facts of a particular election system" and can be resolved as a matter of law only in "a most unusual circumstance." *Ariz. Green Party v. Reagan*, 838 F.3d 983, 990-991 (9th Cir. 2016). Even if the burden on the right to vote is not severe, a court should ordinarily await "[a] fully developed evidentiary record" to decide whether challenged laws are "constitutionally permissible means" for achieving state objectives. *Soltysik v. Padilla*, 910 F.3d 438, 447-49 (9th Cir. 2018).

### 1.      The Court cannot resolve this claim on the pleadings.

The Attorney General asserts that Plaintiffs' *Anderson-Burdick* challenge to SB 1485 fails as a matter of law because the burden on voting is "minimal" and the State's interests are sufficient. AG Br. 17-21. He is wrong on both counts. Plaintiffs have alleged a substantial burden on voting rights and have challenged the legitimacy and rationality of the State's asserted interests. That is more than sufficient to state a plausible claim— particularly where, as here, the law allegedly "place[s] a particular burden on an identifiable segment" of voters and is thus "more likely to raise constitutional concerns," *Hobbs*, 18 F.4th at 1190, and the Attorney General cites no case dismissing a similar *Anderson-Burdick* challenge on the pleadings.

#### a.      SB 1485's burdens are substantial.

The Attorney General contends the burden in this case is minimal because active voters are not removed from the EVL and those who are removed can add themselves back to the list or vote in person. *See* AG Br. 17-18. That misunderstands the legal standard. In

assessing the relevant burden for purposes of *Anderson-Burdick*, the appropriate question is not just the burden the restriction imposes on voters generally, but the burden it imposes on those voters who are most affected by the law. *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1021 n.2 (9th Cir. 2016) (in assessing a voting restriction's constitutionality, "courts may consider not only a given law's impact on the electorate in general, but also its impact on subgroups, for whom the burden, when considered in context, may be more severe"). Plaintiffs have alleged precisely those impacts here. *See* Compl. ¶¶ 77-82.

None of the cases the Attorney General cites (AG Br. 17-18) show that SB 1485's burden can be deemed "minimal" on a motion to dismiss. In *Short v. Brown*, 893 F.3d 671 (9th Cir. 2018), the Ninth Circuit held that a statute that authorized voters in some counties to receive a ballot by mail automatically did not impose a "severe" burden on voters who did not receive the automatic option. But *Short* arose following the denial of a preliminary injunction, where the plaintiffs had an opportunity to put on evidence. Moreover, whereas the law challenged in *Short* made it *easier* for some to vote, the court recognized that laws that make it *harder* for some early voters to cast a ballot relative to other voters—like SB 1485—can constitute a "moderate" burden. *Id*. at 677-78 (citing *Obama for Am. v. Husted*, 697 F.3d 423, 433 (6th Cir. 2012)).

*Crawford v. Marion County Election Board*, 553 U.S. 181 (2008), and *Dudum v. Arntz*, 640 F.3d 1098 (9th Cir. 2011), are similarly inapposite. *Crawford* was decided "[a]fter discovery." 553 U.S. at 187. *Dudum* too was decided after a grant of summary judgment. Indeed, the Ninth Circuit has distinguished *Dudum* at the pleading stage on that basis. *See Soltysik*, 910 F.3d at 449. In addition, both *Crawford* and *Dudum* addressed different election systems (in Indiana and California, respectively) and different challenged restrictions (voter ID laws and instant runoff voting) than are at issue in this case. As the Ninth Circuit has explained, "[a]nalogy and rhetoric are no substitute for evidence, particularly where there are significant differences between the cases" a party "relies on and the Arizona election system." *Ariz. Green Party*, 838 F.3d at 990; *see also* Compl.

PLAINTIFFS' OPPOSITION TO THE ATTORNEY GENERAL'S MOTION TO DISMISS

1    ¶¶ 41-47 (describing the historical role of mail-in voting in Arizona). This also disposes of

2    the argument that Arizona's voting laws are in certain ways supposedly "more generous"

3    than the laws of other states. AG Br. 18-19.[9]

4                        **b.    The State's asserted interests are insufficient.**

5         Even if the Attorney General were correct that the Court can hold that SB 1485

6    imposes a minimal burden at the pleading stage—and he is not—his motion still should be

7    denied. "However slight" a burden may appear, "it must be justified by relevant and

8    legitimate state interests" that are "sufficiently weighty to justify the limitation." *Crawford*,

9    553 U.S. at 191 (cleaned up). Tellingly, all of the cases the Attorney General cites were

10   decided based on record evidence after the pleading stage. AG Br. 19-21.[10] The Ninth

11   Circuit has refused to defer to "speculative" state interests at the pleading stage just because

12   the burden on voting is supposedly not severe. *Soltysik*, 910 F.3d at 448-49 (reversing

13   dismissal of *Anderson/Burdick* claim and noting similar inappropriate reliance on later-

14   stage cases).

