KEN PAXTON
Attorney General
BRENT WEBSTER
First Assistant Attorney General
JUDD E. STONE II (Tex. State Bar # 24076720)
Solicitor General
*(Admitted pro hac vice)*
BETH KLUSMANN
Assistant Solicitor General
Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Judd.Stone@oag.texas.gov

*Counsel for Amici Curiae*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Mi Familia Vota, et al.,<br>Plaintiffs,<br>and<br>DSCC and DCCC,<br>Plaintiff-Intervenors,<br>vs.<br>Katie Hobbs, in her official capacity as Arizona Secretary of State, et al.,<br>Defendants,<br>and<br>RNC and NRSC,<br>Defendant-Intervenors. | Case No: 2:21-cv-01423-DWL<br><br>**AMICUS CURIAE BRIEF FOR THE STATES OF TEXAS, ALABAMA, ALASKA, ARKANSAS, IDAHO, INDIANA, KENTUCKY, LOUISIANA, MONTANA, MISSISSIPPI, MISSOURI, OKLAHOMA, SOUTH CAROLINA, AND UTAH IN SUPPORT OF CORRECTED ATTORNEY GENERAL'S CONSOLIDATED MOTION TO DISMISS PLAINTIFFS' AND INTERVENOR PLAINTIFFS' COMPLAINTS UNDER RULES 12(B)(1) AND 12(B)(6)** |

## TABLE OF CONTENTS

Page

Index of Authorities ........ ii

Interest of Amici Curiae ........ 1

Argument ........ 2

I. Discriminatory-Purpose Claims Require Allegations That Plausibly Overcome the Presumption of Legislative Good Faith. ........ 2

A. Proving a discriminatory-purpose claim is more difficult than proving a results claim. ........ 3

B. Plaintiffs must overcome the presumption of legislative good faith. ........ 5

II. Holding Plaintiffs to Their Pleading Burden Reduces the Significant Cost of Discovery in Election-Law Cases. ........ 6

III. Plaintiffs Have Not Plausibly Alleged Purposeful Race Discrimination. ........ 9

Conclusion ........ 13

Certificate of Service ........ 14

## INDEX OF AUTHORITIES

Page(s)

Cases:

*Abbott v. Perez*,
138 S. Ct. 2305 (2018) ........ 3, 5, 10

*Ariz. Democratic Party v. Hobbs*,
18 F.4th 1179 (9th Cir. 2021) ........ 2, 9

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 2, 5, 6, 9, 10

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983) ........ 6

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 2, 6

*Brnovich v. Democratic Nat'l Comm.*,
141 S. Ct. 2321 (2021) ........ 1, 3, 9, 11, 12

*Brown v. Detzner*,
895 F. Supp. 2d 1236 (M.D. Fla. 2012) ........ 1

*Car Carriers, Inc. v. Ford Motor Co.*,
745 F.2d 1101 (7th Cir. 1984) .......... 6
*Carrington v. Rash*,
380 U.S. 89 (1965) .......... 1
*City of Mobile v. Bolden*,
446 U.S. 55 (1980) .......... 4, 10
*Democratic Nat'l Comm. v. Hobbs*,
948 F.3d 989 (9th Cir. 2020) .......... 12
*Democratic Nat'l Comm. v. Reagan*,
329 F. Supp. 3d 824 (D. Ariz. 2018) .......... 9
*Fusilier v. Landry*,
963 F.3d 447 (5th Cir. 2020) .......... 1, 5
*Greater Birmingham Ministries v. Sec'y of State for State of Ala.*,
992 F.3d 1299 (11th Cir. 2021) .......... 1
*League of Women Voters of Fla., Inc. v. Lee*,
No. 4:21-CV-186-MW/MAF,
2021 WL 5283949 (N.D. Fla. Nov. 4, 2021) .......... 7, 9
*Lee v. City of Los Angeles*,
908 F.3d 1175 (9th Cir. 2018) .......... 7
*Miller v. Johnson*,
515 U.S. 900 (1995) .......... 5
*Pers. Adm'r of Mass. v. Feeney*,
442 U.S. 256 (1979) .......... 5, 11
*Reno v. Bossier Par. Sch. Bd.*,
520 U.S. 471 (1997) .......... 3
*Shelby County v. Holder*,
570 U.S. 529 (2013) .......... 10
*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) .......... 6
*Tenney v. Brandhove*,
341 U.S. 367 (1951) .......... 7
*Thornburg v. Gingles*,
478 U.S. 30 (1986) .......... 4
*Veasey v. Abbott*,
830 F.3d 216 (5th Cir. 2016) .......... 7, 8
*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) .......... 7, 10
*Washington v. Davis*,
426 U.S. 229 (1976) .......... 5

