**MARK BRNOVICH**
**ATTORNEY GENERAL**
Joseph A. Kanefield (No. 15838)
*Chief Deputy & Chief of Staff*
Brunn ("Beau") W. Roysden III (No. 28698)
*Division Chief*
Drew C. Ensign (No. 25463)
*Deputy Solicitor General*
Robert J. Makar (No. 33579)
*Assistant Attorney General*
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-5200
Drew.Ensign@azag.gov

*Attorneys for Mark Brnovich,*
*Arizona Attorney General*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Mi Familia Vota, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>Katie Hobbs, et al.,<br><br>Defendants. | Case No: 2:21-cv-01423-DWL<br><br>**ATTORNEY GENERAL'S CONSOLIDATED REPLY TO RESPONSES IN SUPPORT OF HIS MOTION TO DISMISS AND RESPONSE TO UNITED STATES' STATEMENT OF INTEREST** |

# TABLE OF CONTENTS


**INTRODUCTION** ..... 1

**ARGUMENT** ..... 3

I. Plaintiffs' Opposition Mischaracterizes The Motion-To-Dismiss Standard 3

A. Plaintiffs' Burden In Pleading Is Governed By Their Ultimate Burden Of Proof And Is Not Some Independently Watered Down Standard ..... 3

B. The Facial/As-Applied Distinction Applies At The MTD Phase ..... 6

II. Plaintiffs Lack Standing To Assert Their Intentional Discrimination Challenge To SB 1003 And Any As-Applied Challenges ..... 7

A. Plaintiffs' Intentional Discrimination SB 1003 Claim Is Not Redressable ..... 7

1. Pre-Existing, Unchallenged Laws Preclude Post-Election Curing Of Non-Signatures ..... 7

2. Plaintiffs' Arguments Rely On Egregious Misrepresentations ..... 8

3. This Court Lacks Jurisdiction To Create New Legislation ..... 9

B. Plaintiffs Lack Standing To Assert Any As-Applied Claims ..... 10

III. Plaintiffs' *Anderson-Burdick* Challenge To SB 1003 Fails ..... 10

A. The Burden Is Minimal At Most, Both Under *Hobbs I & II* and on a Clean Precedential Slate ..... 11

IV. Plaintiffs' *Anderson-Burdick* Challenge To SB 1485 Fails ..... 17

A. The Burden Imposed By The Periodic Voting Requirement Is Minimal ..... 17

V. Plaintiffs' Intentional Discrimination Claims Fail ..... 24

A. Most of Plaintiffs' Key Allegations Are Conclusory ..... 24

B. Plaintiffs' Nonconclusory Allegations Fail To Plausibly Allege Intentional Discrimination ..... 25

1. Disparate Impacts ........ 26
2. Legislative Statements ........ 27
3. Departures From Practice ........ 28
4. History ........ 28
C. Plaintiffs Have Not Pled Sufficient Facts to Overcome the Presumption of Good Faith Or The More Likely Explanations For The Challenged Provisions ........ 29
D. The State Does Not Oppose Leave To Amend ........ 29
VI. Democratic Intervenors' Independent Arguments Are Irrelevant ........ 29
VII. The United States' Arguments Lack Merit ........ 30
**CONCLUSION** ........ 32

## TABLE OF AUTHORITIES

**CASES**

*Abbott v. Perez*,
138 S. Ct. 2305 (2018)........................................4, 5, 32

*Allen v. Wright*,
468 U.S. 737 (1984)........................................10

*ACLU v. Holder*,
673 F.3d 245 (4th Cir. 2011)........................................7

*Arizona Democratic Party v. Hobbs ("Hobbs I")*,
976 F.3d 1081 (9th Cir. 2020)........................................11

*Arizona Democratic Party v. Hobbs ("Hobbs II")*,
18 F.4th 1179 (9th Cir. 2021)........................................2, 3, 8, 9, 11, 12, 13, 15, 20, 21

*Arizona Green Party v. Reagan*,
838 F.3d 983 (9th Cir. 2016)........................................20

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)........................................1, 3, 4, 5, 6, 22, 24, 25, 26, 27, 32

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................1, 25

*Brnovich v. DNC*,
141 S. Ct. 2321 (2021)........................................1, 5, 14, 19, 26, 27, 28

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973)........................................7

*California v. DHS*,
476 F. Supp. 3d 994 (N.D. Cal. 2020)........................................27

*Cato v. United States*,
70 F.3d 1103 (9th Cir. 1995)........................................10

*Citizens United v. FEC*,
558 U.S. 310 (2010) ........ 7

*Common Cause/Ga. v. Billups*,
554 F.3d 1340 (11th Cir. 2009) ........ 23

*Crawford v. Marion County Election Bd.*,
553 U.S. 181 (2008) ........ 19

*Dutil v. Murphy*,
550 F.3d 154 (1st Cir. 2008) ........ 7

*Dudum v. Arntz*,
640 F.3d 1098 (9th Cir. 2011) ........ 14

*Edmonds v. Compagnie Generale Transatlantique*,
443 U.S. 256 (1979) ........ 31

*Enter. Leasing Co. v. ADOR*,
211 P.3d 1 (Ariz. Ct. App. 2008) ........ 8

*Frank v. Walker*,
768 F.3d 744 (7th Cir. 2014)

*Fusilier v. Landry*,
963 F.3d 447 (5th Cir. 2020) ........ 29

*Georgia Cemetery Ass'n, Inc. v. Cox*,
353 F.3d 1319 (11th Cir. 2003) ........ 7

*Greater Birmingham Ministries v. Merrill*,
284 F. Supp. 3d 1253 (N.D. Ala 2018) ........ 32

*Greater Birmingham Ministries v. Sec'y of State for State of Ala.*,
992 F.3d 1299 (11th Cir. 2021) ........ 28

*Hotel & Motel Ass'n of Oakland v. Oakland*,
344 F.3d 959 (9th Cir. 2003) ........ 7

*Husted v. A. Philip Randolph Institute*,
138 S. Ct. 1833 ........................................ 22
*J & J Sports Prods., Inc. v. Martinez*,
No. 11-00676, 2011 WL 4375019 (E.D. Cal. Sept. 19, 2011) ........................................ 7
*James Madison Ltd. by Hecht v. Ludwig*,
82 F.3d 1085 (D.C. Cir. 1996) ........................................ 7
*La Clinica De La Raza v. Trump,*
477 F. Supp. 3d 951 (N.D. Cal. 2020) ........................................ 27
*Lazy Y Ranch Ltd. v. Behrens*,
546 F.3d 580 (9th Cir. 2008) ........................................ 21
*Lee v. Va. State Bd. of Elections*,
843 F.3d 592 (4th Cir. 2016) ........................................ 32
*Lemons v. Bradbury*,
538 F.3d 1098 (9th Cir. 2008) ........................................ 11, 21
*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........................................ 10
*Mays v. LaRose*,
951 F.3d 775 (6th Cir. 2020) ........................................ 19, 23
*Mecinas v. Hobbs*,
468 F. Supp. 3d 1186 (D. Ariz. 2020) ........................................ 15
*Mi Familia Vota v. Hobbs*,
977 F.3d 948 (9th Cir. 2020) ........................................ 14
*Miller v. Johnson*,
515 U.S. 900 (1995) ........................................ 4, 29
*Morrison v. Peterson*,
809 F.3d 1059 (9th Cir. 2015) ........................................ 6

*N.C. State Conference of the NAACP v. McCrory*,
831 F.3d 204 (4th Cir. 2016) .......... 32
*Nichols v. Harris*,
17 F. Supp. 3d 989 (C.D. Cal. 2014) .......... 7
*Ophca LLC v. City of Berkeley*,
No. 16-3046, 2016 WL 6679560 (N.D. Cal. Nov. 14, 2016) .......... 7
*Prete v. Bradbury*,
438 F.3d 949 (9th Cir. 2006) .......... 2, 14
*Purcell v. Gonzalez*,
549 U.S. 1 (2006) .......... 22
*Regents of the Univ. of California v. DHS*,
140 S. Ct. 1891 (2020) .......... 3, 25, 26, 27, 28
*Regents of the Univ. of California v. DHS*,
908 F.3d 476 (9th Cir. 2018) .......... 25
*Rent Stabilization Ass'n of City of New York v. Dinkins*,
5 F.3d 591 (2d Cir. 1993) .......... 7
*Rosenblatt v. City of Santa Monica*,
940 F.3d 439, 442 (9th Cir. 2019) .......... 7
*Saldana v. Occidental Petroleum Corp.*,
774 F.3d 544 (9th Cir. 2014) .......... 21
*Short v. Brown*,
893 F.3d 671 (9th Cir. 2018) .......... 2, 15, 18, 20
*Timmons v. Twin Cities Area New Party*,
520 U.S. 351 (1997) .......... 14, 22
*United States v. Salerno*,
481 U.S. 739 (1987) .......... 6, 17, 24

*Village. Of Arlington Heights v. Metro. Hous. Dev. Co.*,
429 U.S. 252 (1977) ........ 26, 28, 31
*Wasco Prod., Inc. v. Southwall Techs, Inc.*,
435 F.3d 989 (9th Cir. 2006) ........ 18
*Washington State Grange v. Washington State Republican Party*,
552 U.S. 442 (2008) ........ 23
*Winter v. NRDC*,
555 U.S. 7 (2008) ........ 19

**STATUTES**

A.R.S. §16-550 ........ 8
A.R.S. §16-552 ........ 8
A.R.S. §16-548 ........ 8

## INTRODUCTION

Plaintiffs' suit is fundamentally miscast. It is overwhelmingly fixated on disparate *impacts*. But Plaintiffs have no apparent interest in asserting the *one* type of claim that is *specifically* designed to address disparate impacts: *i.e.*, a results-test claim under Section 2 of the Voting Rights Act. Apparently still smarting from their resounding defeat in *Brnovich v. DNC*, 141 S. Ct. 2321 (2021)—and overlooking that *Brnovich* also involved an entirely independent intentional-discrimination holding, *id.* at 2348-50—Plaintiffs have refused to assert the sole type of claim to which disparate impacts are specifically directed.

