1
2
3
4
5
6            **IN THE UNITED STATES DISTRICT COURT**
7              **FOR THE DISTRICT OF ARIZONA**
8

9   Mi Familia Vota, et al.,                    No. CV-21-01423-PHX-DWL

10                  Plaintiffs,                  **ORDER**

11   v.

12   Katie Hobbs, et al.,

13                  Defendants.

14

15          In advance of the motion hearing on June 7, 2022, the Court wishes to provide the

16   parties with its tentative ruling.  This is, to be clear, only a tentative ruling.  The point of

17   providing it beforehand is to allow the parties to focus their argument on the issues that

18   seem salient to the Court and to maximize their ability to address any perceived errors in

19   the Court's logic.  This is not an invitation to submit additional briefing.

20          Dated this 16th day of May, 2022.

21
22
23                                   _____
24                                        Dominic W. Lanza
                                       United States District Judge
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>TENTATIVE RULING</u>

**INTRODUCTION**

This action involves a challenge to two voting laws that were enacted by the Arizona legislature following the 2020 election. The first is Senate Bill 1485, which provides that voters who do not cast a mail-in ballot in two consecutive election cycles must be removed from Arizona's permanent early voting list. The second is Senate Bill 1003, which clarifies that the deadline for a voter to attempt to "cure" a missing signature on an early ballot is 7:00 PM on election day. (Doc. 1 ¶ 1.)[1]

Plaintiffs in this action are four nonprofit groups, the Democratic Senatorial Campaign Committee, and the Democratic Congressional Campaign Committee. Defendants are Arizona Secretary of State Katie Hobbs, Arizona Attorney General Mark Brnovich, the recorders from all 15 Arizona counties, the Republican National Committee, the National Republican Senatorial Committee.

Plaintiffs[2] assert three claims. In Count One, Plaintiffs contend that S.B. 1485 and S.B. 1003, "individually and collectively," violate the First and Fourteenth Amendments because they create an undue burden on the right to vote. (*Id.* ¶¶ 127-35.) In Count Two, Plaintiffs contend that S.B. 1485 and S.B. 1003, "individually and collectively, violate the Fourteenth and Fifteenth Amendments because they were adopted for the purpose of denying voters of color full and equal access to the political process." (*Id.* ¶¶ 136-41.) And in Count Three, Plaintiffs contend that S.B. 1485 and S.B. 1003, "individually and collectively, violate Section 2 of the Voting Rights Act because they were adopted for the purpose of denying voters of color full and equal access to the political process." (*Id.* ¶¶ 142-45.)

---

[1]     The parties offer competing shorthand descriptions of the laws at issue. Plaintiffs refer to the two challenged laws as the "Voter Purge Law" and the "Cure Period Law." (Doc. 1 ¶ 1.) The Attorney General refers to the two challenged laws as the "Periodic Voting Requirement" and the "Poll-Close Deadline." (Doc. 58 at 3.) The Court will simply refer to the challenged laws as S.B. 1485 and S.B. 1003.

[2]     Where there is no meaningful difference between the positions of the four nonprofit groups ("Plaintiffs") and the Democratic Party entities ("Intervenor-Plaintiffs"), the Court refers to them collectively as "Plaintiffs." Additionally, the Court refers to Secretary Hobbs, Attorney General Brnovich, and the 15 county recorders collectively as "the State."

Now pending before the Court is the State's corrected consolidated motion to dismiss under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  (Doc. 76.)  For the following reasons, the State's motion is granted in part and denied in part.

## BACKGROUND

I.    Factual Background

A.    **Arizona's History Of Discrimination**

Plaintiff's complaint includes a lengthy section entitled "Arizona's History of Discrimination and Voter Suppression."  (Doc. 1 ¶¶ 97-126.)  The State does not, in general, challenge the factual allegations appearing in that portion of the complaint for purposes of the pending motion.  Accordingly, the following facts are presumed true for purposes of resolving the State's motion.

1.    Voting Discrimination

The United States acquired present-day Arizona from Mexico under the 1848 Treaty of Guadalupe Hidalgo and the 1853 Gadsden Purchase.  (Doc. 1 ¶ 98.)  Indigenous nations had no authority over the transfer of their lands, and by the 1880s, Native Americans were largely confined to reservations, often through violent means.  (*Id.* ¶¶ 98-99.)  In 1928, the Arizona Supreme Court held that Native Americans were ineligible to vote in Arizona, despite a 1924 federal law that declared Native Americans to be citizens of the United States and their state of residence.  (*Id.* ¶ 102.)

In 1909, Arizona's territorial legislature adopted an English language literacy test as a prerequisite to voter registration.  (*Id.* ¶ 100.)  When Congress passed a law the next year that authorized Arizona to draft a state constitution as a prelude to statehood, the law prohibited Arizona from using the literacy test as an eligibility requirement to vote on the proposed constitution.  (*Id.*)  Once Arizona achieved statehood in 1912, the legislature re-imposed an English literacy test for voting, which was not repealed until 1972.  (*Id.* ¶ 101.)

Although the Arizona Supreme Court recognized Native Americans' right to vote in 1948, Arizona's literacy test disenfranchised 80-90% of Native Americans that year and still disenfranchised about half of Native Americans by the 1960s.  (*Id.* ¶¶ 102-03.)  County

officials also used the literacy test discriminatorily to prevent eligible Latino and black citizens from voting.  (*Id.*)

In 1964, Arizona Republicans strategically challenged voters' right to vote, particularly the right of voters of color, at the polls.  (*Id.* ¶ 105.)

In 1970, the Arizona legislature purged the voter rolls and required all citizens to re-register to vote.  (*Id.* ¶ 106.)  Many Latino voters did not realize they needed to re-register, and in the 1970 election Democrat Raul Castro narrowly lost the governor's race despite receiving 90% of the Latino vote.  (*Id.*)

In 1975, Congress amended the Voting Rights Act and made all Arizona jurisdictions subject to "preclearance."  (*Id.* ¶ 107.)  In the 1980s and 1990s, the United States Department of Justice issued 17 preclearance objections to proposed changes in Arizona election procedures, concluding that the changes had the purpose or effect of discriminating against Arizona's Native American or Latino voters.  (*Id.* ¶ 108.)

During the presidential primary election in 2016, voters in Maricopa County—a county in which more than 45% of residents are people of color—waited in lines for up to five hours to vote after county officials cut polling locations by 85% as compared to the 2008 presidential primary.  (*Id.* ¶ 109.)  "In Phoenix, where a majority of voters are people of color, there was one polling location for every 108,000 residents, while in Cave Creek/Carefree, a predominantly white community, there was one polling location for every 8,500 residents and in Peoria, also predominantly white, there was one polling location for every 54,000 residents."  (*Id.* ¶ 110.)

In 2012, the official Spanish-language pamphlet in Maricopa County stated that the November 6 election would be held on November 8.  (*Id.* ¶ 111.)  Four years later, in 2016, Spanish-language ballots in Maricopa County incorrectly translated a ballot proposition.  (*Id.*)

2.    Racial Discrimination

Arizona's educational system was formally segregated by race for decades.  (*Id.* ¶ 113.)  Arizona mandated English-only education in public schools as early as 1919, and

in 2000, Arizona banned bilingual education.  (*Id.* ¶ 114.)  Arizona also has a history of failing to adequately fund its English Language Learning Program.  (*Id.*)  After World War II, Phoenix placed Latino veterans in housing units separated from white Arizonans.  (*Id.* ¶ 116.)  Latinos were not permitted to use the same theaters, swimming pools, parks, or restaurants as whites.  (*Id.*)

In Arizona, 34% of Native Americans, 19% of black people, and 19% of Hispanics live below the poverty line, compared to only 9% of white people.  (*Id.* ¶ 117.)  The unemployment rate is higher for Latinos, Native Americans, and black people than white people.  (*Id.*)  White Arizonans are more likely than Latino, Native American, and black Arizonans to graduate high school and nearly three times more likely to have a bachelor's degree than Latino and Native American Arizonans.  (*Id.* ¶ 115.)  In 2017, home ownership by people of color was significantly lower than by white Arizonans.  (*Id.* ¶ 118.)  Also in 2017, Latinos, Native Americans, and black people in Arizona ranked below white people in "relative healthiness."  (*Id.* ¶ 119.)  Native Americans and black Arizonans are more likely than white Arizonans to die before the age of 65.  (*Id.*)  Latinos, Native Americans, and black people are overrepresented in Arizona jails.  (*Id.*)

### 3.   Voting Consequences

Although the voter turnout rate among Native Americans nationwide is anywhere from one to ten percentage points lower than that of other groups, turnout among Arizona's Native American population is even lower—15 to 20 percentage points lower than the statewide voter turnout in 2020 and 2016, respectively.  (*Id.* ¶ 122.)

In 2012, 40.4% of Arizona's Latino citizens and 46% of Arizona's black citizens voted, as compared to 62.4% of Arizona's non-Hispanic white citizens.  (*Id.* ¶ 123.)  In 2016, nearly 75% of white citizens were registered to vote and more than 68% voted.  (*Id.* ¶ 124.)  That same year, only 57% of Latino citizens were registered to vote and only 47.4% voted.  (*Id.*)  Additionally, only 50.9% of black citizens voted in 2016.  (*Id.*)  In both the 2012 and 2016 elections, the presidential candidate preferred by minority Arizonans did not win the state's general election.  (*Id.* ¶ 125.)

Between 1990 and 2020, Arizona's Latino population nearly doubled from 18.8% of the general population to 30.7%. (*Id.* ¶ 50.) Arizona's black population increased during the same time span from 3% to 6.2%, and Arizona's Asian population increased from 1.4% to 4.9%. (*Id.*)

In the 2020 general election, 59% of voters of color voted for the Biden-Harris ticket, including 61% of Latinos and 80% of voters in the Navajo Nation and Hopi Reservation. (*Id.* ¶ 49.)

### B.   **Arizona's Early Voting System**

Since 1991, all eligible Arizona voters have been able to participate in early voting. (*Id.* ¶ 42.) Today, a voter who wishes to vote early may request a mailed ballot, so long as the request is received no later than 5:00 PM on the eleventh day before the election. (*Id.* ¶ 43.)

In 2007, Arizona created the permanent early voting list ("PEVL"). (*Id.* ¶ 42.) Voters who join the PEVL are automatically sent an early ballot no later than the first day of the 27-day early voting period. (*Id.* ¶ 43.) Voters may return their early ballots by mail postage-free; in person at a polling place, voting center, or election official's office; or by putting the ballot in a dropbox if a dropbox is provided by the voter's county. (*Id.*)

Arizona law has long required counties to follow certain procedures to verify voters' addresses and desire to remain on the PEVL and to ensure that voters whose registrations are moved to "inactive" status are removed from the PEVL. (Doc. 55 ¶ 46.) Before each election, county recorders must mail a notice to all voters on the PEVL which, among other things, provides the voter a means to update his or her address or decline to receive a mail ballot for the upcoming election. (*Id.*) If that notice is returned as undeliverable, and the voter does not respond to a follow-up notice within 35 days, the voter's registration status will be changed from active to inactive. (*Id.*)

Around 60% of Arizona voters voted by mail in the 2010 general election. (Doc. 1 ¶ 44.) This figure rose to 66% in 2012 and 80% in 2016. (*Id.*) In 2020, 2.5 million Arizonans voted by mail or early in-person, which was 88% of all voters and over 900,000

more early votes than were cast in 2016.  (Doc. 1 ¶ 45; Doc. 55 ¶ 4.)  Between 2012 and 2020, most of the voters on the PEVL voted, and they did so at a higher rate than voters who were not on the PEVL.  (Doc. 1 ¶ 70.)  As of 2020, at least 75% of all registered voters are on the PEVL.  (Doc. 55 ¶ 47.)  In contrast, around 21% of voters nationally cast their ballot by mail.  (*Id.*)

In 2020, voters of color were disproportionately likely to be new to voting and new to voting by mail.  (Doc. 1 ¶ 46.)  When comparing the population of new early voters to the population of all registered voters, voters of color were a larger percentage of *new* early voters than they were of *all* registered voters.  (*Id.*)

Finally, Plaintiffs allege, and the State does not dispute for purposes of the motion to dismiss, that "[i]n the nearly three decades it has existed, there have been no examples of widespread election fraud in connection with Arizona's vote-by-mail system."  (*Id.* ¶ 47.)

