**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mi Familia Vota, et al., | No. CV-21-01423-PHX-DWL |
| Plaintiffs, | **ORDER** |
| v. | |
| Katie Hobbs, et al., | |
| Defendants. | |

This action involves a challenge to a voting law, Senate Bill 1485 ("S.B. 1485"), that was enacted by the Arizona legislature following the 2020 election.  It provides that voters who do not cast a mail-in ballot in two consecutive election cycles must be removed from Arizona's permanent early voting list.  (Doc. 1.)

Plaintiffs in this action are four nonprofit groups.  Additionally, the Democratic Senatorial Campaign Committee and the Democratic Congressional Campaign Committee have intervened as Plaintiffs.  Defendants are Arizona Secretary of State Katie Hobbs, Arizona Attorney General Mark Brnovich, and the recorders from all 15 Arizona counties. Additionally, the Republican National Committee and the National Republican Senatorial Committee have intervened as Defendants.  For ease of reference, the Court will refer to the various entities on each side of this dispute as Plaintiffs and Defendants.

Now pending before the Court is Plaintiffs' motion to compel a non-party, the Republican Party of Arizona ("RPA"), to comply with a subpoena for certain records. (Doc. 161.)  For the following reasons, Plaintiffs' motion is granted in part.

**RELEVANT BACKGROUND**

I.    Underlying Litigation

On August 17, 2021, Plaintiffs initiated this action, asserting three claims.  (Doc. 1.) In Count One, Plaintiffs allege that S.B. 1485 and Senate Bill 1003 ("S.B. 1003"), "individually and collectively," violate the First and Fourteenth Amendments because they create an undue burden on the right to vote.  (Id. ¶¶ 127-35.)[1]  In Count Two, Plaintiffs allege that S.B. 1485 and S.B. 1003, "individually and collectively, violate the Fourteenth and Fifteenth Amendments because they were adopted for the purpose of denying voters of color full and equal access to the political process."  (Id. ¶¶ 136-41.)  And in Count Three, Plaintiffs allege that S.B. 1485 and S.B. 1003, "individually and collectively, violate Section 2 of the Voting Rights Act because they were adopted for the purpose of denying voters of color full and equal access to the political process."  (Id. ¶¶ 142-45.)

On November 24, 2021, Defendants moved to dismiss all of Plaintiffs' claims. (Docs. 76, 77.)

On December 15, 2021, the Court issued a Rule 16 scheduling order that, among other things, set a November 18, 2022 deadline for completion of fact discovery.  (Doc. 85.)  The deadline has since been extended to May 18, 2023.  (Doc. 182.)

On June 24, 2022, after full briefing on the motion to dismiss (Docs. 83, 99, 100, 118) and oral argument (Doc. 149), the Court dismissed Count One in its entirety.  (Doc. 154 at 22, 34, 41, 60.)  The Court also dismissed the challenges to S.B. 1003 in Counts Two and Three.  (Id. at 44, 60.)  The Court denied the motion to dismiss with respect to the challenges to S.B. 1485 in Counts Two and Three.  (Id. at 52, 60.)  The Court also granted Plaintiffs leave to amend.  (Id. at 59-60.)  However, Plaintiffs declined to amend their complaint by the amendment deadline.  (Doc. 168.)

…

…

---

[1]    S.B. 1003, which was also enacted by the Arizona legislature following the 2020 election, clarifies that the deadline for a voter to attempt to "cure" a missing signature on an early ballot is 7:00 PM on election day.  (Doc. 1 ¶ 1.)

## II.   Discovery Dispute

On January 10, 2022, Plaintiffs served a subpoena on the RPA, a non-party.  (Doc. 156-1 at 5-16.)  The subpoena requires the RPA to produce discovery responsive to twelve requests for production ("RFPs"), which are described in more detail in later sections of this order.  (*Id.*)

On January 24, 2022, the RPA served written objections to the subpoena.  (*Id.* at 18-23.)  The RPA objected to all twelve RFPs on "the grounds of First Amendment privilege."  (*Id* at 19.)[2]  The RPA also raised other objections to certain RFPs and argued that the requested communications "can be obtained from the government/government officials if at all.  And any evidence that plaintiffs intend to present in support of their theory that race bears a relationship with being an active voter, no matter how objectively repugnant that theory may be, can presumably be obtained through other sources and without infringing on the [RPA's] First-Amendment protected activity."  (*Id.* at 19-22.)  Finally, the RPA asserted it had been "unable to conduct a search for responsive documents" thus far but that it was "entirely possible if not likely that the [RPA] simply has no responsive materials to any or all of these requests . . . ."  (*Id.* at 19-20.)

Between January 24, 2022, and April 29, 2022, Plaintiffs' counsel and counsel for the RPA communicated via email and telephone about the RPA's objections and the possibility that the RPA would produce documents responsive to the subpoena.  (*See, e.g.*, *id.* at 30-40 [emails between counsel].)[3]  The exhibits provided by the parties suggest these

---

[2]    The RPA did not identify any specific privileged documents, in a privilege log or otherwise.  (*Id.* at 18-23.)

[3]    At least some of these communications are attached as exhibits to the parties' joint summary of the discovery dispute.  (*Id.* at 18-40.)  Plaintiffs attached the same exhibits to their motion to compel.  (Doc. 161-1 at 28-50.)  The RPA does not challenge the validity of any of these exhibits but argues "the first several pages of Plaintiffs' Motion mischaracterize[] the extent to which the [RPA] attempted to 'meet and confer' with Plaintiffs in regards to their subpoena, as belied by their own counsel's Declaration.  In addition to multiple letters and emails, counsel for both sides engaged in a lengthy phone call to go over each and every item in the subpoena, during which [the RPA's] counsel informed Plaintiffs' counsel that there were no responsive documents to several of the requests, and all counsel discussed the serious problems—both legal and practical—with the subpoena." (Doc. 171 at 1-2.) In reply, Plaintiffs argue: "[The RPA] makes unspecified claims that there is a 'mischaracterization' of the meet and confer process in Plaintiffs' papers.  Plaintiffs stand by their description of the record here, respectfully refer the Court

1    meet-and-confer attempts fizzled quickly.  (*Id.* at 18-40.)

2         After the parties conferred telephonically on February 7, 2022, Plaintiffs' counsel

3    sent a follow-up letter.  (*Id.* at 25-28.)  The letter (1) addressed the relevance and breadth

4    of each RFP and offered to narrow certain RFPs; (2) expressed skepticism as to the RPA's

5    claim that no responsive documents exist for certain RFPs and requested descriptions of

6    the searches conducted; and (3) challenged the RPA's "blanket First Amendment

7    objection" and requested a "privilege log for any responsive documents that [the RPA]

8    intends to withhold so that we can consider whether such privilege assertions are

9    appropriate."  (*Id.*)

10        On March 15, 2022, after receiving no response, Plaintiffs' counsel sent a follow-up

11   email.  (*Id.* at 37-38.)  In response, counsel for the RPA stated that Plaintiffs' "letter appears

12   to change nothing," reiterated the "obvious First Amendment problems here" as well as

13   "more conventional problems" like "relevance, expense, and the availability of information

14   from other sources," and asserted that "[a]s a matter of law, political parties and other

15   members of the public do not control legislators' judgment, and are clearly entitled to freely

16   exercise their free-speech rights without fear of subpoenas exactly like this one."  (*Id.* at

17   36-37.)  In reply, Plaintiffs' counsel again requested a privilege log and information about

18   the searches conducted, offered "to discuss these matters further," and emphasized "we

19   cannot accept a blanket refusal by [the RPA] to respond to the subpoena."  (*Id.* at 35-36.)

20        On April 29, 2022, Plaintiffs' counsel informed the RPA's counsel of Plaintiffs'

21   intent to "present this dispute to the Court for resolution."  (*Id.* at 34-35.)  Plaintiffs also

22   asked if the RPA was "willing to provide its position" in a joint submission.  (*Id.*)  After

23   _____

24   to copies of the parties' correspondence attached to their Motion, and also note that [the
     RPA] provides nothing to refute those materials.  In any event, the Opposition makes clear
25   that [the RPA] is resisting compliance with the Subpoena in any manner, as it has from the
     very beginning.  Plaintiffs are not aware of a material dispute about the meet and confer
     process that is relevant to resolution of the Motion."  (Doc. 172 at 6 n.4, internal citations
26   omitted.)  Neither party argues this dispute over the substance of the parties' meet-and-
     confer efforts is dispositive.  At any rate, under the applicable rules, a motion to compel
27   must be accompanied by a certification that the movant has in good faith conferred or
     attempted to confer with the party failing to make disclosure in an effort to obtain a
28   resolution without judicial intervention.  Fed. R. Civ. P. 37(a)(1); LRCiv 7.2(j).  Plaintiffs
     fulfilled this obligation.  (Doc. 161-1 at 1-2.)

some discussion (during which the parties agreed to postpone any filing until after the Court ruled on Defendants' motion to dismiss), on July 5, 2022, the parties filed a joint summary of the dispute and Plaintiffs' alternative request for leave to file a motion to compel. (Doc. 156.)

On July 7, 2022, "given the seeming complexity of the issues," the Court granted Plaintiffs leave to file a motion to compel. (Doc. 158.)

On July 14, 2022, Plaintiffs filed the pending motion to compel. (Doc. 161.) The motion is now fully briefed. (Docs. 171, 172.) Neither side requested oral argument.

**DISCUSSION**

I. Legal Standard

Rule 34(c) of the Federal Rules of Civil Procedure grants parties the ability to seek the production of relevant, non-privileged documents from non-parties through a subpoena issued in accordance with Rule 45 of the Federal Rules of Civil Procedure. Under Rule 45(d)(2)(B)(i), if the recipient of such a subpoena refuses to produce requested documents, the proponent may move for an order compelling production. "To obtain such an order, the proponent must first show that . . . the requested material . . . [is] discoverable." *Puente Arizona v. Arpaio*, 314 F.R.D. 664, 667 (D. Ariz. 2016). "If the proponent makes this showing, the burden shifts to the recipient to establish that the requested discovery should be denied." *Id*.

"[T]he scope of discovery through a subpoena is the same as that applicable to Rule 34 and the other discovery rules." Fed. R. Civ. P. 45, advisory committee notes on the 1970 amendments. Under Rule 34(a), the proper scope of discovery is the same as under Rule 26(b). *See also Aquastar Pool Prods. Inc. v. Paramount Pool & Spa Sys.*, 2019 WL 250429, *2 (D. Ariz. 2019) ("[T]he test for 'relevance,' in the context of a Rule 45 subpoena to a non-party, is no different than the test under Rules 26 and 34."); *Brown v. Sperber-Porter*, 2018 WL 4091696, *3 (D. Ariz. 2018) ("Rule 26 . . . defines the permissible scope of discovery and that same scope of discovery applies to a Rule 45 subpoena."). Under Rule 26(b)(1), in turn:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1).

"[T]he party seeking to compel discovery has the initial burden of establishing that its request satisfies the relevancy requirements of Rule 26(b)." *Doe v. Swift Transp. Co.*, 2015 WL 4307800, *1 (D. Ariz. 2015). This "is a relatively low bar." *Continental Circuits LLC v. Intel Corp.*, 435 F. Supp. 3d 1014, 1018 (D. Ariz. 2020). *See also* Fed. R. Civ. P. 26(b)(1) ("Information within this scope of discovery need not be admissible in evidence to be discoverable.").

