**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Mi Familia Vota, et al.,

          Plaintiffs,

v.

Katie Hobbs, et al.,

          Defendants.

No. CV-21-01423-PHX-DWL

**ORDER**

This action involves a challenge to an Arizona voting law, Senate Bill 1485 ("S.B. 1485"). In 2022, Plaintiffs served several non-party state legislators (collectively, "Legislators") with Rule 45 subpoenas seeking documents concerning S.B. 1485 and related legislation. Now pending before the Court is Plaintiffs' motion to compel Legislators to produce 196 responsive documents that Legislators have withheld on legislative privilege grounds. (Doc. 197.) For the following reasons, Plaintiffs' motion is granted in part and denied in part—the Court will not order any production at this time but will conduct an *in camera* review of the documents at issue.

## RELEVANT BACKGROUND

On August 17, 2021, Plaintiffs initiated this action. (Doc. 1.) In a nutshell, Plaintiffs allege that S.B. 1485 and Senate Bill 1003 ("S.B. 1003"), both of which were enacted by the Arizona legislature following the 2020 election and concern early voting procedures, violate (1) the First and Fourteenth Amendments, by creating an undue burden on the right to vote (Count One); (2) the Fourteenth and Fifteenth Amendments, because they were

enacted for a racially discriminatory purpose (Count Two); and (3) Section 2 of the Voting Rights Act, for the same reason (Count Three).[1]

On November 24, 2021, Defendants moved to dismiss all of Plaintiffs' claims. (Docs. 76, 77.)

On June 24, 2022, after a full briefing (Docs. 83, 99, 100, 118), a tentative order (Doc. 144), and oral argument (Doc. 149), the Court dismissed Count One in its entirety and dismissed Counts Two and Three with respect to the challenges to S.B. 1003. (Doc. 154.)   The Court denied the motion to dismiss with respect to the challenges to S.B. 1485 in Counts Two and Three.   (*Id.* at 52, 60.)[2]

On January 7, 2022, Plaintiffs served document subpoenas on former State Senators Kelly Townsend and Michelle Ugenti-Rita, as well as on the Arizona House of Representatives and the Arizona Senate.   (Doc. 198 ¶ 2.)   On April 27, 2022, Plaintiffs served similar subpoenas on former State Senator Karen Fann, former Speaker of the House Rusty Bowers, former State Representative John Fillmore, and State Senators David Gowan, Jake Hoffman, and JD Mesnard.   (*Id.*)   In broad strokes, the subpoenas seek information related to certain Arizona voting laws, including S.B. 1485 and S.B. 1003. (Doc. 198-1 at 14-16.)

Beginning in January 2022, Plaintiffs' counsel and Legislators' counsel engaged in extensive meet-and-confer efforts concerning the subpoenas.   (Doc. 198 ¶¶ 3-8.) Throughout that process, Legislators' counsel produced several privilege logs.   (*Id.* ¶¶ 4-5. *See also* Docs. 198-2, 198-3, 202-1.)

Ultimately, on February 17, 2023, counsel determined they were at an impasse about 196 responsive documents that Legislators were withholding on legislative privilege grounds.   (Doc. 198 ¶¶ 7-8; Doc. 198-4.)

---

[1]      S.B. 1485 provides that voters who do not cast a mail-in ballot in two consecutive election cycles must be removed from Arizona's permanent early voting list.   (Doc. 1 ¶ 1.) S.B. 1003 clarifies that the deadline for a voter to attempt to "cure" a missing signature on an early ballot is 7:00 PM on election day.   (*Id.*)

[2]      Although the Court granted Plaintiffs leave to amend their complaint (Doc. 154 at 59-60), Plaintiffs declined to do so by the amendment deadline (Doc. 168).

On March 2, 2023, Plaintiffs and Legislators submitted a joint summary of their discovery dispute, stating that they disagree about the applicability and scope of the state legislative privilege and asking the Court "to set a briefing schedule to resolve this dispute." (Doc. 194 at 1.)

On March 3, 2023, the Court granted Plaintiffs leave to file a motion to compel. (Doc. 195 ["[G]iven the seeming complexity of the issues, the current dispute is better resolved through formal motion practice than through the Court's informal discovery dispute resolution process."].)

On March 14, 2023, Plaintiffs filed a motion to compel Legislators to produce the 196 documents in question. (Doc. 197.) The motion is now fully briefed. (Docs. 202, 209.)

In May 2023, the Fifth Circuit issued a pair of published decisions that touch on issues raised in the motion-to-compel briefing: *Jackson Municip. Airport Auth. v. Harkins*, 67 F.4th 678 (5th Cir. 2023), and *La Union Del Pueblo Entero v. Abbott*, 68 F.4th 228 (5th Cir. 2023). Accordingly, on May 26, 2023, the Court invited each side to file a supplemental brief discussing the two new decisions. (Doc. 221.)

On June 6, 2023—before the supplemental briefs were due—the Eighth Circuit issued a published decision that also touches upon issues raised in the motion-to-compel briefing: *In re N. Dakota Legis. Assembly*, 70 F.4th 460 (8th Cir. 2023).

On June 9, 2023, each side filed a supplemental brief. (Docs. 225, 26.)

On July 7, 2023, the Court issued a tentative ruling. (Doc. 232.)

On July 17, 2023, the Court heard oral argument. (Doc. 235.)

## DISCUSSION

Plaintiffs move to compel Legislators to produce 196 documents that Legislators have withheld "pursuant to claims of legislative privilege." (Doc. 197 at 1.) The withheld documents consist of 38 communications between Legislators and third parties outside the legislature (*e.g.*, county officials) and 158 intra-legislative communications (*e.g.*, communications between Legislators and legislative staffers). (*Id.* at 3.)

With exceptions not applicable here, "[t]he common law—as interpreted by United States courts in the light of reason and experience—governs a claim of privilege." Fed. R. Evid. 501. "The party asserting an evidentiary privilege has the burden to demonstrate that the privilege applies to the information in question." *Tornay v. United States*, 840 F.2d 1424, 1426 (9th Cir. 1988).

Plaintiffs contend that Legislators "cannot rely on state legislative privilege to withhold the documents on their privilege logs" because (1) the privilege does not apply to the 38 "logged communications with third parties outside the legislative branch"; and (2) more broadly, "legislative privilege is a qualified privilege, which gives way when the discovery sought is as central as it is here to a claim vindicating federal constitutional rights." (Doc. 197 at 3, emphasis omitted.)

I.   Communications With Third Parties

A.   **The Parties' Arguments**

As for the 38 communications with third parties outside the legislative branch,[3] Plaintiffs contend that "a clear majority of courts have held[] [that] legislative privilege does not extend to communications with outside parties, who do not deliberate over and vote for legislation." (Doc. 197 at 4.)  According to Plaintiffs, "[c]ourts have offered two related but distinct rationales for this conclusion"—"[s]ome hold that legislative privilege does not apply to communications with third parties at all" while others "hold that legislators waive any privilege that might have existed when they communicate with a third party." (*Id.* at 4-5, collecting cases.)  Plaintiffs contend that, "[u]nder either rationale, legislators cannot cloak conversations with executive-branch officials, lobbyists, and other interested outsiders in *their* privilege." (*Id.* at 5, internal quotation marks and citation omitted).  Plaintiffs acknowledge that in *Puente Arizona v. Arpaio*, 314 F.R.D. 664 (D. Ariz. 2016), Judge Campbell held that the state legislative privilege may apply to state

---

[3]     In their motion, Plaintiffs contend that "approximately 39" of the withheld documents are communications with third parties.  (Doc. 197 at 1.)  In their response, Legislators assert that the number is 38 (Doc. 202 at 3) and provide a privilege log indicating the same (Doc. 202-1).  Plaintiffs do not dispute this number in their reply.  (Doc. 209.)  Accordingly, the Court accepts that the number is 38.

