1    **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                       **FOR THE DISTRICT OF ARIZONA**

8

9    Mi Familia Vota, et al.,                    No. CV-21-01423-PHX-DWL

10                  Plaintiffs,                   **ORDER**

11   v.

12   Adrian Fontes, et al.,

13                  Defendant.

14

15                            **INTRODUCTION**

16          This action involves a challenge to a voting law, Senate Bill 1485 ("S.B. 1485"),

17   that was enacted by the Arizona legislature following the 2020 election.  It provides that

18   voters who do not cast a mail-in ballot in two consecutive election cycles must be removed

19   from Arizona's permanent early voting list.  According to Plaintiffs, S.B. 1485 is invalid

20   because it was enacted with a discriminatory purpose, in violation of the Fourteenth and

21   Fifteenth Amendments and Section 2 of the Voting Rights Act.[1]

22          In January 2022, Plaintiffs served the Republican Party of Arizona ("RPA"), a non-

23   party, with a Rule 45 subpoena seeking documents concerning S.B. 1485 and related

24   legislation.  (Doc. 156-1 at 5-16.)  Since then—a period of over 21 months—the subpoena

---

[1]      Plaintiffs in this action are four nonprofit groups.  Additionally, the Democratic Senatorial Campaign Committee and the Democratic Congressional Campaign Committee have intervened as Plaintiffs.  Defendants are Arizona Secretary of State Adrian Fontes, Arizona Attorney General Kris Mayes, and the recorders from all 15 Arizona counties. Additionally, the Republican National Committee and the National Republican Senatorial Committee have intervened as Defendants.  For ease of reference, the Court will refer to the various entities on each side of this dispute as Plaintiffs and Defendants.

has generated no shortage of disputes between Plaintiffs and the RPA.  The Court has repeatedly resolved those disputes in Plaintiffs' favor, in large part due to the RPA's failure to raise its objections in a timely or legally compliant manner.

Now pending before the Court is the latest iteration of subpoena-related litigation—specifically, Plaintiffs' motion to compel the RPA to produce certain documents the RPA has withheld on First Amendment and attorney-client privilege grounds.  (Doc. 253.)  For the following reasons, Plaintiffs' motion is granted in part and denied in part.

**BACKGROUND**

I.   Underlying Litigation

On August 17, 2021, Plaintiffs initiated this action, asserting three claims.  (Doc. 1.)  In Count One, Plaintiffs allege that S.B. 1485 and S.B. 1003, "individually and collectively," violate the First and Fourteenth Amendments because they create an undue burden on the right to vote.  (*Id.* ¶¶ 127-35.)[2]  In Count Two, Plaintiffs allege that S.B. 1485 and S.B. 1003, "individually and collectively, violate the Fourteenth and Fifteenth Amendments because they were adopted for the purpose of denying voters of color full and equal access to the political process."  (*Id.* ¶¶ 136-41.)  In Count Three, Plaintiffs allege that S.B. 1485 and S.B. 1003, "individually and collectively, violate Section 2 of the Voting Rights Act because they were adopted for the purpose of denying voters of color full and equal access to the political process."  (*Id.* ¶¶ 142-45.)

On November 24, 2021, Defendants moved to dismiss all of Plaintiffs' claims.  (Docs. 72, 76, 77.)

On December 15, 2021, the Court issued a Rule 16 scheduling order that, among other things, set a November 18, 2022 deadline for completion of fact discovery.  (Doc. 85.)  The deadline has since been extended multiple times, most recently to December 22, 2023.  (Doc. 260.)

On June 24, 2022, after full briefing on the motion to dismiss (Docs. 83, 99, 100,

---

[2]   S.B. 1003, which was also enacted by the Arizona legislature following the 2020 election, clarifies that the deadline for a voter to attempt to "cure" a missing signature on an early ballot is 7:00 PM on election day.  (Doc. 1 ¶ 1.)

118) and oral argument (Doc. 149), the Court dismissed Count One in its entirety.  (Doc. 154 at 22, 34, 41, 60.)  The Court also dismissed the challenges to S.B. 1003 in Counts Two and Three.  (*Id.* at 44, 60.)  The Court denied the motion to dismiss with respect to the challenges to S.B. 1485 in Counts Two and Three.  (*Id.* at 52, 60.)  The Court also granted Plaintiffs leave to amend.  (*Id.* at 59-60.)  However, Plaintiffs declined to amend their complaint by the amendment deadline.  (Doc. 168.)

II.     The First Discovery Dispute Related To The Subpoena

On January 10, 2022, Plaintiffs served a subpoena on the RPA.  (Doc. 156-1 at 5-16.)  The subpoena requires the RPA to produce discovery responsive to 12 requests for production ("RFPs").  (*Id.*)

On January 24, 2022, the RPA served written objections to the subpoena.  (*Id.* at 18-23.)  The RPA objected to all 12 RFPs on "the grounds of First Amendment privilege." (*Id.* at 19.)[3]  The RPA also raised other objections to certain RFPs and argued that the requested communications "can be obtained from the government/government officials if at all.  And any evidence that plaintiffs intend to present in support of their theory that race bears a relationship with being an active voter, no matter how objectively repugnant that theory may be, can presumably be obtained through other sources and without infringing on the [RPA's] First-Amendment protected activity."  (*Id.* at 19-22.)  Finally, the RPA asserted it had been "unable to conduct a search for responsive documents" thus far but that it was "entirely possible if not likely that the [RPA] simply has no responsive materials to any or all of these requests."  (*Id.* at 19.)

Between January 24, 2022, and April 29, 2022, Plaintiffs' counsel and counsel for the RPA communicated via email and telephone about the RPA's objections and the possibility that the RPA would produce documents responsive to the subpoena.  (*See, e.g.*, *id.* at 30-40 [emails between counsel].)  As relevant here, after the parties conferred telephonically on February 7, 2022, Plaintiffs' counsel sent a follow-up letter.  (*Id.* at 25-

---

[3]     At the time, the RPA did not identify any specific privileged documents or provide a privilege log.  (*Id.* at 18-23.)

28.)  The letter (1) addressed the relevance and breadth of each RFP and offered to narrow certain RFPs; (2) expressed skepticism as to the RPA's claim that no responsive documents exist for certain RFPs and requested descriptions of the searches conducted; and (3) challenged the RPA's "blanket First Amendment objection" and requested a "privilege log for any responsive documents that [the RPA] intends to withhold so that we can consider whether such privilege assertions are appropriate."  (*Id.*)

On March 15, 2022, after receiving no response, Plaintiffs' counsel sent a follow-up email.  (*Id.* at 37-38.)  In response, counsel for the RPA stated that Plaintiffs' "letter appears to change nothing," reiterated the "obvious First Amendment problems here" as well as "more conventional problems" like "relevance, expense, and the availability of information from other sources," and asserted that "[a]s a matter of law, political parties and other members of the public do not control legislators' judgment, and are clearly entitled to freely exercise their free-speech rights without fear of subpoenas exactly like this one."  (*Id.* at 36-37.)  In reply, Plaintiffs' counsel again requested a privilege log and information about the searches conducted, offered "to discuss these matters further," and emphasized "we cannot accept a blanket refusal by [the RPA] to respond to the subpoena."  (*Id.* at 35-36.)

On April 29, 2022, Plaintiffs' counsel informed the RPA's counsel of Plaintiffs' intent to "present this dispute to the Court for resolution."  (*Id.* at 34-35.)  Plaintiffs also asked if the RPA was "willing to provide its position" in a joint submission.  (*Id.*)  After some discussion (during which the parties agreed to postpone any filing until after the Court ruled on Defendants' motion to dismiss), on July 5, 2022, the parties filed a joint summary of the dispute and Plaintiffs' alternative request for leave to file a motion to compel.  (Doc. 156.)

On July 7, 2022, "given the seeming complexity of the issues," the Court granted Plaintiffs leave to file a motion to compel.  (Doc. 158.)

…

…

- 4 -

III.   <u>The First Order Compelling The RPA To Comply With The Subpoena</u>

On October 27, 2022, after full briefing on Plaintiffs' motion to compel (Docs. 161, 171, 172), the Court granted the motion in significant part.  (Doc. 184.)  More specifically, the Court first ruled that "[t]he RPA's reliance on the First Amendment as a basis for categorically refusing to comply with the subpoena fails for two independent reasons," which were (1) the RPA's failure to provide a privilege log and (2) the RPA's failure to provide any cognizable evidence in support of its assertion that complying with the subpoena would result in a chilling effect.  (*Id.* at 9-13.)  As for the latter point, the Court specifically noted that "only some of the RFPs seek information that might be considered internal communications of the RPA," whereas "[o]ther RFPs seek external communications," and "[t]he RPA makes no effort to explain why such communications could be considered privileged from disclosure under the First Amendment."  (*Id.* at 12-13.)

Next, the Court addressed the RPA's objections based on relevance and overbreadth, concluding that most of those objections lacked merit.  (*Id.* at 16-29.)  Along the way, the Court specifically held that "to the extent the RPA seeks to avoid compliance with the subpoena on the ground that Plaintiffs lack a sufficient basis for suspecting the RPA possesses any of the documents in question, this argument fails on both the law and the facts."  (*Id.* at 19.)

Next, the Court addressed the RPA's objections based on proportionality and undue burden, concluding for various reasons that those objections did not justify non-compliance with the subpoena.  (*Id.* at 29-37.)  In this portion of the order, the Court repeatedly acknowledged that because the RPA is a non-party, it is entitled to "special consideration" and "special protection" against the time and expense of complying.  (*Id.* at 30-31, 36-37.)  The Court thus explained that, "had the RPA provided any reasoned argument or evidentiary support for its assertion that complying with the subpoena would be 'burdensome,' the Court would have been particularly receptive."  (*Id.* at 36-37.)  The Court continued:

Unfortunately, the RPA fails to articulate how the factors relevant to burden (*i.e.*, cost of searching, time constraints, lack of resources, inconvenience) play out in this case. It is unclear how voluminous the RPA expects the responsive discovery would be, how logistically difficult it would be for the RPA to comply to the subpoena, and whether compliance would impose large costs on the RPA. The Court also takes into account Plaintiffs' offers to narrow several of the requests (particularly to avoid requesting discovery that is available from a party to the litigation), the relevance of the documents sought by Plaintiffs, and the fact that most of the relevant facts about the purposes behind S.B. 1485 are not possessed by Plaintiffs. Thus, even considering the RPA's non-party status, the Court does not find that the burden imposed by compliance with the subpoena (as narrowed by Plaintiffs and further modified by this order) outweighs the value of the discovery to Plaintiffs.

(*Id.* at 37, internal citation omitted.)

Next, the Court addressed the parties' dispute over the sufficiency of the RPA's search methodology, concluding that "given the RPA's non-party status, the narrowed scope of the subpoena, and the Court's impression that the RPA has, to date, focused more of its efforts on formulating objections to the subpoena than on searching for responsive documents, the Court will simply order the RPA to comply with the parameters of the subpoena as narrowed herein and will not, at least for the time being, order the RPA to provide specific information regarding its resulting searches for responsive information. This ruling is without prejudice to Plaintiffs' ability to renew their request for compelled disclosure on this topic should future disagreements about compliance arise." (*Id.* at 37-40.)

Next, the Court denied the RPA's request for cost-shifting for the same reasons it had rejected the RPA's undue-burden arguments: "Despite the Court's duty to protect non-parties like the RPA from significant expense, the RPA is not entitled to cost shifting here for the simple reason that it has made no factual showing in support of its request. . . . The RPA has not itemized (or even mentioned) its expenses, so the Court has no way of knowing whether they were reasonably incurred and/or 'significant.' . . . The Court has already determined that the RPA provided little to no information indicating that

enforcement would impose an undue burden.  Thus, an award of attorneys' fees and costs under Rule 45(d)(1) is unwarranted."  (*Id.* at 40-42, citations omitted.)

Finally, in the last section of the order, the Court added the following observation: "The Court recognizes there is a significant risk of abuse when a political party attempts to use a Rule 45 subpoena to gather materials, including internal analyses with potential competitive ramifications, from an opposing political party.  In a different case with a different record, such concerns might very well counsel in favor of denying a motion to compel.  Nevertheless, here the RPA has failed to substantiate many of its contentions, failed to provide a privilege log, and frequently resorted to boilerplate objections.  Given that backdrop, and in light of the limited nature of the relief sought in Plaintiffs' motion—Plaintiffs are not seeking a conclusive determination that the RPA has forfeited any claim of First Amendment privilege and acknowledge the RPA may withhold documents in response to this order by producing a privilege log—the Court agrees that Plaintiffs are entitled to much of the relief they currently seek."  (*Id.* at 42, internal citation omitted.)

IV.    The Meet-And-Confer Efforts Following The October 2022 Ruling

Between October 27, 2022, and June 30, 2023, Plaintiffs' counsel and the RPA's counsel repeatedly communicated via email and telephone about the RPA's search methodology, production of documents, and privilege claims.  (*See, e.g.*, Doc. 228-1 at 2-29 [emails between counsel]; Doc. 228-2 at 2-11 [same].)

On December 13, 2022, as those discussions were ongoing, the RPA provided an "initial production" "of outward-facing/public items on social media etc." and raised objections based on the First Amendment and attorney-client privileges but did not provide a privilege log.  (Doc. 228-1 at 21-23.)

On January 17, 2023, after an intervening telephonic meet-and-confer conference, Plaintiffs' counsel made a renewed request for all outstanding documents and privilege logs by January 27, 2023.  (*Id.* at 15.)

On January 19, 2023, the RPA made its "remaining production," also disclosed an attorney-client privilege log, and raised claims of First Amendment privilege (without an

accompanying First Amendment privilege log).  (*Id.* at 14.)[4]

On January 31, 2023, Plaintiffs' counsel sent a follow-up email (1) stating that the RPA's attorney-client privilege log was insufficient "because it does not provide sufficient information about the nature of the withheld emails, their general subject matter, or the reason why attorney-client or work-product privilege might apply"; (2) requesting a revised privilege log; (3) requesting additional responsive documents the RPA had not produced; and (4) "requesting that [the RPA] provide [Plaintiffs] with a detailed description of its search efforts . . . and the volume of documents that were ultimately reviewed but determined to be irrelevant, if any."  (*Id.* at 11-12.)

