**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mi Familia Vota, et al., | No. CV-21-01423-PHX-DWL |
| Plaintiffs, | **ORDER** |
| v. | |
| Larry Noble, et al., | |
| Respondents. | |

Pending before the Court is Plaintiffs' motion to compel "certain third parties who communicated with non-party Arizona legislators to produce documents responsive to the Rule 45 subpoenas that Plaintiffs served on or about August 28, 2023." (Doc. 283.) For the reasons that follow, the motion to compel is denied.

## RELEVANT BACKGROUND

I.  <u>The Earlier Dispute Over The State Legislative Privilege</u>

This action involves a challenge to an Arizona voting law, Senate Bill 1485 ("S.B. 1485"). In 2022, Plaintiffs served several current and former Arizona legislators ("Legislators") with Rule 45 subpoenas seeking documents concerning S.B. 1485 and related legislation. The requested documents included, *inter alia*, certain communications between Legislators and third parties outside the legislature.

The service of those subpoenas led to a protracted privilege dispute. Legislators opposed compliance by invoking the state legislative privilege while Plaintiffs argued that the "state legislative privilege does not extend to legislators' communications with third

parties outside the legislature" in light of "the significant difference between internal discussions among legislators, which the privilege is meant to protect, and legislators' communications with outside parties." (Doc. 209 at 1.)

On July 18, 2023, the Court rejected Plaintiffs' position and concluded that Legislators could "invoke the state legislative privilege in relation to communications with third parties outside of the legislature." (Doc. 237 at 7.) In reaching that conclusion, the Court acknowledged that "[t]he Ninth Circuit has not, unfortunately, addressed whether the state legislative privilege extends to communications between state legislators and third parties outside the legislative branch" and that other "federal courts have come to differing conclusions on this issue." (*Id.* at 9-12.) On the merits, the Court deemed it significant that in *Lee v. City of Los Angeles*, 908 F.3d 1175 (9th Cir. 2018), the Ninth Circuit indicated that the "rationale for the [state legislative] privilege" is not "limited to maintaining confidentiality" and also encompasses legislators' "interest in minimizing the distraction of diverting their time, energy, and attention from their legislative tasks to defend the litigation." (*Id.* at 13, cleaned up.) Thus, the Court joined "the Fifth Circuit, the Eighth Circuit, and Judge Campbell in [*Puente Arizona v. Arpaio*, 314 F.R.D. 664 (D. Ariz. 2016)]" in concluding that "the state legislative privilege may apply to communications between legislators and third parties outside the legislative branch." (*Id.* at 15.)

This determination did not end the analysis, because "the state legislative privilege is a qualified privilege that may be overcome." (*Id.*) Accordingly, the Court proceeded to consider the five factors that "courts often consider" when determining whether a claim of state legislative privilege should be upheld. (*Id.* at 15-28.) One of those factors is "the availability of other evidence." (*Id.* at 20.) As to that factor, the Court noted that "Plaintiffs may have other tools at their disposal to obtain the documents at issue" because "during oral argument, both sides seemed to agree that it would be possible for Plaintiffs to issue additional subpoenas to other third parties identified in Legislators' privilege log and that the state legislative privilege would not be implicated by such an approach (although the recipients might have other grounds for resisting compliance). The seeming availability of

alternative avenues for obtaining communications between Legislators and third parties—which would not raise the significant concerns raised by a subpoena issued directly to Legislators—is another reason why the second factor weighs against disclosure." (*Id.* at 22-23.)  However, in an accompanying footnote, the Court clarified that it did not intend "to express any definitive conclusions about whether the state legislative privilege would be implicated by a subpoena issued to a third party to obtain that party's communications with a member of a state legislature. This issue has not been the subject of briefing by the parties and does not appear to have been addressed in any of the decisions discussed in Part I of this order, which confront the distinct question of whether the state legislative privilege applies when a state legislature or individual state legislator receives a subpoena (or other discovery demand) seeking communications with third parties that relate to the legislative process." (*Id.* at 23 n.10.)

