**KRISTIN K. MAYES**
**ATTORNEY GENERAL**
(Firm State Bar No. 14000)

Hayleigh S. Crawford (No. 032326)
Joshua M. Whitaker (No. 032724)
Kathryn E. Boughton (No. 036105)
Joshua G. Nomkin (No. 039213)
Office of the Arizona Attorney General
2005 N. Central Avenue
Phoenix, AZ 85004-1592
(602) 542-3333
Hayleigh.Crawford@azag.gov
Joshua.Whitaker@azag.gov
Kathryn.Boughton@azag.gov
Joshua.Nomkin@azag.gov
ACL@azag.gov

*Attorneys for Defendant*
*Attorney General Kristin K. Mayes*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Mi Familia Vota; et al.,<br><br>Plaintiffs,<br>v.<br><br>Adrian Fontes, in his official capacity as Arizona Secretary of State; et al.,<br><br>Defendants,<br><br>and<br><br>RNC and NRSC,<br><br>Defendant-Intervenors. | No. 2:21-cv-01423-DWL<br><br>**Motion to Exclude Parts of Expert Testimony – Dean Franita Tolson, J.D.** |

The single remaining issue in this case is whether Arizona's 2021 law, S.B. 1485 was enacted with discriminatory purpose. *See* 2021 Ariz. Sess. Laws ch. 359 (1st Reg. Sess.). On this question, Plaintiffs' expert, Dean Franita Tolson, J.D., offers irrelevant evidence from more than a century ago about Arizona's pre-statehood history, which sheds no light on the motives of the legislators who passed S.B. 1485 five years ago. In addition, at times she substitutes her judgment for the Court's judgment by attempting to divine legislative intent, and she uses an untested and unreliable method for doing so. Because those opinions violate Federal Rule of Evidence 702, this Court should exclude them.

## BACKGROUND

### I. The Challenged Law

In 2021, the Arizona Legislature passed S.B. 1485, changing the Permanent Early Voting List to the Active Early Voting List. Before the law's passage, a voter in Arizona could sign up to receive early ballots in the mail, and the voter would continue receiving an early ballot by mail in each election unless (1) she requested not to, (2) she had an inactive or canceled registration status, or (3) a notice was returned as undeliverable and the voter could not be contacted. *See* 2021 Ariz. Sess. Laws ch. 359, § 6 (1st Reg. Sess.)

S.B. 1485 added a fourth category of voters who would not automatically receive early ballots by mail, even if they previously signed up for the Early Voting List: Under the law, if a "voter fails to vote an early ballot in all elections for two consecutive election cycles," then the "officer in charge of elections shall send a notice" to that voter. A.R.S. § 16-544(H)(4), (K), (L). If a voter "receives a notice" and "fails to respond" within ninety days, her name is removed from the Early Voting List. *Id.* § 16-544(M).

Arizona is within the second election cycle covered by the law, meaning the first notices will be sent on January 15, 2027. Ariz. Sec'y of State, 2025 Elections Procedures Manual 67 n.4, https://apps.azsos.gov/election/files/epm/2025/Election-Procedures-Manual-2025--FINAL-12-22-25.pdf.

## II. Procedural History

In 2021, Plaintiffs filed a three-count Complaint challenging two laws. (Doc. 1 at ¶¶ 127-145). This Court granted in part the Attorney General's Motion to Dismiss. (Docs. 76, 154). Although the Court dismissed Count One, it held that Counts Two and Three "pleaded a plausible purposeful discrimination challenge to S.B. 1485 under the United States Constitution" and under Section 2 of the Voting Rights Act. (Doc. 154 at 59).

The parties have pursued discovery, including expert discovery. Plaintiffs have disclosed two experts, one of whom is Dean Franita Tolson, J.D. (Doc. 323). Dean Tolson disclosed a Report purporting to show that "SB 1485 was *designed* to burden the voting rights of [minority] voters by forcing them away from vote-by-mail into a potentially more burdensome in-person voting process." Report ¶ 1 (emphasis added).[1] To reach that conclusion, the Report relied on Arizona's "lengthy history of official actions, many of which predate Arizona's admission as a state." Report ¶ 6. It also applied a methodology termed "colorblind targeting." *See* Report ¶ 101. The Report's "colorblind targeting" method involves reviewing three factors—"timing, geography, and voting method"—to offer an opinion "demonstrat[ing] how [a] state legislature targets minority voters without relying on facially discriminatory language but … nonetheless singles out these populations." *Id.* Defendants deposed Dean Tolson. (Doc. 330).[2]

## LEGAL STANDARD

Rule 702 requires an expert's proponent to "demonstrate[ ] to the court that it is more likely than not that (a) the expert's … specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and

---

[1] Dean Tolson disclosed a corrected expert report on December 10, 2025, which is attached as Exhibit 1.