15        The Attorney General's litigation assertions regarding the State's interests, which

16   Plaintiffs have not yet been able to test via discovery, are insufficient to justify dismissal.

17   Although the Attorney General claims an interest in reducing administrative burdens, AG

18   Br. 19-20, it is settled that a state may not deprive citizens of their constitutional right to

19   vote "because of some remote administrative benefit," *Carrington v. Rash*, 380 U.S. 89,

20   96 (1965), particularly where the challenged rule is not "in any sense necessary to the

21   proper administration of its election laws," *Harman v. Forssenius*, 380 U.S. 528, 542-43

22   _____

     [9] Even in the voter ID context, moreover, *Crawford*'s discussion of the burdens of voter
23   ID turned heavily on lack of relevant evidence in the record. In other cases where there is
     "concrete record evidence" of burden, voter ID laws may impose a "significant burden" on
24   the right to vote. *Fish v. Schwab*, 957 F.3d 1105, 1131 (10th Cir. 2020).

25   [10] They were decided on motions for summary judgment, *see Greater Birmingham
     Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299 (11th Cir. 2021); *Mays v.
26   LaRose*, 951 F.3d 775 (6th Cir. 2020), permanent injunction, *see Brnovich*, 141 S. Ct. 2321;
     *Ohio Democratic Party v. Husted*, 834 F.3d 620 (6th Cir. 2016); *Frank v. Walker*, 768 F.3d
27   744 (7th Cir. 2014); *Lemons v. Bradbury*, 538 F.3d 1098 (9th Cir. 2008), or preliminary
     injunction, *see Purcell v. Gonzalez*, 549 U.S. 1 (2006); *Common Cause/Ga. v. Billups*, 554
28   F.3d 1340 (11th Cir. 2009); *Prete v. Bradbury*, 438 F.3d 949 (9th Cir. 2006).

                    PLAINTIFFS' OPPOSITION TO THE ATTORNEY GENERAL'S MOTION TO
                                              DISMISS

1  (1965); *see also Husted*, 697 F.3d at 434 (a "vague" administrative interest is insufficient).

2  The only "evidence" of an administrative interest at this stage is a single document the

3  Attorney General submitted showing the costs of printing, processing and sending *all* mail-

4  in ballots for Maricopa County for the November 2020 election. AG Br. 20.

5        The supposed interest in "secure" elections also does not support dismissal.

6  Plaintiffs have specifically asserted that this justification is a pretext and lacks a rational

7  basis. Compl. ¶¶ 66-67, 134; *see also* Interv. Compl. ¶¶ 101-02, 107, 136. The Attorney

8  General's principal authority, *Husted v. A. Philip Randolph Institute*, 138 S. Ct. 1833

9  (2018), did not involve an *Anderson-Burdick* claim or a motion to dismiss. And a purported

10  interest in election integrity "in the abstract" is not enough if there is no "evidence that

11  such an interest made it necessary to burden voters' rights here." *Fish*, 957 F.3d at 1133.

12                    **c.    *Hobbs* does not support dismissal.**

13        In a supplemental brief, the Attorney General contends that *Arizona Democratic*

14  *Party v. Hobbs* supports dismissal of the SB 1485 claim. ECF No. 83 at 2-3. The Attorney

15  General's reliance on *Hobbs* is misplaced. *Hobbs* did not address SB 1485 or the EVL.

16  Indeed, the majority expressly stated that "we are aware of recent efforts by state

17  legislatures to *restrict* the ability of voters to cast a ballot" and underscored that "[t]his case

18  does not concern those efforts." 18 F.4th at 1195. In addition, the majority in *Hobbs* noted

19  that the plaintiffs had not argued—or provided evidence to show—that the burden of the

20  challenged law fell disproportionately on particular voters. *Id*. at 1190 n.5. Plaintiffs allege

21  just such a disproportionate burden here. Compl. ¶ 84.