**Constitutional Provisions, Statutes, and Rules:**

U.S. Const. amend.:
XIV ........ 1, 2
XV ........ 1, 2, 4
52 U.S.C.:
§ 10301 ........ 1, 2, 3, 4, 10, 11
§ 10301(a) ........ 4
2021 Ariz. Legis. Serv.:
ch. 343 § 2 ........ 2
ch. 359 § 6 ........ 2
Ariz. Rev. Stat.:
§ 16-544 ........ 2
§ 16-550(A) ........ 2
Fed. R. Civ. P.:
8 ........ 1, 6
8(a)(2) ........ 2
12(b)(6) ........ 1, 2, 3, 9, 10

**Other Authorities:**

Joint Fed. R. Civ. P. 26 Report Between the U.S. and Defs., *La Union del Pueblo Entero v. Abbott*, No. 5:21-CV-0844-XR (W.D. Tex. Nov. 15, 2021) ........ 8
Joint Fed. R. Civ. P. 26 Report, *La Union del Pueblo Entero v. Abbott*, No. 5:21-CV-0844-XR (W.D. Tex. Nov. 11, 2021) ........ 8
Order, *La Union del Pueblo Entero v. Abbott*, No. 5:21-CV-0844-XR (W.D. Tex. Sept. 30, 2021) ........ 8
Plfs. Rule 26(a)(1) Initial Discl., *Fla. State Conf. of Branches & Youth Units of the NAACP v. Lee*, No. 4:21-cv-00187-MW-MAF (N.D. Fla. July 26, 2021) ........ 8
S. Rep. No. 97-417 (1982) ........ 4

## INTEREST OF AMICI CURIAE

Amici curiae are the States of Texas, Alabama, Alaska, Arkansas, Idaho, Indiana, Kentucky, Louisiana, Mississippi, Missouri, Montana, Oklahoma, South Carolina, and Utah. States have "broad powers to determine the conditions under which the right of suffrage may be exercised." *Carrington v. Rash*, 380 U.S. 89, 91 (1965) (internal quotation marks omitted). Amici States have exercised those powers to enact election laws to ensure that voting is both open to all who are eligible and secure against those who are not. Yet States often face litigation, like Arizona here, over claims that their legislatures had an improper purpose when enacting any law regulating elections. *See, e.g.*, *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2348-50 (2021); *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1328 (11th Cir. 2021); *Fusilier v. Landry*, 963 F.3d 447, 463-67 (5th Cir. 2020); *Brown v. Detzner*, 895 F. Supp. 2d 1236, 1245-49 (M.D. Fla. 2012).

Amici States therefore have an interest in the proper application of Rules 8 and 12(b)(6) of the Federal Rules of Civil Procedure to claims that election laws were enacted with a discriminatory purpose in violation of the Constitution and Voting Rights Act. *See* U.S. Const. amends. XIV, XV; 52 U.S.C. § 10301. Because of the costs of litigation and the disruption to state governments caused by these claims, Amici States seek to ensure that only plausible claims are permitted to survive motions to dismiss.

## ARGUMENT

### I. Discriminatory-Purpose Claims Require Allegations That Plausibly Overcome the Presumption of Legislative Good Faith.