Instead, Plaintiffs assert only *Anderson-Burdick* and intentional-discrimination claims for which disparate impacts are *at most* indirectly relevant. The former focus on the magnitude of the burdens and the governmental interests while the latter are premised on *intent* to discriminate, not disparate impacts. That is unlike a results-test §2 claim, which expressly mandates consideration of the "size of any disparities in a rule's impact on members of different racial or ethnic groups[.]" *Id.* at 2339.

In essence, Plaintiffs' Complaint is little more than a hammer, and Plaintiffs spend 23 pages pounding away at everything *except nails.* That accomplishes little despite the sheer amount of blunt force that Plaintiffs apply.

In addition to being aimed at the wrong sorts of claims, Plaintiffs' arguments are trained at the wrong era of jurisprudence. Plaintiffs' repeated pleas (at 12, 14, 15, 16) that they must be given an opportunity to present evidence before dismissal echo the "prove no set of facts" standard of *Conley v. Gibson*, 355 U.S. 41, 45-47 (1957). That has not been good law for more than decade since *Twombly* and *Iqbal* were decided. It is now well-established that the Federal Rules "do[] not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). And here Plaintiffs offer little more than that—and often less: many of Plaintiffs conclusory allegations also contradict controlling precedent and come nowhere near crossing "'the line from conceivable to plausible.'" *Id.* at 683 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). And while Plaintiffs suggest *Twombly*'s and *Iqbal*'s

application of substantive presumptions at the pleading phase does not apply here, Plaintiffs forget that *Iqbal* itself was (as here) a case involving claims of "purposeful discrimination." *Id.*

As to the applicable burdens, Plaintiffs conflate the magnitude of their antipathy for the requirements at issue with the actual burden of complying with them. Here those burdens are *trivial* at most. As to the lack of post-election curing of non-signatures, the Ninth Circuit has held outright it is only a "*minimal burden* on the voter[s for them] to sign the affidavit or to correct a missing signature by election day." *Arizona Democratic Party v. Hobbs ("Hobbs II")*, 18 F.4th 1179, 1181 (9th Cir. 2021) (emphasis added). Plaintiffs' claim here involves a burden that is not merely similar, but in fact *literally identical*. *Hobbs II's* holding is thus binding here, and Plaintiffs provide no valid basis for distinguishing it.

As to the Periodic Voting Requirement, it can be satisfied/avoided by (1) voting once every four years, (2) responding to a notice, or (3) filling out a EVL request form every four years. The Ninth Circuit has already resolved that the magnitude of the burden of filling out a request form for a mail-in ballot for a *single* election (*i.e.*, not one form for *four entire years* of elections): "To the extent that having to register to receive a mailed ballot could be viewed as a burden, *it is an extremely small one*, and certainly not one that demands serious constitutional scrutiny." *Short v. Brown*, 893 F.3d 671, 677 (9th Cir. 2018) (emphasis added). And while Plaintiffs protest (at 15) that they must be given "an opportunity to put on evidence," they fail to state what they could put into evidence which would change this picture. Indeed, it is their failure to *allege* plausibly anything more than a minimal burden is thus fatal under Rule 12(b)(6). Moreover, Plaintiffs' conclusory insistence that trivial burdens are in fact "severe" underscores both (1) how completely they infantilize their own voters and (2) their brazen willingness to make arguments that patently contravene controlling precedent.

Because the burden for both Poll-Close Deadline and Periodic Voting Requirement are both minimal, this Court's inquiry "is limited to whether the chosen method is reasonably related to [an] important regulatory interest." *Prete v. Bradbury*, 438 F.3d 949,

971 (9th Cir. 2006). The Ninth Circuit has already performed that analysis as to the Poll-Close Deadline and held it was constitutional. *Hobbs II*, 18 F.4th at 1190-94. Moreover, Plaintiffs neither appear to challenge that SB 1003 is constitutional if it imposes only a minimal burden, nor do they address two of State's supporting interests *at all*. As to the Periodic Voting Requirement, Plaintiffs do not meaningfully address the State's interest in avoiding the *uncontested* costs of printing and mailing ballots, which easily suffices.

Nor have Plaintiffs adequately alleged intentional discrimination claims here. Most of Plaintiffs' allegations are conclusory statements bereft of specifics, which thus must be discounted under *Iqbal*. What little is left consists of largely disparate impact allegations, a single unrelated statement from a legislator, and the generic reference to Arizona history. That does not suffice under *Iqbal* and *DHS v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891 (2020). Moreover, Plaintiffs necessarily rely on "cat's paw" theory and have not explained how their allegations are more substantial than the Le Faro video evidence in *Brnovich*—which did not suffice. Nor have Plaintiffs provided sufficient allegations to overcome the presumption of good faith here.[1]

## ARGUMENT

### I. Plaintiffs' Opposition Mischaracterizes The Motion-To-Dismiss Standard

Plaintiffs' opposition relies heavily on their contention that the claims at issue here are essentially impossible to resolve on a motion to dismiss, and further that the substantive burdens that Plaintiffs must satisfy with evidence (*e.g.*, overcoming presumption of good faith) are irrelevant at the pleading stage. Plaintiffs are wrong.

#### A. Plaintiffs' Burden In Pleading Is Governed By Their Ultimate Burden Of Proof And Is Not Some Independently Watered Down Standard

Plaintiffs' arguments all assume that this Court must apply a watered-down pleading standard to their claims. But the Federal Rules are applied equally "'in all civil actions,'" no matter the claim alleged or the plaintiff alleging it. *Iqbal*, 556 U.S. at 684. In all cases, whether a plaintiff's "'well-pleaded factual allegations' ... 'plausibly suggest an

[1] Defendants have conferred with Defendant-Intervenors. They "join this brief in full, except they take no position on whether Plaintiffs and Plaintiff-Intervenors have Article III standing to raise facial challenges."

entitlement to a relief' ... necessarily turns on the substantive standard that applies to the plaintiffs' claims." *Int'l Refugee Assistance Proj. v. Trump*, 961 F.3d 635, 648 (4th Cir. 2020). Plaintiffs' allegations thus are not subject to a relaxed pleading standard; their *pleading* burdens is governed by their ultimate burden of *proof*. *Id.* at 685 (declining "invitation to relax the pleading requirements"). Accordingly, they bear the burden of pleading specific facts that both "overcom[e] the presumption of good faith" and "proving discriminatory intent." *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018).

Contrary to Plaintiffs' repeated contentions, courts routinely dismiss both *Anderson-Burdick* and intentional discrimination cases at the pleading stage. For example, in *Rubin v. City of Santa Monica*, the Ninth Circuit affirmed the dismissal of an *Anderson-Burdick* challenge to a ballot regulation. 308 F.3d 1008 (9th Cir. 2002). And courts routinely dismiss intentional discrimination claims too, such as in *Regents*. Indeed, *Iqbal* itself was a complaint against the Government that failed to plausibly allege discriminatory intent. *Iqbal*, 556 U.S. at 680-87. Plaintiffs simply cannot "insulate their claims from dismissal by contending that [courts] should not determine the 'sensitive inquiry' into racial animus at the motion to dismiss stage." *Robinson v. Md. Dep't of the Env't*, 2014 WL 2038022, at *11 (D. Md. May 16, 2014). In sum, "there is nothing remarkable about granting a motion to dismiss in an election-law case if careful consideration of the complaint shows that the plaintiff has not stated a claim." *Stone v. Bd. of Election Comm'rs*, 750 F.3d 678, 686 (7th Cir. 2014) (collecting cases). That is just so here.

Plaintiffs (at 10-11) and the Government (at 14-15) insist that the presumption of good faith does not apply at the pleading stage. But as the Court explained in *Miller v. Johnson*, the legal "principles" governing intentional discrimination claims—including "the presumption of good faith that must be accorded legislative enactments"—affect more than "the plaintiff's burden of proof at trial." 515 U.S. 900, 916 (1995). That presumption *also applies* "when assessing … the adequacy of a plaintiff's showing at the various stages of litigation," including when "determining whether to permit discovery" under Rule 12(b). *Id.* at 916-17. In fact, *Iqbal* itself applied an analogous presumption at the pleading

stage. 556 U.S. at 685-86. The presumption is necessary, because the pleading rules do not allow plaintiffs alleging "discriminatory intent on the part of [a] legislature" to conduct "a fishing expedition for unspecified evidence." *Wesley v. Collins*, 791 F.2d 1255, 1262-63 (6th Cir. 1986).

Several of the negative inferences that Plaintiffs try to draw are impermissible in light of the presumption of good faith. For example, Plaintiffs assert (at 7-8) that statements that having nothing to do with race were evidence of a discriminatory purpose, that (at 8-9) "the timing of the legislature's new-found concern for limiting early voting points to an invidious purpose," and that (at 9) past discrimination demonstrates present animus. But the Court has been clear that the presumption of good faith is not displaced by precisely these types of allegations of "past discrimination" or insinuations about "the brevity of the legislative process." *Abbott*, 138 S. Ct. at 2324-25, 2328-29.

Like the presumption of good faith, this Court also must consider the Supreme Court's rejection of the "cat's paw" theory at this stage. *Brnovich* could not be clearer that "[t]he 'cat's paw' theory has *no application* to legislative bodies." 141 S. Ct. at 2350 (emphasis added). As a matter of law, then, one statement by one legislator cannot be used to impute discriminatory purpose to the entire legislature. Contrary to Plaintiffs' contention (at 11), Defendants do not argue that courts "should disregard the allegations of contemporaneous statements by legislators regarding the laws." Defendants argue that *Plaintiffs'* allegations—which impute animus from *one* statement from *one* Representative to the *entire* Arizona legislature—are impermissible and implausible under *Brnovich*. The "legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents." *Id*. It is "insulting," inaccurate, and impermissible to argue otherwise. *Id.* Moreover, Plaintiffs' sly use of the plural "statements" where their Complaint has only *one such statement* quoted (at ¶67) underscores the gulf between how Plaintiffs' brief portrays their Complaint and the reality of what is alleged.