C.   **The 2020 Election And The Legislative Response**

In the 2020 general election, over 3.4 million Arizonans voted, which was nearly 80% of registered Arizona voters.  (*Id.* ¶ 48.)  59% of Arizona's total voting age population voted, which was nearly 10% higher than in 2016.  (*Id.*)

The 80% turnout in 2020 was about 5% higher than turnout in 2012 and 2016, and turnout increased most noticeably in areas heavily populated by people of color.  (Doc. 55 ¶ 3.)  Several precincts in South Phoenix, home to large numbers of black and Latino residents, saw increases of about 10%, and precincts in Arizona's Native American reservations saw increases of about 12-13%.  (*Id.*)  However, minority turnout remained low compared to statewide turnout—for instance, turnout on the reservations was around 65%.  (*Id.*)

Plaintiffs allege that Arizona's governor, local and national election officials, and the state and federal judiciary rejected the notion that the 2020 election was affected by widespread voter fraud.  (Doc. 1 ¶¶ 51-57.)  Plaintiffs further allege that election audits produced no evidence of fraud and were alleged to be motivated by conspiracy theories

(*id.* ¶¶ 57-63); that multiple lawsuits alleging fraud were dismissed for lack of evidence (Doc. 55 ¶¶ 66-67); that no Arizona legislator has identified any instance of voter fraud in connection with a mail-in ballot (Doc. 1 ¶ 66); and that "there is no evidence of widespread voter fraud that undermined the integrity of Arizona's 2020 election" (*id.*).

After the 2020 election, legislators across the country introduced more than 400 bills (a dramatic increase from prior years) that would make it harder to register to vote, remain on the voter rolls, or cast a ballot. (*Id.* ¶ 65.) The Arizona legislature proposed S.B. 1485 and S.B. 1003 (collectively, "the challenged legislation"). During debates, legislators opposed to the challenged legislation argued it would result in fewer citizens of color voting. (*Id.* ¶ 67.) Democratic Representative Reginald Bolding, who is black, stated that S.B. 1485 would make it harder for "independent voters, seniors, Native Americans, Black, brown and low income people to vote." (Doc. 55 ¶ 114.) Republican Representative Travis Grantham replied: "I feel personally that motives were [attributed to] members, including myself with regards to colored people, Black people, whatever people this individual wants to single out and their ability to vote . . . . I think he should be sat down and he shouldn't be allowed to speak." (*Id.*)

In March 2021, Republican Representative John Kavanaugh made a statement regarding the challenged legislation. Although only a portion of the statement appears in the body of the complaint, a citation to a news article that purports to contain the entire statement appears in an accompanying footnote. (Doc. 1 ¶ 67 & n.17.) As discussed in more detail below, the State argues in its motion papers that the context arising from the fuller statement is important when evaluating Representative Kavanaugh's statement (Doc. 76 at 14) and Plaintiffs do not dispute the accuracy of the State's description of the fuller statement—instead, Plaintiffs only dispute the relevance of the fuller statement at this stage of the proceedings (Doc 99 at 11-12). In any event, because the news article containing Representative Kavanaugh's fuller statement was incorporated by reference into the complaint by virtue of Plaintiffs' citation to it, the fuller version of the statement is properly

part of the record for purposes of the current dispute.[3]  The fuller version, as derived from the cited news article, is as follows:

> Democrats value as many people as possible voting, and they're willing to risk fraud.  Republicans are more concerned about fraud, so we don't mind putting security measures in that won't let everybody vote—but everybody shouldn't be voting.
>
> * * *
>
> Not everybody wants to vote, and if somebody is uninterested in voting, that probably means that they're totally uninformed on the issues.  Quantity is important, but we have to look at the quality of votes, as well.

Timothy Bella, *A GOP Lawmaker Says the 'Quality' of a Vote Matters. Critics Say That's 'Straight out of Jim Crow'*, Wash. Post (Mar. 13, 2021) https://www.washingtonpost.com/politics/2021/03/13/arizona-quality-votes-kavanagh/.

### D.   **S.B. 1485**

Under S.B. 1485, "[a] voter's failure to vote an early ballot once received does not constitute grounds to remove the voter from the [PEVL], except that a county recorder shall remove a voter from the [PEVL] if . . . [t]he voter fails to vote using an early ballot in all of the following elections for two consecutive election cycles: (a) A regular primary and regular general election for which there was a federal race on the ballot[; and] (b) A city or town candidate primary or first election and a city or town candidate second, general or runoff election."  A.R.S. § 16-544(K)(2).  Once a voter has failed to vote using an early ballot in the specified elections for two consecutive election cycles, "the county recorder or other officer in charge of elections shall send a notice . . . [that] shall inform the voter that if the voter wishes to remain on the [PEVL], the voter shall do both of the following with the notice received: 1. Confirm in writing the voter's desire to remain on the active early voting list[; and] 2. Return the completed notice to the county recorder or other officer in charge of elections within ninety days after the notice is sent to the voter."  *Id.* § 16-544(L).  "If a voter receives a notice as prescribed by subsection L of this section and the

---

[3]      *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("A court may . . . consider . . . documents incorporated by reference in the complaint . . . without converting the motion to dismiss into a motion for summary judgment.").

voter fails to respond within the ninety-day period, the county recorder or other officer in charge of elections shall remove the voter's name from the active early voting list."  *Id.* § 16-544(M).

A voter who is removed from the PEVL may still vote in person.  (Doc. 1 ¶ 83.) However, voting in person will not prevent the voter from being removed from the PEVL. (Doc. 55 ¶ 92.)

S.B. 1485 requires counties to implement a new system to track and mail additional notices, which will impose further and new costs upon the counties.  (*Id.* ¶ 104.)  Between 125,000 and 150,000 voters will be removed from the PEVL after S.B. 1485 takes effect. (Doc. 1 ¶ 76.)  If it had been enacted in 2019 (and in effect in 2020), 126,000 voters who ultimately voted would have been removed from the PEVL.  (*Id.*)  If enacted in 2015 or 2017 (before the 2016 and 2018 elections, respectively), more than 200,000 voters would have been removed from the PEVL.  (*Id.*)

White Arizonans account for 71% of all registered voters but only 54% of removed voters will be white.  (*Id.* ¶ 77.)  Black and Hispanic Americans are more likely to be intermittent or rare voters as compared to white voters, and low-income Americans are similarly more likely to be intermittent or rare voters.  (*Id.* ¶ 75.)  Latinos are 19% of registered voters but will account for 33% of removed voters, blacks are 4% of registered voters but will account for 5% of removed voters, and Native Americans are 0.9% of registered voters but will account for 1.3% of removed voters.  (*Id.* ¶ 77.)  Of the eight legislative districts in Arizona with the highest number of voters likely to be removed from the PEVL, seven are majority-minority districts.  (*Id.*)

Voters who lack residential mail service will find it challenging to receive and return the removal notice in the 90-day window they are given.  (*Id.* ¶ 79.)  Voters who need a translated notice, who are disproportionately voters of color, will struggle to understand and respond to the notice.  (*Id.* ¶ 80.)  Voters who have limited funds to purchase postage, limited mobility, or otherwise have limited access to a post or election office will struggle to respond to removal notices in writing.  (*Id.* ¶ 81.)  Elderly voters and voters experiencing

poverty are more likely to be removed because they are more likely to vote intermittently. (Doc. 55 ¶ 96.)  Young voters, such as college students, move frequently and may not receive removal notices.  (*Id.* ¶ 98.)  Finally, the removal process is often based on error-ridden lists and there is a substantial risk of manipulation.  (Doc. 1 ¶ 74.)

Although a voter who is removed from the PEVL may still vote in person, young voters are more likely to be outside the county in which they would be permitted to vote in person by the time they realize they will not be receiving a mailed ballot.  (Doc. 55 ¶ 98.) And even if the voter is within the correct county, Arizona has had the "most widespread reduction" in polling places of any state over the last decade—the state now has 320 fewer polling places than it did in 2012.  (*Id.* ¶ 48.)  At least one in five people over the age of 70 do not drive.  (Doc. 1 ¶ 83.)  People of color are less likely to have reliable access to a vehicle and are more likely to have a job with inflexible scheduling, making it difficult to travel to vote in person.  (*Id.*) Voters who live on the state's tribal lands are likely to face transportation accessibility issues and long distances to travel to a polling place.  (Doc. 55 ¶ 97.)

E.    **S.B. 1003**

Under Arizona law, early vote ballots must include a signed affidavit.  (Doc. 1 ¶ 85). S.B. 1003 provides that, if an early ballot arrives without a signed affidavit, the voter must sign the affidavit by 7:00 PM on election day in order for the ballot to be counted. (*Id.* ¶ 86.)  In contrast, if an early ballot arrives with a signature that does not appear to match voter registration records, a 2019 law allows the voter to cure the mismatched signature up to five days after a federal election.  (*Id.* ¶ 85.)

Before the 2020 election, Defendant Hobbs wanted to issue guidance in Arizona's Election Procedures Manual ("EPM") that would allow missing and mismatched signatures to be cured on the same timeline—within five days of the election.  (*Id.* ¶ 85 n.21.) Defendant Hobbs has stated that there is no reason to distinguish between unsigned and mismatched ballots and that Arizona could easily allow unsigned ballots to be cured during a five-day post-election cure period because Arizona already allows such a cure period for

other voter identification issues.  (*Id.* ¶ 96.)  Arizona is the only state in the country that imposes an inconsistent cure period for voters.  (Doc. 55 ¶ 55.)  Defendant Brnovich objected to the proposed guidance,[4] so Defendant Hobbs issued revised guidance that missing signatures would have to be cured by 7:00 PM on election day.  (Doc. 1 ¶ 85 n.21.)

Even if an unsigned ballot is received well before election day, S.B. 1003 requires only that election officials make "reasonable efforts" to contact the voter and allow the voter to sign the ballot before 7:00 PM on election day.  (*Id.* ¶ 88.)  The law does not specify what reasonable efforts must be made.  (*Id.*)  Nor is there a provision in the law that provides alternatives for voters who cannot reasonably travel to the place where their ballots are held.  (*Id.* ¶ 89.)

Native American voters already struggle to access polling places and election offices, which would slow the process by which they receive notice of signature deficiencies.  (*Id.* ¶ 91.)  Black and Latino voters often live in neighborhoods with limited access to public transportation and few election offices, and people of color are nearly twice as likely to lack access to a car as white Americans.  (*Id.* ¶ 92.)  In Maricopa County, voters in neighborhoods with high concentrations of black and Latino voters would have to travel two hours by public transportation—each way—to provide a missing signature, or the equivalent of between $7 and $19.50 in taxi fare.  (*Id.*)  In Yuma County, neighborhoods with high concentrations of black and Latino voters are between 25 and 90 minutes away from election offices by car, or the equivalent of a $75 taxi ride.  (*Id.*)  No provision of S.B. 1003 requires that notice be given in a language spoken by the voter, and voters with a language barrier are more likely to violate the signature requirement, less likely to be aware of the need to cure deficiencies, and more likely to fail to successfully communicate with election officials.  (*Id.* ¶ 93.)  Disabled voters often struggle to access public transportation, and voters who cannot physically provide a valid signature risk having their ballots discarded without sufficient time to cure the ballot. (*Id.* ¶ 94.)

---

[4]     Arizona law requires the Attorney General to approve the draft EPM before it goes into effect.  (Doc. 55 ¶ 54.)

F.     **Plaintiffs' Organizing Efforts**

Plaintiff Living United for Change in Arizona ("LUCHA") is a nonprofit organization that organizes voter registration drives and educates voters by, for example, encouraging them to register for Arizona's PEVL.  (*Id.* ¶ 9.)  Up to 80% of LUCHA's 93,000 members are early voters, and LUCHA's membership includes people of color, students, the elderly, and the economically disadvantaged.  (*Id.* ¶ 11.)

As a result of the challenged legislation, LUCHA must "divert money, personnel, time and resources away from other activities" to ensure that voters, "particularly of color and those who are low income, can navigate the restrictions" created by the challenged legislation.  (*Id.* ¶ 10.)  These diversions have already occurred and will continue to occur. (*Id.*)  LUCHA must now train volunteers about the challenged legislation, create voter education campaigns to combat misinformation about the challenged legislation, and dedicate more support to ballot-curing efforts.  (*Id.*)

Plaintiff League of Conservation Voters ("Chispa AZ"), a network of around 20,000 members and volunteers, aims to increase political participation among Latinos and low-income communities of color in Arizona.  (*Id.* ¶ 12.)  Chispa AZ performs similar services as LUCHA and those services will be diverted by the challenged legislation, thus requiring more resources overall, in a similar way.  (*Id.* ¶¶ 12-13.)