Rule 26(b)(1) also requires that discovery be proportional to the needs of the case. *In re Bard IVC Filters Prod. Liab. Litig.*, 317 F.R.D. 562, 564 (D. Ariz. 2016) ("The 2015 amendments also added proportionality as a requirement for permissible discovery. Relevancy alone is no longer sufficient . . . .") "The parties and the court have a collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes." Fed. R. Civ. P. 26, advisory committee notes on the 2015 amendments. In other words, Rule 26 "does not place the burden of proving proportionality on the party seeking discovery." *In re Bard IVC Filters*, 317 F.R.D. at 564. *See also id.* (noting that the proportionality inquiry "requires input from both sides").

Finally, non-parties are entitled to special consideration when it comes to subpoena requests under Rule 45. *See, e.g.*, *Dart Industries Co., Inc. v. Westwood Chemical Co.*, 649 F.2d 646, 649 (9th Cir. 1980); *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998). As one treatise explains:

> [W]hen used improperly or too zealously, subpoenas can cause significant hardship to . . . nonparties. And while the discovery rules generally seek to avoid undue burdens, that concern is particularly important in the subpoena context precisely because the nonparty targets of the subpoenas do not have a direct stake in the lawsuit. . . . [Thus], we do not expect [nonparties] to shoulder the same types of discovery burdens as the parties and are therefore

- 6 -

quicker to find that the burden or expense in question is undue and offer protection as needed to alleviate it.

1 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 45, at 1370 (2022). "The proper way to afford this special consideration is to 'weigh the burden to the subpoenaed party against the value of the information to the serving party. Generally, this requires consideration of relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed.'" *Aquastar Pool Prods.*, 2019 WL 250429 at *3 (quoting *Soto v. Castlerock Farming & Transport, Inc.*, 282 F.R.D. 492, 504 (E.D. Cal. 2012)). *See also Eichler v. Sherbin*, 520 F. App'x 560, 562 (9th Cir. 2013) (quoting *Dart Indus.*, 649 F.2d at 649, for the proposition that "limitations on discovery 'may be broader when a nonparty is the target of discovery'"). As part of this inquiry, the Court may evaluate whether information requested through a non-party subpoena is readily available from a party. *See, e.g.*, *Duong v. Groundhog Enterprises, Inc.*, 2020 WL 2041939, *7 (C.D. Cal. 2020); *Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 638 (C.D. Cal. 2005).

II.    Overview Of The Parties' Arguments

Plaintiffs make a somewhat limited request for relief in their motion to compel. (Doc. 161.) In lieu of seeking an unqualified order compelling RPA to comply with the subpoena, Plaintiffs seek the more intermediate relief of an order compelling the RPA to (1) "conduct a reasonable search for documents responsive to the Subpoena," (2) "disclose what files are searched and in what manner (e.g., through the use of search terms or otherwise)," (3) "produce those responsive documents over which the [RPA] does not claim any applicable privilege," and (4) "provide a privilege log as to the balance." (*Id.* at 12.) Plaintiffs contend that the First Amendment associational privilege does not allow the RPA to refuse to comply with the subpoena. (*Id.* at 11-12.) Plaintiffs also contend the requested discovery is relevant to Plaintiffs' claims and proportional to the needs of the case. (*Id.* at 6-10.) Finally, Plaintiffs argue "there is substantial basis to believe that [the

RPA] has responsive documents" and they are not "required to take [the RPA's] assertions [to the contrary] at face value." (*Id.* at 9-10.)

The RPA opposes Plaintiffs' motion. (Doc. 171.)  As discussed in more detail in later sections of this order, the RPA contends that (1) the requested discovery is privileged under the First Amendment because requiring the RPA to produce the materials at issue would chill its members' associational rights, and Plaintiffs cannot overcome this privilege because they have not demonstrated that the information sought is "highly relevant" to Plaintiffs' claims and "otherwise unavailable"; (2) Plaintiffs' basis for subpoenaing the RPA, a non-party, is "plainly inadequate" in that "[n]obody should be hauled into Court simply because they publicly support a law"; (3) for various reasons, each RFP is irrelevant, overbroad, argumentative, and/or unduly burdensome; and (4) the Court should award costs and fees to the RPA. (*Id.* at 2-9.)

III.   First Amendment Privilege

A.   **The Parties' Arguments**

The RPA objected to the subpoena by asserting a First Amendment privilege in response to all twelve RFPs. (Doc. 156-1 at 18-23.)

Plaintiffs contend the RPA has failed to make a threshold showing of an arguable First Amendment privilege because it has not identified, "even in broad strokes, what responsive documents exist whose disclosure could implicate the First Amendment." (Doc. 161 at 11-12.  *See also id.* at 6 ["Plaintiffs are cognizant that First Amendment concerns can apply in this context.  But those concerns do not justify [the RPA's] complete stonewalling of Plaintiffs' legitimate discovery requests . . . ."].)  Plaintiffs further contend that, even if the RPA could make a *prima facie* showing, the requested documents would remain subject to disclosure because Plaintiffs have a "compelling need" for those documents, which "very well could be crucial to vindicating an equally weighty constitutional right: the right to vote." (*Id.* at 11-12.)  Finally, Plaintiffs note that courts "routinely require privilege logs" in this context, but the RPA has not provided one. (*Id.* at 12.)

In response, the RPA argues that requiring it to produce its internal documents and communications simply because it supported S.B. 1485 and S.B. 1003 is "chilling to free speech" and "abusive." (Doc. 171 at 2-5. *See also id.* at 3 ["Americans must be free to exercise their important right to speak out in support of proposed legislation without fear of being hauled into Court under threat of subpoena (or having to pay for attorneys to review and rebut lengthy briefs) solely because of the content of their speech."].) Without addressing the absence of a privilege log, the RPA characterizes the subpoena as "Kafkaesque" and contends that enforcing the subpoena would be tantamount "to a kind of court-ordered 'Spanish Inquisition.'" (*Id.* at 4.)

In reply, Plaintiffs argue the RPA failed to make a *prima facie* showing of arguable First Amendment infringement because it has not provided evidence that "compliance with the Subpoena would subject [it] to threats, harassment, or reprisals" or cause a "chilling" of its members' associational rights. (Doc. 172 at 1-4.)

B.    **Analysis**

The RPA's reliance on the First Amendment as a basis for categorically refusing to comply with the subpoena fails for two independent reasons.

First, to claim this privilege, the RPA was required to provide a privilege log describing the nature of the withheld documents or communications "in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." *Karnoski v. Trump*, 926 F.3d 1180, 1195 (9th Cir. 2019). *See also* Fed. R. Civ. P. 26(b)(5)(A)(ii). A blanket assertion, like the one made here, is insufficient. *Perry v. Schwarzenegger*, 591 F.3d 1147, 1153 n.1 (9th Cir. 2010) ("The district court also observed that Proponents [of the First Amendment privilege claim] had failed to produce a privilege log required by Federal Rule of Civil Procedure 26(b)(5)(A)(ii). We agree that some form of a privilege log is required and reject Proponents' contention that producing any privilege log would impose an unconstitutional burden."). *See also Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Ct. for Dist. of Mont.*, 408 F.3d 1142, 1149 (9th Cir. 2005) ("We hold that boilerplate objections or blanket refusals inserted into a response to a Rule

34 request for production of documents are insufficient to assert a privilege.").

Second, in addition to failing to provide a privilege log, the RPA failed to provide the sort of evidence that is a prerequisite to the successful assertion of a First Amendment privilege claim under Ninth Circuit law. As the Ninth Circuit has explained, "a claim of First Amendment privilege is subject to a two-part framework." *Perry*, 591 F.3d at 1160.[4] Under the first step, the party asserting the privilege must demonstrate a *prima facie* showing of an arguable First Amendment infringement. *Perry*, 591 F.3d at 1160. If the proponent makes this showing, "the evidentiary burden shifts to the plaintiffs to demonstrate a sufficient need for the discovery to counterbalance that infringement." *Id.* at 1164. In other words, once the *prima facie* showing is made, the Court applies "a balancing test to the dispute at issue, essentially requiring both a heightened degree of relevance to the subject matter of the suit and a showing by the party seeking discovery that it has made reasonable, unsuccessful attempts to obtain the information elsewhere." *Wilkinson v. F.B.I.*, 111 F.R.D. 432, 436 (C.D. Cal. 1986).

To make the *prima facie* showing required under the first step, the privilege proponent must demonstrate that enforcement of the discovery request will result in either (1) "harassment, membership withdrawal, or discouragement of new members" or (2) "other consequences which objectively suggest an impact on, or chilling of, the members' associational rights." *Perry*, 591 F.3d at 1160 (internal quotations omitted). "The existence of a prima facie case turns not on the type of information sought, but on whether disclosure of the information will have a deterrent effect on the exercise of protected activities." *Id.* at 1162. The evidence offered need show only a "reasonable probability" of such harm. *Brock v. Loc. 375 Plumbers Int'l Union of Am., AFL-CIO*, 860 F.2d 346, 350 n.1 (9th Cir. 1988). However, the showing requires "objective and articulable facts, which go beyond broad allegations or subjective fears." *Id. See also Dole v. Serv. Emps. Union, AFL-CIO, Loc. 280*, 950 F.2d 1456, 1460 (9th Cir. 1991). Such evidence may

---

[4]     This privilege applies to discovery orders even if all of the litigants are private entities. *Perry*, 591 at 1160 n.5.

include, for example, declarations from members attesting to the effect of compelled disclosure on their associational rights or the possibility of membership withdrawal as result of compelled disclosure. *See, e.g.*, *Perry*, 591 F.3d at 1163 (*prima facie* showing satisfied by "declarations from several individuals attesting to the impact compelled disclosure would have on participation and formulation of strategy," which created a "reasonable inference that disclosure would have the practical effects of discouraging political association"); *Dole*, 950 F.2d at 1460 (*prima facie* showing satisfied by "two letters from members who stated that they would no longer attend meetings" due to privacy concerns); *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. F.E.C.*, 333 F.3d 168, 176-77 (D.C. Cir. 2003) (*prima facie* showing satisfied by affidavits attesting that disclosure would "make it more difficult for the organizations to recruit future personnel" and "frustrate the organizations' ability to pursue their political goals effectively by revealing to their opponents 'activities, strategies and tactics [that] we have pursued in subsequent elections and will likely follow in the future'").[5]

Here, to support its privilege claim, the RPA includes the following passage in its response brief:

[5] *See also Democratic Nat'l Comm. v. Ariz. Sec'y of State's Off.*, 2017 WL 3149914, *2 (D. Ariz. 2017) (*prima facie* showing based on a detailed affidavit from the Arizona Democratic Party's chair explaining what the requested documents contained and why disclosure would "reveal[] the viewpoints, political associations, and strategies" of strategic partners in such a way that would "chill such partners from associating with the ADP in the future" and "reveal to ADP's political opponents where and when it is likely to focus its activities in future elections, thereby severely impeding its ability to advocate successfully for its candidates and causes"); *Aldapa v. Fowler Packing Co. Inc.*, 2016 WL 3361807, *5 (E.D. Cal. 2016) (*prima facie* showing based on a declaration stating that the intended class counsel conducted seven meetings at which putative class members expressed concern about suffering harassment if their participation was disclosed to their employers); *Puente Arizona*, 314 F.R.D. at 672-73 (*prima facie* showing based on an affidavit from a third party stating that an email between the third party and a legislator was confidential and disclosure would "undoubtedly induce members and organizations to withdraw their participation in our current strategy sessions"); *Compare McLaughlin v. Serv. Emps. Union, AFL-CIO, Loc. 280*, 880 F.2d 170, 175 (9th Cir. 1989) (finding, in the context of a pending Department of Labor investigation, that the union "failed to make any factual showing of past or threatened first amendment infringement" when it merely offered "the declaration of one of its attorneys . . . contain[ing] argument—not facts— concerning the impact of an unrestricted administrative review of the minutes of union meetings").