- 4 -

legislators' communications with third parties, but they argue that *Puente Arizona* (and other courts reaching similar conclusions) erred by relying on case law concerning the Speech or Debate Clause (which does not apply to state legislators), by "conflating legislative *immunity* and legislative *privilege*," and by failing to "recognize the tension between its holding that legislators could retain privilege over communications with third parties and the general rules of waiver." (Doc. 197 at 5-8.)

In response, Legislators contend that the state legislative privilege applies to communications with third parties because "[o]ne of the key purposes for the legislative privilege is to protect legislators from undue intrusion into their routine actions taken in their legislative capacity" and meetings between legislators and third parties are part of the "legislative process" that the privilege protects. (Doc. 202 at 4-5.) Thus, Legislators contend that "as applied to federal legislators, federal courts, including the Ninth Circuit, have held that legislative privilege applies to communications between a legislator and constituents or third parties about legislation or legislative strategy. The same should apply to state legislators." (*Id.* at 5.) Legislators acknowledge that some "district courts outside of the Ninth Circuit . . . have come to the opposite conclusion" but argue that such cases are neither binding nor persuasive "in light of the purposes behind the legislative privilege" and urge the Court to instead follow the reasoning in *Puente Arizona* and similar cases. (*Id.* at 6-7.) Turning to the "38 communications between legislators and third parties" at issue here, Legislators argue that "[a]n examination of the log entries for these communications affirms that the communications were regarding bona fide legislative activity." (*Id.* at 7.) Legislators conclude that, "[b]ecause the Legislators engaged in these third-party communications as part of the legislative process, the Court should find these third-party communications protected by the legislative privilege." (*Id.*)

In reply, Plaintiffs do not challenge Legislators' assertion that the subjects discussed in the 38 communications are related to legislative activity. (Doc. 209 at 1-5.) Instead, Plaintiffs reiterate that "an overwhelming majority of courts" have held that "state legislative privilege does not extend to legislators' communications with third parties

outside the legislature," in recognition of "the significant difference between internal discussions among legislators, which the privilege is meant to protect, and legislators' communications with outside parties." (*Id.* at 1.) As for Legislators' discussion of the *federal* legislative privilege, Plaintiffs contend that "the Supreme Court has specifically refused to recognize an evidentiary privilege similar in scope to the Federal Speech or Debate Clause for state legislators." (*Id.* at 2-3, internal quotation marks omitted. *See also id.* [reiterating that *Puente Arizona* erred by "rel[ying] on cases concerning *federal* legislative privilege to ascertain the scope of *state* legislative privilege"].) In a related vein, Plaintiffs argue that Legislators' arguments (like those in *Puente Arizona*) fail because "they rely on cases dealing with the distinct concept of legislative immunity." (*Id.* at 3-4. *See also id.* at 3 ["Because of this, [Legislators] never address the fundamental difference, for purposes of privilege, between internal legislative discussions and communications with outsiders."].) Finally, after providing a number of reasons that the other cases upon which Legislators rely are unpersuasive, Plaintiffs contend that Legislators are "seek[ing] to expand the scope of . . . [legislative] privilege far beyond its purposes by immunizing all conversations between legislators and third parties from discovery." (*Id.* at 4-5.)

In their supplemental brief, Legislators contend that the Fifth Circuit in *La Union Del Pueblo Entero* "explicitly rejected" Plaintiffs' argument that *Puente Arizona* erred by "analogizing to the federal legislative privilege and legislative immunity in reaching its decision." (Doc. 225 at 2.) Next, Legislators argue that, as a practical matter, if the privilege is not interpreted as "cover[ing] communications with third parties regarding potential or pending legislation," "a large segment of the modern legislative process would not be covered by the privilege." (*Id.* at 4.) Legislators contend this logic is supported the Eighth Circuit's recent decision in *North Dakota Legislative Assembly*, which held that "the legislative privilege covers communications between legislators and third parties." (*Id.*)

In their supplemental brief, Plaintiffs contend that "the *Pueblo Entero* and *Jackson Municipal Airport* decisions are unpersuasive and reflect a minority view concerning the

application of the privilege to third-party communications." (Doc. 226 at 1.)  According to Plaintiffs, the Fifth Circuit erred by "ignor[ing] the core purpose of the privilege" (*i.e.*, protecting candor in internal exchanges and encouraging frank and honest discussion among lawmakers), "conflat[ing] legislative privilege and immunity," "mistakenly apply[ing] federal constitutional protections arising from the Speech or Debate Clause to the narrower privilege for state legislators," and "ignor[ing] general waiver principles." (*Id.*)

B.    **Analysis**

The Court agrees with Legislators that they may invoke the state legislative privilege in relation to communications with third parties outside of the legislature.

Under the Speech or Debate Clause, U.S. Const. art. I, § 6, federal legislators are absolutely immune from liability for activities taken within the sphere of legitimate legislative activity.  *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 501-02 (1975).  The Speech or Debate Clause also provides an evidentiary privilege "against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts." *United States v. Gillock*, 445 U.S. 360, 366-67 (1980) (citation omitted).  "Two interrelated rationales underlie the Speech or Debate Clause: first, the need to avoid intrusion by the Executive or Judiciary into the affairs of a coequal branch, and second, the desire to protect legislative independence." *Id.* at 369.

The Speech or Debate Clause "by its terms is confined to federal legislators." *Id.* at 374.  However, under federal common law, state legislators are entitled to the same absolute immunity from civil liability for their legislative activities as their federal counterparts.  *Tenney v. Brandhove*, 341 U.S. 367, 372-76 (1951).  *See also Bogan v. Scott-Harris*, 523 U.S. 44, 48-49 (1998) ("The principle that legislators are absolutely immune from liability for their legislative activities has long been recognized in Anglo-American law. . . .  Recognizing this venerable tradition, we have held that state and regional legislators are entitled to absolute immunity from liability under § 1983 for their legislative activities.").

As for the state legislative privilege, in *Gillock*, the Supreme Court addressed whether federal common law recognizes an evidentiary privilege for state legislators in federal criminal prosecutions that is comparable to the federal legislative privilege provided by the Speech or Debate Clause.  445 U.S. at 367.  The Court reasoned that the separation-of-powers doctrine does not support an evidentiary privilege for state legislators in federal criminal prosecutions because "federal interference in the state legislative process is not on the same constitutional footing with the interference of one branch of the Federal Government in the affairs of a coequal branch."  *Id.* at 370.  Accordingly, although "principles of comity" may favor "the extension of a speech or debate type privilege to state legislators" in federal court, the Court held that the state legislative privilege is more limited than its federal counterpart, reasoning that "where important federal interests are at stake, as in the enforcement of federal criminal statutes, comity yields."  *Id.* at 370-73.