On February 1, 2023, the RPA made an additional production.  (*Id.* at 10-11.)

On March 6, 2023, after reviewing those documents, Plaintiffs again requested that the RPA run additional searches for responsive documents and provide an updated privilege log or further explanation of the privilege log.  (*Id.* at 9-10.)

On March 9, 2023, the RPA reasserted a claim of First Amendment privilege, asked Plaintiffs to clarify their requests, and challenged Plaintiffs' ability to subpoena the RPA as a third party.  (*Id.* at 7-9.)

On March 23, 2023, Plaintiffs' counsel clarified Plaintiffs' requests for additional searches and asked for the RPA's response by March 30, 2023.  (*Id.* at 7.)

On March 29, 2023, the RPA's counsel stated that he was communicating with the RPA regarding Plaintiffs' requests.  (*Id.* at 6-7.)

On April 10, 2023, after receiving no follow-up, Plaintiffs' counsel informed the RPA's counsel that "in the absence of an agreement by April 12 we plan to file a motion with the Court seeking to compel [the RPA's] compliance with its order by a date certain." (*Id.* at 6.)  That same day, the RPA's counsel responded that the RPA had contacted a third party, TERIS, to perform the searches and requested that Plaintiffs pay TERIS.  (*Id.* at 5.)

On April 24, 2023, Plaintiffs' counsel rejected the RPA's counsel's request for

---

[4]    In a cover email, the RPA's counsel noted that the RPA "did not withhold any documents based on First Amendment privilege."  (*Id.* at 14.)

Plaintiffs to pay TERIS and informed the RPA's counsel of Plaintiffs' intent to "bring this issue to the Court for resolution again." (*Id.* at 4-5.) Over the next few days, the RPA's counsel sent a series of emails in which the RPA agreed to run additional searches. (*Id.* at 2-4.) To that end, on May 5, 2023, the RPA's counsel provided a detailed list of the search terms that the RPA had agreed to use as part of the search and asked Plaintiffs' counsel to confirm that the search terms were acceptable. (Doc. 228-2 at 8-10.) On May 12, 2023, after some additional back-and-forth, Plaintiffs' counsel confirmed that the proposed search terms were acceptable. (*Id.* at 6-8.)

Four days later, on May 16, 2023, the RPA changed course and stated it was unwilling to run the proposed searches and then review the results because the RPA's counsel "cannot spend the time to review such a production." (*Id.* at 5.)

On June 2, 2023, Plaintiffs' counsel suggested altering one of the search terms and looking into software solutions to accommodate the RPA's burden-related concerns. (*Id.* at 3-4.)

That same day, the RPA's counsel responded in relevant part that "my client will not pay to review this number of documents and emails, and to date you have indicated that your clients refuse to share in any expense here, so we appear to be at an impasse." (*Id.*)

On July 6, 2023, Plaintiffs filed a unilateral "summary of discovery dispute relating to compliance with the Court's October 27, 2022 order." (Doc. 228.)

That same day, RPA filed a motion to strike Plaintiffs' statement and filed its own statement regarding the dispute. (Doc. 229.) As an attachment to its statement, the RPA filed a declaration from its executive director, Nick Ivory. (*Id.* at 9-11.) In his declaration, Ivory contends that Plaintiffs' subpoena is "deeply chilling" because it was issued "as the direct result of [the RPA's former chair] speaking out in support of legislation." (*Id.* at 9 ¶ 2.) According to Ivory, "knowing that my staff or I will be subject to such compelled disclosure is deeply chilling to our public messaging, because it means that if we express support on matters of public interest like legislation, then it will necessarily expose our

internal emails and documents to public scrutiny, including by politically-hostile parties (like the Plaintiffs in this case) or even the government." (*Id.* at 9 ¶ 3.) "Further, it is chilling to the ability of my staff and myself to freely discuss matters like fundraising and voter turnou[t], both with persons inside and outside of the [RPA], when any mention of any demographic group of voters in our communications will result in them becoming public. We have a valid and reasonable expectation that our communications will stay private, so that opposing political part(ies) or other hostile groups cannot 'steal' or otherwise scrutinize our communications and strategies." (*Id.* at 10 ¶ 4.) Additionally, Ivory contends that "the cost of searching, compiling, and reviewing thousands of documents under these circumstances . . . is harassing and chilling as well. . . . Being subject to so much burden (the exposure and expense of compiling, reviewing and producing around at least 8,000 documents under these circumstances), as the result of merely engaging in protected activity (speaking out in support of legislation), is clearly chilling and harmful to this organization's ability to operate both now and in the future." (*Id.* at 10-11 ¶ 5.)

V.      <u>The Second Order Compelling The RPA To Comply With The Subpoena</u>

On July 17, 2023, the Court heard oral argument regarding the parties' discovery dispute. (Doc. 239 [transcript].) During the hearing, Plaintiffs' counsel agreed that the requested search could be limited to four RPA custodians. (*Id.* at 7.) Additionally, after the Court asked whether a ruling in Plaintiffs' favor would simply result in the RPA "compiling the big privilege log that they didn't compile last time and then we would likely have another round of litigation over whether the privilege has been properly substantiated here," Plaintiffs' counsel responded: "That's possible . . . [but] at one point in time they recommended something akin to a nonwaiver agreement where they would produce documents . . . with the assumption that if there was anything in there that was significant that we wanted to litigate over, we would do so. We are still amenable to such an approach and we would be willing to consider options other than logging where we can understand what has not been logged. . . . We're willing to do something akin to a nonwaiver

agreement." (*Id.* at 9-10.)  Meanwhile, the RPA's counsel stated during his portion of the argument that the RPA should not be required to incur compliance costs because the RPA is "essentially a ma and pa shop" with limited resources.  (*Id.* at 15.)  The RPA's counsel also questioned the necessity and usefulness of any First Amendment privilege log, arguing "if it's a log of every document responsive to these keywords, we're talking thousands of documents.  I don't see what healthy salutary beneficial purpose we're serving in creating a log of that expansive nature. . . .  [T]he privilege here is apparent on its face and from the . . . declaration we submitted, that the party is being subjected to extensive searches of its internal e-mails and documents based solely on speaking on the support of a law.  That is a clear self-evident First Amendment issue . . . [so] I'm not seeing what exactly is being contemplated as being helpful in this log . . . or what more it would add to this issue." (*Id.* at 26.)

The Court ruled from the bench at the conclusion of the hearing, ordering the RPA to run the search terms it had previously agreed to run (which one narrowing modification) and to "produce the documents responsive to the search terms and/or disclose a privilege log" within 21 days.  (Doc. 236.)  The Court also rejected the RPA's renewed request for cost-shifting, explaining:

> First and most important, I find that any argument on that issue is forfeited . . . .  A tremendous amount of judicial resources went into the October 2022 order on the motion to compel.  That was the [RPA's] chance to talk about relevance, undue burden, and all these things.  For whatever reason, the [RPA] basically tried to take a blanket position that we don't even need to do anything in response to the subpoena because of the First Amendment privilege and otherwise made some unsupported . . . [and] fleeting [a]llusions to cost and burden without supporting them.  That was the time to do it. . . . [I]t was my expectation that based on the guidance I gave in the October [2022] order this process would be completed quickly.  It's certainly not an opportunity now many months later to relitigate these issues that should have been litigated at the outset.
>
> Separate from that, . . . there's a lack of evidence as to the cost shifting.  There have been some fairly vague statements about the costs of complying with the subpoena which haven't really been substantiated to my satisfaction. Also, the proposition that the [RPA] is a mom and pop shop that can't bear

litigation costs is not persuasive to me.

And, finally, I think another important consideration with cost shifting is . . . [that] the plaintiffs have done a number of things to try to really limit the costs here and reduce the burden on the [RPA].  In no particular order, they didn't press this waiver claim as to the First Amendment privilege that they perhaps could have pressed earlier in the litigation but instead have really continued to work iteratively with the [RPA] on these discovery issues. Second, there's been an agreement to limit at least the search for now to four custodians.  Third, one way . . . I am trying to further limit the burden is . . . limit[ing] the search terms to the ones that were set forth in [the RPA counsel's] e-mail of May 10th, which the [RPA] initially agreed to.  So that's a further way to try to reduce the cost of production here.  And then fourth, even though it's ultimately the [RPA's] decision to decide what to do with respect to the assertion of any First Amendment privilege when complying with this discovery order, I do note I had a discussion with [Plaintiffs' counsel] where the plaintiffs have proposed alternatives that would not require at least the [RPA] in the first instance to go to the cost and expense of coming up with a formal privilege log but instead turning over the documents without such a log while still retaining the right to assert privileges at a later stage of the proceedings.  Again, it's . . . the [RPA's] choice on what to do with that.  They can reject it if they want and go with the log, but that's, in my view, a further way to try to avoid the undue burden under these circumstances by coming up with creative alternatives to reduce the cost of compliance on the [RPA].

(Doc. 239 at 35-37.)

VI.    Developments Since The Second Order Compelling Compliance

August 7, 2023 was the deadline for the RPA to complete its search and produce responsive documents and/or a privilege log. It does not appear the RPA and Plaintiffs engaged in any email communications during the 21-day period between the July 17, 2023 hearing and this deadline.  It appears the only attempted communication during this period was a voicemail the RPA's counsel left for Plaintiff's counsel on the late afternoon of August 7, 2023 in which the RPA apparently expressed an interest in agreeing to a protective order that would enable the RPA to make an initial production of documents without waiving its right to assert privilege claims with respect to those documents.  (Doc. 244-1 at 3 [August 8, 2023 email from the RPA's counsel: "I tried to call you yesterday

and left a voicemail."]; Doc. 244-4 at 3 [August 12, 2023 email from Plaintiffs' counsel: "[W]e believe the appropriate time to negotiate any protective order or course of conduct regarding AI would have been prior to the August 7, 2023, Court-ordered deadline. Instead, you mentioned a protective order for the first time at 4:30 MST on August 7."].)

On August 8, 2023 (*i.e.*, the day after the compliance deadline), the RPA's counsel sent an email to Plaintiffs' counsel. (Doc. 244-1 at 3-4.)[5] First, the RPA's counsel summarized the results of the RPA's search efforts, explaining that the search terms resulted in 61,298 hits. (*Id.*) Next, the RPA's counsel explained that the RPA had not actually reviewed those documents to determine whether they were relevant or responsive to the subpoena: "[W]e do not have the time or resources to review more than 61,298 emails or documents for actual relevance or responsiveness to your subpoena; therefore we assert lack of relevance or actual responsiveness as an objection to the production of these documents, and excessive burden with respect to such a review." (*Id.* at 4.) The RPA's counsel also explained that the RPA was withholding all 61,298 of the unreviewed documents pursuant to the RPA's First Amendment privilege claim: "[T]he AZGOP is asserting First Amendment privilege with respect to all of these documents." (*Id.*) To that end, the RPA provided a First Amendment privilege log (Doc. 244-2) and explained in the cover email that the privilege log only included three fields of information: "[1] the date of the document/email, [2] the nature of the document (email, docx, etc.), and [3] the searches that 'hit' on the document." (Doc. 244-1 at 4.) Separately, the RPA also provided an attorney-client privilege log that listed 1,016 items (Doc. 244-3) and explained in the cover email that, because the RPA's counsel had not actually reviewed the withheld documents,

---

[5] During oral argument, the RPA's counsel stated that the RPA mistakenly believed August 8, 2023 (rather than August 7, 2023) was the compliance deadline because counsel's firm's internal docketing system showed that the minute entry establishing the 21-day compliance period was docketed on July 18, 2023. This suggestion is puzzling because the minute entry from the July 17, 2023 hearing was docketed that same day. (Doc. 236 [July 17, 2023 minute entry: "Within 21 days of this date Non-Party Republican Party of Arizona shall run the search terms . . . and shall produce the documents responsive to the search terms and/or disclose a privilege log."].) Further, the text of the minute entry identifies the date of the hearing as July 17, 2023 and sets the deadline for production as 21 days from that date. (*Id.* ["MINUTE ENTRY for proceedings held before Judge Dominic W Lanza: Discovery Dispute Hearing held on 7/17/2023 . . ."].)

1   "there may be items listed on the separate attorney-client privilege log which are not in fact

2   subject to privilege."  (Doc. 244-1 at 4.)

3       Later that day, Plaintiffs responded in relevant part as follows: "AZ GOP has been

4   ordered (twice) to produce documents responsive to the subpoena and to provide a privilege

5   log that complies with the requirements of the Federal Rules for any documents that it has

6   a legitimate and good faith basis to withhold as privileged.  By your own statements . . . it

7   is clear that no one has even reviewed the documents that may be responsive to the

8   subpoena identified through the application of the search terms, and AZ GOP cannot in

9   good faith assert that it has a basis to withhold all of these documents under any privilege."

10  (*Id.* at 2-3.)

11      In the days that followed, Plaintiffs' counsel and the RPA's counsel engaged in

12  additional telephonic and email discussions, including further discussions about the

13  possibility of a protective order.  (*Id.* at 2; Doc. 244-4.)

14      On August 22, 2023, after those discussions proved unavailing, Plaintiffs and the

15  RPA filed a joint summary of discovery dispute.  (Doc. 244.)

16      On August 31, 2023, after a short hearing, the Court issued an order authorizing

17  additional briefing from Plaintiffs and the RPA on two discrete issues: (1) "the sufficiency

18  of the two privilege logs"; and (2) "if the privilege logs are found to be inadequate, whether

19  that will result in a waiver."  (Doc. 249.)

20      On September 8, 2023, Plaintiffs filed the pending motion to compel.  (Doc. 253.)

21  After the motion became fully briefed (Docs. 254, 256, 261),[6] the Court set an oral

22  argument date and noted that "[t]he Court will issue a tentative ruling prior to the hearing."

23  (Doc. 262.)

24      On October 25, 2023, the Court issued a 53-page tentative ruling.  (Doc. 265.)

25      On November 2, 2023, the Court heard oral argument.  (Doc. 268.)  At the outset of

26

27  [6]   The response deadline was September 18, 2023.  (Doc. 249.)  On September 22,
    2023, four days after the deadline, the RPA filed a response (Doc. 256) and an extension
28  request that attributed the missed deadline to "an internal docketing error" (Doc. 255).  The
    extension request was granted.  (Doc. 257.)