After assessing the five factors, the Court determined that "[t]wo of the relevant factors favor disclosure, two other factors favor non-disclosure, and the final factor is essentially neutral." (*Id.* at 25.)  Because both sides agreed that *in camera* review of the withheld documents could be helpful in evaluating their relevance (one of the applicable factors), the Court agreed to perform an *in camera* review before making a final decision as to whether Legislators' claim of privilege should be upheld. (*Id.* at 25-28.)

On August 1, 2023, Legislators provided the withheld documents to the Court for *in camera* review. (Doc. 240.)

On August 4, 2023, the Court issued an order explaining that it had "completed its *in camera* review of the documents that Legislators withheld pursuant to the state legislative privilege. Based on that review, the withheld documents are not more relevant and/or valuable to Plaintiffs' claims than the Court assumed when considering them in the abstract. The *in camera* review thus confirms that the balancing test supports applying the state legislative privilege in this case and that Legislators should be allowed to withhold the documents based on that privilege." (Doc. 242.)

…

II. The Current Dispute

On August 28, 2023, Plaintiffs "issued 10 document subpoenas to individuals who were listed on the Legislators' privilege logs. Each of these subpoenas asked the recipients to produce documents and communications identified on the Legislators' privilege logs (attached as Exhibit A to each of the subpoenas) as well as communications with Arizona state legislators 'related to SB 1485, SB 1003, or other potential or enacted voting legislation introduced in the same legislative term related to the Permanent Early Voting List.'" (Doc. 292 at 3, quoting Doc. 283-2 at 12.) "Several recipients responded that they possessed responsive documents but declined to produce them, asserting legislative and First Amendment privileges and other objections. Counsel for the Legislators also asserted that the Court's prior Orders foreclose production of the requested documents by third-parties." (Doc. 280 at 1.)

On March 11, 2024, following unsuccessful meet-and-confer efforts, Plaintiffs filed the pending motion to compel. (Doc. 283.)

On April 19, 2024, a joint response was filed by two groups of non-parties: (1) Legislators; and (2) Aimee Yentes, Mark Lewis, Dan Farley, and the Free Enterprise Club (together, "the Free Enterprise Club Recipients"). (Doc. 292.)

On May 2, 2024, Plaintiffs filed a reply. (Doc. 293.) Neither side requested oral argument.

**DISCUSSION**

I. Legislators' Objections

    A. **The Parties' Arguments**

Plaintiffs argue that Legislators cannot invoke the state legislative privilege because it is intended to protect the "two tenets" of "open discussion and freedom from distraction," neither of which is implicated here. (Doc. 283 at 7-11.) More specifically, Plaintiffs argue that the first tenet is inapplicable because "protecting communications that the Legislators *chose* to have with third parties does not facilitate candor in intra-legislator discussion." (*Id.* at 7-8.) Plaintiffs also reject any characterization of their litigation tactics as

"gamesmanship," arguing that it was permissible for them to use the privilege log that Legislators submitted as part of the earlier privilege dispute to discover the identities of the current subpoena recipients. (*Id.* at 8.) As for the second tenet, Plaintiffs argue that "[a]ny burden that the Legislators face by choosing to object to the Subpoenas is self-inflicted and cannot be the basis to invoke legislative privilege. Legislators reached out to affirmatively interject themselves into Plaintiffs' meet-and-confer discussions with the subpoena recipients." (*Id.* at 9.) Plaintiffs also question the sincerity of Legislators' claim of distraction in light of one Legislator's affirmative efforts to pursue other litigation related to Arizona voting laws. (*Id.*) Finally, Plaintiffs argue that even if Legislators theoretically could invoke the state legislative privilege here, it should be overcome based on the balancing test. (*Id.* at 9-11.)