[2] Portions of Dean Tolson's deposition transcript are attached as Exhibit 2.

methods to the facts of the case." Fed. R. Evid. 702. Thus, the "decision to admit or exclude expert testimony is guided by a two-part test that focuses on the opinion's relevance and reliability." *Unknown Party v. Ariz. Bd. of Regents*, No. CV-18-01623-PHX-DWL, 2022 WL 4481519, at *1 (D. Ariz. Sept. 27, 2022); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (similar).

Recent amendments "clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. "Properly applied, Rule 702 requires that challenges to an expert's opinion go to the weight of the evidence only if a court first finds it more likely than not that an expert has a sufficient basis to support an opinion." *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1049 (9th Cir. 2025).

"[T]here is no presumption in favor of admission," and "the district court's gatekeeper function applies to all expert testimony, not just scientific expert testimony." *Id.* at 1048-49. "If Plaintiffs fail to carry this burden, the opinions of their experts are not admissible." *Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 WL 3532179, at *3 (D. Ariz. Aug. 2, 2019).

On the merits, the only remaining question in this case is whether "S.B. 1485 was enacted for the purpose of preventing voters of color from exercising the right to vote, in violation of the Fourteenth and Fifteenth Amendments and Section 2 of the Voting Rights Act." (Doc. 184 at 13). "A legislature acts in violation of the Fourteenth and Fifteenth Amendments when 'a discriminatory purpose [is] a motivating factor' in the legislature's action." (Doc. 154 at 49-50) (quoting *Vill. of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977)). And because "Section 2 of the Voting Rights Act … prohibits voting laws and practices adopted with a discriminatory purpose … a showing of intent of intent 'sufficient to constitute a violation of the [F]ourteenth [A]mendment' also suffices 'to constitute a violation of [S]ection 2.'" (Doc. 154 at 50) (quoting *McMillan v. Escambia County*, 748 F.2d 1037, 1046 (5th Cir. 1984)). Thus,

there is not a meaningful difference between the standard of proof for the remaining claims in this case.

## ARGUMENT

### I. Dean Tolson's opinions about Arizona's pre-statehood history are unhelpful and should be excluded.

This Court should exclude Dean Tolson's opinions about Arizona's pre-statehood history because that history is irrelevant to the remaining claims and thus not helpful to this Court's determination of the facts. *See* Fed. R. Evid. 702(a).

Arizona became a state in 1912. Pre-statehood history cannot support "whether invidious discriminatory purpose was a motivating factor" of the 2021 Arizona Legislature that enacted S.B. 1485. *See Vill. of Arlington Heights*, 429 U.S. at 266. "[U]nless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value." *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987). In this case, "all that matters is the intent of the legislature responsible for the enactment at issue" and "the views of an earlier legislature are generally not probative of the intent of a later legislature, particularly when the subsequent legislature has a substantially different composition." *United States v. Carillo-Lopez*, 68 F.4th 1133, 1140-41 (9th Cir. 2023) (cleaned up).

Because the Report's purported "relevant historical background" addresses the territorial legislature, other territorial government actors, pre-statehood general sentiments, and other states' laws, it extends well beyond any evidence relevant to the 2021 Legislature's decision-making. *See* Report ¶ 1; *see also Mi Familia Vota v. Fontes*, 129 F.4th 691, 725 (9th Cir. 2025) (requiring consideration of circumstantial evidence), *pet. for writ of cert. filed*, *Arizona v. Promise Ariz., et al.*, No. 25-1022 (U.S. Feb. 19, 2026).