22              **2.    The Attorney General's other two arguments are meritless.**

23        Neither of the Attorney General's other arguments to urge dismissal have merit.

24                    **a.    That SB 1485 involves absentee ballots is irrelevant.**

25        The Attorney General first contends that Plaintiffs face an "uphill climb" on their

26  *Anderson-Burdick* claim because "there is no constitutional right to an absentee ballot."

27  AG Br. 16-17 (citing *McDonald v. Bd. of Election Commr's of Chi.*, 394 U.S. 802, 807-09

28  (1969)). But this misstates Plaintiffs' claim: that the purging process will place an

**PLAINTIFFS' OPPOSITION TO THE ATTORNEY GENERAL'S MOTION TO DISMISS**

unconstitutional burden on voters, particularly voters of color. And in the next breath, the Attorney General concedes that *Anderson-Burdick* rather than *McDonald* governs when he notes that the Ninth Circuit has applied the *Anderson-Burdick* framework to a challenge involving mail-in ballots. AG Br. 17 (citing *Short*). *Hobbs*—which also applied *Anderson-Burdick* to mail-in voting—re-affirmed that rule. 18 F.4th at 1181.[11] In addition, because *McDonald* was a summary judgment decision, it does not justify dismissal before Plaintiffs have had an opportunity to assemble a record. *See O'Brien v. Skinner*, 414 U.S. 524, 529 (1974) ("Essentially the Court's disposition of the claims in *McDonald* rested on failure of proof."). Finally, whether or not the Plaintiffs face an "uphill climb" in proving their *Anderson-Burdick* claim is legally irrelevant. At this stage, Plaintiffs need only make out a plausible claim for relief. Plaintiffs' amply plead that SB1485 unconstitutionally burdens impacted voters' right to vote, and thus state a claim under *Anderson-Burdick*.

### b.   *Washington State Grange* **is inapposite.**

Citing *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442 (2008), the Attorney General argues that a "facial" challenge to SB 1485 fails because Plaintiffs cannot show that there are "no set of circumstances" under which SB 1485 would be valid. "[S]urely," the Attorney General posits, it would be lawful for Arizona to enact a law that would remove some non-voting individuals from the EVL without violating the Constitution. AG Br. 21-22. This argument fundamentally misunderstands what *Washington State Grange* meant by a facial versus as-applied challenge in this context.

*Washington State Grange* addressed a Washington initiative that allowed candidates to be listed on the ballot according to their "party preference." The political parties

---

[11] Moreover, courts outside the Ninth Circuit agree. *See, e.g.*, *Husted*, 697 F.3d at 430-31 ("Plaintiffs [do] not need to show that they were legally prohibited from voting, but only that 'burdened voters have few alternate means of access to the ballot'") (cleaned up); *Price v. N.Y. State Bd. of Elections*, 540 F.3d 101, 109 & n.9 (2d Cir. 2008) (it is sufficient if "there is at least some burden on the voter-plaintiffs' rights" that made it "difficult to vote in person"); *League of Women Voters of Fla., Inc. v. Lee*, 2021 WL 4962099, at *14-15 (N.D. Fla. Oct. 8, 2021) ("*McDonald* did not—in one sentence—create a sweeping vote-by-mail exception to the Constitution.").

PLAINTIFFS' OPPOSITION TO THE ATTORNEY GENERAL'S MOTION TO DISMISS

contended that the law infringed their First Amendment rights by forcing them to associate with candidates against their wishes and by confusing voters. Contrary to the Attorney General's suggestion, the Supreme Court rejected a facial challenge in *Washington State Grange* not because laws governing voting and election procedures are generally immune from facial challenge, but because the parties sued to block the law before the ballots had been printed, so the Court had "no idea what those ballots will look like." 552 U.S. at 460 (Roberts, C.J., concurring). In rejecting this challenge, the majority simply declined to "speculate" on whether the ballots would actually cause voter confusion. *See id*. at 455-56.

In this case, by contrast, there is no need to speculate. SB 1485's requirements are apparent on the face of the statute. Even if a more narrowly targeted law that did not disproportionately impact certain categories of voters could be constitutional, that is not the law Arizona passed. *Washington State Grange* thus provides no support for dismissal.