To survive a Rule 12(b)(6) motion, plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). But despite their length, plaintiffs' complaints[1] do not contain a "short and plain statement of the claim showing that [they are] entitled to relief." Fed. R. Civ. P. 8(a)(2). "[W]here the well-pleaded facts do not permit the court to infer more than the mere *possibility* of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (emphasis added) (quoting Fed. R. Civ. P. 8(a)(2)). Because the allegations in plaintiffs' pleadings are entirely consistent with the conclusion that the Arizona Legislature acted in a race-neutral manner, plaintiffs have not shown that their claims are plausible. Consequently, their lawsuit should be dismissed.[2]

Plaintiffs have asserted that the Arizona Legislature enacted the Signature Requirement (2021 Ariz. Legis. Serv. ch. 343 § 2 (amending Ariz. Rev. Stat. § 16-550(A))) and the Early Voting List (EVL) Periodic Voting Requirement (2021 Ariz. Legis. Serv. ch. 359 § 6 (amending Ariz. Rev. Stat. § 16-544))) with a discriminatory purpose in violation of the Fourteenth and Fifteenth Amendments, as well as section 2 of the Voting Rights Act (VRA). Compl. ¶¶ 136-45; Intervenor Compl. ¶¶ 132-41. But they have not alleged that either law creates disparate results, which would independently violate the

---

[1] Unless necessary to distinguish, this brief will refer to plaintiffs and plaintiff-intervenors as "plaintiffs."

[2] This brief focuses on plaintiffs' discriminatory-purpose claims. Compl. ¶¶ 136-45 (bringing discriminatory-purpose claims under the Fourteenth and Fifteenth Amendments as well as section 2 of the Voting Rights Act, 52 U.S.C. § 10301); *see also* Intervenor Compl. ¶¶ 132-41. Amici States also believe the undue-burden-on-voting claim should be dismissed, Compl. ¶¶ 127-35; Intervenor Compl. ¶¶ 122-31; *see Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179 (9th Cir. 2021).

VRA. 52 U.S.C. § 10301. As explained in *Brnovich*, a results claim asks whether the election process is "equally open" to all, regardless of race. 141 S. Ct. at 2338. Presumably unable to demonstrate that the minimal regulations imposed by the laws challenged here render voting in Arizona not "equally open" to all, plaintiffs have brought a discriminatory-purpose claim instead.

But simply replacing "results" with "purpose" does not make surviving a 12(b)(6) motion any easier—it makes it harder. And it should be. Accusations that a legislative body actively discriminated on the basis of race should not be lightly made and require proof that overcomes the presumption of legislative good faith. Opening the door to voluminous discovery based on insufficient allegations disrupts other branches of government and wastes the taxpayers' money. The Court should hold plaintiffs to their burden of pleading a plausible discriminatory-purpose claim, conclude their pleadings are insufficient, and dismiss plaintiffs' lawsuit.

### A. Proving a discriminatory-purpose claim is more difficult than proving a results claim.

Plaintiffs bear the ultimate burden of proof in this case—showing that the Signature Requirement and EVL Periodic Voting Requirement were enacted with a discriminatory purpose. *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018) ("Whenever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State." (citing *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 481 (1997))). Plaintiffs thus have the burden of (1) "overcoming the presumption of good faith," and (2) "proving discriminatory intent." *Id.* at 2325. Accordingly, their complaint must contain factual allegations that, if true, would make it plausible, not just possible, that the Arizona Legislature chose to enact the challenged laws—which still permit more opportunities for mail-in voting than many other States, Mot. to Dismiss at 1—because legislators wanted to make it harder for minorities to vote.

Proving a claim of purposeful or intentional race discrimination is more difficult than proving a results claim under section 2 of the VRA (52 U.S.C. § 10301), as demonstrated

by the history of that provision. In 1980, a plurality of the Supreme Court held that the then-existing version of section 2 was coextensive with the Fifteenth Amendment, requiring proof of purposeful discrimination. *City of Mobile v. Bolden*, 446 U.S. 55, 61-62 (1980) (plurality op.). As a consequence, Congress amended section 2 to permit claims based on results, prohibiting States from enacting laws that "result[] in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a).

Describing the reason for the amendment, the Senate Report explained that the "intent test places an unacceptably difficult burden on plaintiffs." S. Rep. No. 97-417, at 16 (1982). The Senate Report went on to quote the testimony of Dr. Arthur S. Flemming, Chairman of the United States Commission on Civil Rights regarding the difficulty of proving discriminatory intent:

> (L)itigators representing excluded minorities will have to explore the motivations of individual council members, mayors, and other citizens. The question would be whether their decisions were motivated by invidious racial considerations. Such inquiries can only be divisive, threatening to destroy any existing racial progress in a community. It is the intent test, not the results test, that would make it necessary to brand individuals as racist in order to obtain judicial relief.