Assessed under the appropriate standard, little is left of Plaintiffs' complaint except "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678; *see*

MTD at 11-15. Plaintiffs' only response is a bare recitation of the *Arlington Heights* factors. For example, they flatly declare (at 7 (quoting Compl. ¶67)) that SB 1485 and SB 1003 were enacted for "the purpose of disproportionately impacting voters of color and suppressing voter turnout." Yet this allegation is merely a "formulaic recitation of the elements" of their cause of action. *Iqbal*, 556 U.S. at 678. And Plaintiffs present no plausible factual support for such "labels and conclusions," *id.*, beyond a legislative statement that has nothing to do with racial discrimination. Indeed, as Defendants explained (at 14), these statements have an "obvious alternative explanation"—discussing the lack of informed voters. *Id.* at 682; *see also id.* ("[T]he purposeful, invidious discrimination respondent asks us to infer, discrimination is not a plausible conclusion."). Plaintiffs admit (at 6) that their allegations merely "touch on each of the *Arlington Heights* factors." The problem for Plaintiffs is that the Federal Rules require more.

**B. The Facial/As-Applied Distinction Applies At The MTD Phase**

Plaintiffs appear to contend (at 20 n.12) that federal courts may not consider whether plaintiffs have satisfied *Salerno* at the pleading stage. The Ninth Circuit has directly held otherwise in binding precedents.

The Ninth Circuit's decision in *Morrison v. Peterson*, 809 F.3d 1059 (9th Cir. 2015) is instructive—and ultimately controlling—here. As to Morrison's facial claims the Ninth Circuit explained that "Because Morrison raises a facial challenge … he must 'establish that no set of circumstances exists under which the Act would be valid.'" *Id.* at 1068 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). It then determined that Morrison had failed to satisfy the governing requirements and therefore affirmed dismissal of his facial claims *on the pleadings*. *Id.* at 1068-70.

Similarly, in *Rosenblatt v. City of Santa Monica*, the Ninth Circuit similarly upheld dismissal of a facial claim on the pleadings based on the *Salerno* standard. 940 F.3d 439, 442 (9th Cir. 2019). In *Rosenblatt* further made clear that *Salerno* applies and has effect even at the pleading stage. *Id.* at 444. *See also Young v. Hawaii*, 992 F.3d 765, 779 (9th Cir. 2021) (en banc) (affirming dismissal of an as-applied challenge on pleadings).

Moreover, numerous other circuit courts and district courts within the Ninth Circuit have similarly applied *Salerno* at the pleading stage to dismiss facial claims/affirms dismissals of facial claims.[2]

Plaintiffs have pointed (at 20 n.12) to *Citizens United v. FEC*, 558 U.S. 310 (2010) to argue that the facial/as-applied distinction is irrelevant at the pleading stage. But *Citizens United* is inapposite. That case involved a First Amendment claim. *Id.* at 340-41. In that context—unlike the constitutional/statutory claims here—a facial claim can be based on overbreadth. *Hotel & Motel Ass'n of Oakland v. Oakland*, 344 F.3d 959, 971-72 (9th Cir. 2003). For a facial overbreadth challenge, a plaintiff can prevail on a facial claim by proving "overbreadth … *judged in relation to the statute's plainly legitimate sweep*." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973) (emphasis added).

An overbreadth claim is thus far less susceptible to dismissal on the pleadings because subsequent factual development may make or break it. But where *Salerno* governs, the existence of even *one* constitutional application of a statute fatally finishes a facial challenge. That is just so here.

## II. Plaintiffs Lack Standing To Assert Their Intentional Discrimination Challenge To SB 1003 And Any As-Applied Challenges

### A. Plaintiffs' Intentional Discrimination SB 1003 Claim Is Not Redressable

#### 1. Pre-Existing, Unchallenged Laws Preclude Post-Election Curing Of Non-Signatures

Signatures on early ballot affidavits have been required since 1918, and until very recently, without challenge. *See* 1918 Ariz. Session Laws Ch. 11 §7 (H.B. 3) ("[i]f the voter has signed the affidavit… the Board shall deposit [it] in a suitable sealed ballot

---

[2] *Rent Stabilization Ass'n v. Dinkins*, 5 F.3d 591, 594-95 (2d Cir. 1993) (affirming *Salerno*-based dismissal on pleadings); *Georgia Cemetery Ass'n, Inc. v. Cox*, 353 F.3d 1319, 1322-23 (11th Cir. 2003) (same); *Dutil v. Murphy*, 550 F.3d 154, 162 (1st Cir. 2008) (same); *ACLU v. Holder*, 673 F.3d 245, 254 (4th Cir. 2011) (same); *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1101 (D.C. Cir. 1996) (leave to add facial claim was futile); *J & J Sports Prods., Inc. v. Martinez*, No. 11-00676, 2011 WL 4375019, at *3 (E.D. Cal. Sept. 19, 2011) (dismissing facial claim on the pleadings under *Salerno*); *Ophca LLC v. City of Berkeley*, No. 16-3046, 2016 WL 6679560, at *45 (N.D. Cal. Nov. 14, 2016) (same); *Nichols v. Harris*, 17 F. Supp. 3d 989, 1009, 1011 (C.D. Cal. 2014) (same).

box."). In fact, the *Hobbs II* court recognized that "in the nearly century of early voting in Arizona, no county recorder ever has allowed a voter to correct a ballot with a missing signature after election day" and that "Arizona always has imposed the election-day deadline on voters to submit a signed ballot." 18 F.4th at 1183.

Plaintiffs' contrary contentions fail. In addition to A.R.S. §16-550 (requiring only "completed affidavit[s]" to be held unopened until delivered to the election board), A.R.S. §16-548(A) (requiring voters to "make and sign the affidavit" that "must be received… no later than 7:00pm on election day") and §16-552(B) (preventing early election boards from counting a ballot if the affidavit is insufficient) provide further evidence that pre-SB 1003 Arizona law was settled that ballots must be poll-close time to be counted.

Plaintiffs also argue (at 23) that SB 1003 shows that preexisting law did not preclude post-election curing under "basic rules of statutory construction," presumably meaning the canon of avoiding surplusage. But SB 1003 *expressly* stated that it was merely clarifying existing law. SB 1003 §3. The canon of avoiding surplusage thus yields to the Legislature's express statement that it did not intend to alter existing law, but rather merely clarify what it has always been. And contrary to Plaintiffs' contention (at 23 n.15), the Legislature *can* clarify what prior law has been retroactively. *Enter. Leasing Co. v. ADOR*, 211 P.3d 1, 4 ¶ 12 (Ariz. Ct. App. 2008). SB 1003 thus further supports Plaintiffs' redressability arguments.

**2. Plaintiffs' Arguments Rely On Egregious Misrepresentations**

To bolster their redressability arguments, Plaintiffs rely (at 23) on the purported "2021 Election Procedures Manual" that is a "legally binding document under Arizona law," and "effective Dec. 31, 2021." Each of these contentions is flatly false.

As Plaintiffs well know from both their statements in their Opposition (23 n.16) and Complaint (Compl. at 19 n.21), however, a draft Election Procedural Manual ("EPM") can only become effective if approved by the Attorney General and the Governor. *See* A.R.S. 16-452(B). As Democratic Intervenors accurately state in their Complaint (at ¶54), "the EPM requires the Attorney General's approval to go into effect." *Hobbs II* reiterates

this point. 18 F.4th at 1184 ("[B]oth the Governor and the Attorney General must approve it.").

But the putative EPM that Plaintiffs cite was a mere *draft* that the Attorney General refused to approve *precisely* because it misstated Arizona law.[3] It was thus not the 2021 EPM (which does not actually exist) and was neither a "legally binding … under Arizona law" nor "effective Dec. 31, 2021." Plaintiffs' representations to this Court are thus outrageously false.

Moreover, applying Plaintiffs' view that EPMs clarify statutory law, the 2019 EPM—the last version actually approved and still in effect—expressly disallowed post-election curing. Plaintiffs themselves note as much (at 23 n.15), though they blame that manual's explicit disallowance of post-election curing on "the Secretary acquiesc[ing] to the Attorney General's view to meet the statutory deadline to finalize the 2019 EPM."

**3. This Court Lacks Jurisdiction To Create New Legislation**

Plaintiffs do not deny that Arizona law has *never* permitted post-election curing of non-signatures and make no attempt to reconcile that fact with the Ninth Circuit's holding that the "absence of a law … has never been held to constitute a 'substantive result' subject to judicial review" since "structural constitutional limits prevent federal courts from ordering government officials to enact or implement a bill." *M.S. v. Brown*, 902 F.3d 1076, 1087 (9th Cir. 2018). Indeed, Plaintiffs do not address *M.S. at all*. Because this Court could strike down *every* Arizona statute ever enacted and no post-election cure period would ever be created, Plaintiffs have not established redressability.

Instead, Plaintiffs attempt to rescue redressability by recasting (at 21) their injury as "being subject to a racially discriminatory law *inherently*" injures them. But this is not the injury alleged in their Complaint, which focused their on purported need to "divert money, personnel, time and resources away." *See* Compl. at 17-20. Plaintiffs cannot not rely on *unalleged* stigmatic injury to survive a motion to dismiss.

[3] *See, e.g.*, https://www.azcentral.com/story/news/politics/arizona/2021/12/24/brnovich-hobbs-dispute-sidelines-new-elections-manual-arizona/9010881002/; https://www.thecentersquare.com/arizona/arizona-election-bible-stalls-as-ducey-refuses-to-sign-unfinished-work/article_5eced55c-6e3f-11ec-8731-efc705b9a540.html.