Plaintiff Mi Familia Vota ("MFV") is a national nonprofit dedicated to uniting Latino, immigrant, and allied communities to promote social and economic justice.  (*Id.* ¶ 15.)  MFV has operations in six states, including Arizona, where it is headquartered.  (*Id.*) MFV has 14,000 members in Arizona.  (*Id.*)  MFV performs similar services as LUCHA, and those services will be diverted by the challenged legislation, thus requiring more resources overall, in a similar way.  (*Id.* ¶¶ 16-17.)  During a voter registration drive performed before the 2020 election, more than 90% of individuals registered by MFV also signed up for the PEVL.  (*Id.* ¶ 16.)

1    Plaintiff Arizona Coalition for Change ("AZC4C") performs similar services as
2    LUCHA, and those services will be diverted by the challenged legislation, thus requiring
3    more resources overall, in a similar way. (*Id.* ¶¶ 19-20.)
4    II.    Relevant Procedural Background
5          On August 17, 2021, Plaintiffs filed the complaint.  (Doc. 1.)
6          On September 2, 2021, the Republican Party committees moved to intervene.  (Doc.
7    28.)
8          On September 24, 2021, the Democratic Party committees moved to intervene.
9    (Doc. 50.)
10         On October 4, 2021, the Court granted the motions to intervene.  (Doc. 53.)  That
11   same day, Intervenor-Plaintiffs filed a complaint.  (Doc. 55.)
12         On November 24, 2021, the State filed the motion now pending before the Court—
13   a corrected, consolidated motion to dismiss both complaints under Rules 12(b)(1) and
14   12(b)(6).  (Doc. 76.)
15         On November 26, 2021, Intervenor-Defendants filed a joinder in the State's motion.
16   (Doc. 77.)
17         On November 30, 2021, the United States filed a statement of interest.  (Doc. 78.)
18         On December 12, 2021, the State filed a notice regarding the Ninth Circuit's
19   decision in *Arizona Democratic Party v. Hobbs*, 18 F.4th 1179 (9th Cir. 2021).  (Doc. 83.)
20         On January 4, 2022, Plaintiffs and Intervenor-Plaintiffs filed responses to the State's
21   motion to dismiss.  (Docs. 99, 100.)
22         On February 16, 2022, the State filed a consolidated reply in support of its motion
23   to dismiss.  (Doc. 118.)
24         On March 14, 2022, Plaintiffs filed a notice that they would not be seeking a
25   preliminary injunction.  (Doc. 123.)
26         On May 16, 2022, the Court issued a tentative ruling.  (Doc. 144.)
27         On June 7, 2022, the Court heard oral argument.
28         …

**DISCUSSION**

I.  <u>Legal Standard</u>

Rule 12(b)(1) of the Federal Rules of Civil Procedure provides that a defendant may move to dismiss an action for "lack of subject-matter jurisdiction." Courts "have an independent obligation to determine whether subject-matter jurisdiction exists." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). *See also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). "Under Rule 12(b)(1), a defendant may challenge the plaintiff's jurisdictional allegations in one of two ways. A 'facial' attack accepts the truth of the plaintiff's allegations but asserts that they are insufficient on their face to invoke federal jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (citation omitted). "A 'factual' attack, by contrast, contests the truth of the plaintiff's factual allegations, usually by introducing evidence outside the pleadings." *Id.* The plaintiff bears the burden of establishing that subject-matter jurisdiction exists. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

To survive a motion to dismiss under Rule 12(b)(6), "a party must allege 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1144-45 (internal quotation marks omitted). However, the court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 679-80. Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 679. The Court also may dismiss due to "a lack of a cognizable theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

II.    Analysis

   A.    **Facial Versus As-Applied Challenge**

   "A facial challenge is a claim that the legislature has violated the Constitution, while an as-applied challenge is a claim directed at the execution of the law." *Young v. Hawaii*, 992 F.3d 765, 779 (9th Cir. 2021).

   Throughout its briefing, the State argues that Plaintiffs "have not pled a viable facial claim." (Doc. 118 at 17.  *See also* Doc. 76 at 10, 21-22.)  In a nutshell, the State contends that (1) Plaintiffs cannot argue the challenged legislation is "particularly burdensome as applied to particular groups" because their claim is facial, not as-applied, and "they have not joined any such affected voters" as plaintiffs (Doc. 118 at 12); and (2) any facial claim is necessarily invalid because there are obvious scenarios in which the application of the challenged legislation would not raise constitutional concerns (*id.* at 17).  In response, Plaintiffs accuse the State of "fundamentally misunderstand[ing]" how the Supreme Court has considered "a facial versus as-applied challenge in this context" and argue that "[t]he distinction between facial and as-applied challenges is irrelevant at the pleading stage." (Doc. 99 at 18-20 & n.12.)

   The State is not entitled to dismissal based on its arguments related to facial versus as-applied challenges.  As an initial matter, the Supreme Court has emphasized that "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge.  The distinction . . . goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010).  It is difficult to reconcile the State's position—that Plaintiffs' claims must be dismissed at the pleading stage due to Plaintiffs' imprecision in defining the nature of their challenge—with this principle.

   At any rate, Plaintiffs' argument that the challenged legislation creates burdens that will be disproportionately borne by particular groups does not necessarily mean they are raising an as-applied challenge.  As discussed in more detail below, Plaintiffs contend those

uneven burdens are evidence of a constitutional violation (the legislature's discriminatory motive or a severe burden on the right to vote) that infects the legislation itself. The Ninth Circuit has suggested that such claims may be raised as part of a facial challenge to a voting law. *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1024 n.2 (9th Cir. 2016) ("Under *Burdick*, courts are to assess the 'character and magnitude' of the asserted burden, the proven strength of the state's interest, and whether the extent of the burden is 'necessary' given the strength of that interest, so as to ferret out and reject unconstitutional restrictions. . . . [I]n so doing, courts may consider not only a given law's impact on the electorate in general, but also its impact on subgroups, for whom the burden, when considered in context, may be more severe.") (citations omitted).[5] Proceeding under this theory may make it more difficult to prevail on a facial challenge,[6] but it does not necessarily transform the challenge into an as-applied challenge.

The State also fails to cite any cases suggesting that Plaintiffs must join individual voters as parties before raising the type of challenges being raised here. Nor would such a rule make sense. As alleged in the complaint, Plaintiffs are organizations dedicated to serving the groups that are affected in disproportionate ways by the challenged legislation

---

[5]      The Court notes that, in *Crawford v. Marion County Election Bd.*, 553 U.S. 181 (2008), the plaintiffs "advanced a broad attack on the constitutionality of" an Indiana voter-identification statute, "seeking relief that would invalidate the statute in all its applications." *Id.* at 200. In raising this challenge, the plaintiffs asked the courts "to perform a unique balancing analysis that looks specifically at a small number of voters who may experience a special burden under the statute and weighs their burdens against the State's broad interests in protecting election integrity." *Id.* Some members of the Court characterized this as a "facial challenge" to the Indiana law in the course of explaining why the challenge lacked merit. *Id.* at 201-02. However, other members of the Court (who otherwise concurred in the rejection of the challenge) characterized as "irrelevant" the "petitioners' premise that the voter-identification law 'may have imposed a special burden on' some voters" and stated that "weighing the burden of a nondiscriminatory voting law upon each voter and concomitantly requiring exceptions for vulnerable voters would effectively turn back decades of equal-protection jurisprudence." *Id.* at 204-07 (Scalia, J., concurring). In any event, this Court must follow the Ninth Circuit's subsequent decision in *Public Integrity Alliance*, which holds that district courts must consider whether a challenged voting law creates a severe burden on subgroups.

[6]      In *Crawford*, the Supreme Court rejected the challenge in part because "petitioners have not demonstrated that the proper remedy—even assuming an unjustified burden on some voters—would be to invalidate the entire statute." 553 U.S. at 202-03 (citations and internal quotation marks omitted).

and Plaintiffs will suffer various injuries due to these disproportionate burdens.  The State does not challenge the sufficiency of these allegations for purposes of standing.  Thus, it is unclear why Plaintiffs would need to formally join individual voters as parties as a prerequisite to raising the type of challenges they seek to raise here.

*United States v. Salerno*, 481 U.S. 739 (1987), does not compel a different conclusion.  The State cited *Salerno* for the proposition that those who bring a facial claim against legislation must allege that "no set of circumstances exists under which the Act[s] would be valid."  (Doc. 76 at 10.)  The State argues that, for example, a voter who has never used his PEVL privileges since joining the list in 2017 can be removed from the PEVL without violating the Constitution.  (*Id.* at 22.)  But even assuming the State is correct, this would at most affect the scope of relief that Plaintiffs could obtain at the conclusion of this action.  *Cf. Frank v. Walker*, 819 F.3d 384, 386-87 (7th Cir. 2016) ("The district court had held in 2014 that, because some voters face undue difficulties in obtaining acceptable photo IDs, Wisconsin could not require any voter to present a photo ID. . . .  We reversed that injunction . . . [because] an across-the-board injunction would be improper because the application of the statute to the vast majority of Indiana voters is amply justified . . . .  The argument plaintiffs now present is different.  Instead of saying that inconvenience for some voters means that no one needs photo ID, plaintiffs contend that high hurdles for some persons eligible to vote entitle those particular persons to relief.  Plaintiffs' approach is potentially sound . . . .") (cleaned up).

### B.    **Count One**

In Count One of the complaint, Plaintiffs argue that S.B. 1485 and S.B. 1003, individually and collectively, are unconstitutional because they create an undue burden on the right to vote.  (Doc. 1 ¶¶ 127-35.)  The State argues (Doc. 76 at 15-16), and Plaintiffs seem to agree (Doc. 99 at 13), that the *Anderson-Burdick* framework supplies the relevant test when evaluating such a claim.[7]  That framework is a "flexible standard" balances the

---

[7]    This framework draws its name from *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992).

severity of the restriction against the government's asserted interest.  *Dudum v. Arntz*, 640 F.3d 1098, 1105-1106 (9th Cir. 2011). Severe restrictions trigger strict scrutiny, but less-than-severe restrictions only require the government to establish "important regulatory interests." *Id.*

    1.   <u>S.B. 1003</u>

    a.   ***Hobbs***

Before turning to Plaintiffs' Count One challenge to S.B. 1003, it is necessary to address the elephant in the room—the Ninth Circuit's decision in *Arizona Democratic Party v. Hobbs*, 18 F.4th 1179 (9th Cir. 2021), which was issued as the motion-to-dismiss briefing process was unfolding.

*Hobbs* involved a challenge to a provision of Arizona's then-applicable EPM that ordered county recorders not to count ballots with unsigned affidavits, but rather to "make a reasonable and meaningful attempt" to contact the voter, and to allow such voters to cure the missing signature until 7:00 PM on Election Day. *Arizona Democratic Party v. Hobbs*, 485 F. Supp. 3d 1073, 1082 (D. Ariz. 2020).  The provision at issue in *Hobbs* was identical, in substance, to S.B. 1003—the only difference is that the former appeared in the EPM while the latter clarified that the same rule should be codified in Arizona's statutory law. The plaintiffs in *Hobbs* argued that the prohibition on curing missing signatures after election night unjustifiably burdened the right to vote.  *Id.*  The district court granted the plaintiffs' request for a preliminary injunction but the Ninth Circuit reversed.

As for the burden created by the challenged rule, the Ninth Circuit held that "the election-day deadline for submitting a completed ballot imposes, at most, a minimal burden." *Hobbs*, 18 F.4th at 1187.  Under *Anderson-Burdick*, this determination meant that strict scrutiny did not apply and Arizona only needed to establish that the challenged rule was supported by "important regulatory interests."  *Id.* at 1186-87, 1190.  The court held that this standard was satisfied in light of "the State's important regulatory interest in reducing administrative burdens on poll workers." *Id.* at 1194.  Thus, the court concluded that "Arizona's law is constitutional." *Id.* at 1196.  However, in reaching these conclusions,

the court emphasized that "Plaintiffs have not alleged that the burden of signing the affidavit falls disproportionately on a discrete group of voters, thereby implicating heightened constitutional concerns" or that "the burden of fixing a missing signature—that is, casting a replacement or provisional ballot—falls disproportionately on a discrete group, thereby implicating heightened constitutional concerns." *Id.* at 1190.   The court characterized these omissions as "[i]mportant to our analysis." *Id.*

### b.   **The Parties' Arguments**

The State argues that "this Court should dismiss the virtually identical *Anderson-Burdick* claim here for the reasons explained by *Hobbs*." (Doc. 83 at 2.) The State asserts that *Hobbs* conclusively establishes that the rule codified by S.B. 1003 imposes a minimal burden on voting rights that is outweighed by the State's important interest in reducing administrative burdens on poll workers. (*Id.* at 2-3.)[8]

Plaintiffs make three points in response: (1) *Hobbs* is distinguishable because the plaintiffs there did not argue that the burdens of the challenged law fall disproportionately on discrete groups of voters; (2) *Hobbs* did not (and could not) review evidence from the November 2020 election, which strengthens the burden argument; and (3) *Hobbs* did not rule on the cumulative burden created by S.B. 1003 and S.B. 1485, as is asserted here. (Doc. 99 at 19-20.)