- 11 -

1
2
3
4
5
6

> Plaintiffs' subpoena was occasioned solely by the content of [the RPA's]
> political speech (and by its alleged exercise of associational rights). If the
> [RPA] can be ordered to respond to intrusive subpoenas for all of its
> "Documents and Communications" "related to actual or potential changes to
> Arizona law or regulations on voting," or "aspects of Arizona's voting
> system," every time it/its members bother to speak out about such things—
> which they do often—then that will obviously be deeply chilling to their First
> Amendment rights. This is self-evident—after all, nobody wants to be
> subject to a kind of court-endorsed "Spanish Inquisition" simply because
> they engage in political activity and/or share their opinions about new laws.

7
8

(Doc. 171 at 4.) The RPA does not, however, submit any evidence in support of these assertions.

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

This showing is insufficient. The Court does not quarrel with the proposition that disclosure of a political association's internal communications could, in general, deter participation in protected activities. *See, e.g.*, *Perry*, 591 F.3d at 1162 ("We have little difficulty concluding that disclosure of internal campaign communications *can* have [a deterrent] effect on the exercise of protected activities."). The difficulty here is that the RPA offers no evidence of such a chilling effect. At most, it provides broad, theoretical arguments by its counsel about the "fear of being hauled into Court under the threat of subpoena" harming its members' ability to "freely associate and share thoughts and opinions." (*Id.* at 3, 6.) But conclusory statements, alone, do not establish a *prima facie* showing of First Amendment infringement. *See, e.g.*, *Ward v. Thompson*, 2022 WL 4386788, *8 (D. Ariz. 2022), *aff'd Ward v. Thompson*, No. 22-CV-16473 (9th Cir. 2022) (unpublished) (finding that plaintiffs failed to demonstrate a cognizable First Amendment privilege where they "allege[d] that the subpoena 'must be declared violative of Plaintiffs' First Amendment associational rights'" but did not explain, "beyond conclusory allegations," how enforcement "will have a deterrent effect of the exercise of protected activities"); *United States v. Town of Colorado City, Ariz.*, 2014 WL 5465104, *2 (D. Ariz. 2014) (*prima facie* showing not made where the "showing of adverse consequences is both speculative and conclusory").

27
28

Additionally, here, only some of the RFPs seek information that might be considered internal communications of the RPA. Other RFPs seek external

- 12 -

communications, such as communications between members of the RPA and members of the Arizona legislature.  The RPA makes no effort to explain why such communications could be considered privileged from disclosure under the First Amendment.  *Sol v. Whiting*, 2014 WL 12519787, *4 (D. Ariz. 2014) (rejecting former Arizona legislator's invocation of a First Amendment privilege to redact "the names of people who had emailed him about matters involving S.B. 1070," because "*Perry* and its progeny have all dealt with the disclosure of either the identity of association members or internal communications—not communications with third parties") (citation omitted).  *See also Ward*, No. 22-CV-16473 at 4-5 ("That some of the people with whom Ward communicated may be members of a political party does not establish that the subpoena is likely to reveal sensitive information about [the party's] members and supporters. . . .  To prevail, Ward must therefore identify some reason to think that compliance with this subpoena will burden association.") (internal quotations omitted).

For these reasons, the RPA's blanket First Amendment privilege challenge to the subpoena fails.  Because the RPA has not made a *prima facie* showing of arguable First Amendment infringement, it is unnecessary to address the second prong of the *Perry* test.

IV.   Discoverability Under Rules 26 And 45

The parties also dispute whether the discovery sought by Plaintiffs is relevant, proportional, and not unduly burdensome.

A.   **Background**

Before turning to the parties' arguments, it is helpful to summarize Plaintiffs' underlying claims and the governing legal framework because the "complaint guides the parties' discovery . . . ."  *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000).

1.   Legal Framework

In their remaining claims in this action, Plaintiffs allege that S.B. 1485 was enacted for the purpose of preventing voters of color from exercising the right to vote, in violation of the Fourteenth and Fifteenth Amendments and Section 2 of the Voting Rights Act.  (Doc. 1 ¶¶ 1-4.)  A legislature acts in violation of the Fourteenth and Fifteenth Amendments when

1    "a discriminatory purpose [is] a motivating factor" in the legislature's action.   *Vill. Of*

2    *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977).  *See also City*

3    *of Mobile, Ala. v. Bolden*, 446 U.S. 55, 62 (1980).  Similarly, Section 2 of the Voting Rights

4    Act prohibits voting laws and practices adopted with a discriminatory purpose.  *Chisom v.*

5    *Roemer*, 501 U.S. 380, 394 n.21 (1991).  Thus, a showing of intent "sufficient to constitute

6    a violation of the [F]ourteenth [A]mendment" also suffices "to constitute a violation of

7    [S]ection 2."  *McMillan v. Escambia Cnty.*, 748 F.2d 1037, 1046 (5th Cir. 1984).  *See also*

8    *Democratic Nat'l Committee v. Hobbs*, 948 F.3d 989, 1038 (9th Cir. 2020), *rev'd on other*

9    *grounds by Brnovich v. Democratic National Committee*, 141 S. Ct. 2321 (2021)

10   ("[*Arlington Heights*] provides the framework for analyzing a claim of intentional

11   discrimination under Section 2.").

12          In *Arlington Heights*, "[t]he Supreme Court articulated the following, non-

13   exhaustive factors that a court should consider in assessing whether a defendant acted with

14   discriminatory purpose: (1) the impact of the official action and whether it bears more

15   heavily on one race than another; (2) the historical background of the decision; (3) the

16   specific sequence of events leading to the challenged action; (4) the defendant's departures

17   from normal procedures or substantive conclusions; and (5) the relevant legislative or

18   administrative history."  *Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015).  A plaintiff

19   need not establish any particular element in order to prevail.  *Pac. Shores Properties, LLC*

20   *v. City of Newport Beach*, 730 F.3d 1142, 1156 (9th Cir. 2013).  "[A]ny indication of

21   discriminatory motive may suffice to raise a question that can only be resolved by a

22   factfinder."  *Id.* (quotations omitted).

23          …

24          …

25          …

26          …

27          …

28          …

1

2.      The Requests

2

In full, RFP Nos. 1 through 8 and 10 through 12[6] are as follows:

3

[RFP No. 1:] All Documents and Communications related to SB 1485 or SB
1003, including without limitation any analysis of whether SB 1485 or SB
1003 would impact particular groups of voters more than others, such as
particular racial or ethnic groups (including Native Americans), disabled
voters, or voters of particular age groups. . . .

4

5

6

[RFP No. 2]: All Documents and Communications from January 14, 2019 to
present related to any actual or potential changes to Arizona law or
regulations on voting, including without limitation any analysis of whether
any actual or potential changes would impact particular groups of voters
more than others, such as particular racial or ethnic groups (including Native
Americans), disabled voters, or voters of particular age groups. . . .

7

8

9

[RFP No. 3]: All Communications from January 14, 2019 to present between
You and Executive Branch officials (including without limitation the
Governor, Secretary of State, and Attorney General), their employees or
campaign staff, federal or state legislators, county election officials, or any
other public officials discussing any actual or proposed changes to Arizona
law or regulations relating to (1) the Permanent Early Voting List; (2) the
process by which a voter may "cure" an unsigned or mismatched signature
Early Ballot; or (3) other aspects of Arizona's voting system. . . .

10

11

12

13

14

[RFP No. 4]: Documents from January 14, 2019 to present related to
budgeting, costs, or other burdens of administering the Permanent Early
Voting List, both before and after the passage of SB 1485, including
projections thereof.

15

16

17

[RFP No. 5]: All Documents from January 14, 2019 to present related to
budgeting, costs, or other burdens of administering the process by which a
voter may "cure" an unsigned or mismatched signature Early Ballot, both
before and after the passage of SB 1003, including projections thereof. . . .

18

19

[RFP No. 6]: All Documents from January 14, 2019 to present related to the
demographics and/or partisan affiliation of voters on the Permanent Early
Voting List. . . .

20

21

[RFP No. 7]: All Documents from January 14, 2019 to present related to the
demographics and/or partisan affiliation of voters who submit Early Ballots.

22

23

[RFP No. 8] . . . All Documents from January 14, 2019 to present related to
potential or actual risk of voter fraud related to the Permanent Early Voting
List, an unsigned Early Ballot, or a mismatched signature Early Ballot. . . .

24

25

[RFP No. 10]: All Documents related to the Cyber Ninjas Audit. . . .

26

[RFP No. 11]: All Communications between You and third-party
organizations, including but not limited to the Heritage Foundation,
regarding SB 1485 and SB 1003, including without limitation any analysis
of whether SB 1485 or SB 1003 would impact particular groups of voters

27

28

---

[6]      RFP No. 9 is identical to RFP No. 8 and is therefore omitted.  (Doc. 156-1 at 16.)

more than others, such as particular racial or ethnic groups (including Native Americans), disabled voters, or voters of particular age groups. . . .

[RFP No. 12]: All Documents discussing or reflecting the legitimate state interests that SB 1485 and SB 1003 further.

(Doc. 156-1 at 15-16.)

B.   **Relevance And Overbreadth**

1.   The Parties' Arguments

All told, the RFPs seek information related to S.B. 1485 and S.B. 1003 (and whether these bills would affect particular groups more than others), the demographics of early voters, the administrative burdens and voter-fraud risks related to early voting, and the Cyber Ninjas audit.  Plaintiffs contend these materials are relevant because they "bear on whether Republican officials understood the legislation would disproportionately impact voters of color and whether their election integrity claims were pretextual," which are "central to the question [of] whether the Court can infer discriminatory intent."  (Doc. 161 at 6-10.)  Plaintiffs argue the RPA is a "natural source" of the information sought because the legislation "was introduced and supported by Republican legislators, and [the RPA] was involved in pressing for this and similar legislation."  (*Id.* at 6-8.  *See also id.* [noting that the RPA's chairwoman, Dr. Kelli Ward, "made frequent public statements regarding the prevalence of election fraud in the wake of the 2020 election" and the RPA "called for new voting related legislation by the Arizona legislature" in social media posts].)  Plaintiffs' more specific arguments related to each individual RFP are discussed in more detail below.