As for the scope of the state legislative privilege in civil litigation, in *Lee v. City of Los Angeles*, 908 F.3d 1175 (9th Cir. 2018), the Ninth Circuit rejected the contention that "the legislative privilege does not apply at all to state and local officials," reasoning that the "logic" of *Tenney*, which was a case about immunity, "supports extending the corollary legislative privilege from compulsory testimony to state and local officials as well."  *Id.* at 1186-87.  The court explained that "[t]he rationale for the privilege—to allow duly elected legislators to discharge their public duties without concern of adverse consequences outside the ballot box—applies equally to federal, state, and local officials."  *Id.*  The court also clarified that there may be "circumstances under which the privilege must yield to the need for a decision maker's testimony" but concluded that the plaintiffs in that case—who were seeking to compel the testimony of the local officials responsible for a redistricting decision being challenged on equal protection grounds—had not made the sort of showing necessary to overcome the privilege.  *Id.* 1187-88.  Other federal courts have likewise recognized a qualified state legislative privilege under federal common law.  *See, e.g.*, *Am. Trucking Ass'ns, Inc. v. Alviti*, 14 F.4th 76, 87 (1st Cir. 2021) ("Assertions of legislative immunity and privilege by state lawmakers . . . are governed by federal common law rather than the

Speech or Debate Clause, which by its terms applies only to federal legislators.  And the common-law legislative immunity and privilege are less protective than their constitutional counterparts.  That is because the separation-of-powers rationale underpinning the Speech or Debate Clause does not apply when it is a state lawmaker claiming legislative immunity or privilege.") (internal citations omitted)).

The Ninth Circuit has not, unfortunately, addressed whether the state legislative privilege extends to communications between state legislators and third parties outside the legislative branch.  In general, federal courts have come to differing conclusions on this issue.  Some decisions support Plaintiffs' position.  *See, e.g.*, *Plain Loc. Sch. Dist. Bd. of Educ. v. DeWine*, 464 F. Supp. 3d 915, 921 (S.D. Ohio 2020) ("[N]ot every action or communication by a legislator is covered by the legislative privilege, and courts have declined to apply the privilege to communications between legislators and third parties, such as lobbyists or constituents.") (collecting cases); *Favors v. Cuomo*, 285 F.R.D. 187, 212 (E.D.N.Y. 2012) ("[A]lthough in this Circuit communications between legislators and 'experts retained by them to assist in their legislative functions' are subject to the qualified privilege, communications with 'knowledgeable outsiders'—e.g., lobbyists—fall outside the privilege.") (internal citation omitted); *Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections*, 2011 WL 4837508, *10 (N.D. Ill. 2011) ("As with any privilege, the legislative privilege can be waived when the parties holding the privilege share their communications with an outsider.").

Other decisions support Legislators' position.  *See, e.g.*, *League of Women Voters of Fla., Inc. v. Lee*, 340 F.R.D. 446, 454 (N.D. Fla. 2021) ("[C]ommunications with third parties are subject to legislative privilege so long as those communications were part of the formulation of legislation."); *Puente Arizona*, 314 F.R.D. at 670.  Significantly, all of the published decisions by federal *appellate* courts on this issue favor Legislators.  In two recent decisions, the Fifth Circuit held that the state legislative privilege may apply to communications with third parties and, in a related vein, that state legislators do not waive the privilege by communicating with third parties.  In *La Union Del Pueblo Entero*, the

- 9 -

court reasoned that, as part of "the regular course of the legislative process," state lawmakers "routinely" meet with third parties outside the legislature "to discuss issues that bear on potential legislation." 68 F.4th at 235-36. "Consequently, some communications with third parties, such as private communications with advocacy groups, are protected by legislative privilege." *Id.* (citation omitted). The court further reasoned that a contrary approach—*i.e.*, that legislators waive the privilege by communicating with parties outside the legislature—would "flout[] the rule that the privilege covers legislators' actions in the proposal, formulation, and passage of legislation. An exception for communications 'outside the legislature' would swallow the rule almost whole, because meeting with 'interest' groups is a part and parcel of the modern legislative procedures through which legislators receive information possibly bearing on the legislation they are to consider." *Id.* (cleaned up). Similarly, in *Jackson Municipal Airport Authority*, the court held that "communications with third parties outside the legislature might still be within the sphere of 'legitimate legislative activity' if the communication bears on potential legislation" and stated: "[W]e disagree with the district court's broad pronouncement that the Legislators waived their legislative privilege for any documents or information that had been shared with third parties." 67 F.4th at 687.

The Eighth Circuit adopted the same rule in *North Dakota Legislative Assembly*, concluding that the district court's conclusion that the state legislative privilege "did not apply because the subpoena sought communications between legislators and third parties" was "based on a mistaken conception of the legislative privilege." 70 F.4th at 464. The court elaborated:

> Legislative privilege applies where legislators or their aides are acting in the sphere of legitimate legislative activity. . . .
>
> In its order enforcing the document subpoenas, the district court reasoned that legislative privilege did not apply because the subpoena sought communications between legislators and third parties. The legislative privilege, however, is not limited to a bar on inquiry into communications among legislators or between legislators and their aides. The privilege is not designed merely to protect the confidentiality of deliberations within a legislative body; it protects the functioning of the legislature more broadly. Communications with constituents, advocacy groups, and others outside the legislature are a legitimate aspect of legislative activity. The use of

compulsory evidentiary process against legislators and their aides to gather evidence about this legislative activity is thus barred by the legislative privilege.

*Id.* at 463-64 (citations and internal quotation marks omitted).[4]

Plaintiffs argue that the Fifth Circuit's reasoning in *La Union Del Pueblo Entero* and *Jackson Municipal Airport Authority* is unpersuasive because it erroneously equates the "federal constitutional protections arising from the Speech or Debate Clause" with "the narrower privilege for state legislators" and also erroneously equates legislative privilege with legislative immunity. (Doc. 226 at 1-4.) Plaintiffs advance the same reasons for questioning *North Dakota Legislative Assembly* and *Puente Arizona.* (*Id.* at 5 n.4; Doc. 197 at 4-8.)

On the one hand, Plaintiffs are correct that the courts applying the state legislative privilege to communications with third parties have relied, at least in large part, on cases analyzing the scope of the Speech or Debate Clause and of legislative immunity. For example, *La Union Del Pueblo Entero* supported its conclusion that the state legislative privilege protects "actions that occurred within the sphere of legitimate legislative activity or within the regular course of the legislative process" by citing *Tenney*, which analyzed the scope of state legislative immunity, and *United States v. Helstoski*, 442 U.S. 477 (1979), which discussed the scope of the Speech or Debate Clause.[5] 68 F.4th at 235 (cleaned up).

---

[4]     The Court acknowledges that other passages from *North Dakota Legislative Assembly* could be viewed as inconsistent with Ninth Circuit precedent. The Eighth Circuit described the state legislative privilege as "absolute" and declined to employ the five-factor balancing test discussed in Part II of this order. 70 F.4th at 464 ("Dicta from *Village of Arlington Heights* does not support the use of a five-factor balancing test in lieu of the ordinary rule that inquiry into legislative conduct is strictly barred by the privilege.") In contrast, in *Lee*, the Ninth Circuit relied on *Arlington Heights* to conclude that "the factual record . . . falls short of justifying the 'substantial intrusion' into the legislative process," reasoning that there were not "sufficient grounds" to distinguish the circumstances in *Arlington Heights* from those at hand. 908 F.3d at 1188. Additionally, as discussed in Part II, the parties here agree that the state legislative privilege is qualified. To the extent *North Dakota Legislative Assembly* can be read as inconsistent with *Lee*, the Court clarifies that its conclusions in this order are based on the Ninth Circuit's conception of the state legislative privilege.