1  the hearing, the RPA's counsel informed the Court that he had not reviewed the tentative

2  ruling.[7]  In response, the Court offered to postpone the hearing so the RPA's counsel could

3  review it.  Counsel declined this invitation.

4  **DISCUSSION**

5  I.  <u>Meet And Confer</u>

6  A.  **The Parties' Arguments**

7  The RPA argues that "[i]nstead of engaging in a good faith conversation regarding

8  any purported deficiencies, Plaintiffs ran to this Court seeking relief regarding some kind

9  of 'gotcha,'" which violated Plaintiffs' "continuing duty to meet and confer with the [RPA]

10  regarding the alleged deficiencies."  (Doc. 256 at 7-8, citations omitted).

11  In reply, Plaintiffs argue they fulfilled their duty to meet and confer with the RPA

12  before the production deadline and "had no such duty" "*after* the Court-ordered August 7

13  deadline for the RPA's production of a log."  (Doc. 261 at 8, emphasis in original.)

14  Plaintiffs also argue that any additional conferral would have been futile.  (*Id.*)

15  B.  **Analysis**

16  Rule 37(a)(1) provides that a motion to compel must "include a certification that the

17  movant has in good faith conferred or attempted to confer with the person or party failing

18  to make disclosure or discovery in an effort to obtain it without court action."  *Id.  See also*

19  LRCiv 7.2(j) ("No discovery motion will be considered or decided unless a statement of

20  moving counsel is attached thereto certifying that after personal consultation and sincere

21  efforts to do so, counsel have been unable to satisfactorily resolve the matter.").

22  Although Plaintiffs did not include a formal meet-and-confer certification with their

23  motion filed on September 8, 2023, the Court concludes, for several reasons, that this does

24  not serve as an impediment to relief.  First, the Court specifically authorized Plaintiffs to

25  file a motion to compel during the August 31, 2023 hearing, after Plaintiffs initially

26  attempted to bring the current dispute to the Court's attention by way of the informal

27

28

---

[7]    As with the missed compliance deadline discussed in footnote five and the missed response-brief deadline discussed in footnote six, Counsel attributed the failure to review the tentative ruling to an internal docketing error.

discovery-dispute resolution process set forth in the scheduling order.

Second, at any rate, Plaintiffs fulfilled their obligation to meet and confer by repeatedly raising concerns regarding the RPA's privilege assertions and privilege logs (or lack thereof). More specifically, as for the First Amendment privilege log, Plaintiffs informed the RPA in February 2022 of the necessity of such a log should the RPA wish to withhold documents pursuant to a claim of First Amendment privilege. (Doc. 156-1 at 27-28.) In the October 2022 order, the Court reiterated the necessity of such a log. (Doc. 184.) Plaintiffs continued to raise concerns over the RPA's failure to provide a First Amendment privilege log during meet-and-confer communications with the RPA in late 2022 and early 2023. (*See, e.g.*, Doc. 228-1 at 19 [December 19, 2022 email: "As for the privilege log, to the extent that AZ GOP wishes to assert privilege and withhold information, . . . [t]he Court has already rejected any suggestion that requirements for logging documents covered by the First Amendment privilege differs from documents covered by other privileges. Accordingly, we are not amenable to blanket privilege assertions rather than the production of an appropriate privilege log for any materials that AZ GOP is withholding that are responsive to the Subpoena."]; *id.* at 3 [April 25, 2023 email: "Please confirm . . . that AZ GOP will complete its production by May 19, and provide a privilege log for any materials it is withholding."].) In the July 2023 order, the Court once again reiterated the necessity of such a log. (Docs. 236, 239.) Finally, one day after the August 7, 2023 compliance deadline, the RPA for the first time produced a First Amendment privilege log. (Doc. 244-2.) That same day, Plaintiffs raised various concerns with the sufficiency of the log, offered to engage in further meet-and-confer discussions, and even offered the RPA another opportunity to "immediately . . . provide a compliant privilege log for materials that [the RPA] has a legitimate and good faith basis to withhold." (Doc. 244-1 at 2-3.) It is difficult to see what more Plaintiffs could have done to meet and confer on this issue.[8]

Similarly, as for the attorney-client privilege log, the RPA first produced such a log

---

[8]  The RPA cites *Markson v. CRST Int'l, Inc.*, 2021 WL 4027515 (C.D. Cal. 2021), to support its argument that Plaintiffs failed to meet and confer. In *Markson*, the deficiencies

in January 2023.  (Doc. 228-1 at 14.)[9]  Shortly thereafter, Plaintiffs pointed out that the log was "not compliant . . . because it does not provide sufficient information about the nature of the withheld emails, their general subject matter, or the reason why attorney-client or work-product privilege might apply."  (*Id.* at 12.)  Plaintiffs cited an array of authorities supporting their claim of insufficiency, asked the RPA to "[p]lease let us know by Feb 8 whether [you] will provide a supplemental privilege log that complies with the Court's Order," and advised that if the RPA was unwilling to address the deficiencies, "we'll need to raise the privilege log with the Court at this point."  (*Id.*)  On February 1, 2023, the RPA's counsel sent a response email in which he did not provide an updated version of the privilege log but offered some additional details about why a subset of the withheld documents should be considered covered by the attorney-client privilege.  (*Id.* at 10-11.) On March 6, 2023, Plaintiffs' counsel sent a response email that questioned whether one of the subsets of documents discussed in the February 1, 2023 email should be considered privileged.  (*Id.* at 9-10 ["[T]hank you for the additional details about the materials listed on the privilege log.  As to the Specht emails, it's still not clear to us how those materials could be withheld for privilege, at least in their entirety.  If you have case law that you're relying on for some type of common interest privilege that would allow ARP to assert privilege over these materials, we would certainly be willing to consider it."].)  On March 9, 2023, the RPA's counsel responded by providing additional authority in support of the claim of privilege as to that subset of documents.  (*Id.* at 7-8.)  Finally, on August 8, 2023, the RPA produced another version of an attorney-client privilege log.  (Doc. 244-1 at 3-4 [cover email]; Doc. 244-3 [actual log].)  As discussed in more detail in Part II.D below, that version fails to cure the deficiencies and omissions that Plaintiffs first pointed out in their January 2023 meet-and-confer email.  Thus, as with the First Amendment privilege

---

in the privilege log "could have been resolved with a timely request for clarification." *Markson*, 2021 WL 4027515, at *2.  Here, the asserted deficiencies could not have been resolved through a simple clarification request—the parties are at an impasse over fundamental disagreements regarding the necessity and sufficiency of the RPA's privilege logs.

[9]     It does not appear that this version of the RPA's attorney-client privilege log is in the record.  Instead, it is simply cross-referenced in an email.  (Doc. 228-1 at 14.)

log, it is difficult to see what more Plaintiffs could have done to meet and confer.

Third, in a related vein, further conferral attempts here would have been futile. The current motion to compel marks Plaintiffs' third attempt to compel the RPA to comply with a subpoena that Plaintiffs served over 21 months ago. Since then, the RPA has repeatedly stated that it does not believe it should be required to provide the additional information Plaintiffs contend is lacking. (Doc. 239 at 26 [July 17, 2023 hearing transcript]; Doc. 244-1 at 3-4 [RPA's August 8, 2023 email].) Ordering the parties to continue conferring about these issues would thus be an exercise in futility—the parties are at an impasse and require a ruling. *SiteLock LLC v. GoDaddy.com LLC*, 2023 WL 3344638, *17 (D. Ariz. 2023) ("[I]t seems unlikely that further conferral efforts about the scheduling issues would be productive without further guidance from the Court. Thus, judicial economy weighs in favor of resolving both motions on the merits.").

II.    Sufficiency Of Privilege Assertions

A.    **Legal Standard**

Under Rule 26(b)(5)(A) of the Federal Rules of Civil Procedure:

> When a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party must: (i) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim.

*Id.*

The customary way of asserting a privilege claim is through the preparation of a privilege log. *See, e.g., Apple Inc. v. Samsung Elec. Co., Ltd.*, 306 F.R.D. 234, 237 (N.D. Cal. 2015) ("The party asserting the privilege bears the burden of establishing all necessary elements. . . . The most common way to do this is with a privilege log."). To be clear, a privilege log is not always the only way to raise a privilege claim. *See, e.g., Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Ct. for Dist. of Mont.*, 408 F.3d 1142, 1147-49 (9th Cir. 2005) (noting that "[t]his circuit has held that a privilege log is *sufficient* to properly assert the privilege, without explicitly holding that it is *necessary*"); *In re Grand Jury*

*Investigation*, 974 F.2d 1068, 1071 (9th Cir. 1992) ("We have previously recognized a number of means of sufficiently establishing the [attorney-client] privilege, one of which is the privilege log approach."); *Apple*, 306 F.R.D. at 237 ("[C]laims of privilege may pass muster despite an inadequate privilege log").  *See generally* 1 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 26, at 868-69 (2022) ("Claims of privilege can come in many different shapes and sizes, and what qualifies as an appropriate identification or justification will vary depending on the circumstances. . . .  [I]t has become conventional to prepare a privilege log when documents are withheld.  But that does not mean that privilege logs are always required. . . .  At bottom, any method of identifying what was withheld and justifying the claim will be sufficient if it serves the purposes underlying Rule 26(b)(5).").  However, in the context of First Amendment privilege claims, the Ninth Circuit has held that a privilege log is required.  *Perry v. Schwarzenegger*, 591 F.3d 1147, 1153 n.1 (9th Cir. 2010) ("The district court also observed that Proponents had failed to produce a privilege log required by Federal Rule of Civil Procedure 26(b)(5)(A)(ii).  We agree that some form of a privilege log is required and reject Proponents' contention that producing any privilege log would impose an unconstitutional burden.").

## B.    **The Parties' Arguments**

Plaintiffs argue that the RPA's privilege logs are inadequate because "[n]either . . . contains the information needed for the Court or Plaintiffs to 'evaluate the claim of privilege' for the individual documents."  (Doc. 253 at 3, 5, cleaned up.)  Regarding the First Amendment privilege log, Plaintiffs argue that it "lists only (1) a 'control number,' (2) various date-related fields, (3) the file extension, and (4) the search terms on which the documents hit."  (*Id.* at 5.)  Accordingly, Plaintiffs argue that the log "provides the Court and Plaintiffs with *no* additional germane information beyond what was available when the RPA categorically refused to comply with the subpoena."  (*Id.* at 5-6.)  Plaintiffs further argue that the RPA's failure to conduct "any actual review" of the withheld documents undermines any claim of privilege because "the RPA apparently has not determined if

emails exist within the broad set of documents that are between the RPA and individuals who do not necessarily share the RPA's mission.  Such emails would not be subject to the First Amendment Privilege, but neither the Court nor Plaintiffs can determine whether such documents have been withheld through the facially delinquent logs that the RPA has produced."  (*Id.* at 6.)  Similarly, Plaintiffs argue that RPA's attorney-client privilege log is insufficient because "[it] omits email subject lines, file names, any description of the documents, and fails to identify the specific privilege being asserted."  (*Id.* at 5.)  Plaintiffs conclude: "In sum, the RPA's privilege logs fall far short of providing the details required for the Court and Plaintiffs to adequately determine whether the RPA's privilege claims have merit."  (*Id.* at 8.)

In response, the RPA argues that "there is no dispute that [the RPA] produced privilege logs" and "Plaintiffs are apparently dissatisfied with the contents of the privilege log without telling [the RPA] why."  (Doc. 256 at 6.)  More broadly, the RPA argues that its First Amendment privilege log should be deemed adequate because (1) "[it] expressly stated that the documents were subject to the First Amendment privilege"; (2) "[it] described the type of document by including the file extension"; (3) "[it] also included the internal control number so the document could be easily identified in [the RPA]'s ediscovery platform, the date of the document, and the search term(s) the documents were associated with"; and (4) "[a]ny additional information would reveal information that is protected under the First Amendment."  (*Id.* at 6-7.)  Regarding the attorney-client privilege log, the RPA argues, albeit with less than ideal clarity, that such a log only requires "a general description such as 'providing legal advice to client' [to] describe[] the contents of the communication."  (*Id.* at 7.)

In reply, Plaintiffs reiterate their contention that the RPA's First Amendment and attorney-client privilege logs are both inadequate.  (Doc. 261 at 2-7.)  Regarding the First Amendment privilege log, Plaintiffs restate their argument that "[t]he RPA's privilege logs are so bare in substance that a ruling that they are adequate . . . would in effect allow a blanket assertion of privilege."  (*Id.* at 4.)  Plaintiffs also argue that "[t]he RPA's assertion

that 'the privilege does not arise out of the nature of the documents withheld' is baseless"
because Ninth Circuit law "expressly considered the nature of the withheld documents."
(*Id.* at 3, internal citation omitted.)  Plaintiffs further contend that "[t]he RPA does not cite
any cases that support its position that its privilege logs are adequate, and instead resorts
to [mischaracterizing] the decisions that Plaintiffs cited." (*Id.* at 5.)  Regarding the
attorney-client privilege log, Plaintiffs argue that "the RPA musters hardly any argument
as to why its attorney-client privilege log is compliant with Ninth Circuit law." (*Id.* at 6.)

### C. First Amendment Privilege Log

As noted, the Ninth Circuit has held that "some form of a privilege log is required"
to assert a valid claim of First Amendment privilege.  *Perry*, 591 F.3d at 1153 n.1.  Thus,
the analysis here turns on whether the RPA's First Amendment privilege log (Doc. 244-2)
supplies the information required by Rule 26(b)(5)(A)(ii)—that is, whether the privilege
log "describe[s] the nature of" the withheld documents "and do[es] so in a manner that,
without revealing information itself privileged or protected, will enable other parties to
assess the claim." *See also Point Ruston, LLC v. Pac. Nw. Reg'l Council of United Bhd.
of Carpenters & Joiners of Am.*, 2009 WL 3190361, *1 (W.D. Wash. 2009) ("The Court
expects that JWJ will . . . not use this privilege log as an opportunity to assert privilege on
a wholesale basis.  Instead, the Court expects JWJ to use the privilege log to dutifully
inform Plaintiffs as to what documents or other requested materials JWJ believes are
protected under privilege, whether it be associational or otherwise."); *In re Motor Fuel
Temperature Sales Pracs. Litig.*, 258 F.R.D. 407, 420 (D. Kan. 2009), *rev'd in part on
other grounds*, 707 F. Supp. 2d 1145 (D. Kan. 2010) ("Although the court has determined
that certain categories of documents are protected from disclosure by the First Amendment,
it is clear defendants are withholding documents that do not fall under the limited privilege
recognized in this order.  The court is not satisfied with the current privilege logs prepared
by defendants.  With respect to documents in the possession of defendants, many
defendants have provided only categorical privilege logs that do not 'describe the nature
of the documents' being withheld and consequentially, do not permit plaintiffs to 'assess

1   the claim' of privilege.") (citations omitted).