In response, Legislators argue that "when the Court issued its order on the motion to compel documents directly from the legislators, it did not have the benefit of" *La Union del Pueblo Entero v. Abbott*, 93 F.4th 310 (5th Cir. 2024), "which was issued a few days after the Court allowed briefing on this dispute. *La Union* resolves all of the questions posed by the Court in favor of upholding the legislative privilege against the discovery sought here." (Doc. 292 at 4.) According to Legislators, *La Union* recognizes that any effort to inquire into legislators' subjective motivation when drafting, supporting, or opposing legislation—even a subpoena served on a non-legislator—interferes with legislators' ability to discharge their duties without inhibition. (*Id.* at 4-6.) Legislators continue: "[A]lthough the Legislators do not bear the burden of directly producing the subpoenaed documents, the disclosure and use of privileged legislator communications in this case in response to Plaintiffs' subpoenas will interfere with the legislative process by chilling future dialogue between lawmakers and third parties. If a legislator knows that his or her written communications will not be protected from use in a lawsuit even if the Court upholds the legislator's privilege claim, he or she will likely choose not to engage in those communications going forward so as to protect their preliminary opinions from public disclosure and critique." (*Id.* at 6.) Legislators also dispute whether the state legislative

privilege can ever be overcome based on the five-factor test discussed in the July 2023 order, arguing that the relevant test is narrower and more restrictive. (*Id.* at 7-9.) Finally, Legislators argue that the motives of a single legislator have "*de minimis* relevance" in a case involving a constitutional challenge to legislation. (*Id.* at 9-10.)

In reply, Plaintiffs fault Legislators for "rely[ing] on an extreme and poorly reasoned 2-1 decision by the Fifth Circuit, [*La Union*], that is out of step with the law in this circuit. As the dissenting opinion in that case recognizes, *La Union* extraordinarily expands the scope of the legislative privilege . . . . This Court should decline to adopt such a radical and sweeping expansion of the privilege." (Doc. 293 at 1, 4-5.) Plaintiffs also contend that Legislators' objections are "premised upon the suggestion that there is an objective and legitimate expectation of privacy in legislator and third-party communications any time those communications concern the 'legislative process.' But this Court and others have observed that confidentiality concerns are not the driving force behind the legislative privilege." (*Id.* at 3.) Next, Plaintiffs argue that *La Union* is factually distinguishable because the third-party subpoena recipient in that case had been "brought into the legislative process" at the behest of legislators. (*Id.* at 5-6.) Finally, Plaintiffs disagree with Legislators' contention that the five-factor test discussed in the July 2023 order is inapplicable. (*Id.* at 6-8.)

B. **Analysis**

The Court concludes that Legislators may invoke the state legislative privilege here even though they are not the individuals and entities being subpoenaed. Although the July 2023 order reached a different tentative conclusion on that issue, the issue had not been briefed at that time and the legal landscape has changed in the interim.

The most significant development is the Fifth Circuit's decision in *La Union*, which was decided in February 2024. In that case, which involved a challenge to a Texas voting law, the plaintiff sought to compel the Harris County Republican Party ("HCRP") to disclose certain of its communications with the members of the Texas legislature. 93 F.4th at 313-14. After an HCRP representative declined to answer certain questions on the

ground that they "appeared potentially to encompass [his] communications with the legislators," the plaintiff moved to compel. *Id.* at 314-15. The district court granted the motion to compel but the Fifth Circuit reversed. *Id.* at 314. As an initial matter, the court held that the members of the Texas legislature had standing to challenge the compulsion order in part because "[w]hile [the] discovery request may be directed at HCRP, the materials it seeks go to the content of the legislators' communications. Discovery requests that reveal such communications, even if served on non-legislators, nonetheless burden— and therefore deter—legislators from the uninhibited discharge of their legislative duty." *Id.* at 317-18 (cleaned up). In reaching this conclusion, the court rejected the plaintiff's argument—similar to Plaintiffs' argument here—that the members of the Texas legislature had no reason to complain because the "discovery request does not impose cost or burden on [them]," explaining: "True, one purpose is to protect legislators from the cost, burden, and inconvenience of trial. But that's not all. Equally important is the privilege's function to guard against judicial interference by protecting legislators from courts' seeking to inquire into the motives of legislators and uncover a legislator's subjective intent in drafting, supporting, or opposing proposed or enacted legislation." *Id.* at 317 (cleaned up). On the merits, the court held that the materials at issue were covered by the state legislative privilege because "[t]he legislative privilege applies to documents shared, and communications made, between the legislators and [the HCRP's representative]. That includes [his] emails, which contain the legislators' communications with a third party who was brought into the legislative process. [Those] emails are part and parcel of the modern legislative process through which legislators receive information possibly bearing on the legislation they are to consider. Because they were created, transmitted, and considered within the legislative process itself, they are protected by legislative privilege." *Id.* at 323 (cleaned up).