Specifically, paragraphs 14 through 31 recount parts of Arizona's history that are plainly not at issue in this case. For example, they describe territorial days' interaction with the Confederate State of America, (¶ 14), labor conditions on "corporate farms, mining and railroads in the 1870s and 1880s," (¶ 15), white Democrats' views of

Republicans in the 1880s and 1890s, (¶ 16), commentators "writing on the eve of the Civil War," (¶ 17), "fear of interracial marriage" and 1865 and 1901 anti-miscegenation laws, (¶¶ 18-19), pre-statehood "unwritten norms" restricting "the role of racial minorities in legal proceedings," (¶ 20), a criminal law passed in 1867, (¶¶ 24-25), the prison population in 1894, (¶ 26), a 1901 felon disenfranchisement law, (*id.*), peonage before and after the 1867 Anti-Peonage Act, (¶ 28), a 1909 literacy requirement for voting, (¶ 30), and political elites' "voter suppression" tactics "on the eve of statehood," (¶ 31). This description of Arizona's history and practice cannot properly be considered "historical background" of S.B. 1485's 2021 enactment, even on a lenient view of relevance.

Other parts of those challenged paragraphs consider pre-1912 practices in other states, which also cannot be "historical evidence relating to the enactment at issue." *Carillo-Lopez*, 68 F.4th at 1141. For example, the Report states (at ¶ 19) that anti-miscegenation laws like Arizona's "were common in the post-bellum statutes of a number of southern states including North Carolina, Virginia, Georgia, Alabama, and also in the surrounding states of California and Nevada." Even if that evidence is true, other states' laws are irrelevant to the intent of the 2021 Arizona Legislature.

Similarly, the Report (at ¶ 27) describes laws from Mississippi, Florida, and North Carolina. Although it asserts that Arizona "borrowed" its laws from those other states, the existence of *other states'* pre-1912 laws has no bearing on a fact at issue in this case. *See also* Report ¶ 29 (comparing pre-1912 Arizona to other "jurisdictions with ties to the former Confederacy"). "[W]hat matters … is the intent of the [2021] Legislature," not other states' laws. *Abbott v. Perez*, 585 U.S. 579, 605 (2018).

Moreover, even Dean Tolson's Report suggests that these pre-Statehood discussions lack relevance. Although these pre-Statehood facts are included in the Report's background section, they are not incorporated or used in Dean Tolson's primary "colorblind targeting" methodology, which she uses to opine on whether S.B. 1485 "single[d] out" minority voters "without relying on facially discriminatory language."

*See* Report ¶ 101. The absence of these pre-Statehood facts in Dean Tolson's ultimate opinions is not surprising as these facts are not reasonably contemporary to SB 1485's passage nor do they provide any insight into the purposes of the Legislature that passed this law.

For these reasons, the Court should exclude opinions discussed in paragraphs 14 through 31 of the Report.

**II. The Report's colorblind targeting methodology improperly offers opinions on legislative intent.**

**A. The Report's conclusions about intent are unhelpful.**

Dean Tolson's opinions on "intent, state of mind, or motivations" are "outside the bounds of appropriate expert testimony." *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX-DGC, 2018 WL 495187, at *3 (D. Ariz. Jan. 22, 2018) (citation omitted). "Courts routinely exclude as impermissible expert testimony as to intent, motive or state of mind" because that testimony "offers no more than the drawing of an inference from the facts of the case," and "permitting expert testimony on this subject would be merely substituting the expert's judgment for the [factfinder's] and would not be helpful to the [factfinder]." *McGee v. Zurich Am. Ins. Co.*, CV-17-04024-PHX-DGC, 2021 WL 6070590, at *8 (D. Ariz. Dec. 22, 2021) (citations omitted).

Because Dean Tolson's methodology and some of her opinions attempt to answer "whether invidious discriminatory purpose was a motivating factor," *Vill. of Arlington Heights*, 429 U.S. at 564, they substitute her judgment about legislative intent for the factfinder's and are therefore unhelpful, *see Democratic Nat'l Comm. v. Reagan*, No. CV-16-01065-PHX-DLR, 2018 WL 10455202, at *10 (D. Ariz. May 8, 2018) (applying this standard to legislative intent).

The Report's animating methodology is "colorblind targeting," which purports to examine "three factors—timing, geography, and voting method—that demonstrate how the state legislature targets minority voters without relying on facially discriminatory language but … nonetheless singles out these populations." Report ¶ 101. In other words, the methodology seeks to deduce whether a law is an "effort[ ] to circumscribe minority

voting rights." Report ¶ 177; *see also* Report ¶ 9 (defining "colorblind targeting" as a "strategy" using "using race neutral voting restrictions that, nonetheless, target minorities and function similar to facially race-based regulations"). These issues—whether the Arizona Legislature intended to "single out" minority voters, enacted the law as an "effort" to "circumscribe" their rights, or pursued a particular "strategy" so that it would have that effect—all present a "question of intent." *Abbott v. Perez*, 585 U.S. 579, 604 (2018). That is not properly the subject of expert testimony.