### B.   Plaintiffs State A Claim As To SB 1003.

In seeking to dismiss Plaintiffs' challenge to SB 1003, the Attorney General incorporates by reference his arguments from the then-pending appeal in *Hobbs*. AG Br. 10. After the Ninth Circuit decided that appeal, the Attorney General submitted a supplemental brief contending that Plaintiffs' challenge is "no longer tenable" in light of the decision. ECF No. 83 at 1. However, the Ninth Circuit's decision in *Hobbs* does not support dismissal of Plaintiffs' claims here for at least two reasons.

*First*, *Hobbs* does not establish that the burden of SB 1003 is minimal. The Ninth Circuit expressly indicated that the claim in *Hobbs* "does not contain an equal-protection component," which would "implicat[e] heightened constitutional concerns." 18 F.4th at 1190. In particular, no party argued that the cure-period requirement was "a proxy for some other form of discrimination" or that the burden of that requirement "falls disproportionately on a discrete group." *Id*. Plaintiffs here make just such allegations. Compl. ¶¶ 90-94.

*Second*, the claims in this case are different from those in *Hobbs* because Plaintiffs challenge SB 1003 and SB 1485 cumulatively, and Plaintiffs intend to introduce evidence

PLAINTIFFS' OPPOSITION TO THE ATTORNEY GENERAL'S MOTION TO DISMISS

based on how the cure period was actually implemented in the 2020 election. ECF No. 66 at 4-5. In his reply in support of his motion to stay—which this Court denied—the Attorney General argued that SB 1003 and SB 1485 are not "cumulative" because the two laws target different aspects of the voting process. ECF No. 74 at 2; ECF No. 83 at 2 (incorporating this discussion). That rings hollow given the Attorney General's own reliance on other aspects of Arizona's voting system not impacted by SB 1003 and SB 1485. *See* AG Br. 4. The Attorney General also faults Plaintiffs for "offer[ing] neither evidence nor allegations why data from the 2020 election is likely to change anything." ECF No. 74 at 3. But Plaintiffs allege that the 2020 election is a crucial backdrop for SB 1003 and SB 1485, Compl. ¶¶ 64-68, and do not need to offer "evidence" at the motion-to-dismiss stage.

## III.    The Attorney General's Standing Arguments As To SB 1003 Are Meritless.

The Attorney General does not dispute that Plaintiffs have standing as to all their challenges to SB 1485. Nor does he dispute that Plaintiffs have standing to challenge SB 1003 under *Anderson-Burdick*. Rather, the Attorney General disputes Plaintiffs' standing only as to the intentional discrimination claim against SB 1003. But his argument that such a claim is not redressable is clearly incorrect. A favorable ruling—an order voiding the law—would redress not only the harms from the rejection of unsigned mail ballots, but also broader harms from being subjected to a law passed with discriminatory purpose.[12]

To establish Article III standing, a plaintiff must demonstrate an (1) injury that is (2) caused by the challenged act and (3) redressable through an order of the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Redressability requires Plaintiffs to show that it is "likely" that the injury will be "redressed by a favorable decision." *Id.* (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976)).

Here, Plaintiffs have requested an order declaring that SB 1003 was passed with

---

[12] The Attorney General also confusingly claims that Plaintiffs lack standing to assert an "as-applied" challenge because no plaintiffs are individual voters. AG Br. 10. The distinction between facial and as-applied challenges is irrelevant at the pleading stage; it goes solely "to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010).

racially discriminatory purpose, an injunction preventing its enforcement, and further just-and-proper relief. Compl. at 31; Interv. Compl. at 31. The Attorney General argues that an injunction against SB 1003 will not redress any of Plaintiffs' injuries because pre-existing and unchallenged Arizona laws supposedly preclude allowing post-election curing of unsigned mail-in ballots. AG Br. 7-9. That argument not only assumes that the Attorney General is correct in his dubious and contested interpretation of state law, but more importantly fails to grapple with the unique injury that racially discriminatory laws inflict.