*Id.* at 36 (footnotes omitted).

As the Supreme Court subsequently summarized, "[t]he intent test was repudiated for three principal reasons—it is 'unnecessarily divisive because it involves charges of racism on the part of individual officials or entire communities,' it places an 'inordinately difficult' burden of proof on plaintiffs, and it 'asks the wrong question.'" *Thornburg v. Gingles*, 478 U.S. 30, 44 (1986). In other words, proving that a legislative body enacted a law because members wished to suppress voters of a disfavored race is an "inordinately difficult" burden—which is why Congress created the less burdensome results test. Plaintiffs' decision to forego a results claim and focus on purposeful discrimination thus increases their burden and demands significant allegations to meet that standard.

### B. Plaintiffs must overcome the presumption of legislative good faith.

A primary reason that proving a discriminatory purpose is difficult in the legislative context is that courts are to presume that legislatures act in good faith. *Abbott*, 138 S. Ct. at 2325 (referring to plaintiffs' burden to "overcome the presumption of legislative good faith"). Thus, "until a claimant makes a showing sufficient to support that allegation [of purposeful discrimination,] the good faith of a state legislature must be presumed." *Miller v. Johnson*, 515 U.S. 900, 915 (1995); *see also Fusilier*, 963 F.3d at 464 ("[T]he Supreme Court has long cautioned against the quick attribution of improper motives, which would interfere with the legislature's rightful independence and ability to function.").

Purposeful discrimination requires more than "intent as volition or intent as awareness of consequences." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Instead, "[i]t implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* Thus, a discriminatory purpose is not shown merely because a law "may affect a greater proportion of one race than of another." *Washington v. Davis*, 426 U.S. 229, 242 (1976). The United States is simply wrong to assert in its statement of interest that, because it is an "inherently fact-based question," the presumption of good faith plays no role at the motion-to-dismiss stage. U.S. Stmt. of Interest at 14-15. Whether someone possessed a discriminatory motive is always a fact-dependent inquiry, but that has not stopped the Supreme Court from holding that there must still be sufficient pleadings to make such claims plausible. *See Iqbal*, 556 U.S. at 687 (concluding that plaintiff failed to state a claim for "purposeful and unlawful discrimination").

Courts should "exercise extraordinary caution in adjudicating claims that a State has [acted] on the basis of race." *Miller*, 515 U.S. at 916. Thus, while this case has not reached the stage where plaintiffs must produce evidence of their claims, their pleadings must demonstrate plausible grounds for a judgment in their favor—facts that show that the Arizona Legislature did not act in good faith but with the intent to discriminate. *See Iqbal*, 556 U.S. at 678. As demonstrated below, plaintiffs' pleadings do not meet that standard,

as none of the facts they allege would, if true, make it plausible that the Arizona Legislature was motivated by race when it enacted the Signature Requirement and the EVL Periodic Voting Requirement. The Court should dismiss the case now, before additional court and state resources are spent on claims destined to fail.

## II. Holding Plaintiffs to Their Pleading Burden Reduces the Significant Cost of Discovery in Election-Law Cases.

**A.** One consequence of failing to hold plaintiffs to the proper pleading standard is that States and other governmental entities will have to endure significant costs of discovery. While the pleading standard of Rule 8 was a "notable and generous departure from the hypertechnical, code-pleading regime of a prior era," "it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678-79. Instead, district courts retain "the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 n.17 (1983). As the Ninth Circuit has explained, "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011); *see also Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984) (noting that the costs of certain litigation and increasing federal caseloads "counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint").

The Supreme Court has rejected the argument that claims that are "just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through 'careful case management,'" citing that "common lament that the success of judicial supervision in checking discovery abuse has been on the modest side." *Twombly*, 550 U.S. at 559. The need to avoid burdensome discovery is especially important in the context of election-law litigation where the other branches of government face disruption

if the case moves forward. The Ninth Circuit has acknowledged this principle, noting that "state and local officials undoubtedly share an interest in minimizing the 'distraction' of 'divert[ing] their time, energy, and attention from their legislative tasks to defend the litigation.'" *Lee v. City of Los Angeles*, 908 F.3d 1175, 1187 (9th Cir. 2018); *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 n.18 (1977) (noting that "judicial inquiries into legislative or executive motivation represent a substantial intrusion into the workings of other branches of government").