But even if they could, Courts have uniformly held that this kind of stigmatic injury only exists where a plaintiff is "personally subject to discriminatory treatment." *Allen v. Wright*, 468 U.S. 737, 757 n.22 (1984). *See also Cato v. United States*, 70 F.3d 1103, 1109–10 (9th Cir. 1995) (no standing "to litigate claims based on the stigmatizing injury to all African Americans caused by racial discrimination."). This is based on the fundamental Article III requirement that injuries be both concrete and particularized. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Here, Plaintiffs do not—and could not—allege that they personally are subject to discriminatory treatment *because of* SB 1003. Even if SB 1003 were enjoined, Plaintiffs still would not be able to cure non-signatures after when polls close (and thus would not obtain redress). Nor is the purported injury fairly traceable to SB 1003, since Arizona law sans SB 1003 still does not provide them the post-election cure opportunity they seek. And to the extent they rely on the alleged bare discriminatory intent alone, that is "abstract stigmatic injury" that is not cognizable. *Allen*, 468 U.S. at 755.

**B. Plaintiffs Lack Standing To Assert Any As-Applied Claims**

As the State explained previously (MTD at 10), Plaintiffs lack standing to assert as-applied challenges. Plaintiffs' only response (at 20 n.12) is to deny that the facial-vs-as-applied distinction applies at the pleading stage. It does. *Supra* Section I.B. Because Plaintiffs offer no allegations that could establish standing for as-applied challenges, and because "standing is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996), any as-applied challenges by Plaintiffs must be dismissed under Rule 12(b)(1).

**III. Plaintiffs' *Anderson-Burdick* Challenge To SB 1003 Fails**

The Ninth Circuit's decision in *Hobbs II* fully resolves Plaintiffs' *Anderson-Burdick* claim against the Poll-Close Deadline. That decision addressed an *identical burden*, held it was "at most, a minimal burden," and then held that the State's interest in reducing administrative burdens was sufficient to sustain it. Moreover, Plaintiffs simply ignore entirely the State's other justifications, which also require dismissal here.

### A. The Burden Is Minimal At Most, Both Under *Hobbs I & II* and on a Clean Precedential Slate

The Ninth Circuit's decision in *Hobbs II* controls the applicable burden question here. That decision considered an *identical burden*: *i.e.*, that imposed by the State's signature requirement combined curing opportunities limited by the Poll-Close Deadline. SB 1003 merely codifies that pre-existing practice.

The Ninth Circuit's description of the *Hobbs II* burden is equally applicable here: it was only a "minimal burden on the voter to sign the affidavit or to correct a missing signature by election day." *Hobbs II*, 18 F.4th at 1181. Indeed, *Hobbs II* viewed the burden as being *no more* than minimal, and perhaps less: "The election-day deadline for submitting a completed ballot imposes, *at most,* a minimal burden." *Id.* at 1887 (emphasis added). This tracks the Ninth Circuit's prior holding in *Hobbs I* that the Poll-Close Deadline "imposes, *at most, a 'minimal' burden*." *Arizona Democratic Party v. Hobbs ("Hobbs I")*, 976 F.3d 1081, 1085 (9th Cir. 2020) (emphasis added).

Even aside from *Hobbs I* and *II*, the burden is self-evidently minimal. Although Plaintiffs acknowledge that the State "incorporate[d] by reference [its] arguments from the then-pending appeal in *Hobbs [II]*," MTD Opp. at 19, Plaintiffs do not make *any* attempt to answer those incorporated arguments. Instead, Plaintiffs train their fire *exclusively* on the *Hobbs II* decision alone. *See* MTD Opp. at 19-20.

The State's incorporated opening brief offered *seven* distinct reasons why the applicable burden was minimal and cited two controlling precedents that supported that argument. *See* Opening Brief (Doc. 58-2) at 35-40 (citing *Rosario v. Rockefeller*, 410 U.S. 752 (1973) and *Lemons v. Bradbury*, 538 F.3d 1098 (9th Cir. 2008)). Plaintiffs completely ignore *Rosario*, and only note in a footnote (at 16 n.10) that *Lemons* was decided on summary judgment (without addressing its actual holdings). And they address only one of the *seven* reasons given by the State (*i.e.*, the facial neutrality in light of disparate impacts, MTD Opp. at 19—which fails for the reasons discussed next).

Tellingly missing from Plaintiffs' brief is any real engagement with these reasons

about the truly trivial burden here: *i.e.*, "a voter need only sign once, where prominently indicated, sometime within roughly a month." Doc. 58-2 at 37. And they may do so either the first time when returning their ballot, or subsequently by curing a non-signature as long as they do so by when polls close. Common sense is sufficient to evaluate that burden as minimal at most.

### B. Plaintiffs Have Provided No Valid Basis For Distinguishing *Hobbs II*

Plaintiffs offer a few scant bases for distinguishing *Hobbs II* (at 19-20): purported disparate impacts, cumulative burden, and evidence from the 2020 election. Those skeletal contentions fail for five reasons.

*First*, Plaintiffs lack standing to assert any as-applied challenges, as set forth above and previously. *Supra* 8; MTD at 10. Thus, while Plaintiffs may have standing to bring a facial challenge, they lack standing to contend that the Poll-Close Deadline is particularly burdensome as applied to particular groups where (1) they have not joined any such affected voters or (2) alleged any concrete examples of such purported deprivations that could support as-applied challenges. Similarly, Plaintiffs cannot rely on allegations/evidence from the 2020 elections where they do not allege any specific deprivations from that election or join any voters affected in that election cycle.

Plaintiffs' reliance on allegedly disproportionate impacts thus fails where they neither have standing to raise such as-applied contentions nor have alleged any such particularized deprivations. Moreover, Plaintiffs' pleading omissions highlight the implausibility here: if the Poll-Close Deadline truly does affect minority voters significantly and disproportionately, why haven't Plaintiffs joined or identified a single such voter?

*Second*, the allegations of Plaintiffs' Complaint are insufficient to distinguish *Hobbs II*. In particular, in *Hobbs II* "Plaintiffs have not alleged that the burden of signing [as opposed to curing] the affidavit falls disproportionately on a discrete [racial] group of voters." 18 F.4th at 1190. Similarly, in *Hobbs II* as here, "Plaintiffs do not argue that forgetfulness 'is a proxy for some other form of discrimination—that it is a racial or

political gerrymander disguised as a [neutral] distinction.'" *Id.* (citation omitted). And voters would only ever need a cure period—whether limited to pre-poll close or not—if they experience such "forgetfulness" that is not even *alleged* to be a racially disproportionate characteristic. To the contrary, "forgetfulness is an involuntary state that any voter might reasonably experience." *Id.* (cleaned up).

Thus, for the *vast* majority of voters—more than 99%, *id.* at 1190—signing their ballot is the beginning and *end* of the applicable burden, and that burden is not even *alleged* to be disparate between racial groups. Thus, to the extent that *any* burdens are unequal, those putative disparate impacts affect only the tiniest sliver of voters. And that is essentially all that Plaintiffs allege. *See* MTD Opp. at 19 (citing Compl. ¶¶90-94 as setting forth discriminatory impacts). Paragraphs 90-94 of the Complaint allege only disparate impacts as to the cure opportunities—not the signature requirement (which, if complied with, obviates any need to cure) except for two inapposite exceptions.[4] Compl. ¶¶90-94.

*Third*, even if there are racial disparities, the relevant burdens here are so low that they remain "minimal" even if doubled or tripled for particular individuals or groups. The need for any cure opportunity can be eliminated *entirely* simply by signing once where prominently indicated. As authentication methods go for mail-in ballots, it is doubtful that this burden can go any lower without being zero—or eliminating any pretense of authentication altogether. Plaintiffs certainly cite no State whose authentication requirement is less burdensome. The opportunity for curing (which many states completely deny their voters)—even if not as generous as Plaintiffs prefer—only serves to ameliorate

---

[4] Plaintiffs allege (at ¶93) that "[l]ack of language access substantially increases the likelihood that voters will miss the signature requirement." That contention fails because: (1) it is not redressable, as Plaintiffs do not challenge the languages that ballots are printed in and (2) Plaintiffs not do not challenge the signature requirement itself, which will continue to exist even if all relief that Plaintiffs seek is granted.

Plaintiffs similarly allege (at ¶94) that "Voters who are unable to provide a physical signature, or whose marks are not recognized as a signature, risk having their ballots discarded without sufficient time to cure their ballots." But Plaintiffs do not challenge the signature requirement itself, nor do they assert a claim under the Americans with Disabilities Act. Moreover, Plaintiffs ignore that Arizona law permits disabled voters to allow others to sign for them. *See Hobbs II*, 18 F.4th at 1182 (ballot affidavit); A.R.S. §16-547. Nor do Plaintiffs identify any inadequacies with this accommodation.

further what is already one of the smallest burdens that exists in voting.

Notably, "differences in employment, wealth, and education may make it virtually impossible for a State to devise rules that do not have some disparate impact." *Brnovich*, 141 S. Ct. at 2343. If Plaintiffs' bare allegations of disparate impacts here can serve to transform minimal burdens into severe ones, then *Anderson-Burdick* doctrine will be upended. After all, "'States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder.'" *Prete*, 438 F.3d at 961 (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)). And "every voting rule imposes a burden of some sort." *Brnovich*, 141 S. Ct. at 2338. If these ubiquitous "burden[s] of some sort," combined with the omnipresent and nigh-impossible-to-avoid fact of those burdens being imperfectly shared by all, are sufficient to trigger strict scrutiny, then virtually every voting rule will be subject to it. But that simply is not the law: "voting regulations are rarely subjected to strict scrutiny." *Dudum v. Arntz*, 640 F.3d 1098, 1106 (9th Cir. 2011).