The State makes five points in reply: (1) because Plaintiffs lack standing to bring as-applied challenges, they cannot contend that S.B. 1003 is particularly burdensome when applied to particular groups; (2) Plaintiffs do not allege that the burden of *signing* the affidavit falls disproportionately on discrete groups; (3) even if there are racial disparities regarding the burden of curing a ballot affidavit, the burdens are still minimal; (4) Plaintiffs may not rely on "cumulative" burdens because the two laws are not meaningfully cumulative; and (5) Plaintiffs may not rely on 2020 voting evidence because they have not offered specific factual allegations concerning that evidence. (Doc. 118 at 12-16.)

---

[8]     The State also asserted collateral estoppel and *res judicata* claims that have since been withdrawn.  (Doc. 83 at 2; Doc. 118 at 29.)

1    c.    **Analysis**

2        The Court agrees with the State that Plaintiffs' challenge to S.B. 1003 in Count One

3    is subject to dismissal.  In *Hobbs*, the Ninth Circuit rejected a challenge to what is

4    essentially the same law, and although Plaintiffs purport to identify various differences

5    between this case and *Hobbs*, those differences are immaterial.

6        As for Plaintiffs' contention that they "intend to introduce evidence based on how

7    the cure period was actually implemented in the 2020 election" (Doc. 99 at 19-20), the

8    problem is that none of the allegations in the complaint pertaining to the 2020 election

9    touch upon (let alone call into question) the two core factual determinations underlying

10   *Hobbs*: first, that the election-night curing deadline creates only a minor burden on the right

11   to vote; and second, that the deadline furthers Arizona's important regulatory interest in

12   reducing administrative burdens on poll workers.  Although Plaintiffs point to paragraphs

13   64-68 of their complaint as "a crucial backdrop" for the challenged legislation, those

14   paragraphs only allege that the State's putative interests in preventing election fraud are

15   unfounded or misleading.  *Hobbs* did not mention the word "fraud"—instead, the court

16   upheld the law based on the state's important interest of reducing administrative burdens.

17   Thus, Plaintiffs have not alleged facts that would distinguish this case from *Hobbs*.

18       As for Plaintiffs' contention that *Hobbs* is distinguishable because it only involved

19   a challenge to one election law, whereas here S.B. 1003 and S.B. 1485 must be considered

20   "collectively" and are "cumulative" (Doc. 99 at 20), the problem once again is that the

21   complaint is devoid of well-pleaded facts that might support this conclusion.  Nor do

22   Plaintiffs elsewhere explain how the combination of the two laws burdens Arizona's voters

23   more than they do individually.  The Court can imagine how a pair of election laws could

24   be more onerous when combined: for instance, one law that required voters to use their

25   own pen to mark ballots, and another that prevented voters from returning to the polling

26   place if they forgot to bring a pen. Reviewing those laws separately might not recognize

27   the burden they create together.  But the laws challenged here are not obviously cumulative.

28   Indeed, S.B. 1485 is being challenged under the theory that it will *prevent* voters from

receiving a mailed ballot, whereas S.B. 1003 is being challenged because it will make it difficult for voters who *receive* a mailed ballot (notwithstanding the obstacles created by S.B. 1485) to go further and cast that ballot in a meaningful way.  Tellingly, Plaintiffs' only response is that the State's objection "rings hollow" because the State's own briefing mentions other election laws that are not challenged here.  At minimum, this response does not explain why the two challenged laws must be considered cumulatively.

More fundamentally, even accepting that the cumulative burden arising from two challenged voting laws may be greater than the individual burden arising from either law, it doesn't follow that the cumulative burden is necessarily significant.  In *Hobbs*, the Ninth Circuit held that "[t]he election-day deadline for submitting a completed ballot imposes, at most, a minimal burden."  18 F.4th at 1187.  As discussed elsewhere in this order, the burden arising from S.B. 1485 is also, at most, minimal.  The sum of these two burdens remains minimal.  *Cf. Henderson v. Kennedy*, 253 F.3d 12, 19 (D.C. Cir. 2001) ("For this argument to prevail, one would have to conclude that . . . the combination of two untenable claims equals a tenable one.  But in law as in mathematics zero plus zero equals zero.").

Plaintiffs' final basis for distinguishing *Hobbs* is that they are making the sort of "disparate impact on discrete groups of voters" claim that was absent in *Hobbs*.  (Doc. 99 at 19.)  Although this argument presents a closer call, it ultimately does not provide a basis for avoiding dismissal.

As noted, the Ninth Circuit in *Hobbs* took pains to note that the plaintiffs were not arguing that the burdens arising from the signature-curing deadline fell disproportionately on a discrete group of voters.  18 F.4th at 1190.  The court held that such disproportionate burdens "are more likely to raise constitutional concerns" and characterized the absence of allegations on this point as "[i]mportant to our analysis."  *Id.  Hobbs* thus suggests that Plaintiffs' allegations of disproportionate burden here might qualify as a weightier burden than the one dismissed as insufficient in *Hobbs*.

Weightier, however, does not necessarily mean moderate or severe.  Accordingly, it is necessary to look to other portions of *Hobbs* when evaluating whether the type of

allegations raised by Plaintiffs would be considered sufficient under Ninth Circuit law. *Hart v. Massanari*, 266 F.3d 1155, 1170 (9th Cir. 2001) ("In determining whether it is bound by an earlier decision, a court considers . . . other rules considered and rejected . . . . [W]hen crafting binding authority, the precise language employed is often crucial to the contours and scope of the rule announced."). Notably, *Hobbs* cited *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Bullock v. Carter*, 405 U.S. 134 (1972), as two examples of the type of evidence was *not* present in *Hobbs*. In *Anderson*, the Supreme Court concluded that an Ohio statute that imposed an early filing deadline on independent candidates, but not candidates of recognized parties, "discriminates against those candidates and—of particular importance—against those voters whose political preferences lie outside the existing political parties." 460 U.S. at 793-94. In *Bullock*, the Court concluded that exorbitant filing fees for a candidate to appear on the ballot of a primary election (as high as $8,900 in 1972, or approximately $61,000 today[9]) raised the "obvious likelihood that this limitation would fall more heavily on the less affluent segment of the community." 405 U.S. at 144.

Having taken the Ninth Circuit's guidance as far as it will go, the Court must now compare Plaintiffs' well-pleaded allegations of disproportionate burden to the examples provided in *Hobbs*. The Court will begin by setting forth each well-pleaded fact in Plaintiffs' complaint that is relevant to the disproportionate burden arising from S.B. 1003:

▪ Arizona election officials already deprive many Native American voters who live on reservations of reasonable access to polling places and election offices. Lack of access to post offices and street addresses slows the process by which they obtain and submit ballots and would similarly slow the process by which they receive notice of deficiencies. (Doc. 1 ¶ 91.)

▪ Black and Latino voters are also burdened by lack of reasonable access to polling places and election offices. Many such voters live in neighborhoods with unequal and insufficient infrastructure. People of color are nearly twice as likely to lack access to a car than white Americans. In Maricopa County, for example, voters in neighborhoods with high concentrations of black and Latino voters would have to travel up to two hours one way by public

---

[9] U.S. Inflation Calculator, https://www.usinflationcalculator.com (last visited Apr. 25, 2022).

transportation in order to provide a missing signature.  It would cost such voters between $7 and $19.50 each way to take a taxi to the election office. In Yuma County, neighborhoods with high concentrations of black and Latino voters are between 25 and 90 minutes away from election offices by car, and a cab could cost nearly $75.  (*Id.* ¶ 92.)

▪ Lack of language access substantially increases the likelihood that voters will miss the signature requirement and be unaware of the need for curing. Language barriers also make it more challenging for these voters to understand any notice of the ballot's deficiency, communicate with elections officials, or learn what they need to do to cure their ballots.  No provision in S.B. 1003 provides for notice to be given in a language spoken by the voter. (*Id.* ¶ 93.)

▪ Finally, disabled voters often struggle to access public transportation. Voters who are unable to provide a physical signature, or whose marks are not recognized as a signature, risk having their ballots discarded without sufficient time to cure their ballots.  (*Id.* ¶ 94.)

The putative disparate burdens can thus be split into four categories: (1) inconsistent mail service (disproportionately burdening Native Americans); (2) limited access to transportation and election offices (disproportionately burdening some black, Latino, and disabled voters); (3) inability to read and understand a ballot's signature requirement and/or instructions for curing a missing signature (disproportionately burdening those with language barriers); and (4) inability to validly sign a ballot (disproportionately burdening disabled voters).

These facts, accepted as true and viewed in the light most favorable to Plaintiffs, do not compare to the situations in *Anderson* or *Bullock*, which involved regulations that necessarily affected all members of a discrete group (independent voters and candidates in *Anderson*, "less affluent" candidates in *Bullock*) but did not affect members of other groups.  This case is different for at least three reasons.  First, Plaintiffs allege that some Native American, black, Latino, and disabled voters struggle to reliably receive mail and access transportation—many others, by implication, do not.  Further, many voters who are *not* Native American, black, Latino, or disabled also experience these burdens because they are poor or live in rural areas.  Second, it is true that anyone who struggles with a language barrier may be unable to understand and comply with cure notices that require an affidavit

to be signed by 7:00 PM on Election Day—but they may be just as unable to comply with the cure deadlines that *Plaintiffs* prefer because they will be just as unable to understand notices setting forth Plaintiffs' preferred deadlines.  And third, Arizona law permits disabled voters to allow others to sign for them, which suggests that even some voters that are profoundly disabled will not face this burden.  A.R.S § 16-547.

Each of the burdens Plaintiffs raise are thus either the broadly distributed externalities of normal "differences in employment, wealth, and education [that are] virtually impossible for a State to" eliminate, *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2343 (2021), or are burdens that would equally beset the voter's ability to receive, sign, and send the affidavit itself, which is not challenged by this lawsuit.  Given that a vanishingly small percentage[10] of voters experience any difficulty with the signature requirement in the first place, Plaintiffs' allegation that only some members of some demographics of a minuscule fraction of voters will be burdened disproportionately cannot plausibly convert "at most, a minimal burden" into a severe one.

This conclusion is underscored by the fact that, as the Ninth Circuit recognized in *Hobbs*, "the challenged cure provision is more lenient than that of many other States." *Id.* at 1185.  Although "[m]ost forms of voter negligence have no remedy," "Arizona law offers a measure of grace" for "voters who forget to sign the affidavit." *Id.* at 1188.  In the Court's view, it would be anomalous to conclude that Arizona's approach of allowing voters to cure missing signatures on mailed ballots, so long as the curing occurs by election night, qualifies as a severe and unconstitutional burden on the right to vote even though many of its sister states do not allow for curing at all.  *Cf. Brnovich*, 141 S. Ct. at 2338-39 ("Because every voting rule imposes a burden of some sort, it is useful to have benchmarks with which the burdens imposed by a challenged rule can be compared. . . .  We doubt that Congress intended to uproot facially neutral time, place, and manner regulations that . . .

---

[10]     "Arizona election officials reject only a small fraction—approximately one-tenth of one percent—of the total number of ballots due to a missing signature.  Missing signatures led officials to reject 3,079 ballots in 2016 and 2,435 ballots in 2018." *Hobbs*, 18 F.4th at 1190.

are in widespread use in the United States.").  True, Arizona could have made it even easier to cure missing signatures, such as by enacting a later curing deadline, but the mere existence of a less-restrictive option does not mean that Arizona's chosen option is constitutionally suspect.  *Short v. Brown*, 893 F.3d 671, 676 (9th Cir. 2018) ("No one disputes that the right to vote is fundamental.  But not all election laws impose constitutionally suspect burdens on that right.  And states retain broad authority to structure and regulate elections.") (citations omitted).  After all, "the Constitution merely sets a floor. Nothing in our opinion should be construed as dissuading Arizona, or other States, from providing a more generous deadline than the Constitution requires. . . .  We are not called upon to express our political views; instead, we merely decide the narrow question before us: whether this one voting regulation violates the Constitution."  *Hobbs*, 18 F.4th at 1195 (citations omitted).