In response, the RPA contends the requested discovery is categorically irrelevant because the Supreme Court's decision in *Brnovich v. Democratic National Committee*, 141 S. Ct. 2321 (2021), "put the focus in these cases squarely on the motivations of the legislature as a whole, rather than individual legislators much less non-legislators or other members of the public like the [RPA]."  (Doc. 171 at 4-5.)  According to the RPA, "[s]uch an inquiry does not permit, or even naturally lead to, intrusive subpoenas to organizations or members of the public who simply supported a law."  (*Id.* at 5.)  The RPA also argues

that Plaintiffs offer no evidence that it worked "'hand in glove' [with elected officials] to get these laws passed" and that Dr. Ward's advocacy is a "plainly inadequate basis on which to start issuing subpoenas to non-parties, and it also presents a serious First Amendment problem." (*Id.* at 2.) The RPA also contends that if its support for S.B. 1485 and S.B. 1003 were, alone, sufficient to justify a subpoena, "Plaintiffs could subpoena hundreds of organizations and millions of people that were also supportive of the laws at issue." (*Id. See also id.* at 2-3 ["And by demanding that the [RPA]—as well as its 'employees, staff, officers, agents or representatives,' which arguably includes thousands of precinct committeemen—produce responsive documents, that is exactly what the Plaintiffs are trying to do."].) The RPA also asserts specific objections to individual RFPs, which are addressed in more detail below.

In reply, Plaintiffs contend that, even after under *Brnovich*, the *Arlington Heights* test for intentional discrimination still applies and the "statements of individual legislators are critically relevant. Documents responsive to this Subpoena would, at the very least, bear on whether [the RPA]—and thus likely other Republican officials, who are among [the RPA's] members—understood the legislation would disproportionately impact voters of color and whether their election integrity claims were pretextual." (Doc. 172 at 5, internal citations omitted.) Plaintiffs also reiterate that the RPA is "uniquely positioned to provide evidence that goes to the core of Plaintiffs' claims" as a "vocal, very public advocate for SB 1485 and other voting restrictions in the wake of the 2020 election . . . [that] worked closely with GOP legislators to push for these bills." (*Id.* at 4.) Plaintiffs specifically identify the so-called "fake elector plan" as evidence of the RPA's involvement:

> At least 11 individuals—including current and former members of the Arizona legislature—are alleged to have met at the [RPA] headquarters to "falsely declare themselves the [S]tate's official presidential electors" in the wake of the 2020 election. According to an email from [RPA]'s counsel that has been publicly reported, [RPA] Chair Dr. Ward wanted to keep [the RPA]'s plan to submit these "fake" electors to Congress "under wraps" until January 6th. Such reports, relying on source emails that have come to light in recent days, belie claims that [the RPA] is just a fundraising booster unlikely to have relevant documents, or as [the RPA] puts it, has nothing "to do with this case." The "fake" elector plan—[the RPA's] counsel's words,

not Plaintiffs'—just like SB 1485 and other "election integrity" initiatives pushed for by [the RPA], all stem from a refusal to accept the 2020 election results and to ensure that candidates preferred by the [RPA] but opposed by the majority of voters of color are elected.  This is not a situation where [the RPA] received a Subpoena for merely expressing its views . . . .

(*Id.* at 4-5, internal citations omitted).

> 2. Analysis

> a. **Threshold Considerations**

As an initial matter, the Court disagrees with the RPA's interpretation of how *Brnovich* affects relevance in the context of this discovery dispute.  The RPA contends that none of the requested discovery is relevant because *Brnovich* held that discriminatory intent refers to the "motivation of the legislature as a whole" rather than individual legislators or third parties (such as the RPA).  (Doc. 171 at 6.)

The Court already addressed, and rejected, a variant of this argument in the order resolving Defendants' motion to dismiss.  (Doc. 154 at 55-59.)  As noted there, *Brnovich* does not hold that contemporaneous statements made by legislators (or third parties) are, as a matter of law, irrelevant when evaluating the presence or absence of discriminatory legislative intent.  Of course, "[c]ourts must use caution . . . when seeking to glean a *legislature's* motivations from the statements of a handful of lawmakers."  *United States v. Machic-Xiap*, 552 F. Supp. 3d 1055, 1062 (D. Or. 2021).  *See also United States v. Rodriguez-Arevalo*, 2022 WL 1542151, *4 (M.D. Pa. 2022).  But that does not mean evidence of an individual legislator's motive is irrelevant to the question of the legislature's motive, particularly for discovery purposes given the relatively low bar of relevance in Rule 26(b)(1).  *See also League of United Latin Am. Citizens v. Abbott*, 2022 WL 1410729, *22 n.13 (W.D. Tex. 2022) (rejecting a similar reading of *Brnovich* as "somewhat aggressive" and noting that "statements of discriminatory intent by a committee chair made during floor debate would doubtless be of some weight in judging the intentions of the body as a whole, particularly at this preliminary stage"); *Am. Trucking Ass'ns, Inc. v. Alviti*, 14 F.4th 76, 90 (1st Cir. 2021) ("[W]e do not hold that evidence of individual legislators' motives is always irrelevant per se; we mean only to point out that it is often less reliable

and therefore less probative than other forms of evidence bearing on legislative purpose . . . .").

The Court also notes that the RPA argues each category of information sought in the subpoena is not "highly relevant." This purported requirement—that discovery be "*highly* relevant" to the claim—is from the second step of the First Amendment privilege framework. *Perry* 591 F.3d at 1161 (once a *prima facie* showing is made, "the party seeking the discovery must show that the information sought is highly relevant to the claims or defenses in the litigation—a more demanding standard of relevance than that under Federal Rule of Civil Procedure 26(b)(1)"). Because the RPA has not made a *prima facie* showing of arguable First Amendment infringement, the heightened relevance standard does not apply here.

Finally, to the extent the RPA seeks to avoid compliance with the subpoena on the ground that Plaintiffs lack a sufficient basis for suspecting the RPA possesses any of the documents in question, this argument fails on both the law and the facts. Legally, the argument fails because, although the RPA's brief is not entirely clear on the point, the RPA appears to be arguing that Plaintiffs' purported lack of a basis for this belief poses a First Amendment retaliation problem, as opposed to a relevance problem. (Doc. 171 at 2 ["[A]ll that Plaintiffs are really saying is that the [RPA's] Chairwoman publicly supported the legislation that they are challenging. This is a plainly inadequate basis on which to start issuing subpoenas to non-parties, and it also presents a serious First Amendment problem."].) But as discussed in Part III above, Plaintiffs have failed to establish a *prima facie* case of First Amendment protection.

To the extent this argument was intended to be a relevance argument, it fares no better. Relevance addresses whether the requested documents are relevant to the underlying litigation, not the likelihood that the subpoenaed party possesses the documents at issue. A subpoena recipient that lacks any responsive documents need not *object* to the subpoena on the ground that the subpoena is unlikely to result in the production of any responsive documents—it can simply *respond* to the subpoena by certifying that nothing

1   responsive was found.[7]

2       At any rate, even assuming the issue has some bearing on the question of relevance,

3   the Court is satisfied that Plaintiffs had a sufficient factual foundation for suspecting the

4   RPA would possess the materials sought in the subpoena.  Among other things, Plaintiffs

5   present evidence that the "legislation was introduced and supported by Republican

6   legislators" (including members of the RPA), that the RPA provided vocal advocacy in

7   support of S.B. 1485 and other voting restrictions (particularly through statements by Dr.

8   Ward), that the RPA made public statements about the proffered justifications for S.B.

9   1485 (*i.e.*, voter fraud and administrative burdens), and that other Republican Party groups

10  have intervened in this matter.  (Doc. 161 at 6-13; Doc. 172 at 5-6.)[8]  These are sufficient

11  bases for suspecting the RPA may possess the documents at issue.

12                  **b.      RFP Nos. 1, 2, and 11**

13      RFP Nos. 1, 2, and 11 request documents and communications related to S.B. 1485

14  and S.B. 1003.  (Doc. 156-1 at 15-16.)

15      The inclusion of S.B. 1003 in these requests gives the Court some pause.  Plaintiffs'

16  claims regarding S.B. 1003 have now been dismissed.  (Doc. 154.)  Generally, "it is proper

17  to deny discovery of matter that is relevant only to claims or defenses that have been

18  stricken . . . unless the information sought is otherwise relevant to issues in the case."

19  *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 352 (1978) (citations omitted).

20      Despite this, Plaintiffs contend that because "SB 1485 and SB 1003 were introduced

21  [7]     It might be possible for a subpoena recipient to raise an undue burden objection in
22  this circumstance, under the theory that conducting the sort of comprehensive search
    necessary to certify the absence of responsive documents would pose an undue burden in
23  light of the objective unlikelihood that any responsive documents exist.  The RPA has not
    made such an argument here, and such an argument would fail in any event because, as
24  discussed elsewhere in this order, Plaintiffs have a sufficient factual foundation for their
    belief that the RPA may possess responsive documents.

25  [8]     In particular, Plaintiffs reference various posts from the RPA's Twitter account and
    Dr. Ward's Twitter account, as well as news articles reporting Dr. Ward's involvement in
26  the so-called "fake elector plan."  (Doc. 171 at 7-8 & nn.5-9; Doc. 172 at 4-5 & n.3.).
    Plaintiffs also allege that at least one Republican member of the Arizona House of
27  Representatives, Representative John Kavanaugh, made statements expressing the
    discriminatory trope that minorities are uneducated voters (Doc. 1 ¶ 67 & n.17) and note
28  that both S.B. 1485 and S.B. 1003 were sponsored by Republican Senator Ugenti-Rita
    (Doc. 161 at 8).

                                    - 20 -

and advanced through the legislature at almost the same time based on the same purported need to enhance election integrity in the wake of the 2020 presidential election," it follows that "[RPA] documents relevant to the justifications for both Bills are relevant whether the Arizona legislature was motivated by pretextual rationales when considering various voting rights bills, including SB 1485, and thus would be central to Plaintiffs' intentional discrimination claim directed at SB 1485." (Doc. 161 at 1 n.2. *See also id.* [arguing documents regarding S.B. 1003 are "relevant to the intentional discrimination claim as to SB 1485, as the fact that the legislature was contemporaneously considering other legislation also designed to adversely impact minority groups is probative of the legislature's intent with respect to SB 1485"].) Notably, the RPA does not argue in its response that documents related to S.B. 1003 are no longer relevant in light of the June 2022 dismissal order, despite discussing other "specific problems" with each request and mentioning S.B. 1003 several times in the process. (*See, e.g.*, Doc. 171 at 6, 8.) Nor does the RPA argue that allowing discovery related to S.B. 1003 (as opposed to solely S.B. 1485) would substantially increase the burden of complying with the subpoena. Given this backdrop, although the Court is cautious about allowing discovery that could be viewed as intended to revive dismiss claims, it will not *sua sponte* excise the references to S.B. 1003 in RFP Nos. 1, 2, and 11.

On the merits, RFP Nos. 1, 2, and 11 request documents and communications related to S.B. 1485 and S.B. 1003 and their effects on particular voter groups. (Doc. 156-1 at 15-16.) The Court agrees with Plaintiffs that such materials are relevant within the meaning of Rule 26(b). First, given the RPA's close relationship with relevant lawmakers and advocacy in support of the bill, materials bearing on whether the RPA knew (or expected) that S.B. 1485 would affect particular racial groups more than others could provide circumstantial evidence that lawmakers (some of whom are members of the RPA) possessed the same knowledge or opinion. *Brnovich*, 141 S. Ct. at 2349 (noting "the law's impact on different racial groups" is one of multiple factors courts must consider when determining whether a challenged law was "enacted with a racially discriminatory

purpose").  Second, as prominent supporters of S.B. 1485, the RPA's own reasons for supporting S.B. 1485 and S.B. 1003 (including, potentially, the effect on particular racial groups) are, under Ninth Circuit law, potentially relevant to legislative intent.  *See, e.g.*, *Ave. 6 E Invs. LLC v. City of Yuma*, 818 F.3d 493, 504 (9th Cir. 2016) ("The presence of community animus can support a finding of discriminatory motives by government officials, even if the officials do not personally hold such views."); *Ave. 6 E Invs. v. City of Yuma*, 2018 WL 2446482, *1 (D. Ariz. 2018) (evidence of widespread support for or opposition to legislation "based on ethnic prejudice" may "support an inference that the [legislators] acted to mollify their constituents' prejudicial concerns," even if certain specific statements were not known to legislators).