[5]     More specifically, *Helstoski* held that "evidence of a legislative act by a member of Congress may not be introduced by Government in a prosecution for bribery of public officials," emphasizing that "the Speech or Debate Clause was designed to preclude prosecution of Members for legislative acts." 442 U.S. at 477, 488.

Likewise, *Puente Arizona* relied on cases analyzing the scope of protection under the Speech or Debate Clause and cases involving state legislative immunity to find that "communications with third parties about legislation or legislative strategy" are "protected by the state legislative privilege." 314 F.R.D. at 670.

On the other hand, it is not clear that these courts were wrong to do so. As for the federal legislative privilege, Plaintiffs do not explain, nor can this Court ascertain, how *Gillock*'s holding—that the state legislative privilege may yield where important federal interests are at stake—requires courts to wholly disregard the purposes behind the Speech or Debate Clause when analyzing the state legislative privilege. "Even if the federal privilege yields to fewer exceptions than the state privilege," that distinction is not, on its own, a "reason to differentiate between state and federal lawmakers when determining what counts as 'legitimate legislative activity.'" *La Union Del Pueblo Entero*, 68 F.4th at 237. *See also id.* ("In other words, the legislative privilege's scope is similar for state and federal lawmakers—even if the privilege for state lawmakers has more exceptions."). Indeed, Plaintiffs' insistence that "[a]ny reliance on cases applying the privilege for federal legislators is . . . misplaced" (Doc. 226 at 4) is difficult to reconcile with *Jeff D. v. Otter*, 643 F.3d 278 (9th Cir. 2011). There, the Ninth Circuit relied on *Gravel v. United States*, 408 U.S. 606 (1972), which addressed whether the Speech or Debate Clause applies to a federal legislator's aide, to hold that the state legislative privilege extends "not only to legislators but to legislative aides and assistants, the day-to-day work of whom is so critical to a legislator's performance that they must be treated as the latter's alter egos." *Id.* at 290 (cleaned up). This suggests that the Ninth Circuit would agree with the analytical approach employed by the courts that have construed the state legislative privilege as potentially applying to third-party communications. Likewise, in *Lee*, the Ninth Circuit applied the logic of *Tenney*, which involved legislative immunity, to hold that "state and local legislators may invoke legislative privilege." 908 F.3d at 1186-87. This makes sense— both the legislative privilege and legislative immunity "involve the core question whether a lawmaker may be made to answer—either in terms of questions or in terms of defending

from prosecution." *La Union Del Pueblo Entero*, 68 F.4th at 237 (cleaned up).

Plaintiffs also contend that the purpose of the state legislative privilege is "protecting candor in internal exchanges and encouraging frank and honest discussion among lawmakers" and that this purpose is not served by protecting communications with third parties.  (Doc. 226 at 2, cleaned up.)  However, the Court is not persuaded that the rationale for the legislative privilege identified in *Gillock* (*i.e.*, "the need to insure legislative independence," 445 U.S. at 371) is limited to maintaining confidentiality within the legislature.  In *Lee*, the Ninth Circuit stated that the "rationale for the privilege" includes legislators' "interest in minimizing the 'distraction' of 'divert[ing] their time, energy, and attention from their legislative tasks to defend the litigation.'"  908 F.3d at 1187 (citation omitted).  This is not an interest limited to maintaining confidentiality.  *See also Am. Trucking Ass'ns*, 14 F.4th at 86-87 (describing the "legislative independence" concerns discussed in *Gillock* as "protect[ing] legislators from proceedings that 'divert their time, energy, and attention from their legislative tasks,' otherwise 'delay and disrupt the legislative function,' or 'deter[] . . . the uninhibited discharge of their legislative duties'" and noting that "the interests in legislative independence served by the Speech or Debate Clause remain relevant in the common-law context"); *N. Dakota Legis. Assembly*, 70 F.4th at 464 ("The privilege is not designed merely to protect the confidentiality of deliberations within a legislative body; it protects the functioning of the legislature more broadly."); *League of Women Voters of Fla.*, 340 F.R.D. at 454 ("[T]his Court agrees with the Legislators and the Governor's office that the maintenance of confidentiality is not the fundamental concern of the legislative privilege.  Instead, the privilege serves to prevent parties from harassing legislators—or the Governor—for actions those legislators take in their legislative capacity.  And meeting with persons outside the legislature is a routine and legitimate part of the modern-day legislative process.") (cleaned up).

Plaintiffs also contend that applying the state legislative privilege to communications with third parties "contravenes the well-established principles of waiver." (Doc. 226 at 4.)  The Court is unpersuaded.  To be sure, the general rule is that "voluntarily

disclosing privileged documents to third parties will . . . destroy the privilege." *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1126-27 (9th Cir. 2012).  Based on that general rule, some district courts have concluded that,"[a]s with any privilege, the legislative privilege can be waived when the parties holding the privilege share their communications with an outsider." *Comm. for a Fair & Balanced Map*, 2011 WL 4837508 at *10.  *See also Page v. Virginia State Bd. of Elections*, 15 F. Supp. 3d 657, 662 n.3 (E.D. Va. 2014); *ACORN v. Cty. of Nassau*, 2007 WL 2815810, *4 (E.D.N.Y. 2007) ("As with many testimonial privileges, the legislative privilege may be waived as to communications made in the presence of third parties.").

However, the legislative privilege is distinct from other recognized privileges in that, as discussed, its animating purpose is not limited to the maintenance of confidentiality. Thus, even if confidentiality interests are less discernible in the context of documents revealing communications between legislators and third parties than they are in the context of internal communications within the legislative branch, other interests served by the legislative privilege would be undermined by applying waiver in the manner Plaintiffs suggest.  *See also Pulte Home Corp. v. Montgomery Cty., Md.*, 2017 WL 2361167, *7 (D. Md. 2017) (applying the general rule of waiver to legislators' communications with third parties "fails to recognize that the compelled disclosure of communications by legislators undermines other interests that justify the legislative privilege besides the interest in maintaining a decision-making process that does not occur 'in a fishbowl'") (citation omitted).  Just as the value and importance of the legislative privilege is lessened if it is not applied to legislative staff and aides, *Jeff D.*, 643 F.3d at 289-90, premising waiver of the privilege on an action (*i.e.*, communicating with constituents) that courts have characterized as "part and parcel" of the modern legislative process would "swallow the rule almost whole." *La Union Del Pueblo Entero*, 68 F.4th at 236.[6]  Accordingly, the Court

---

[6]     Plaintiffs attempt to refute this argument by noting that, here, "[o]nly approximately 38 of the 196 documents that [Legislators] withhold are communications with third parties." (Doc. 226 at 5.)  However, in the Court's view, the fact that approximately 20% of the logged documents are communications with third parties suggests, if anything, that engaging with individuals outside the legislature about potential legislation is a significant

1  agrees with the Fifth Circuit that Plaintiffs' waiver argument is effectively "an indirect
2  attack on the privilege's scope." *Id.*

3         For these reasons, although the Court acknowledges that other courts have reached
4  different conclusions on the issue, it concludes (as did the Fifth Circuit, the Eighth Circuit,
5  and Judge Campbell in *Puente Arizona*) that the state legislative privilege may apply to
6  communications between legislators and third parties outside the legislative branch.
7  Accordingly, to the extent Plaintiffs move to compel the production of the 38
8  communications with third parties identified in Legislators' privilege log solely on the
9  ground that the communications were with third parties, the motion is denied.  Whether
10 Plaintiffs have identified other reasons for compelling the production of those (and other)
11 communications is addressed in Part II below.