2       To conduct that evaluation, it is necessary to identify the kinds of information and

3   documents that the First Amendment privilege might (and might not) cover.  Under Ninth

4   Circuit law, "[t]he party asserting the privilege must demonstrate a prima facie showing of

5   arguable first amendment infringement.  This prima facie showing requires [the privilege

6   proponent] to demonstrate that enforcement of the discovery requests will result in (1)

7   harassment, membership withdrawal, or discouragement of new members, or (2) other

8   consequences which objectively suggest an impact on, or chilling of, the members'

9   associational rights."  *Perry*, 591 F.3d at 1160 (cleaned up).  "The existence of a prima

10  facie case turns not on the type of information sought, but on whether disclosure of the

11  information will have a deterrent effect on the exercise of protected activities."  *Id.* at 1162.

12  In *Perry*, the Ninth Circuit identified several examples of the sort of information whose

13  disclosure might have such a deterrent effect.  *Id.* at 1161-64.  Those examples include "the

14  identities of rank-and-file members" of a political organization, "the views expressed and

15  ideas advocated at political party meetings," "statements of a highly sensitive and political

16  character made at union membership meetings," "internal campaign information,"

17  "contributions to candidates and political parties," "internal communications and

18  evaluations about advocacy of [trade associations'] members' positions on contested

19  political issues," and "internal campaign communications."  *Id.* (cleaned up).  *See also*

20  *Americans for Prosperity Foundation v. Bonta*, 141 S. Ct. 2373, 2382 (2021) ("We have

21  held . . . that the freedom of association may be violated where a group is required to take

22  in members it does not want, where individuals are punished for their political affiliation,

23  or where members of an organization are denied benefits based on the organization's

24  message.  We have also noted that it is hardly a novel perception that compelled disclosure

25  of affiliation with groups engaged in advocacy may constitute as effective a restraint on

26  freedom of association as other forms of governmental action.") (cleaned up).

27       The common denominator among *Perry*'s examples of potentially privileged

28  information is that all involve internal communications or information otherwise held in

confidence within a political party or association.  *See, e.g., La Union Del Pueblo Entero v. Abbott*, 2022 WL 17574079, *8 (W.D. Tex. 2022) ("*Perry* and its progeny have all dealt with the disclosure of either the identity of association members or internal communications—not communications with third parties."); *Ohio A. Philip Randolph Institute v. Householder*, 2019 WL 3288170, *4 (S.D. Ohio 2019), *vacated as moot sub nom. Ohio A. Philip Randolph Inst. v. Obhof*, 802 F. App'x 185 (6th Cir. 2020) ("Although [the leading Supreme Court and lower-court decisions on the First Amendment privilege] consider the speech and association chilling effects of the disclosure of membership or donor lists, *Perry* expands that analysis to encompass the disclosure of internal communications."); *Dunnet Bay Constr. Co. v. Hannig*, 2011 WL 5417123, *3 (C.D. Ill. 2011) ("The First Amendment privilege from disclosure in discovery has been extended to protect against the disclosure of the identity of members and the content of internal communications between members, employees, and agents of political campaigns.") (citations omitted).  Indeed, *Perry* emphasized that its conclusions were derived "from cases that have recognized the right of associations to be free of infringements in their *internal affairs*."  591 F.3d at 1162 n.9 (emphasis added).[10]  Thus, courts have held that a political party or other organization may not invoke the First Amendment privilege to thwart discovery of its external communications with government officials or other third parties.  *See, e.g., Sol v. Whiting*, 2013 WL 12098752, *3 (D. Ariz. 2013) ("*Perry* and its progeny have all dealt with the disclosure of either the identity of association members or internal communications—not communications with third parties, let alone public officials. . . .  [T]he communications Plaintiffs seek are not internal communications, but rather communications between Movants and public officials.  The Court finds that the First Amendment privilege, as described in *Perry*, does not apply to the information Plaintiffs seek through discovery."); *La Union Del Pueblo Entero*, 2022 WL 17574079 at

---

[10]     The RPA, too, seems to acknowledge this point in portions of its response brief.  (Doc. 256 at 10, emphasis added ["Federal courts have consistently held that disclosure of *internal associational activities* (i.e., membership lists, volunteer lists, financial contributor lists, and past political activities of members) satisfies this *prima facie* showing because disclosure of these associational activities chills freedom of association."].)

*8 ("The Defendant Intervenors' communications with third-party organizations are not protected by the First Amendment privilege of association.  The Court will not presume that a protected associational relationship exists between a party and every other person or entity with whom they share common beliefs or goals.  Indeed, such an expansive view of the associational privilege would swallow the discovery process altogether."); *Fla. State Conf. of Branches & Youth Units of NAACP v. Lee*, 568 F. Supp. 3d 1301, 1307 (S.D. Fla. 2021) ("Here, Heritage has failed to make the required prima facie showing of infringement of its First Amendment associational privilege.  First, Plaintiffs do not seek to reveal the identities of any Heritage members or donors.  As such, the subpoenas do not seek disclosure of the information typically covered by the associational privilege.  Moreover, Heritage has failed to demonstrate how disclosure of the specific information Plaintiffs request—Heritage's external communications with government officials related to Senate Bill 90—would subject its members to 'threats, harassment, or reprisals' from the Government or private individuals.") (internal citation omitted); *Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*, 2016 WL 5922315, *7 (W.D. Tex. 2016) ("[W]hile citizens plainly have a right to communicate with public officials on a matter of public concern, that does not mean they have a right to protect these communications from public view.  This, however, is effectively what the TPSA contends—that there is a First Amendment right not only to lobby the government, but to do so secretly.") (cleaned up).[11]

    With these principles in mind, the sufficiency of the RPA's First Amendment privilege log does not present a close question.  Again, the test under Rule 26(b)(5)(A)(ii)

---

[11] The Court notes that the legislative privilege, which is not implicated here, operates in a different manner.  (Doc. 237 at 7 [concluding that Arizona legislators could assert claims of legislative privilege even "in relation to communications with third parties outside of the legislature"].)  The Court also notes that it has located one case concluding that the First Amendment privilege may potentially cover an association's external communications.  *In re Kincaid*, 2023 WL 5933341, *6 (D.D.C. 2023).  Not only is that conclusion difficult to reconcile with *Perry*, *Sol*, and the other authorities cited above, but *Kincaid* ultimately concluded that the proponent's First Amendment privilege claim failed under the second step of the privilege analysis.  *Kincaid*, 2023 WL 5933341 at *7-8 ("While NRRT does have a First Amendment interest in its internal and external communications and operations, this interest is outweighed by the LULAC Plaintiff's substantial need for the requested discovery.") (cleaned up).

is whether the log describes the nature of the withheld documents "in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the [privilege] claim." *Id.*  The RPA's privilege log fails to satisfy this standard because it provides no information whatsoever about the contents of the 61,298 withheld documents or the identity of the creator/sender/recipient of each withheld document.  Instead, the log simply provides certain internal tracking numbers created by the RPA's e-discovery vendor and then identifies the type of file, the date the file was last modified (and, in the case of emails, the date the email was sent), and the keyword search terms associated with each file.  (Doc. 244-2, cleaned up.)  Although the keywords provide some possible clues as to the contents of each withheld document, it is still impossible to tell, from the limited information the RPA has chosen to provide, whether a particular withheld document involves, for example, an internal communication regarding S.B. 1485 (*i.e.*, information presumptively covered by the First Amendment privilege per *Perry*) or an external communication between one of the RPA's custodians and a third party (*i.e.*, information not covered by the First Amendment privilege per *Sol*, *La Union Del Pueblo Entero*, *Lee*, and *Wal-Mart*).  As a result, both Plaintiffs and the Court are left without any meaningful way to evaluate whether the RPA has met its initial burden of establishing that each of the 61,298 withheld documents is even potentially covered by the privilege.

In reaching this conclusion, the Court acknowledges that some of the information sought in Plaintiffs' subpoena could implicate the First Amendment privilege.  For example, RFP No. 1 seeks "[a]ll Documents and Communications related to SB 1485 . . . [including] any analysis of whether SB 1485 . . . would impact particular groups of voters more than others."  (Doc. 156-1 at 15.)  If any of the 61,298 withheld documents involve internal RPA communications on that topic, the RPA would undoubtedly be able to make the required step-one showing as to those documents.  *Cf. Apple Inc. v. Match Group, Inc.*, 2021 WL 3727067, *8 (N.D. Cal. 2021) ("Turning over the Coalition's internal communications to Apple—its public policy opponent—would chill any further participation in the organization.  Who in their right mind would want to participate in a

public advocacy organization, knowing that all their internal communications about strategy, lobbying, planning, and so on, would be turned over to their principal opponent?").  The Court is highly attuned to this dynamic and went out of its way to emphasize this point in the October 2022 order resolving the parties' first subpoena-related dispute.  (Doc. 184 at 42 ["The Court recognizes there is a significant risk of abuse when a political party attempts to use a Rule 45 subpoena to gather materials, including internal analyses with potential competitive ramifications, from an opposing political party."].)  However, RFP No. 1 is not limited to internal communications, and if the withheld documents involve external communications between the RPA's custodians and third parties, there would be no potential claim of First Amendment privilege.  Indeed, several of the other RFPs explicitly seek external communications on various topics.  For example, RFP No. 3 seeks various categories of communications "between [the RPA] and Executive Branch officials (including without limitation the Governor, Secretary of State, and Attorney General), their employees or campaign staff, federal or state legislators, county election officials, or any other public officials" and RFP No. 11 seeks various categories of communications "between [the RPA] and third-party organizations, including but not limited to the Heritage Foundation."  (Doc. 156-1 at 15-16.)

These observations, again, illustrate why the RPA's First Amendment privilege log is invalid.  The RPA is effectively arguing that any document that might be responsive to Plaintiffs' subpoena is therefore covered by the First Amendment privilege, such that it does not even need to review the 61,298 documents generated by its keyword searches.  But this approach ignores the nuanced manner in which the First Amendment privilege operates.  As other courts have recognized, political parties and other associations "are not entitled to assert a blanket privilege by virtue of their status as associations. . . .  [T]he associational privilege is limited . . . [so] assertions of privilege must be specifically asserted on a document-by-document basis."  *La Union Del Pueblo Entero*, 2022 WL 17574079 at *9 (cleaned up).  The RPA's failure to do so here means it has not met its

1   burden under the first step of the *Perry* framework.[12]

2       Although the privilege analysis need not go any further in light of that conclusion,

3   the Court also notes that the boilerplate nature of the RPA's First Amendment privilege

4   log makes it impossible to complete the second step of the *Perry* inquiry, which would

5   require the Court to determine whether Plaintiffs can "demonstrate a sufficient need for the

6   discovery to counterbalance [any First Amendment] infringement."  591 F.3d at 1164.

7   Although the RPA might very well be able to muster strong arguments as to why it should

8   be allowed to withhold certain documents, its failure to provide any information about the

9   contents and nature of each withheld document precludes the Court from performing the

10  sort of analysis the second step requires.  *La Union Del Pueblo Entero*, 2022 WL 17574079

11  at *8 ("Even assuming the seriousness of the chilling effects on Defendant Intervenors'

12  First Amendment rights, the Court must determine whether Private Plaintiffs have borne

13  their burden under *Perry*.  Private Plaintiffs must establish a substantial need for the

14  withheld documents that outweighs the intrusion into the Defendant Intervenors'

15  constitutional rights.  Evaluating whether this burden has been met requires a document-

16  by-document approach because the relevance and need for the document clearly depend on

17  the contents of the document itself.") (citation omitted); *Kincaid*, 2023 WL 59333341 at

18  *7 ("While NRRT does have a First Amendment interest in its internal and external

19  communications and operations, this interest is outweighed by the LULAC Plaintiff's

20  substantial need for the requested discovery.") (cleaned up).

21      Nor is there any merit to the RPA's argument that it would have been impossible to

22  prepare a more detailed First Amendment privilege log without revealing the information

23  whose disclosure could lead to a chilling effect.  Although Rule 26(b)(5) makes clear that

24  a privilege proponent need not "reveal[] information" that is "itself privileged or protected"

25  in the course of asserting a privilege, this does not justify what the RPA did here, which is

---

12      The Court also notes that the RPA has not provided, in its briefs to this Court or in its correspondence with Plaintiffs, the sort of information that would be necessary to substantiate a claim of First Amendment privilege under *Perry*.  Thus, even if it were possible (contrary to *Perry*) to assert a claim of First Amendment privilege without a First Amendment privilege log, the analysis and outcome here would be the same.

make a categorical privilege assertion as to 61,298 documents—which, again, the RPA itself has not even reviewed—without providing any information that would enable the Court and Plaintiffs to evaluate the validity of the privilege claim.  "[B]oilerplate objections or blanket refusals . . . are insufficient to assert a privilege." *Burlington Northern*, 408 F.3d at 1149.  *See also The Ohio Organizing Collaborative v. Husted*, 2015 WL 7008530, \*4 (S.D. Ohio 2015) ("[A]lthough plaintiffs have established a First Amendment associational privilege, the mere invocation of that privilege does not shield the Democratic Party from the requirements of Rule 26(b)(5). . . .  Plaintiffs concede that they failed to produce a privilege log, but argue that to do so would be tantamount to an infringement on their First Amendment rights because '[a] privilege log would disclose the identities of Plaintiffs' supporters and those with whom they communicate about their plans, strategies and goals.' This Court disagrees.  The Rule expressly contemplates a privilege log that does not disclose the 'privileged or protected' information.  The Democratic Party must, therefore, produce a privilege log that, without divulging the privileged information, refers to each document withheld (or category of documents withheld) and includes sufficient information to justify the invocation of the privilege.") (citations omitted).