It is also notable that, in an even more recent decision issued after the briefing on Plaintiffs' motion became complete, another court reached a similar conclusion. In *Milligan v. Allen*, 2024 WL 3666369 (N.D. Ala. 2024), decided on July 12, 2024, a three-

judge panel consisting of one circuit judge and two district judges considered a request by the plaintiffs in a redistricting challenge to compel non-party RedState Strategies to produce "documents and information about RedState's work for and communications with" certain Alabama state legislators "in connection with the Alabama Legislature's adoption of a congressional redistricting plan in the summer of 2023." *Id.* at *1. Although the panel acknowledged that "[n]either the Supreme Court nor the Eleventh Circuit . . . has decided whether the legislative privilege may be invoked by a third party acting on behalf of a legislator," it concluded that "logic, common sense, and precedent counsel in favor of finding that third parties may invoke the legislative privilege in appropriate circumstances." *Id.* at *3. As for logic and common sense, the panel noted that "third parties, no less than a legislator's aides and assistants, sometimes perform acts that fall within the sphere of legitimate legislative activity and as a part of the modern legislative process," and thus "[t]he scope of the privilege is defined by the nature of the act performed, again, not by the privilege-seeker's title." *Id.* at *4 (cleaned up). As for precedent, the panel noted that "[o]nly one Circuit," the Fifth Circuit in *La Union*, "appears to have considered whether the state legislative privilege also protects a third party from complying with a subpoena seeking communications between the third party and state legislators about the performance of legislative acts—and it reached the same conclusion we do." *Id.*

The Court acknowledges that *La Union* and *Milligan* are not the only decisions addressing this issue. For example, the order in *League of Women Voters of Fla., Inc. v. Lee*, 340 F.R.D. 446 (N.D. Fla. 2021), resembles, in many respects, this Court's July 2023 order. There, the plaintiffs in a voting rights lawsuit served deposition subpoenas on certain members of the Florida legislature. *Id.* at 452. Among other things, the subpoenas sought to compel the Florida legislators to discuss their "interactions with third-party groups like Heritage Action and the James Madison Institute," and the Florida legislators moved to quash by invoking the state legislative privilege. *Id.* at 452-53. Like the July 2023 order, the court in *League of Women Voters* concluded that "the legislative privilege

is not waived simply because a legislator has communicated with third parties." *Id.* at 454 (cleaned up). Also like the July 2023 order, the court went on to suggest—even though the issue was not squarely presented—that "because confidentiality is not the legislative privilege's animating concern, the privilege would not prevent Plaintiffs from asking the third parties with which the Legislators communicated about those communications." *Id.* at 454 n.2.

Plaintiffs cite this footnote from *League of Women Voters* as one of the leading authorities supporting their position. (Doc. 283 at 7.) Although this approach is understandable, Plaintiffs overlook that the Florida legislators in *League of Women Voters* apparently conceded, during the motion-to-quash process, that the state legislative privilege would not apply if the plaintiffs subpoenaed the third parties with whom the legislators were communicating: "The Legislators also argue that Plaintiffs can get much of the information they seek from other parties, such as the Heritage Foundation." *Lee*, 340 F.R.D. at 457. That concession presumably informed the conclusion expressed in the cited footnote. Here, in contrast, Legislators have now clarified (although their position was less than fully clear during the previous motion-to-compel process) that they do not concede the inapplicability of the privilege in this context.