Although Dean Tolson testified that colorblind targeting seeks merely to provide context, *see, e.g.*, Tolson Dep. 20:14-17, the Report belies that limited characterization. Throughout, it assesses the Legislature's intent when enacting S.B. 1485, and courts "routinely exclude as impermissible expert testimony as to intent, motive, or state of mind." *Siring v. Or. State Bd. of Higher Ed. ex rel. E. Or. Univ.*, 927 F. Supp. 2d 1069, 1077 (D. Or. 2013) (collecting cases). For example, Dean Tolson opines that:

- "The state's lengthy history of discrimination against minorities and its connection to SB 1485 **suggest that there was discriminatory intent behind SB 1485**." Report ¶ 13 (emphasis added).
- S.B. 1485 is an example of a law that "take[s] advantage" of the "geographic location" of minority communities "**for purposes of** disenfranchisement." Report ¶ 103 (emphasis added).
- The "conflation" of "timing, geography, and voting method" shows that laws like S.B. 1485 and other laws "are **designed** to mimic laws that are enacted with racially discriminatory intent." Report ¶ 105 (emphasis added).
- S.B 1485 is an example of "voting restrictions that **target** minority populations following a contentious election cycle." Report ¶ 109 (emphasis added).
- Arizona had "voter **suppression tactics**" that "geographically **targeted** minority voters." Report ¶ 125 (emphasis added).

- "In reality, these restrictions **are a response** to higher participation from minority voters in recent competitive election cycles." Report ¶ 141 (emphasis added)
- "SB 1485 has to be understood as a part of a broader **scheme** for burdening minority voting rights." Report ¶ 149 (emphasis added)
- Timing, geography, and voting method "can align in ways that **defy arguments** that Arizona **did not intend** to make voting harder for people of color." Report ¶ 157 (emphasis added).
- "Arizona amended its election laws in 1970, requiring all voters to register annually, **for exactly the same reason** that **motivated the passage** of SB 1485: to increase the likelihood that voters who don't vote consistently, or in the same manner, will be disenfranchised." Report ¶ 160.
- S.B. 1485 is "is a part of a **systematic and persistent effort** on the part of the state legislature **to burden** those voting mechanisms preferred by minority voters in the face of increasing electoral threat." Report ¶¶ 10.b., 162 (emphasis added).
- S.B. 1485 "was enacted **for reasons** other than those articulated." Report ¶¶ 10, 165 (emphasis added).

These conclusions are examples of improper deductions about what the Arizona Legislature intended. They opine on, for example, the Legislature's motivation for passing the law (¶ 160), and whether it had a "scheme" to "burden[ ] minority voting rights" (¶ 149). They deduce the "reason[ ]" Arizona enacted a law (¶ 165), and whether S.B. 1485 was a "tactic" to "target[ ]" minority voters (¶ 125).

Indeed, Dean Tolson's report (at ¶ 1) purports to "show" that "SB 1485 was designed to burden the voting rights of [minority voters]." In that context, "design" is simply a synonym for "intend." *See Design*, Cambridge Dictionary (last visited Mar. 11, 2026), https://dictionary.cambridge.org/dictionary/english/design (defining "design" as

"to intend"). These opinions should all be excluded as unhelpful substitutes for the Court's own judgment on a question of intent. *See McGee*, 2021 WL 6070590, at *8.

**B. Courts already have a different method for assessing legislative intent, and colorblind targeting is no substitute.**

Dean Tolson's opinions on intent are not only an improper substitute for the Court's judgment, but they also rest on an analytical method that differs from the method the Supreme Court has instructed courts to use. In other words, courts already have an established test "to try to ascertain intent when you might not have smoking-gun evidence or … really persuasive … direct evidence" of discriminatory intent, which is what the colorblind targeting method purports to do. Tolson Dep. 115:10-16. The Supreme Court set out that test in *Arlington Heights*. *See* 429 U.S. at 266-68. Dean Tolson cannot use the colorblind targeting method to "give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law," especially when it bypasses an established legal test. *See Nyegres v. Hillstone Rest. Grp. Inc.*, No CV-19-02376-PHX-DWL, 2021 WL 3290463, at *8 (D. Ariz. Aug. 2, 2021) (quoting *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004)). For that reason, the colorblind targeting method should be excluded.