### A.    A Favorable Ruling Will Redress The Harm Of Racial Discrimination.

"An official action . . . taken for the purpose of discriminat[ion] . . . on account of [] race has no legitimacy at all under our Constitution or under the [Voting Rights Act]." *City of Richmond v. United States*, 422 U.S. 358, 378 (1975); *see also, e.g.*, *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 484 (1982). Thus, being subject to a racially discriminatory law *inherently* constitutes an Article III injury, and an injunction against such a law remedies that injury. Indeed, in other contexts, the Supreme Court has recognized that racially motivated actions impose their own unique injury. *Cf. Powers v. Ohio*, 499 U.S. 400, 409 (1991) ("An individual juror does not have a right to sit on any particular petit jury, but he or she does possess the right not to be excluded from one on account of race."). Striking down SB 1003 would redress the "broader" harms suffered by voters who are subjected to an intentionally discriminatory state law. *See N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 240 (4th Cir. 2016) ("[L]aws passed with discriminatory intent inflict a broader injury and cannot stand.").[13]

This is not a case in which it is unclear or speculative that a favorable ruling would provide redress, making the Attorney General's cases inapposite. AG Br. 8 (citing *Nuclear Info. & Res. Serv. v. Nuclear Regul. Comm'n*, 457 F.3d 941, 955 (9th Cir. 2006), *Renne v.*

---

[13] Upon a finding of intentional discrimination, district courts also have authority to enter *further* relief as necessary to address all the underlying harm. *Terry v. Adams*, 345 U.S. 461, 470 (1953) (directing the district court to "enter such orders and decrees as are necessary and proper" to "determine what provisions are essential to afford" Black citizens "full protection from future discriminatory" election practices); *McCrory*, 831 F.3d at 240 (similar). Such relief would therefore be in the Court's discretion. *See id.*

PLAINTIFFS' OPPOSITION TO THE ATTORNEY GENERAL'S MOTION TO DISMISS

1  *Geary*, 501 U.S. 312, 319 (1991), and *Arizonans for Fair Elections v. Hobbs*, 454 F. Supp.

2  3d 910, 917-19 (D. Ariz. 2020)). None of these cases involved an intentional discrimination

3  claim, which redresses a "broader" scope of harms. *McCrory*, 831 F.3d at 240.

4        **B.**    **The Attorney General Misinterprets State Law.**

5        Regardless, the Attorney General's argument that Arizona law already prohibited

6  post-election curing of unsigned ballots is unavailing. This is, at best, a disputed issue of

7  state law. Indeed, Defendant Hobbs—the State's chief election official—has made clear

8  that, prior to SB 1003, nothing in Arizona law prohibited election officials from allowing

9  voters to cure unsigned early ballots after election day. ECF No. 63, Hobbs Answer ¶ 53.

10       The Attorney General concludes differently by misreading Arizona law. He argues

11 that the interaction of A.R.S. § 16-548(A) and A.R.S. § 16-552(B) precludes county

12 recorders from allowing curing of unsigned mail-in ballots once the election-day deadline

13 passes. *See* AG Br. 8.[14] But this reading muddles the sequence of events. A.R.S. § 16-

14 548(A) instructs voters to submit their ballots to county recorders, who then "compare the

15 signatures thereon with the signature of the elector on the elector's registration record."

16 A.R.S. § 16-550. Once the signature is verified, A.R.S. § 16-551 requires recorders to

17 deliver the ballots to the "early election board," which *then* "canvass[es] and tall[ies] early

18 election ballots" under A.R.S. § 16-551(A); *see id*. § 550(B).

19       The Attorney General conflates two separate processes. The code only obliges the

20 early election board not to "allow" insufficient affidavits *at the time of the canvass*, a later

21 stage in the ballot counting process that continues for several days after Election Day. It

22 imposes no corresponding duty on the county recorders who initially *receive* the ballot. *See*

23 A.R.S. §§ 16-548, 16-550, 16-552. The county recorders are at issue in this lawsuit, as they

24 are responsible for preventing voters from curing their ballots after election day.

25       The Attorney General's interpretation of state law also violates bedrock rules of

---

[14] *See* A.R.S. § 16-548(A) (instructing voters to fill out their mail ballot and sign the affidavit before submitting it to the county recorder, or any polling place, by 7:00 p.m. on election day); A.R.S. § 16-552(B) (pertaining to the later canvassing of mail ballots by a separately established "early election board").