For example, the Supreme Court has indicated that a legislators should be forced to testify only in extraordinary circumstances, *Arlington Heights*, 429 U.S. at 268, and "the claim of an unworthy purpose does not destroy [legislative] privilege," *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951). The Ninth Circuit has recognized the importance of legislative immunity and that it is not overcome merely by alleging discriminatory intent. *Lee*, 908 F.3d at 1187-88; *see also Arlington Heights*, 429 U.S. at 268 (indicating testimony from legislators "frequently will be barred by privilege").[3] But that has not stopped plaintiffs from seeking legislator depositions to try and discern allegedly hidden discriminatory motives, leading to additional efforts to quash those subpoenas and discovery requests. *See, e.g.*, *League of Women Voters of Fla., Inc. v. Lee*, No. 4:21-CV-186-MW/MAF, 2021 WL 5283949, at *5 (N.D. Fla. Nov. 4, 2021). It is, therefore, important for courts to weed out meritless claims early in the litigation to ensure that States are not subjected to unnecessary discovery requests that impact the functioning of their governments.

---

[3] Other courts have not always given legislative privilege its due. *See, e.g.*, *Veasey v. Abbott*, 830 F.3d 216, 288 (5th Cir. 2016) (Jones, J., concurring in part and dissenting in part) (noting that, in Texas's voter-identification litigation, "the plaintiffs took weeks of seven-hour-long depositions from over two dozen witnesses, including: eleven legislators and members of their staff and over a dozen individuals from state agencies such as the Department of Public Safety, the Office of the Secretary of State, the Office of the Attorney General, and the Department of State Health Services").

**B.** Recent and pending election-law litigation demonstrates that discovery can create significant burdens on the State and its taxpayers.

**Texas:** As indicated above, Texas's voter-identification litigation involved numerous depositions of state legislators and agency officials. *Veasey*, 830 F.3d at 288 (Jones, J., concurring in part and dissenting in part). It also included "twenty-nine depositions of legislators, their staff, and state agency officials that were taken in . . . preclearance litigation," including sixteen depositions of legislators. *Id.* at 288. And yet, no smoking gun was found. *Id.*

Texas is also currently facing numerous lawsuits (from private parties and the United States) about the changes to election law made by the 2021 Legislature. Order, *La Union del Pueblo Entero v. Abbott*, No. 5:21-CV-0844-XR (W.D. Tex. Sept. 30, 2021) (consolidating five lawsuits challenging Texas election law). In that consolidated case, the plaintiffs have identified 260 witnesses in their initial disclosures and have proposed 35 depositions per side. Joint Fed. R. Civ. P. 26 Report at 13-14, *La Union del Pueblo Entero*, No. 5:21-CV-0844-XR (W.D. Tex. Nov. 11, 2021). They also intend to seek discovery on the broad topic of "the history of race discrimination in Texas and its impact on elections and voting rights." *Id.* at 12. Joining that litigation, the United States has demanded access to Texas's Election Administration database, driver license and personal identification card database, and election identification certificate database, which contain the personal information of millions of Texans. Joint Fed. R. Civ. P. 26 Report Between the U.S. and Defs. at 4, *La Union del Pueblo Entero*, No. 5:21-CV-0844-XR (W.D. Tex. Nov. 15, 2021). Thus, Texas faces the prospect of upwards of 70 depositions while having to turn over massive databases to the federal government full of private information of its citizens.

**Florida:** In election-law litigation in Florida, the plaintiffs identified over 100 potential witnesses, including numerous state legislators. Plfs. Rule 26(a)(1) Initial Discl., at 3-45, *Fla. State Conf. of Branches & Youth Units of the NAACP v. Lee*, No. 4:21-cv-00187-MW-MAF (N.D. Fla. July 26, 2021). And as noted above, Florida has had to move

to quash the subpoenas of numerous legislators and their staff. *League of Women Voters of Fla.*, 2021 WL 5283949, at *5.