*Fourth*, Plaintiffs' reliance (at 19-20) on putative "cumulative" burdens is misplaced. As an initial matter, Plaintiffs do not cite a single case in support of their cumulative-burden argument. Nor are the burdens here in fact meaningfully cumulative. This is not, for example, a challenge to a state having too few polling places combined with short hours that cumulatively make it hard to vote. Instead, one law applies to obtaining ballot while the other addresses the separate process of casting a vote.

Plaintiffs' "cumulative burden" approach could rapidly collapse *Anderson-Burdick* doctrine into absurdity as *every* requirement would soon be subject to strict scrutiny. Consider, for example, all the minimal burdens that are unchallenged in this suit—though many have been challenged elsewhere by one or more Plaintiffs here—that must be surmounted. To vote by mail, a voter must: (1) Register to vote; (2) Be registered sufficiently in advance of an election;[5] (3) Complete a form requesting inclusion on an

[5] Two of Plaintiffs here filed an *Anderson-Burdick* challenge to the deadline to register to vote 29 days before the 2020 election in *Mi Familia Vota v. Hobbs*, 977 F.3d 948 (9th Cir. 2020). Although this Court granted a preliminary injunction, the Ninth Circuit stayed that injunction pending appeal and the action was eventually dismissed. *Id.*

EVL or a single mail-in ballot; (4) Sign that form; (5) Sign the ballot affidavit at some point; (6) Spot their preferred candidate on the ballot under whatever ballot order candidates are listed;[6] (7) Cast no more than the allowable votes for each office (8) Complete a line next to the desired candidate rather than circling the name; (9) Place their ballot in a mailbox, dedicated drop box, or return it to a polling station; and (10) Do so with sufficient time for the ballot to arrive by when polls close.[7]

All of these individual burdens are minimal. But if Plaintiffs can simply assert a "cumulative burden" claim by adding together all of the usual burdens of voting to obtain strict-scrutiny review, every *Anderson-Burdick* claim will soon become an omnibus/cumulative-burden challenge to the entire voting system, and few "cumulative" burdens won't be severe (at least under Plaintiffs' estimation of what burdens are severe). A court would then presumably have to determine whether Arizona's "cumulative state interests" (whatever that means) are narrowly tailored to its cumulative set of voting regulations (whatever that means). Plaintiffs' logic quickly breaks down.

Moreover, even if Plaintiffs could simply add the two burdens challenged here, in this case that is only a (1) "at most, minimal" burden,[8] combined with a (2) less-than-"extremely small" burden that might not even be capable of being "viewed as a burden" at all.[9] That combination of burdens still is nowhere near severe. Indeed, that aggregated burden may not even be a "minimal" burden itself since both individual components potentially fall *below* that "minimal" threshold. But even if the cumulative aspect were sufficient to strike the "at most" qualifier from the *Hobbs II* "at most, minimal" burden holding—leaving it just "minimal"—that would still do Plaintiffs little good.

*Fifth*, Plaintiffs' reliance on the 2020 election voting evidence is similarly

---

[6] One of Intervenor-Plaintiffs here filed an *Anderson-Burdick* challenge to the order in which candidates appear, which this Court dismissed. *See Mecinas v. Hobbs*, 468 F. Supp. 3d 1186, 1193 (D. Ariz. 2020). An appeal is pending in the Ninth Circuit.

[7] The requirement that the ballots arrive by poll-close time on election day was challenged under an *Anderson-Burdick* theory in *Voto Latino Foundation v. Hobbs*, No. 19-CV-5685-DWL. That case was dismissed pursuant to a settlement agreed to by Secretary Hobbs.

[8] *Hobbs II*, 18 F.4th at 1186.

[9] *Short*, 893 F.3d at 677; *infra* Section IV.A.

unavailing, particularly as it is not supported by any specific allegations in the Complaint. While Plaintiffs need not "offer 'evidence' at the motion-to-dismiss stage," MTD Opp. at 20, they do need to offer *specific factual allegations*. While Plaintiffs point (at 20) to paragraphs 64-68, none of those paragraphs offers anything from the 2020 election that supports a contention that the burden was greater than that considered in *Hobbs II*.

Those paragraphs do not, for example, allege that the rate of ballots being disqualified for non-signature was higher in 2020, or that curing was uniquely harder (it wasn't; for the first time, county officials had a mandatory duty to assist in curing). Compl. ¶¶64-68. Instead, those paragraphs are largely filled with Plaintiffs' political missives about the 2020 audit, disparate impact allegations, a conclusory discriminatory purpose allegation (¶67), and a vague statement by a single legislator (¶67).

Nothing about those paragraphs has anything to do with the 2020 election showing that the *actual* burden of the Poll-Close Deadline was greater than that considered in *Hobbs II*. And outside of those paragraphs, Plaintiffs have affirmatively alleged that the 2020 election was "an election with historic voter turnout." Doc. 66 at 4.

To state what should be obvious: record number of voters casting ballots in 2020 is *not* evidence of election laws being more burdensome than previously understood. Plaintiffs' belief that historically *high* turnout somehow proves that Arizona has made it uniquely burdensome to vote lacks any semblance of logical soundness.

Moreover, while Plaintiffs profess (at 20) that they "intend to introduce evidence based on how the cure period was actually implemented in the 2020 election," they have not offered a *single* allegation to that effect. Plaintiffs cannot circumvent Rule 12(b)(6) merely by promising evidence in the future. Their Complaint must stand or fall based on the *allegations* they offer *now*, not the evidence they merely *intend* to offer in the future.

* * * * *

For all of these reasons, *Hobbs II*'s "at most, minimal" burden holding analyzing an *identical* burden to that presented here is binding in this Court and Plaintiffs have offered no basis to overcome or distinguish that controlling precedent.

### C. Plaintiffs Effectively Concede That SB 1003 Is Constitutional Under *Hobbs II* If The Applicable Burden Is Minimal

Although Plaintiffs attempt to distinguish *Hobbs II*'s holding that the burden imposed by the Poll-Close Deadline is at most minimal, they do not appear to challenge *Hobbs II's* holding that the State's interest in reducing administrative burdens is sufficient to sustain the Poll-Close Deadline where the burden on voting is minimal. *See* MTD Opp. at 19-20. Plaintiffs have therefore forfeited any argument that they can prevail on their *Anderson-Burdick* challenge to SB 1003 if the burden is minimal. And *Hobbs II* compels a conclusion that it is.

Plaintiffs have also not responded to the State's interest in securing its electoral systems and promoting orderly elections. This Court expressly incorporated the State's arguments from its Ninth Circuit briefs by reference. Doc. 75 at 5. And those briefs expressly raise those interests. Doc. 58-2 at 43-55; 58-6 at 25-28. Plaintiffs' failure to respond to those interests concedes that they also sustain the Poll-Close Deadline.

### D. Plaintiffs Have Not Pled a Viable Facial Claim

Plaintiffs notably do not deny that their claims are facial in nature, and while Plaintiffs argue (at 18-19) that the facial-vs-as-applied distinction does not apply at the pleading stage, they are mistaken. *See supra* Section I.B.

Plaintiffs never even *attempt* to answer the State's incorporated arguments that "there are obvious circumstances where Plaintiffs' theories fail even under their own terms," such as "when a voter receives notice of an absent signature three weeks before the election." Doc. 58-2 at 58-59. Plaintiffs' silence concedes the existence of a "set of circumstances exists under which the [Poll-Close Deadline] would be valid." *Salerno*, 481 U.S. at 745. That in turn concedes that their facial-only claims necessarily fail and should be dismissed.

## IV. Plaintiffs' *Anderson-Burdick* Challenge To SB 1485 Fails

### A. The Burden Imposed By The Periodic Voting Requirement Is Minimal

Even under the facts as alleged by Plaintiffs, the burden imposed by the Periodic

Voting Requirement is minimal. Plaintiffs do not deny that the Periodic Voting Requirement can be satisfied either by voting once every four years *or* responding to a notice *or* reapplying for the EVL. And the Ninth Circuit has already squarely addressed and definitively resolved the magnitude of the burden of filling out a form to request a mail-in ballot: "To the extent that having to register to receive a mailed ballot could be viewed as a burden, it is an *extremely small one*, and certainly not one that demands serious constitutional scrutiny." *Short*, 893 F.3d at 677 (emphasis added).

The ability to comply with the Periodic Voting Requirement by filling out a form thus necessarily means that the applicable burden is thus "an extremely small one" (if one at all). Indeed, the burden will be *even less* for two reasons that Plaintiffs ignore: (1) Unlike in *Short*, where the plaintiffs needed to complete a request form for *each election*, here one form is good for *all elections* for at least *four years* and (2) under SB1485, that form will be sent to voters, rather than the voters needing to obtain it themselves. In addition, the alternative compliance methods simply by voting once every four years or filling out another EVL request form further lessen the applicable burden.

Plaintiffs offer two responses to *Short*. Both fail. First, Plaintiffs argue (at 15) that *Short* arose "following the denial of a preliminary injunction, where the plaintiffs had an opportunity to put on evidence." But Plaintiffs have not offered even *allegations* that would establish that responding to the SB 1485 notices is somehow more burdensome than filling out the form in *Short*, thus requiring dismissal of their claim. "Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings." *Wasco Prod., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006).

Second, Plaintiffs argue (at 15) that "the law challenged in *Short* made it easier for some to vote," while SB 1485 does not. But *Anderson-Burdick* doctrine is concerned with the *actual* burden on voting, not the first derivative of it. And accepting Plaintiffs' rationale would essentially transform *Anderson-Burdick* doctrine into some never-before-seen analog of the anti-retrogression requirement of Section 5 of the Voting Rights Act (which Congress enacted precisely because the Constitution did not impose one on its own).

Plaintiffs' proposed one-way ratchet simply is not how *Anderson-Burdick* doctrine operates. Indeed, the effects of that standard would be perverse: it would *punish* States for adopting more generous voting measures by subjecting their future actions to judicial micro-management and second-guessing, which their less-generous sister states would not suffer. *Anderson-Burdick* does not constitutionalize the "no good deed goes unpunished" aphorism. *Winter v. NRDC*, 555 U.S. 7, 31 (2008).