To be clear, Plaintiffs are correct that they "do not need to offer 'evidence' at the motion-to-dismiss stage."  (Doc. 99 at 20.)  However, Plaintiffs do need to offer well-pleaded factual allegations supporting their claim.  *Iqbal*, 556 U.S. at 679.  Here, Plaintiffs have failed to plead a disproportionate burden that would distinguish their case from *Hobbs*.  Thus, there would be no point in allowing discovery with respect to Plaintiffs' challenge to S.B. 1003 in Count One—even if the discovery process ended up generating evidence that fully supported all of the factual allegations in the complaint, that evidence still would not establish anything more than a minimal burden on the right to vote.

Given this conclusion, it follows that S.B. 1003 is not unconstitutional under the *Anderson-Burdick* framework.  In *Hobbs*, the Ninth Circuit held that "[t]he State has an important regulatory interest in reducing the administrative burden on poll workers, and Plaintiffs' proposed relief would increase that burden in a meaningful manner."  18 F.4th at 1192.  In reaching this conclusion, the court acknowledged that Arizona *could* allow for post-election curing of missing signatures and that Arizona already allowed for the curing of *mismatched* signatures but held that these features of Arizona law did not undermine the bottom-line conclusion that "the State's important regulatory interest in reducing

administrative burdens on poll workers sufficiently justifies the minimal burden on a voter to sign the affidavit or to correct a missing signature by election day."  *Id.* at 1192-94. Here, similarly, none of the well-pleaded factual allegations in the complaint undermine the State's contention that requiring Arizona to extend the current deadline for curing missing signatures would result in an increased administrative burden.  Indeed, Plaintiffs don't appear to challenge this aspect of *Hobbs* in their response to the motion to dismiss— all of their effort to distinguish *Hobbs* turn on the Ninth Circuit's analysis concerning the first prong of the *Anderson-Burdick* analysis, which evaluates the severity of the burden placed on the right to vote, and not the second prong, which evaluates the State's regulatory interests (including administrative burdens).

"[V]oting regulations are rarely subjected to strict scrutiny."  *Dudum*, 640 F.3d at 1106.  Rarer still is the situation where a district court is presented with the Ninth Circuit's definitive answer to a nearly identical question but finds reason to chart its own course. The Court concludes that Plaintiffs' *Anderson-Burdick* challenge to S.B. 1003 in Count One must be dismissed for failure to state a claim.

2.   S.B. 1485

a.   **The Parties' Arguments**

The State argues that "Plaintiffs have no right to vote by mail at all—let alone remain on an EVL despite chronic non-voting." (Doc. 76 at 16.)  "To the extent Plaintiffs' claim is cognizable at all," the State argues that "the actual burden imposed is truly minimal," especially when compared to early voting programs in other states, and that the State's important interests in reducing administrative burdens and costs and securing elections are sufficient to sustain S.B. 1485.  (*Id.* at 17-21.)  Finally, the State argues that Plaintiffs have not satisfied the requirements to bring a facial claim.  (*Id.* at 21-22.)

Plaintiffs respond that the Court cannot resolve this claim on the pleadings without a fully developed evidentiary record, particularly when the law allegedly places a disproportionate burden on an identifiable segment of voters and is thus more likely to raise constitutional concerns.  (Doc. 99 at 14.)  Plaintiffs argue that "[n]one of the cases the

[State] cites show that SB 1485's burden can be deemed 'minimal' on a motion to dismiss." (*Id.* at 15.)  Plaintiffs also assert that, even if the actual burden is minimal, the State's putative interests are insufficient: the cost of printing, processing, and sending all mail-in ballots for Maricopa County is not enough to "deprive citizens of their constitutional right to vote" and the interest in secure elections "is a pretext and lacks a rational basis."  (*Id.* at 16-17.)

In reply, the State contends that, under *Short v. Brown*, 893 F.3d 671 (9th Cir. 2018), and given that Arizona's voting regime is much more generous than the norm, the burden imposed by S.B. 1485 is extremely minimal.  (Doc. 118 at 17-20.)  The State also argues that its interest in reducing administrative burdens is "concrete and substantial" and that its interest in securing elections is a compelling interest that cannot be defeated by allegations about the subjective motivations of legislators.  (*Id.* at 22-23.)

b.   **Analysis**

As with S.B. 1003, the Court does not write on a clean slate when analyzing Plaintiffs' challenge to S.B. 1485.  Just as *Hobbs* serves as the starting point (and, in many respects, the ending point) for the analysis concerning S.B. 1003, the Ninth Circuit's recent decision in *Short v. Brown* serves as the starting point for the analysis concerning S.B. 1485.

*Short* involved a challenge to California's Voter's Choice Act ("VCA").  893 F.3d at 674.  The VCA created an "all-mailed ballot system," under which "a ballot is automatically mailed to every registered voter twenty-nine days before the election date," but it did not call for statewide implementation of the new system in one fell swoop.  *Id.* at 674-75.  Instead, the VCA authorized 14 of California's 58 counties to opt into the new system in 2018 and authorized the remaining counties to opt into the new system in 2020.  *Id.*  In *Short*, the plaintiffs argued that because it was undisputed that "election participation will be higher under the all-mailed ballot election system than it would be under the traditional polling-place system," it followed that "the VCA's county-by-county structure—permitting voters in some counties to receive a ballot by mail automatically,

while requiring voters in other counties to register to receive a ballot by mail—inequitably 'dilutes' votes in 'disfavored' counties." *Id.* at 675, 677.  The district court denied the plaintiffs' request for a preliminary injunction and the Ninth Circuit affirmed.  First, when assessing the severity of the burden created by the VCA, the Court held that "[a]s for voters outside the counties that have opted in to the all-mailed system, . . . [t]o the extent that having to register to receive a mailed ballot could be viewed as a burden, it is an extremely small one, and certainly not one that demands serious constitutional scrutiny." *Id.* at 677.  In reaching this conclusion, the court emphasized (similar to the court in *Hobbs*) that the plaintiffs did "not argue that the VCA's distinction along county lines is a proxy for some other form of discrimination—that it is a racial or political gerrymander disguised as a geographic distinction." *Id.* at 679.  Finally, given that the burden created by the challenged rule was "so slight," the court concluded that California's important regulatory interests (which included "incremental election-system experimentation") were sufficient to immunize the law from constitutional challenge.  *Id.*

S.B. 1485 is similar to the VCA in that both regulate how voters may choose to vote by mail.  Even though it was undisputed in *Short* that the VCA would, as a statistical matter, make it more difficult to vote by mail in certain California counties, the Ninth Circuit held that the burden faced by voters in those counties was "so slight," "an extremely small one," and "certainly not one that demands serious constitutional scrutiny" because the only thing such voters needed to do to receive a mailed ballot was "to register." *Id.* at 677, 679.  Similarly, although S.B. 1485 will lead to some voters being removed from the PEVL, those voters can be reinstated and continue receiving mailed ballots simply by re-registering—the very step that was found to create an "extremely small" and "slight" burden in *Short*.

Plaintiffs argue that *Short* is distinguishable because it arose in the context of a request for a preliminary injunction, whereas this case involves a challenge to the pleadings. (Doc. 99 at 15.)  But *Short*'s determination that a registration requirement to receive a mailed ballot creates a "slight" and "minimal" burden on the right to vote was

not, at least in the Court's estimation, some sort of fact-bound determination that was based on the specific evidentiary record in *Short*—rather, it was a common-sense observation that has the force of law and must be applied by district courts in the Ninth Circuit in future cases.   Moreover, although the Ninth Circuit has suggested that a "fully developed evidentiary record" is sometimes necessary to evaluate an *Anderson-Burdick* challenge to a voting regulation, *Soltysik v. Padilla*, 910 F.3d 438, 447-50 (9th Cir. 2018), the Ninth Circuit has also held that the dismissal of a challenge to a voting regulation may be permissible at the pleading stage where—as here—the well-pleaded facts only establish the existence of a minimal burden on the right to vote.   *Tedards v. Ducey*, 951 F.3d 1041, 1067 (9th Cir. 2020) ("Plaintiffs argue that all of Defendants' arguments fail at the motion to dismiss stage because an evidentiary hearing is necessary to apply something more than rational basis review.  We disagree.").

    Another potential difference between this case and *Short* is that the plaintiffs in *Short* did not argue that the VCA would create a disparate impact on discrete groups of voters, whereas Plaintiffs raise such a claim here.  But the analysis as to this issue mirrors the analysis concerning H.B. 1003 and *Hobbs*.  The Court accepts that the presence of these allegations means that *Short* is not fully on point, but their presence also does not mean that Plaintiffs have necessarily alleged the existence of a moderate or severe burden on the right to vote.  Instead, the Court again looks to *Hobbs* in evaluating how the type of disparate burdens alleged in the complaint compare to the type of disparate burdens at issue in *Anderson* and *Bullock*.[11]  And once again, this comparison shows that the burdens raised by Plaintiffs are dissimilar because they are broadly distributed externalities of normal "differences in employment, wealth, and education [that are] virtually impossible for a

---

[11]     In *Short*, the Ninth Circuit seemed to identify the Sixth Circuit's decision in *Obama for America v. Husted*, 697 F.3d 423 (6th Cir. 2012), as another example of a voting regulation that would not pass muster under the *Anderson-Burdick* framework.  893 F.3d at 678.  However, *Husted* does not support Plaintiffs' position for the same reasons that *Anderson and Bullock* don't support Plaintiffs' position—there, the challenged regulation (an Ohio statute that shortened the early-voting period for the general population but not for military personnel) directly affected all members of one discrete group but no members of other discrete groups.

State to" eliminate, *Brnovich,* 141 S. Ct. at 2343, or are burdens that would equally beset the voter's *initial* ability to register for the PEVL (a requirement Plaintiffs do not challenge in this lawsuit).

Plaintiffs' challenge to S.B. 1485 is also undermined by Arizona's undisputed and judicially noticeable showing that "[a] full thirty states have no EVL for anyone."  (Doc. 76 at 18.)  In *Brnovich*, the Supreme Court emphasized that Arizona's practice of allowing "[a]ll Arizonans [to] vote by mail," without the need for a "special excuse," simply by "ask[ing] to be sent an early ballot automatically in future elections" meant that "Arizona voting law . . . generally makes it quite easy for residents to vote."  141 S. Ct. at 2333-34.  Those features of Arizona voting law remain in place after the enactment of S.B. 1485.  As discussed above with respect to S.B. 1003, it would be anomalous if Arizona's utilization of a voting practice that is substantially more generous than the voting practices of more than half of its sister states could be said to qualify as a severe or even moderate burden on the right to vote.  Plaintiffs make much of the fact that S.B. 1485 represents a retraction from Arizona's previous approach to the PEVL, but as other courts have recognized, the *Anderson-Burdick* framework does not stand for the proposition "that any expansion of voting rights must remain on the books forever."  *Ohio Democratic Party v. Husted*, 834 F.3d 620, 635 (6th Cir. 2016).  "Such a rule would have a chilling effect on the democratic process: states would have little incentive to pass bills expanding voting access if, once in place, they could never be modified in a way that might arguably burden some segment of the voting population's right to vote.  Accepting the 'long recognized . . . role of the States as laboratories for devising solutions to difficult legal problems,' . . . imposing such a one-way ratchet is incompatible with the 'flexible' *Anderson-Burdick* framework."  *Id.* (citations omitted).

Because S.B. 1485 creates only a minimal burden on the right to vote, it is not subject to strict scrutiny and need only be supported by important regulatory interests.

1    Here, the State identifies two such interests: (1) reducing administrative costs and burdens
2    and (2) promoting election integrity.  (Doc. 76 at 19-21.)[12]

3           As for the former, the State has submitted judicially noticeable materials
4    establishing that the cost of mailing each early ballot is $2 to $3.  (Doc. 76 at 19, citing
5    Doc. 68 at 430.)[13]  According to the allegation in the complaint, S.B. 1485 will result in
6    the elimination of 125,000 to 150,000 voters from the PEVL.  (Doc. 1 ¶ 76.)  Thus,
7    according to Plaintiffs' own allegations, S.B. 1485 may result in a savings of up to
8    $450,000 per election cycle in the cost of printing and mailing ballots.