The RPA's arguments to the contrary are unavailing.  In relation to RFP Nos. 1, 2, and 11, the RPA relies heavily on *Brnovich* to establish irrelevance—otherwise, it resorts to conclusory statements (*e.g.*, "the [RPA's] views on these bills are not 'highly relevant' to this litigation") that are devoid of specifics.  (Doc. 171 at 7-8.)  Because the Court disagrees with the RPA's interpretation of *Brnovich* for the reasons stated above, the RPA's relevance objections are unpersuasive.

The RPA also contends that RFP No. 2 is overbroad because it "would encompass everything from communications that the [RPA] may have with the Secretary of State about changes to the Secretary's Elections Procedures Manual, to emails about new elections laws with anyone apparently, all of which have nothing to do with this suit," and would require the RPA to "disclose all of its thoughts and communications and other free speech surrounding new election laws and 'Arizona's voting system.'"  (Doc. 171 at 5.)  This argument is unavailing because Plaintiffs have already agreed to "narrow this Request to documents, communications, and analyses of SB 1485 and SB 1003 and their potential impact on any groups of Arizona voters."  (Doc. 156-1 at 25.)  So narrowed, the request does not broadly encompass all of the RPA's views on any matter related to elections but instead focuses on the specific election law still at issue in this case.

…

1

### c.   RFP No. 3

RFP No. 3 requests communications between the RPA and various government officials[9] discussing "any actual or proposed changes to Arizona law or regulations relating to" the Permanent Early Voting List and the process for curing a mismatched (or missing) signature on an early ballot.  (Doc. 156-1 at 15.)  The RPA objects to RFP No. 3 on the same grounds as RFP No. 2—namely, that (1) the discovery sought is not "highly relevant" under *Brnovich* and would encompass materials that "have nothing to do with this suit"; and (2) the request is overbroad.  (Doc. 171 at 5-6.)

These arguments are unpersuasive.  The Permanent Early Voting List and the process for curing a mismatched or missing signature on an early ballot are the subjects of S.B. 1485 and S.B. 1003, respectively, and thus relevant to Plaintiffs' claims.[10] Communications with government actors are potentially relevant "contemporary statements" under *Arlington Heights*.  *Arce*, 793 F.3d at 979 n.5 (describing "emails from legislators evincing animus against [a racial group] while advocating for this legislation" as "highly relevant to the *Arlington Heights* analysis").[11]  Also, RFP No. 3 encompasses only communications with government actors and is limited in time from January 14, 2019 to present.  As a result, and given that the RPA's relevance objections to RFP No. 3 rely heavily on *Brnovich* and otherwise lack detail, Plaintiffs have established that such

---

[9]   The officials included are: "Executive Branch officials (including without limitation the Governor, Secretary of State, and Attorney General), their employees or campaign staff, federal or state legislators, county election officials, or any other public officials." (Doc. 156-1 at 15.)

[10]   As noted, although the Court is wary of authorizing discovery related to S.B. 1003, Plaintiffs have offered arguments concerning the relevance of that discovery under Rule 26(b)(1) and the RPA did not meaningfully respond to those arguments.

[11]   *See also Puente Arizona*, 314 F.R.D. at 668 (finding that "emails between [a legislator] and various third party attorneys, lobbyists, and constituents regarding anti-illegal immigration legislation [the legislator] was sponsoring" were relevant to "whether the Arizona Legislature acted with a constitutionally impermissible purpose in adopting H.B. 2779 and H.B. 2745"); *Sol*, 2013 WL 12098752 at *3 (in the context of an Equal Protection challenge to legislation, noting that "communications between Arizona legislators and the people advising them through the process of drafting the legislation that eventually became S.B. 1070" were "likely to contain admissible evidence or lead to the discovery of admissible evidence of those legislators' intent in drafting and supporting S.B. 1070 as 'contemporary statements by members of the decisionmaking body'").

1    communications are relevant within the meaning of Rule 26(b).

2         Finally, the overbreadth objection to RFP No. 3 (Doc. 171 at 5) fails for the same

3    reason as the overbreadth objection to RFP No. 2—it ignores Plaintiffs' subsequent

4    agreement to narrow the scope of RFP No. 3 to only encompass the specific election-related

5    disputes at issue in this case.  (Doc. 156-1 at 26 ["We are also willing to further narrow

6    this Request to communications with the remaining Executive Branches relating to SB

7    1485 and SB 1003, and any claims of election fraud or irregularities in the 2020

8    election."].)

9                                   d.    **RFP Nos. 4 and 5**

10        RFP Nos. 4 and 5 request documents "from January 14, 2019 to present related to

11   budgeting, costs, or other burdens of administering" the Permanent Early Voting List and

12   the process by which a voter may cure a missing or mismatched signature on an early ballot.

13   (Doc. 156-1 at 15-16.)  According to Plaintiffs, RFP Nos. 4 and 5 seek relevant information

14   because "[o]ne of the justifications proffered by prominent Republicans seeking changes

15   to Arizona's voting laws is the purported burdens associated with the PEVL and cure

16   processes."  (*Id.* at 26.)  In response, the RPA argues that, because it does not administer

17   any early voting procedures, it is an unlikely source for detailed analyses of the

18   administrative burdens associated with such procedures.  (Doc. 171 at 6-7.)

19        This objection is unavailing because, as discussed in Part IV.B.2.a, it conflates the

20   relevance of the requested documents with the likelihood that the RPA actually possesses

21   any responsive documents.  Additionally, although the RPA itself is not responsible for

22   administering the election processes in question, it is conceivable that the RPA possesses

23   documents touching upon these issues in light of Plaintiffs' proffered evidence concerning

24   the RPA's role in promoting the legislation at issue.  Thus, to the extent the RPA possesses

25   documents that are responsive to RFP Nos. 4 and 5, the Court agrees with Plaintiffs that

26   such documents are relevant within the meaning of Rule 26(b).

27                                  e.    **RFP Nos. 6 and 7**

28        RFP Nos. 6 and 7 request documents "from January 14, 2019 to present related to

the demographics and/or partisan affiliation" of early voters.  (Doc. 156-1 at 16.)  Plaintiffs contend these documents are relevant to the "purpose of the Bills" because they "shed light on how [the RPA] and the Arizona Legislature understood such legislation would impact different demographic groups and individuals with different partisan affiliations." (Doc. 161 at 3.)  In response, the RPA's only relevance-related arguments are (1) the requests "are hopelessly broad on their face, since they call for all documents regarding the information of millions of voters"; and (2) the requested documents are, for unexplained reasons, "not 'highly relevant' to [this] case." (Doc. 171 at 6.)[12]

These objections lack merit.  Plaintiffs made clear during the meet-and-confer process that they are not seeking every document that happens to mention the demographic information of an individual voter, but rather are seeking "demographics data from the State that are augmented in any way, or other demographics data not provided by the State," in which case Plaintiffs "request a description of that data along with the identification of any fields in the database not available from the State of Arizona." (Doc. 156-1 at 26.) This is not a "hopelessly overbroad" request.

The requested information is also relevant within the meaning of Rule 26(b).  As noted in *Brnovich*, although partisan and racial motives are distinct, "racially polarized voting can sometimes blur the lines." 141 S. Ct. at 2335. "While racially polarized voting alone does not signal a constitutional violation, it is a factor that increases the vulnerability of racial minorities to discriminatory changes in voting law." *Shelby Cnty., Ala. v. Holder,* 570 U.S. 529, 578 (2013). *See also id.* ("[W]hen political preferences fall along racial lines, the natural inclinations of incumbents and ruling parties to entrench themselves have predictable racial effects.  Under circumstances of severe racial polarization, efforts to gain political advantage translate into race-specific disadvantages."). Thus, documents related to the partisan affiliations of early voters are relevant, at least for discovery purposes, to Plaintiffs' claims.

---

[12]      The RPA also raises arguments related to undue burden and availability from other sources, which are addressed in Part IV.C of this order.

1    The "demographics" portion of RFP Nos. 6 and 7 presents a bit closer call.  The

2    relevance of early voters' racial and ethnic demographics is clear—as discussed elsewhere

3    in this order, evidence that the RPA considered the relationship between early voting and

4    race or ethnicity may provide circumstantial evidence that lawmakers did the same.

5    However, it is less clear why evidence related to *any* demographic information about early

6    voters is relevant under Rule 26(b)(1).  Nevertheless, because the RPA has not raised any

7    developed argument on this point, *see United States v. Sineneng-Smith*, 140 S. Ct. 1575,

8    1579 (2020) (under "the principle of party presentation," courts "should not sally forth each

9    day looking for wrongs to right" and instead should "normally decide only questions

10   presented by the parties") (cleaned up), and because Plaintiffs have made clear through the

11   meet-and-confer process that they are simply seeking evidence of any augmentation the

12   RPA performed on demographic data provided by the State, the Court is satisfied that Rule

13   26(b)'s relatively low bar for relevance is met.

14                        f.    **RFP Nos. 8 and 10**

15   RFP Nos. 8 and 10 request information about the risks of voter fraud related to early

16   voting and the Cyber Ninjas audit.[13]  In the June 24, 2022 order, the Court noted the

17   relevance of the Cyber Ninjas audit to Plaintiffs' remaining claims.  (Doc. 154 at 57-58

18   ["[T]his episode is plausibly (if indirectly) related to the enactment of S.B. 1485 because

19   one of the proffered justifications for that law was the need to enhance voter integrity and

20   combat electoral fraud.  If that justification was pretextual, as Plaintiffs allege, this can

21   plausibly be viewed as circumstantial evidence supporting Plaintiffs' contention that one

22   of the true, unexpressed motivations for the law was discriminatory."].)[14]  Concerns about

23   voter fraud and election integrity in the context of the 2020 election are relevant, within

24   the meaning of Rule 26(b), for the same reasons.  *Cf. Reeves v. Sanderson*, 530 U.S. 133,

25   147 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one

26   _____

     [13]      RFP No. 9 is identical to RFP No. 8.  (Doc. 156-1 at 16.)  The Court assumes the
27   duplication is an error and will ignore RFP No. 9.

     [14]      In their complaint, Plaintiffs allege that, despite the Cyber Ninjas audit not revealing
28   any voter fraud, Arizona legislators continued to rely on fraud-related allegations to justify
     S.B. 1485 and related voting restrictions.  (Doc. 1 ¶ 66.)

form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."). *See also D.H.S. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1915 (2020) (noting that, under *Arlington Heights*, departures from the normal procedural sequence may be evidence of a discriminatory purpose);[15] *Ave. 6 E*, 818 F.3d at 507 ("A city's decision to disregard the zoning advice of its own experts can provide evidence of discriminatory intent, particularly when, as here, that recommendation is consonant with the municipality's general zoning requirements and plaintiffs proffer additional evidence of animus.").