12 II.    Should The Qualified Privilege Be Overcome?

13        Even though the Court has concluded that all 196 documents being withheld by
14 Legislators fall within the scope of the state legislative privilege, this does not end the
15 analysis.  As discussed, the state legislative privilege is a qualified privilege that may be
16 overcome.

17        "To determine whether the legislative privilege precludes disclosure, a court must
18 balance the interests of the party seeking the evidence against the interests of the individual
19 claiming the privilege." *Favors*, 285 F.R.D. at 209.[7]  When doing so, courts often consider
20 the following factors: "(i) the relevance of the evidence sought to be protected; (ii) the
21 availability of other evidence; (iii) the seriousness of the litigation and the issues involved;
22 (iv) the role of government in the litigation; and (v) the purposes of the privilege." *Puente*

23

24 part of the legislative process.

25 [7]    Although this multifactor balancing test has not been expressly adopted by the Ninth
26 Circuit, it is widely used by federal courts and is consistent with the Ninth Circuit's
   indication, in *Lee*, that the state legislative privilege is a qualified privilege that may be
   overcome in certain "extraordinary" circumstances—*i.e.*, where the facts justify "the
27 'substantial intrusion' into the legislative process."  908 F.3d at 1187-88.  Here, both sides
   agree that the multifactor balancing test applies.  (Doc. 197 at 9; Doc. 202 at 8.)  *See also*
28 *League of Women Voters of Fla.*, 340 F.R.D. at 456; *Kay v. City of Rancho Palos Verdes*,
   2003 WL 25294710, *17 (C.D. Cal. 2003).

*Arizona*, 314 F.R.D. at 672.[8]  In considering these factors, the Court's goal is to determine whether important federal interests exist that justify the "substantial intrusion" that "judicial inquiries into legislative . . . motivation represent." *Lee*, 908 F.3d at 1187 (citation omitted).  *See also N. Carolina State Conf. v. McCrory*, 2015 WL 12683665, *4 (M.D.N.C. 2015) ("[D]etermining the scope and application of State legislative privilege requires a flexible approach.") (collecting cases).

### A.    **The Parties' Arguments**

Plaintiffs contend that, "[c]onsidered as a whole, the five factors support the need for disclosure in this case."  (Doc. 197 at 11.)  As for the first factor, Plaintiffs argue that the evidence sought is "highly relevant" because "[t]he legislature's decision-making process behind S.B. 1485 is at the crux of Plaintiffs' claim of intentional discrimination" and "contemporaneous statements by legislators . . . and any communications evidencing discriminatory intent would be 'highly relevant to the *Arlington Heights* analysis.'"  (*Id.* at 9, citation omitted.)  As for the second factor, Plaintiffs argue that "direct evidence of legislative intent is not otherwise available, given the practical reality that officials seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority."  (*Id.* at 9-10, citation and quotation marks omitted.)  As for the third factor, Plaintiffs argue that "this litigation involves equal access to the fundamental right to vote, a right that is 'preservative of all other rights.'"  (*Id.* at 10, citation omitted.)  As for the fourth factor, Plaintiffs contend that "the legislature's 'direct role in the litigation supports overcoming the privilege.'"  (*Id.* at 11, citation omitted.)  As for the fifth factor, Plaintiffs argue that "there is no reason to believe that disclosure of the limited documents in dispute will chill legislative deliberation" and that "concern over preserving a candid exchange of ideas" does not justify "protect[ing]

---

[8]    Plaintiffs describe the fifth factor as "the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable" (Doc. 197 at 9, citation omitted); Legislators describe it as "the purposes of the privilege" (Doc. 202 at 8, citation omitted).  The Court agrees with Legislators' formulation.  As discussed in Part I above, the purpose of the state legislative privilege is not limited to protecting confidentiality.

communications revealing an unconstitutional intent behind a legislative enactment." (*Id.*, citations omitted.)

In response, Legislators argue that "[t]he application of the five-factor test here supports upholding the Legislators' interests in non-disclosure." (Doc. 202 at 8.)  As for relevance, Legislators contend that "Plaintiffs' argument ignores the types of documents withheld and the many materials to which they already have access."  (*Id.*)   More specifically, Legislators point out that "approximately 57 documents [of the documents listed in Legislators' privilege log] can be described as administrative in nature, most of which involve draft agendas, minutes . . . .  To the extent that agendas and minutes bear any relevance to Plaintiffs' intentional discrimination claims, drafts of such documents do not." (*Id.*)  "Another 28 documents refer to draft bills or draft amendments to those bills. . . .  [T]hese internal drafts exchanged between a legislator and his or her staff that were not shared with other legislators cannot inform the intent of the legislature as a whole." (*Id.* at 8-9.)  Legislators also argue that many of the withheld documents are not specific to S.B. 1485 (but instead contain information about other voting legislation) and dispute Plaintiffs' position that comments by individual legislators are probative of whether the legislature, as a whole, acted with discriminatory intent.  (*Id.* at 9.)  As for the availability of other evidence, Legislators assert that "Plaintiffs have over 30,000 documents from the Legislators, as well as the legislative history documents for S.B. 1485 . . . , [and] Legislators' public statements regarding S.B. 1485."  (*Id.* at 10.)   Legislators further contend that many of the requested documents are drafts of already-produced materials. (*See, e.g.*, *id.* at 8 [administrative documents, such as agendas and minutes, "are fully available to Plaintiffs"]; *id.* [as for documents referring to draft bills or draft amendments, "Plaintiffs already have access to the final versions of each bill and amendment introduced at the legislature"]; *id.* at 9-10 ["Plaintiffs already have access to the publicly available documents detailing the legislative history of S.B. 1485 (and the other voting bills considered during the legislative session.  This includes minutes, agendas, fact sheets and summaries, and videos of the hearings at which the bills were considered.  Thus, Plaintiffs

already have the typical materials that courts rely upon to determine legislative intent."].) As for the seriousness of the issues, Legislators acknowledge that "this voting rights case involves serious issues" but contend that "this factor alone is not determinative." (*Id.* at 11.) As for the government's role in the litigation, Legislators argue that the State, as "a defendant in this case," has a "strong governmental interest" in upholding S.B. 1485. (*Id.*) Finally, as for the purposes behind the privilege, Legislators argue that "[t]o disclose these internal communications would interfere with the Legislators' legitimate legislative activity and ability to communicate freely with each other and their staff." (*Id.  See also id.* at 12 ["If every communication with staff or a legislative colleague is subject to production when a plaintiff files suit, the legislative process will be hampered."].)