In a related vein, there is no merit to the RPA's assertion that "stating the to and from would reveal the members associated with the [RPA]."  (Doc. 256 at 7.)  This argument fails to account for the fact that Plaintiffs have agreed to limit the production to four RPA custodians whose identities and association with the RPA are already a matter of public record.  (Doc. 239 at 6-7; Doc. 228 at 3 n.4 ["On December 5, 2022, Plaintiffs agreed that the RPA could focus its initial search efforts on its four permanent employees, and, while reserving all rights, did not insist on expansive searches of the custodial files maintained by RPA's Executive Committee, temporary employees, and precinct-level committee staff in the first instance."]; Doc. 228-1 at 27 [RPA's November 2022 email: "We'd like to confirm that it is sufficient for the AZGOP to search only the email accounts for its 4 'permanent' staff during the relevant time period, who are: Chair Kelli Ward, (former) Executive Director Greg Safsten, Communications Director Zach Taylor, and

1   Shia Grooman (whose role is essentially 'office manager').").]13

2   Accordingly, the RPA's First Amendment privilege log is insufficient under Rule

3   26(b)(5) and the RPA has therefore failed to justify its withholding of any of the 61,298

4   documents pursuant to the First Amendment privilege.

5          **D.**    **Attorney-Client Privilege Log**

6   As discussed in Part II.A above, the preparation of a privilege log is one way (albeit

7   not the only way) to justify the withholding of responsive documents pursuant to the

8   attorney-client privilege.  The Ninth Circuit has held that an attorney-client privilege log is

9   sufficient where it identifies, for each withheld document, "the attorney and client

10  involved," "the nature of the document," "all persons or entities shown on the document to

11  have received or sent the document," "the date the document was generated, prepared, or

12  dated," and "information on the subject matter of each document."  *In re Grand Jury*

13  *Investigation*, 974 F.2d at 1071.  *See also MJG Enterprises, Inc. v. Cloyd*, 2012 WL

14  12964345, *2 (D. Ariz. 2012) ("[A] 'privilege log'. . . generally must include the following

15  information for each document: (1) the author(s); (2) the nature or type of document; (3)

16  the names of all individuals who were shown, sent, received, or informed of the substance

17   

18                      

---

13      Additionally, if any of the withheld communications involve internal communications between one of the specified custodians and other RPA members whose associations with the RPA are not a matter of public record, the RPA could have potentially used redactions or other anonymization techniques in its privilege log to shield those individuals' identities from public disclosure.  *See, e.g., Columbia Mut. Ins. Co v. Baloru Enterprises, LLC*, 2023 WL 2829686, *5 (N.D. Okla. 2023) ("Columbia may have an argument that . . . the names of the persons its litigation counsel chose to interview could also reveal protected work product.  This does not, however, excuse Columbia from providing a privilege log in these circumstances.  Rule 26 specifically provides that the privilege log must describe the nature of the documents 'without revealing information itself privileged or protected' while still providing enough information that the opposing party may assess the privilege claim. . . .  Even if Columbia believes the witnesses' identities are themselves work product, Columbia can provide the other information required by the local rule.") (internal citation omitted); *Jardaneh v. Garland*, 2021 WL 4169600, *6 (D. Md. 2021) (noting that "the 1993 Advisory Committee notes" to Rule 26 "explain that in 'rare circumstances some of the pertinent information affecting applicability of the claim, such as the identity of the client, may itself be privileged; the rule provides that such information need not be disclosed'") (citation omitted).  In any event, that the RPA instead chose to disclose the names of individual RPA members (beyond the four custodians) in its attorney-client privilege log undermines any suggestion that the RPA views the disclosure of such names as creating an impermissible chilling effect.

of the document; (4) the date of the document; and (5) the subject matter of the document.").

The RPA's attorney-client privilege log (Doc. 244-3) does not contain all of these categories of information.  More specifically, the RPA's attorney-client privilege log provides, for each logged document, the following categories of information: (1) the "MasterDate"; (2) for emails, the date the email was sent; (3) the "last modified date"; (4) for emails, the sender and recipient(s) of the email, including cc'd recipients; (5) the type of file (*i.e.*, Word document, .pdf file, Excel file, website, or email); (6) a field entitled "AC/WP Priv," the apparent purpose of which is to note that a law firm's domain name is associated with the withheld document in some unspecified way;[14] and (7) the keyword search terms associated with each document.  (Doc. 244-3.)[15]  Notably absent from this list is any description of the subject matter of each withheld document.  As with the First Amendment privilege log, although the keyword field perhaps provides some ability to speculate about the subject matter of a particular withheld document, this is no substitute for the required subject-matter description.  *See, e.g., Norton v. Arpaio*, 2016 WL 11513612, *1 (D. Ariz. 2016) ("Maricopa County identified the date, the sender and the recipient of the email, the agency the sender or recipient worked for, and the privilege asserted . . .  [but] the privilege log lacks any information regarding the subject matter of the documents. . . .  [Thus], Plaintiffs are unable to assess the documents and challenge the withholding of specific documents.") (citations omitted); *Saud v. State of California*, 2016 WL 2927591, *3 (E.D. Cal. 2016) ("Here, the privilege log provides little information other than authorship or receipt of the emails by in-house counsel.  The descriptions of the documents are too brief to permit determination whether they involve legal advice.");

---

[14]     In the cover email to which the attorney-client privilege log was attached, the RPA's counsel explained: "[T]he second privilege log attached lists all emails in which there was a 'hit' but a law firm's domain was in the to/from/cc fields."  (Doc. 244-1 at 4.)  As explained in further detail in the body of this order, counsel's explanation on this point is at best incomplete.  Many of the withheld documents are not emails, and in many instances, there is no "to/from/cc" information provided for such documents.  In those instances, the source of the information appearing in the "AC/WP Priv" column is unclear.

[15]     The log also identifies, in the first two columns, the tracking numbers created by the RPA's e-discovery vendor.  (Doc. 244-3.)

*Johnson v. Ford Motor Co.*, 309 F.R.D. 226, 234 (S.D.W. Va. 2015) ("Ford's privilege log does not comply with Rule 26(b)(5)(A) because it fails to provide any concrete facts about the nature or subject matter of the withheld documents, which would allow an individual reviewing the log to assess the appropriateness of the privilege claim.").

To be clear, the document descriptions in a privilege log need "not [be] sufficient to make a confident ruling on whether the privilege claims are valid." *S.G.D. Eng'g, Ltd. v. Lockheed Martin Corp.*, 2013 WL 2297175, *12 (D. Ariz. 2013). For example, the Court previously determined that a log that "expressly invoked the attorney-client privilege ('Nature of Privilege: A/C Privilege'), described the nature of the document (*e.g.*, 'Draft Memorandum from Phil McLaughlin, dated October 11, 2018'), and provided enough information about the nature of the document to enable Plaintiff to assess the privilege assertion (e.g., 'discussing legal advice regarding [Employee's] performance issues')" was sufficiently detailed to satisfy Rule 26(b)(5). *Miller v. Arizona Pub. Serv. Co.*, 2020 WL 5880143, *3 (D. Ariz. 2020). Even less detail can suffice so long as the log makes clear that the withheld communications occurred between an attorney and client and involved the confidential provision or solicitation of legal advice. *See, e.g.*, *S.G.D. Eng'g, Ltd.*, 2013 WL 2297175 at *10 (describing the following as sufficient: "Redacted email from Rock Groupe to Barry Hennegan, Esq. re request for legal advice, and email from Rock Groupe which includes contents of communications from Barry Hennegan, Esq. to Rock Groupe").

Nevertheless, the RPA's attorney-client privilege log fails to meet the low bar of sufficiency because it does not include enough information for the Court or Plaintiffs to understand the RPA's basis for asserting the privilege as to any particular document. As an initial matter, the log does not clearly identify whether each withheld document involves a communication between an attorney and client. For non-email entries, the log lacks any reference to the senders and recipients of those files. (Doc. 244-3.) For email entries, it's not always clear that an email exchange involved a confidential communication between a client and attorney. (*See, e.g., id.* at 9 [email sent on 11/29/2020 between two non-parties whose email addresses do not indicate they are members of the RPA, where two of the "cc"

recipients are identified as an RPA member and a member of the law firm representing the RPA in this matter].)  These details are potentially significant in light of "the settled rule that any voluntary disclosure of information to a third party waives the attorney-client privilege, regardless of whether such disclosure later turns out to be harmful."  *United States v. Ruehle*, 583 F.3d 600, 612 (9th Cir. 2009).  *See also In re Pacific Pictures Corp.*, 679 F.3d 1121, 1126-27 (9th Cir. 2012) ("[V]oluntarily disclosing privileged documents to third parties will generally destroy the privilege.").  Separately, and more important, the absence of any information about the subject matter of any of the withheld communications makes it impossible to conduct any meaningful evaluation of the RPA's privilege assertion.  *See, e.g., Norton*, 2016 WL 11513612 at *1; *Saud*, 2016 WL 2927591 at *3; *Johnson*, 309 F.R.D. at 234; *Morgan Hill Concerned Parents Ass'n v. California Dep't of Educ.*, 2017 WL 445722, *9 (E.D. Cal. 2017) ("[T]he logs did not indicate whether either the sender or recipient was an attorney or a client.  They did not indicate what was the subject of the communication, and instead simply reprinted the subject line of the email.  Incredibly, the subject line itself was often redacted, making it impossible to know what the email was about.").

One final point underscores why the RPA's attorney-client privilege log could not possibly be deemed sufficient here.  In the cover email to which the privilege log was attached, the RPA's counsel admitted that because the RPA had not actually reviewed all of the withheld documents, "there may be items listed on the separate attorney-client privilege log which are not in fact subject to privilege."  (Doc. 244-1 at 4.)  It is difficult to understand how the Court could make a finding of sufficiency under these circumstances.

Accordingly, the Court concludes that the RPA's attorney-client privilege log is insufficient under Rule 26(b)(5).  Additionally, although a privilege log is not the only way to assert the attorney-client privilege, the RPA has not (except for a few isolated examples discussed in further detail in Part III.D below) provided additional information in its briefs or elsewhere that might remedy the omissions identified above.

…

III.   <u>Waiver</u>

A.   **Legal Standard**

The Ninth Circuit has declined to adopt "a *per se* rule that failure to produce a privilege log in a timely manner triggers waiver of privileges." *Burlington Northern*, 408 F.3d at 1147.  Instead,

> a district court should make a case-by-case determination, taking into account the following factors: the degree to which the objection or assertion of privilege enables the litigant seeking discovery and the court to evaluate whether each of the withheld documents is privileged (where providing particulars typically contained in a privilege log is presumptively sufficient and boilerplate objections are presumptively insufficient); the timeliness of the objection and accompanying information about the withheld documents (where service within 30 days, as a default guideline, is sufficient); the magnitude of the document production; and other particular circumstances of the litigation that make responding to discovery unusually easy . . . or unusually hard.  These factors should be applied in the context of a holistic reasonableness analysis, intended to forestall needless waste of time and resources, as well as tactical manipulation of the rules and the discovery process.  They should not be applied as a mechanistic determination of whether the information is provided in a particular format.  Finally, the application of these factors shall be subject to any applicable local rules, agreements or stipulations among the litigants, and discovery or protective orders.

*Id.* at 1149.  *See also* Gensler, *supra*, Rule 26, at 875-76 ("Rule 26(b)(5) does not specify the consequence of failing to make or perfect a timely and sufficient claim of privilege or work-product protection.  The Advisory Committee notes suggest that waiver might be one such consequence [but] . . . [m]ost courts take a flexible approach . . . .  In determining what action to take, courts look at many factors including how much information was provided in a timely fashion, the scope of discovery, the nature and length of the delay, and any other issues going to fairness.").

B.   **The Parties' Arguments**

Plaintiffs argue that "[a]ll four [*Burlington Northern*] factors weigh in favor of a finding of waiver."  (Doc. 253 at 7-10.)  More specifically, Plaintiffs argue that the first factor supports waiver because the RPA's "blanket" and "boilerplate" "assertions of

privilege completely deprive both the Court and Plaintiffs of the ability to determine the validity of the assertions" (*id.* at 7-8); that the second factor supports waiver because "[t]he RPA has had nearly 20 months to support its assertions of privilege" yet "has continually failed to do so" (*id.* at 9); that the third factor, despite being "unclear on its face," supports waiver because "[t]he RPA cannot use its refusal to identify the responsive documents to argue that the magnitude of production is too high to justify waiver" or at a minimum "is outweighed by the other factors" (*id.* at 10); and that the fourth factor supports waiver because "[t]he particular circumstances of this case therefore make clear that responding to Plaintiffs' requests would have been straightforward" (*id.* at 10-11).   Plaintiffs emphasize that (1) "the RPA has had 20 months to identify responsive documents and make proper assertions over privileged documents"; (2) "the RPA has failed to point to any unusual factors that would make it unduly burdensome to respond to Plaintiffs' requests"; (3) "at an earlier stage, Plaintiffs expressed a willingness to consider an attorneys'-eyes-only arrangement, which would further simplify the discovery process"; and (4) "[i]t was the RPA's choice to not pursue this in any manner until 4:30 PM the day compliance with the Court's July 17, 2023 Order was due."  (*Id.*, citation omitted.)

In response, the RPA argues that "[t]here is nothing in the record that [the RPA] has intentionally relinquished its rights or privileges in this case."  (Doc. 256 at 11-12.)  The RPA contends that Plaintiffs' reliance on *Burlington Northern* is misplaced because that case "does not discuss the First Amendment privilege—it only discusses the attorney-client privilege.  Plaintiffs did not cite a single case in which a court had determined that the First Amendment privilege was waived based on an insufficient privilege log."  (*Id.* at 12.) Further, the RPA argues that "[g]iven the concerns that give rise to the First Amendment privilege . . . it would seriously undermine constitutional protections if a political organization engaging in protected activity risked compelled disclosure of protected information by advancing a highly curated portion of its message to the public outside the context of litigation.   In such a case, a broad finding of waiver would be clearly inappropriate." (*Id.* at 9, citations omitted.)  Finally, the RPA contends that "[i]f the Court

intends to grant Plaintiffs' Motion to Compel, it should only order [the RPA] to produce the approximately 5,000 documents" that the RPA has subsequently deemed responsive through the use of artificial intelligence ("AI") tools.  (*Id.* at 4.)