The other contrary decision cited by Plaintiffs is *Cano v. Davis*, 193 F. Supp. 2d 1177 (C.D. Cal. 2002). Similar to *Milligan*, *Cano* involved a three-judge panel (consisting of one circuit judge and two district judges) considering several discovery disputes that arose during a redistricting challenge. Although the terse decision in *Cano* does not provide many background details, it appears that one of the discovery disputes involved an attempt by members of the California legislature to bar the deposition of "Antonio Gonzalez, a third party non-legislator." *Id.* at 1179. The *Cano* panel held that "[t]he legislative privilege does not bar [Gonzalez] from testifying to conversations with legislators and their staffs." *Id.* However, the *Cano* panel did not provide any reasoned explanation in support of that conclusion and cited only one case, *Gravel v. United States*, 408 U.S. 606, 629 n.18 (1972), as a supporting authority. *Id.*

Given this lack of explanation, as well as the various dissimilarities between this case and the situation addressed in footnote 18 in *Gravel*, the Court is hesitant to view *Cano* as the definitive final word on this issue, particularly where it conflicts with the more carefully reasoned decisions in *La Union* and *Milligan.* In a related vein, although *La Union* and *Milligan* (like *League of Women Voters* and *Cano*) are obviously not binding here, the Court views them as consistent with the applicable Ninth Circuit and Supreme Court authorities. Although one of the purposes underlying the state legislative privilege—the interest in shielding legislators from the time, expense, and hassle of responding to discovery requests—is no longer implicated here (as it was in the Ninth Circuit's decision in *Lee* and in the July 2023 order), that is not the only purpose the privilege is intended to effectuate. As *La Union* explains, because "lawmakers routinely meet with persons outside the legislature—such as executive officers, partisans, political interest groups, or constituents—to discuss issues that bear on potential legislation as part of the regular course of the legislative process," "[d]iscovery requests that reveal such communications, even if served on non-legislators, nonetheless burden—and therefore deter—legislators from the uninhibited discharge of their legislative duty." 93 F.4th at 318, 323. *See also Puente Arizona v. Arpaio*, 314 F.R.D. 664, 670 (D. Ariz. 2016) ("The Ninth Circuit has held that because obtaining information pertinent to potential legislation or investigation is a legitimate legislative activity, the federal legislative privilege applies to communications in which constituents urge their congressperson to initiate or support some legislative action and provide data to document their views. Other courts have held that the federal legislative privilege applies more broadly to a congressperson's communications with third parties about legislation or legislative strategy. Courts have held that communications of this type are also protected by the state legislative privilege and immunity doctrines.") (cleaned up). *Cf. Almonte v. City of Long Beach*, 478 F.3d 100, 107 (2d Cir. 2007) ("[L]egislative immunity is not limited to the casting of a vote on a resolution or bill; it covers all aspects of the legislative process, including the discussions held and alliances struck regarding a legislative matter in anticipation of a formal vote. . . . Meeting with

persons outside the legislature—such as executive officers, partisans, political interest groups, or constituents—to discuss issues that bear on potential legislation, and participating in party caucuses to form a united position on matters of legislative policy, assist legislators in the discharge of their legislative duty. These activities are also a routine and legitimate part of the modern-day legislative process. The fact that such meetings are politically motivated, or conducted behind closed doors, does not take away from the legislative character of the process.") (cleaned up).

The Court does not perceive any tension between this conclusion and its observations in the July 2023 order that "the legislative privilege is distinct from other recognized privileges in that . . . its animating purpose is not limited to the maintenance of confidentiality" and that "confidentiality interests are less discernible in the context of documents revealing communications between legislators and third parties than they are in the context of internal communications within the legislative branch." (Doc. 237 at 14.) Those passages were simply intended to explain that the state legislative privilege's goal of protecting state legislators from the hassle and expense of responding to discovery requests—which was the interest most directly implicated by Plaintiffs' earlier effort to subpoena Legislators directly—is separate and distinct from the privilege's goal of protecting certain confidentiality interests. They were not meant to definitively resolve the scope of those confidentiality interests or suggest that the only other purpose of the privilege is to protect confidentiality interests. Indeed, the Court ultimately concluded that it was "not persuaded that the rationale for the legislative privilege identified in [*United States v. Gillock*, 445 U.S. 360 (1980)] (i.e., "the need to insure legislative independence"), is limited to maintaining confidentiality within the legislature." (*Id.* at 13.)