Moreover, the colorblind targeting method is a bad substitute for *Arlington Heights*. It is underinclusive of what the Supreme Court has instructed courts to consider, because it does not implement that "the burden of proof lies with the challenger, not the State," meaning "the presumption of legislative good faith" is "not changed by a finding of past discrimination." *Abbott*, 585 U.S. at 603. Although Dean Tolson's Report cites part of this standard, it does not apply it. *See* Report ¶ 6 n.1.

For example, in passing S.B. 1485, the Legislature found "that integrity in all elections in this state is a matter of statewide concern" and declared "that a person who requests to be on the active early voting list and who repeatedly fails to vote with the ballots that are mailed out by the county recorder increases the likelihood of fraudulent use of those unvoted ballots" and "maintenance of an accurate active early voting list is

therefore essential to maintaining the integrity of this state's elections." 2021 Ariz. Sess. Laws ch. 359, § 7 (1st Reg. Sess.).

However, the colorblind targeting methodology as applied to S.B. 1485 does not assess whether those legislative findings were made in good faith. The Report does not contest them. Tolson Dep. 126:12-21. It does not even mention them. *Id.* 125:19. And yet, bypassing that analysis, the Report concludes that "SB 1485 was designed to burden the voting rights of [minority] voters." Report ¶ 1.

The method also transforms one type of alleged legal violation into another type. It leaps past *Arlington Heights* to conclude, for example, that certain Arizona jurisdictions' failure to "comply with the requirements of Section 203 of the Voting Rights Act … is an attempt to burden a particular voting method (in-person voting) so that this vehicle to casting a ballot becomes meaningless for minority communities without accommodations for language and/or literacy barriers." Report ¶ 150. Section 203, however, "imposes certain bilingual or multilingual election requirements for 'covered' States or political subdivisions," but it is not an intent-based test. *See Padilla v. Lever*, 463 F.3d 1046, 1050 (9th Cir. 2006). A Section 203 failure is not conclusive evidence of an "attempt" to burden a voting method "so that" the method "becomes meaningless for minority communities," but colorblind targeting says it is.

The colorblind targeting framework is also overinclusive—that is, it considers factors beyond what the Supreme Court has instructed courts to consider. It looks well beyond the relevant governmental body to assess legislative intent. *See Abbott*, 585 U.S. at 604. Using that method, the "report canvasses a century and a half of history that involves state decisions, that involves local decisions. It's all about showing patterns across time. And it includes decisions by relevant local – relevant decision-makers, but it also includes – I talk about the Ku Klux Klan in my report, right, because that's relevant to understanding the politics in Arizona." Tolson Dep. 43:7-13. The method therefore looks past the "historical background *of the decision*," *Vill. of Arlington Heights*, 429 U.S. at 267 (emphasis added), to reach determinations about legislative intent. That does not

pass muster under *Arlington Heights* because "[p]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Abbot*, 585 U.S. at 603 (citation omitted).

By evading these presumptions and protections built into in the *Arlington Heights* test, the colorblind targeting method, if relied on by the factfinder, would produce results inconsistent with what the Supreme Court has instructed.

**III. The colorblind targeting method should also be excluded because it is not generally accepted.**

The general acceptance of an expert's methodologies can be an "important factor in ruling particular evidence admissible." *Davis*, 2019 W 3532179, at *10 (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594 (1993)). Colorblind targeting is a new "theory" that Dean Tolson "developed relatively recently," Tolson Dep. 27:1-20, which counsels against its admission. No other court and no other scholar have adopted this methodology examining geography, timing, and voting method to determine legislative intent. *Id.* 28:15-21. This Court should not be the first to adopt this untested and unreliable concept.

**IV. The colorblind targeting method should also be excluded because it is unreliable.**

The colorblind targeting method produces unreliable results. The Supreme Court has "made clear" that "'nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.'" *Tavilla v. Cephalon Inc.*, No. CV11-0270-PHX-DGC, 2012 WL 1190828, at *6 (D. Ariz. Apr. 12, 2012) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). The colorblind targeting method should also be excluded because it yields conclusions that fail to "allow[ ] the Court to determine whether [Dean Tolson is] using reliable principles and methods and [is] applying them to the facts of the case in a reliable manner." *Farmers Ins. Co. of Ariz. v. DNS Auto Glass Shop LLC*, No. CV-21-01390-PHX-DGC, 2024 WL 1256042, at *8 (D. Ariz. Mar. 25, 2024) (citation omitted).