PLAINTIFFS' OPPOSITION TO THE ATTORNEY GENERAL'S MOTION TO DISMISS

statutory construction. When legislators amend a statute, a court "must presume they intended to change existing law rather than perform a futile act." *Rotter v. Coconino Cnty.*, 818 P.2d 704, 709 (Ariz. 1991) (cleaned up); *see also Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 945 (9th Cir. 2013) ("In interpreting a state statute, we apply the state's rules of statutory construction."). The Attorney General asks this court to conclude that S.B. 1003 changed nothing about the curing of missing signatures under Arizona law. This reading fails basic rules of statutory construction.[15]

That SB 1003 imposes new rules is further confirmed by the 2021 Election Procedures Manual ("EPM") (effective Dec. 31, 2021), a legally binding document under Arizona law. *See* A.R.S. § 16-452. The 2021 EPM "[i]mplemented" S.B. 1003 by requiring curing of unsigned early ballots by election day. It does not cite any other, pre-existing Arizona law as the basis of its authority to impose that requirement. *See* Summary of Updates, 2021 EPM (Rev. Oct. 1, 2021), https://azsos.gov/node/1015.[16]

Regardless, at this juncture, the Court need not resolve these questions of Arizona law to find that Plaintiffs have standing to bring an intentional discrimination claim here. Enjoining SB 1003 would, at the very least, leave Arizona officials and judges free to resolve whether post-election curing is permitted under state law *without* being dictated to choose one result by an unconstitutionally discriminatory law. If SB 1003's "discriminatory policies are enjoined," then any injury from the denial of post-election ballot curing "due to" the legislature's racially discriminatory motivation "is likely to be redressed." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979 (9th Cir. 2011).

## CONCLUSION

The Attorney General's motion to dismiss should be denied.

---

[15] S.B. 1003 states that its changes were "clarifying" only, but such declarations about "what an earlier legislature intended" do not govern the meaning of preexisting law. *E.C. Garcia & Co. v. Ariz. State Dep't of Revenue*, 875 P.2d 169, 176 (Ariz. Ct. App. 1993).

[16] The previous version of the EPM precluded post-election curing of such ballots only because the Secretary acquiesced to the Attorney General's view to meet the statutory deadline to finalize the 2019 EPM. *See Hobbs*, 18 F.4th at 1179; ECF No. 63, Hobbs Answer ¶¶ 53-54.

PLAINTIFFS' OPPOSITION TO THE ATTORNEY GENERAL'S MOTION TO DISMISS

1
2

Dated: December 29, 2021

Respectfully submitted,

3
4

Lee H. Rubin (Admitted PHV)
MAYER BROWN LLP
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
(650) 331-2000
lrubin@mayerbrown.com

*/s/ Lauren Elliott Stine*
Lauren Elliott Stine (AZ #025083)
Coree E. Neumeyer (AZ# 025787)
QUARLES & BRADY LLP
One Renaissance Square
Two North Central Avenue
Phoenix, AZ 85004-2391
(602) 229-5200
Lauren.Stine@quarles.com
Coree.Neumeyer@quarles.com

5
6
7
8
9
10

Gary A. Isaac (Admitted PHV)
Daniel T. Fenske (Admitted PHV)
Jed W. Glickstein (Admitted PHV)
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600
gisaac@mayerbrown.com
dfenske@mayerbrown.com
jglickstein@mayerbrown.com

Courtney Hostetler (Admitted PHV)
John Bonifaz (Admitted PHV)
Ben Clements (Admitted PHV)
FREE SPEECH FOR PEOPLE
1320 Centre Street, Suite 405
Newton, MA 02459
(617) 249-3015
chostetler@freespeechforpeople.org
jbonifaz@freespeechforpeople.org
bclements@freespeechforpeople.org

11
12
13
14
15
16

Rachel J. Lamorte (Admitted PHV)
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 362-3000
rlamorte@mayerbrown.com

17
18
19

*Attorneys for Plaintiffs*

20
21
22
23
24
25
26
27
28

PLAINTIFFS' OPPOSITION TO THE ATTORNEY GENERAL'S MOTION TO DISMISS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on December 29, 2021, a copy of the foregoing **PLAINTIFFS'**
**OPPOSITION TO THE ATTORNEY GENERAL'S CORRECTED**
**CONSOLIDATED MOTION TO DISMISS PLAINTIFFS' AND INTERVENOR-**
**PLAINTIFFS' COMPLAINTS UNDER RULE 12(B)(1) AND 12(B)(6)** was filed
electronically with the Arizona District Court Clerk's Office using the CM/ECF System
for filing, which will provide a Notice of Electronic Filing to all CM/ECF registrants.


          */s/ Lauren Elliott Stine*

PLAINTIFFS' OPPOSITION TO THE ATTORNEY GENERAL'S MOTION TO
DISMISS