**Arizona:** The district court in the *Brnovich* case heard the testimony of seven expert witnesses, thirty-three lay witnesses, and an additional eleven witnesses by deposition in a ten-day bench trial. *Democratic Nat'l Comm. v. Reagan*, 329 F. Supp. 3d 824, 833-38 (D. Ariz. 2018). And none of that was enough to prove that the ballot-collection law was enacted with a racial purpose. *Brnovich*, 141 S. Ct. at 2348-50.

And in this case, as indicated by the Rule 26(f) joint report, plaintiffs intend to seek discovery of, among other things, "Arizona's history of discrimination, the ongoing effects of that history, and the linkage between that history and its ongoing effects and the disparate burdens imposed by" the challenged laws. Rule 26(f) Joint Case Mgmt. Rep. at 8. Such a broad and wide-ranging scope of potential discovery, when plaintiffs have sought to make relevant high school graduation rates, home ownership, health status, and prison population (Compl. ¶¶ 112-20), should not be permitted on the basis of such flimsy allegations.

## III. Plaintiffs Have Not Plausibly Alleged Purposeful Race Discrimination.

As the Supreme Court has noted, "Arizona law generally makes it very easy to vote." *Brnovich*, 141 S. Ct. at 2330; *see also Ariz. Democratic Party*, 18 F.4th at 1196 (holding that the Signature Requirement is not an undue burden on voting). Yet plaintiffs in this case contend the minimal regulations adopted in the Signature Requirement and EVL Periodic Voting Requirement are purposeful race discrimination. Compl. ¶¶ 136-45; Intervenor Compl. ¶¶ 132-41. But the facts they allege, even if true, fall far short of establishing such a serious claim.

To be plausible and survive a 12(b)(6) motion, a complaint must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks omitted). Plaintiffs' allegations here stop short of that line, as the facts pleaded in their complaints

establish nothing more than the "sheer possibility that [Arizona] has acted unlawfully," which is insufficient to survive Rule 12(b)(6). *Id.*

**History:** Plaintiffs (but not intervenors) include allegations regarding historical discrimination in voting in Arizona, but their examples are decades old—some more than a century ago. Compl. ¶¶ 100-111 (discussing alleged discrimination in 1909, 1928, 1964, and 1970, with a vague comment about the 1980s and 1990s).[4] But as the Supreme Court held in *Shelby County v. Holder*, it would be "irrational" to base a law on "40-year-old data, when today's statistics tell an entirely different story." 570 U.S. 529, 556 (2013). It would be similarly irrational to hold the Arizona Legislature liable today for actions taken decades ago, some well before any legislator was even born. *See id.* at 542 (noting that Arizona had no successful section 2 suits reported in a recent twenty-four-year period), "The [Fifteenth] Amendment is not designed to punish for the past; its purpose is to ensure a better future." *Id.* at 553.

Regardless, "[t]he allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination." *Abbott*, 138 S. Ct. at 2324. As the Supreme Court has explained, "[p]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Id.* (citing *Mobile*, 446 U.S. at 74 (plurality opinion)). The "ultimate question remains whether a discriminatory intent has been proved in a given case." *Id.* at 2324-25. Thus, while a history of discrimination is one factor a court may look to in determining whether current discrimination exists, *Arlington Heights*, 429 U.S. at 267, it is not determinative, does not overcome the presumption of legislative good faith, and has not been sufficiently pleaded here.

---

[4] Plaintiffs also refer to recent long lines to vote in a handful of counties and several errors in information given out by a county. Compl. ¶¶ 109-11. But those (1) are not attributable to the Arizona Legislature, and (2) do not demonstrate that anyone, much less the Legislature, had an invidious racial purpose.

**Disparate results:** Plaintiffs provide very little in the way of demonstrating that the challenged laws will have a disparate impact on minorities. They do not allege that minorities are uniquely likely to fail to sign the affidavit accompanying their ballots. Instead, plaintiffs cobble together allegations that the mail is slow in some communities, minorities might have difficulty traveling to an election office to provide a signature, and some might have language barriers. Compl. ¶¶ 91-93. Their allegations regarding the EVL Periodic Voting Requirement fare no better. The percentages by race of those who would no longer automatically receive mail-in ballots match the population in general. *Compare* Compl. ¶ 50 (general population is 30.7% Latino and 6.2% black) *with* ¶ 77 (population impacted by law is 33% Latino and 5% black). Thus, plaintiffs make similar allegations about lack of mail service, difficulty in traveling, and language barriers. Compl. ¶¶ 79-83. But that string of inferences is not enough to make a discriminatory purpose plausible, as opposed to merely possible.