Nor did *Short* hold that the *direction* of the burden transformed a minimal burden into a moderate one; it only accurately *described* what had occurred in *Obama for America v. Husted*, 697 F.3d 423 (6th Cir. 2012). That *description* in *Short* is not a holding.

Similarly, Plaintiffs' attempt (at 15) to distinguish *Crawford v. Marion County Election Bd.*, 553 U.S. 181 (2008) because that case arose "after discovery." But the burdens at issue there were patently greater than those that Plaintiffs have *alleged* here: *i.e.*, ""inconvenience of making a trip to the BMV, gathering the required documents, and posing for a photograph." *Id.* at 198. Plaintiffs never explain how they have *plausibly alleged* that simply completing a form or voting once every four reasons could *ever plausibly* be considered more burdensome than the burden in *Crawford*.

The truly miniscule magnitude of the burden here becomes even more apparent when placed in context, both historically and as compared to other States' current practices. Historically, there has been no constitutional right to vote by mail *at all*. *See* MTD at 16. Indeed, "[a]s of January 1980, only three States permitted no-excuse absentee voting," *Brnovich*, 141 S. Ct. at 2339, and none had permanent voting by mail. It is against that historical backdrop, in which it was widely understood that ""there is no constitutional right to an absentee ballot" at all, *Mays v. LaRose*, 951 F.3d 775, 792 (6th Cir. 2020), that Plaintiffs' claim arises. Given that the Constitution has never been understood to require no-excuse voting by mail generally, it strains credulity that the State's modest conditioning of *permanent*, no-excuse balloting with the Periodic Voting Requirement imposes a "severe burden." Whatever burden that requirement imposes, it is manifestly less than that of 47 states for the entirety of the 1868-1980 period that did not permit no-excuse mail-in

balloting *at all*, all without hint from any court that such "burden" violated the Constitution. While Plaintiffs' views about mail-in balloting this last decade have evolved, the text of the First and Fourteenth Amendments has not.

Similarly, Plaintiffs do not dispute that at least 40 states do not have an EVL or fully mail-in balloting system. MTD at 16. Nor do they dispute that 30 states do not have an EVL for *anyone*. MTD at 1; Appendix. But Plaintiffs offer only a *single sentence* about those other states, contending (at 15-16) that *Arizona Green Party v. Reagan*, 838 F.3d 983 (9th Cir. 2016), "disposes of the argument that Arizona's voting laws are in certain ways supposedly 'more generous' than the laws of other states." But *Reagan* does no such thing. True, it rejects inapposite comparisons based on "'strained analogies' to past cases." *Id.* at 990 (cleaned up). But this case presents a direct apples-to-apples comparison, where some states (like Arizona) have EVLs open to all voters and the vast majority do not.

In any event, *Hobbs II* makes plain that such contextual comparisons between states *are* appropriate. In supporting its conclusion that the Poll-Close Deadline imposed only a minimal burden, the Ninth Circuit specifically reasoned that its conclusion was supported by the fact that Arizona was "in the middle of the spectrum" for missing signature curing. 18 F.4th at 1188. Plaintiffs do not even attempt to respond to this aspect of *Hobbs II*. And unlike that case, Arizona is not even arguably even "in the middle of the spectrum" vis-à-vis early voting lists. It is undeniably more generous than at least 30 states with no such lists, and almost certainly more generous than the 10 states that deny participation in EVLs to all except those over 64 and/or with disabilities. That comparative generosity is a relevant factor under controlling authority, and Plaintiffs' one-sentence hand waiving it off (at 15-16) does not satisfy their burden under Rules 8 and 12(b)(6).

For all these reasons, the burden imposed by the Periodic Voting Requirement is minimal at most, and likely even smaller than "extremely small." *Short*, 893 F.3d at 677.

### B. The State's Interests Sustain SB 1485

The State has two interests that both independently sustain the Periodic Voting Requirement under *Anderson-Burdick*, particularly as the burden is minimal: the State's

interests (1) in reducing administrative burdens and (2) securing its elections.

**1. Administrative Burdens**

Although Plaintiffs plainly have little regard for it (at 16-17), "the State has an important regulatory interest in reducing the administrative burden[s]" on its electoral systems. *Hobbs II*, 18 F.4th at 1181; *accord Lemons*, 538 F.3d at 1104-05 (reducing "administrative burden" is an important state interest). Plaintiffs also failed to raise any timely objection to the State's request for this Court to take judicial notice, which this Court thus granted as unopposed. *See* Doc. 89. This Court can therefore consider it in resolving the State's Rule 12(b) motion. *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001). Moreover, this Court "need not accept as true allegations contradicting documents … that are properly subject to judicial notice." *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008); *accord Saldana v. Occidental Petroleum Corp.*, 774 F.3d 544, 551 (9th Cir. 2014) (same) (collecting cases).

The report that this Court took judicial notice of establishes that it costs "roughly $2-3 per ballot" in printing and postage costs. MTD at 19-20. The costs at issue are thus substantial, and *dwarf* the applicable administrative burdens in *Hobbs II*, 18 F.4th at 1192—the avoidance of which was sufficient to sustain the Poll Close Deadline. Against this clear evidence, Plaintiffs offer three cursory objections. All fail.

*First*, Plaintiffs suggest (at 16-17) that the State's interest is somehow "remote" or "vague." Not so. Plaintiffs themselves allege that the Periodic Voting Requirement could affect "125,000 to 150,000" voters. Compl. ¶76. Accepting that allegation as true, the costs to Maricopa County alone would be between $250,000 and $450,000 *per election*, or $500,000 to $900,000 for federal primary and general elections each cycle, on top of local and special elections. That is neither remote nor vague, but rather concrete and substantial.

*Second*, seeking to downplay the effect of their forfeiture, Plaintiffs denigrate (at 17) the State's evidence as a "single document the Attorney General submitted showing the costs of printing, processing and sending *all* mail-in ballots for Maricopa County for the November 2020 election." But Plaintiffs never explain why that "single document"

does not establish exactly what the State contends that it does: that printing and postage costs are roughly $2-3 per ballot, particularly where that judicially noticed document estimated turnout of 1.7-1.8 million voters by mail-in ballots. Doc. 68 Ex. 2 at 9, 43. Particularly as "[e]laborate, empirical verification of weightiness is not required" under *Anderson-Burdick*, *Timmons*, 520 U.S. at 352, nothing more was required for the State to carry its burden. Under evidence that may properly be considered now, the State has amply demonstrated that the administrative costs of printing and mailing ballots are substantial.

These costs are particularly substantial as Plaintiffs do not concede that the State can *ever* remove a voter from the EVL for non-voting and non-response to notices. The State's interest thus spans potential *decades* of printing largely or completely unused ballots for voters. The Constitution does not demand such waste.

*Third*, Plaintiffs briefly protest (at 16) that they "have not yet been able to test via discovery" the State's evidence. But Plaintiffs do not deny that judicially noticeable documents can be properly considered at the pleading stage. And if those documents satisfy the State's burden now, there is no basis for Plaintiffs to obtain discovery on a doomed claim. *See*, *e.g.*, *Iqbal*, 556 U.S. at 678-79 (holding that the Federal Rules "do[] not unlock the doors of discovery for a plaintiff" that cannot satisfy Rule 8).

**2. Securing Elections**

The State also "indisputably has a compelling interest in preserving the integrity of its election process.'" *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). That same *interest* was specifically considered in *Husted v. A. Philip Randolph Institute*, 138 S. Ct. 1833 (2018). True, Plaintiffs are correct (at 17) that *Husted* "did not involve an *Anderson-Burdick* claim or a motion to dismiss," but the ultimate electoral-integrity interest of the State was identical and Plaintiffs' failure even to *allege* what the *Husted* plaintiffs had *proved* requires dismissal. Moreover, the State's interests are treated as a "legislative fact," and this Court "must accept findings by the Supreme Court" on the subject. *Frank v. Walker*, 768 F.3d 744, 750 (7th Cir. 2014). The Supreme Court's legislative findings in *Husted* about the election integrity concerns of maintaining up-to-date lists based on non-

voting/non-response to notices are thus binding here. In addition, the State's actions here are more narrowly tailored than in *Husted*, as the State merely removes voters from EVLs, rather than removing their registrations entirely as Ohio had.

Moreover, while Plaintiffs assert (at 17) that they "have specifically asserted that this justification is a pretext and lacks a rational basis," those are simply conclusory assertions of *legal conclusions* that need not be accepted as true. In any event, at best those are merely allegations about the subjective actual motivations of legislators, which are irrelevant for *Anderson-Burdick* purposes: States may rely on "post hoc rationalizations," can "come up with [their] justifications at any time," and have no "limit[s]" on the type of "record [they] can build in order to justify a burden placed on the right to vote." *Mays*, 951 F.3d at 789. Indeed, States need not submit "any record evidence in support of" their interests at all. *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1353 (11th Cir. 2009). Thus even if Plaintiffs had plausibly alleged bad subjective intent, *but see infra* Section V, that would only go to their intentional discrimination claims.

### C. Plaintiffs Have Not Pled a Viable Facial Claim

Even assuming *arguendo* that Plaintiffs had pled plausibly that some applications of SB 1485 could potentially violate *Anderson-Burdick*, their claim still must be dismissed as a facial-only claim that does not satisfy the *Salerno*/no-set-of-circumstances standard for facial claims. As explained above, the facial-vs-as-applied distinction *does* apply at the pleading stage. *Supra* Section I.B.

Moreover, contrary to Plaintiffs' apparent contention. *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442 (2008) is not a one-off flash in the pan, but rather merely the tip of the iceberg of cases applying *Salerno* to facial claims. Plaintiffs' devotion of an entire section (at 18-19) to distinguishing *Washington State Grange on its fact*s is thus a sideshow. It is Plaintiffs' failure to satisfy *Salerno*/the no-set-of-circumstances test that dooms their facial-only *Anderson-Burdick* claim now.