9           In their response to the motion to dismiss, Plaintiffs tellingly do not dispute that S.B.
10   1485 will result in *some* cost-savings benefit—they simply dismiss that benefit as "remote"
11   and "not in any sense necessary to the proper administration of [Arizona's] election laws."
12   (Doc. 99 at 16-17, citations and internal quotation marks omitted).  These arguments are
13   unavailing because, as the Ninth Circuit and other courts have recognized, cost savings
14   qualify as an important regulatory interest that may justify a regulation that creates only a
15   minimal burden on the right to vote.  *See, e.g.*, *Dudum*, 640 F.3d at 1116 ("The City points
16   to evidence that restricted IRV will save money . . . .  The interest in alleviating the costs
17   and administrative burdens of conducting additional elections can be 'a legitimate state
18   objective' that also justifies the use of IRV, given the minimal at best burdens the system
19   imposes on voters' constitutional rights to vote."); *Weber v. Shelley*, 347 F.3d 1101, 1106
20   (9th Cir. 2003) (identifying "saving money" as one of the "positive changes" that may

21   ---

22   [12]    In *Short*, the regulatory interest that was deemed sufficient was California's interest
     in "incremental election-system experimentation."  893 F.3d at 679.  Because Arizona does
     not seek to justify S.B. 1485 based on this interest, *Short*'s analysis of the second prong of
23   the *Anderson-Burdick* test is less useful here.

24   [13]    Because Plaintiffs did not oppose the State's request for judicial notice, the Court
     summarily granted it under LRCiv 7.2.  (Doc. 89.)  Additionally, although Plaintiffs assert
25   in their response to the motion to dismiss that the judicially noticeable materials merely
     establish "the costs of printing, processing and sending *all* mail-in ballots for Maricopa
     County for the November 2020 election" (Doc. 99 at 17), Plaintiffs specifically allege in
26   the complaint that "[o]ver two million of the 2.6 million registered voters in Maricopa
     County—Arizona's largest county—are on the permanent early voting list."  (Doc. 1 ¶ 69.)
27   Thus, the State's calculation of a per-ballot cost of $2-3 is a simple function of dividing
     the judicially noticeable overall cost of $4,956,384 for "Early Ballot Printing and
28   processing and Mailing" (Doc. 68 at 430) by the number of printed ballots (2 million)
     alleged in the complaint.

- 33 -

justify a voting regulation that does not "severely restrict[] the right to vote"); *Husted*, 834 F.3d at 634 n.8 ("Though saving tens of thousands of dollars may be a 'minimal' benefit when compared to the overall election budgets, we reject the district court's dubious and blanket proposition that 'where more than minimal burdens on voters are established, the State must demonstrate that such costs would actually be burdensome.' Fiscal responsibility, even if only incrementally served, is undeniably a legitimate and reasonable legislative purpose."). *Cf. Clements v. Fashing*, 457 U.S. 957, 965 (1982) ("States have important interests in . . . avoiding the expense and burden of run-off elections.").

Given this determination, the Court need not decide whether the State's other proffered regulatory interest, promoting election integrity, would also be sufficient to insulate S.B. 1485 from challenge under *Anderson-Burdick*. Plaintiffs' challenge to S.B. 1485 in Count One must be dismissed for failure to state a claim.

### C.   Counts Two And Three—S.B. 1003

In Counts Two and Three of the complaint, Plaintiffs challenge S.B. 1485 and S.B. 1003 under the theory that each law was enacted with a discriminatory purpose. In response, the State not only argues that these counts fail to state a claim but also argues that Plaintiffs (and Plaintiffs-Intervenors) lack standing to the extent they wish to challenge S.B. 1003 under a discriminatory-purpose theory. Because "a federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction)," *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007), the Court begins by addressing the State's standing challenge.

#### 1.   Legal Standard

"[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "[T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or

1    hypothetical.   Second, there must be a causal connection between the injury and the

2    conduct complained of—the injury has to be fairly traceable to the challenged action of the

3    defendant, and not the result of the independent action of some third party not before the

4    court.   Third, it must be likely, as opposed to merely speculative, that the injury will be

5    redressed by a favorable decision."   *Id.* at 560-61 (cleaned up).

6          "[T]he 'fairly traceable' and 'redressability' components for standing overlap and

7    are 'two facets of a single causation requirement.'"   *Washington Env't Council v. Bellon*,

8    732 F.3d 1131, 1146 (9th Cir. 2013) (citation omitted).   However, they are distinct in that

9    traceability "examines the connection between the alleged misconduct and injury, whereas

10   redressability analyzes the connection between the alleged injury and requested relief."   *Id.*

11   Redressability is satisfied so long as the requested remedy "would amount to a significant

12   increase in the likelihood that the plaintiff would obtain relief that directly redresses the

13   injury suffered."   *Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2012).

14                  2.      The Parties' Arguments

15         The State argues that "prior to S.B. 1003 passing, preexisting Arizona statutory law

16   affirmatively precluded counting mail-in ballots not signed or cured by poll-close time,

17   thereby barring a post-election cure period."   (Doc. 76 at 7.)   Specifically, the State points

18   to A.R.S. §16-548(A), which requires that a ballot affidavit "must be received . . . [by] 7:00

19   pm on election day," and A.R.S. § 16-552(B), which provides that "[i]f the affidavit is

20   insufficient, the vote shall not be allowed."   The State contends that the combination of the

21   two provisions means "that ballots must have arrived with their respective ballot affidavits

22   by poll-close time, and that if they are not sufficient then, the vote accordingly 'will not be

23   allowed.'"   (*Id.*)   The State argues that "because Plaintiffs' alleged injury is the inability to

24   cure non-signatures after election day, and even granting their requested relief as to S.B.

25   1003 *in its entirety* would not allow them do so, Plaintiffs cannot satisfy their burden to

26   establish redressability."   (*Id.* at 8.)   The State adds that Plaintiffs fundamentally ask the

27   Court to "conjure a law providing for . . . curing" because there "is no pre-existing law to

28   revert to that would permit such curing," and because neither the Reconstruction

1    Amendments nor the VRA permit that result, the Court cannot redress Plaintiffs' putative

2    injury.  (*Id.* at 9.)  Finally, the State contends that it "raised this precise argument in" *Hobbs*.

3    (*Id.* at 8.)

4          Plaintiffs respond that, regardless of the Court's interpretation of preexisting

5    Arizona law, "a favorable ruling will redress the harm of racial discrimination," which

6    itself constitutes an Article III injury.  (Doc. 99 at 21.)  Plaintiffs also argue that the State's

7    interpretation of state law presents, "at best, a disputed issue."  (*Id.* at 22.)  Plaintiffs assert

8    that the State's proffered interpretation "conflates two separate processes" and "violates

9    bedrock rules of statutory construction."  (*Id.* at 22-23.)  Plaintiffs also point to Defendant

10   Hobbs' answer, which purportedly states that, "prior to SB 1003, nothing in Arizona law

11   prohibited election officials from allowing voters to cure unsigned early ballots after

12   election day."  (*Id.* at 22 [citing Doc. 63 ¶ 53].)  Plaintiffs support Defendant Hobbs'

13   position by reference to the 2021 EPM, which "implemented S.B. 1003 by requiring curing

14   of unsigned early ballots by election day.  It does not cite any other, pre-existing Arizona

15   law as the basis of its authority to impose that requirement."  (*Id.* at 30.)  Finally, Plaintiffs

16   argue that "the Court need not resolve these questions of Arizona law" because "[e]njoining

17   S.B. 1003 would, at the very least, leave Arizona officials and judges free to resolve

18   whether post-election curing is permitted under state law *without* being dictated to choose

19   one result by an unconstitutionally discriminatory law."  (*Id.* at 23.)

20         The State replies that *Hobbs* recognized that "Arizona always has imposed the

21   election-day deadline on voters to submit a signed ballot" and that Plaintiffs' contrary

22   contentions fail.  (Doc. 118 at 7-8.)  The State also asserts that Plaintiffs' arguments about

23   the 2021 EPM are categorically false.[14]  (*Id.* at 8-9.)  The State also interprets Plaintiffs'

24   argument about "the harm of racial discrimination" as a "stigmatic injury," which

25   according to the State can only exist when a plaintiff is personally subject to discriminatory

26   treatment.  (*Id.* at 17-18.)  Because Plaintiffs do not allege they were personally subject to

---

27   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

28   [14]     Following the submission of the State's reply, Plaintiffs filed a notice in which they acknowledged that their response brief "mistakenly characterized the legal status of the draft 2021 EPM."  (Doc. 122 at 2.)

discriminatory treatment, and because bare discriminatory intent alone is "abstract stigmatic injury" that is not cognizable, the State argues that Plaintiffs have not established standing. (*Id.* at 18.)

### 3. Analysis

The Court agrees that Plaintiffs lack standing to pursue their challenges in Counts Two and Three against S.B. 1003. As discussed in Part I.F of the Background section of this order, Plaintiffs are nonprofit organizations who allege that, because S.B. 1003 will make voting more difficult for members of the communities they serve, they will need to divert their resources in various ways to support educational and ballot-curing efforts. Similarly, Plaintiffs-Intervenors are political organizations who allege that, because "[i]t is inevitable that Democrats or those who would support Democratic candidates will not have their vote counted as a result of" S.B. 1003, they will suffer "harms to their competitive interests" as a result of S.B. 1003 and will also need to divert resources. (Doc. 55 ¶¶ 24-26.) At bottom, all of these theories of harm are predicted on the notion that an order enjoining or otherwise nullifying S.B. 1003 would, alone, make it easier for certain voters to have their votes counted (because such voters could, but-for S.B. 1003, take advantage of post-election day opportunities to cure missing signatures).[15]

The difficulty with this approach is that, even if S.B. 1003 were enjoined and declared invalid, it is entirely speculative that an Arizona voter who submitted a mailed ballot with a missing signature would be allowed to cure the missing signature after election day. As noted by the Ninth Circuit in *Hobbs,* Arizona has never allowed unsigned affidavits to be cured after election day. *Hobbs*, 18 F.4th at 1183 ("So far as the record in this case reveals, in the nearly century of early voting in Arizona, no county recorder ever

---

[15]    Notably, Plaintiffs and Plaintiffs-Intervenors do not seek an order affirmatively requiring Arizona election officials to permit the curing of missing signatures after election day—the only forms of relief sought in their complaints are injunctive and declaratory relief that would enjoin or otherwise nullify S.B. 1003. (Doc. 1 at 31; Doc. 55 at 31.) In contrast, the plaintiffs in *Hobbs* sought a declaration that "all voters who submit a ballot without a signature must be allowed the same opportunity to cure that defect as is allowed to voters who submit a mail ballot with a signature mismatch." Complaint for Injunctive and Declaratory Relief, *Hobbs*, No. 2:20-CV-01143, 2020 WL 5535933 (D. Ariz. 2020).

has allowed a voter to correct a ballot with a missing signature after election day.  Arizona always has imposed the election-day deadline on voters to submit a signed ballot.").  Although the parties dispute whether pre-existing statutes prevent county recorders from extending the cure period for unsigned affidavits to five days after the election, it is apparently undisputed that no preexisting statute requires county recorders to do so.

Plaintiffs argue that "[e]njoining SB 1003 would, at the very least, leave Arizona officials and judges free to resolve whether post-election curing is permitted under state law without being dictated to choose one result by an unconstitutionally discriminatory law."  (Doc. 99 at 23.)  But "[a] litigant must demonstrate . . . a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury to satisfy the 'case or controversy' requirement."  *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 79 (1978).  Thus, "[t]o establish redressability, a plaintiff must show that it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'"  *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018) (quoting *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 561 (1992)).  Here, given that Arizona has never allowed post-election curing of missing signatures throughout its 110 years of statehood, the Court cannot find that the simple elimination of S.B. 1003 would, without more, "amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered."  *Mecinas v. Hobbs*, 30 F.4th 890, 900 (9th Cir. 2022).

In many respects, the situation here mirrors the situation in *Arizonans for Fair Elections v. Hobbs*, 454 F. Supp. 3d 910 (D. Ariz. 2020).  There, the plaintiffs sought to challenge certain Arizona statutes that require in-person signature gathering for initiative petitions but did not challenge the provisions of the Arizona constitution that impose the same requirements.  *Id.* at 917.  As a result, the State argued that the plaintiffs had failed to establish redressability.  *Id.* ("In the State's view, this creates a standing problem—even if Plaintiffs succeed in arguing that Title 19 is unconstitutional, the Arizona constitution would stand and Plaintiffs' injury would not be redressed.").  In response, the plaintiffs argued that "the requested relief would still redress their injury because, once [the

statutory] requirements are stripped away, the Arizona courts would be free to" rule in their favor. *Id.* at 917-18. This Court disagreed, holding that because it was "entirely speculative that the Arizona courts" would eliminate the requirement of in-person signature gathering based solely on the invalidation of the challenged statutes, if followed that plaintiffs had failed to establish redressability. *Id.* at 918-20. Afterward, the Ninth Circuit denied the plaintiffs' request for emergency relief for the same reason, holding that "Appellants, having failed to challenge the Arizona constitutional requirement of in-person signatures, cannot get the redress from the court they now seek by only challenging the statute at issue." *Arizonans for Fair Elections v. Hobbs*, 9th Cir. No. 20-15719, Dkt. 37 (May 5, 2020).