At issue here, however, is whether *the RPA's* documents related to voter fraud, election integrity, and the Cyber Ninjas audit are relevant within the meaning of Rule 26(b) to Plaintiffs' claims. As evidence of the RPA's role in these events, Plaintiffs note that the RPA "frequently tweets about so-called election integrity matters" (Doc. 156-1 at 26-27),[16] that Dr. Ward "made frequent public statements regarding the prevalence of election fraud in the wake of the 2020 election" (Doc. 161 at 4),[17] and that Dr. Ward "lobbied for so-called 'election integrity' bills generally, for SB 1485 specifically, and seemingly accused its sponsor of accepting a bribe when earlier restrictive voting legislation failed." (*Id. See also id.* at 7-8 & n.6. [referencing a video posted to the RPA's Twitter account in which Dr. Ward claims that "there were 'almost innumerable episodes of potential fraud [and] voting irregularities' and that voter fraud 'unquestionably exists and must be investigated'"]; *id.* at 8 n.7 [referencing a tweet from the RPA identifying "election

---

[15]    Plaintiffs allege several procedural irregularities regarding the Cyber Ninjas audit. (Doc. 1 ¶¶ 58-63.)

[16]    Plaintiffs note statements by Dr. Ward "demanding a 'full forensic audit' following the 2020 election," which the RPA amplified via social media, and allege the RPA "signaled its support for the State GOP Senate 'standing strong' to pursue audits." (Doc. 156-1 at 27.) Plaintiffs also describe statements by the RPA about voter fraud, "mischief and malfeasance" in Arizona related to voting, and flaws in voting software following the 2020 election. (*Id.*)

[17]    Specifically, Plaintiffs reference tweets in which Dr. Ward suggested, after an earlier voting bill failed, that Arizona State Senator Ugenti-Rita (who sponsored both S.B. 1485 and S.B. 1003) accepted bribes. (Doc. 161 at 8 n.8.) In later tweet referenced by Plaintiffs, Dr. Ward expressed support for Senator Ugenti-Rita in relation to S.B. 1485. (*Id.* at 8 n.9.)

integrity" as a top priority "this legislative cycle"].)[18]  In response, the RPA argues that its public support is not evidence that the RPA "had anything to do with [the audit]" and what it thinks about the audit is "not 'highly relevant' to this case."  (Doc. 171 at 7-8.)

The Court agrees with Plaintiffs that the RPA's public support for the Cyber Ninjas audit and statements about voter fraud and election integrity suggest that, although the audit *itself* was state-run, the discovery requested by RFP Nos. 8 and 10 may be relevant within the meaning of Rule 26(b) to the legislature's intent when enacting responsive voting-related legislation.  Plaintiffs allege that election integrity concerns, including those leading to the Cyber Ninjas audit, were pretext for enacting racially discriminatory legislation.  Because the RPA vocally supported the legislation (and its membership includes lawmakers who voted for S.B. 1485, specifically), its documents related to how early voting influences election integrity and the Cyber Ninjas audit meet Rule 26(b)'s relatively low threshold for relevance in light of Plaintiffs' claim in this case.

Finally, the RPA also raises an overbreadth challenge to RFP No. 10, arguing that the "request for '[a]ll documents related to' [the Cyber Ninjas audit] is . . . plainly overbroad."  (Doc. 171 at 8.)[19]  This argument lacks merit.  RFP No. 10 requests "All Documents related to the Cyber Ninjas Audit."  (Doc. 156-1 at 16.)  The subpoena defines the Cyber Ninjas audit as "the audit of the Maricopa County 2020 general election performed by Cyber Ninjas on behalf of the Arizona State Senate beginning in April 2021, with results delivered on or around September 24, 2021."  (*Id.* at 8.)  In other words, RFP No. 10 is limited by subject matter (the audit) and by time.  This is not overly broad.

g.    **RFP No. 12**

RFP No. 12, which requests "Documents discussing or reflecting the legitimate state interests that SB 1485 and SB 1003 further" (Doc. 156-1 at 15), is relevant for the same reasons as RFP Nos. 1, 2, 3, and 11—the RPA's relationship with the lawmakers who

---

[18]    Plaintiffs also identify statements by both the RPA and Dr. Ward describing S.B. 1485 as "important Election Integrity legislation." (Doc. 161 at 8 n.9.)

[19]    The RPA also raises objections to RFA No. 8 based on undue burden and a lack of narrow tailoring, which are addressed in Part IV.C of this order.

supported S.B. 1485, combined with its own advocacy for the legislation, suggests that its members' views about what state interests would be served by S.B. 1485 (and S.B. 1003) are relevant to lawmakers' intent, at least within the meaning of Rule 26(b).[20]

## C.   Proportionality/Burden

### 1.   The Parties' Arguments

Plaintiffs contend the discovery sought is proportional to the needs of the case because "[c]ourts have permitted comparable third-party discovery in voting rights cases like these." (Doc. 161 at 8.) Plaintiffs also contend the RPA "has not even attempted to show that the Subpoena would actually subject it to undue burden or expense" and when Plaintiffs "offered to narrow their requests," the RPA "never substantively responded to that offer, other than [to] categorically refuse to respond to the Subpoena." (*Id.* at 8-9.)

In response, the RPA argues the requests are "generally . . . burdensome." (Doc. 171 at 5. *See also id.* at 4 ["Plaintiffs' requests are a Kafkaesque exercise in overbroad, irrelevant, and even argumentative demands . . . ."].) The RPA also raises specific proportionality and burdensomeness objections to individual RFPs, which are addressed in more detail below.

In reply, Plaintiffs argue the RPA "complains about the breadth of some of the requests but fails to come forward with any factual basis to suggest that compliance with the Subpoena would be disproportionately burdensome." (Doc. 172 at 7.) Plaintiffs also note that the RPA has not submitted "declarations or anything else to the Court providing any details that indicate there would be an inordinate or disproportionate burden if it were required to comply" and "instead rests on its own unilateral and untenable position that it 'has nothing to do with this case.'" (*Id.*) Plaintiffs characterize the RPA as "completely stonewall[ing]" during discovery and "drag[ging] out the process in an effort to avoid producing responsive information." (*Id.* at 7-8.) Finally, and as discussed in more detail

---

[20]    The RPA's assertion that "such things would not be 'highly relevant' to Plaintiffs' suit as they would just contain the views or other thoughts of the [RPA], which are of no relevance to their suit" (Doc. 171 at 7) is unpersuasive for the reasons stated elsewhere in this order.

1    below, Plaintiffs respond to the RPA's specific objections to individual RFPs.  (*Id.* at 6-8.)

2                    2.    Analysis

3                         a.    **Initial Considerations**

4           Under Rule 26(b)(1), the proportionality analysis involves "considering the

5    importance of the issues at stake in the action, the amount in controversy, the parties'

6    relative access to relevant information, the parties' resources, the importance of the

7    discovery in resolving the issues, and whether the burden or expense of the proposed

8    discovery outweighs its likely benefit."  Assessing proportionality requires the input of

9    both parties:

> A party claiming undue burden or expense ordinarily has far better
> information—perhaps the only information—with respect to that part of the
> determination.  A party claiming that a request is important to resolve the
> issues should be able to explain the ways in which the underlying information
> bears on the issues as that party understands them.  The court's responsibility,
> using all the information provided by the parties, is to consider these and all
> the other factors in reaching a case-specific determination of the appropriate
> scope of discovery.

15   Fed. R. Civ. P. 26, advisory committee notes on the 2015 amendments.  *See also In re Bard*

16   *IVC Filters*, 317 F.R.D. at 564 ("The inquiry to be conducted under the proportionality

17   requirement, therefore, requires input from both sides.").  Also, the special consideration

18   afforded to non-parties when it comes to subpoena requests under Rule 45 involves

19   weighing the burden to the subpoenaed party against the value of the information to the

20   serving party.  *Aquastar Pool Prods.*, 2019 WL 250429, at *3.  This includes considering

21   whether the information is available elsewhere.[21]

22          As for the first factor of the proportionality analysis, there is no question that the

23   issues in this case are important.  *See, e.g.*, *Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964)

---

[21]    The RPA argues that many of the RFPs seek information that is "otherwise
available" (*i.e.*, information that could be sought from a party to the litigation).  The
"otherwise available" requirement is from the second step of the First Amendment
privilege framework.  *Perry* 591 F.3d at 1161.  Here, because the RPA has not made a
*prima facie* showing of arguable First Amendment infringement, whether the information
is otherwise available is not dispositive.  Nevertheless, because the RPA is a non-party,
whether information is available elsewhere, particularly from a party to the litigation, is
one relevant consideration when determining whether enforcing the request is appropriate.
*Moon*, 232 F.R.D. at 638.

1   ("Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic

2   society.  Especially since the right to exercise the franchise in a free and unimpaired manner

3   is preservative of other basic civil and political rights, any alleged infringement of the right

4   of citizens to vote must be carefully and meticulously scrutinized.").

5          The second factor, the amount in controversy, is inapplicable because Plaintiffs are

6   not seeking money damages.

7          Neither party addresses the third factor (relative resources) or the fourth factor (the

8   parties' relative access to the information).  As noted in the Court's previous order,

9   however, "most of the relevant facts about . . . the purposes animating . . . SB 1485 are

10   possessed solely by the State, its counties, and other governmental actors.  Discovery may

11   help illuminate those purposes."  (Doc. 154 at 57, internal quotations omitted.)

12          Most of the parties' arguments bear on the fifth and sixth factors—the importance

13   of the information to resolving the issues and the relative burden on the RPA—and thus

14   significantly overlap with the special consideration afforded to the RPA as a non-party.  As

15   for the fifth factor, for reasons summarized earlier in this order, Plaintiffs have established

16   the information sought is relevant to their remaining claims.  This indicates the requested

17   discovery is important to resolving the issues.  *See also Arlington Heights*, 429 U.S. at 266

18   ("Determining whether invidious discriminatory purpose was a motivating factor demands

19   a sensitive inquiry into such circumstantial and direct evidence of intent as may be

20   available.").  Nevertheless, because the RPA is a non-party, the necessity of the discovery

21   to Plaintiffs may need to be greater to justify compelling the RPA to bear the burdens of

22   discovery.  In other words, the sixth factor—whether the burden or expense of the proposed

23   discovery outweighs its likely benefit, Fed. R. Civ. P. 26(b)(1)—is particularly important

24   here.  *See, e.g.*, *Dart Indus.*, 649 F.2d at 649 ("[T]he word nonparty serves as a constant

25   reminder of the reasons for the limitations that characterize 'third-party' discovery.")

26   (citation and quotations omitted).

27          …

28          …

1

b.      **"Otherwise Available"**

2          The RPA asserts that at least some of the information sought by Plaintiffs' subpoena

3   is "otherwise available."  (Doc. 171 at 5-8.)

4          In general, "there is a preference for parties to obtain discovery from one another

5   before burdening non-parties with discovery requests."      *Soto*, 282 F.R.D. at 505.

6   "Consequently, where plaintiffs have not shown they attempted to obtain documents from

7   the defendant in an action prior to seeking the documents from a non-party, a subpoena

8   duces tecum places an undue burden on a non-party."   *Id.   See also Moon*, 232 F.R.D. at

9   637-38 (holding that where the propounding party could "more easily and inexpensively

10  obtain the documents" from a party to the litigation, a non-party subpoena seeking those

11  documents is unduly burdensome); *Hickman v. Mead*, 2019 WL 3837784, *2 (D. Nev.