In reply, Plaintiffs argue that "the legislators are wrong that individual legislators' communications are not relevant to legislative intent," reasoning that "[w]hether an individual legislator's statements establish legislative intent for purposes of statutory interpretation is a separate question than whether the statements are relevant for purposes of a discrimination claim. . . .  [E]ven if one legislator's statements cannot necessarily be imputed to other legislators, an individual legislator's motivation can still 'constitute an important part of the case presented against, or in favor of' the challenged legislation.'" (Doc. 209 at 6, citation omitted.)  As for "discovery related to legislation closely linked to S.B. 1485," Plaintiffs contend that such discovery is "directly relevan[t]" because "[t]hese bills from the same legislative session also concerned changes to the Permanent Early Voting List (PEVL)" and "S.B. 1069, in particular, was an effort to remove voters from the PEVL for failure to vote, just like S.B. 1485, and was sponsored by the same state senator who sponsored S.B. 1485." (*Id.* at 6-7.)  Next, Plaintiffs contend that they "have a strong need for this unique evidence" because internal communications are far more probative of legislative intent than the materials Legislators have already produced (which "consist[] largely of 'thousands of stock emails'") and "public legislative history materials." (*Id.* at 7, citation omitted.)  Likewise, as for "draft bills and amendments," Plaintiffs contend that "[d]raft materials can demonstrate legislators' considerations and

motivations" during "the decision-making process behind the final legislative actions leading to S.B. 1485." (*Id.*)  According to Plaintiffs, "[o]n the other side of the ledger, the legislators have pointed only to speculative fears about chilling legislative candor.  The legislators have given no concrete reason to think that the specific disclosure of the materials in dispute will stifle frank deliberation." (*Id.*)

### B.  **Analysis**

The first factor (*i.e.*, relevance) supports Plaintiffs' position.  What motivated the Arizona legislature to enact S.B. 1485 is at the heart of this litigation.  *Puente Arizona*, 314 F.R.D. at 672 (concluding that the first factor "favor[s] Plaintiffs" because "the emails at issue may be relevant, particularly those that relate to the legislation at issue in this case").  As discussed in prior orders (Doc. 154 at 55-57; Doc. 184 at 18-19, 23-24), contemporaneous statements by individual state legislators may be relevant under the *Arlington Heights* framework to show discriminatory intent in the passage of legislation.  *See, e.g.*, *Arce v. Douglas*, 793 F.3d 968, 979 n.5 (9th Cir. 2015) ("emails from legislators evincing animus against [a racial group] while advocating for this legislation" are "highly relevant to the *Arlington Heights* analysis").  Many of Legislators' arguments to the contrary—for example, that Plaintiffs do not "need" to access the requested documents (Doc. 202 at 8-9)—bear more on the availability of other evidence than relevance.  Although Legislators are correct that "[t]he purpose of a single legislator is normally too slim a reed upon which to rest a determination regarding the legislature as a whole," *Fla. v. United States*, 885 F. Supp. 2d 299, 354 (D.D.C. 2012), the fact that statements by individual lawmakers may alone be insufficient to establish the motivation of the legislature does not eliminate the relevance of such statements.  *Cf. Gonzales v. Google, Inc.*, 234 F.R.D. 674, 685-86 (N.D. Cal. 2006) ("As a rule, information need not be dispositive of the entire issue disputed in the litigation in order to be discoverable by subpoena.").  Thus, the first factor favors disclosure.

The third factor (*i.e.*, the seriousness of the litigation and the issues involved) also favors disclosure.  Legislators seem to acknowledge this point (Doc. 202 at 11) and the

Court agrees.  "The federal interest in protecting voting rights is a serious one."  *Harris v. Ariz. Indep. Redistricting Comm'n*, 993 F. Supp. 2d 1042, 1071 (D. Ariz. 2014).  *See also Badham v. U.S. Dist. Ct. for N. Dist. of Cal.*, 721 F.2d 1170, 1173 (9th Cir. 1983) ("The right to vote is fundamental 'because it is preservative of all rights.") (cleaned up).  Likewise, the right to be free from discrimination on the basis of race is a vital constitutional right.  "At the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class."  *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (internal quotation marks and citation omitted).  Thus, the seriousness of the issues in this litigation weighs in favor of disclosure.  *Puente Arizona*, 314 F.R.D. at 672 (third factor favored plaintiffs in lawsuit asserting equal protection challenge to state legislation).

The second factor (*i.e.*, the availability of alternative evidence), which was the subject of extensive discussion during oral argument, weighs against disclosure.  Legislators assert without contradiction that they have already produced over 30,000 documents.  (Doc. 202 at 10.)  Legislators also describe the nature of these disclosed materials, which include "minutes, agendas, fact sheets and summaries, and videos of the hearings at which the bills were considered," and explain why these sorts of materials qualify as "the typical materials that courts rely upon to determine legislative intent."  (*Id.* at 9-10.)  Although, as Plaintiffs correctly noted during oral argument, the quality and nature of the disclosed documents matters more than the volume of the disclosed documents, the second factor still favors Legislators.

In reaching this conclusion, the Court acknowledges that "[m]otive is often most easily discovered by examining the unguarded acts and statements of those who would otherwise attempt to conceal evidence of discriminatory intent."  *Cano v. Davis*, 193 F. Supp. 2d 1177, 1182 (C.D. Cal. 2002).  Nevertheless, direct evidence of discriminatory intent is not required for Plaintiffs to prevail on their claims.  *Arlington Heights*, 429 U.S. at 267-68 (noting that "[t]he historical background of the decision," "[t]he specific

sequence of events leading up to the challenged decision," "[d]epartures from the normal procedural sequence," and "[t]he legislative or administrative history" may "shed some light on the decisionmaker's purposes").   Thus, even if the public legislative history materials and the other materials currently in Plaintiffs' possession are less likely than the requested materials to contain direct statements of discriminatory intent, the fact that Plaintiffs have access to a substantial amount of other evidence weighs against disclosure. *Puente Arizona*, 314 F.R.D. at 672 ("[T]he second factor—the availability of other evidence—tips the balance.   Plaintiffs have access to the traditional sources of legislative history in this case. . . .   The State asserts without contradiction that it has 'disclosed literally thousands of emails in response to Plaintiffs' subpoenas and public records act requests.'   The Court concludes that the substantial availability of other evidence in this case tips the balance in favor of the State and Pearce.") (citations omitted).

As for Plaintiffs' observation that "the practical reality is that officials seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority" (Doc. 197 at 9-10, citation omitted), the difficulty with this argument is that it would apply to almost every case involving alleged discrimination by government officials.   But the Ninth Circuit has cautioned against allowing "a categorical exception whenever a constitutional claim directly implicates the government's intent," specifically noting that even cases involving "racial gerrymandering" and equal protection challenges will rarely justify an exception to the state legislative privilege.   *Lee*, 908 F.3d at 1188.   As the *Lee* court noted, such an exception would conflict with *Arlington Heights*, which "itself . . . involved an equal protection claim alleging racial discrimination—putting the government's intent directly at issue—but nonetheless suggested that such a claim was not, in and of itself, within the subset of 'extraordinary instances' that might justify an exception to the privilege."   *Id.* (citation omitted).   Although Plaintiffs contend they are not "seeking a 'categorical exception' to legislative privilege," they do not explain in their motion papers how the facts of this case distinguish it from every other case involving alleged discriminatory intent (Doc. 209 at 8,

1    citation omitted) and were unable to provide any meaningful distinctions on this point
2    during oral argument.