In reply, Plaintiffs argue that "[t]he RPA does not meaningfully respond to Plaintiffs' argument that the RPA's continued failure to comply with the Court's orders and provide adequate privilege logs has resulted in waiver of its privilege assertions." (Doc. 261 at 6, internal citation omitted.)   Regarding the First Amendment privilege, Plaintiffs contend that the *Burlington Northern* waiver test applies to "all privilege claims, not solely the attorney-client privilege." (*Id.* at 7.)  Regarding the attorney-client privilege, Plaintiffs argue that "the RPA puts forward no argument as to why it should not be found to have waived the putative assertions of privilege on its attorney-client privilege log based on the patent insufficiency of that log." (*Id.* at 7 n.4.)  Plaintiffs also argue that the Court should reject the RPA's AI proposal because it was offered "only after missing the Court-ordered August 7 deadline" and "the RPA has offered no affidavit or explanation as to how it applied AI technology to filter these documents, nor has it explained how it can be certain that the remaining documents are irrelevant." (*Id.* at 9 & n.5.)

C.   **First Amendment Privilege**

1.   Threshold Considerations

As an initial matter, the Court agrees with Plaintiffs that the *Burlington Northern* test for waiver is not limited to the attorney-client privilege and also applies when evaluating whether a proponent has waived a claim of First Amendment privilege.  Rule 26(b)(5) broadly governs how to assert any claim of privilege, not just a claim of attorney-client privilege, and *Burlington Northern* broadly addresses how district courts should evaluate a claim of waiver arising from a failure to raise a timely, valid claim of privilege under Rule 26(b)(5).  *Burlington Northern*, 408 F.3d at 1147 ("The advisory committee notes accompanying the addition of the relevant paragraph to Rule 26(b)(5) do suggest a temporal framework for asserting privilege, and also suggest waiver as a possible result of failure to properly provide 26(b)(5) notice.").  Thus, the same waiver standards that apply

to the attorney-client privilege also apply to the First Amendment privilege.  The RPA cites no case holding otherwise.  Additionally, as discussed during oral argument, adoption of the rule proposed by the RPA would essentially mean that a party asserting a First Amendment privilege claim would never be required to attempt to substantiate its basis for claiming the privilege—it could simply continue offering deficient explanations, without consequence, until the discovery period ends.  That cannot possibly be the rule.

### 2.   Sufficiency

The first *Burlington Northern* factor (*i.e.*, "the degree to which the objection or assertion of privilege enables the litigant seeking discovery and the court to evaluate whether each of the withheld documents is privileged") essentially incorporates the Rule 26(b)(5) sufficiency analysis.  This factor favors waiver if the privilege proponent offers "'presumptively insufficient' 'boilerplate objections.'"  *Sweet v. City of Mesa*, 2022 WL 326406, *4 (D. Ariz. 2022) (quoting *Burlington Northern*, 408 F.3d at 1149).  As discussed in Part II.C above, the Court has already determined that the RPA's First Amendment privilege log amounts to an invalid boilerplate/blanket privilege assertion.  Thus, the first *Burlington Northern* factor favors waiver.

### 3.   Timeliness

The second *Burlington Northern* factor (*i.e.*, "the timeliness of the objection and accompanying information about the withheld documents") also favors a finding of waiver.  The relevant chronology is that Plaintiffs served their subpoena on the RPA in January 2022, more than 21 months ago.  During the ensuing meet-and-confer discussions, Plaintiffs repeatedly informed the RPA that it would need to create a legally compliant First Amendment privilege log if it wished to withhold any responsive documents pursuant to the First Amendment privilege.  (*See, e.g.,* Doc. 161-1 at 37-38 [February 2022 letter: "[The RPA] asserts a blanket First Amendment objection in response to each Request, and you stated during our call that [the RPA] would not produce any documents whatsoever on the basis of that objection.  Such a blanket privilege assertion is not sufficient to support a privilege claim, and as [the RPA] bears the burden of establishing any privilege exists, we

request that [the RPA] provide a privilege log for any responsive documents that [the RPA] intends to withhold so that we can consider whether such privilege assertions are appropriate.  The federal rules so require."].)  The parties then presented their dispute for judicial resolution.

In an October 2022 order—that is, more than a year ago—the Court clarified that a legally compliant First Amendment privilege log was indeed required.  (Doc. 184 at 9 ["The RPA's reliance on the First Amendment as a basis for categorically refusing to comply with the subpoena fails . . . [because] to claim this privilege, the RPA was required to provide a privilege log describing the nature of the withheld documents or communications 'in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim.'"].)  The October 2022 order also identified, as further discussed in Part II.C of this order, the problems with the RPA's attempt to assert claims of First Amendment privilege over external communications with third parties.  (*Id.* at 12-13 ["[Some] RFPs seek external communications . . . [but the] RPA makes no effort to explain why such communications could be considered privileged from disclosure under the First Amendment."].)  Nevertheless, rather than consider the question of waiver at that time, the Court simply provided the RPA with a new opportunity to create the required First Amendment privilege log.  (*Id.* at 42 ["Plaintiffs are not seeking a conclusive determination that the RPA has forfeited any claim of First Amendment privilege and acknowledge the RPA may withhold documents in response to this order by producing a privilege log."].)

During the ensuing nine-month period, it appears the RPA took no steps to complete that task.  Instead, in July 2023, Plaintiffs and the RPA presented another subpoena-related dispute for judicial resolution.  During the July 17, 2023 hearing, the RPA's counsel again questioned the need for a First Amendment privilege log.  (Doc. 239 at 26.)  The Court again rejected those arguments and again affirmed the necessity of preparing such a log.  (*Id.* at 32.)  The Court also set a firm (and long overdue) deadline of August 7, 2023 for the RPA to "produce the documents responsive to the search terms and/or disclose a

privilege log." (Doc. 236.)  When setting that deadline, the Court clarified that it was affording the RPA more time than it would ordinarily afford a party on the losing end of a motion to compel in light of the RPA's "status as a nonparty" and in an attempt to "reduce burdens" on the RPA.  (Doc. 239 at 38.)  In response, the RPA's counsel did not request more time to comply—instead, counsel simply noted that, "[i]f there's a need, we may file something else on this just because I don't know if they can do this" by the deadline.  (*Id.* at 42.)

During the ensuing compliance period, the RPA took no steps to refine its First Amendment privilege claim.  Nor did the RPA ask the Court or Plaintiffs for an extension of the deadline.  The RPA ultimately produced its First Amendment privilege log to Plaintiffs on August 8, 2023, the day after the deadline.  (Doc. 244-1 at 3-4.)  Additionally, the RPA admitted in a post-deadline email that it had not even reviewed the withheld documents before preparing the privilege log (*id.*), then claimed in another post-deadline email that nearly half of the withheld documents were actually unresponsive to the subpoena (Doc. 244-4 at 5).

Against this backdrop, it is impossible to see how the second *Burlington Northern* factor might favor the RPA.  The original compliance date for the subpoena was in February 2022 and the RPA has been on express notice since (at a minimum) October 2022 of the need to prepare a First Amendment privilege log should it wish to withhold any responsive documents based on the First Amendment privilege.  The Court eventually set an August 7, 2023 deadline for the production of that log.  This should have been ample time for the RPA to comply (and the RPA did not, at any rate, request an extension).  Nevertheless, not only did the RPA miss the August 7, 2023 deadline by a day, but the privilege log it belatedly produced is facially deficient for reasons that should have been apparent to the RPA, given that those reasons were previewed in the October 2022 order and have been consistently identified in the relevant case law on this topic.  *Cf. Natural-Immunogenics Corp. v. Newport Trial Grp.*, 2017 WL 10562986, *8 (C.D. Cal. 2017) ("From at least July 20, 2016, NTG Defendants reasonably should have known that it

would be necessary to . . . [determine] which documents to protect under the attorney-client privilege and the work product doctrine.  Instead, NTG Defendants took the unprecedented stance that they would not produce any privilege logs unless they were ordered to do so (or changed their mind).  That refusal was inexcusable and undoubtedly contributed to a lot of the delay in NTG Defendants providing a privilege log. . . .  NTG Defendants' initial unprecedented refusal to produce any privilege log is not a mitigating circumstance; it is an aggravating circumstance.").   Additionally, the RPA did not review the withheld documents before listing them on its First Amendment privilege log and then effectively sought to modify the scope of the log through post-deadline communications to Plaintiffs. *Cf. Burlington Northern*, 408 F.3d at 1150 (affirming district court's finding of waiver in part because "even after producing the privilege log, Burlington made substantive changes to that log, removing 'documents which, upon additional review, were not responsive'").

### 4.   Magnitude Of Production

The third *Burlington Northern* factor (*i.e.*, "the magnitude of the document production") presents a closer call.  When evaluating this factor, courts consider the breadth of the discovery request, how many documents the privilege proponent has already produced, and the number of documents subject to the privilege claim.  *Sweet*, 2022 WL 326406 at *5; *McKeen-Chaplin v. Provident Savings Bank, FSB*, 2015 WL 502697, *11 (E.D. Cal. 2015).   Generally, this factor weighs against waiver when the withheld documents comprise only a small fraction of the overall number of documents at issue. *Sweet*, 2022 WL 326406 at *5 ("Plaintiff asserts the work product doctrine against a small fraction of the overall discovery that has been propounded."); *McKeen-Chaplin*, 2015 WL 502697 at *11 (defendant produced "over 12,000 pages of documents" and "only seeks to withhold three documents from plaintiffs based on privilege").

An initial difficulty in evaluating this factor is that it remains unclear just how many documents are subject to the RPA's First Amendment privilege claim.  Although the First Amendment privilege log identifies 61,298 withheld documents (Doc. 244-1 at 4), the RPA has since advised Plaintiffs that 32,619 of those documents are non-responsive to Plaintiffs'

subpoena and further suggested that, based on some form of AI review, only 5,039 of the withheld documents are likely responsive to Plaintiffs' subpoena (Doc. 244-4 at 5).  At any rate, regardless of the exact numbers, it is clear that a large number of documents are subject to the RPA's First Amendment privilege claim.

On the one hand, the sheer number of documents at issue—and the time and expense associated with reviewing, evaluating, and logging them—can be viewed as weighing against a finding of waiver.  As the Ninth Circuit has recognized, "compiling a privilege log within 30 days may be exceedingly difficult, even for counsel who are sophisticated, experienced, well-funded, and acting in good faith." *Burlington Northern*, 408 F.3d at 1149 n.3.  Additionally, and as the Court has repeatedly noted throughout these proceedings, the RPA is entitled to special protection against compliance-related burdens in light of its status as a non-party.  (Doc. 184 at 30-31- 36-37, 40-42; Doc. 239 at 37-38.)

On the other hand, regardless of the exact number of documents subject to the RPA's First Amendment privilege claim, it is clear that those documents comprise an overwhelmingly high percentage of the documents at issue.  To the Court's knowledge, the RPA has made three productions in response to Plaintiffs' subpoena—an unspecified number of "outward-facing/public items on social media" (Doc. 256-1 at 9); 1,400 pages of non-privileged emails and attachments (*id.* at 11); and 286 pages of non-privileged emails and attachments (*id.* at 13).  Consequently, the RPA's First Amendment privilege claim encompasses nearly all of the discovery materials that Plaintiffs seek.  As noted, courts often conclude that the third factor favors waiver in this circumstance.

Additionally, the chronology outlined in relation to the second factor cannot be ignored when evaluating the third factor.  The RPA was informed by Plaintiffs in February 2022 that it would need to produce a legally compliant First Amendment privilege log, was told the same thing by the Court in October 2022 and again July 2023, and did not request an extension when the Court finally set an August 7, 2023 compliance deadline.  It turns out that the RPA did not even review the documents that were potentially responsive to Plaintiffs' discovery requests (*i.e.*, the documents generated by the keyword searches) by

that deadline, let alone conduct any sort of individualized analysis as to whether those documents might be covered by the First Amendment and/or attorney-client privileges. This was not a permissible approach. *Natural-Immunogenics Corp.*, 2017 WL 10562986 at *8 (noting that it would not be unreasonable for privilege proponents "to delay producing documents and privilege logs responsive to the Requests . . . *provided* they were contemporaneously reviewing their records to determine whether they possessed responsive and privileged documents").

In fact, the RPA still has not conducted any individualized analysis. Instead, the RPA seeks to withhold thousands and thousands of documents based on the theories that (a) any document that is responsive to Plaintiffs' subpoena must be covered by the First Amendment privilege; and (b) any document generated by its keyword searches that is somehow associated with a law firm's domain name (regardless of whether the document was a confidential communication and regardless of whether the document involves the solicitation or provision of legal advice) must be covered by the attorney-client privilege. As discussed in earlier portions of this order, those theories are incorrect, and it should have been apparent to the RPA based on a review of the relevant caselaw (not to mention the October 2022 order) that they were wrong. Under these circumstances, it is difficult to see how the process of formulating sufficient privilege logs could be viewed as some impossible task that was thrust upon the RPA with insufficient time for research, analysis, and reflection. The RPA's efforts to develop its privilege claims are essentially no more developed than they were in February 2022, some 21 months ago, when compliance was originally due.

For these reasons, the Court concludes the third *Burlington Northern* factor is neutral or, at most, weighs only weakly against a finding of waiver.

### 5. Particular Circumstances

The fourth *Burlington Northern* factor (*i.e.*, "other particular circumstances of the litigation that make responding to discovery unusually easy . . . or unusually hard") presents a close call for largely the same reasons. On the one hand, the Court agrees with the RPA

1   (Doc. 256 at 5) that its status as a non-party is a relevant consideration that weighs against

2   a finding of waiver.

3           On the other hand, the RPA is a sophisticated party that is no stranger to high-stakes

4   election litigation.  Although the RPA's counsel recently argued that the RPA lacks the

5   wherewithal and financial resources to comply with the subpoena because it is "essentially

6   a ma and pa shop" (Doc. 239 at 15), a Westlaw search reveals that the RPA has been a

7   litigant in several recent lawsuits, including successful litigation before the Supreme Court.