Plaintiffs' counterarguments, although not frivolous, do not require a different conclusion. Although Plaintiffs argue that "there is no legitimate expectation of privacy in documents that legislators send to third-parties (and vice versa)" (Doc. 293 at 3), the Court is not convinced that only purpose of the state legislative privilege, apart from enabling legislators to avoid the hassle and expense of discovery compliance, is to protect intra-

legislative confidentiality and privacy interests. In *Lee*, the Ninth Circuit explained that "[t]he rationale for the privilege" is "to allow duly elected legislators to discharge their public duties without concern of adverse consequences outside the ballot box." 908 F.3d at 1187. That conceptualization of the purpose of the privilege—although admittedly vague and subject to interpretation—seems to go beyond protecting intra-legislative confidentiality and privacy. *See also La Union*, 93 F.4th at 323; *Milligan*, 2024 WL 3666369 at \*4; *Puente Arizona*, 314 F.R.D. at 670. Indeed, the Ninth Circuit has held, albeit in the context of the federal legislative privilege, that "[o]btaining information pertinent to potential legislation or investigation" from "constituents" is "one of the things generally done in a session of the House concerning matters within the legitimate legislative sphere" and that "[t]he possibility of public exposure could constrain these sources. It could deter constituents from candid communication with their legislative representatives and otherwise cause the loss of valuable information. . . . We [thus] conclude that the privilege extends to questions about a Congressman's sources of information." *Miller v. Transamerican Press, Inc*., 709 F.2d 524, 530-31 (9th Cir. 1983) (cleaned up). Although Plaintiff correctly notes that *Miller* is factually distinguishable from this case in certain respects (Doc. 293 at 3-4), it still espouses principles that are consistent with the conclusions reached in *La Union* and *Milligan*.

Plaintiffs also argue that accepting *La Union*'s logic would lead to absurd consequences, because "[i]t cannot be the case, for example, that public mailings that legislators send to donors and/or constituents who might influence the legislative process are covered by the privilege" or that the privilege applies "to any random party volunteer or operative who ever communicated with a legislator on a given topic." (Doc. 293 at 5, cleaned up.) Although those hypothetical concerns might be more persuasive in a different case, they fail to account for how the current dispute arose. As noted, Plaintiffs initially attempted to subpoena Legislators directly for their communications with third parties. Those subpoenas, in turn, prompted Legislators to create a privilege log identifying a subset of 38 third-party communications being withheld pursuant to the state legislative privilege.

(Doc. 202-1.) Legislators avowed that all of these withheld communications "were regarding bona fide legislative activity" that occurred "as part of the legislative process." (Doc. 202 at 7.) Notably, Legislators also declined to assert any claim of privilege with respect to "approximately 33,000 documents" they produced to Plaintiffs pursuant to the subpoenas, which "include[d] thousands of stock emails sent to the Legislators from constituents or third-party groups advocating certain positions on pending bills or other issues related to voting and mass emails sent by Legislators to members of the public regarding those bills." (*Id.* at 3.) At no point did Plaintiffs "challenge Legislators' assertion that the subjects discussed in the 38 [withheld] communications are related to legislative activity." (Doc. 237 at 5, citing Doc. 209 at 1-5.) It was only after their motion to compel as to Legislators was denied that Plaintiffs turned around and used the recipient information from Legislators' privilege log to attempt to obtain the same documents, as well as certain other related documents, directly from the recipients. (Doc. 283 at 1 [Plaintiffs' acknowledgement that they "did just that"].) This backdrop undermines any suggestion that upholding the privilege claim here would lead to withholding of mass mailings or off-the-cuff conversations with random party volunteers.[1]