Although colorblind targeting purportedly "look[s] at patterns of behavior," Tolson Dep. 115:11, by examining "timing, geography, and voting method," *see, e.g.*, Report ¶ 101, those factors can give way for unexplained reasons. For example, the Report (at ¶¶ 10.a-b., 165) considers "[t]he process leading to SB 1485's passage," which is relevant to *Arlington Heights*, but not the three colorblind targeting axes. *See* Report ¶ 101. Dean Tolson explained that "there may be other things that are relevant, you know, that inform my thinking that don't necessarily fit neatly into those three categories," Tolson Dep. 26:4-7, but that just suggests Dean Tolson's *ipse dixit* determines the method.

Furthermore, the Report asserts that many laws and proposed laws fit into "Colorblind Targeting in Arizona, 2018-2023," but there is no clear link to the colorblind targeting method other than that they are recent regulations or proposed regulations related to voting. Report ¶¶ 162-77. In other words, the unifying theme of that section is not the three colorblind targeting factors, but it is instead Dean Tolson's say-so.

For example, the Report (at ¶ 163) discusses S.B. 1072, 2019 Ariz. Sess. Laws ch. 15 (1st Reg. Sess.), which required voters to present identification before receiving a ballot at an early voting location. A.R.S. § 16-542(A). And it mentions (at ¶ 163) H.B. 2196, 54th Leg., 1st Reg. Sess (Ariz. 2019), which would have required voters casting early ballots at polling locations on election day to confirm their identification. The discussion of those proposals does not mention why presenting identification at an early voting location would impact minority voters or how a geographic analysis would be relevant. It just baldly asserts that the proposals were considered "after voters on the permanent early voting list dropped off their ballots in significant numbers at early voting centers in Maricopa County." Report ¶ 163.

And the Report (at ¶ 164) notes a law that "restricted election-related deadlines from being adjusted," which was passed "in response to a judicial decision that extended the voter registration deadline for the November 2020 general election." (discussing H.B. 2794, 2021 Ariz. Sess. Laws, ch. 380 (1st Reg. Sess.)). The Report simply characterizes

it as a "voting restriction[ ]" without describing why it is problematic under colorblind targeting.

In addition, the Report describes (at ¶ 166) S.B. 1593, 55th Leg., 1st Reg. Sess. (Ariz. 2021), which "would have reduced the number of days that early voters had to review their ballots, from 27 days to 22," and would have required voters to use a provisional ballot if they vote in person but do not return a mail-in ballot. Yet the Report does not apply the three colorblind targeting factors to explain why that bill is suspect.

The Report characterized (at ¶ 167) a proposal to allow "the legislature to choose the state's presidential electors" as "*presumably* another check against an increasingly diverse electorate." (citing S.C.R. 1006, 55th Leg., 1st Reg. Sess. (Ariz. 2021)) (emphasis added). The Report, however, does not explain why this presumption is reasonable under the colorblind targeting framework, or how the proposal could be interpreted as burdening a "voting mechanism."

And (at ¶ 176-77), the Report asserts that a proposal to require "voters who are not elderly, disabled, or out of precinct to provide a reason for not voting in person" was a "fitting bookend to the last two decades of nonstop efforts to circumscribe minority voting rights." (citing H.B. 2876, 56th Leg., 2d Reg. Sess. (Ariz. 2024)). But that conclusion simply suggests that any regulation of mail-in voting would be suspect under colorblind targeting.

For a test to yield reliable results, there must be some greater connection between a voting regulation and the presumption that it is "another check against an increasingly diverse electorate," or the conclusion it is an "effort[ ] to circumscribe minority voting rights." *See* Report ¶¶ 162, 167, 177. Rather than being a reliable method with clearly defined objective criteria, Dean Tolson's colorblind targeting method relies largely on her own *ipse dixit* and should be excluded.

## CONCLUSION

This Court should exclude Dean Tolson's opinions that rely on Arizona territorial history and that opine on legislative intent. It should also exclude opinions that rely on Dean Tolson's novel colorblind targeting method.

RESPECTFULLY SUBMITTED this 11th day of March, 2026.

**KRISTIN K. MAYES**
**ATTORNEY GENERAL**

By: /s/ Joshua G. Nomkin

Hayleigh S. Crawford
Joshua M. Whitaker
Kathryn E. Boughton
Joshua G. Nomkin
Office of the Arizona Attorney General
2005 N. Central Ave.
Phoenix, Arizona 85004-1592
Telephone: (602) 542-3333