As described above, *supra* p.5, even if there were allegations of a more significant impact on minorities, that would not demonstrate an invidious purpose on the part of the Arizona Legislature. *Feeney*, 442 U.S. at 279. The Supreme Court has noted that "differences in employment, wealth, and education may make it virtually impossible for a State to devise rules that do not have some disparate impact." *Brnovich*, 141 S. Ct. at 2343. It is an unreasonable stretch to conclude that the Arizona Legislature purposefully discriminated on the basis of race when it is unclear that the challenged laws will even have any impact on the ability of minorities to vote. Plaintiffs' allegations would not establish a results claim under section 2—they certainly cannot make a purpose claim plausible.

**Legislator statement:** Finally, plaintiffs cite a statement from a single state representative as support for their claim that a majority of Arizona legislators acted with racial intent. But that statement, which refers to the "quality of votes," Compl. ¶ 67, is not

an obvious reference to race, much less proof that the Arizona Legislature was motivated by race.[5]

Even so, the idea that the lone statement of a legislator could be sufficient to prove that a legislative body acted with racial intent was rejected by the Supreme Court in *Brnovich*. There, the Ninth Circuit had ruled that the actions of two individuals—a state senator and a county party chair—who allegedly acted with racial motives could be attributed to the rest of the legislature under a "cat's paw" theory. *Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989, 1040-41 (9th Cir. 2020) (en banc). Reversing the Ninth Circuit's judgment, the Supreme Court held that the cat's paw theory has no application to legislative bodies. *Brnovich*, 141 S. Ct. at 2350. Legislators are not agents of a bill's sponsor or supporters, but instead exercise independent judgment to represent their constituents. *Id.* Suggesting otherwise, the Court said, was "insulting." *Id.*

The same holds here. Plaintiffs have access to all public statements of legislators, and this lone statement was the best they could find. But a single vague statement cannot open the door to discovery of whether the Arizona Legislature was motivated by race.

* * *

In sum, nothing in plaintiffs' complaints makes it plausible that the Arizona Legislature had an invidious discriminatory purpose when it enacted race-neutral laws regarding mail-in voting—laws that still leave Arizona at the forefront in ease of voting by mail. Plaintiffs' attempts to piece together a discriminatory purpose through decades old history, little-to-no disparate impact, and a single vague statement by a legislator should be rejected, and the presumption that the Arizona Legislature acted in good faith remains intact. The Court should grant the motion to dismiss.

---

[5] The intervenors' complaint adds nothing to this argument, as the only additional statement identified was one condemning those who suggested that members of the Arizona Legislature had racial motives. Intervenors' Compl. ¶ 114.

## CONCLUSION

For the foregoing reasons, the Court should grant the Arizona Attorney General's motion to dismiss the complaints.

Date: January 25, 2022

Additional counsel:

STEVE MARSHALL
Attorney General of Alabama

TREG R. TAYLOR
Attorney General of Alaska

LESLIE RUTLEDGE
Attorney General of Arkansas

LAWRENCE G. WASDEN
Attorney General of Idaho

THEODORE E. ROKITA
Attorney General of Indiana

DANIEL CAMERON
Attorney General of Kentucky

JEFF LANDRY
Attorney General of Louisiana

LYNN FITCH
Attorney General of Mississippi

ERIC SCHMITT
Attorney General of Missouri

AUSTIN KNUDSEN
Attorney General of Montana

JOHN O'CONNOR
Attorney General of Oklahoma

ALAN WILSON
Attorney General of South Carolina

SEAN D. REYES
Attorney General of Utah

KEN PAXTON
Attorney General

BRENT WEBSTER
First Assistant Attorney General

/s/ Judd E. Stone II
JUDD E. STONE II (Tex. Bar # 24076720)
Solicitor General
*(Admitted pro hac vice)*

BETH KLUSMANN
Assistant Solicitor General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Judd.Stone@oag.texas.gov

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on January 25, 2022, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for Filing, which will send notice of such filing to all registered CM/ECF users.

/s/ Judd E. Stone II
JUDD E. STONE II
*Counsel for Amici Curiae*