More fundamentally, Plaintiffs never answer the State's argument that circumstances *do* exist under which the Periodic Voting Requirement is constitutional.

Plaintiffs, for example, *never* address the State's example of a voter that has "has not voted in a single federal or municipal election since then [2007]—now at least 14 in all, and perhaps as many as 30—and also does not respond to future notices and continues not to vote." MTD at 22.

Plaintiffs' failure to offer *any* argument that removing that voter from the EVL under SB 1485 violates *Anderson-Burdick*. And if that EVL removal is constitutional (which Plaintiffs do not actually contest), it necessarily means that there is a "set of circumstances exists under which [SB 1485] would be valid." *Salerno*, 481 U.S. at 745. That alone requires dismissal of Plaintiffs' facial claim.

## V. Plaintiffs' Intentional Discrimination Claims Fail

Plaintiffs have failed to plead a plausible case of intentional discrimination for either challenged provision. Most of their allegations are mere conclusory recitations of the legal elements and do nothing to advance the ball. *See Iqbal*, 556 U.S. at 680. Vast other swaths of their Complaint deal with irrelevancies, such as the 2020 audit. Compl. ¶¶58-63. What remains is simply not sufficient: The Supreme Court made clear in *Regents* that a Plaintiff cannot plead a plausible case of discriminatory intent, notwithstanding *Arlington Heights*, simply by alleging discriminatory impact and combining that with remote, unrelated statements and other similarly thin "circumstantial" evidence. 140 S. Ct. at 1916. And that is all that Plaintiffs have done here.

### A. Most of Plaintiffs' Key Allegations Are Conclusory

As the Supreme Court did in *Iqbal,* the analysis begins by "identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. In *Iqbal* the Court addressed a host of arguments which were mere "bare assertions" and effectively "formulaic recitations" of discriminatory intent. For example, the Court addressed—and discarded—Iqbal's claims that the government "knew of, condoned, and willfully and maliciously agreed to subject him" to confinement because of his religion and/or race, and that defendant Ashcroft was the "architect" of this policy and that defendant Mueller was "instrumental" in adopting it. *Id.* at 680-81.

Plaintiffs' Complaint here is similarly infirm. The central paragraph for Plaintiffs' intentional discrimination claims is paragraph 67 (*see* MTD Opp. at 3, 7, 11, 14, 17), which is replete with the same sort of "formulaic recitations" as in *Iqbal*: (1) "Arizona legislators enacted the laws with full knowledge that they will burden voters of color and for the purpose of disproportionately impacting voters of color and suppressing voter turnout," (2) proponents "made clear that reducing the number of citizens of color who vote is in fact the purpose of these laws." Compl. ¶ 67. And the rest of that paragraph is either the statements of the Acts' *opponents*, or a single statement of Representative Kavanaugh that does not mention race at all, and is insufficient under *Brnovich*'s rejection of cat's paw theory. *Supra* at 6. Other paragraphs are that Plaintiffs rely upon are similarly conclusory incantations of the elements. *See*, *e.g.*, Compl. ¶3 (cited at MTD 8, 9).

**B. Plaintiffs' Nonconclusory Allegations Fail To Plausibly Allege Intentional Discrimination**

Once the conclusory statements are removed, the question for the Court then is whether what is left is sufficient to "nudge [the Plaintiffs'] claim of purposeful discrimination across the line from conceivable to plausible." *Id.* at 683 (cleaned up). But the Plaintiffs' remaining allegations are, at best, merely consistent with their theory, rather than establishing its plausibility. That is insufficient: "Where a complaint pleads facts that are 'merely consistent with' [intentional discrimination], it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557)

*Regents* is highly instructive here. There, the Ninth Circuit wrongly accepted as sufficient under *Twombly/Iqbal* allegations strikingly similar to those made here, *i.e.*, that DACA "disproportionately impact[ed] Latinos and individuals of Mexican heritage;" that many statements by President Trump evidenced "animus toward persons of Hispanic descent;" that there was a history of such animus; and that DACA was subject to a "unusual history," including a "strange about-face, done at lightning speed." *See Regents of the Univ. of California v. DHS*, 908 F.3d 476, 519 (9th Cir. 2018), *rev'd in part* 140 S. Ct.

1891 (2020).

The Supreme Court had little trouble reversing: "none of these points, either singly or in concert, establishes a plausible equal protection claim." *Regents*, 140 S. Ct. at 1915. The Supreme Court's rejection of that claim—much more extensively supported than the Plaintiffs' here—strongly supports dismissal.

The Plaintiffs' nonconclusory allegations fall into a few categories: (1) allegations relating to disparate impacts; (2) a legislator's statement; (3) allegations relating to "departures from practice;" and (4) allegations relating to "history." Those fail to satisfy their burden under *Twombly/Iqbal/Regents*.

**1. Disparate Impacts**

Plaintiffs provide several allegations as to disparate impact. *See* MTD Opp. at 6-7 (citing Compl. ¶¶ 77, 83, 90-94; Interv. Compl. ¶¶ 97, 120-21). But the bare statistical patterns Plaintiffs rely upon are not "unexplainable on grounds other than race." *Village Of Arlington Heights v. Metro. Hous. Dev. Co.*, 429 U.S. 252, 266 (1977). Instead, "differences in employment, wealth, and education may make it virtually impossible for a State to devise rules that do not have some disparate impact." *Brnovich*, 141 S. Ct. at 2343. They are thus readily explainable on other grounds—which Plaintiffs' allegations certainly do not preclude. Plaintiffs' statistical allegations are "'merely consistent with'" their claims, *Iqbal*, 556 U.S. at 678, and thus do little to satisfy their burden of pleading facts making intentional discrimination plausible.

As *Regents* explains, "[w]ere this fact [that immigration policy disproportionately affects Latinos] sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds." *Regents*, 140 S. Ct. at 1915-16. So too here, as it is "virtually impossible" for electoral regulations *not* to have "some disparate impact." *Brnovich*, 141 S. Ct. at 2343. *See also Ramos v. Wolf*, 975 F.3d 872, 898 (9th Cir. 2020) ("Under the district court's logic, almost any TPS termination in the history of the program would bear 'more heavily' on 'non-white, non-European' populations and thereby give rise to a potential equal protection claim.").

**2. Legislative Statements**

Plaintiffs' Complaint cites only the statement of a *single* legislator, Representative Kavanaugh. Compl. ¶67.[10] But that statement was plainly not about race at all. Any racial subtext that Plaintiffs wish to read into these statements is nothing more than a conclusory assertion about what these representatives "really meant"—in contradiction to the plain meaning of the statements themselves. Such conclusory claims are not entitled to a presumption of truth. *Iqbal*, 556 U.S. at 680. Accordingly, the Court should read these statements for itself and determine if they support the plausibility of Plaintiffs' claims. *Compare with Brnovich*, 141 S. Ct. at 2349-50 (concluding that "'racially-tinged' video" used in debate over bill did not show discriminatory purpose).

But even if Representative Kavanaugh's statement were read in the Orwellian manner that Plaintiffs require, it still would not suffice for two reasons. *First*, as the statement of only one legislator, by definition it could not be used to impugn the entire legislature *except* through cat's paw theory. *Second*, Plaintiffs do not even attempt to respond to the State's argument (MTD at 14) that Kavanaugh's is *far* less probative of discriminatory intent than the Le Faro video in *Brnovich*—which the Supreme Court held was insufficient.[11]

---

[10] Intervenor-Plaintiffs also quoted (at ¶114) a second statement by Representative Grantham, though Plaintiffs do not rely upon it meaningfully in their opposition: neither quoting it nor referencing Grantham by name at any point. Nor could that statement save Original Plaintiffs' complaint from dismissal. In any event, the same deficiencies that apply to the Kavanaugh Statement apply to the Grantham statement.

[11] Similarly, the Supreme Court in *Regents* rejected the significance of President Trump's allegedly discriminatory statements about Latinos, holding that the statements were too "remote in time and made in unrelated contexts" to be imputed to the "relevant actors." *Regents*, 140 S. Ct. at 1916. Here, Plaintiffs do not allege Representative Kavanaugh (or Grantham) had any particular or decisive role with respect to these laws, nor do they allege that these statements had any impact on the challenged provisions' content or passage. *See La Clinica De La Raza v. Trump*, 477 F. Supp. 3d 951, 978–79 (N.D. Cal. 2020) ("Even assuming [the Deputy Secretary of DHS's] statements plausibly demonstrate discriminatory intent, plaintiffs have not alleged he was a relevant actor in the rulemaking process. This reasoning also applies to the statement by acting director Morgan, who has no apparent connection to the Rule."); *accord California v. DHS*, 476 F. Supp. 3d 994, 1025–26 (N.D. Cal. 2020) (same).

### 3. Departures From Practice

Plaintiffs also rely on the supposedly suspicious timing of the challenged provisions. Specifically, Plaintiffs point to the fact that these provisions were enacted "after an election in which the candidate preferred by minority voters won" and the fact that they were enacted at a similar time as the Arizona Senate "audit." MTD Opp. at 8-9.

These are not the sort of procedural irregularities that *Arlington* indicated would form meaningful circumstantial evidence of intentional discrimination. *Arlington* instead referred to "departures from practice"—*i.e.*, changes in ordinary *procedure* that indicated some invidious motive was at work. *Arlington Heights*, 429 U.S. at 267 ("Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role."). *See also Regents*, 140 S. Ct. at 1916 (concluding "there is nothing irregular about the history leading up to" DACA recession by evaluating procedural history of agency action). Here, Plaintiffs provide no indication that the procedural history of these laws was in any way irregular.