Here, although there is no provision of the Arizona constitution that specifically prohibits the curing of missing signatures after election night, other statutes (which existed before S.B. 1003 was enacted) arguably prohibit such curing and *Hobbs* makes clear that such curing has never been allowed in Arizona. Under these circumstances, it is "merely speculative," as opposed to "likely," that an order nullifying S.B. 1003 would result in a change to Arizona's historical practice of prohibiting the curing of missing signatures after election night. *M.S.*, 902 F.3d 1076 at 1083.[16]

For these reasons, this case is distinguishable from *Mecinas*. There, the plaintiffs challenged Arizona's "Ballot Order Statute" under the theory that "it gives candidates the benefit of appearing first on the ballot, not on the basis of some politically neutral ordering (such as alphabetically or by lot), but on the basis of political affiliation." 30 F.4th at 894.

---

[16] There is no merit to Plaintiffs' contention that the fact of S.B. 1003's enactment shows that the Arizona legislature intended to change existing law. (Doc. 99 at 22-23.) The legislature expressly noted in the text of S.B. 1003 that it was clarifying existing law, not changing it. *See* 2021 Ariz. Legis. Serv. Ch. 343 (S.B. 1003), *available at* https://www.azleg.gov/legtext/55leg/1R/bills/SB1003S.pdf ("The legislature intends that the amendments made by this act to 44 sections 16-547 and 16-550, Arizona Revised Statutes, are clarifying changes only and do not provide for any substantive change in the law."). The Arizona courts have held that the legislature may engage in such acts of clarification. *Enter. Leasing Co. of Phoenix v. Ariz. Dep't. of Revenue*, 211 P.3d 1, 4 (Ariz. Ct. App. 2008) ("In this case, the Legislature indicated its curative intent as directly as possible. It stated that the revisions were intended to be 'clarifying changes and are consistent with the legislature's intent when those sections were enacted' . . . .").

In response, the defendants argued that redressability was lacking because the Secretary of State's "ability to adhere to a court's injunction may be stymied by the governor or the attorney general, both of whom must approve the [EPM] before it can go into effect." *Id.* at 900. The Ninth Circuit disagreed, holding that the defendants' redressability concerns were "of no moment" because "an injunction against the Secretary would 'significant[ly] increase' the likelihood of relief." *Id.* In reaching this conclusion, the court emphasized that, in previous decisions, it had recognized "that a challenged Arizona election law [is] traceable to the Secretary." *Id.* But here, the issue isn't whether some unspecified Arizona official might, following a ruling in Plaintiffs' favor regarding the validity of S.B. 1003, attempt to obstruct Defendants' efforts to authorize the post-election curing of unsigned affidavits—rather, the issue is that the post-election curing of unsigned affidavits would remain impermissible following such a ruling due to Arizona's settled, century-long practice of disallowance (as recognized in *Hobbs*).

Finally, as for Plaintiffs' contention that "being subject to a racially discriminatory law inherently constitutes an Article III injury, and an injunction against such a law remedies that injury" (Doc. 99 at 21), the Court agrees with the State's response that "this is not the injury alleged in their Complaint, which focused [on Plaintiffs'] purported need to 'divert money, personnel, time and resources away." (Doc. 118 at 9.) Plaintiffs also vaguely assert that the challenged legislation "will negatively affect" their members (Doc. 1 ¶¶ 11, 14, 18),[17] but Plaintiffs have not argued associational standing or alleged that their organizations would, themselves, harmed because of *the existence of* a discriminatory law.

For these reasons, Plaintiffs have not met their burden of establishing that subject-matter jurisdiction exists. *Kokkonen*, 511 U.S. at 377. Thus, Plaintiffs' challenges to S.B. 1003 in Counts Two and Three are dismissed for lack of standing. *DaimlerChrysler Corp.*

---

[17]    Intervenor-Plaintiffs assert similar injuries but also assert an injury to their "competitive standing." (Doc. 55 ¶ 21.) In *Mecinas*, the Ninth Circuit held that an injury to competitive standing is not redressable if the court's action will not significantly increase the likelihood of relief. 30 F.4th at 898-99. Thus, Intervenor-Plaintiffs' competitive standing injury is not redressable for the reasons set forth above.

*v. Cuno*, 547 U.S. 332, 352 (2006) ("A plaintiff must demonstrate standing for each claim he seeks to press.").

       D.     **Counts Two And Three—S.B. 1485**

           a.     <u>Legal Standard</u>

A legislature acts in violation of the Fourteenth and Fifteenth Amendments when "a discriminatory purpose [is] a motivating factor" in the legislature's action. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977). A plaintiff asserting a discriminatory-purpose claim need not prove that "the challenged action rested *solely* on racially discriminatory purposes . . . ; racial discrimination is not just another competing consideration. When there is proof that a discriminatory purpose has been a motivating factor in the decision, . . . judicial deference is no longer justified." *Id.* (emphasis added). In *Arlington Heights*, "[t]he Supreme Court articulated the following, non-exhaustive factors that a court should consider in assessing whether a defendant acted with discriminatory purpose: (1) the impact of the official action and whether it bears more heavily on one race than another; (2) the historical background of the decision; (3) the specific sequence of events leading to the challenged action; (4) the defendant's departures from normal procedures or substantive conclusions; and (5) the relevant legislative or administrative history." *Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015). A plaintiff need not establish any particular element in order to prevail. *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1156 (9th Cir. 2013) ("[A]ny indication of discriminatory motive may suffice to raise a question that can only be resolved by a factfinder.").

Like the Fourteenth and Fifteenth Amendments, Section 2 of the Voting Rights Act ("VRA § 2") prohibits voting laws and practices adopted with a discriminatory purpose. *Chisom v. Roemer*, 501 U.S. 380, 394 n.21 (1991). Thus, a showing of intent "sufficient to constitute a violation of the [F]ourteenth [A]mendment" also suffices "to constitute a violation of [S]ection 2." *McMillan v. Escambia Cnty.*, 748 F.2d 1037, 1046 (5th Cir. 1984). *See also Democratic Nat'l Committee v. Hobbs*, 948 F.3d 989, 1038 (9th Cir. 2020),

1  *rev'd on other grounds by Brnovich*, 141 S.Ct. at 2321 ("[*Arlington Heights*] provides the

2  framework for analyzing a claim of intentional discrimination under Section 2.").

3                   b.     The Parties' Arguments

4         The State argues that "Plaintiffs' allegations fall short of plausibly establishing

5  discriminatory intent, especially when considered against the background of the strong

6  presumption of good faith for state legislatures." (Doc. 76 at 11.) The State asserts that

7  Plaintiffs' claims "rely almost exclusively on mere 'awareness' of disparate impacts, [and

8  thus] they have failed to plead a cognizable intentional discrimination claim." (*Id.* at 12.)

9  The State also argues that Plaintiffs' allegations, which are limited to (1) historical

10  discrimination in Arizona, (2) ambiguous legislator statements, and (3) discriminatory

11  effect, are insufficient to defeat the presumption of legislative good faith. (*Id.* at 12-14.)

12  In particular, the State urges the Court to reject application of the "cat's paw" theory[18] to

13  legislator statements. (*Id.* at 14-15.)

14         Plaintiffs respond that they have pleaded a cognizable intentional discrimination

15  claim under *Arlington Heights* by alleging facts that touch upon the discriminatory impact

16  of the challenged legislation, legislative history and contemporaneous statements,

17  precipitating events and departures from practice, and Arizona's history of discrimination

18  preceding the official action. (Doc. 99 at 5-9.) Plaintiffs also argue that this Court need

19  not give excessive deference to legislative good faith at the motion-to-dismiss stage,

20  otherwise "no plaintiff could state an intentional discrimination claim in which legislators

21  were smart enough not to announce their discriminatory animus." (*Id.* at 11.) On that note,

22  Plaintiffs assert that Representative Kavanaugh's statement "suggests a discriminatory

23   

---

[18]     "The term 'cat's paw' derives from a fable conceived by Aesop . . . and injected into
United States employment discrimination law by Judge Posner in 1990. . . . In the fable, a
monkey induces a cat by flattery to extract roasting chestnuts from the fire. After
the cat has done so, burning its paws in the process, the monkey makes off with the
chestnuts and leaves the cat with nothing. [The fable] observes that the cat is similar to
princes who, flattered by the king, perform services on the king's behalf and receive no
reward." *Staub v. Proctor Hosp.*, 562 U.S. 411, 416 n.1 (2011). *See also Brnovich*, 141
S. Ct. at 2325 ("The Court of Appeals concluded that the District Court committed clear
error by failing to apply a 'cat's paw' theory—which analyzes whether an actor was a
'dupe' who was 'used by another to accomplish his purposes.' That theory has its origin
in employment discrimination cases and has no application to legislative bodies.").

purpose and gives the lie to the notion that the legislature was *really* concerned about election integrity," and even if the Court were otherwise inclined to credit Representative Kavanaugh's attempt to "pass it off as something else," it could not do so at the pleading stage where all inferences must be drawn in their favor.  (*Id.*)  Plaintiffs also assert that the Supreme Court's dismissal of the "cat's paw" theory for legislators is irrelevant when considering the plausibility of the complaint's allegations.  (*Id.* at 12.)

In its statement of interest, the United States argues that "Plaintiffs' allegations regarding the foreseeable discriminatory impact SB 1003 and SB 1485 will have on Native American, Latino, and Black voters . . . when viewed as a whole, raise a strong inference that the adverse effects were desired, weighing in favor of a finding of discriminatory purpose." (Doc. 78 at 12.) The United States further asserts that "whether [the presumption of legislative good faith] stands or yields is an inherently fact-based question best suited for the merits stage of litigation."  (*Id.* at 14.)

In reply, the State argues that "most of Plaintiffs' key allegations are conclusory" and cannot survive *Iqbal* and that the remaining "nonconclusory allegations fail to plausibly allege intentional discrimination."  (Doc. 118 at 24-25.)  According to the State, statistical patterns supporting Plaintiffs' disparate impact theory are explainable on grounds other than race; the legislative statements at issue here cannot impugn the entire legislature and are less probative than other statements held to be insufficient; the alleged "departures from practice" do not qualify as the sort of procedural irregularities described by *Arlington Heights*; and the history cited by Plaintiffs "does nothing to advance their claim of plausibility."  (*Id.*  at 26-28.)  Finally, the State emphasizes the "extraordinary caution" the Court should apply when adjudicating claims that a state has acted on the basis of race and argues that Plaintiffs have failed to bring forth the "specific, non-conclusory allegations" to defeat the presumption of legislative good faith, even at the pleading stage.  (*Id.* at 29.)

…

…

1          c.    <u>Analysis</u>

2          To survive the State's motion to dismiss under 12(b)(6), Plaintiffs must allege

3    sufficient factual matter, accepted as true, to state a claim of intentional racial

4    discrimination that is plausible on its face.  *Iqbal*, 556 U.S. at 678.  Although it presents a

5    somewhat close call, the Court concludes that Plaintiffs have met this threshold.[19]

6          First, "an invidious discriminatory purpose may often be inferred from the totality

7    of the relevant facts, including the fact, if it is true, that the law bears more heavily on one

8    race than another."  *Washington v. Davis*, 426 U.S. 229, 242 (1976).  As discussed in Part

9    II.B.2 above, Plaintiffs plausibly allege that voters of color will be disproportionately

10   affected by S.B. 1485.  Although the alleged burden is not significant or even moderate, it

11   will still (according to Plaintiffs' well-pleaded allegations) be felt disproportionately by

12   protected groups.