12  2019) ("The court also has an obligation to protect non-parties from being burdened with

13  subpoenas for documents that can more easily and inexpensively be obtained from the

14  opposing party.").[22]

15         As an initial matter, many of the RPA's arguments on this topic fail to account for

16  the manner in which Plaintiffs agreed to narrow the scope of the subpoena during the meet-

17  and-confer process.  As discussed above, Plaintiffs have agreed that RFP No. 2 may be

18  limited to "documents, communications, and analyses of SB 1485 and SB 1003 and their

19  potential impact on any groups of Arizona voters" and that RPF No. 3 may be construed

20  as excluding any "communications in the possession, custody, or control of the Arizona

21  Attorney General or Secretary of State" and as further "limited to "communications with

22  the remaining Executive Branches relating to SB 1485 and SB 1003, and any claims of

23  election fraud or irregularities in the 2020 election."  (Doc. 156-1 at 25-26.)

24         As for RFP Nos. 4 and 5, the RPA contends information about the administrative

25  _____

26  [22]    Many of the decisions regarding burden were issued before the 2015 amendments
    to Rule 26(b)(1) and analyzed burden in the context of whether a subpoena should be
27  quashed because it subjected a party to "undue burden" under Rule 45(d)(3)(A)(iv) (rather
    than burden in the context of Rule 26(b)(1)).  However, the undue burden analysis overlaps
28  substantially with the special consideration afforded to non-party subpoenas in that both
    require a court to weigh the value of the information to the propounding party against the
    burden imposed on the recipient.

burdens related to early voting is "clearly available from the State." (Doc. 171 at 7.) The Court agrees with the RPA that the State is likely a better source for relevant financial data. However, for reasons discussed earlier in this order, the RPA's knowledge of and opinions about such data may provide important circumstantial evidence of lawmakers' knowledge and opinions. Further, the RPA does not argue that responding to RFP Nos. 4 and 5 would be burdensome—in fact, it offers no proportionality arguments related to these two requests other than the conclusory statement that the requested information is available from the State. Because the "otherwise unavailable" requirement is not dispositive here, and Plaintiffs provide convincing explanations for why they believe the RPA's documents on these issues are important to their case, the Court is not persuaded that RFP Nos. 4 and 5 should be narrowed or stricken on proportionality and burdensomeness grounds.

For the same reasons, the RPA's argument that documents responsive to RFP Nos. 8 and 12 are available from the State is unpersuasive. As Plaintiffs correctly note, these requests "seek documents that are relevant to assessing what interests the legislation supposedly furthers and whether claims by supporters—including the [the RPA]—that SB 1485 and similar legislation was necessary to prevent election fraud and promote election integrity were legitimate, or merely pretextual." (*Id.* at 161 at 3-4. *See also* Doc. 172 at 5 ["Documents responsive to this Subpoena would, at the very least, bear on whether . . . their election integrity claims were pretextual."]. In other words, the Court is not convinced that the information available from the State regarding administrative burdens related to early voting, voter fraud risks related to early voting, and state interests furthered by the challenged legislation is identical to the information Plaintiffs are seeking from the RPA in RFP Nos. 4, 5, 8, and 12. The RPA's failure to discuss whether complying with these requests would pose a burden further supports compelling compliance. *See, e.g.*, *Blemaster v. Sabo*, 2017 WL 4843241, *4 (D. Ariz. 2017) ("The Sabos' boilerplate objections are inappropriate, tantamount to no objection at all.").

As for RFP Nos. 6 and 7, as discussed elsewhere in this order, Plaintiffs have offered to limit these requests to any "demographics data from the State that are augmented in any

1    way, or other demographics data not provided by the State," in which case Plaintiffs

2    "request a description of that data along with the identification of any fields in the database

3    not available from the State of Arizona." (Doc. 156-1 at 26.) Plaintiffs contend the RPA

4    "never substantively responded to that offer, other than to categorically refuse to respond

5    to the Subpoena." (Doc. 161 at 9.) This contention is supported by the exhibits attached

6    to the parties' joint summary of the dispute and to Plaintiffs' motion to compel. (Doc.

7    156-1 at 30-40; Doc. 161-1 at 40-50.) The RPA disputes Plaintiffs' characterization of its

8    meet-and-confer efforts but does not specifically disavow this allegation. (Doc. 171 at

9    1-2.) Nor does the RPA provide any details about its discovery efforts (other than alleging

10   there were "multiple letters and emails" and "a lengthy phone call to go over each and

11   every item in the subpoena"). (*Id.*) In the Court's view, Plaintiffs' offer during the meet-

12   and-confer process seems like a reasonable compromise and avoids any suggestion that

13   RFP Nos. 6 and 7 are disproportionate because they seek information that is otherwise

14   available from the State.

15         As for RFP Nos. 1 and 11, the Court is not convinced they seek communications

16   available from other sources. These requests seek all materials related to whether S.B.

17   1485 or S.B. 1003 affect particular groups more than others, not simply communications

18   with public officials (unlike RFP No. 3). Further, there is no indication (or argument) that

19   RFP Nos. 1 and 11 include *primarily* communications available from the State, such that

20   the burden of complying with these requests would be substantially reduced by adding

21   language that excludes information available from the State.[23] Thus, the fact that some

22   unknown subset of the communications responsive to RFP Nos. 1 and 11 may be available

23   from the State does not establish that those requests are disproportionate under Rule

24   26(b)(1).

25         …

26

27   ───────────────────────

[23]   Also, given the parties' inability to engage cooperatively in discovery thus far, the

28   Court is concerned that adding a clause to RFP Nos. 1 and 11 to exclude "communications
     with State officials that are otherwise available from the State" will lead to more, rather
     than less, disagreement.

1

### c.   **Particularity**

The RPA also objects to three phrases within the RFPs as imprecise or ambiguous: (1) "burdens of administering" (RFP Nos. 4 and 5); (2) "actual or potential voter fraud" (RFP No. 8); and (3) "legitimate state interests" (RFP No. 12).

The "particularity with which the documents are described" is relevant to whether a discovery request is unduly burdensome. *Aquastar Pool Prods.*, 2019 WL 250429 at *3. Unfortunately, the parties' discussion of the phrase "burdens of administering" leaves much to be desired.[24]   The RPA merely states it is "unclear"; Plaintiffs do not respond. (Doc. 171 at 7; *see generally* Doc. 172.)  In the Court's view, the operative phrases are: "budgeting, costs, or other burdens of administering the Permanent Early Voting List, both before and after the passage of SB 1485, including projections thereof" (RFP No. 4) and "budgeting, costs, or other burdens of administering the process by which a voter may 'cure' an unsigned or mismatched signature Early Ballot, both before and after the passage of SB 1003, including projections thereof" (RFP No. 5).  (Doc. 156-1 at 15-16.)  *Cf. Deal v. United States*, 508 U.S. 129, 132 (1993) (noting it is a "fundamental principle of . . . language itself . . . that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used") (internal ellipses omitted).  With this added context, RFP Nos. 4 and 5 are not unclear.  The ordinary and common meaning of these words indicates they refer to administrative costs related to early voting—for example, the costs of mailing early ballots to all voters on the Permanent Early Voting List or the amount of staff time required to process post-election cures of missing signatures.  *See, e.g.*, *Arizona Democratic Party v. Hobbs*, 18 F.4th 1179, 1186, 1190-91 (9th Cir. 2021) (discussing the evidence that "allowing a five-day grace period beyond Election Day to supply missing signatures would indeed increase the administrative burdens on the State

---

[24]     Ideally, Plaintiffs would define all ambiguous terms in the Definitions section of the subpoena ("Attachment A"); perhaps a definition of "burdens of administering" would be helpful.   However, the Court notes Plaintiffs *did* include more than three pages of definitions (Doc. 156-1 at 8-11) and, based on the exhibits attached to the parties' joint dispute summary, Defendants do not appear to have voiced confusion during the meet-and-confer process about any specific terms (*id.* at 18-40).

to some extent").

As for RFP No. 8, the RPA contends that searching for responsive documents would be difficult "as a practical matter" because the phrase "actual or potential voter fraud" is unclear. (Doc. 171 at 7.) This argument is unavailing. RFP No. 8 does not request documents related to "actual or potential voter fraud" *in general*—it requests documents related to "potential or actual risk of voter fraud related to the Permanent Early Voting List, an unsigned Early Ballot, or a mismatched signature Early Ballot." (Doc. 156-1 at 16.). The terms "Permanent Early Voting List" and "Early Ballot" are both defined. (*Id.* at 9-10.) RFP No. 8 is also limited to documents from January 14, 2019 to present. (*Id.* at 16.) Considering the RPA publicly (and frequently) voiced concerns about voter fraud and election integrity during this period and that the same concerns were used to justify S.B. 1485, its argument that the terms are so unclear that it cannot "search for, as a practical matter . . . documents that were responsive to these . . . requests" (Doc. 171 at 7, internal ellipses omitted) is unconvincing.

The RPA next contends the phrase "legitimate state interests" in RFP No. 12 is unclear such that it would be difficult to respond to the request. (*Id.* at 6.) The RPA's primary objection seems to be that "legitimate" is a subjective term. (*Id.* ["What Plaintiffs consider to be 'the legitimate state interests that SB 1485 and SB 1003 further' is at once argumentative and unclear."].) Therefore, the Court will change the request to "state interests" to remove the subjective element. In this context, it seems clear that Plaintiffs are requesting documents related to why the RPA supported and advocated for S.B. 1485 and S.B. 1003—in other words, what state interests the RPA felt were served by the legislation.

### d.    **Time And Expense Required To Comply**

"The Federal Rules . . . afford nonparties special protection against the time and expense of complying with subpoenas." *Exxon Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774, 779 (9th Cir. 1994). Accordingly, had the RPA provided any reasoned argument or evidentiary support for its assertion that complying with the subpoena would be

1     "burdensome," the Court would have been particularly receptive.  Unfortunately, the RPA

2     fails to articulate how the factors relevant to burden (*i.e.*, cost of searching, time constraints,

3     lack of resources, inconvenience) play out in this case.[25]  *See, e.g.*, *Amazing Ins., Inc. v.*

4     *DiManno*, 2020 WL 5440050, *4 (E.D. Cal. 2020) ("Plaintiff and third-party defendants

5     have not satisfied their burden to show that responding to the discovery requests poses an

6     undue burden.  They have not submitted affidavits or other evidence to support their undue

7     burden argument, nor have they submitted summaries or other information about the

8     discovery already produced to establish that the requested ESI would be duplicative or

9     unreasonably cumulative.").  It is unclear how voluminous the RPA expects the responsive

10    discovery would be, how logistically difficult it would be for the RPA to comply to the

11    subpoena, and whether compliance would impose large costs on the RPA.  The Court also

12    takes into account Plaintiffs' offers to narrow several of the requests (particularly to avoid

13    requesting discovery that is available from a party to the litigation), the relevance of the

14    documents sought by Plaintiffs, and the fact that most of the relevant facts about the

15    purposes behind S.B. 1485 are not possessed by Plaintiffs.  Thus, even considering the

16    RPA's non-party status, the Court does not find that the burden imposed by compliance

17    with the subpoena (as narrowed by Plaintiffs and further modified by this order) outweighs

18    the value of the discovery to Plaintiffs.

19    V.    Search Methodology

20          The parties dispute whether the RPA provided sufficient details about the searches

21    it conducted.