3         Nor does the fact that Plaintiffs "made a plausible showing of discriminatory intent,
4    based among other things on statements by key legislators" at the motion-to-dismiss stage
5    (Doc. 209 at 8) establish that this case involves the sort of circumstances under which the
6    state legislative privilege must yield.  *Cf. Puente Arizona*, 314 F.R.D. at 672 (the fact that
7    the plaintiffs had produced enough evidence to prevail during an earlier stage of the case
8    cut against their need to overcome the qualified privilege).  Indeed, in *Lee*, the plaintiffs
9    pointed to statements by city councilmembers that suggested race was a motivation in
10   redrawing a district's boundaries.  908 F.3d at 1183-84.  Despite this evidence, and the fact
11   that "claims of racial gerrymandering involve serious allegations," the Ninth Circuit
12   concluded that "the factual record in this case falls short of justifying the 'substantial
13   intrusion' into the legislative process."  *Id.* at 1188.  *See also La Union Del Pueblo Entero*,
14   68 F.4th at 238 ("Even for allegations involving racial animus or retaliation for the exercise
15   of First Amendment rights, the Supreme Court has held that the legislative privilege stands
16   fast.").

17        Finally, with respect to one subset of the withheld documents—the communications
18   with third parties outside the legislative branch—the second factor weighs against
19   disclosure for the additional reason that Plaintiffs may have other tools at their disposal to
20   obtain the documents at issue.  As part of the discovery process in this case, Plaintiffs
21   issued a subpoena to non-party The Republican Party of Arizona ("RPA").  Among other
22   things, that subpoena seeks certain "communications between members of the RPA and
23   members of the Arizona legislature."  (Doc. 184 at 12.)  Notably, Legislators have not
24   sought to assert any state legislative privilege as to *that* subpoena.[9]  Furthermore, during
25   oral argument, both sides seemed to agree that it would be possible for Plaintiffs to issue

26

27   _____
     [9]    Although Plaintiffs are still awaiting compliance as to their subpoena to the RPA
28   (and although the RPA may ultimately be entitled to resist production based on a privilege
     that is distinct from the state legislative privilege), the Court has now issued two orders
     compelling the RPA to comply.  (Docs. 184, 236.)

additional subpoenas to other third parties identified in Legislators' privilege log and that the state legislative privilege would not be implicated by such an approach (although the recipients might have other grounds for resisting compliance). The seeming availability of alternative avenues for obtaining communications between Legislators and third parties—which would not raise the significant concerns raised by a subpoena issued directly to Legislators—is another reason why the second factor weighs against disclosure.[10]

The fifth factor (*i.e.*, the purposes of the privilege) also favors nondisclosure. As an initial matter, many of the requested documents involve internal communications between members of the legislative branch. "Failure to protect confidential communications between lawmakers and their staff will not only chill legislative debate, it will also discourage 'earnest discussion within governmental walls.'" *Comm. for a Fair & Balanced Map*, 2011 WL 4837508 at *9. Plaintiffs fault Legislators for failing to provide specific evidence that disclosure will chill legislative deliberation (*see, e.g.*, Doc. 197 at 11), but such a showing is not required. It is self-evident that "[o]pen dialogue between lawmakers and their staff would be chilled if their subjective, preliminary opinions and considerations are potentially subject to public disclosure and critique." *Citizens Union of City of N.Y. v. Att'y Gen. of N.Y.*, 269 F. Supp. 3d 124, 170 (S.D.N.Y. 2017). Such chilling would, in turn, impede Legislators' ability to discharge their public duties with "firmness and success," "without concern of adverse consequences outside the ballot box." *Lee*, 908 F.3d

---

[10]     The Court uses the phrase "seeming availability" because it does not mean to express any definitive conclusions about whether the state legislative privilege would be implicated by a subpoena issued to a third party to obtain that party's communications with a member of a state legislature. This issue has not been the subject of briefing by the parties and does not appear to have been addressed in any of the decisions discussed in Part I of this order, which confront the distinct question of whether the state legislative privilege applies when a state legislature or individual state legislator receives a subpoena (or other discovery demand) seeking communications with third parties that relate to the legislative process. As discussed in Part I, the state legislative privilege applies in that scenario because the privilege is not concerned solely with protecting intra-legislative confidentiality—it also exists to shield legislators from distraction and harassment and to promote legislative independence. *Gillock*, 445 U.S. at 371; *Lee*, 908 F.3d at 1186-87; *Puente Arizona*, 314 F.R.D. at 672; *N. Dakota Legis. Assembly*, 70 F.4th at 464; *Am. Trucking Ass'ns*, 14 F.4th at 86-87; *League of Women Voters of Fla.*, 340 F.R.D. at 454. But it is unclear whether a subpoena directed to a third party, compelling the third party to comply, would implicate any of those additional considerations.

- 23 -

at 1186-87 (citation omitted).  *See also Favors*, 285 F.R.D. at 220 ("[A]llowing discovery to draw back the legislative curtain has the potential . . . to deter legislators from open and honest deliberations with one another, with their staffs, and with retained experts, for fear that any such communications will be discoverable in future litigation.").

During oral argument, Plaintiffs emphasized that a subset of the withheld documents involve third-party communications and argued that, at least as to that subset, the fifth factor does not support Legislators' position.  This argument is unavailing.  As discussed in more detail in Part I (as well as in footnote 10), the state legislative privilege is not concerned solely with protecting the confidentiality of intra-legislative communications but also seeks to shield legislators from distraction and harassment and to promote legislative independence.  *Gillock,* 445 U.S. at 371; *Lee*, 908 F.3d at 1186-87; *Puente Arizona*, 314 F.R.D. at 672; *N. Dakota Legis. Assembly*, 70 F.4th at 464; *Am. Trucking Ass'ns*, 14 F.4th at 86-87; *League of Women Voters of Fla.*, 340 F.R.D. at 454.  Thus, compelling Legislators to comply with a subpoena seeking their communications with third parties would still undermine the purposes of the privilege.[11]

When evaluating the fifth factor, it is also instructive to note the differences between this case and *Harris*.  There, the court declined to extend the state legislative privilege to members of an independent redistricting commission at least in part because, unlike legislators, "the commissioners have no other public duties from which to be distracted" and "the nature and purpose of the Commission undermines the claim that allowing discovery will chill future deliberations by the Commission or deter future commissioners from serving."  993 F. Supp. 2d at 1069-71.  Here, the opposite is true—Legislators are current and former elected officials with a broad range of legislative duties.  Requiring them to produce communications touching upon the legislative process would constitute

---

[11]    Additionally, to the extent the fifth factor does not cut as decisively in Legislators' favor when it comes to third-party communications (as contrasted with how it applies to internal communications), this does not affect the overall balancing calculus because the second factor cuts more decisively in Legislators' favor when it comes to third-party communications (due to the potential availability of other mechanisms for obtaining those communications).

the precise sort of interference that the state legislative privilege was designed to prevent. *Lee*, 908 F.3d at 1187.  *See also Comm. for a Fair & Balanced Map*, 2011 WL 4837508 at *8 ("Legislators face competing demands from constituents, lobbyists, party leaders, special interest groups and others.  They must be able to confer with one another without fear of public disclosure.").