8   *See, e.g.*, *Brnovich v. Democratic National Committee*, 141 S. Ct. 2321, 2336 (2021) ("A

9   petition for a writ of certiorari was filed by the Arizona attorney general on his own behalf

10  and on behalf of the State, which had intervened below; another petition was filed by the

11  Arizona Republican Party and other private parties who also had intervened.  We granted

12  the petitions . . . ."); *Arizona Republican Party v. Richer*, 532 P.3d 355, 357 (Ariz. Ct. App.

13  2023) ("The Arizona Republican Party . . . appeals the superior court's dismissal of its

14  complaint challenging the hand count audit process Maricopa County used for the 2020

15  general election.  ARP also challenges the court's decision to award attorneys' fees in favor

16  of Arizona's Secretary of State . . . under A.R.S. § 12-349.  Because ARP has not shown

17  the court erred in dismissing the complaint or abused its discretion in awarding fees, we

18  affirm."); *Arizona Republican Party v. Fontes*, 2023 WL 193620, *1 (Ariz. Ct. App. 2023)

19  ("The Arizona Republican Party . . . filed this case against the Arizona Secretary of State

20  . . . and election officials in each of Arizona's fifteen counties . . . , alleging Arizona's mail-

21  in voting laws violate Article 7, Section 1 of the Arizona Constitution . . . .").  Additionally,

22  public reports indicate that the RPA had $214,571.98 of cash on hand as of September 30,

23  2023.  *See* ARIZ. SEC'Y OF STATE, CAMPAIGN FINANCE REPORT 1 (2023),

24  https://seethemoney.az.gov/PublicReports/2024/96003D8A-C6A7-4DA1-B6BB-

25  5058B8812111.pdf.   This litigation history and financial information is difficult to

26  reconcile with counsel's "ma and pa shop" claim.

27          In a related vein, the RPA had a full and fair opportunity, when responding to

28  Plaintiffs' initial motion to compel in 2022, to quantify its anticipated compliance-related

1    costs and seek cost-shifting.  The RPA declined to do so and instead took the untenable

2    position (whose invalidity, again, should have been clear from a review of the relevant

3    caselaw) that it could simply refuse to respond to Plaintiffs' subpoena pursuant to the First

4    Amendment privilege.  Since then, the RPA has also rejected various other options

5    proposed by Plaintiffs to reduce the costs and burdens associated with compliance.

6                   6.    Other Considerations

7          The factors identified in *Burlington Northern* are not exhaustive and are simply

8    intended to assist district courts in performing "a holistic reasonableness analysis."  408

9    F.3d at 1149.  In the Court's view, there is one additional reason why it is necessary to

10   bring this long-running compliance dispute to a close (as opposed to declining to find

11   waiver, which would invite months of further discovery-related delays and litigation).  This

12   lawsuit involves a challenge to an Arizona election law.  The relief sought by Plaintiffs

13   thus potentially implicates the "*Purcell* principle," which holds that "lower federal courts

14   should ordinarily not alter the election rules on the eve of an election."  *Republican Nat.*

15   *Comm. v. Democratic Nat. Comm.*, 140 S. Ct. 1205, 1207 (2020) (citing *Purcell v.*

16   *Gonzalez*, 549 U.S. 1 (2006) (per curiam)).  *See also Merrill v. Milligan*, 142 S. Ct. 879,

17   880-81 (2022) (Kavanaugh, J., concurring) ("[T]he *Purcell* principle . . . reflects a bedrock

18   tenet of election law: When an election is close at hand, the rules of the road must be clear

19   and settled.  Late judicial tinkering with election laws can lead to disruption and to

20   unanticipated and unfair consequences for candidates, political parties, and voters, among

21   others.  It is one thing for a State on its own to toy with its election laws close to a State's

22   elections.  But it is quite another thing for a federal court to swoop in and re-do a State's

23   election laws in the period close to an election.").

24         From the outset of this case, the parties and Court have been attuned to its potential

25   *Purcell* ramifications.  In the Rule 26(f) report filed at the outset of the case, Plaintiffs

26   noted that they were "considering moving for a preliminary injunction because of

27   Defendants' position that [*Purcell*] may bar this Court granting relief in advance of the

28   November 2022 election."  (Doc. 79 at 7.)  Accordingly, during the Rule 16 conference in

December 2021, the Court explained that "I'd like to try to get this case resolved as quickly as possible, so that if it's possible for me to reach a ruling far enough in advance of the 2022 election to not create any *Purcell* problems, that would be my objective and my desire to do that." (Doc. 101 at 9.)  To that end, in the scheduling order, the Court set a deadline of April 2022 for Plaintiffs to file any motion for preliminary injunction and a deadline of November 2022 for the close of fact discovery.  (Doc. 85 at 2-3.)  In part, those deadlines were intended to ensure that any preliminary-injunction ruling would not raise *Purcell* problems with respect to the 2022 election and that any merits ruling would not raise *Purcell* problems with respect to the 2024 election.  Plaintiffs, in turn, subsequently informed the Court that, due to the slower-than-anticipated "pace of discovery" and in light of the Court's statements about *Purcell* concerns, they would not be "fil[ing] a motion for a preliminary injunction seeking relief in advance of the 2022 elections." (Doc. 123 at 2.)

Unfortunately, in large part to due to the still-unresolved dispute over Plaintiffs' subpoena to the RPA, the discovery deadline in this case has now been extended three times.  In the first extension request, filed in October 2022, Plaintiffs noted that the RPA "has yet to comply in any material respect with the Rule 45 subpoena Plaintiffs served on it more than eight months ago . . . [and] categorically refuses to produce documents, or even provide a privilege log supporting its assertions of privilege under the First Amendment." (Doc. 180 at 3.)  In the second extension request, filed in May 2023, Plaintiffs noted that they had "not yet been able to obtain full compliance from the RPA . . . notwithstanding this Court's October 27, 2022 Order enforcing the subpoena" and that although the RPA had agreed "to conduct further searches [it] is not yet able to provide a timeline for completion of its production." (Doc. 216 at 3.)  Finally, in the third extension request, filed in September 2023, Plaintiffs noted that they had "not yet been able to obtain full compliance from the RPA with the Rule 45 subpoena Plaintiffs served nearly two years ago . . . notwithstanding this Court's orders enforcing the subpoena." (Doc. 258 at 3.)  Based on these extension requests, the new discovery deadline is December 29, 2023, and the Court has not yet set deadlines for the disclosure of expert reports or the filing of

1   dispositive motions.  (Doc. 260.)

2         This backdrop informs the waiver analysis here.  Courts should, of course, be

3   hesitant to order waiver when it comes to important privileges.  *See generally* Gensler,

4   *supra*, Rule 26 at 875-76 ("[C]ourts often state that waiver should result only for flagrant

5   or willful failures. . . .  Ordering waiver is not the only option, of course.  In many cases,

6   the court will simply order the party to cure the failure by producing a sufficient log by a

7   specified date.").  The Court is particularly hesitant to find waiver here in light of the RPA's

8   status as a non-party and in light of the dynamic emphasized in the October 2022 order,

9   which is that "there is a significant risk of abuse when a political party attempts to use a

10  Rule 45 subpoena to gather materials, including internal analyses with potential

11  competitive ramifications, from an opposing political party."  (Doc. 184 at 42.)  For these

12  reasons, the Court has repeatedly attempted to find ways to reduce the burdens on the RPA

13  and to provide the RPA with enough time to develop and assert its privilege claims.  But

14  such solicitude must have a limit.  The RPA's development of its privilege claims is still

15  in an embryonic stage, despite the passage of 21 months since the RPA was first served

16  with Plaintiffs' subpoena.  If the Court were to decline to make a finding of waiver and

17  instead afford the RPA yet another opportunity to create and submit a First Amendment

18  privilege log (or otherwise develop and present its First Amendment privilege claim), this

19  would result in further extensions of the discovery deadline.  This would be highly

20  prejudicial to Plaintiffs in a case where they had initially hoped to obtain relief in advance

21  of the 2022 election cycle.[16]

22        …

23  _____

24  [16]      The tentative ruling issued before oral argument stated that further extensions of the
    discovery schedule could imperil Plaintiffs' ability to obtain a merits ruling on their
    challenge to S.B. 1485 in advance of the 2024 election cycle.  During oral argument,
25  Plaintiffs agreed that *Purcell* concerns generally favor a finding of waiver but stated that a
    ruling in advance of the 2024 election cycle may be unnecessary in light of certain recent
26  changes to Arizona's election rules.  Counsel for one of the Defendants, in turn, disagreed
    and stated that S.B. 1485 will be in effect during the 2024 election cycle.  The Court finds
27  it unnecessary to delve into that dispute here—the broader point is that *Purcell* concerns
    counsel against repeatedly postponing the discovery deadline in this case simply because
28  the RPA has not taken advantage of earlier opportunities to develop and assert its privilege
    claims.

- 45 -

7.      Conclusion

Having performed the "holistic reasonableness analysis" required by *Burlington Northern*, the Court concludes that the RPA has waived any claim of First Amendment privilege with respect to the documents withheld pursuant to its First Amendment privilege log.  This is an unfortunate outcome, as the RPA likely would have been able to make strong claims of First Amendment privilege as to at least some of the documents at issue here, but it is entirely a consequence of the RPA's own choices and litigation conduct over the last 21 months.  *See generally Burlington Northern*, 408 F.3d at 1149 (as part of the waiver analysis, courts must "forestall needless waste of time and resources, as well as tactical manipulation of the rules and the discovery process").

D.      **Attorney-Client Privilege**

The *Burlington Northern* analysis as to the RPA's attorney-client privilege claim is largely the same.  The first factor, for the most part, favors waiver because the RPA's attorney-client privilege log is facially insufficient for the reasons described in Part II.D above.  However, the Court's review of the parties' meet-and-confer correspondence suggests that there are a few subsets of withheld communications as to which the RPA attempted to provide supplemental information in support of its privilege claim.  More specifically, on February 1, 2023, the RPA's counsel sent an email in response to Plaintiffs' (accurate) assertion that an earlier version of the RPA's attorney-client privilege log was deficient because it lacked various fields of necessary information.  (Doc. 228-1 at 10-11.) Although the RPA's response email impermissibly failed to attempt to remedy that deficiency as to all of the withheld documents, it did provide the following additional details as to why a handful of the withheld documents should be considered covered by the privilege:

> With respect to the attorney-client privilege log: the emails on which myself or Lee Miller were copied (nos. 24, 28, 29, 30, 31, 32, 33, and 34 in the privilege log) directly concerned legal advice on your client's subpoena.  Lee Miller and I are both licensed attorneys.  No. 25 is a forward of my email concerning your client's subpoena from the Executive Director Greg Safsten to an AZGOP [staff member], Matt Grim.  Alyssa Gonzales Specht is a

1
2
3
4
5
6
7
8
9

licensed attorney and Election Integrity Counsel for the RNC and state parties. The emails from her are "RNC Election Law Updates" distributed to the state parties, including former AZGOP Executive Director Greg Safsten. These emails were captured because they mention updates on CyberNinjas litigation as well as this suit. The email from attorney Mandy Lester (which shows up as nos. 107, 111, 120, and 119 in the log – all duplicates) is a forward by Ms. Lester to Greg Safsten of one of Ms. Specht's "Litigation Updates" emails, and also contains a comment from Ms. Lester in reference to legal advice regarding this action. Mandy Abbott Lester is an RNC attorney along with Ms. Specht. (Finally, I note there is an obvious typo in no. 119 in the log – the "FROM" column erroneously lists both Safsten and Lester. In fact this was an email from Safsten to Ward in which he forwarded, without comment, the email to him from Lester.)

10

(*Id.* at 11.)

11
12
13
14
15
16
17
18
19
20
21
22
23

In the Court's estimation, it would be improper to make a finding of waiver as to the subset of documents identified in the February 1, 2023 email because the RPA at least attempted to provide a valid explanation of its basis for asserting the attorney-client privilege as to those documents. Thus, as to those documents (*i.e.*, the documents that were identified as Nos. 24, 25, 28, 29, 30, 31, 32, 33, 34, 107, 111, 119, and 120 in the initial version of the RPA's privilege log, as well as the documents in the initial version of the RPA's privilege log that were "RNC Election Law Updates" from Specht), no waiver of the attorney-client privilege has yet occurred. Instead, the RPA will be given an opportunity to create a revised privilege log as to those documents and the parties may thereafter, if necessary, bring any unresolved dispute to the Court for resolution, keeping in mind the looming discovery deadline.[17]

The second factor favors waiver because, despite the specific concerns that

24
25
26
27
28

_____

[17] The Court notes that it is unclear whether the current version of the RPA's attorney-client privilege log (Doc. 244-3) even includes the documents identified above. Although the RPA's counsel used numerical identifiers (*i.e.*, "nos. 24, 28, 29, 30, 31, 32, 33, and 34 in the privilege log") in his February 1, 2023 email when identifying the documents in question (Doc. 228-1 at 11), the current version of the RPA's attorney-client privilege log (Doc. 244-3) does not use the same numbering approach. For this and other reasons, Plaintiffs' counsel suggested during oral argument that the RPA be required to create a new, legally compliant privilege log as to the subset of documents at issue. The Court agrees with that suggestion, which has been incorporated into this order.

Plaintiffs raised in January 2023 about the sufficiency of the first version of the RPA's attorney-client privilege log, the RPA still has not (except for the small subset of documents discussed above) provided basic details about the withheld documents that are necessary to evaluate whether they are actually covered by the attorney-client privilege. Also, the RPA acknowledges that it did not even conduct its own review of all of the withheld documents before listing them on the attorney-client privilege log and that, as a result, some of the logged documents may not be privileged.

As for the third factor, although the RPA has withheld, on an absolute basis, fewer documents pursuant to the attorney-client privilege than it has withheld pursuant to the First Amendment privilege, the RPA still had plenty of time to formulate an adequate attorney-client privilege log (and ample notice of the areas of deficiency in its initial log, which it declined to remedy in the version now before the Court). Also, the number of documents being withheld pursuant to the attorney-client privilege is still substantial.

The analysis as to the fourth factor mirrors the analysis in Part III.C.5 above. Likewise, the *Purcell* considerations discussed in Part III.C.6 above are equally applicable in this context.