For these reasons, the Court concludes that the documents at issue here are covered by the state legislative privilege. Additionally, even assuming the five-factor test discussed in the July 2023 order remains the valid test for deciding whether the privilege has been overcome—a premise that Legislators dispute—Plaintiffs are not entitled to the documents under that test. The Court already conducted an *in camera* review of many of the withheld

---

[1] The Court also notes that it would create perverse incentives to allow Plaintiffs' discovery strategy to succeed. Legislators, to their credit, expended significant resources compiling a legally sufficient privilege log in response to the subpoenas they received—something not all of the third-party subpoena recipients in this case have done. (Doc. 269 at 25 ["The RPA's privilege log fails . . . because it provides no information whatsoever about the contents of the 61,298 withheld documents or the identity of the creator/sender/recipient of each withheld document."].) It would be anomalous if Plaintiffs could then use the recipient information from that privilege log—information they did not possess before receiving the privilege log—to identify a new wave of third parties to subpoena. The Court does not mean to suggest that Plaintiffs did anything wrong by pursuing this tactic, particularly in light of the July 2023 order's discussion of its potential validity. The point is simply that, on reflection, it would be odd to allow it to succeed.

documents in August 2023, as part of the earlier motion-to-compel proceedings, and determined at the conclusion of that review that "the withheld documents are not more relevant and/or valuable to Plaintiffs' claims than the Court assumed when considering them in the abstract. The *in camera* review thus confirms that the balancing test supports applying the state legislative privilege in this case and that Legislators should be allowed to withhold the documents based on that privilege." (Doc. 242.) Also, although the analysis of the second factor ("availability of alternative evidence") in the July 2023 order assumed that the subpoenas at issue here would be enforceable, the Court's resolution of the second factor in Legislators' favor did not turn on that assumption. (Doc. 237 at 20-23.) That assumption simply provided "*another* reason why the second factor weighs against disclosure," with the primary reasons being that Plaintiffs had already obtained over 30,000 documents from Legislators and that Legislators had not asserted the privilege in relation to a different subpoena to the Republican Party of Arizona that sought, *inter alia*, certain of its communications with legislators. (*Id.*, emphasis added.) Thus, the five-factor balancing test continues to support applying the state legislative privilege here.[2]

II.     The Free Enterprise Club Recipients' Objections

The Free Enterprise Club Recipients raise an additional reason, separate and apart from the state legislative privilege, why they should not be required to comply with the subpoenas directed to them. (Doc. 292 at 3, 10-14.) According to the Free Enterprise Club Recipients, "the subpoenas infringe upon [their] First Amendment rights because the disclosure of the subpoenaed documents would unjustifiably burden [their] associational and political activity." (*Id.*) Plaintiffs disagree, arguing that the First Amendment privilege only applies to an association's internal communications and that the Free Enterprise Club

---

[2] Although more Legislator/third-party communications are being withheld in response to the current round of subpoenas than were withheld in response to the initial round of subpoenas to Legislators (Doc. 292 at 3 ["The Free Enterprise Club's privilege log identifies approximately 303 individual text messages with the Legislators concerning not just S.B. 1485, but also S.B. 1103, S.B. 1106, and S.B. 1713."], neither side has asked the Court to perform an *in camera* review of those additional communications before deciding the applicability of the privilege. In contrast, both sides agreed to *in camera* review during the earlier motion-to-compel proceedings, which was in part why the Court agreed to perform that review. (Doc. 237 at 26-28.)

Recipients have not, at any rate, "offered anything to explain how disclosure of Plaintiffs' requested documents will chill associational speech." (Doc. 283 at 11-13; Doc. 293 at 8-11.)

The Court finds it unnecessary to resolve the Free Enterprise Club Recipients' First Amendment objection because, as discussed in Part I above, the subpoenas are unenforceable pursuant to Legislators' assertion of the state legislative privilege.

Accordingly,

**IT IS ORDERED** that Plaintiffs' motion to compel (Doc. 283) is **denied**.

Dated this 2nd day of October, 2024.

Dominic W. Lanza
United States District Judge