### 4. History

Finally, the history cited by Plaintiffs does nothing to advance their claim to plausibility. Even if Arizona, like virtually *every* state, has a deplorable history of racial discrimination, the Eleventh Circuit recently explained that a State's prior history cannot bar its current legislature from "enacting otherwise constitutional laws about voting." *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1325 (11th Cir. 2021). *Greater Birmingham* limits a court's analysis to "the precise circumstances surrounding the passing of the [challenged] law." *Id.* Evidence of historical discrimination, the Eleventh Circuit held, is irrelevant under *Arlington Heights*, insufficient under *Abbott*, and impermissible under *Shelby County*. *See id.* at 1325-26. Moreover, the Supreme Court in *Brnovich* also considered *Arizona*'s history of racial discrimination and rejected Plaintiffs' intentional discrimination claim with facts far more probative than those pled here. *Brnovich*, 141 S. Ct. at 2344.

### C. Plaintiffs Have Not Pled Sufficient Facts to Overcome the Presumption of Good Faith Or The More Likely Explanations For The Challenged Provisions

Finally, even to the extent the non-conclusory facts the Plaintiffs allege are relevant, they cannot overcome the presumption of good faith. "[U]ntil a claimant makes a showing sufficient to support that allegation [of purposeful discrimination,] the good faith of a state legislature must be presumed." *Miller v. Johnson*, 515 U.S. 900, 915 (1995). There is a strong reason for this presumption; courts should "exercise extraordinary caution in adjudicating claims that a State has [acted] on the basis of race" lest it paralyze States with burdensome litigation. *Miller*, 515 U.S. at 916. *See also Fusilier v. Landry*, 963 F.3d 447, 463-67 (5th Cir. 2020) ("[T]he Supreme Court has long cautioned against the quick attribution of improper motives, which would interfere with the legislature's rightful independence and ability to function.").

Plaintiffs' primary response (and the United States') is that the presumption of good faith does not apply at the pleading stage. But as explained above and in *Miller*, Plaintiffs' ultimate burden includes overcoming that presumption with *evidence*, and they necessarily have to do so with *specific, non-conclusory allegations* now. *Supra* Section I.A.

### D. The State Does Not Oppose Leave To Amend

Given the Ninth Circuit's mandate that plaintiffs should generally be given at least one chance at amendment, the State does not oppose leave for Plaintiffs to attempt to cure these deficiencies. But their current Complaint does not suffice under *Twombly*/*Iqbal*/*Regents*, and thus must be dismissed.

## VI. Democratic Intervenors' Independent Arguments Are Irrelevant

Democratic Intervenors protest (Doc. 94) that res judicata and collateral estoppel should not apply here. The State agrees that DCCC would not be bound by claim or issue preclusion by *Hobbs II*, though it remains a precedent to which *all* parties are bound in the Ninth Circuit. Because the time for DSCC to seek Supreme Court review of *Hobbs II* has not yet run (though the deadline to seek rehearing has lapsed without a petition by DSCC), the State withdraws its application of claim or issue preclusion now and may renew by

separate motion at a later time.

The State disagrees, however, that "[t]he evidence here is necessarily different, given the events that have transpired since Hobbs." Doc. 94 at 2. As set forth above, the 2020 election does not change the *Hobbs II* analysis at all. *Supra* at 15-16. Moreover, if DSCC believed that such evidence did alter the *Hobbs II* holding, its remedy would be to seek relief under Rule 59(e) or 60(b) in the *Hobbs II* case based on "newly discovered evidence" (Rule 60(b)(2))—not to bring a new freestanding action challenging the identical practice as in *Hobbs II*. DSCC tellingly has not done so, and thereby betrays its own view of the merit of their "newly discovered evidence" from 2020.

## VII. The United States' Arguments Lack Merit

Finally, the arguments advanced by the United States in its statement of interest (Doc. 78) lack merit.

As an initial matter, it is important to put into perspective the positions of the Administration from which that brief emerges. The Biden Administration's views of what constitutes racial discrimination have become dangerously demagogic and rely on hyperbole that has become unhinged. President Biden himself has *expressly* and *directly* compared those that seek minor changes of election law, such as reducing the number of ballot drop boxes, to "George Wallace," "Bull Connor," and "Jefferson Davis"—*i.e.*, two avowed segregationists and the leader of the Confederacy engaged in civil war (in which more than one million Americans died) to preserve race-based slavery.[12] President Biden has also repeatedly referred to recent election bills as "Jim Crow 2.0," [13]—even though Jim Crow reprehensibly, and with surgical accuracy, disenfranchised virtually all African American voters in the South. Put simply, the overwrought claims of discrimination made by President Biden bear no resemblance to the actual governing law, which has no trouble distinguishing between the patently illegal measures of the actual Jim Crow system and

---

[12] *See* Remarks of President Biden on Protecting the Right to Vote (Jan. 11, 2022) https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/01/11/remarks-by-president-biden-on-protecting-the-right-to-vote/

[13] *See, e.g., id.*; https://www.ajc.com/politics/what-does-jim-crow-20-mean-a-look-at-the-history-of-segregation-laws/NNCS3B7I2ZDPNCVQ3IKU6BVI5E/.

putative "Jim Crow 2.0" measures that the Biden Administration somehow thinks are virtually indistinguishable.

The Biden Administration's credibility on this issue as a neutral voice is thus dubious at best, undermining the value of its views as to the sufficiency of Plaintiffs' intentional discrimination claims. Indeed, one might fairly wonder if this Administration has ever encountered *any* complaint challenging voting laws that it thought fails to state a claim of intentional discrimination. Moreover, it is quite notable what the Government will not say: *i.e.*, a single word supporting Plaintiffs' standing arguments or their *Anderson-Burdick* claim. And that is in spite of its willingness to make outlandish Jefferson-Davis-esque claims elsewhere. Given its propensity to see "Jim Crow 2.0" around innumerable corners, its "silence is most eloquent" as to the merits of those arguments/claims. *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 266-67 (1979).

As to the claims to which the United States is willing to lend any support, its arguments are unpersuasive. First, the United States' view of what allegations are sufficient violate controlling precedent (much of which it ignores). For example, the United States essentially argues (at 10)—contrary to the Plaintiffs own position—that the disparate impacts alone establish discriminatory intent. Not so. "[A]bsent a pattern as stark as *Gomillion* or *Yick Wo*, impact alone is not determinative." *Arlington*, 429 U.S. at 266. And those cases involved extreme effects, like a district drawing in *Gomillion* which removed almost 400 black voters and 0 white voters; nothing like the impact alleged here. And the United States does not even mention *Regents*, which involved *much* starker disparate impacts of the DACA recission on Latinos—and that was not even sufficient to survive a motion to dismiss, must less establish discriminatory intent on its own.

The United States' consideration of the remaining *Arlington Heights* components is similarly deficient. Importantly, the United States fails to distinguish between conclusory and non-conclusory statements, as required by *Iqbal*. And its consideration of Plaintiffs' complaint does not meaningfully address the content of those allegations, rather choosing to summarize them in a cursory manner. *See* U.S. Br. at 12-14 (citing paragraph

blocks in Plaintiffs' complaints without discussing the content of those paragraphs).

In addition to these deficiencies, the only real case relied on by the United States to support Plaintiffs wafer-thin allegations is the Fourth Circuit's decision in *N.C. State Conference of the NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016). And *McCrory* is an out-of-circuit decision, with highly distinguishable facts, that does not bind this Court. *Cf. Greater Birmingham Ministries v. Merrill*, 284 F. Supp. 3d 1253, 1278-79 (N.D. Ala. 2018) (stressing the unusual facts of *McCrory*); *Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 603-04 (4th Cir. 2016) (same). Furthermore, four Supreme Court Justices (on an eight-Justice Court) voted to stay the Fourth Circuit's decision in that case. *See* 137 S. Ct. 27, 28 (2016), and the standard it applied is unlikely to survive if it reaches the Court again.

Finally, the United States argues (at 14) that the presumption of good faith should not apply now. But their central argument is that applying that presumption now would force Plaintiffs to "prove their claim now at the motion to dismiss stage." U.S. Br. at 15. But asking Plaintiffs to plead sufficient facts such that, if taken as true, it would entitle them to relief, is simply asking them to comply with Rule 8. *See Iqbal*, 556 U.S. at 684 (federal rules apply the same way in "all civil actions"). Accordingly, Plaintiffs must *plead* (but not yet prove) specific facts that both "overcom[e] the presumption of good faith" and "prov[e] discriminatory intent"—that is, to show that they would be entitled to relief on the face of their complaint. *See Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018). *See also supra* Section I.A.

In both *Iqbal* and *Regents*, the Supreme Court dismissed claims of discrimination because alternative explanations were much more likely. But the United States completely ignores *Regents*, and never acknowledges that *Iqbal* was a case involving intentional discrimination. Indeed, aside from citing *Iqbal* in its legal standard section (at 4), the U.S. tellingly never cites it (or *Twombly*) anywhere else. A brief about pleading sufficiency in a case like this that never grapples with *Twombly*, *Iqbal*, or *Regents* is simply unserious.

## CONCLUSION

Plaintiffs' and Intervenor-Plaintiffs' Complaints should be dismissed.

Respectfully submitted this 11th day of February, 2022.

MARK BRNOVICH
ATTORNEY GENERAL

By: s/ Drew C. Ensign
Joseph A. Kanefield (No. 15838)
*Chief Deputy & Chief of Staff*
Brunn ("Beau") W. Roysden III (No. 28698)
*Solicitor General*
Drew C. Ensign (No. 25463)
*Deputy Solicitor General*
Robert J. Makar (No. 33579)
*Assistant Attorney General*
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-5200
Drew.Ensign@azag.gov

*Attorneys for Mark Brnovich, Arizona Attorney General*

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of February, 2022, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for Filing, which will send notice of such filing to all registered CM/ECF users.

s/ Drew C. Ensign
Drew C. Ensign
*Counsel for Mark Brnovich, Arizona Attorney General*