13         None of the cases cited by the State—*Brnovich*, *Regents of the Univ. of California*

14   *v. DHS*, 140 S. Ct. 1891 (2020), and *Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020)—compels

15   a contrary conclusion.  In *Brnovich*, the Supreme Court held that a facially neutral voting

16   rule with a long pedigree that reasonably advances important state interests should not be

17   "taken down" by the mere fact of disparate outcome that could be explainable by

18   differences in employment, wealth, and education.  141 S. Ct. at 2343.  But this analysis

19   appeared in the portion of *Brnovich* addressing the plaintiffs' disparate *impact* claim under

20   VRA § 2.  In the separate portion of the decision addressing the plaintiffs' discriminatory

21   *purpose* claim, the Court simply noted that "the law's impact on different racial groups" is

22

23   [19]    The State frequently mentions the "presumption of [legislative] good faith."  (Doc.
     76 at 2, 11-14; Doc. 118 at 3-5, 29, 32.)  To the extent the State argues that the presumption
24   of good faith is a separate hurdle Plaintiffs must clear beyond plausibly alleging intentional
     racial discrimination, the State is incorrect.  The presumption of good faith is baked into
25   the *Arlington Heights* framework: "When there is proof that a discriminatory purpose has
     been a motivating factor in the decision, . . . judicial deference is no longer justified." 429
26   U.S. at 265-66.  That is, there is no difference between concluding that Plaintiffs have "pled
     insufficient facts to overcome the presumption of good faith" (Doc. 118 at 29) and arguing
27   that they have simply failed to satisfy the *Arlington Heights* test.  *Cf. Regents of Univ. of
     California v. Bakke*, 438 U.S. 265, 319 (1978) ("In short, good faith would be presumed in
28   the absence of a showing to the contrary in the manner permitted by our cases.  *See, e.g.*,
     *Arlington Heights* . . . .").

one of multiple factors courts must consider when evaluating such a claim before affirming the district court's overall finding that the challenged law "was not enacted with a racially discriminatory purpose." *Id.* at 2348-50.  Here, because Plaintiffs have plausibly alleged that S.B. 1485 does, in fact, have a disparate impact on different racial groups, they have plausibly alleged one of the considerations that might, in combination with other considerations, support a discriminatory purpose claim under *Arlington Heights* and VRA § 2.

In *Regents*, the Supreme Court addressed whether the rescission of the Deferred Action for Childhood Arrivals program ("DACA") violated the Fifth Amendment because it was "motivated by animus."  140 S. Ct. at 1915-16.  The Court concluded that the plaintiffs had not sufficiently pleaded such a claim because their three proffered indicia of animus—"(1) the disparate impact of the rescission on Latinos from Mexico, who represent 78% of DACA recipients; (2) the unusual history behind the rescission; and (3) pre- and post-election statements by President Trump"—did not "either singly or in concert[] establish[] a plausible equal protection claim."  *Id.*  With respect to the first factor, the Court stated that "because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program.  Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds."  *Id.* (citations omitted).  But here, the State has not identified a similar "unsurprising" reason why S.B. 1485 would have a disparate impact on minorities.  Additionally, the Court does not construe the cited passage from *Regents* as a holding that a showing of disparate impact can never form *one component* of a discriminatory purpose claim under *Arlington Heights*.  Rather, *Regents* holds that a showing of disparate impact *alone* is insufficient to state a plausible discriminatory purpose claim.  Here, Plaintiffs do not rely solely on their allegations of disparate treatment but identify those allegations as one component of a multi-factor showing.

Finally, in *Ramos*, the plaintiffs raised a discriminatory purpose challenge to the government's decision to terminate temporary protected status ("TPS") for refugees from certain "non-white, non-European" countries. 975 F.3d at 898. The Ninth Circuit held that this claim "fail[ed] predominantly due to the glaring lack of evidence tying the President's alleged discriminatory intent to the specific TPS terminations." *Id.* at 897. Additionally, the court held that the plaintiffs' purported evidence of disparate impact did "not help [them] much" because "[w]hile the four countries at issue in this case are 'non-European' with predominantly 'non-white' populations, the same is true for the four other countries whose TPS designations were extended by the Trump Administration during the same period. In fact, virtually every country that has been designated for TPS since its inception has been 'non-European' . . . and most have majority 'non-white' populations. Under the district court's logic, almost any TPS termination in the history of the program would bear 'more heavily' on 'non-white, non-European' populations and thereby give rise to a potential equal protection claim. This cannot be the case, as the Supreme Court recently pointed out in rejecting the disparate impact argument in *Regents*." *Id.* at 898. But once again, the situation is very different here.

Second, the legislative history of a statute, "especially where there are contemporary statements by members of the decisionmaking body," is sometimes probative when evaluating a discriminatory purpose claim. *Arlington Heights*, 429 U.S. at 266. Here, Plaintiffs point to statements by Republican Representatives Grantham and Kavanaugh.

On the one hand, even when viewing it in the light most favorable to Plaintiffs, the Court does not see how Representative Grantham's statement could be plausibly viewed as betraying racial animus. The context is that Representative Reginald Bolding, a black man who is the minority leader of the Arizona House, made a speech on the House floor. (Doc. 55 ¶ 114.) Representative Bolding stated that S.B. 1485 would make it harder for "independent voters, seniors, Native Americans, Black, brown and low income people to vote." (*Id.*) In response, Representative Grantham stated, "I feel personally that motives were [attributed to] members, including myself with regards to colored people, Black

people, whatever people this individual wants to single out and their ability to vote . . . I think he should be sat down and he shouldn't be allowed to speak." (*Id.*)  This statement constitutes a *denial* by Representative Grantham that supporters of S.B. 1485 were motivated by any sort of racial animus.  It would be bizarre if such a denial could be twisted into evidence of racial animus.  Nor does a plausible inference of racial animus arise from the fact that Representative Grantham is white and Representative Bolding is black.  Members of different races may disagree with each other about the merits of disputed issues, including race-related issues, without raising an inference of racial animus.  Finally, without in any way defending Representative Grantham's use of the phrase "colored people," that phrase's inclusion in a broader statement denying the existence of racial animus among supporters of S.B. 1485 does not—even when viewed in the light most favorable to Plaintiffs—raise a plausible inference that Representative Grantham secretly meant the exact opposite of what he was saying.

On the other hand, Representative Kavanaugh's statement, viewed in the light most favorable to Plaintiffs, can be construed as evidence supporting their claim.  As noted, Representative Kavanaugh stated in an interview that:

> Democrats value as many people as possible voting, and they're willing to risk fraud. Republicans are more concerned about fraud, so we don't mind putting security measures in that won't let everybody vote—but everybody shouldn't be voting.
>
> * * *
>
> Not everybody wants to vote, and if somebody is uninterested in voting, that probably means that they're totally uninformed on the issues.  Quantity is important, but we have to look at the quality of votes, as well.

Although Representative Kavanaugh first addressed voter fraud, he then transitioned, for unexplained reasons, into an argument for reducing the voting population based on the "quality" of voters.  There may be innocent reasons for this segue that will be revealed during future stages of this case, but the latter part of Representative Kavanaugh's statement could be viewed, when construed in the light most favorable to Plaintiffs (and in light of Plaintiffs' other allegations suggesting that it was well known that S.B. 1485 would

1   disproportionately affect minorities), as expressing the discriminatory trope that minorities
2   are uneducated voters.

3   Of course, "[c]ourts must use caution . . . when seeking to glean a *legislature's*
4   motivations from the statements of a handful of lawmakers." *United States v. Machic-*
5   *Xiap*, 552 F. Supp. 3d 1055, 1062 (D. Or. 2021) (citing *Brnovich*, 141 S. Ct. at 2349-50.)
6   The State argues that, even if the proffered statements are viewed unfavorably, *Brnovich*
7   compels this Court to reject a "cat's paw" theory, which would attribute the individual
8   legislators' statements to the legislature.  "As a matter of law, then, one statement by one
9   legislator cannot be used to impute discriminatory purpose to the entire legislature." (Doc.
10  118 at 5.)

11  This argument is unavailing.  If contemporaneous statements made by legislators
12  can still be some evidence of discriminatory intent (and *Brnovich* does not suggest
13  otherwise), the State's concerns are premature.  In *Brnovich*, controversy surrounded a
14  "racially-tinged" video promoted by Representative Don Shooter, which allegedly
15  prompted the enactment of ballot collection legislation.  141 S. Ct. at 2349-50.  The
16  Supreme Court upheld the district court's conclusion, after a bench trial, that "the racially-
17  tinged video helped spur the debate about ballot collection, [but there was] no evidence
18  that the legislature as a whole was imbued with racial motives." *Id.* at 2349-50.  If the
19  *Brnovich* district court could only definitively interpret the import of the Shooter video
20  after a bench trial in which the State produced evidence that the legislature as a whole was
21  not imbued with racial motives, it would be inappropriate to short-circuit that inquiry here
22  by conclusively determining at the pleading stage that, notwithstanding Representative
23  Kavanaugh's statement, the legislature as a whole was not imbued with racial motives.  As
24  the United States points out, "most of the relevant facts about . . . the purposes animating
25  . . . SB 1485 are possessed solely by the State, its counties, and other governmental actors.
26  Discovery may help illuminate those purposes."  (Doc. 78 at 15.)  At this stage, a
27  contemporaneous statement that can be interpreted as "racially-tinged" in the light most

28

favorable to Plaintiffs, in concert with Plaintiffs' other well-pleaded allegations, provides plausible support for Plaintiffs' overall claim.

Third and finally, "[c]ourts may also consider the specific sequence of events leading to the challenged action." *United States v. Carrillo-Lopez*, 555 F. Supp. 3d 996, 1008 (D. Nev. 2021) (citing *Arlington Heights*, 429 U.S. at 265-68). Courts distinguish a "strange about-face," which might be evidence of discriminatory intent, from a "natural response to a newly identified problem." *Regents*, 140 S. Ct. at 1916.

Plaintiffs allege that "[i]n an effort to bolster false and discredited claims of fraud, and provide a veneer of legitimacy for its discriminatory voter suppression efforts, the Arizona Senate hired a Florida corporation called Cyber Ninjas, Inc. to conduct an 'audit' of the 2020 election results in Maricopa." (Doc. 1 ¶ 58.) The State does not directly address Plaintiffs' mention of Cyber Ninjas but obliquely responds that "[t]hese are not the sort of procedural irregularities that *Arlington* indicated would form meaningful circumstantial evidence of intentional discrimination. *Arlington* instead referred to departures from practice—i.e., changes in ordinary procedure that indicated some invidious motive was at work." (Doc. 118 at 28.)

The Court need not credit Plaintiffs' conclusory explanation that the Cyber Ninja audit was "an effort to bolster false and discredited claims of fraud and provide a veneer of legitimacy for its discriminatory voter suppression efforts" to conclude that the alleged facts could give a reasonable juror some pause. The well-pleaded factual allegations, which the Court must accept at this stage of the proceedings, reflect that there was no legitimate evidence supporting the need for an audit, that several Arizona governmental agencies vehemently confirmed the accuracy of the vote count shortly after the election, and that Cyber Ninjas has no experience auditing elections. (Doc. 1 ¶¶ 57-59.) Plaintiffs have thus plausibly alleged that the Senate's decision to hire Cyber Ninjas with no evidence of fraud and against the counsel of state experts was, to paraphrase the State, a "change[] in ordinary procedure that indicated some invidious motive was at work." (Doc. 118 at 28.)

1       For these reasons, Plaintiffs have pleaded a plausible purposeful-discrimination

2   challenge to S.B. 1485 under the United States Constitution and under VRA § 2.[20]

3   III.   <u>Leave To Amend</u>

4       Although Plaintiffs and Plaintiffs-Intervenors do not expressly request leave to

5   amend in their respective responses to the motion to dismiss (Docs. 99, 100), the State

6   contends in its reply that "[g]iven the Ninth Circuit's mandate that plaintiffs should

7   generally be given at least one chance at amendment, the State does not oppose leave for

8   Plaintiffs to attempt to cure these deficiencies."  (Doc. 118 at 29.)  Given this backdrop,

9   and in light of the Ninth Circuit's recognition that, in certain circumstances, "a district

10  court should grant leave to amend even if no request to amend the pleading was made,"

11  *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (citation omitted), the Court will

12  *sua sponte* grant leave to amend to Plaintiffs and Plaintiffs-Intervenors.

13      Accordingly,

14      **IT IS ORDERED** that the State's motion to dismiss (Doc. 76) is **granted in part**

15  **and denied in part.**

16      **IT IS FURTHER ORDERED** that Plaintiffs and Plaintiffs-Intervenors may file

17  amended complaints within 21 days of the issuance of this order.  Any changes shall be

18  limited to attempting to cure the deficiencies raised in this order and Plaintiffs and

19  Plaintiffs-Intervenors shall, consistent with LRCiv 15.1(a), attach a redlined version of the

20  pleading as an exhibit.

21

22

23

24

25

26

---

[20]    The Court perceives no tension between this conclusion and the conclusion that
Plaintiffs' challenge to S.B. 1485 in Count One fails to state a claim.  Although the failure
to plausibly allege anything more than a minimal burden on the right to vote may be fatal
to a claim under *Anderson-Burdick*, that factor forms only one piece of the puzzle for
purposes of a claim for purposeful discrimination under *Arlington Heights* and VRA § 2.