22          A.    **Background**

23          Exhibits attached to the joint dispute summary (Doc. 156) suggest that, sometime

24    between January 24 and February 24, 2022, the RPA notified Plaintiffs that it had

25    "conducted some searches" for documents responsive to RFP Nos. 1, 3, 4, 5, 6, and 11 and

26    "that no responsive documents exist other than those that are publicly available."  (Doc.

---

[25]    If anything, the RPA's insistence that it has "nothing to do with this suit" and
assertion that it has no documents responsive to certain RFPs (Doc. 171 at 5-8) suggests
that compliance would not be too burdensome.

156-1 at 27.)  On February 24, 2022, Plaintiffs' counsel sent a letter to the RPA that, among

other things, stated:

> Given that there is no dispute that [the RPA] has created publicly available information on these bills, it naturally follows that there must have been at least some non-public documents that were created before the publicly released versions of the documents you referenced.  We request copies of those documents if they exist.  We also request a complete description of the searches that [the RPA] conducted, specifically, the names of the custodians whose records were searched, their title and role, the search terms or other methods of search used, and the sources and file locations searched, along with sufficient further detail about those sources such that we can assess whether the search was likely to identify responsive information.

(*Id.*)  In follow-up emails, counsel for the RPA did not respond to this request.  (*Id.* at

37-39.)  Sometime between March 22, 2022 and April 8, 2022, Plaintiffs sent another email

renewing this request: "[G]iven the public statements we cited in our letter, it seems quite

unlikely that [the RPA] possesses no unique responsive documents, as was suggested

during our first discussion about the subpoena, and we have not received any of the

information we requested regarding any searches that may have been conducted." (*Id.* at

36.)  It appears the RPA again did not respond.

    B.    **The Parties' Arguments**

Plaintiffs request an order compelling the RPA to "(1) conduct a reasonable search

for documents responsive to the Subpoena; [and] (2) disclose what files are searched and

in what manner (e.g., through the use of search terms or otherwise) . . . ." (Doc. 161 at 12.)

Plaintiffs challenge the RPA's "claim[] that it has been unable to locate any responsive

documents other than (perhaps) documents publicly available on [the RPA's] website" and

contend the RPA "almost certainly has information in its possession that is responsive to

the Subpoena" given its "social media accounts and similar publicly available information

demonstrate . . . [that the RPA] was instrumental in advocating for SB 1485 or other voting

restrictions in 2021. . . .  [The RPA] and its Chairwoman, Dr. Kelli Ward, made frequent

public statements regarding the prevalence of election fraud in the wake of the 2020

election, lobbied for so-called 'election integrity' bills generally, lobbied for SB 1485

specifically, and seemingly accused its sponsor of accepting a bribe when earlier restrictive

voting legislation failed." (*Id.* at 6-8.)  Plaintiffs contend they are not "required to take [the RPA's] assertions at face value.  Requiring [the RPA] to provide additional detail about its search methodology imposes virtually no burden on [the RPA] and will ensure that Plaintiffs are not deprived of potentially critical discovery because of an inadequate search for responsive material."  (*Id.* at 9.)

The RPA does not directly respond to this argument beyond agreeing that its counsel "informed Plaintiffs' counsel that there were no responsive documents to several of the requests" during the meet-and-confer process.  (Doc. 171 at 1-2.  *See also id.* at 8 ["[T]he [RPA] conducted a search for the bill numbers (SB 1485 and SB 1003) on its email server and did not find anything responsive."].)

In reply, Plaintiffs argue the RPA "does not describe that search in any detail.  And there is no reason to be believe that searching *only* for a bill's number is sufficient to identify responsive documents.  Nor does [the RPA] represent that it searched in any fashion for responsive text messages in its possession, custody, or control, which is critical in a case like this."  (Doc. 172 at 6, internal citations omitted.)  In a footnote, Plaintiffs elaborate on the requested search description: "For example, i) why that email server was the right one to check, ii) whether the search was done in a way likely to identify responsive documents, iii) whose email accounts were searched, iv) during what time period, v) whether any other keywords are likely to identify relevant information, vi) whether there are other sources of potentially relevant information that were not checked, and vii) whether responsive records were discarded but available on back-ups."  (*Id.* at 6 n.5.)

C.      **Analysis**

Courts are hesitant to require discovery into a subpoena recipient's search methodology absent specific evidence that the methodology was inadequate.  *See, e.g.*, *Terpin v. AT&T Inc.*, 2022 WL 3013153, *6 (C.D. Cal. 2022) ("[W]hen courts have allowed discovery into search terms after document production has already occurred, those courts had concluded from specific evidence in the factual record that the producing party's searches and/or disclosures were facially inadequate. . . .  Here, Plaintiff insists that it

should be permitted to test the completeness of Defendant's production, but Plaintiff offers only speculation and unsupported assertions."); *FormFactor, Inc v. Micro-Probe, Inc.*, 2012 WL 1575093, *7 (N.D. Cal. 2012) ("Regarding Plaintiff's alleged failure to produce other documents, the Court finds that Micro-Probe has not made a sufficient showing that responsive documents were withheld or that its objections were not well taken.  Micro-Probe states it has 'grave doubts' that Plaintiff has failed to produce all responsive documents because Eldridge was not aware of any document searches after his initial deposition and because Plaintiff's document production was low relative to MicroProbe's. These facts alone, however, do not provide a colorable basis for Micro-Probe's belief that relevant, responsive documents exist and are being withheld.").

Here, Plaintiffs have offered evidence that the RPA is likely to have responsive materials.  Nevertheless, given the RPA's non-party status, the narrowed scope of the subpoena, and the Court's impression that the RPA has, to date, focused more of its efforts on formulating objections to the subpoena than on searching for responsive documents, the Court will simply order the RPA to comply with the parameters of the subpoena as narrowed herein and will not, at least for the time being, order the RPA to provide specific information regarding its resulting searches for responsive information.  This ruling is without prejudice to Plaintiffs' ability to renew their request for compelled disclosure on this topic should future disagreements about compliance arise.

VI.   Fees And Costs

The parties' final dispute concerns whether the RPA is entitled to cost-shifting and/or an award of costs and fees.  The RPA asks the Court to "shift the burden and expense of such disclosure to Plaintiffs pursuant to Fed.R.Civ.P. 45(d)(2)(B)(ii)" and also "requests an award of its fees and costs under any applicable authority." (Doc. 171 at 8-9.)  In reply, Plaintiffs contend that "[n]o basis for cost shifting exists here because [the RPA's] cursory argument says nothing about, much less establishes, that any costs to comply with the Subpoena would be significant, as required to support a cost-shifting claim." (Doc. 172 at 8 n.6.)  Plaintiffs also note that there is no "basis to suggest that Plaintiffs issued the

1  Subpoena in bad faith, for an improper purpose, or in a manner inconsistent with existing

2  law such that an award of costs and fees could be even remotely appropriate." (*Id.*, internal

3  quotations omitted.)

4  Under Rule 45(d)(2)(B)(ii), when a court orders compliance with a subpoena over

5  an objection, "the order must protect a person who is neither a party nor a party's officer

6  from significant expense resulting from compliance."  In *Legal Voice v. Stormans*, 738

7  F.3d 1178 (9th Cir. 2013), the Ninth Circuit held that the "plain language" of the Rule

8  45(d)(2)(B)(ii) "requires the district court to shift a non-party's costs of compliance with a

9  subpoena, if those costs are significant."  *Id.* at 1184.

10  Despite the Court's duty to protect non-parties like the RPA from significant

11  expense, the RPA is not entitled to cost shifting here for the simple reason that it has made

12  no factual showing in support of its request.  "[T]he nonparty seeking cost shifting must

13  demonstrate that its costs are reasonable and resulted from compliance with the subpoena."

14  *Balfour Beatty Infrastructure, Inc. v. PB & A, Inc.*, 319 F.R.D. 277, 281-82 (N.D. Cal.

15  2017).  *See also United States v. McGraw–Hill Companies, Inc.*, 302 F.R.D. 532, 536 (C.D.

16  Cal. 2014) ("Rule 45 does not cut a blank check to non-parties—unnecessary or unduly

17  expensive services do not 'result from compliance' and, therefore, do not count as

18  'expenses.'").  The RPA has not itemized (or even mentioned) its expenses, so the Court

19  has no way of knowing whether they were reasonably incurred and/or "significant."  *See

20  also Hyundai Motor Am., Inc. v. Pinnacle Grp., LLC*, 2016 WL 6208313, *2 (C.D. Cal.

21  2016).

22  The RPA also cites no law in support of its request for an "award of its fees and

23  costs." (Doc. 171 at 8-9.)  It is possible this request is in reference to Rule 45(d)(1), which

24  authorizes the imposition of sanctions ("which may include lost earnings and reasonable

25  attorney's fees") against a party or attorney for issuing a subpoena "imposing undue burden

26  or expense on a person subject to the subpoena."  Unlike Rule 45(d)(2)(B)(ii), Rule

27  45(d)(1) is discretionary.  *Legal Voice*, 738 F.3d at 1185.  "A court may . . . impose

28  sanctions when a party issues a subpoena in bad faith, for an improper purpose, or in a

1    manner inconsistent with existing law." *Id.*

2         Here, assuming the RPA was requesting Rule 45(d) sanctions, the Court cannot say

3    the subpoena was facially overbroad or that Plaintiffs acted in bad faith or with an improper

4    motive.  Also, "when considering Rule 45(d) sanctions, we have put more emphasis on the

5    recipient's burden than on the issue's motives."  *Id.* at 1186 (internal quotations omitted).

6    The Court has already determined that the RPA provided little to no information indicating

7    that enforcement would impose an undue burden.  *See also Mount Hope Church v. Bash*

8    *Back!*, 705 F.3d 418, 429 (9th Cir. 2012) (finding sanctions were not appropriate where the

9    party did not subpoena information in bad faith and "the demands of the subpoena were

10   focused and not unduly burdensome in terms of required production of documents").  Thus,

11   an award of attorneys' fees and costs under Rule 45(d)(1) is unwarranted.

12   VII.   Conclusion

13        The Court recognizes there is a significant risk of abuse when a political party

14   attempts to use a Rule 45 subpoena to gather materials, including internal analyses with

15   potential competitive ramifications, from an opposing political party.  In a different case

16   with a different record, such concerns might very well counsel in favor of denying a motion

17   to compel.  Nevertheless, here the RPA has failed to substantiate many of its contentions,

18   failed to provide a privilege log, and frequently resorted to boilerplate objections.  *See also*

19   *Ward*, No. 22-CV-16473 at 5-6 (noting that if vague objections that the requested

20   information is "of a political nature" were sufficient to implicate the First Amendment

21   privilege, "it would mean that anyone could raise a First Amendment objection to any

22   subpoena for records of calls that included discussions of politics—or, presumably, of

23   'social, economic, religious, [or] cultural' matters. . . .  But that is not the law.").  Given

24   that backdrop, and in light of the limited nature of the relief sought in Plaintiffs' motion—

25   Plaintiffs are not seeking a conclusive determination that the RPA has forfeited any claim

26   of First Amendment privilege and acknowledge the RPA may withhold documents in

27   response to this order by producing a privilege log—the Court agrees that Plaintiffs are

28   entitled to much of the relief they currently seek.

Accordingly,

**IT IS ORDERED** that Plaintiffs' motion to compel (Doc. 161) **is granted in part and denied in part**, as discussed herein.

Dated this 27th day of October, 2022.

_____
Dominic W. Lanza
United States District Judge