Finally, the fourth factor (*i.e.*, the government's role in this litigation) is somewhat neutral.  On the one hand, some courts have held that where, as here, the plaintiffs' allegations "raise[] serious charges about the fairness and impartiality of some of the central institutions of our state government," the fourth factor supports disclosure. *Rodriguez v. Pataki*, 280 F. Supp. 2d 89, 102 (S.D.N.Y. 2003).  Other courts have held that where, as here, individual legislators are not parties to the litigation, the fourth factor weighs in favor of disclosure because legislative immunity is not under threat.  *Bethune-Hill v. Va. State Bd. of Elections*, 114 F. Supp. 3d 323, 341 (E.D. Va. 2015) ("[W]here the legislature—rather than the legislators—are the target of the remedy and legislative immunity is not under threat, application of the legislative privilege may be tempered."). On the other hand, still other courts have held that the fourth factor weighs against disclosure where, as here, representatives of a state government "seek[] to uphold the validity of the challenged legislation, as well as protect[] the Arizona legislative process from unwarranted intrusion." *Puente Arizona*, 341 F.R.D. at 672.  Finally, still other courts have held that the fourth factor "is inapt in the legislative privilege context" and "a wash" because "[o]f course the state is involved, there would be no point in deposing the Governor's office or the Legislators if it were not." *League of Women Voters of Fla.*, 340 F.R.D. at 457.

As the foregoing discussion makes clear, the balancing analysis here presents a close call.  Two of the relevant factors favor disclosure, two other factors favor non-disclosure, and the final factor is essentially neutral.  Acknowledging the closeness of the decision, the Court concludes that the balancing test supports applying the state legislative privilege in this case.  "Proving the motivation behind official action is often a problematic

undertaking," *Hunter v. Underwood*, 471 U.S. 222, 228 (1985), and the Court does not take lightly Plaintiffs' position that the requested communications may be uniquely valuable in establishing discriminatory intent.  Nevertheless, the Court concludes that the fifth factor tilts so strongly in favor of non-disclosure that it tips the balance in Legislators' favor.[12] Additionally, Plaintiffs have not identified meaningful grounds for distinguishing this case from *Lee* and *Puente Arizona*, both of which declined to override the state legislative privilege under analogous circumstances.[13]

III.   *In Camera* Review

As a fallback request, Plaintiffs ask the Court to conduct an *in camera* review of the 196 documents so it can "weigh the legislature's interests against the weighty federal interests on an individualized basis."  (Doc. 197 at 12 n.3.)

In the tentative ruling issued before oral argument, the Court concluded that this request should be denied.  (Doc. 232 at 26-28.)  However, upon further consideration of the points raised during oral argument, the Court changes course and concludes that the request for *in camera* review should be granted.  In their response to Plaintiffs' motion to compel, Legislators wrote the following: "If the Court has any question as to the relevance of these documents, the Legislators would be open to an *in camera* inspection for the Court to assess whether the remaining documents are substantially relevant to Plaintiffs' remaining claim in this case such that the legislative privilege should not apply."  (Doc. 202 at 10.)  Legislators also wrote: "Should the Court wish to examine the withheld documents [themselves], the Legislators support an *in camera* review of the documents to determine whether they are substantially relevant to Plaintiffs' remaining claim, and thus

---

[12]   For this reason, the Court clarifies that it would decline to order disclosure even if the fourth factor were deemed to favor Plaintiffs.  The five-factor test is not a mechanical inquiry under which a court must automatically rule in one side's favor if three or more of the factors support that side's position.  Instead, the test calls for a flexible, qualitative inquiry.

[13]   Although not addressed by either side, the fact that Arizona recognizes a privilege for its own legislators, *see Fann v. Kemp in & for Cty. of Maricopa*, 515 P.3d 1275, 1281 (Ariz. 2022), also supports the outcome here.  *Fla. v. United States*, 886 F. Supp. 2d 1301, 1304 (N.D. Fla. 2012) ("[I]f a state indeed did not recognize a privilege for its own legislators, the case for recognizing a federal privilege would be weaker.").

whether the privilege should be applied in this case." (*Id.* at 12.)  Although the Court does not agree with Plaintiffs' contention during oral argument that these statements constitute unqualified concessions as to the necessity of *in camera* review, they do qualify as concessions that *in camera* review would be warranted if certain conditions were satisfied—specifically, "[i]f the Court has any questions as to the relevance of these documents" and/or "[s]hould the Court wish to examine the withheld documents."[14]  Both conditions are satisfied here, as the Court has questions about the relevance of the withheld documents[15] and wishes to examine them.

As discussed in Part II above, the existence of unresolved questions over the withheld documents' relevance does not mean that the qualified privilege has been overcome on the present record.  Nevertheless, the Court would be in an even better position to perform the balancing analysis (and, potentially, recalibrate its conclusions as to the first factor, which addresses the relevance of the withheld documents) if aware of the actual contents of those documents.  Given Legislators' agreement to submit the withheld documents for *in camera* review under these circumstances, it is unnecessary to decide (as the tentative ruling attempted to do) whether the requirements for *in camera* review set forth in *In re Grand Jury Investigation*, 974 F.2d 1068 (9th Cir. 1992), and *United States v. Zolin*, 491 U.S. 554 (1989), are otherwise satisfied.  *Cf. United States v.*

---

[14]     During oral argument, Plaintiffs also asserted that a third statement in Legislators' brief qualifies as a concession—the statement that "if the Court has any questions regarding whether or not the third-party communications concern legitimate legislative activity, the Legislators support an *in camera* review of the documents."  (Doc. 202 at 7.)   This particular statement does not support Plaintiffs' position, as Legislators' counsel verified (via the act of logging the withheld documents on the privilege log) that all of the withheld documents concern legitimate legislative activity and Plaintiffs have not identified any reason to question this determination.     To the extent Plaintiffs' theory is that communications reflecting potential racial bias are *per se* examples of *il*legitimate legislative activity, the Court is unpersuaded.

[15]     During oral argument, Legislators' counsel suggested that the Court should have no reason to question the relevance of the withheld documents because "emails in which a legislator is emailing with his or her staff . . . are irrelevant because [they] weren't shared with the legislature as a whole and . . . therefore[] cannot inform the court as to what the legislature as on whole intended when passing the bill."  But as discussed in previous orders and in Part II of this order, the Court respectfully disagrees with Legislators' position that such communications are categorically irrelevant—they may not be dispositive, but they are potentially relevant under Ninth Circuit law.

*Sineneng-Smith*, 140 S.Ct. 1575, 1579 (2020) (discussing "the principle of party presentation," which holds that courts "should not[] sally forth each day looking for wrongs to right" and instead should "wait for cases to come to [them] . . . [and] normally decide only questions presented by the parties") (citations and internal quotation marks omitted).

Accordingly,

**IT IS ORDERED** that Plaintiffs' motion to compel (Doc. 197) is **granted in part and denied in part**.  The Court will not order the production of any of the withheld documents at this time but will conduct an *in camera* review.

**IT IS FURTHER ORDERED** that Legislators shall provide copies of the withheld documents to the Court for *in camera* review by **August 1, 2023**.  Legislators shall do so by delivering, to the Court's chambers, hard copies of the withheld documents as well as a thumb drive containing the withheld documents in an electronic, word-searchable format.

Dated this 18th day of July, 2023.

_____
Dominic W. Lanza
United States District Judge