Accordingly, having performed the "holistic reasonableness analysis" required by *Burlington Northern*, the Court concludes that the RPA has waived any claim of attorney-client privilege with respect to the documents withheld pursuant to its attorney-client privilege log, with the exception of (1) the documents that were identified as Nos. 24, 25, 28, 29, 30, 31, 32, 33, 34, 107, 111, 119, and 120 in the initial version of the RPA's privilege log and (2) the documents in the initial version of the RPA's privilege log that were "RNC Election Law Updates" from Specht.

E.     **Scope Of Production**

The RPA argues in its response brief that, at some point after the August 7, 2023 production deadline, it "used artificial intelligence . . . to drastically cut down the number of responsive documents to approximately 5,000 documents. If the Court intends to grant Plaintiffs' Motion to Compel, it should only order [the RPA] to produce the approximately

5,000 documents."  (Doc. 256 at 4.)

In evaluating this request, it is necessary to provide some context.  As noted, on July 17, 2023, the Court held a lengthy discovery-dispute hearing.  (Docs. 236, 239.)  The main dispute was over how the RPA would conduct its search for responsive documents.  (Docs. 228, 229.)  The parties had already met and conferred on that subject *ad nauseam*, including during the nine-month period after the issuance of the October 2022 order compelling the RPA to comply with the subpoena.  At no point during those meet-and-confer discussions (or during the resulting discovery-dispute briefing and argument process) did the RPA raise the possibility of using AI tools to search for responsive documents.  At the conclusion of the July 17, 2023 hearing, the Court ruled that the RPA "shall run the search terms as outlined in [the RPA's counsel's] May 10, 2023 email (except the search term CUR* shall be changed to cure, curing and cured) and shall produce the documents responsive to the search terms and/or disclose a privilege log."  (Doc. 236.)  Thus, by now asking for permission to use AI tools to search for responsive documents, the RPA is effectively seeking to relitigate the issues raised and resolved during the July 17, 2023 hearing.

"The Court will ordinarily deny a motion for reconsideration of an Order absent a showing of manifest error or a showing of new facts or legal authority that could not have been brought to its attention earlier with reasonable diligence."  LRCiv. 7.2(g)(1).  Reconsideration is an "extraordinary remedy" that is available only in "highly unusual circumstances."  *Kona Enters., Inc. v. Est. of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000) (internal quotation marks omitted).  "Motions for reconsideration are disfavored . . . and are not the place for parties to make new arguments not raised in their original briefs.  Nor is reconsideration to be used to ask the Court to rethink what it has already thought."  *Motorola, Inc. v. J.B. Rodgers Mechanical Contractors*, 215 F.R.D. 581, 582 (D. Ariz. 2003) (citation omitted).  *See also FTC v. Noland*, 2022 WL 901386, *3 (D. Ariz. 2022) ("Local Rule 7.2(g) . . . [creates] essentially the same standard a district court outside the District of Arizona . . . would apply when resolving a reconsideration motion under Rule 54(b).") (citations omitted); Gensler, *supra*, Rule 54, at 77-78 ("Rule 54(b) is not a

mechanism to get a 'do over' to try different arguments or present additional evidence when the first attempt failed.  Thus, while the limits governing reconsideration of final judgments under Rule 59(e) do not strictly apply, courts frequently invoke them as common-sense guideposts when parties seek reconsideration of an interlocutory ruling under Rule 54(b).  In sum, trial courts will exercise their discretion to reconsider interlocutory rulings only when there is a good reason to do so, including (but not limited to) the existence of newly-discovered evidence that was not previously available, an intervening change in the controlling law, or a clear error rendering the initial decision manifestly unjust.") (citations omitted).

Applying these standards, the RPA has not established a valid basis for reconsideration.  The RPA had ample time to work cooperatively with Plaintiffs in an attempt to formulate an agreed-to AI protocol for identifying responsive documents.  Instead, the RPA initially refused to produce anything, then seemed to agree to use keyword searches in an attempt to locate responsive documents, then retracted that offer.  When the parties eventually raised that dispute for judicial resolution, the RPA still did not suggest using AI tools to assist in the search.  Had the RPA done so in a timely manner and described its anticipated AI-assisted search process in a sufficiently detailed manner, the Court would have been very open to it.  *Bridgestone Americans, Inc. v. Int'l Business Machines Corp.*, 2014 WL 4923014, *1 (M.D. Tenn. 2014) (allowing responding party "to switch horses in midstream" by "us[ing] predictive coding in reviewing something over two million documents for responsiveness," where the adverse party "opposed this request as being an unwarranted change in the original case management order . . . and on the grounds that it is unfair to use predictive coding after an initial screening has been done with search terms," but emphasizing that "openness and transparency in what Plaintiff is doing will be of critical importance," that "Plaintiff has advised that they will provide the seed documents they are initially using to set up predictive coding," and that "[t]he Magistrate Judge expects full openness in this matter").  Indeed, the Court has repeatedly expressed its interest in mechanisms for reducing the RPA's compliance-related burdens.

But that ship has now sailed.  It is simply too late in the process for the RPA to belatedly, and without justification, identify an entirely different process for locating documents that are responsive to a subpoena served over 21 months ago.

The Court further notes that, during the compliance period following the July 17, 2023 hearing, the RPA again made no effort to communicate with Plaintiffs (or the Court) about the possibility of using AI as an alternative search method.  It was only in the days and weeks after the compliance deadline expired that the RPA first raised that possibility. Additionally, the RPA has still provided only cursory details about what the AI search process would involve.[18]  This proposal comes too late and is far too generic to suffice. *See, e.g., Progressive Cas. Ins. Co. v. Delaney*, 2014 WL 3563467, *9, 11 (D. Nev. 2014) (rejecting responding party's request to use predictive coding to identify responsive documents, and instead ordering responding party to produce the large number of documents generated through keywords searches, because the parties had not "agreed at the onset . . . to a predictive coding-based ESI protocol" and the responding party was "unwilling to engage in the type of cooperation and transparency that its own e-discovery consultant has so comprehensibly and persuasively explained is needed for a predictive coding protocol to be accepted by the court or opposing counsel as a reasonable method to search for and produce responsive ESI"); *Youngevity Int'l, Corp. v. Smith*, 2019 WL 1542300, *12 (S.D. Cal. 2019) ("Technology-assisted review of ESI . . . require[s] an unprecedented degree of transparency and cooperation among counsel in the review and production of ESI responsive to discovery requests.  In this regard, courts typically have required the producing party to provide the requesting party with full disclosure about the

---

[18]      During oral argument, the RPA's counsel was able to provide essentially no details about the proposed AI search process.  A few additional, albeit still insufficient, details are provided in one of the emails that the RPA's counsel sent to Plaintiffs' counsel in the days following the expiration of the production deadline.  (Doc. 244-4 at 5 [RPA's August 11, 2023 email: "We [Repario] reviewed a statistical sample of all search term hit documents and their attachments.  The sample was pulled using a 95% confidence interval with a margin of error +/- 2.5%.  This yielded a sample of 1,431 documents.  An attorney review of these documents identified 327 documents as responsive to the subpoena (approx. 23%) and 1,104 documents as not responsive to the subpoena.  These results were loaded into an active Learning model which identified 3,916 additional documents as likely responsive, expanding to 5,039 documents when including attachments."].)

technology used, the process, and the methodology, including the documents used to 'train' the computer.") (cleaned up); *Moore v. Publicis Groupe*, 287 F.R.D. 182, 183, 189 (S.D.N.Y. 2012) (recognizing that "computer-assisted review is an acceptable way to search for relevant ESI in appropriate cases" but emphasizing that "computer-assisted review is not a magic, Staples-Easy-Button, solution appropriate for all cases" and that "it is the process used and the interaction of man and machine that the courts needs to examine").

IV.   The RPA's Additional Reconsideration Arguments

Although the August 31, 2023 order (Doc. 249) only authorized the parties to submit briefing on two discrete issues (*i.e.*, the sufficiency of the RPA's privilege logs and the question of waiver), the RPA seeks to raise several additional issues in its response brief.

First, the RPA argues that "Plaintiffs have proffered only two dubious and speculative rationales for seeking information from [the RPA] in this case . . . [which are] plainly inadequate to warrant the issuance of subpoenas to nonparties . . . ." (Doc. 256 at 2.)  This constitutes an impermissible attempt to seek reconsideration of the October 2022 order, which considered this exact issue and resolved it in Plaintiffs' favor after extensive briefing and consideration.  (Doc. 184 at 19 ["[T]o the extent the RPA seeks to avoid compliance with the subpoena on the ground that Plaintiffs lack a sufficient basis for suspecting the RPA possesses any of the documents in question, this argument fails on both the law and the facts."].)

Second, the RPA argues that simply being forced to respond to the subpoena constitutes First Amendment retaliation, because the "[e]ntire subpoena arises from protected activities." (Doc. 256 at 5. *See also id.* at 8-9 ["To compel the [RPA] to respond would be to endorse the idea that Plaintiffs can subpoena any person or organization simply because they expressed support for the laws at issue, which is not only chilling to free speech but abusive."].)  This marks another impermissible attempt to seek reconsideration of the October 2022 order, which resolved this issue in Plaintiffs' favor after extensive briefing and consideration.  (Doc. 184 at 9-13 [concluding that "[t]he RPA's reliance on

the First Amendment as a basis for categorically refusing to comply with the subpoena fails for two independent reasons," which were (1) the RPA's failure to provide a privilege log and (2) the RPA's failure "to provide the sort of evidence that is a prerequisite to the successful assertion of a First Amendment privilege claim under Ninth Circuit law"].)

The RPA's arguments on this point are also predicated on the same misunderstanding of the First Amendment privilege that is addressed in earlier portions of this order. As discussed in Part II.C above, the potential applicability of the privilege depends on various factors, including the substance of the communication and the speaker and recipients, and thus must be assessed on a document-by-document basis. Accordingly, even if the RPA had provided the Ivory declaration (Doc. 229 at 9-11) during the initial motion-to-compel briefing process in 2022 (instead of untimely providing it for the first time in July 2023), the outcome would have been the same. The thrust of the Ivory declaration is that simply receiving and being required to respond to the subpoena (including creating a privilege log) constitutes First Amendment retaliation that creates an impermissible chilling effect. But that argument (which, again, was addressed and resolved in the October 2022 order, *see* Doc. 184 at 9-13) is not how the Ninth Circuit and other courts conceive of the First Amendment privilege. *Perry*, 591 F.3d at 1153 n.1 ("We . . . reject Proponents' contention that producing any privilege log would impose an unconstitutional burden."). As noted, political associations "are not entitled to assert a blanket privilege by virtue of their status as associations. . . . [T]he associational privilege is limited . . . [so] assertions of privilege must be specifically asserted on a document-by-document basis." *La Union Del Pueblo Entero*, 2022 WL 17574079 at *9 (cleaned up). *See also Point Ruston*, 2009 WL 3190361 at *1 (emphasizing that proponent of First Amendment privilege could "not use this privilege log as an opportunity to assert privilege on a wholesale basis"); *In re Motor Fuel Temperature Sales Pracs. Litig.*, 258 F.R.D. at 420 (same).

Third, the RPA argues it should be "reimbursed for its fees and costs associated with Plaintiff's subpoena. . . . [The RPA] has been charged at least $26,153.76 to respond to

Plaintiffs' subpoena . . . ." (Doc. 256 at 12, citations omitted.)  This amounts to another impermissible reconsideration request.  In the October 2022 order, the Court specifically addressed the issue of cost-shifting and found that the RPA had forfeited any claim by failing to develop and support its assertions.  (Doc. 184 at 41-42 ["Despite the Court's duty to protect non-parties like the RPA from significant expense, the RPA is not entitled to cost shifting here for the simple reason that it has made no factual showing in support of its request. . . .  The RPA has not itemized (or even mentioned) its expenses, so the Court has no way of knowing whether they were reasonably incurred and/or 'significant.' . . .  The Court has already determined that the RPA provided little to no information indicating that enforcement would impose an undue burden.  Thus, an award of attorneys' fees and costs under Rule 45(d)(1) is unwarranted."].)  Similarly, during the July 2023 hearing, the Court explained that any belated request for cost-shifting was not only foreclosed by the October 2022 order but, "[s]eparate from that," the RPA still "lack[ed]   . . . evidence as to the cost shifting . . . [because] [t]here have been some fairly vague statements about the costs of complying with the subpoena which haven't really been substantiated to my satisfaction" and "another important consideration with cost shifting is . . . [that] the plaintiffs have done a number of things to try to really limit the costs here and reduce the burden."  (Doc. 239 at 35-37.)  As discussed in relation to some of the other disputed issues here, although the Court has attempted to show great solicitude toward the RPA in light of its status as a non-party and the potential sensitivity of the information being sought by Plaintiffs, such solicitude does not mean the Court must allow the RPA to use each successive motion to compel as an opportunity to relitigate issues that were previously resolved with finality after a full and fair briefing opportunity.  This is particularly true in light of the *Purcell* overhang here.

…

…

…

…

Accordingly,

**IT IS ORDERED** that Plaintiffs' motion to compel (Doc. 253) is **granted in part and denied in part**.

**IT IS FURTHER ORDERED** that the RPA must, within seven days of the issuance of this order, produce all of the documents identified on its attorney-client privilege log, with the exception of (1) the documents that were identified as Nos. 24, 25, 28, 29, 30, 31, 32, 33, 34, 107, 111, 119, and 120 in the initial version of the RPA's privilege log and (2) the documents in the initial version of the RPA's privilege log that were "RNC Election Law Updates" from Specht.  As for those documents, the RPA must, within 14 days of the issuance of this order, provide Plaintiffs with a legally compliant attorney-client privilege log.

**IT IS FURTHER ORDERED** that the RPA must, within seven days of the issuance of this order, produce all of the documents identified on its First Amendment privilege log, with the exception of the documents that have since been identified as auto-generated emails related to donations.  As for those documents, the RPA must, within seven days of the issuance of this order, provide certification to Plaintiffs as to what it has done to confirm those documents' non-responsiveness.[19]

Dated this 8th day of November, 2023.

Dominic W. Lanza
United States District Judge

---

[19]      In their reply brief, Plaintiffs agree that the RPA may provide a certification in lieu of producing the withheld documents that the RPA has since deemed to be non-responsive auto-generated emails.  (Doc. 261 at 1 n.1.)