# EXHIBIT 1
# December 10, 2025,
# Tolson Corrected Report

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| MI FAMILIA VOTA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ADRIAN FONTES, *et al.*,<br><br>Defendants. | **No. CV-21-01423-PHX-DWL** |

**Expert Report of Franita Tolson, J.D.**


**Dean and Carl Mason Franklin Chair in Law**
**Professor of Political Science and International Relations (Courtesy)**
**USC Gould School of Law**
**699 W. Exposition Blvd.**
**Los Angeles, CA 90089**


On behalf of Plaintiffs

## I. Purpose and Organization of This Report

**1.** Plaintiffs Mi Familia Vota, Arizona Coalition for Change, Living United for Change in Arizona ("LUCHA"), and League of Conservation Voters, Inc. d/b/a Chispa AZ ("Chispa AZ") in *Mi Familia Vota v. Fontes* (the "Plaintiffs") have asked me to evaluate the historical context for Arizona Senate Bill 1485 ("SB 1485"), which implements the active early voting list, and its similarity to prior voting restrictions and practices in the state that have minimized the political power of minority communities. This report describes how, both before and after statehood, Arizona has disenfranchised minority voters through facially race-neutral practices by singling out their geographic location and targeting the voting methods predominantly used by these communities. SB 1485 was enacted in response to the substantial increase in minority turnout and participation in the 2020 election. The relevant historical background, the attendant facts and circumstances surrounding its passage, and the expected disparate impact of the law are consistent with conclusion that the purpose of SB 1485 is to reduce the number of minority voters. As this report will show, SB 1485 was designed to burden the voting rights of these voters by forcing them away from vote-by-mail into a potentially more burdensome in-person voting process.

## II. Table of Contents

I. Purpose and Organization of This Report ..... 1
II. Table of Contents ..... 2
III. Credentials ..... 2
IV. Summary of Major Findings ..... 3
V. Discriminatory Voting Practices in Arizona, from 1860 to the Present, as Historical Context for SB 1485 ..... 9
A. The Confederate and Jim Crow Origins of Arizona Territory, 1860-1912 ..... 10
B. Maintaining a White Electorate: Racial Discrimination in Arizona Politics 1912-1966 ..... 18
C. The Shift to Colorblind Targeting: The Voting Rights Act in Arizona, 1966-2000 ..... 25
D. Resisting A Diverse Electorate: Colorblind Targeting from 2000-2018 ..... 32
VI. Putting SB 1485 in Historical and Contemporary Context: Colorblind Targeting As Discriminatory Intent ..... ~~40~~41
A. SB 1485 as Colorblind Targeting: The Historical Importance of Timing ..... ~~43~~44
1. George W.P. Hunt and the Threat of Minority Voters in the Progressive Era ..... 45
2. The Timing of Voter Suppression in the Voting Rights Act and Post-Voting Rights Act Eras ..... 46
B. SB 1485 as Colorblind Targeting: The Historical Importance of Geography ..... 50
1. Maricopa County as a Case Study in Geographic Targeting ..... 52
2. Counties with Native American Reservations as Case Studies for Geographic Targeting ..... 58
C. SB 1485 as Colorblind Targeting: The Historical Importance of Selectively Restricting Specific Voting Methods ..... 60
D. Placing SB 1485 in Broader Political Context: Colorblind Targeting in Arizona, 2018-2023 ..... 65
VII. Bibliography ..... 71

## III. Credentials

**2.** I am Dean and Carl Mason Franklin Chair in Law at University of Southern California (USC) Gould School of Law. I also hold a courtesy appointment in the Political Science and International Relations Department at USC. A graduate of the University of Chicago Law School, I have been a visiting professor at the University of Chicago Law School and Northwestern University School of Law. My scholarship and teaching focus on election law, constitutional law, and legal history. I write on many topics including partisan

gerrymandering, political parties, the Elections Clause, the Voting Rights Act of 1965, and the Fourteenth and Fifteenth Amendments. My work uses history as a methodology to illuminate modern day controversies over the right to vote and the scope of congressional power to regulate elections. My research has appeared or will appear in leading law reviews including the *Harvard Law Review*, *Yale Law Journal*, *Stanford Law Review*, *California Law Review*, *University of Pennsylvania Law Review*, and *Vanderbilt Law Review*. I am also one of the coauthors of the leading election law casebook, *The Law of Democracy* (Foundation Press, 6th ed. 2022). My forthcoming book, *In Congress We Trust?: Enforcing Voting Rights from the Founding to the Jim Crow Era*, will be published in 2026 by Cambridge University Press.

**3.** As a nationally recognized expert in election law, I have written for or appeared as a commentator for mass media outlets including *The New York Times*, *The Los Angeles Times*, *The Wall Street Journal*, *Reuters*, and *Bloomberg Law*. I have testified before Congress (both House and Senate) on voting rights issues four times since 2019. I am also a consultant on voting rights litigation and redistricting processes, both for amicus briefs and as a compensated expert. In 2020, I authored a legal analysis at the request of Senators Elizabeth Warren and Richard Durbin regarding a proposed constitutional amendment that would explicitly protect the right to vote. During the fall of 2020, CNN employed me as an election law analyst, and I continue to appear on that network and others. I was also a voting rights consultant for Facebook from 2020-2022 and helped the platform develop a voter information center that helped over four million people register to vote during the 2020 election cycle. During the 2020 election cycle, I co-hosted an election themed podcast, *Free and Fair with Franita and Foley*, with Professor Edward Foley of the Ohio State University Moritz College of Law. During the fall of 2024, I was a political commentator for MSNBC.

**4.** The analyses and opinions expressed in this report are my own. In this report, I have utilized the standard methodology used by historians, political scientists, and election law scholars when investigating the discriminatory intent and effect of a contested election law. Relying on primary and secondary sources— including newspapers, comments by state officials, scholarly books and articles, legislative history and official reports from government bodies, quantitative evidence of voter behavior, court decisions, and documents produced during litigation—this report evaluates the historical, political, institutional, and social context in which SB 1485 was adopted.

**5.** I am being compensated for my time at an hourly rate of $400. My compensation in this matter is not in any way contingent or based on the content of my opinions or the outcome of this or any other matter.

## IV. Summary of Major Findings

**6.** My **first conclusion** is that Arizona has a lengthy history of official actions, many of which predate Arizona's admission as a state, that have been undertaken for invidious purposes and that continues to the modern day.[1] Under *Arlington Heights*, both the history of racial

[1] *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977)("The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes."). *See also Abbott v. Perez*, 585 U.S. 579, 603-604 (2018) (noting that historical evidence of past discrimination cannot shift the burden of proof in intent cases, but nonetheless reaffirming the importance of this evidence in establishing the existence of discriminatory intent (citing *Arlington Heights*)).

discrimination in Arizona and the sequence of events leading up to SB 1485's enaction demonstrates the discriminatory intent behind the law.

a. Prior to statehood, the white population in Arizona pursued a strategy of marginalization and discrimination among its minority populations in both law and practice. As a result, the territory and later, state, of Arizona used many of the same discriminatory tactics as states in the former Confederacy—Jim Crow laws, felon disenfranchisement and peonage laws, school segregation, literacy tests, racialized violence, fostering of an active Ku Klux Klan presence, and utilization of other methods designed to oppress Native American, Latino, African American, Chinese, and other ethnic populations.

b. Thus, with respect to its laws and racial politics, Arizona—itself a former Confederate territory—did not look very different from many states in the former Confederacy whose discriminatory practices were regularly challenged and periodically enjoined by the courts. Similar to states in the former Confederacy, facially discriminatory laws persisted in Arizona until expressly prohibited by federal law in the 1960s.[2]

**7.** My **second conclusion** is that the response to anti-discrimination efforts by minority groups in the 1950s and 1960s was an emerging political movement defined by its opposition to federal civil rights legislation. Republican Barry Goldwater, elected to the U.S. Senate from Arizona in 1952, became the face of this opposition.[3] In 1964, the state realigned politically around this opposition, shifting from domination by the Democratic Party to domination by the Republican Party much more quickly than other states in the former Confederacy.

**8.** My **third conclusion** is that, in the wake of the adoption of the Voting Rights Act of 1965, the demographic and geographic composition of Arizona's population made the shift from race-conscious to race-neutral methods of discrimination easier than in other states. Its respective minority populations were smaller, more centrally located, and had language/cultural barriers that the state could exploit more effectively than states in the deep South; as a result, finding proxies for discrimination—geographic location on remote reservations, citizenship status, low literacy rates, residential segregation in urban areas, etc.—was an effective means of limiting the political power of racial minorities in the state.

**9.** My **fourth conclusion** is that Arizona engaged in a strategy known as "**Colorblind Targeting**," or the use of race neutral voting restrictions that, nonetheless, target minorities and function similar to facially race-based regulations. This type of targeting usually has three aspects: timing, geography, and voting method.

a. **Timing**: As the Supreme Court has held, the specific sequence of events leading up to official action—including the timing of controversial decisions— is relevant to the discriminatory intent analysis because it "sheds light on the decisionmaker's

[2] *See Rogers v. Lodge*, 458 U.S. 613, 625 (1982) ("Evidence of historical discrimination is relevant to drawing an inference of purposeful discrimination, particularly in cases such as this one where the evidence shows that discriminatory practices were commonly utilized, that they were abandoned when enjoined by courts or made illegal by civil rights legislation, and that they were replaced by laws and practices which, though neutral on their face, serve to maintain the status quo."). *See also Barnhardt v. Meridian Mun. Separate Sch. Dist.*, 394 F.2d 454 (5th Cir. 1968) *and Barnhardt v. Meridian Mun. Separate Sch. Dist.*, No. 4:65-cv-01300-HTW-LGI (S.D. Miss. Aug. 4, 2023) (school desegregation case originally filed in 1965 that did not settle until 2023 because of continuing discriminatory practices).

[3] David Farber, *The Rise and Fall of Modern American Conservatism: A Short History* 81 (2010).

purposes."[4] Historically, new voting restrictions in Arizona occurred: 1) following a sizeable increase in the minority population and/or an increase in the political activism of a minority group; 2) following an election in which a minority group served as a pivotal swing bloc and/or had a substantial influence on the outcome of the election; or 3) following a contentious election cycle in which a political party sought to secure its majority. In Arizona, the time periods of many of these voting restrictions included: the 1964-1966 elections (backlash to the Civil Rights Era); the 1966-1975 elections (grappling with the democratizing effects of the Voting Rights Act of 1965); the 1990-2004 elections (rise of a competitive Democratic Party); and 2018-2022 (shrinking Republican Party majority), all of which are examples of election cycles in which the majority party sought to cement or avoid erosion of its majority status by diminishing the ability of minority voters to serve as a swing bloc.

i. This historical background that immediately preceded the enactment of SB 1485 demonstrates a pattern consistent with earlier attempts to diminish minority political power in the state.[5] Indeed, the *Arlington Heights* framework is designed to apprise courts of the dubious and harmful legislative history that hangs over legislation like SB 1485. SB 1485 became law after Arizona, in 2020, voted for a Democratic presidential candidate for the first time since 1996 and a Democratic governor for the first time since 2002 based in significant part on substantial minority voter support for the Democratic candidates. The use of the permanent early voting list by minority voters during the 2020 election contributed to these margins of victory.[6] As elections became more contested, Republicans campaigned on promises to eliminate this system,[7] first with SB 1485 but also with subsequent proposals designed to significantly reduce the availability of or circumscribe vote-by-mail for numerous demographics.[8]

b. **Geography**: Generally, states are precluded from perpetuating discriminatory effects by taking advantage of de facto residential segregation.[9] By focusing on geography and, in particular, patterns of segregated housing, the state legislature can more easily

[4] *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977). *See also* N.*C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 226 (4th Cir. 2016) (finding that the North Carolina legislature implemented its racially discriminatory voting law "to counter recent success by another party" in the prior election cycle).

[5] *See Arce v. Douglas*, 793 F.3d 968, 973 (9th Cir. 2015) (discussing how the political environment surrounding the adoption of a law that "promot[es] ethnocentrism and reverse racism" supported an inference of discriminatory intent because its supporters campaigned on promises to target Mexican American studies programs in Tucson schools if elected).

[6] *See* Part V(D). The permanent early voting list is also referred to as the "PEVL" in the report.

[7] Caitlin Sievers, *Republicans want to roll back the clock 30 years and end no-excuse early voting*, Ariz. Mirror, Feb. 15, 2024 ("The GOP long benefited from early voting here until then-President Donald Trump and his supporters began spreading misinformation about vote-by-mail fraud after he lost the 2020 presidential election. Since then, Republicans like Rep. Rachel Jones, R-Tucson, who says that her constituents are asking for the system to be scrapped, have tried to eliminate early voting.").

[8] *See, e.g.*, *id.* (discussing House Bill 2876, proposed in February 2024, which "would basically ban the state's no-excuse early voting system, with exceptions only for the elderly, disabled and for people who must be out of their precinct on Election Day.").

[9] *See, e.g.*, *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 539-40 (2015) (citing *Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Par.*, 641 F. Supp. 2d 563, 569, 577-578 (E.D. La. 2009), which was a case "invalidating post-Hurricane Katrina ordinance [under the Fair Housing Act] restricting the rental of housing units to only "blood relative[s]" in an area of the city that was 88.3% white and 7.6% black").

target minority communities with burdensome voting restrictions.[10] Because Arizona's minority communities are concentrated in remote rural areas (such as Native Americans on reservations) or urban areas in big counties (such as African Americans or Latinos in Maricopa County), the state legislature has, in the past, taken advantage of the geographic location of these groups to unduly burden their voting rights.

i. Holding true to its roots in the Confederacy, Arizona has a long history of using geography as a proxy for race and socioeconomic status, a tactic that was common in states across the southern United States. The gerrymandering of Native American reservations—usually by breaking apart this voting bloc to decrease their ability to elect their candidate of choice—and the reduction of polling locations in large cities are recent examples of ways in which Arizona, like states across the south, attempted to use the urban/rural divide to target specific categories of voters. SB 1485 is the next chapter in Arizona's history of using geography as a proxy for race. It is a history that *Arlington Heights* requires courts to consider in reading SB 1485.

ii. SB 1485 takes advantage of the fact that minorities are geographically concentrated, thanks in part to the socioeconomic disparities that persist for minority communities as compared to white voters.[11] Despite the widespread reduction of polling locations in predominantly minority communities from 2013-2019, SB 1485 forces voters who live in these communities, or in remote places such as rural reservations, to turn to in-person voting by making it easier for them to be removed from the law's active early voting list. While there has been an increase in polling locations between 2019-2022, in-person voting will remain challenging and uncertain for the foreseeable future because of a number of factors, including: the difficulty of finding poll workers to staff locations, especially those in rural areas; the high rate of turnover among county election directors; and safety concerns at polling sites.[12] Legislative proposals that will make in-person

---

[10] *Cf. Rogers v. Lodge*, 458 U.S. 613, 627 (1982) (noting that "the sheer geographic size of the county…tends to impair the access of blacks to the political process").

[11] In a recent opinion finding that Arizona's proof of citizenship requirements violated the Civil Rights Act of 1964 and the National Voter Registration Act (NVRA), the district court detailed these inequities, noting:

> The median household income for Black, Native Indian and Alaska Native, and Latino individuals is approximately $9,000 to $21,000 less than the household average. Non-White Arizonans are also more likely than White Arizonans to live in a household with an income falling below the poverty line. For example, 19.2% of Latino Arizonans live in a household below the poverty line, compared to 9.6% of White Arizonans, although naturalized citizens are less likely than native-born citizens to live in poverty. Moreover, approximately 72% of voting-age Latino and 78% of American Indian or Alaska Native Arizonans have earned a high school diploma or equivalent, compared to 95% of White Arizonans.

*Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 969, 1018-19 (D. Ariz. 2024) (internal citations omitted)(also holding that the state's process of checking the voting eligibility of only those individuals suspected of being non-citizens violated the Civil Rights Act of 1964).

[12] *See, e.g.*, Summer Hom, *Cochise County faces a shortage of poll workers ahead of Presidential Primary Election in March*, AZPM News, Dec. 20, 2023; Sasha Hupka, *After wave of poll workers in 2020, political climate and inflation leaves counties searching for*

voting more difficult persist,[13] illustrating the importance of the permanent early voting list.

c. **Voting Method**: The disparate impact of a law remains, under current Supreme Court jurisprudence, compelling evidence of racially discriminatory intent.[14] Over the course of Arizona history, the state has targeted specific voting methods, usually by adopting facially race-neutral laws that have a racially discriminatory impact, to minimize minority political influence in ways similar to restrictions imposed by states across the south. The most widely used discriminatory devices in Arizona for decades were its literacy test and English-only ballots, both of which had a racially discriminatory impact and burdened in-person voting for people of color.[15]

i. Because of the COVID-19 pandemic, during which many voters nationwide shifted their voting method from in-person Election Day voting to early in-person or vote-by-mail options,[16] the state's permanent early voting list was an obvious target in the state's increasingly partisan warfare that came to a head during the 2020 election.[17]

ii. SB 1485 burdens the ability of individuals to vote by mail, and the options that remain open for casting a ballot do not mitigate the disparate impact of this provision.[18] While 75-80% of the state's voters prefer this method of voting, as demonstrated by Plaintiffs' expert Dr. Michael Herron,[19] SB 1485 will likely have a disproportionate impact on the ability of Native Americans, Latinos, and African Americans to stay on the now rebranded "active" early voting list, forcing many of these voters to cast ballots in-person, which has become more logistically complex and, as such, is an increasingly disfavored mechanism of voting for Arizona voters.[20] Under *Arlington Heights*, it is imperative that courts recognize statistics

*workers in upcoming elections*, Ariz. Republic, July 29, 2022. *See also* Yvonne Wingett Sanchez, *Alleged voter intimidation at Arizona drop box puts officials on watch*, Wash. Post., Oct. 20, 2022; Caitlin Sievers, *Republicans want to limit voting to 1,000-voter precincts. Arizona would need more than 4,100*, Ariz. Mirror, March 4, 2024.

[13] Sievers, *supra* note 7.

[14] *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) (noting that evidence of invidious discriminatory purpose includes the disparate impact of the law on a particular group). *See also Doe v. Horne*, 115 F.4th 1083, 1103 (9th Cir. 2024) ("[T]he Supreme Court has long recognized that a policy's discriminatory impact may support a finding a discriminatory purpose.").

[15] *See Rogers v. Lodge*, 458 U.S. 613, 618, 624 (1982) (noting that "the impact of past discrimination" is relevant to finding discrimination under *Arlington Heights*).

[16] *See, e.g.*, Gloria Rebecca Gomez, *Nearly 90% of Arizona voters use early ballots. Republicans would eliminate that to combat imagined fraud*, Ariz. Mirror, Feb. 8, 2022.

[17] *See, e.g.*, Ali Swenson, *Arizona expects to be back at the center of election attacks. Its top officials are going on offense*, AP, March 23, 2024.

[18] *See, e.g.*, *N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 230 (4th Cir. 2016)(rejecting the premise that the disproportionate impact of the challenged legislation depends on the options remaining after its enactment). As the *McCrory* court observed, "[*Arlington Heights*] did not require those minority plaintiffs to show that the Chicago area as a whole lacked low-income housing or that the plaintiffs had no other housing options. Instead, it was sufficient that the zoning decision excluded them from a particular area." *Id.*

[19] Expert Report of Michael Herron, at ~~95-100-101~~¶¶ 4-7.; *Mi Familia Vota v. Hobbs*, CV-21-01423-PHX-DWL, (D. Ariz.).

[20] *See* Part V(D) and Part VI, *infra.*

demonstrating a clear pattern of discriminatory effect. The effects of SB 1485 are probative of discriminatory intent.

iii. The fact that SB 1485 is likely "to bear more heavily on one race than another" is especially harmful for those groups who are still working to overcome past injustices.[21] While many racial groups in Arizona face these challenges, Native Americans, in particular, have experienced the lingering effects of past discrimination, filing numerous legal challenges to restrictive gerrymanders; language and accessibility barriers to voting; discrimination in education and other publicly available resources; and intentional disenfranchisement.[22] SB 1485 will only exacerbate their lack of access in a political process that they have yet to be able to participate in on equal terms.

**10.** My **fifth** conclusion is that SB 1485 has to be viewed, not only in the broader context of racial discrimination in voting that has persisted over the course of Arizona history, but also in light of more recent efforts to burden the right to vote in the state.[23] The years 2018-2023 marked a historic shift in the state's political complexion, from solidly Republican with a rising Democratic opposition, to a purple state with divided government. This state of affairs continues to the present. SB 1485, which its supporters presented as necessary to combat voter fraud, was in reality a response to increasing partisan competitiveness within the state driven by increased political participation by minority voters.[24] Indeed, the significant lack of evidence of systemic fraud,[25] claims of which were debunked following a lengthy audit of the 2020 election by county officials as well as the Cyber Ninjas[26] (a firm hired by Republicans in the state senate), suggests that the legislature's stated reason that SB 1485 was enacted to address voter fraud was pretextual and that body acted for reasons other than those articulated.[27]

a. The process leading to SB 1485's passage, which departed from normal procedures for passing legislation, further corroborates that the legislature's justification was pretextual. According to *Arlington Heights*, courts may consider departure from

[21] *See Washington v. Davis*, 426 U.S. 229, 242 (1976); *Rogers v. Lodge*, 458 U.S. 613, 618, 624 (1982).
[22] *See Rogers*, 458 U.S. at 624 (stating that past discrimination in voting and education that "lingers to this day" is relevant to an assessment of discriminatory intent). *See also* Part V(A-C).
[23] *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) (finding that the school board adopted a series of policies over the course of a decade that resulted in a racially segregated school system) (citing *Keyes v. Sch. Dist.*, 413 U.S. 189 (1973))).
[24] *See* Part VI, *infra*.
[25] *See Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 966 (D. Ariz. 2024) (stating that "there have been 38 total prosecutions related to illegal voting by the [Arizona] Attorney General since 2008").
[26] Dartunorro Clark, *Cyber Ninjas, company that led Arizona GOP election 'audit,' is shutting down*, NBC News, Jan. 6, 2022.
[27] *See Doe v. Horne*, 115 F.4th 1083, 1103 (9th Cir. 2024) (finding evidence of discriminatory intent under *Arlington Heights* where a law that barred all male students from female sports had the effect of targeting students "based entirely on transgender status and [was] not at all based on factors that the district court found bear a genuine connection to athletic performance and competitive advantage"). The law's effect as well as its failure to further its purported aims suggests, according to the Court, that the legislature's articulated reason was not its real reason for enacting the law. *Id. See also* Letter from Secretary of State Katie Hobbs to Governor Greg Ducey, *Re: SB 1485 (early voting list; eligibility)*, April 22, 2021 (SOS_MFV00013114) (noting that SB 1485 is unnecessary because "Arizona already has a process to ensure that voter registrations are current, a process that prevents truly inactive voters from receiving a ballot in the mail").

normal procedures ~~when~~in enacting legislation when probing discriminatory intent. A Republican, Senator Paul Boyer, voted with all of the Democrats in the chamber to block the bill, leading the sponsor of SB 1485, Senator Michelle Ugenti-Rita, to retaliate by recalling his bill expanding the state's school voucher program—legislation completely unrelated to the substance of SB 1485—that had been enacted the day before.[28] Only then did the Arizona senate revisit SB 1485.[29] This sequence of events—in which a bill that had successfully passed the Senate was recalled in retaliation against a Republican senator for failing to support SB 1485—speaks to the extent to which SB 1485 was enacted in a process that departed from normal procedural circumstances.[30]

b. The Republican state legislature was willing to punish members of its own party who did not vote in support of SB 1485 because this law does not stand in isolation from other recent voter suppression efforts.[31] Instead, it is a part of a systematic and persistent effort on the part of the Republican state legislature to burden those voting mechanisms increasingly used by minority voters in the face of a rising electoral threat from candidates largely supported by minority voters. As the Supreme Court observed in *Arlington Heights*, "Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." [32] This is certainly the case with SB 1485, which was part of a series of legislative efforts from 2018 onward that were designed to burden minority political rights.

## V. Discriminatory Voting Practices in Arizona, from 1860 to the Present, as Historical Context for SB 1485

**11.** Throughout the nineteenth and twentieth centuries, Arizona embarked on a program of discriminatory voting practices that continue to the current day. Although slavery never gained traction in Arizona territory, the state's politics were similar to the political systems of many states in the former Confederacy, notably marked by aggressive efforts to minimize the political power of racial minorities within its borders. There were also significant differences between Arizona and the Old South that had implications for the trajectory of race relations in the territory, and later, state of Arizona. Like many southwestern states, Arizona had a much smaller minority population than its southern counterparts. The state was also distinct because of its large Native American population, who were denied citizenship, housed on rural reservations, and disenfranchised by law until well into the twentieth century.

[28] Andrew Oxford, *Bill to cut Arizona's permanent early-voting list fails, leading to drama in the state Senate*, Ariz. Republic, Feb. 16, 2021.
[29] *Id.*
[30] *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977)(noting that "[d]epartures from the normal procedural sequence also might afford evidence that improper purposes are playing a role").
[31] *See Hunt v. Cromartie*, 526 U.S. 541, 553 (1999)(stating that the discriminatory intent analysis should include an assessment of the broader context surrounding passage of the legislation because "[o]utright admissions of impermissible racial motivation are infrequent").
[32] *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

**12.** The Arizona political elite were concerned that minority voters, despite their small numbers, would serve as an important swing bloc in close elections.[33] Unlike other territories and states, there was a relatively robust two-party system in Arizona, where the Republican and Democratic Parties often battled for control of state government.[34] Because of this partisan competition (discussed below), which lasted until the mid-twentieth century and picked up again on the eve of the twenty-first, minority voters had to contend with a range of disenfranchising devices and tactics including literacy tests, racial gerrymanders, intimidation at the polls, and various restrictive voting laws.

**13.** During the long period of Republican dominance from the mid-1960s until the early twenty-first century, attempts to marginalize minority voters did not abate. This period was marked by efforts to maintain a predominantly white governance structure with marginalized minority representation. When Arizona became a covered jurisdiction under the Voting Rights Act of 1965, the newly dominant Republican Party shifted to facially race-neutral means of purging minority voters from the electorate by legally restricting practices disproportionately used by geographically concentrated minority voters to cast their ballots (also known as "Colorblind Targeting"). The ascendance of the Democratic Party in the late 1990s only increased the Republican Party's efforts to fight both the rising tide of demographic change and increasing minority political power. SB 1485, enacted in 2021, is a part of this 150-year battle in which the dominant political party—first the Democratic Party and then the Republican Party following a partisan realignment that started in the 1950s and 1960s[35]—used facially race-based and facially race-neutral practices to, first, create a white electorate and then, later, maintain a white electorate. Using the framework of colorblind targeting, Part V shows how SB 1485 should be understood as part of this long, complex history of race-based voting discrimination as well as contemporary attempts to restrict the right to vote in Arizona. The state's lengthy history of discrimination against minorities and its connection to SB 1485 suggest that there was discriminatory intent behind SB 1485.

### A. The Confederate and Jim Crow Origins of Arizona Territory, 1860-1912

**14.** For most of its history, the territory (and later state) of Arizona has had a marginalized racial minority community governed by a white political class. Although the land that would later comprise the state of Arizona was taken from Mexico in 1848 as a part of the treaty of Guadalupe-Hidalgo, its location in the American west often obscures the state's southern foundations; indeed, Arizona did not start as an American territory, but as a Confederate one. Like the southern states, white people in New Mexico territory, of which Arizona was a part, relied on slave labor, although they primarily enslaved Native Americans.[36] In 1860, Congress delayed Arizona's admission out of fear that it would enter the union as a slave

[33] Ray Stern, *Arizona has a history of its voting laws coming under federal scrutiny. That Continues Today*, Ariz. Republic, Aug. 23, 2022.

[34] David R. Berman, *Arizona Politics and Government: The Quest for Autonomy, Democracy and Development* 18 (1998).

[35] Paul Frymer, *Debating the Causes of Party Polarization in America*, 99 Calif. L. Rev. 335, 341 (2011)("Whereas 92 percent of Southern voters in presidential elections voted for Democrats between 1932 and 1944, this number dropped to 38 percent between 1952 and 1964."); Nicholas A. Valentino & David O. Sears, *Old Times There are not Forgotten: Race and Partisan Realignment in the Contemporary South*, 49 Am. J. Pol. Sci. 672 (2005)(discussing the political realignment among white voters in the South since the 1960s).

[36] Kristina M. Campbell, *Rising Arizona: The Legacy of the Jim Crow Southwest on Immigration Law and Policy after 100 Years of Statehood*, 24 Berk. La Raza L.J 1, 4, 24 & fn. 189 (2014).

state and Arizona remained a part of New Mexico territory. In 1861, pro-Confederate inhabitants of southern New Mexico territory (Arizona) voted to secede from the Union. The Confederate States of America took over the territory in March of 1861 with the hope of establishing an empire that stretched across the western states.[37] In 1862, the Confederate Congress established Arizona's government, creating a six-year term for the Governor, establishing the territorial legislature and laying out the duties for each branch. After the Union Army defeated the Confederates at the battle of Glorieta Pass in 1862, the United States Congress passed an act a year later to "establish and organize the territory of Arizona," requiring the establishment of a republican form of government and barring slavery within its borders.[38]

**15.** The Republican Party was responsible for establishing the territorial government, but control by the party of African American emancipation did not translate into political and economic equality for non-white residents within the state. The racial, ethnic, and religious diversity of the population, as well as the transient nature of its residents (often seeking work in the mines for a term), created a complicated melting pot that white political elites sought to control by subjugating certain groups.[39] For example, residents of Mexican descent, once middle class, found themselves relegated to cheap labor with the emergence of corporate farms, mining, and railroads in the 1870s and 1880s.[40] The intense partisanship in the territory only contributed to the marginalization of this group and others.

**16.** Prior to statehood, the Democratic and Republican Parties engaged in intensely competitive election cycles, with control of the territorial legislature regularly changing hands in the 1880s and 1890s.[41] Because Republicans were willing, at times, to solicit the votes of minority groups, white Democrats viewed Republicans in the territory with the same contempt that white Democrats held for Republicans across the south—that Republicans were "corrupt officials and carpetbaggers who accepted bribes…"[42]

[37] Judge Robert L. Rodgers, *Confederate States Organized Arizona in 1862*, 28 S. Hist. Soc. Papers 222 (1900).
[38] The Organic Act of Arizona, 37 Cong. ch. 56, 12 Stat. 664 (1863); Martin Hardwick Hall, *The Mesilla Times: A Journal of Confederate Arizona*, 5 Ariz. and the W. 337 (1963).
[39] Amy de Haan, *The 1912 Initiative Campaign for Women's Suffrage*, 45 J. Ariz. Hist. 375, 377 (2004) (noting that "Arizona's population during this period was roughly 65 percent Roman Catholic, 15 percent Mormon, and 12 percent Protestant; the remaining 8 percent embraced Native American, Asian, and other religious beliefs. Mining towns, especially, were highly transient…"). *See also* Linda C. Noel, *'I am an American': Anglos, Mexicans, Nativos, and the National Debate over Arizona and New Mexico Statehood*, 80 Pac. Hist. Rev. 430, 434 (2011) (arguing that statehood was ultimately delayed, in part, because the diversity of the population required Arizona residents "to persuade the nation that residents of Mexican descent could be assimilated readily into the United States").
[40] Noel, *supra* note 39, at 449. *See also id.* at 462-63 ("Marginalizationists [in Arizona] succeeded in persuading many Americans that their territory was quite different from New Mexico [and its policy of assimilation] and more like the rest of the nation. They did this by restricting most people of Mexican descent to the bottom rung of society so as to emphasize control over them and their territory.").
[41] *See* Mark E. Pry, *Statehood Politics and Territorial Development: The Arizona Constitution of 1891*, 35 J. Ariz. Hist. 397, 401 (1994); Mary Dale Palsson, *The Arizona Constitutional Convention of 1910: The Election of Delegates in Pima County*, 16 Ariz. and the W. 111 (1974).
[42] Noel, *supra* note 39, at 450.

**17.** Given the partisan wrangling, an enfranchised minority group—even a numerically small one—could make a difference in close elections.[43] Thus, Arizona followed the discriminatory manner of the former Confederate states—in ideology, practice, and law—as political elites sought to control the growing minority population, even though the territory lacked the plantation system of the Old South.[44] While those of Mexican descent were populous mostly in northern New Mexico and southern Texas during the mid-nineteenth century, this population grew substantially in the early decades of Arizona's territorial history.[45] White people in Arizona worried that the growing Hispanic population would have common affinity with African Americans, many of whom had been enslaved. Despite the fact that the Treaty of Guadalupe Hidalgo guaranteed American citizenship to those from Mexico, it was clear that citizenship would be an insufficient foil to distinguish one oppressed minority group from another. As one commentator in Arizona, writing on the eve of the Civil War, observed, "The negro affiliates so readily with the common Mexican that he cannot be retained in bondage in the same neighborhood, and there is no *safety* in slave property."[46]

**18.** Not surprisingly, the laws became more restrictive as increasing numbers of Chinese and African American men migrated to the region. In 1880, there were 110 Chinese people in Phoenix, or 4.6 percent of the population, and by 1900, 150 African Americans, or 2.7 percent of the Phoenix population.[47] These numbers may seem small, but Chinese and African American males were more numerous than women from these groups during this period. In addition, native Mexican and Native American people continued to outnumber white people in the territory's early decades.[48] Thus, the fear of interracial marriage between minority men and white women was prevalent among white Arizonians.[49] In 1865, the territory passed its first anti-miscegenation law, providing that "All marriages of white

[43] *See id.* ("Most Mexican Americans in Arizona voted Republican…[B]ut the entering Anglos largely supported Democrats.").

[44] For the southern states in which slavery was prevalent, the motivation behind the quick adoption of the black codes, which subjected the formerly enslaved to employment restrictions, among other things, was to protect planters who faced the prospect of a mobile class of black laborers who had to be paid wages and to preserve the planters' ability to get labor for free or as close to free as possible. *See, e.g.*, James B. Browning, *North Carolina Black Code*, 15 J. Negro Hist. 461, 461-62 (1930); Joe M. Richardson, *Florida Black Codes*, 47 Fla. Hist. Q. 365-372 (1969). Arizona sought to replicate this hierarchy in which employers economically exploited minority workers based on their perceived inferiority; however, this structure threatened the racial hierarchy in Arizona (just like it had in some southern states) when minority workers competed with impoverished white workers for jobs in times of economic scarcity. *See., e.g.*, Eric V. Meeks, *Protecting the "White Citizen Worker": Race, Labor, and Citizenship in South-Central Arizona, 1929-1945*, 48 J. of the Sw. 91, 97 (2006).

[45] Brian Gratton & Emily Klancher Merchant, *An Immigrant's Tale: The Mexican American Southwest 1850 to 1950*, 39 Soc. Sci. Hist. 521, 525-26 (2015) (noting that the Hispanic population was 50 percent larger in 1900 than in 1880, with geographical expansion reaching into central Arizona and other parts of the southwest).

[46] Edward E. Dunbar, *Letter to the Editor*, *Arizona and Sonora*, N.Y. Times, Jan. 14, 1859.

[47] Matthew C. Whitaker, *The Rise of Black Phoenix: African-American Migration, Settlement, and Community Development in Maricopa County, Arizona 1868-1930*, 85 J. Negro Hist. 197, 198 (2000).

[48] Campbell, *supra* note 36, at 6.

[49] *See* Roger D. Hardaway, *Unlawful Love: A History of Arizona's Miscegenation Law*, 27 J. Ariz. Hist. 377, 379 (1986), https://www.jstor.org/stable/41859700 ("When Arizona became a territory in 1863, its leaders quickly decided that keeping the white race white was a good idea."). *See also* Salvador Acosta, *Crossing Borders, Erasing Boundaries: Interethnic Marriages in Tucson, 1854-1930* 44 (2010) (Ph.D. dissertation, University of Arizona), https://repository.arizona.edu/bitstream/handle/10150/194086/azu_etd_11001_sip1_m.pdf?sequence=1&isAllowed=y (noting that the Arizona Territory also holds the dubious distinction of being one of the "first American legislatures to adopt strict definitions of whiteness in its miscegenation law").

persons with negroes, mulattoes, indians or mongolians are declared illegal and void."[50] Intermarriage between those of Mexican descent and white people had been an important avenue through which Mexican residents gained political power. Following the adoption of this law, the status quo changed. For example, the percentage of interracial marriage between these groups in Pima County dropped from 22.8 percent in the 1870s to 9.1 percent of all marriages three decades later.[51]

**19.** The 1901 version of the law similarly prohibited "the marriage of a person of Caucasian blood with a Negro or Mongolian," but expanded upon the 1865 law by prohibiting marriage between the descendants of white people and the descendants of those in the aforementioned groups.[52] The law was amended again in 1939 to add "Hindus or members of the Malay race" to the list of groups prohibited from marrying white people, subject to a felony conviction for noncompliance and a potential prison term of 2-7 years.[53] Arizona was not an aberration in strictly policing the boundaries of intimate relationships. These types of laws were common in the post-bellum statutes of a number of southern states including North Carolina,[54] Virginia,[55] Georgia,[56] Alabama,[57] and also in the surrounding states of California[58] and Nevada.[59]

[50] Ariz. Stat., Chap. XXX, § 3 (1865). *See also id.* Chap. XXXI ("[A]ll marriages between a white person and a negro shall, if solemnized within this Territory, be absolutely void, without any decree of divorce or other legal process."). *See also In re Walker's Estate*, 46 Pac. 67 (Ariz. 1896)(rejecting a challenge to the territory's 1865 anti-miscegenation law). For purposes of clarity, "mulattos" would have been those individuals of mixed race; "Indians" was a reference to those of Native American ancestry; and "Mongolians" was a reference to those of immigrated from Asia or were of Asian descent.

[51] Thomas E. Sheridan, *Los Tucsonenses: The Mexican Community in Tucson, 1854-1941* 149 (1986).

[52] Ariz. Rev. Stat., Title XLV, Chap. 1, § 6 (1901)("All marriages of persons of Caucasian blood, or their descendants with negroes, Mongolians or Indians, and their descendants, shall be null and void."). *See also* Hardaway, *supra* note 49, at 379 (noting that the legal implications of the amended statute were "absurd" because it rendered some mixed race people incapable of marrying anyone). *See also* Nyla Provost, *A History of Anti-Miscegenation Laws in the United States*, 16 Hist. in the Making 75, 75 (2023).

[53] Ariz. Rev. Stat. Ann. §§ 63-107, 108 (1939). *See also* James R. Browning, *Anti-Miscegenation Laws in the United States*, 1 Duke Bar J. 26, 27 (1951). The term "Malay" was a term used to refer to indigenous populations from a number of places including (but not limited to) Indonesia, Malaysia, the Philippians, and Madagascar, all of whom have a similar language (referred to as "Austronesian"), culture, and identity. *See* Peter Bellwood et al., *The Austronesians: Historical and Comparative Perspectives* (2006).

[54] *See, e.g.*, Browning, *supra* note 44, at 465. It was also a misdemeanor in North Carolina for someone to officiate a marriage between a white person and a person of color. *Id.*

[55] *See Naim v. Naim*, 350 U.S. 985 (1955) (dismissing a challenge to Virginia's anti-miscegenation law for want of jurisdiction). *But see Loving v. Virginia*, 388 U.S. 1 (1967)(holding that anti-miscegenation laws violate the Equal Protection Clause of the Fourteenth Amendment).

[56] *Scott v. Georgia*, 39 Ga. 321, 323 (1869)(upholding Georgia's anti-miscegenation statute).

[57] *Pace v. Alabama*, 106 U.S. 583 (1882)(rejecting a challenge to Alabama's anti-miscegenation statute).

[58] The California Supreme Court struck down that state's anti-miscegenation law, first passed in 1850, in *Perez v. Sharp*, 198 P.2d 17 (Cal. 1948).

[59] *See* Phillip I. Earl, *Nevada's Miscegenation Laws and the Marriage of Mr. and Mrs. Bridges*, 37 Nev. Hist. Soc. Q. 1 (1994) (discussing Nevada's 1861 anti-miscegenation law that was later repealed by the state legislature in 1959).

**20.** Arizona also borrowed from the Jim Crow regimes of the southern states in other ways. The territory had sundown towns;[60] instances of mass violence against racial minorities;[61] and social norms that mandated racial exclusion even where the law did not explicitly require it.[62] For example, while its territorial law did not explicitly bar minorities from testifying against white people in court, like neighboring California,[63] unwritten social norms and threats of physical and economic intimidation made such testimony rare.[64] In practice, Arizona's unwritten norms operated similar to the laws of other states that sought to cast doubt on the veracity of testimony by African Americans.[65] Given the state's origins, it was no surprise that Arizona joined other former Confederate jurisdictions in enforcing similar restrictions on the role of racial minorities in legal proceedings, even if law did not require their exclusion.[66]

**21.** With the end of Reconstruction, exclusionary practices against minorities escalated in Arizona much as they had in former Confederate jurisdictions across the south. The composition of the jury pool, for example, was based on the voting rolls that, under an 1871 Arizona law, remained white:

> Every white male citizen of the United States, and every white male citizen of Mexico, who shall have elected to become a citizen of the United States under the treaty of peace exchanged and ratified at Quintero on the 30th day of May, 1848, and the Gadsden treaty of 1854, of the age of twenty-one years, who shall have been a resident of the Territory six months next preceding the election, and the county or precinct in which he claims his vote ten days, shall be entitled to vote at all elections which are now, or hereafter may be, authorized by law.[67]

[60] Campbell, *supra* note 36, at 15 (noting that "Bisbee [Arizona] in particular was inhospitable—even hostile—to non-White persons who attempted to live or work in the town. Following Tombstone's lead, Bisbee first enacted a series of laws aimed at Chinese immigrants, forbidding them from being in town after sundown, a common restriction among so-called 'Sundown Towns' in the Jim Crow South and Southwest.").

[61] *Id.* at 8 (discussing the Camp Grant massacre of 1871 in which "a vigilante group slaughtered more than 100 Aravaipa and Pinal Apaches, the majority of whom were women and children.").

[62] According to one scholar, even Mexicans deemed white by law did not always receive its benefits:

> The social experiences of Mexicans in Arizona proved that legal whiteness did not necessarily translate into social toleration. They were victims of lynchings and mob violence; a sheriff could manipulate state tax laws to strip them of their property; they participated on juries at lower rates than whites; they were subject to more prosecutions, longer sentences, and a disproportionate number of death sentences; hospitals often denied them services; some employers - mines in particular - used dual-wage systems where Mexicans received lower salaries for equal work and had no access to higher-paying positions…

Acosta, *supra* note 49, at 56.

[63] Rudolph M. Lapp, *Blacks in the Gold Rush California* 192 (1977) (stating that "no black or mulatto or Indian shall be permitted to give evidence in favor of or against any white person").

[64] Acosta, *supra* note 49, at 56.

[65] Florida's law "permitted Negroes to testify in criminal proceedings when a member of their race was involved, but an all-white jury would determine the witnesses' credibility." Richardson, *supra* note 44, at 372. *See also Strauder v. W. Va.*, 100 U.S. 303 (1880) (finding that a Black criminal defendant was denied equal protection in violation of the Fourteenth Amendment after he was convicted by an all-white jury), abrogated by *Taylor v. Louisiana,* 419 U.S. 522 (1975). Similarly, North Carolina and South Carolina also limited or attempted to limit the testimony of black witnesses in matters involving other persons of color in the post-War era. *See, e.g.*, Browning, *supra* note 44, at 465.

[66] *See* Melissa Milewski, *Litigating Across the Color Line: Civil Cases Between Black and White Southerners from the End of Slavery to Civil Rights* (2018).

[67] Ariz. Stat., Chap. XXIV, § 6 (1871). *Cf.* Milewski, *supra* note 66, at 117 ("To ensure that the legal system remained in white hands, black men were chosen less to serve on juries—and in many southern counties not included at all.").

**22.** Despite the Fifteenth Amendment, which prohibited racial discrimination in voting and had been ratified a year earlier, this law ensured that both the electorate and the jury pool would be white and male, like their counterparts across much of the former Confederacy.[68] Had Arizona sought entry into the Union at this point, Congress likely would have denied their request on the grounds that their government and laws were unrepublican in form as required by the act establishing the territory eight years earlier.[69]

**23.** Arizona's late entry as a Union territory during the Civil War meant that governing elites could not introduce slave labor in any systematic manner, but what emerged instead was meant to be just as exploitative of its minority population: convict leasing. In the late nineteenth century, most of the Mexican population in Arizona was concentrated in the southern border counties, forced out of many other areas in the state, and also, like African Americans in the former Confederacy, subject to a penal system designed to further marginalize them and exploit their labor.

**24.** Arizona territory passed a number of vague and overbroad statutes that were used to shepherd minorities into its criminal justice system. For example, an 1867 Arizona law provided that,

> Sec. 1. All persons except Indians belonging to civilized tribes in this Territory, who have no visible means of support, and who within ten days seek neither labor nor employment when employment is offered to them; all persons except as aforesaid, who roam about from place to place without any lawful business; all persons of notoriously bad character who live without any settled home or lawful occupation, may be arrested and committed to jail and sentenced to hard labor for such time as the court before whom they shall think proper, not exceeding ninety days.[70]

**25.** In addition, the 1867 law required Arizona jails to use individuals arrested under Section 1 for labor or outside employment:

> The keeper of the jail, or such other person as the sheriff of the county may appoint, shall be keeper of such prisoners after conviction, and shall employ them at any kind of labor that the board of supervisors of the county may direct, and each and every person so convicted shall be secured while employed outside of the county jail in such manner as shall prevent the escape of the said prisoner.[71]

**26.** Arizona linked its criminal justice regime to its political system to further marginalize these groups. Its territorial law contained a provision that disenfranchised individuals for the commission of any felony, including felonies codified by racially targeted statutes like those

---

[68] *See, e.g.*, *Strauder v. W. Va.*, 100 U.S. 303 (1879).

[69] The Organic Act of Arizona, 37 Cong. ch. 56, 12 Stat. 664 (1863) ("…said government shall be maintained and continued until such time as the people residing in said Territory shall, with the consent of Congress, form a State government, republican in form, as prescribed in the Constitution of the United States…"). *See also* Franita Tolson, *In Congress We Trust: Congressional Power over Voting from the Founding to the Jim Crow Era* (forthcoming 2026); Franita Tolson, *In Whom is the Right of Suffrage?" The Reconstruction Acts as Sources of Constitutional Meaning*, 169 U. Pa. L. Rev. 211 (2021).

[70] Ariz. Stat., Chap. X, § 1 (1867).

[71] *Id.* at § 3.

mentioned above. The immediate effects of its 1901 felon disenfranchisement law, which disproportionately affected the state's Hispanic residents, were severe.[72] By 1894, three-fourths of the inmates in Arizona prisons were of Mexican descent.[73] To put this number in context, Arizona's Mexican population fell from approximately 45 percent of its total residents in 1870 to 20 percent by the end of the nineteenth century.[74] Thus, prisoners of Mexican descent—all of whom were ineligible to vote under the 1901 law—comprised the bulk of Arizona's penal system, even as that group's population fell dramatically over the course of the latter half of the nineteenth century.[75] Even more pointedly, the absence of African American slavery did not prevent the emergence of a parallel, and similarly destructive, system designed to subjugate those of Mexican heritage, who were the predominant minority group in the territory.

**27.** Like its other race-based laws, Arizona borrowed this system from the former Confederate states.[76] The use of vagrancy laws to force minorities to work under threat of criminal punishment, or by using the criminal justice system directly to shepherd individuals into pseudo-slavery, was common throughout the post-Civil War south. Mississippi, the first state to adopt "black codes" to govern the lives of the recently emancipated, required individuals, primarily the formerly enslaved, to obtain labor contracts to stay out of prison. The absence of such a contract was prima facie evidence of vagrancy, the definition of which not only included being idle and disorderly but also encompassed: runaways, lewd persons, those who "misspend their earnings or neglect their work," and white people who associated with black people.[77] Similarly, in late 1865, the Florida legislature adopted a law that, upon the complaint of any citizen, imposed criminal penalties on any person "wandering or strolling about or leading an idle, profligate, or immoral course of life." If convicted, the person could face up to 12 months of forced labor.[78] Strict vagrancy laws were also the norm in postwar North Carolina, which, like its sister states, used these laws not only to populate its jails (leading to disenfranchisement) but also as the basis for a peonage system in which those convicted of vagrancy were often sent to work houses.[79]

---

[72] Ariz. Rev. Stat., Title XX, Chap. III, § 11 (1901).
[73] *See generally Not to be Trusted: Arizona's Claim to Statehood Said to Be Unreliable*, Chicago Daily Tribune, Feb. 11, 1894.
[74] *See* Noel, *supra* note 39, at 451.
[75] This trend is in consistent with other states across the southern United States. *Cf.* Douglas A. Blackmon, *Slavery by Another Name: The Re-Enslavement of Black Americans from the Civil War to World War II* 105 (2008) (noting that the number of black prisoners working in Alabama's mines grew by 42% from 1889 to 1892). According to this commentator, by 1927, "One out of every nineteen black men over the age of twelve in Alabama was captured in some form of involuntary servitude." *Id.* at 375 (noting that charges against these individuals ranged from vagrancy, gaming, and adultery to leaving an employer's farm without permission).
[76] *Id.*
[77] Daniel A. Novak, *The Wheel of Servitude: Black Forced Labor after Slavery* 3 (1978).
[78] Richardson, *supra* note 44, at 372.
[79] *See, e.g.*, Browning, *supra* note 44, at 467.

**28.** Peonage was a system that the southwest helped export to the south.[80] Peonage was common in New Mexico territory (the southern portion of which became a part of Arizona territory in the 1860s),[81] and spread from the southwest to the south after the Civil War.[82] Under this system, a laborer received a monthly stipend and a small food ration to support both himself and his family.[83] Most of the time, this payment went towards paying off a debt, but oftentimes, the debt was never repaid and peonage morphed into a form of involuntary servitude.[84] The peonage system ensured that Hispanics remained economically depressed, feeding into the perception that they were unsuited for voting rights and full citizenship.[85] Despite the passage of the 1867 Anti-Peonage Act by Congress, the practice persisted.

**29.** Like most jurisdictions with ties to the former Confederacy, Arizona territorial law reaffirmed the subordinate status of its minority populations in the late nineteenth and early twentieth century. For example, Native Americans, despite being twenty percent of the territory's population by the end of the nineteenth century, could not challenge their political exclusion by white elites; [86] this group was not granted citizenship until 1924 and would not be given equal voting rights until the 1950s. The othering of Native Americans similarly affected the

---

[80] William S. Kiser, *Borderlands of Slavery: The Struggle over Captivity and Peonage in the American Southwest* 96 (2017) ("Due to the availability of an indigent, socially subordinate class of peon laborers, racial or chattel slavery never gained a foothold in New Mexico [territory]"). Some southern senators pointed to peonage as worse than slavery because, according to Senator John C. Calhoun, "the Puros [referring to peons and Indian captives collectively] are as much slaves as our negroes, and are less intelligent and well treated."). *Id.* at 97. *See also* Andrés Reséndez, *North American Peonage*, 7 J. Civ. War Era 597, 603 (2017) (quoting W.W.H. Davis, U.S attorney in New Mexico from 1853-54, who noted that "[t]he only practical difference between [peonage] and negro slavery is that the peones are not bought and sold in the market as chattels…").

[81] Kiser, *supra* note 80, at 89-90.

[82] Reséndez, *supra* note 80, at 608 ("In 1865–66 various southern states—including Mississippi, South Carolina, Georgia, Florida, Alabama, Louisiana, and Texas—enacted vagrancy laws and systems of debt payable through labor. Although very similar to the labor regime that existed in Mexico and the American Southwest, the peonage system that emerged in the South had its own distinctive traits particularly adapted to the post–Civil War legal environment."). The system of debt peonage that emerged in the southern states was commonly known as sharecropping. *See* Roger L. Ransom and Richard Sutch, *Debt Peonage in the Cotton South after the Civil War*, 32 J. Econ. Hist. 641 (1972).

[83] Kiser, *supra* note 80, at 89-90.

[84] According to historian Andrés Reséndez:

> New Mexico's 1851 servitude code—formally known as the law regulating contracts between masters and servants—is notable for its harshness, delivered in dismayingly euphemistic terms. The initial agreement between master and servant, for example, was predicated on the "free and voluntary will" of both parties and based on mutual "obligations and natural rights." Yet, once the agreement was signed it became enforceable "by the proper tribunals." All of this simply meant that any master with a missing peon could go before a justice of the peace to obtain a "warrant of the debt," authorizing the owner to "proceed in person or otherwise, to any part of the Territory and make his claim"—that is, seize the absconding servant. In a similar tenor, section 4 prohibited parents from "binding out their children to serve, contracting excessive debts until they are driven into a state of slavery." Yet, at the very end of what appeared a remarkably altruistic section, the code made an exception in cases "when their poverty demands it," thus rendering meaningless everything that came before. The only shred of protection the code afforded to the servants was in regards to corporal punishment.

Reséndez, *supra* note 80, at 603.

[85] *See* Noel, *supra* note 39, at 452.

[86] *Id.* at 450.

political rights of Mexican Americans who were perceived as "mixed" or "Indian" by white residents, and disenfranchised as a result of that perception.[87]

**30.** The eve of statehood saw a number of restrictions designed to further marginalize the minority communities in Arizona. In 1909, the territory added a literacy requirement that voters write their name and "read the Constitution of the United States in the English language in such manner as to show he is neither prompted nor reciting from memory" to cast a ballot. This provision was designed to have disparate racial effects, with the aim of disenfranchising the growing minority population.[88] That same year, the legislature mandated segregation among black and white children in Arizona elementary schools, adding to the growing list of restaurants, hotels, cemeteries, and other places of public accommodation in which minorities were already excluded.[89] At the high school level, once a school reached a certain diversity tipping point—25% African American—then district residents were empowered by state law to call an election to decide whether to impose segregation.[90]

**31.** Arizona's fraught relationship with its various minority groups arguably contributed to its forty-year delay in becoming a state. Statehood had been hindered for a number of reasons—massive misrepresentations to Congress about the taxable real estate and resources in the state; substantial population decreases; a territorial government that was rife with fraud and corruption; and growing concerns about the territory's growing Mormon population.[91] Importantly, however, white political elites used fraud, violence and voter suppression to control the state's minority population, casting doubt on the political processes designed to establish that Arizona's demands for statehood were viable. Notably, the one representative of Mexican descent to attend its 1910 constitutional convention—Carlos Corella Jacome—had no recorded remarks and served on no major committees, refusing, in the end, to sign the proposed constitution.[92] This was not surprising given that the Convention was dominated by Democrats, the same political party who endorsed racial and ethnic intolerance in the south.[93] This was Arizona on the eve of statehood.

[87] *Id.*
[88] Ray Stern, '*We see through the sham': Arizona election proposals remind some of harassment of Black voters in 1960s*, Ariz. Republic (Feb. 16, 2022), https://www.azcentral.com/story/news/politics/legislature/2022/02/16/some-see-parallels-past-harassment-black-voters-arizona-history/6653989001/.
[89] Mary Melcher, *Black and Whites Together: Interracial Leadership in the Phoenix Civil Rights Movement*, 32 J. Ariz. Hist. 195, ~~195~~196 (1991); *see also* Whitaker, *supra* note 47, at 204.
[90] Melcher, *supra* note 89, at 196.
[91] *Not to be Trusted: Arizona's Claim to Statehood Said to Be Unreliable*, Chicago Daily Tribune, Feb. 11, 1894. *See also Some Facts Concerning the Territory: Points from the Official Report of the Present Acting Governor*, San Francisco Chronicle, Oct. 3, 1890. In 1893, for example, there was a convention held to produce a memorial requesting that Arizona be admitted as a state. At this convention, some counties were not represented, nor was anyone from the current Administration in attendance. *See Not to be Trusted: Arizona's Claim to Statehood Said to Be Unreliable*, Chicago Daily Tribune, Feb. 11, 1894. *See also* Acosta, *supra* note 49, at 172 (noting that, in 1902, the congressional Committee on Territories "found Arizona and New Mexico guilty of being too Mexican for statehood").
[92] Noel, *supra* note 39, at 431; Mark E. Pry, *Statehood Politics and Territorial Development: The Arizona Constitution of 1891*, 35 J. Ariz. Hist. 397, 406 (1994) ("Some Arizonians also felt that statehood depended on demonstrating the territory's improved moral tone and showing that its social and political institutions were sufficiently "Americanized," by which they meant that the territory had transcended and subordinated Mormon, Hispanic, and Indian cultural influences.").
[93] Noel, *supra* note 39, at 462-63.

### B. Maintaining a White Electorate: Racial Discrimination in Arizona Politics 1912-1966

**32.** Post-statehood, Arizona reaffirmed its commitment to racial discrimination in every aspect of public life. The African American population in Arizona remained relatively small in the early twentieth century, but its growth, concentrated mostly in Phoenix, nonetheless triggered the same Jim Crow policies that dominated the southern states.[94] For example, school segregation for black and white children continued after statehood, a policy the state formally maintained until the 1950s but persisted well into modern times.[95] The state continued to require English-only classroom instruction, which had a disparate impact on many Native Americans, Latinos, and other non-English speakers.[96] So too did the state maintain its anti-miscegenation law, reaffirming its prohibition on marriage between white people and "Negroes, Mongolians, Malayans, Hindus, and Indians" in 1939.[97] In 1912, the state legislature instituted a school segregation law that was much more stringent than the law adopted prior to statehood. The new law removed the old law's "flexibility" by mandating segregation, rather than allowing school districts to opt out of segregated facilities.[98]

**33.** Phoenix established the all-black "Colored High School" in 1914, which had facilities that were far inferior to its white counterpart.[99] Notably, the city which, according to one commentator, was the "only southwestern metropolis founded and run exclusively by Anglos," published a city directory that broadly advertised to newcomers that it was "a modern town of 40,000 people, and the best kind of people too. A very small percentage of Mexicans, negroes or foreigners."[100]

**34.** So too would the English literacy test be reauthorized once Arizona became a state in 1912, ensuring that minority political participation would be minimal.[101] High illiteracy rates also guaranteed the continuation of oppressive debt peonage practices. The difficulty of checking the debtor's books to verify whether the debt was repaid, combined with an inability to challenge these practices in court or through the political process, kept minorities as a perpetual underclass in the state.[102] Similarly, the state continued to disenfranchise those convicted of any felony or who had not lived in the state for at least one year, requirements

---

[94] Whitaker, *supra* note 47, at 199 ("Between 1920 and 1940, Phoenix's black population more than tripled: the vast majority were working-class blacks who, upon arrival, received inadequate education, few job opportunities, and were systematically locked out of residential areas owned and maintained by whites.").

[95] Berman, *supra* note 34, at 14 ("For most of this period, the state required separate schools for blacks and whites in grade schools and allowed high school districts to segregate the races when the black student population was 25 percent or more of the total."). In 2013, Tucson Public Schools entered into a consent decree with the Department of Justice over its desegregation plan. *See Democratic Nat'l Comm. v. Reagan*, 16-cv-01065 DLR (D. Ariz. 2018), ECF No. 416 (discussing the consent decree).

[96] *See Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 968 (D. Ariz. 2024).

[97] Ariz. Rev. Stat. Ann., §§ 63-107,108 (1939).

[98] David R. Berman, *George Hunt: Arizona's Crusading Seven-Term Governor* 62 (2015).

[99] Melcher, *supra* note 89, at 197.

[100] *Id.* at 195-96 (noting that "newcomers arrived in Arizona with their prejudices intact and tried to recast the Anglo-dominated society of their original homes").

[101] Berman, *supra* note 34, at 14.

[102] Ransom, *supra* note 82, at 654.

designed to single out its respective minority populations based on their perceived criminality and transient natures.[103]

**35.** The legal disenfranchisement of minority groups in the state was reinforced by the Ku Klux Klan, which had a renaissance across the United States during 1910s and 1920s. Like states in both the north and the south during this period, Arizona enjoyed a sizable Ku Klux Klan presence.[104] As early as 1916, the Klan was present in Phoenix, where its membership was about three hundred, and the group used violence to intimidate African Americans in the city.[105] Regardless of their economic status, African Americans were relegated to segregated sections of Phoenix and treated as second class citizens, a line that was actively policed by the Klan in the 1920s (but continued well into the 1950s).[106] In 1924, the Klan was responsible for at least four acts of violence in Phoenix, three of which were perpetuated against African Americans.[107] They had a similar presence in Tucson, where they positioned themselves as a law and order group, responsible for punishing lawbreakers, bootleggers, and soft-on-crime government officials.[108] In rural areas, the Klan focused much of its intimidation on Catholic Mexican-Americans, targeted for their religion, their ethnicity, and their competition for jobs.[109]

**36.** In addition to its Klan presence that heavily intimidated black and Hispanic residents, Arizona also continued to discriminate against its Native American population. At the time of statehood, Native Americans were approximately 14.3% of the population, comprising a third of Pinal County (3,139 out of 9,045), two-thirds of Apache County (6,131 out of 9,196), almost half of Navajo County (5,752 out of 11,471), and a quarter of Coconino County (2,788 out of 8,130).[110]

**37.** Despite gaining U.S. citizenship in 1924, Native Americans continued to be disenfranchised under Arizona law well into the 1960s. In the 1928 case of *Porter v. Hall*, the Arizona Supreme Court held that election officials did not have to register Native Americans, even if the prospective voter met the voter qualifications required under Arizona law, because the reservations were not subject to the laws of Arizona. While reservations were within the geographical boundaries of the state, the existence of tribal government rendered the plaintiffs non-residents of the state of Arizona and therefore ineligible to vote.[111] *Porter*

[103] Ariz. Const. art. VII, § 2 (1912).
[104] Whitaker, *supra* note 47, at 203.
[105] *Id.* ("Nevertheless, despite its late arrival, the terrorist group did attempt to frighten black Phoenicians into submission. The Klan began to penetrate Arizona towns around 1916, and at least two blacks were known to have been Klan victims. In 1924, an advertising executive and a city newspaper editor were tried and exonerated of beating a black man because he had helped a white woman off an elevator."). *See also* Berman, *supra* note 98, at 134.
[106] Whitaker, *supra* note 47, at 206 ("By 1920, in addition to segregating blacks in schools, many whites lobbied for the exclusion of blacks from 'their' neighborhoods. Blacks had 'no choice but to remain in or near segregated sections regardless of their economic position' because the "real estate agents and loan companies exerted the leadership in Arizona housing practices.")(internal citation omitted); Melcher, supra note 89, at 197 (noting that "prior to World War II most blacks (and many Mexican families) lived in poverty in the ghettos of southwest Phoenix. An influx of veterans and migrant cotton pickers after the war exacerbated the already horrible living arrangements").
[107] Sue Wilson Abbey, *The KKK in Arizona* 15 (1973).
[108] *Id.* at 20-21.
[109] *Id.* at 18.
[110] Patty Ferguson-Bohnee, *The History of Indian Voting Rights in Arizona: Overcoming Decades of Voter*, 47 Ariz. St. L.J. 1099, 1104 (2015).
[111] *Porter v. Hall*, 34 Ariz. 308, 325, 331 (1928) ("Whenever [the federal] government shall determine in regard to any Indian or class of Indians that they are so released, and that their status in regard to the responsibilities of citizenship is

ratified existing decisions by some county attorneys to reject the registration of Native Americans, including in Maricopa County (the state's largest county) and Pinal County (which had a large Native American population).[112] The rationale of *Porter* was rooted in the racist sentiment that Native Americans were wards of the United States, incapable of overseeing their own affairs. This guardianship was not eliminated when Native Americans became citizens of the United States, and Arizona law continued to disenfranchise "persons under guardianship, *non compos mentis*, and insane;" thus, Native Americans, even as citizens, were not permitted to vote.[113]

**38.** Attempts to limit Native American suffrage came on the heels of a particularly competitive gubernatorial campaign. Democratic governor George W.P. Hunt sought to limit Native American voting rights because the Republican Party had been actively soliciting the support of these new voters.[114] What resulted was a systematic attempt by the Democratic Party to challenge the voter registration of these individuals in key counties. When two Native American voters, Peter Porter and Rudolph Johnson, had their registrations successfully challenged in Pinal County, their exclusions are the ones that led to the aforementioned landmark decision in *Porter v. Hall.*[115] While the strategy of challenging individual voters at the polls was insufficient to secure Governor Hunt's re-election (he lost in 1928), the *Porter* decision helped secure Governor Hunt's seventh term in 1932 and effectively eliminated Native Americans from the electorate for another two decades.

**39.** *Porter* was overruled in 1948, in a case called *Harrison v. Leveen*, which led to the "technical" enfranchisement of Native Americans who, at 11.5% of the state's population, constituted its largest minority group.[116] *Harrison* did not result in a large increase in Native American voter registration; according to one scholar, approximately 80-90% of Native Americans could not read the English language, making Arizona's literacy test an effective barrier to voter registration for this demographic.[117] Nevertheless, a 1961 *Arizona Republic* story celebrated a decision by a three judge court upholding literacy tests for voting, arguing that the Kennedy Administration should hesitate before "seeking to destroy legitimate qualifications" and "abandon its threat to deprive states of one of their few remaining sovereign powers."[118]

**40.** In the post-World War II era, minorities in the state continued to experience segregation in places of public accommodation, high unemployment and underemployment, and abysmal living conditions.[119] Increasing agitation from the state's growing civil rights community would lead to more opportunity, but also more opposition during this time. Schools were

Indian or class of Indians that they are so released, and that their status in regard to the responsibilities of citizenship is the same as that of any other citizen, the law of this state considers them no longer 'persons under guardianship' within the meaning of section 2, article 7, of our Constitution, and they will be entitled to vote on the same terms as all other citizens..").

[112] Ferguson-Bohnee, *supra* note 110, at 1107.

[113] *Porter v. Hall*, 34 Ariz. 308, 323 (1928). *See also* Ariz. Const. Art. VII, § 2 (1912).

[114] For an extended discussion of how the 1928 Gubernatorial Campaign affects the Colorblind Targeting framework, *see* Part VI(A)(1).

[115] Ferguson-Bohnee, *supra* note 110, at 1108.

[116] *Harrison v. Laveen*, 67 Ariz. 337 (1948). *See also* Ferguson-Bohnee, *supra* note 110, at 1111.

[117] Ferguson-Bohnee, *supra* note 110, at 1112.

[118] *Literacy and Voting*, Ariz. Republic, Nov. 6, 1961.

[119] Melcher, *supra* note 89, at ~~204~~195.

desegregated in 1953—one year before the Supreme Court decided *Brown v. Board of Education*.[120]

**41.** Not coincidentally, Republican Barry Goldwater—leader of a budding new conservative movement in Arizona—was first elected to the U.S. Senate in 1952. However, his platform was not unlike that of the Democratic Party that had long dominated the state. Until the early 1960s, Arizona—just like the southern states in the former Confederacy—was predominantly controlled by the Democratic Party. According to one commentator, "At one time the preponderance of voter registration was as high as ten to one Democratic, declining to eight to one just prior to World War II."[121] Like many places in the South, the Democratic primary was the dispositive election in most contested races in Arizona; in some instances, the Republicans would not field a candidate at all.[122] By 1958, the Democrats' enduring hold on Arizona politics was on the decline. By 1960, Arizona Republicans, led by Senator Barry Goldwater, were fairly confident of their hold on the state.[123]

**42.** The state's switch from Democrat to Republican control did not lessen the barriers to minority political participation. In 1960, Republicans attempted to intimidate African American and Hispanic voters in Phoenix who were waiting to vote in elections that year.[124] Republicans repeated this behavior in the 1962 elections, with the chairman of the Maricopa County Democratic Committee referring to "the Republican policy of employing challengers to indiscriminately and maliciously challenge voters in our Negro and Spanish-American neighborhoods" as "un-American."[125] These efforts were part of a "Ballot Security Program," spearheaded by the Republican National Committee, that sent poll watchers to all of the precincts in South Phoenix (which was primarily black and Latino) to challenge minority voters waiting to cast their ballots.[126] There were enough complaints about voter intimidation that the FBI became involved.[127]

**43.** These areas were also papered with literature warning that those who voted illegally would be prosecuted. A voter challenged in line by a poll watcher as illiterate would trigger follow up from an election inspector to test whether the voter could read a provision of the U.S

---

[120] *Id.* at 195.

[121] Ross R. Rice, *The 1958 Election in Arizona*, 12 W. Pol. Q. 266, 266 (1959) ("Between statehood in 1912 and the 1950's, Republicans had elected governors for three terms (two years each). A Republican had gone to the United States Senate in 1920 for one term.").

[122] *Id.* at 266. *See also* William L. Strauss, *The 1960 Election in Arizona*, 14 W. Pol. Q. 305, 305 (1961) (noting that "the political patterns that developed early in Arizona resembled the dominant one-party Democratic patterns common to the South. More than the vestigial remains of this system survive in contemporary Arizona"). *Compare Terry v. Adams*, 345 U.S. 461 (1953) (invalidating the Democratic Party "Jaybird" primary that restricted participation to only white voters); *Smith v. Allwright*, 321 U.S. 649 (1944) (invalidating the Democratic Party primary on same grounds); *Nixon v. Herndon*, 273 U.S. 536 (1927) (same).

[123] Strauss, *supra* note 122, at 305.

[124] Melcher, *supra* note 89, at 208.

[125] *Voter Challenges Held Un-American*, Ariz. Republic, Nov. 15, 1962.

[126] Stern, *supra* note 88 (detailing efforts by future Supreme Court justice William H. Rehnquist to intimidate black voters waiting to vote at a Phoenix polling place in 1962).

[127] *See* George Lardner Jr. & Al Kamen, *1971 Rehnquist Account is Challenged by 3 Men*, Wash. Post, July 25, 1986 (discussing witness testimony asserting that Rehnquist and other Republicans "aggressively" challenging, "asking Hispanic voters if they could read English and black voters if they could read at all").

Constitution, often to disastrous (and disenfranchising results).[128] Because of this Ballot Security Program, the 1964 elections were similarly punctuated with stories of voter intimidation as minority voters sought to exercise their right to vote.[129]

**44.** With the passage of the Civil Rights Act of 1964 (which made challenging voters with literacy tests illegal) and the Voting Rights Act of 1965 by President Lyndon B. Johnson's Democratic Administration, support among white voters for the Republican Party in Arizona solidified more quickly than in other places.[130] Between 1961 and 1964, African American southerners who identified with the Democratic Party increased by almost thirty percentage points, from 24 percent to 52 percent; Republican support among white voters increased from 9 percent to 18 percent.[131] Arizona, however, was unique in that this realignment among the parties was firmly in place by the 1966 elections; for the states in the former Confederacy, the shift of white voters to the Republican Party would not be complete until the 1980 election of Ronald Reagan (and in some places, not until the early 2000s).[132]

**45.** Notably, it was Barry Goldwater, and not a prominent political figure from the South, who became the face of public opposition to federal civil rights efforts. Senator Goldwater, the 1964 Republican nominee for President, placed his opposition to federal civil rights legislation as a centerpiece of his campaign and his conservative philosophy. As historians Earl and Merle Black have stressed, "At the time of federal intervention in southern race relations most Republican candidates followed the lead of Arizona senator Barry Goldwater, the 1964 presidential nominee of the Republican party, in disregarding potential black support and attempting to unify whites behind a program of racial and economic conservatism."[133] As Goldwater argued in 1961, "We are not going to get the Negro to vote as a bloc in 1964 and 1968, so we ought to go hunting where the ducks are."[134]

**46.** Indeed, Goldwater did not shy away from Arizona's Confederate origins, embracing states' rights rhetoric that paralleled the ideology of that movement,[135] and explicitly disavowing any attempt by the Republican Party to compete with Democrats for minority votes. As historian John S. Huntington observed:

---

[128] *Id.*

[129] *Id.* (discussing accounts that Chief Justice Rehnquist intimidated voters in his role overseeing the GOP ballot security program from 1958 to 1964).

[130] Republicans became dominant in Arizona at the height of the Civil Rights movement, whereas the realignment of most southern states from the Democratic to the Republican Party happened more gradually from the mid-1960s to the early 2000s. *See, e.g.*, *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 411 (2006)(noting that the Republican Party did not gain control of both houses of the state legislature and the governorship until 2003); Jenny Jarvie, *Biden is projected to win Georgia. Here's how he flipped the Southern battleground*, LA Times, Nov. 13, 2020 (noting that prior to Biden's 2020 win, no Democratic presidential candidate had won Georgia since 1992).

[131] Nancy Beck Young, *Two Suns of the Southwest: Lyndon Johnson, Barry Goldwater, and the 1964 Battle Between Liberalism and Conservatism* 30 (2019). *See also* Daniel Black, *Black and Black: On Our Resilience and Brilliance in America* 205 (2023) ("Since 1964 more whites [in the South] have voted Republican than Democratic in every single presidential election.").

[132] Fred Shelley et. al, *The Civil Rights Movement and Recent Electoral Realignment in the South*, 47 Se. Geographer 13, 18 (2007).

[133] Earl Black & Merle Black, *The Rise of Southern Republicans* 28 (2002). *See also Barry Goldwater? No! No! Colored GOP'ers nix report*, Afro-American, July 18, 1964; *Barry Goldwater for President*, L.A. Times, Oct. 4, 1964 (endorsing Barry Goldwater in the 1964 election despite "vigorously disagree[ing]" with his position "on the civil rights law").

[134] Joseph A. Aistrup, *The Southern Strategy Revisited* 25 (1996).

[135] John S. Huntington, *Far-Right Vanguard: The Radical Roots of Modern Conservatism* 144 (2021).

> Goldwater…noted with pride that conservative Republicans were contesting liberal policies on every front. The key to this battle, [according to Goldwater], was empowering the states. "I am the one person that believes that state's rights is the cornerstone, the keystone, of our whole constitutional republic." It is unclear whether or not Goldwater intended to reference Confederate vice president Alexander Stephens's 1861 "Cornerstone Address," wherein Stephens asserted that white supremacy was the foundation of the Confederacy, but the senator certainly hit similar notes. [136]

**47.** Given this, it is unsurprising that Senator Goldwater voted against the 1964 Civil Rights Act, opposing two of what would prove to be its most effective provisions—Title II, which prohibited discrimination in places of public accommodation, and Title VII, which prohibited discrimination in employment. Goldwater referred to these provisions as an "attempted usurpation" of power that was "a grave threat to the very essence of our basic system of government."[137] He further argued that ignoring constitutional limitations on federal power "could ultimately destroy the freedom of all American citizens, including the freedoms of the very persons whose feelings and whose liberties are the major subject of this legislation."[138] Goldwater's opposition to civil rights, under a guise of state's rights and federalism, did not only extend to federal legislation. He also actively opposed local ordinances that would prohibit discrimination in places of public accommodation.[139]

**48.** The 1964 Republican Party platform rejected Goldwater's view that the concept of limited government extended to permitting private discrimination to fester in the name of preserving personal liberty and state sovereignty. The platform promised "full implementation and faithful execution of the Civil Rights Act of 1964, and all other civil rights statutes, to assure equal rights and opportunities guaranteed by the Constitution to every citizen."[140] Yet it was Goldwater's anti-civil rights views that would come to dominate the party once it became clear that his message was attractive to southern white voters who had long been faithful to the Democratic Party. Although Goldwater lost the 1964 presidential election, his success among rural southern white voters was historic. According to prominent historians Earl and Merle Black:

> Johnson's win in much of the outer South—for sure Virginia, North Carolina, Tennessee, Arkansas, and possibly Florida—came only because of newly enfranchised African Americans. Goldwater won rural southern whites in almost equally overwhelming proportion, carrying Mississippi with 87 percent, Alabama with 70 percent, South Carolina with 57 percent, and Georgia with 54 percent.[141]

---

[136] *Id.* *See also* Timothy N. Thurber, *Republicans and Race: The GOP's Frayed Relationship with African Americans, 1945–1974* 172–177 (2013). *See also* David Lawrence, *Election Stilled Racial Vote Myth*, Ariz. Republic, Nov. 24, 1960 (arguing that "civil rights [are] less influential politically" and the Republican strategy of trying to reclaim African American votes in the south yielded few returns in the 1960 election.).

[137] *Text of Goldwater Speech on Rights*, N.Y. Times, June 19, 1964.

[138] *Id.*

[139] Stern, *supra* note 88.

[140] *Democratic and Republican Platform Planks*, 47 Current History 236, 236 (1964).

[141] Black et al., *supra* note 133.

**49.** In the wake of his failed 1964 presidential campaign, referred to by one commentator as "one of the most ideological in U.S. history,"[142] Arizona's switch from Democrat to Republican was firmly in place by the 1966 elections. That election year, according to one commentator:

> …shattered rural dominance of the Legislature forever, and the Democratic Party lost its grip on the Legislature. …[F]or the first 54 years of Arizona statehood—from 1912 to 1966—Democrats governed the House, but for the next 54 years—from 1966 to 2020—Republicans controlled it. In the Arizona Senate, Republicans held the majority in 46 of the following 54 years. Democrats won the Senate in 1974, 1976, and 1990. In 2000, the parties tied at 15 seats each.[143]

**50.** Thus, Goldwater might have lost the battle in 1964, but the Republican Party certainly won the war two years later. Adding to the party's successes in Arizona during the 1966 midterms, Republicans picked up ten state governorships, including three states in the deep south.[144]

**51.** Much of this progress came at the expense of sacrificing the support of African American voters.[145] While President Nixon would take much of the credit years later for the infamous "Southern Strategy," it is clear that its foundation was laid in Arizona by Goldwater.[146] In the decades following Goldwater's 1964 campaign, which he ran on an anti-civil rights and anti-welfare state platform, conservative Republican politicians were less assertive about publicly opposing federal civil rights and instead relied on coded racial language and facially colorblind, but racially targeted, tactics to minimize the political power of racial minorities.[147] Instead of working to attract minority voters, the focus was on minimizing their influence and encouraging bloc voting among white people in opposition to the "other,"[148] a strategy

[142] *Toward Equality*, Ariz. Republic, Oct. 27, 1960. This article noted the significant strides that the Republican Party had made in increasing their influence in the state:

> Just 10 years ago there were 279,533 registered voters in Arizona, and 225,114 of them were Democrats. That gave the Democrats 81 per cent of the total registration. This year there are 391,590 registered voters in Arizona, and 267,881 of them are Democrats. That means the Democratic share of the total registration has dropped to 66 percent. Where there were four Democrats for each Republican in this state 10 years ago, the ratio of Democrats to Republicans now is only one and a half to one.

*Id.*
[143] David J. Cantelme, *Redistricting and Voting in Arizona*, 57 Ariz. Att'y 26, 32 (2020).
[144] Joseph A. Luftus, *Vote Gives G.O.P. Control of 25 Governorships*, N.Y. Times, Nov. 10, 1966 (noting that "Arizona voters gave Republicans a mandate for the first time in the state's history").
[145] George Gallup, *The Gallup Poll: Republicans Gain Labor Votes But Lose Heavily With Negroes*, Ariz. Republic, Oct. 16, 1966. *See also* Aistrup, *supra* note at 134, 25, 26 ("Goldwater pointed to Nixon's pro-civil rights stance as a significant impediment to the Republicans winning the South" and after his 1960 loss, "a distinctive strategy was born that conceded the support of blacks in the Northeast and the South to the Democrats and contained a 'distinctly conservative and segregationist call.'").
[146] *See* Aistrup, *supra* note at 134, 18 ("In 1968, the stage was set for the formal birth of the Southern Strategy. Four short years earlier, Goldwater had framed the issue positions for this strategy. He showed it to be electorally bountiful for reaping white votes in the South.").
[147] Young, *supra* note 131, at 31-32.
[148] *Dangers of Bloc Voting*, Ariz. Republic, Nov. 13, 1964 ("For the Republicans, smarting under the 'racist' tag pinned on Senator Goldwater in an effort to solidify the Negro bloc, there is an equally firm conviction that the Negro

that Goldwater foreshadowed years earlier in explicitly rejecting civil rights legislation,[149] by actively embracing segregationists, [150] and in shifting the Republican Party's policies to the right.[151]

### C. The Shift to Colorblind Targeting: The Voting Rights Act in Arizona, 1966-2000

**52.** The ascension of Goldwater's Republican Party in the state of Arizona in 1966 led to five decades of voting rights policies that disproportionately harmed minority voters. With small, but significant, pockets of minority population in the state and a majority political party focused on racial and economic conservatism, it is not surprising that the fight by Native Americans, African Americans and Latinos to protect their right to vote continued well after the passage of the Voting Rights Act of 1965. These groups have had to consistently defend their right to vote in state and federal court after Arizona led much of the former Confederate south in becoming a Republican stronghold following the civil rights reforms of the 1960s.

**53.** Despite a relatively quick political realignment in the mid-1960s (and the corresponding rejection of political equality for minority voters in the state), Arizona's coverage under the Voting Rights Act happened gradually over the next decade. Notably, the Bureau of the Census found that, in 1965, less than 50% of voting aged residents in Apache County, Navajo County, and Coconino Counties were registered or voted in the 1964 presidential election.[152] Apache, Navajo, and Coconino Counties were briefly covered by the Voting Rights Act in 1965, but were able to successfully bail out despite the fact that the widespread use of literacy tests significantly discriminated against minority voters.[153]

**54.** Literacy tests were officially banned by the 1970 amendments to the Voting Rights Act, and eight Arizona counties found themselves subject to the preclearance requirement of Section 5 including the original three—Apache, Coconino, and Navajo counties.[154] It was not until 1975 that Arizona became covered statewide, this time under Section 4(f)(4) of the Voting Rights Act due to its failure to provide election materials in language other than English despite having more than 5% of its voting age population contain a single language minority

---

vote—come what may—is so firmly wedded to the Democratic Party now that no appeal for understanding is going to make an impression. So, the GOP must reason, why make any concessions to a voting bloc that cannot be successfully wooed in the first place?").

[149] *See* Part V(B), *supra*.

[150] *See, e.g.*, Aistrup, *supra* note 134, at ~~18~~27 (noting that "the insertion of numerous segregationists into the Southern Republican candidate pool in 1962 represents a significant precedent for the 'party of Lincoln.' In addition, the moderate-to-strong showing of these segregationists Republicans provided Goldwater with evidence supporting his strategy for GOP presidential success in the South").

[151] *See id.* at 31-32 ("While the Old South heard and digested Goldwater's message on states' rights, the New South heard this individualistic theme and [opposition to the welfare state and] became the backbone of the Southern GOP…[H]e drew into the party a dedicated elite cadre who were committed to Goldwater's conservative principles and to pursuing these principles in the Republican party").

[152] *Ely v. Klahr*, 403 U.S. 108, 119 (1971)(Douglas, J., concurring).

[153] *Apache Cnty. v. United States*, 256 F. Supp. 903 (D.D.C. 1966) (finding that literacy tests had not been discriminately applied in the three covered Arizona counties).

[154] James Thomas Tucker, et. al, *Voting Rights in Arizona: 1982-2006*, 17 S. Cal. Rev. L. & Soc. Just. 283, 286 (2008).

group (Spanish speakers), and for having less than 50% turnout for the November 1972 presidential election.[155] Twelve of Arizona's fifteen counties are currently covered under the language provisions of Section 203 of the Voting Rights Act.[156]

**55.** The demographic and geographic composition of Arizona made the shift from race conscious to race neutral methods of discrimination easier than other states in the wake of the Voting Rights Act. Much of the race neutral regime that emerged in the American south in the 1890s and early 1900s relied heavily on the discretion of discriminatory election administrators to implement race neutral laws in a disparate manner.[157] In contrast, Arizona could adopt ostensibly race neutral laws that, by their very existence, would have a deleterious impact on the political power of the state's various minority populations because these groups are small in number, have high political cohesion, and are geographically concentrated.

**56.** Following the pivotal 1964 election, in which the national Democratic Party firmly placed its support behind federal civil rights legislation and Goldwater Republicans were able to secure majority status in Arizona by opposing the same, Native Americans continued to face obstacles to full political participation. After Republicans gained control of the state government in 1966, they sought to further diminish the political power of Native American voters by enacting a gerrymandered redistricting plan the next year. In response to Native American voting preferences, Republicans cracked these voters across districts and packed them in another to dilute their voting strength.[158] As reported by the *Arizona Republic* in July 1967:

> Using 1960 population figures, the strategists first combined Yuma County with Maricopa. Then Yuma was subdivided on the basis of the 1966 voter registration figures into a single district to elect one senator and two representatives.
>
> This prevented Yuma County from qualifying for the additional fraction of a senator to which it was entitled on the basis of population alone.
>
> A reverse situation prevailed up north where Navajo, with a Republican voting trend, was first combined with Coconino under 1960 census figures and then subdivided under current voter registration totals into a single district.
>
> Previously Navajo had been aligned with the Apache-Greenlee Democratic Axis. Navajo now stands to elect two Republicans to the legislative three seats.[159]

---

[155] *Id.* at 288.
[156] *Id.* at 289.
[157] *See* Tolson, *In Congress We Trust*, *supra* note 69, at 305-07.
[158] *See* Princeton University, *Gerrymandering Project*, https://gerrymander.princeton.edu/info/ (last accessed Feb. 15, 2025)("'Packing' occurs when many supporters of the victim party are jammed into a small number of districts, giving them a few overwhelming wins. The remaining members of the victim party are then 'cracked,' spread across a large number of districts, so that they consistently win just under 50% of the vote.").
[159] Bernie Wynn, *Arizona's Remarkable Reapportionment: Twisted Boundaries Seal Off or Sandbag Democrat Legislators*, Ariz. Republic, July 16, 1967.

**57.** In addition to extremely gerrymandered legislative districts, Arizona still maintained its literacy test,[160] but the nationwide suspension of literacy tests in the 1970 amendments to the Voting Rights Act paved the way for many Native Americans in the county to register.

**58.** To counter the impact of this reform, the Arizona legislature required a complete re-registration of voters, causing many voters recently enfranchised by the Voting Rights Act to be removed from the rolls.[161] Significantly, annual registration requirements imposed during the immediate post-Jim Crow era essentially functioned as a type of voter purge since all voters were kicked off the rolls and had to re-register every year. The ensuing confusion of determining whether re-registration was necessary, often amid conflicting advice from election registrars,[162] made annual registration stunningly effective in disenfranchising minority voters.

**59.** For example, Maricopa County recorder Paul Marston turned away naturalized citizens seeking to re-register under the 1970 law, noting that he would not re-register these individuals absent naturalization papers.[163] Because of the manner in which the law was implemented, Republicans were able to re-register their voters more seamlessly under the new law than Democrats.[164] This practice of re-registration continued well into the 1980s, disproportionately affecting minority voters as compared to white voters.[165]

**60.** By the early 1970s, Native American voters had increased in number, but restrictive purge policies meant that a failure to vote equaled removal from the rolls. Because of low literacy rates, these voters had difficulty reading ballots and operating the voting machines; once purged, they often could not decipher the letters sent by the county notifying them of their status. In addition, their geographic placement on reservations invited the most extreme

---

[160] *Voting Rights Act extension: Hearings on H.R. 4249 and H.R. 5538 and similar proposals Before the Subcommittee No. 5 of the House Judiciary Committee*, 91st Cong., 1st Sess. 56 (1969).

[161] *Extension of the Voting Rights Act: Hearings Before the Subcomm. On Civ. & Const. Rts of the Comm. On the Judiciary*, H.R., 94th Cong., 1st Sess. 1314–15 (1975) (Report of the United States Commission of Civil Rights, *The Voting Rights Act: Ten Years After*). *See also Attention Voters*, Ariz. Rep., Dec. 2, 1970 (noting that "Although the Maricopa Legal Aid society…contends that the bill discriminates against the poor, surely it is not too much to ask that voters re-register once each decade.").

[162] *Deprived Right, Letter to the Editor*, Ariz. Republic, Nov. 25, 1968. In a letter to the editor, voter John G. DePee detailed how the state's confusing voting system led to his disenfranchisement in the 1968 elections:

> My story should begin in October 1965 when I turned of age. I immediately went down and registered to vote….Then this summer I was in the state tuberculosis sanatorium in Tempe and I checked with a woman registering voters out there and was told I didn't have to register. Then in July [1968] I took my wife 15 miles to the municipal building in Phoenix to register and checked again and was told I was registered. Well then came the big day, Nov. 5, and we went to vote…I wasn't on the list and couldn't vote.

*Id.*

[163] *Marston turns down citizens who lack proof*, Ariz. Republic, Dec 11, 1970, at 25. Arizona is currently dealing with a similar problem with its documentary proof-of-citizenship registration requirement to register to vote in state and local elections because many longtime voters did not provide that information, which was not yet required by law, at the time they registered. *See* Jen Fifield, *Arizona labeled longtime residents as citizens without proof for years, leading to voter roll errors*, Votebeat, Oct. 3, 2024.

[164] *See also Republicans recording gains in countywide reregistration*, Ariz. Republic, Oct 2, 1971, at 29.

[165] *See Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 969 (D. Ariz. 2024)(discussing this history).

forms of gerrymandering and continued disenfranchisement.[166]

**61.** For example, Navajo voters in Apache County were able to elect a member of the county board of supervisors—despite having few polling places, enduring long lines, being purged from the rolls—because the county packed them into one district, ostensibly giving Navajo voters some local representation while limiting their political power more broadly.[167] And, despite electing their one candidate of choice in the context of diminished electoral influence, Navajo voters still faced disenfranchisement when the county refused to seat the newly elected county supervisor, who was Navajo, until ordered to do so by a court.[168]

**62.** In 1975, Navajo voters, with the help of the Department of Justice, successfully challenged the gerrymander that packed them into one supervisorial district. The county, in arguments that harkened back to the discriminatory case of *Porter v. Hall*, unsuccessfully argued that Navajos who lived on the reservation were not United States citizens, should be disenfranchised, and should not count for purposes of apportionment for the county board.[169]

**63.** Discrimination in voting was a reality for Native Americans that affected their status as equal citizens in other domains as well. In 1976, Apache County tried to keep Native American students in segregated schools by holding a bond election that would secure financing for a school that was located in the southern part of the county where there were virtually no Native American families.[170] The bond election had low turnout because of polling place closures—nearly 50% of which were located the Navajo reservation—and the county's refusal to provide language assistance, relying on English language only materials related to the election.[171] Apache County subsequently entered into a consent decree in which it agree to end these discriminatory practices.

**64.** The facts underlying Apache County's extremely gerrymandered plan and its 1976 bond election were not anomalies. The persistent discrimination against minorities, as well as the

[166] In some instances, concentrating minority voters in a single member district facilitates the group's ability to elect their candidate of choice and can avoid a violation of federal law. *See Thornburg v. Gingles*, 478 U.S. 30 (1986) (advocating for the creation of majority-minority districts to avoid liability for vote dilution under Section 2 of the Voting Rights Act). In other instances, concentrating minority voters in a single member district, well in excess of the numbers needed for the group to elect their candidate of choice, or, alternatively, dividing the group across multiple districts where they can never constitute a majority in any district, can effectively dilute their political power. *See Cooper v. Harris*, 581 U.S. 285 (2017)(holding that the state violated the Equal Protection Clause of the Fourteenth Amendment where it packed minority voters in a gerrymandered district without sufficient justification). Where minority groups are naturally compact because of their geographic location, as are Native Americans on reservations in Arizona, it is easier for state legislatures to gerrymander these voters—by packing them into as few districts as possible or dividing them up across districts so as to limit their political influence statewide.

[167] Packing minority voters into fewer districts can help them elect their candidate of choice locally, but it often reduces their ability to have broader political influence across more districts or even statewide. *See Georgia v. Ashcroft*, 539 U.S. 461, 480 (2003)(superseded by statute).

[168] Report of the United States Commission on Civil Rights, *supra* note 161, at 1314-15.

[169] *Goodluck v. Apache County*, 417 F. Supp. 13 (D. Ariz. 1975).

[170] *Apache Cnty. High School No. 90 v. United States*, No. 77-1815 (D.D.C. June 12, 1980).

[171] *See id. See also* Ferguson-Bohnee, *supra* note 110, at 1117.

failure to comply with the one person, one vote principle,[172] led to the invalidation of a series of state and congressional redistricting plans from the late 1960s until the early 1970s. [173] In one case, a federal district court rejected Arizona's 1971 congressional redistricting plan on the grounds that the state had invidiously discriminated when it divided the Navajo Indian Reservation in northeast Arizona into three congressional districts. By splitting up the reservation, on the request of one single incumbent legislator, the state made it impossible for Navajo residents to elect their candidate of choice.[174]

**65.** Arizona's congressional redistricting plans from this era featured prominently during congressional hearings regarding the reauthorization of Sections 4(b) and 5 of the Voting Rights, from which the statewide coverage of Arizona in 1975 ultimately followed. As illustrated above, litigation over the plan (or plans) actually started in the 1960s, with predecessor statutes being found unconstitutional and the legislature failing to adopt a constitutionally valid plan well into the 1970s. According to a 1975 report by the United States Commission on Civil Rights, the 1970 plan—in addition to discriminating against Navajo residents and failing to comply with the one person, one vote standard[175]—used a discriminatory method of determining population.[176] Justice Douglas, concurring in the judgment, latched on to these very concerns in noting the plan's unsound constitutional footing:

> If all segments of society were equally likely to register to vote, then the Arizona method of computing population would be unobjectionable. But all members of a

[172] *See* Reynolds v. Sims, 377 U.S. 533 (1964) *and* Wesberry v. Sanders, 376 U.S. 1 (1964) (requiring state legislative and congressional districts, respectively, to have equal population).
[173] *Klahr v. Goddard*, 254 F. Supp. 997 (D. Ariz. 1966) ("Goddard II")(implementing court ordered redistricting plan for Pima and Maricopa counties); *Klahr v. Goddard*, 250 F. Supp.537 (1966)("Goddard I") (denying motion to dismiss complaint alleging that redistricting plans violated one person, one vote principle); *Klahr v. Williams*, 303 F. Supp. 224 (D. Ariz. 1969) ("Klahr I")(invalidating 1968 redistricting plan, adopted by voter initiative, as violative of one person, one vote principle); *Klahr v. Williams*, 339 F. Supp. 922 (D. Ariz. 1972)("Klahr III")(rejecting the one person, one vote challenge but finding that the state violated the Equal Protection Clause by diluting the vote of Navajo Indians). *See also Klahr v. Williams*, 313 F. Supp.148 (D. Ariz. 1970)("Klahr II")(requiring elections be held under a constitutionally invalid map because of short time frame), *aff'd*, *Ely v. Klahr*, 403 U.S. 108, 117 (1971) (Douglas, J., concurring) (noting that Arizona had not had a constitutionally valid apportionment plan since *Reynolds v. Sims*).
[174] *Klahr III*, 339 F. Supp. 922, 927-29 (D. Ariz. 1972).
[175] Report of the United States Commission on Civil Rights, *supra* note 161, at 1225–1230.
[176] *See id.*:

> Because no population data were available for local voting precincts—the building block of the plan—it was assumed that each precinct had the same percentage of a county's population as it did of the county's registered voters. … [because of Arizona's literacy test] blacks, Mexican Americans, and Native Americans are less likely to be registered than whites. … Thus, there were fewer districts that had a predominantly minority population than the requirement of equal population size dictated…
>
> [T]he computer used in fashioning the plan was instructed to preserve the seats of incumbent legislators and to make districts politically homogeneous. …The effect of this is shown in the treatment of the Navajo Reservation in Northeastern Arizona. While it had sufficient numbers of Indians to justify a separate district which could undoubtedly elect Indian representatives in the State legislature, …[a]t the time of this suit there were no Indians elected to either the State House or Senate. But just to the south of the area two State senators lived 10 miles apart. Hence, the incumbency rule was invoked to split the Indian so as to accommodate the two white senators.

*Id.*

> community are not equally likely to register. For example, only two counties out of eight with Spanish surname populations in excess of 15% showed a voter registration equal to the statewide average. Not only are the poor, the blacks, the Chicanos, and the Indians less likely to register in the first place, they are also likely to have a higher rate of illiteracy among their members. Arizona law at the time of the decision below required a literacy test for voter registration. Naturally this compounded the problem of underregistration of minority groups.[177]

**66.** Minority groups continued to challenge the state's voting related discrimination into the 1980s. In 1982, the San Carlos Apache Tribe, whose reservation is located in southeastern Arizona, challenged the state's 1981 reapportionment and redistricting plan for violating the one person, one vote principle of Article I, Section 2; the Fourteenth and Fifteenth Amendments; and the Voting Rights Act. Under the state legislature's 1981 plan, which was enacted over the Governor's veto, the state split the reservation into three state legislative and three congressional districts, even though prior plans had placed the San Carlos Apache Reservation into one legislative district for both state and congressional purposes.[178]

**67.** In a letter refusing to preclear Arizona's state legislative redistricting plan, the Department of Justice noted that "the manner in which the San Carlos Indian Reservation has been fragmented into different legislative districts raises concerns which will not allow us to conclude that the legislative plan does not have a discriminatory purpose or effect."[179] In addition, the state rejected an alternative plan that, according to the Department of Justice, would not have divided the tribe across legislative districts.[180] Ultimately, the Arizona state legislature and the San Carlos Apache Tribe were able to come to an agreement and modify the plans, placing the reservation in one state legislative and one congressional district, respectively.[181]

**68.** Part of the reason why attempts to diminish minority political power did not abate post-Voting Rights Act is because the Democratic Party became more competitive in the late 1980s and early 1990s, winning the state Senate for the first time in fourteen years during this period. The cracks in the Republican Party's grip on the state were present as early as 1980, when veteran senator Barry Goldwater faced a tough re-election campaign.[182] While Ronald Reagan handily won the state, Goldwater lost most counties with substantial minority populations including Apache, Coconino, Navajo, Pima, and Pinal. By securing a win in majority-Republican Maricopa County, Goldwater carried the state by less than 10,000 votes.

**69.** Given the increasing competitiveness of the state, Native Americans in Coconino, Navajo, and Apache counties found themselves the targets—repeatedly—of voter suppression efforts. In 1988, the Department of Justice successfully sued these counties, as well as the

[177] *Ely v. Klahr*, 403 U.S. 108, 118 (1971) (Douglas, J., concurring) (citation omitted).
[178] *Goddard v. Babbitt*, 536 F. Supp. 538, 540 (D. Ariz. 1982).
[179] AZ-1040, Letter from William Bradford Reynolds, U.S. Department of Justice, to Robert Corbin, Attorney General of Arizona (March 8, 1982).
[180] *Id.*
[181] *Goddard*, 536 F. Supp. at 542.
[182] Dan Nowicki, *Goldwater's last race a cautionary tale*, Ariz. Republic, Nov. 9, 2008, at A6.

state of Arizona, for abridging the voting rights of this group.[183] As commentators have noted, this litigation reflected a pattern of discrimination that has, despite successful litigation, persisted:

> Northern Arizona has a lengthy history of discrimination against Navajo, Apache and Hopi voters. … Coconino, Navajo and Apache Counties … account for nearly half of all of the post 1982 Section 5 objections in Arizona. Before 1998, nearly all of the federal observers and monitors deployed to Arizona were sent to observe elections in Apache and Navajo Counties.[184]

**70.** Notably, this litigation coincided with the adoption of a ballot initiative that same year, Article XXVIII of the Arizona Constitution, that mandated English as the official state language, to be used by all political subdivisions, its elected officials, in its public schools, and for its election ballots unless required to do otherwise by federal law. In *Ruiz v. Hull*,[185] the Arizona Supreme Court struck down this provision as a violation of the First and Fourteenth Amendments, finding that it impinged on the ability of non-English speaking minorities to communicate with the government. As mentioned prior, many Native American (and Latino) voters do not speak English.

**71.** Efforts to disempower minority groups continued into the 1990s. In 1990, the state legislature (with its Democratic controlled Senate and Republican controlled House) was unable to agree on a congressional redistricting plan.[186] A three-judge court drew its own plan that was subsequently challenged by the state Senate as a violation of the Voting Rights Act.[187] The Senate argued that the plan failed to create a second majority-minority district, necessary given the growth of the minority population and the existence of racially polarized voting in the state. When the Republicans regained control of the Senate in 1994, however, they dismissed the appeal.

**72.** Despite a setback in challenging a 1990 Arizona Senate redistricting plan, [188] plaintiffs in other cases have been able to establish that the desire for partisan advantage has often led decisionmakers to select a course of action because of its effect on minority voters. For example, in 1994, the Attorney General denied preclearance under Section 5 of the Voting Rights Act for four additional judgeships to the Arizona Superior Court in Coconino and Navajo counties. The counties attempted to add the judgeships at various points between 1975 and 1990 by placing them on the ballot without federal approval.[189] The Department of Justice argued that county wide elections for the judgeships would diminish the ability of Native American voters to elect their candidates of choice due to the existence of racially

---

[183] Tucker et. al., *supra* note 154, at 293.
[184] *Id.* (citing Consent Decree, *United States v. Ariz.*, No. 88-cv-1989 (D. Ariz. May 22, 1989), ECF No. 31)). As the authors note, a court updated the consent decree in 1993 because the counties continued to violate the law. *See id* (citing *Continuing Need for Section 203's Provisions for Limited English Proficient Voters: Hearing Before the S. Comm. on the Judiciary*, 109th Cong. 496–97 (2006) (testimony of Alfred Yazzie, Navajo Language Consultant, Department of Justice)).
[185] 191 Ariz. 441 (1998).
[186] *Arizonans for Fair Representation v. Symington*, 828 F. Supp.684 (D. Ariz. 1992).
[187] *Arizona State Senate v. Arizonans for Fair Representation*, 507 U.S. 980 (1993).
[188] *Arizonans for Fair Representation v. Symington*, 828 F. Supp. 684, 689 (D. Ariz. 1992).
[189] *Arizona v. Reno*, 887 F. Supp. 318, 319 (D.D.C. 1995). The state had denied that Section 5 applied to judgeships, an argument that the Supreme Court rejected in 1991. *See Clark v. Roemer*, 500 U.S. 646 (1991).

polarized voting. The federal court in Washington, D.C. permitted the suit to move forward to determine if Arizona had acted with racially discriminatory purpose, and a federal court in Arizona later granted plaintiffs a preliminary injunction preventing elections for these judgeships during the 1994 elections.[190]

### D. Resisting A Diverse Electorate: Colorblind Targeting from 2000-2018

**73.** Towards the end of the twentieth century, there were numerous efforts to minimize minority voting strength through facially race-neutral legislation and action. According to a recent study, more than 80% of the Section 5 objections that Arizona faced under the Voting Rights Act occurred between 1982 and 2006.[191] In addition to the numerous federal constitutional challenges to the state's redistricting plans in the 1960s and 1970s, there were also Section 5 objections to the state's redistricting plans in every decennial reapportionment in which the state was subject to preclearance—one objection in the 1980s, two in the 1990s, and one objection in 2002.[192]

**74.** The move towards more voter suppression followed significant demographic change. Arizona had become more racially diverse and its elections significantly more competitive. Between 1990 and 2000, the state experienced 40% population growth,[193] many of whom were people of color, and the Republicans' decades long stranglehold on the political apparatus of the state was increasingly under threat.[194] The state government went from solidly Republican in 1997 to significant periods of divided government between 2003 and the present (the periods of divided government are highlighted in yellow):

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 43rd Arizona Legislature (Jan 1, | 44th Arizona Legislature (Jan 1, | 45th Arizona Legislature (Jan 1, | 46th Arizona Legislature (Jan 1, 2003-Dec 31, | 47th Arizona Legislature (Jan 1, 2005-Dec 31, | 48th Arizona Legislature (Jan 1, 2007-Dec 31, | 49th Arizona Legislature (Jan 1, | 50th Arizona Legislature |

[190] *United States v. Ariz.*, 1994 U.S. Dist. LEXIS 17606 (D. Ariz. Oct. 17, 1994).
[191] Tucker et al., *supra* note 154, at 292.
[192] *Id.* at 292-93.
[193] Sasheen Hollow Horn, *Nation joins Arizona redistricting process*, Navajo Times, June 14, 2001, at A2.
[194] As of August 2000, the *Arizona Republic* noted that "seven of Arizona's eight voices in Washington, eight of nine statewide offices and a majority of both houses of the Legislature are all Republican;" however, "the party [was] fielding…a write-in candidate against U.S. Sen. Jon Kyle, whom it classified a year ago as one of the most vulnerable GOP senators in the nation." Jon Kamman, *State's New Democrats' Stronger; Younger, Centrist Group Called Party's Strength*, Ariz. Republic, Aug. 13, 2000, at A20.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1997-Dec 31, 1998) | 1999-Dec 31, 2000) | 2001-Dec 31, 2002) | 2004) | 2006) | 2008) | 2009-Dec 31, 2010) | (Jan 1, 2011-Dec 31, 2012) |
| Senate (18R-12D) | Senate (16R-14D) | Senate (15R-15D) | Senate (17R-13D) | Senate (18R-12D) | Senate (17R-13D) | Senate (18R-12D) | Senate (21R-9D) |
| House (38R-22D) | House (40R-20D) | House (36R-24D) | House (39R-20D-1I) | House (39R-21D) | House (33R-27D) | House (35R-25D) | House (40R-20D) |
| Symington (R)/Hull (R) | Hull (R) | Hull (R) | Napolitano(D) | Napolitano(D) | Napolitano(D) | Brewer (R) | Brewer (R) |

| 51st Arizona Legislature (Jan 1, 2013-Dec 31, 2014) | 52nd Arizona Legislature (Jan 1, 2015-Dec 31, 2016) | 53rd Arizona Legislature (Jan 1, 2017-Dec 31, 2018) | 54th Arizona Legislature (Jan 1, 2019-Dec 31, 2020) | 55th Arizona Legislature (Jan 1, 2021-Dec 31, 2022) | 56th Arizona Legislature (Jan 1, 2023-Dec 31, 2024) |
|---|---|---|---|---|---|
| Senate (16R-14D) | Senate (18R-12D) | Senate (17R-13D) | Senate (17R-13D) | Senate (16R-14D) | Senate (16R-14D) |
| House (36R-24D) | House (36R-24D) | House (35R-25D) | House (31R-29D) | House (31R-29D) | House (31R-29D) |
| Brewer (R) | Ducey (R) | Ducey (R) | Ducey (R) | Ducey (R) | Hobbs (D) |

**75.** The growing number of minority residents not only led to the state government becoming more divided, but it was also an invitation for those who saw the increasingly diverse population as an opportunity for pluralism and consensus building in politics. In 2000, Arizona voters adopted an initiative that empowered an independent commission to draw its state legislative redistricting plan, in which one senator and two representatives are elected from each of 30 districts, and its congressional plan, which had increased from six districts to eight. Arguably, the commission was a step in the right direction towards minimizing the deleterious effects of racial and partisan gerrymandering that had long undermined the political rights of minorities; however, the body was widely criticized for its entirely white composition, particularly in a state that was, at the time, at least one-third minority.[195] Nonetheless, population growth, the rise of an independent voting bloc,[196] and the

[195] *See* Mike McCloy, *Pair of Hispanic Staffers Hired to Assist Redistricting Panel*, Ariz. Republic, Mar. 21, 2001, at A1 ("Two Hispanics staffers were chosen Tuesday by Arizona's Independent Redistricting Commission, a response to critics who fear an all-White panel might ignore the needs of minorities."); Robbie Sherwood, *Top Minority Quits Redistricting Panel; Some Hispanics Say Official Forced Out*, Ariz. Republic, July 10, 2001, at B5.

[196] Richard de Uriarte, *The Independent Voter Is…One Cool Cat; The 'De-Aligned' Are Wielding Increasing Clout*, Ariz. Republic, July 8, 2001, at V1. Between 1988 and 2001, the number of independent voters rose from 11.4% to 18%. This increase led to Proposition 103, which changed Arizona's primary system from a closed one, in which individuals had to be affiliated with the party to cast a ballot, to an open system, in which independents can vote in any party primary. *Id.*

commission-driven redistricting process resulted in a state legislative map that became gradually more competitive over the first decade of the twenty-first century.[197]

**76.** These were welcome changes after the 1990 round of redistricting, in which incumbents won 96 percent of their races over the course of the decade.[198] Some of the most egregious gerrymandering affected districts with sizable minority populations. For example, Pinal County was split among six different legislative districts under the 1990 plan to protect incumbents. Treating the county as the "state Capitol's cookie jar" for redistricting purposes undermined the ability of the Pinal County's minority population to form coalitions in support of any particular candidate.[199]

**77.** Although imperfect,[200] the plans adopted in the wake of the 2000 election led to an increase in the number of majority-minority districts, a move that better reflected the state's growing minority population. Despite a Hispanic population of 25 percent, the 1990 congressional map had created only one-majority minority district which, not coincidentally, also resulted in the only Democratic representative in the entire state delegation.[201] Post-2000, the Commission adopted a plan that created 2 majority-minority congressional districts and 9 majority-minority state legislative districts. Of the 30 legislative districts, only 7 were majority-minority under the prior plan.[202] Despite the fact that minority communities were better represented under the post-2000 maps, there have been numerous judicial challenges to not only the maps but the existence of the Commission itself.[203] In 2015, the U.S. Supreme Court held that the use of an independent redistricting commission, rather than the state legislature, to draw congressional districts did not violate the Elections Clause of Article I, Section 4 of the U.S. Constitution.[204]

**78.** More equity and fairness in the legislative map drawing process was not the only sea change in Arizona politics at the turn of the twenty-first century. In 2002, Democrat Janet Napolitano won the governorship—the first Democrat to do so since 1948—further signaling that the state was no longer the safe Republican stronghold that it once was.[205]

[197] Rhonda Bodfield Sander, *Tucson loses clout; redistricting completed*, Ariz. Daily Star, Oct. 15, 2001, at A1.

[198] *Nonpartisan Panel is Vital Redistricting Can't Be Left to the Legislature*, Ariz. Republic, Jan. 30, 2000, at B6. *See also* Editorial, *Whistling A New Redistricting Tune: Job too important to leave to politicians*, Ariz. Republic, April 6, 2000, at B8 ("Two years ago, a record low 157 candidates ran for the 90 seats in the Legislature. More than half of the Senate and a third of the House had a free ride in the general election.").

[199] *Political whacking takes toll in Pinal*, Ariz. Republic, May 5, 2000, at B8 (noting that "[l]awmakers dipped into [Pinal] County, which lies southeast of Maricopa County, for a few votes here and a few votes there to make other districts work comfortably for incumbents."). In 1990, Pinal County's population was 59.2% white (non-Hispanic); 29.3% Hispanic; 8.1% Native American; 3% African American; 0.4 Asian/Pacific Islander. *See Our Changing Population: Pinal County, Arizona*, USAFacts, *https*://usafacts.org/data/topics/people-society/population-and-demographics/our-changing-population/state/arizona/county/pinal-county/?endDate=2022-01-01&startDate=1990-01-01 [perma].

[200] Chip Scutari, *Minorities Doubt Redistricting Success*, Ariz. Republic, Oct 16, 2001.

[201] Rhonda Bodfield Sander, *Hispanics hope for 2nd Ariz. seat in Congress*, Ariz. Daily Star, Apr. 7, 2001, at A1.

[202] *See* Jon Kamman and Robbie Sherwood, *Redistrict Plan Unveiled; Proposal Would Boost Minority Clout*, Ariz. Republic, Aug. 9, 2001, at A1; Chip Scutari, *Panel Adopts Final Draft of Legislative Map*, Ariz. Republic, Aug. 18, 2001, at A1; Rhonda Bodfield Sander, *Tucson loses clout; redistricting completed*, Ariz. Daily Star, Oct. 15, 2001, at A1.

[203] Billy House, *Arizona Republicans Plan to Fight Redistricting Lawsuits*, Ariz. Republic, Oct. 12, 2003, at B7.

[204] *See Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787 (2015).

[205] *See, e.g.*, *Kyl Apparently Cruising to Victory, But Kolbe Might Be Facing a Scare*, Roll Call, May 15, 2000, at 1 (noting that "Arizona Democrats haven't posed serious challenges to statewide candidates here in the past decade").

Napolitano's election, combined with the adoption of Proposition 106 (which created the independent redistricting commission) was a backlash to continuing efforts to entrench the Republican Party, which was significantly more conservative than the state as a whole.[206] These changes in the landscape of the state's politics made Arizona into a battleground state headed into the 2004 presidential election.[207]

**79.** Following Napolitano's election and the adoption of the Commission, efforts to limit the electorate increased. The diversity of the population made it difficult to minimize the political power of some minority groups through gerrymandering, so attention turned to imposing more restrictions on voter qualifications. In 2004, Arizona voters passed an initiative—Proposition 200—that, among other things, required documentary proof of citizenship to register to vote and also required that those seeking to vote in person show certain forms of identification at the polls. The law also barred noncitizens from public services provided by the state, including some welfare and healthcare benefits.[208]

**80.** Proposition 200 had been enacted under the guise of preventing non-citizen voting, but the effect of regulations of this type generally has been to depress turnout among individuals, predominantly people of color, who can legally cast a ballot.[209] Proposition 200 was spearheaded by a group known as "Protect Arizona Now" that was widely criticized as racist and nativist.[210] The head of Protect Arizona NOW's national advisory group was Virginia D. Abernathy, a proud "separatist" who responded to charges of racism with her view that "each ethnic group is often happier with its own kind."[211]

**81.** The judicial challenges to Proposition 200 did not focus on whether the law was enacted with racial discriminatory intent.[212] But, by imposing needless hurdles to voter registration, the law nonetheless ran afoul of federal law. In *Arizona v. Inter Tribal Council of Arizona*, the U.S. Supreme Court held that Proposition 200 conflicted with the National Voter Registration Act (NVRA), which required only affirmation of citizenship status, not documentary proof as required by the state law, to register to vote for federal elections.[213] The state followed the decision by running parallel voter registration systems—one for state elections, one for federal—so that it could continue to use its documentary proof of citizenship requirement for state and local elections.[214]

[206] David Parrish, *Arizona Edging Away from Conservatism*, Ariz. Republic, Nov. 9, 2000, at A22.
[207] Maria La Ganga, *Long a Republican Bulwark, a Growing Arizona is in Play*, L.A. Times, Sept. 16, 2004, at A1. *See also* James Ricci, *Kerry Backers Target Arizona; Democratic activists in California are traveling by bus to the historically Republican state, hoping to rally support for their candidate*, L.A. Times, Oct. 18, 2004, at B1; David Parrish, *Arizona Edging Away from Conservatism*, Ariz. Republic, Nov. 9, 2000, at A22 ("Arizona's huge influx of newcomers over the past decade has brought more than traffic jams, Los Angeles-colored air and Krispy Kreme doughnuts. It also has lured voters from regions in the country not steeped in the state's Western conservative roots as exemplified by Sen. Barry Goldwater…").
[208] Sheryl Kornman, *Prop. 200 splits Az. On Proof of citizenship benefits*, Tucson Citizen, Oct. 28, 2004, at A1.
[209] Brennan Ctr. for Just., *Voting Rights & Elections Series: Proof of Citizenship* 1 (2006), http://www.brennancenter.org/sites/default/files/ analysis/Proof%20of%20Cistizenship.pdf [https://perma.cc/9TRG-DPXB] (indicating that proof-of-citizenship requirements disenfranchise many eligible voters). *See also* Howard Fischer, *Voters Without ID Must be Tallied, Judge Says*, Ariz. Daily Star, Nov. 2, 2006, at B4.
[210] Tucker, et. al, *supra* note 154, at 294.
[211] *See* E.J. Montini, *Separate, Unequal Views of Adviser to Proposition 200*, Ariz. Republic, Aug. 17, 2004, at B10; *Ethnic Profiling: Our Stand: Protect Arizona Now Only Divides Arizonans*, Ariz. Republic, Aug. 19, 2004, at B8.
[212] *See, e.g.*, *Schuette v. Coalition to Defend Affirmative Action*, 572 U.S. 291 (2014).
[213] *Ariz. v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013).
[214] Ariz. Advisory Comm., *Voting Rights in Arizona*, *An Advisory Memorandum of the Arizona Advisory Committee to the U.S. Commission on Civil Rights* 3-4 (July 2018), https://www.usccr.gov/files/pubs/2018/07-25-AZ-Voting-Rights.pdf [perma]

**82.** This parallel voter registration system has had a harmful effect on minority voters seeking to participate in state and local elections.[215] In 2018, the state of Arizona entered into a consent decree with the League of United Latin American Citizens after the state continued to reject registrants who used the state form to register for federal elections without documentary proof of citizenship.[216] Also in 2018—based on testimony from numerous voters—the Arizona Advisory Committee to the U.S. Commission on Civil Rights noted that the bifurcated voter registration system was "confusing and may have prevented voters from participating in State and local elections due to the proof of citizenship requirement."[217] Lorena Van Assche, chair of the Advisory Committee, followed this report with congressional testimony in 2019 that noted the bifurcated system was especially damaging to Native American voters:

> Testimony revealed that Arizona's bifurcated voter registration system is confusing and…may have prevented voters from participating in State and local elections due to the proof of citizenship requirement. The State's paper voter registration form is different from the online voter registration form available through servicearizona.com. The State's paper voter registration form provides a space for applicants to add a Tribal ID number that is especially beneficial to our Native Americans citizens but that is unavailable on the online registration system. Therefore, Native Americans who choose to register to vote online face additional challenges when completing their online form.[218]

**83.** And this is not the only time in which the state has been accused of not complying with the NVRA, which requires that public agencies double as voter registration entities. The number of voters who utilized voter registration at public assistance agencies was down by 60 percent between 1999 and 2015, leading the Arizona Advisory Committee to the U.S. Commission on Civil Rights to question the extent to which the state has made its public agencies available to those seeking to register to vote.[219]

**84.** These concerns have only been exacerbated in the wake of the U.S. Supreme Court's decision in *Shelby County v. Holder*.[220] Following the decision, which invalidated the coverage formula

---

*Commission on Civil Rights* 3-4 (July 2018), https://www.usccr.gov/files/pubs/2018/07-25-AZ-Voting-Rights.pdf [perma] (hereinafter, *Voting Rights in Arizona, An Advisory Memorandum*).

[215] *Id.*

[216] *Mi Familia Vota v. Fontes*, CV-22-00509-PHX-SRB, 2023 WL 8183070 (D. Ariz. Feb. 16, 2023). Under the *LULAC* consent decree, Arizona must "(1) treat all registrants the same regardless of whether they use the state form or Federal Form, registering all voters for federal elections regardless of provided evidence of citizenship; and (2) check the motor vehicles database for citizenship documentation before limiting voters to federal-only elections." *Id.* at *3 (discussing *League of United Latin Am. Citizens* ("LULAC") *v. Reagan*, 17-cv-04102-DGC (D. Ariz. 2017)).

[217] *Voting Rights in Arizona*, *An Advisory Memorandum*, *supra* note 214, at 7 (noting the numerous problems with government databases housing citizenship information).

[218] *Voting Rights and Election Administration in Ariz.: Hearing Before the Subcomm. On Elections of the H. Comm. On H. Admin.*, 116th Cong., 1st Sess. (2019) (statement of Hon. Lorena C. Van Assche) (hereinafter, *Voting Rights and Election Administration in Ariz.*).

[219] *Voting Rights in Arizona*, *An Advisory Memorandum*, *supra* note 214, at 8.

[220] *See generally* Catalina Feder & Michael G. Miller, *Voter Purges After* Shelby, 48 Am. Pols. Res. 687 (2020)(finding "increases in purge rate of between 1.5 and 4.5 points in formerly covered jurisdictions post-Shelby, compared with counties that had not been subject to preclearance"); Jonathan Brater et al., *Purges: A Growing Threat to the Right to Vote*,

of Section 4(b) of the Voting Rights Act, Arizona no longer had to submit its election changes to the federal government for preclearance. The partial invalidation of one of the most successful pieces of civil rights legislation in United States history has made it harder for minority voters in Arizona to cast a ballot.[221] In the wake of the decision, almost every county in the state reduced the number of polling places, resulting in 212 fewer locations ahead of the 2016 election.[222] According to testimony before the U.S. House Subcommittee on Elections, "In primarily Anglo communities like Cave Creek, there is one polling place per 8500 residents. In Phoenix, a majority minority city where 40.8 percent of its 1.5 million residents are Hispanic, there is one polling location for every 108,000 residents."[223] This discrepancy meant that the wait time to vote in many places with large minority constituencies increased exponentially with the polling place closures.

**85.** It is not uncommon for the state's largest counties to have these access issues. Pima County, home of Tucson, reported 62 fewer polling locations; similarly, Maricopa County voters reported hours long wait times because election officials cut the number of locations in 2016 by 85 percent (as compared to the 2008 presidential election) and 70 percent (as compared to the same election in 2012).[224] As reported by the 2020 census, Maricopa County has had the largest population growth among African American, Native American and Latino residents than any other U.S. county, with Phoenix taking the top spot as the fastest growing big city between 2010 and 2020.[225]

---

Brennan Ctr. for Just. (2018), https://www.brennancenter.org/media/235/download/Report_Purges_Growing_Threat.pdf?inline=1 ("For the two election cycles between 2012 and 2016, jurisdictions no longer subject to federal preclearance had purge rates significantly higher than jurisdictions that did not have it in 2013").

[221] *See, e.g.*, Jasleen Singh & Sara Carter, *States Have Added Nearly 100 Restrictive Laws Since SCOTUS Gutted the Voting Rights Act 10 Years Ago*, Brennan Ctr. for Just., June 23, 2023, https://www.brennancenter.org/our-work/analysis-opinion/states-have-added-nearly-100-restrictive-laws-scotus-gutted-voting-rights ("Arizona, a state that was previously subject to preclearance, clocks in with the highest number of restrictive voting laws (8) passed in any one state since *Shelby County*."). *See also* Leadership Conf. Educ. Fund, *Democracy Diverted: Polling Place Closures and the Right to Vote* 29 (2019), https://civilrightsdocs.info/pdf/reports/Democracy-Diverted.pdf ("Since the loss of Section 5 preclearance, Arizona counties have embarked on a massive effort to close polling places statewide, and they have succeeded: The state now has 320 fewer polling places in Arizona than it did in 2012."); *Id.* at 30 (discussing a settlement between Maricopa County and civil rights groups to reopen some polling places ahead of the 2016 general election). *See also* Sue Halpern, *The Political Attack on the Native American Vote*, The New Yorker, Nov. 4, 2022 ("Redistricting has also hit Native communities hard. Districts that were created to empower Native Americans have now been sliced and diced to mute Native voices. District 2, for instance, now encompasses sixty per cent of Arizona's landmass, including fourteen of the state's twenty-two tribes. It is the most Native voting district in the state. But the newly drawn map adds a large Republican county, diluting the Native vote and giving the advantage to white Republicans. This new map is a direct legacy of the Supreme Court's 2013 decision in *Shelby County v. Holder*[.]").

[222] *Voting Rights in Arizona, An Advisory Memorandum*, *supra* note 214, at 2.

[223] *Voting Rights and Election Administration in Ariz.*, *supra* note 218 (statement of Darrel L. Hill).

[224] *Id.*

[225] *Maricopa County among top population growth in white, Black, Native, and Hispanic residents last year*, 12News (Jun. 30, 2022 at 1:28 P.M.), https://www.12news.com/article/money/economy/boomtown-2040/maricopa-county-among-top-population-growth-white-black-native-hispanic-residents-last-year/75-42cc6f24-16bd-4f32-a552-f9c823df0670 [perma] (noting a corresponding decline in the white population nationwide over the same period).

**86.** Yet, instead of adding more polling places ahead of this steady population growth over the course of the decade, residents had to contend with fewer locations and more voting restrictions. In 2016, the state legislature passed HB 2023, which prohibited third-party ballot collection and made it a felony to turn in someone else's completed ballot, with only a few narrowly defined exceptions.[226] In addition, under Arizona's "out-of-precinct" policy, voters who cast ballots on election day must vote in their assigned precincts, or have their ballots discarded if cast in the wrong precinct.[227]

**87.** This policy disproportionately affects Native American voters who are often assigned to the wrong precinct because their homes tend to lack street addresses. Notably, the vast majority of out-of-precinct ballots discarded in the 2014 and 2016 general elections in Apache, Navajo, and Coconino counties were in predominantly Native American areas.[228] In 2012, these same counties rejected provisional ballots more than any other county in Arizona, owing in part to voters who cast their ballots in the wrong precinct.[229] Thus, the availability of provisional voting, in a state that leads the nation in rejecting provisional ballots, is oftentimes insufficient to ensure that the votes of Native Americans will be counted.[230]

**88.** For these reasons, Native Americans routinely used third-party ballot collection because of their limited access to polling places and mail services relative to other groups. According to one study, "only 18 percent of reservation residents outside of Maricopa and Pima Counties have physical addresses that receive mail;" in addition, "between 42,000 and 85,000 people living on a reservation do not have a permanent address and move from house to house."[231] Thus, the ban on ballot collection made it especially difficult for Native American voters to coordinate their efforts and collect ballots on remote reservations.[232]

**89.** When a reservation is located in more than one county, such coordination is key. For example, the Navajo reservation is spread across Apache, Navajo, and Coconino counties, each of which offer different ways for voters to cast a ballot, ranging from vote centers to

[226] Ariz. Rev. Stat. Ann. §16-1005(H)-(I) (2016). *See also Voting Rights in Arizona*, *An Advisory Memorandum*, *supra* note 214, at 4 (noting that, for HB 2023, "exceptions exist for a family member, household member or caregiver of the voter as defined within the statute").

[227] Ariz. Rev. Stat. Ann. § 16-122 (2015).

[228] *Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989, 1004 (9th Cir. 2020).

[229] Brandon Quester, *Rejected ballots document continued problems in Arizona's elections*, Arizona Center for Investigative Reporting, https://azcir.org/rejected-ballots-documentcontinued-problems-in-arizonas-elections/.

[230] Halpern, *supra* note 221("Although they may be able to cast a provisional ballot, Arizona rejects provisional ballots more frequently than any other state, and a substantial number of those rejected ballots are from Indigenous communities. And though the state now allows voters to identify their domicile with a code from Google that uses latitude and longitude to create a shareable digital address, numerous challenges, starting with Internet access and poor cell service, make this difficult to implement on reservations.").

[231] *Fighting for a Voice: Native Americans' Right to Vote in Arizona*, Ariz. Hist. Soc. (Jul. 15, 2020), https://arizonahistoricalsociety.org/2020/07/15/fighting-for-a-voice-native-americans-right-to-vote-in-arizona [perma] ("Ballots in Arizona are also not translated to any Indigenous languages to accommodate Americans that do not speak English as a primary language. Many areas on the reservation do not have access to the internet, or even electricity. This fact does not get addressed when laws are put into place.")

[232] *Brnovich v. Democratic Nat'l Comm.*, 594 U.S 647, 727-28 (2021) (Kagan, J., dissenting). *See also* Brief of National Congress of American Indians as Amicus Curiae in Support of Respondents, *Brnovich v. Democratic Nat'l Committee*, 594 U.S. 647 (2021), Nos. 19-1257, 19-1258, 2021 WL 242303, at *22 (noting that "[b]ans on ballot collection can disproportionately and severely impact Native communities").

more traditional precinct voting locations to a mix of both of these options.[233] Given these disparities, the risk of voter confusion, particularly among a group that has historically faced challenges, is substantial.

**90.** Because of their socioeconomic and housing challenges, Native American voters have faced challenges in registering to vote that extend well beyond the burdensome restrictions of the out-of-precinct policy and the third-party ballot collection prohibitions. During the 2012 election, for example, poll workers failed to accept state-approved forms of identification from these voters when presented at the polls.[234]

**91.** Additionally, for members of Alaska Native or Native American groups with unwritten languages, covered jurisdictions have failed to provide oral instructions at all stages of the electoral process, as required by federal law.[235] In fact, Apache County is one of the few places in the United States where one of the primary languages is Navajo, an oral language.[236] Yet, in a 2019 congressional hearing, numerous witnesses discussed how covered counties, including Apache County, failed to provide voting materials in Native American languages.[237] These Voting Rights Act violations happened despite procedures outlined by the Secretary of State that explicitly require state officials to consult with tribal governments on election matters, including language translations and polling place locations.[238]

**92.** In 2018, Native Americans sued Apache, Navajo, and Coconino Counties for a number of policies that disproportionately affected the ability of this group to participate in the political process.[239] These policies included discarding unsigned early ballots and ballots without matching signatures. The affected individuals, many of whom did not speak or read English,

[233] Brief of Amicus Curiae Navajo Nation in Support of Respondents, *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647 (2021), Nos. 19-1257, 19-1258, 2021 WL 260084, at *22.
[234] *Voting Rights in Arizona*, *An Advisory Memorandum*, *supra* note 214, at 8.
[235] *Id.* at 290-91.
[236] Ferguson-Bohnee, *supra* note 110, at 1115. *See also* Tucker, et. al, *supra* note 154, at 292:

> Apache County, home to the capital of the Navajo Nation, is the only jurisdiction in the United States that is covered under all three Section 203 coverage formulas: among all voting-age citizens in the county, 26.5% (11,245) are Navajo-speaking LEP persons. Apache County is also covered by the partial reservation trigger because 36.11% of all persons living on the Navajo Reservation, which is divided between several states and counties, are Navajo-speaking LEP persons. The illiteracy rate among these Navajo voting-age citizens is extreme. It includes more than 25% of all eligible Navajo voters, which is nearly nineteen times the national illiteracy rate. Apache County also is covered for the Apache and Hopi (Pueblo) languages.

*Id* (internal citations omitted).
[237] *Voting Rights and Election Administration in Ariz.*, *supra* note 218 (statement of Lorena C. Van Assche) (noting that "[the Arizona advisory] committee heard testimony that poll workers are not adequately trained to deal with nonnative English speakers. This barrier to voting is especially problematic for Native American voters who often are non-native speakers"). *See also Voting Rights and Election Administration in Ariz.*, *supra* note 218 (statement of Patty Ferguson-Bohnee).
[238] *See* Adrian Fontes, Secretary of State, *State of Arizona 2023 Elections Procedures Manual* 123 ("The County Recorder and officer in charge of elections shall consult with the appropriate tribal government(s) when selecting voting locations on reservations within the county, and in preparing minority language translations required under Section 203 of the Voting Rights Act."). *See also id.* at 160 ("Where the language of the applicable minority group is oral or unwritten, the covered jurisdiction is only required to provide oral instructions, assistance, or other information relating to registration and voting, including voting by mail, in the covered language. Measures that may contribute to this process include using bilingual registrars, placing bilingual poll workers at voting locations, and making announcements over minority language radio and television stations.") (internal citations omitted).
[239] *See* Complaint, *Navajo Nation v. Reagan (Hobbs)*, 18-CV-08329 (D. Ariz. 2018).

were not alerted to these requirements because the counties refused to provide translators for those who received early ballots by mail. Voters who made mistakes were also not given an opportunity to fix these errors and cure their ballots, even though voters located in other counties throughout the state were afforded that opportunity. These counties also refused to open additional voter registration and early voting sites so that these voters would be able to seek assistance with their ballots. The case later settled.[240]

**93.** Native American voters have not been the only demographic group impacted by the state's failure to meet its obligation under Sections 203 and 4(f)(4) of the Voting Rights Act. Of the twelve Arizona counties that must provide election materials in the language of the applicable minority group: six counties must provide Spanish language materials (Cochise, Greenlee, Maricopa, Pima, Santa Cruz and Yuma) and nine counties must provide language assistance for Native Americans (Apache, Coconino, Gila, Graham, Maricopa, Navajo, Pima, Pinal and Yuma).[241] Similarly, Section 4(f)4 of the Voting Rights Act provides separate coverage statewide in which all political subdivisions in the state are required to provide Spanish language assistance.[242] Despite these overlapping legal requirements for Spanish speakers, Cochise County failed to provide sufficient numbers of bilingual poll workers given the county's large Spanish speaking population, leading to a 2006 consent decree with the DOJ.[243]

**94.** As this discussion illustrates, Arizona voters have had to contend with a shifting political landscape over the course of the first two decades of the twentieth century, punctuated by efforts from elected officials seeking to cement their advantage through a series of race-neutral laws and restrictions that, in the aggregate, have had a negative impact on minority voters in an increasingly diverse and politically divided state.

**95.** The 2018 election, in particular, signaled that a seismic political shift was on the horizon, a harbinger for the restrictions that would ultimately follow the 2020 election.[244] After the 2018 and 2020 elections, Democrats held the state's U.S. Senate seats, ~~3~~5 of its 9 seats in the

[240] *See*, *e.g.*, Apache County Settlement, *Navajo Nation v. Reagan (Hobbs)*, 18-CV-08329 (D. Ariz. 2018) (requiring Apache County defendants to (1) make available ~~in-person early voting polling places; (2) develop a voter registration plan for each election cycle; (3) circulate radio and print advertisements that include voter information; (4) make available~~ Navajo-language interpreters at polling places; and (~~5~~2) allow voters to cure unsigned ballots).
[241] Tucker, et. al, *supra* note 154, at 289 ("Under Section 203, a jurisdiction becomes covered if the number of LEP U.S. citizens of voting age in a single language group within the jurisdiction is more than 10,000; or is more than 5% of all citizens of voting age; or on an Indian reservation, more than 5% of the American Indian voting-age citizens are members of a single language minority and are LEP; and the illiteracy rate of the citizens in the language minority group is higher than the national illiteracy rate. The Secretary of State imposes specific requirements on counties covered under Section 203 and Section 4(f)(4) in order to comply with federal law, yet some counties continue to fall short in accommodating these voters."). *See also* Fontes, *supra* note 238, at 91 ("In-person voting, both during the early voting period and on Election Day, requires the deployment of accessible voting equipment for voters with disabilities and/or those needing assistance in a minority language required by federal or state law. Further, some counties use accessible voting equipment for ballot marking by all voters at the voting location."); *id.* at 67 ("For materials provided by mail, there should be appropriate publicity measures taken to advertise the instructions of returning ballots by mail in minority languages, including traditionally unwritten languages, covered by Section 203 of the Voting Rights Act.").
[242] *See* Tucker, et. al, *supra* note 154, at 289.
[243] *See* Consent Decree, Order and Judgment, *United States v. Cochise Cnty.*, No. 4:06-CV-00304 (D. Ariz. Oct. 12, 2006), ECF No. 11.
[244] *Trump's incredible shrinking Arizona Republican Party: Earning the support of swing voters is clear path to victory*, Ariz. Republic, May 31, 2020, at D5.

House of Representatives, and a number of statewide offices. The state house and senate were closely divided with Republicans holding the governorship until losing that office in the 2022 elections while retaining a slim lead in both chambers (16-14 Senate, 31-29 House).[245] As in other times of consequential political change, the long arc of Arizona history provided a blueprint for SB 1485 and other voting restrictions.[245]

## VI. Putting SB 1485 in Historical and Contemporary Context: Colorblind Targeting As Discriminatory Intent

**96.** SB 1485 is the successor to the long history of discriminatory voting related legislation in Arizona, a history in which the legislature has routinely targeted minority voters in enacting such legislation. SB 1485 is no different from its predecessors and was enacted against the backdrop of a political situation that had become increasingly competitive—with the minority preferred presidential candidate winning Arizona by a slim margin in 2020 for the first time in decades—on the back of historic turnout by minority voters.[246]

**97.** During the 2020 election cycle, it was apparent that the state which once had cities that boasted about the small sizes of their minority populations could no longer make that claim. As of 2020, Arizona's demographics were 32.5% Latino, 5.5% African American, 5.2% Native American, and 3.9% Asian; in other words, these groups were sizeable enough to make a difference in a politically divided state.[247] In addition, African Americans—concentrated in some of the state's most populous counties including Maricopa (6.3% black), Pinal (5.2% black), and Pima (4.2% black)—have the fastest growth rate on a percentage basis than any other group in Arizona.[248] Similar to Governor George W.P. Hunt's efforts to limit minority voting rights over a century ago for fear that they might serve as a crucial swing voting bloc in close races,[249] SB 1485 marginalizes the voting power of the rapidly growing population of minority voters who are currently well positioned to determine partisan control of the state.[250]

[245] Tom Kuebel, *Arizona State Legislature update: GOP holds slight edge in local Senate and House* races, Fox 10, Nov. 9 , 2024, https://www.fox10phoenix.com/news/arizona-state-legislature-update-gop-holds-slight-edge-local-senate-house-races-election-2024.

[245] Howard Fischer, *Arizona Republican Party contends some voting was illegal*, Ariz. Daily Star, Nov. 7, 2018, at A29. While Republicans held on to their slim lead in the state legislature after the 2022 elections, a Democrat won the gubernatorial election in 2022.

[246] Courtney Vinopal, *How Mexican American voters helped turned Arizona blue*, PBS, Nov. 4, 2020; Felicia Fonseca & Angeliki Kastanis, *Native American votes helped secure Biden's win in Arizona*, AP, Nov. 19, 2020.

[247] *QuickFacts: Arizona*, U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/AZ/PST045222.

[248] Corina Vanek, *Arizona's Black population growing, but earnings and business opportunities lag, report says*, Phoenix Bus. J. (Mar. 26, 2021), https://www.bizjournals.com/phoenix/news/2021/03/26/black-population-arizona-earnings-businesses.html [perma]; *Arizona Black Population Percentage by County, IndexMundi* (last accessed: July 30, 2025), https://www.indexmundi.com/facts/united-states/quick-facts/arizona/black-population-percentage#map [perma].

[249] *See* Part V(B), *supra*.

[250] *See, e.g.*, Ximena Bustillo, *Native voters could swing Arizona. Both parties want their votes*, NPR, (Oct. 14, 2024); Kalyani Saxena, *How the Navajo Nation Helped Flip Arizona for the Democrats*, NPR, Nov. 13, 2020.

**98.** SB 1485 removes a voter from what is now known as the "active early voting list" if the "voter fails to vote an early ballot in all elections for two consecutive election cycles."[251] Prior to the enactment of SB 1485, any voter on what was then known as the "permanent early voting list" was automatically sent a mail-in ballot for every election. Now, if those voters fail to cast a ballot by mail in two election cycles, county recorders must notify affected voters by January 15th of odd numbered years, and voters have 90 days to respond or face removal.

**99.** The law thus shifts suppression efforts from in-person voting (see, e.g., the racially disproportionate effects of HB 2023, the polling place closures, and the out-of-precinct ballot policy) to the next voting method—vote by mail—that was preferred by most voters in 2020, with 68% of these voters utilizing the permanent early voting list.[252] Indeed, approximately 80% of Arizona voters regularly cast ballots by mail.[253] The shift in suppression efforts reflects that the demographics of the Arizona electorate had dramatically changed over recent election cycles: turnout among Republican leaning white noncollege graduates dropped precipitously from 2010-2022 while turnout among Democratic leaning white college graduates and minorities increased over the same period.[254]

**100.** Despite some combination of legislative and legal efforts to make mail in voting more difficult, rhetoric that cast this mechanism of voting as unreliable, and the end of the COVID-19 lockdown, the number of voters on the permanent early voting list rose to 75% as of 2022.[255] This increase was a reflection that the use of vote by mail, and in particular the permanent early voting list, had been trending upwards with each subsequent election.[256]

---

[251] S.B. 1485, 55th Legis., 1st Sess. (Ariz. 2021).

[252] Gloria Rebecca Gomez, *Nearly 90% of Arizona voters use early ballots. Republicans would eliminate that to combat imagined fraud*, Ariz. Mirror, Feb. 8, 2022; Campaign Legal Center, *Arizona Governor Signs Bill Into Law Limiting Freedom to Vote Early*, May 11, 2021, https://campaignlegal.org/update/arizona-governor-signs-bill-law-limiting-freedom-vote-early.

[253] Gloria Rebecca Gomez, *Nearly 90% of Arizona voters use early ballots. Republicans would eliminate that to combat imagined fraud*, Ariz. Mirror, Feb. 8, 2022 (noting that early mail-in voting "is regularly used by more than 80% of Arizona voters").

[254] *See* William H. Frey, *New voter turnout data from 2022 shows some surprises, including lower turnout for youth, women, and Black Americans in some states*, Brookings, May 18, 2023 (noting that there was a larger decline in turnout among white noncollege voters from 2010-2022 while turnout among white college graduates and nonwhite voters increased over the same period); Jen Fifield, *Republicans helped Arizona champion voting by mail. Now they want it gone.*, Ariz. Mirror, June 13, 2022.

[255] *See* Ben Giles, *Arizona Republicans Enact Sweeping Changes to State's Early Voting List*, NPR, May 11, 2021 (noting that "the PEVL has grown increasingly popular with each passing election in Arizona"). *See also* Christopher Conover, *Arizona's long history with voting by mail*, AZPM News, Aug. 21, 2020 (discussing how President Donald Trump criticized vote-by-mail the day after the Arizona primary). *See also Arizona Republican Party v. Hobbs*, No. CV-22-0048-SA (Ariz. 2022) (case in which the plaintiffs, the Arizona Republican Party, argue that mail-in voting violates the state constitution). *See also* HB 2596 (bill introduced in 2022 that would eliminate early voting, no excuse mail-in voting, and abolish emergency voting centers). *See also* Stephanie Weaver, *Arizona, long considered a GOP stronghold, could be a swing state in 2020 presidential election, experts say*, FOX10, Oct. 9, 2020 (discussing how COVID-19 pandemic contributed to Arizona's status as a swing state because it cut into Trump's base of elderly voters in a state that ranked third in the number of cases per capita).

[256] Campaign Legal Center, *Arizona Governor Signs Bill Into Law Limiting Freedom to Vote Early*, May 11, 2021, https://campaignlegal.org/update/arizona-governor-signs-bill-law-limiting-freedom-vote-early (noting that 68% of voters used the PEVL in 2020); Caitlin Sievers, *More than 75% of voters use early ballots. Every AZ House Republican voted to take that away*, Ariz. Mirror, March 1, 2024 ("Voting by mail remains incredibly popular in Arizona, with…around 75% of voters signed up to receive early ballots in 2022"). *See also* Jen Fifield, *Arizonans left off voter rolls just before primary because of problems with their forms*, Ariz. Mirror, July 29, 2024. *See also* Part VI(D) (discussing SB 1003 and 1072, both of which impose new restrictions on mail in voting).

Unfortunately, it is unclear how much the change from a permanent early voting list to an active voting list will drive this number downward, given that the first crop of voters have yet to be removed from the list; over 100,000 voter in the 2022 election cycle stood to be removed from the permanent early voting list had SB 1485 taken effect before that election.[257] But it is likely that SB 1485 will have a negative impact on the number of minority voters (as a percentage of the electorate) on the early voting list. As noted by Professor Herron, all registered Arizona voters face an increased cost of voting due to SB 1485.[258] SB 1485 raises the cost of voting in Arizona more for non-White registered voters on the active early voting list and, in particular, more for Hispanic and voters of other races/ethnicities (which includes Native Americans) than for White registered voters.[259]

**101.** As this section will show, SB 1485 is an example of colorblind targeting, or a law that, despite being facially race neutral, unduly burdens the voting rights of minority voters with a high degree of precision that one normally sees with racially discriminatory restrictions. With colorblind targeting, there are three factors—timing, geography, and voting method—that demonstrate how the state legislature targets minority voters without relying on facially discriminatory language but that nonetheless singles out these populations.

**102.** Part VI(A) discusses how SB 1485, enacted in 2021, was adopted in the wake of a contentious election cycle in which the Democratic Party was able to win key offices. Historically, new voting restrictions in Arizona have occurred: 1) following a sizeable increase in the minority population and/or an increase in the political activism of a minority group; 2) following an election in which a minority group served as a pivotal swing bloc and/or had a substantial influence on the outcome of the election; or 3) following a contentious election cycle in which a political party sought to secure their majority.[260] By placing SB 1485 in the broader historical context of other voting restrictions that were similarly adopted at politically contentious moments in the state's history, this section shows how the timing of a restriction has been a key indicator that race neutral restrictions were in fact designed to single out minority voters.

**103.** Part VI(B) shows that geography, like timing, has played a similar role in facilitating the disenfranchisement of minority populations. Because Arizona's minority communities are concentrated in remote rural areas (such as Native Americans on reservations) or are condensed in urban areas in big counties (such as African Americans or Latinos in Maricopa

[257] *See* Rachel Leingang, *What has and hasn't changed about voting in Arizona ahead of the primary*, Ariz. Mirror, July 11, 2022. Of the 90% of voters who voted early in 2020, most of them voted by mail. *See also* Campaign Legal Center, *Arizona Governor Signs Bill Into Law Limiting Freedom to Vote Early*, May 11, 2021, https://campaignlegal.org/update/arizona-governor-signs-bill-law-limiting-freedom-vote-early ("Had S.B. 1485 been enacted in 2019, around 126,686 Arizonans who voted in 2020 would have been taken off the PEVL. If the law were to be effective for the 2022 elections, it is estimated that between 125,000 to 150,000 voters would be deleted from the early voting list.").

[258] Herron, *supra* note 19, at 22.

[259] *Id.* at 31,81-82.

[260] There is a distinction between the second and third factors in that, with respect to the former, a majority political party might pass legislation that targets a particular minority group—either directly or through proxies— whose political activity could have been decisive in the prior election, whereas the latter focuses on consolidating the party's base while reducing turnout and participation among other groups, more broadly.

County), the state legislature has, in the past, taken advantage of the geographic location of these groups for purposes of disenfranchisement. SB 1485 is no exception.

**104.** Part VI(C) demonstrates how the state legislature can disenfranchise minority voters with precision by targeting specific voting methods increasingly used by minority voters, or by attaching requirements that impose a unique burden on minority voters who use certain voting methods. In Arizona, this has included exploiting characteristics that disproportionately affect minority communities (such as language differences, low literacy rates, lower socioeconomic status, residential segregation, etc.) to make it difficult for these groups to utilize a particular voting method, in this case vote by mail.

**105.** The conflation of these three factors—timing, geography, and voting method—illustrate how facially race neutral voting restrictions are designed to mimic laws that are enacted with racially discriminatory intent. As Part VI(D) shows, SB 1485 is not an example of colorblind targeting that is happening in isolation; instead, the law must be considered in light of a larger pattern of facially race neutral efforts to target the political power of minority groups that has been prevalent in the state in recent years.

### A. SB 1485 as Colorblind Targeting: The Historical Importance of Timing

**106.** There are a number of indications that the enactment of SB 1485 contemporaneous to a contentious election cycle fits within the colorblind targeting framework. Like other voting restrictions, SB 1485 was enacted after one of the most competitive election cycles in recent Arizona history, in an environment in which Republicans had been steadily losing support over the prior two decades. In 2014, Republicans had a 178,000 margin over Democrats in voter registrations. Republicans also enjoyed a 38-22 majority in the state House of Representatives and picked up an additional congressional seat that year.

**107.** By 2018, the Republicans margin had shrunk in the state house to 31-29. Democrats also reclaimed the congressional seat they lost four years earlier and held four offices decided by statewide vote (including a U.S. Senate seat).[261] The Republican registration advantage had almost been cut in half—down to 94,000 voters. During the 2020 election, about 80% of registered voters cast a ballot, with Democratic candidates securing victories in a number of races, including winning a seat in the United States Senate, replacing a Republican on the Arizona Corporation Commission, and carrying the state in the 2020 general election for the presidency.[262]

**108.** Indeed, 2020 represented the apex of an electorally competitive decade, and voting restrictions tended to correspond to increasing competitiveness and polarization in the state. For example, Arizona led the country in polling places closures ahead of the contentious 2016 election, which had been the most contentious election cycle since 2000. Arizona did not simply lead the country in polling place closures, according to a report issued by the Leadership Conference, Arizona led with respect to "both numbers of polling places closed and percentage of polling places [closed]. Pima County is the nation's biggest closer of

---

[261] *Trump's incredible shrinking Arizona Republican Party: Earning the support of swing voters is clear path to victory*, Ariz. Republic, May 31 2020, at D5.

[262] *Rather than broaden appeal, GOP seeks to shrink Arizona's electorate*, Ariz. Daily Star, Feb. 28, 2001, at B1.

polling places by number with 62 fewer voting locations in 2016 than 2012. Cochise County is the nation's biggest closer by percentage with its 63 percent reduction."[263] When closing polling places did not produce Arizona Republicans' desired results in the 2020 election, legislative action soon followed.

**109.** Because of the COVID-19 pandemic, many voters nationwide had shifted their voting method from in-person Election Day voting to early in person or vote by mail options.[264] The fact that most voters were on the permanent early voting list in a state that is closely divided politically, following an election in which voting by mail was attacked for facilitating fraud by the Republican Party's 2020 presidential candidate, made the permanent early voting list an obvious target in the wake of the 2020 election.[265] SB 1485 is not an anomaly. Throughout Arizona history, vulnerable majority parties have repeatedly implemented voting restrictions that target minority populations following a contentious election cycle.

### 1. George W.P. Hunt and the Threat of Minority Voters in the Progressive Era

**110.** The reelection battles of Governor George W.P. Hunt in the 1910s and 1920s offer a useful comparison point to the 2020 election cycle, which triggered the enactment of SB 1485, because these contentious cycles demonstrate how voting restrictions follow competitive election cycles. Despite aligning himself with populism over most of his political career, seven-time Democratic Governor George W.P Hunt was not progressive on racial matters, and each competitive election cycle served as a lesson for future disenfranchisement. As head of the constitutional convention that enacted Arizona's pre-statehood constitution in 1909, Hunt had been in favor of both school segregation and a literacy test in English for voter registration. The latter measure, eventually reauthorized by statute in 1912, targeted Hispanics, who tended to support Republicans over the Democratic Party.[266] Hunt also tried to secure his political position with white voters by, for example, aligning himself with the Ku Klux Klan. Historians speculate that Hunt agreed not to pursue anti-Ku Klux Klan legislation in exchange for their support in the 1922 primary and general election.[267]

**111.** Hunt also signed a measure in 1913, the Alien Land Bill, that prohibited land ownership by noncitizens and required those who owned land to sell within five years, a measure that targeted Japanese residents in Phoenix.[268] Ahead of the 1916 election, he signed a revised version of the Alien Land Bill, generating substantial backlash from Hispanic and Japanese groups.[269] In 1916, Governor Hunt initially lost reelection that year in part because Hispanic voters overwhelmingly supported his opponent (but was installed as governor after a year of litigation).[270]

[263] Leadership Conf. Educ. Fund, *The Great Poll Closure* 6 (2016), https://civilrightsdocs.info/pdf/reports/2016/poll-closure-report-web.pdf.

[264] Eric McGhee, et. al, *Vote-by-Mail and Voter Turnout in the Pandemic Election*, Pub. Pol'y Inst. of Ca., 5 (Apr. 2021), https://www.ppic.org/wp-content/uploads/vote-by-mail-and-voter-turnout-in-the-pandemic-election-april-2021.pdf [perma].

[265] Jen Fifield, *Republicans helped Arizona champion voting by mail. Now they want it gone.*, Ariz. Mirror, June 13, 2022.

[266] Berman, *supra* note 98, at 60–61, 182.

[267] *Id.* at 135.

[268] *Id.* at 60.

[269] *Id.* at 86.

[270] *Id.* at 108. *See also id.* at 181 ("Hunt's attitude toward Hispanics was shaped in part by his ties to the white-dominated mining unions that were hostile to Hispanic workers and sought restrictions on their employment. It was also

**112.** Learning lessons from the 1916 contest, Hunt tried to minimize the ability of minorities to serve as a swing bloc in future close races. From this perspective, his efforts to prevent Native Americans, who gained citizenship in 1924, from voting were entirely predictable.[271] Hunt endured a very contentious primary election in 1926 which, among other things, included charges of voter fraud and numerous irregularities.[272] He sought to secure his 1928 re-election in another very competitive cycle (Hunt would ultimately lose) by limiting the voting rights of newly enfranchised Native Americans. The disenfranchisement of Native Americans in the 1928 election ultimately culminated in the *Porter v. Hall* decision, finding that Native Americans did not exercise sufficient independence to be voters.[273] *Porter*, decided after the 1928 election, excluded all Native Americans from the Arizona electorate whereas, prior to *Porter*, Native Americans could participate in some counties, even though they still suffered substantial discrimination. It is not until the mid-1960s that Arizona legislators would once again face a significant political threat from minority voters, coinciding with the authorization and reauthorization of the Voting Rights Act, and leading to more efforts to circumscribe their voting power.

### 2. The Timing of Voter Suppression in the Voting Rights Act and Post-Voting Rights Act Eras

**113.** The rise of the Republican Party in Arizona in the 1960s, which coincided with the passage of federal civil rights legislation, predictably triggered attacks on minority political participation because of the desire to protect the Republican Party's new governing majority in Arizona. Federal law now imbued individuals once on the outskirts of the political system with voting rights, posing a threat to a newly dominant party that had built its platform around opposition to federal civil rights and voting legislation.

**114.** As of 1960, 10% of Arizona's voting age population was illiterate, substantially impairing their ability to participate in elections.[274] Three counties in Arizona (Apache, Navajo, Coconino) became covered jurisdictions under the Voting Rights Act in 1965 because of their use of literacy tests. Arizona's restrictive state and local residency requirements for voting also disqualified 15,500 voting age individuals as of 1968.[275]

mining unions that were hostile to Hispanic workers and sought restrictions on their employment. It was also influenced by the tendency of Hispanics to vote Republican (also a strike against blacks), something that a Democrat as committed as Hunt was unlikely to overlook.").

[271] Ferguson-Bohnee, *supra* note 110.

[272] *Bitter Arizona Campaign Ends*, L.A. Times, Sept. 7, 1926 ("Charges of double or fraudulent registration have been made by Ellinwood headquarters with reference to an increase of 5000 registrants in Maricopa County alone, while 2000 voters of the last election have vanished in Gila county, where Hunt received is majority two years ago."); *see also E.S. Clark Answers Governor's Letter By Offering to Present Evidence of Voting Irregularities*, Ariz. Republic, Dec. 19, 1926; *Arizona Vote Recount Soon*, L.A. Times, Dec. 8, 1926.

[273] *Porter v. Hall*, 34 Ariz. 308, 327 (1928); *see* Voting Rights Act of 1965, Pub. L. No. 89-110, 79 Stat. 437 § 5 (codified as amended at 52 U.S.C. § 10101). *See also* Part V(B).

[274] *See* Ariz. Rev. Stat. Ann. § 16- 101 (1956) ("Electors and voters must be able to read the United States Constitution in English in a manner showing that he is neither prompted nor re- citing from memory unless prevented by physical disability and must be able to write his name unless he has a physical disability."); *see also Amendments to the Voting Rights Act of 1965*, *Hearings before the Subcommittee on Constitutional Rights of the Senate Judiciary Committee*, 91st Cong. 216 (1969).

[275] Tucker, et. al, *supra* note 154, at 281.

**115.** Fear of once excluded minority voters having success at the ballot box, thanks to federal voting rights protections, spearheaded more restrictions at the state level. Efforts to gerrymander Native Americans into political obscurity picked up steam in the 1960s, but this timing was no accident. With its new majority firmly in place by 1966, Republicans sought to secure their advantage by changing the apportionment standard to registered voters (rather than total population),[276] which would have had a damaging impact on Native Americans (a group who historically had low voter registration). Even where registered, their perceived lack of citizenship and membership in the American demos (despite federal laws to the contrary) was consistently used as a basis to challenge their citizenship and voting rights.[277]

**116.** Arizona's literacy test was upheld in *Apache County v. United States*, a 1966 case in which a federal district court found that, absent contrary evidence from the federal government, affidavits from voting officials offering explanations for low voter turnout among Native Americans were sufficient to prove that literacy tests had not been used in a discriminatory manner.[278] During the pendency of the *Apache County* litigation, Arizona also amended the law to prohibit the use of literacy tests to challenge voters at the polls but retained the test as a mechanism for voter registration.[279] In the end, Arizona prevailed and these counties were removed from the preclearance regime.

**117.** The *Apache County* ruling did not reflect the reality for most minority voters on the ground. With eight Arizona counties becoming covered jurisdictions under the 1970 amendments to the Voting Rights Act,[280] the Republicans in the state legislature moved to secure their majority and enacted a number of measures to limit the number of new voters. Federal oversight had not only increased the number of minority voters in the state, but it also increased corresponding efforts to minimize their impact on the dominant Republican regime.

**118.** Because the 1970 amendments to the Voting Rights Act (amendments that Arizona unsuccessfully challenged before the U.S. Supreme Court[281]) suspended the use of literacy tests for five years, the state legislature purged all voter registrations, requiring voters to re-register yearly. The re-registration requirement was reminiscent of tactics adopted by other southern states grappling with a potential increase in the number of minority voters.[282] For example, a federal district court struck down Texas' re-registration requirement, enacted after that state, like several counties in Arizona, became subject to the preclearance requirement in 1970. In *Beare v. Smith*,[283] the court, in invalidating the Texas law, described it

[276] *Klahr I*, 303 F. Supp. 224, 225 (D. Ariz. 1969) (In addition to allowing deviations from the ideal district of up to 15%..."[t]he plan of Chapter 1 is for the entire membership of the legislature to be apportioned among the election districts on the basis of population; but Chapter 1 provides, further, that the number of legislators apportioned to each election district shall be apportioned among its legislative districts on the basis of voter registration.").
[277] *See generally* Ferguson-Bohnee, *supra* note 110, at 1102.
[278] *Apache Cnty. v. United States*, 256 F. Supp. 903, 908 (D.D.C. 1966).
[279] *Id.* at 909.
[280] Tucker, et. al, *supra* note 154, at 283, 286-87.
[281] *Or. v. Mitchell*, 400 U.S. 112, 117 (1972).
[282] Tolson, *In Congress We Trust*, *supra* note 69, at 322-25 (discussing an 1882 South Carolina annual registration law that disenfranchised seventy-five percent of the black population in the state).
[283] *Beare v. Smith*, 321 F. Supp. 1100 (S.D. Tex. 1971).

as a "direct descendant of the poll tax." Arizona's law, not coincidentally enacted after Congress banned literacy tests nationwide, generated similar objections and was blocked by the U.S. Supreme Court in September 1971.[284]

**119.** With the elimination of the literacy test and the additional protections afforded to minorities because of federal preclearance under Section 5 of the Voting Rights Act,[285] minority candidates enjoyed more success in running for office but also endured substantially more pushback. Apache County, once again covered under the 1970 amendments after successfully bailing out in 1965, is a prime example. Tom Shirley, who is Native American, was elected to the Apache County Board of Supervisors in November 1972. His opponent filed suit to prevent him from taking office arguing that, among other things, Shirley was ineligible for office because he lived on a reservation and was not a taxpayer.[286] This suit was unsuccessful, and Apache County subsequently gerrymandered its Board of Supervisor districts to dilute Native American voting power.

**120.** In *Goodluck v. Apache County*, a three-judge court held that the County's map violated the Fourteenth and Fifteenth Amendments and the Voting Rights Act.[287] In addition to efforts both to prevent Native American candidates from taking office and to pack Native American voters into gerrymandered districts, these voters also had to endure the closing of many their polling places, leading to a consent decree in Apache County prohibiting the county from discriminating in voting. Notably, these efforts to disenfranchise Native American voters came on the heels of the county's coverage under the 1970 amendments, when it was faced with the prospect, and then the reality, that the substantial Native American population could influence election outcomes.

**121.** The increasing influence of the Democratic Party in the late 1980s generated further concerns in Arizona about the political power of Native Americans. For example, the United States and Arizona entered into a consent decree in 1989 in which Navajo, Apache, and Coconino Counties agreed to stop abridging the voting rights of Native Americans living in those counties and provide affirmative assistance to those seeking to cast ballots.[288] Not coincidentally, in 1990, Democrats won a majority in the state senate for the first time since 1976.

**122.** Similarly, Proposition 200 (Arizona's proof-of-citizenship requirement for voter registration), spearheaded by a group with white supremacist and anti-immigrant ties,[289] was adopted in 2004, right on the heels of: 1) the election of the state's first Democratic governor in decades; 2) the adoption of an independent commission to draw its legislative districts; and 3) the increasing competitiveness of its state senate elections.

---

[284] *Senate Demos join effort on voting law*, Ariz. Republic, May 6, 1971, at 28. *See also Tucson polls open to nonregistered*, Ariz. Republic, Sept. 21, 1971, at 1; Kahr, 403 U.S. at 119.

[285] Tucker, et. al, *supra* note 154, at 283.

[286] *Shirley v. Super. Court*, 109 Ariz. 510, 516 (1973).

[287] *Goodluck v. Apache Cnty.*, 417 F. Supp. 13 (D. Ariz. 1975).

[288] Consent Decree, *United States v. Ariz.*, No. 88-cv-1989 (D. Ariz. May 22, 1989), ECF No. 31. *See also* Part V(B).

[289] For example, a chief sponsor of Proposition 200 was the Federation for American Immigration Reform, a group labeled by the Southern Poverty Law Center as a hate group with ties to white supremacists and eugenicists. S. Poverty L. Ctr., *SPLC: Federation for American Immigration Reform* (July 1, 2024 at 9:30 A.M.), https://www.splcenter.org/fighting-hate/extremist-files/group/federation-american-immigration-reform [perma].

**123.** Thus, SB 1485 comes at a time in which the state is once again a political battleground where minority voters serve as an important swing bloc.[290] Because of racially polarized voting,[291] these voters have threatened the Republican Party's dominance in the state. Joe Biden won the state by 0.3% in 2020,[292] a huge swing over Donald Trump's 3.5% win over Hilary Clinton in the 2016 presidential election. At least some of Biden's margin in the state is attributable to minority voters.[293]

**124.** In some counties, the permanent early voting list made the difference in voter participation in 2020. For example, Pima County, which includes the city of Tucson, has a considerable minority population—38.5% Latino; 4.5% African American; 4.4% ~~Native~~ American Indian and Alaska Native; and 3.4% Asian American.[294] Like most of the state,[295] early voting (including those utilizing the permanent early voting list)[296] was wildly popular in Pima County in 2020. According to the Pima County Recorder, who urged the state legislature not to adopt SB 1485, "our office mailed 544,810 ballots to voters at their homes. 87.5% of those voters voted and returned their ballot by mail—the highest return rate in Pima's history."[297] The contrast between 2016 and 2020 is stark—in 2016, there were 360,762 ballots cast in Pima County, which Hilary Clinton won by 48,630 votes.[298] In 2020, Joe Biden defeated Donald Trump in Pima County by over 100,000 votes, and the county had record voter participation of 82.45% (which translates to 526,319 voters).[299] Thus, the permanent early voting list, which was not only the dominant method of voting but one in which minority preferred candidates overperformed,[300] helped facilitate a six-figure increase in voter

[290] Ashley Lopez, Bret Jaspers and Sergio Martinez-Beltran, *After Democrats Surged in 2018, Republican-Run States Eye New Curbs on Voting*, NPR, April 22, 2019 ("Last fall, Arizona Republicans saw their total control of all statewide offices shattered by surging Democratic turnout, losing four of nine statewide races—including a U.S. Senate seat.").
[291] *See generally* Lisa Handley, *Voting Patterns by Race/Ethnicity in Recent Congressional and State Legislative Elections in Arizona*, https://irc.az.gov/sites/default/files/nrewsroom/Handley%2520report_Voting%2520Patterns%2520by%2520RaceEthnicity%2520in%2520Recent%2520State%2520Legislative%2520Elections%2520in%2520Arizona.pdf (noting that voting in most of Arizona during 2018 and 2020 congressional and state elections was racially polarized).
[292] *Election 2020*: *Arizona*, Wash. Post (last updated Nov. 30, 2020, 4:59 P.M. ET), https://www.washingtonpost.com/elections/election-results/arizona-2020 [perma].
[293] Kalyani Saxena, *How the Navajo Nation Helped Flip Arizona for the Democrats*, NPR, Nov. 13, 2020 (stating that "60% to 90% of the Navajo Nation's roughly 67,000 eligible voters voted for Biden" in the 2020 election).
[294] *QuickFacts: Pima County, Ariz*, U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/pimacountyarizona/LND110210 [perma].
[295] Most early voters were on the permanent early voting list. *See* Campaign Legal Center, *Arizona Governor Signs Bill Into Law Limiting Freedom to Vote Early*, May 11, 2021, https://campaignlegal.org/update/arizona-governor-signs-bill-law-limiting-freedom-vote-early. *See also* Ben Giles, *Arizona Republicans Enact Sweeping Changes to State's Early Voting List*, NPR, May 11, 2021 (noting that "the PEVL has grown increasingly popular with each passing election in Arizona").
[296] Campaign Legal Center, *Arizona Governor Signs Bill Into Law Limiting Freedom to Vote Early*, May 11, 2021, https://campaignlegal.org/update/arizona-governor-signs-bill-law-limiting-freedom-vote-early (noting that 80% of Arizona voters received ballots in the mail, of which 68% were on the PEVL).
[297] Ariz. S. Deb. (May 11, 2021) (comments of Senator Rosanna Gabaldon) (reading statement from Gabriella Cazada-Kelly, the Pima County Recorder).
[298] *Arizona Election Results 2016*, Politico (Dec. 13, 2016), https://www.politico.com/2016-election/results/map/president/arizona/ [perma].
[299] Pima County, Summary Results Report, General Election (Nov. 3, 2020), https://oldcms.pima.gov/UserFiles/Servers/Server_6/File/Government/elections/Election%20Results/General%202020%20Results.pdf.
[300] As mentioned, prior, almost 90% of voters cast early ballots in 2020, most of them by mail, and approximately 68% of voters were on the permanent early voting list during that election cycle. The number of voters on the PEVL rose to

participation in Pima County in 2020 and significant increases in other counties as well.[301] Notably, this trend corresponded to historic losses by the Republican Party in the state during that same election cycle. [302]

### B. SB 1485 as Colorblind Targeting: The Historical Importance of Geography

**125.** As of March 2021, Arizona, along with Texas and Georgia, led the nation in the number of bills introduced in their respective state legislatures seeking to restrict voting access.[303] Voter suppression tactics in these states—like those across much of the south—tended to mirror each other, as all used race neutral voting restrictions that geographically targeted minority voters. Like its southern counterparts,[304] Arizona structured its elections over the last century to minimize minority political power—for example, by having a de facto all white Democratic Primary similar to the primary that operated in both Texas and Georgia;[305] requiring a literacy test like many southern states;[306] adopting yearly re-registration requirements in response to becoming a covered jurisdiction (only a few short years after Texas did the same);[307] and embracing voting restrictions that target geographically concentrated minority voters.

---

of voters were on the permanent early voting list during that election cycle. The number of voters on the PEVL rose to 75% by the 2022 election. *See* Campaign Legal Center, *Arizona Governor Signs Bill Into Law Limiting Freedom to Vote Early*, May 11, 2021, https://campaignlegal.org/update/arizona-governor-signs-bill-law-limiting-freedom-vote-early; Caitlin Sievers, *More than 75% of voters use early ballots. Every AZ House Republican voted to take that away*, Ariz. Mirror, March 1, 2024.

[301] *See, e.g.*, Jessica Swarner, *A Timeline of Arizona's Long History of Early Voting*, The Copper Courier, Oct. 13, 2020 (interviewing officials in Yuma County who noted that, because of early voting and the permanent early voting list, 91% of voters voted early in the county's 2020 primary election). *See also* Office of Maricopa County Recorder Adrian Fontes & the Maricopa County Elections Dep't, *Early Voting Plan: November General Election* 5 (Nov. 3, 2020), https://recorder.maricopa.gov/pdf/GENERAL%20ELECTION%202020_Early%20Voting%20Plan_FINAL.pdf (noting that 250,000 voters joined the PEVL between January and May 2020).

[302] Arizona's results from the last seven presidential elections:

2000: Republican (51%.0)
2004: Republican (54.9%)
2008: Republican (53.6%)
2012: Republican (53.7%)
2016: Republican (48.7%)
2020: Democratic (49.4%)
2024: Republican (52.2%)

*US election: How have the seven swing states voted in the past?*, Al Jazeera, Nov. 5, 2024.

[303] Ariz. S. Deb. (May 11, 2021) (comments of Senator Victoria Steele) (citing report from the Brennan Center, *infra* note 352).

[304] Arizona borrowed from the segregated south in almost all walks of life. *See, e.g.*, Eric V. Meeks, *Border Citizens: The Making of Indians, Mexicans, and Anglos in Arizona* 160 (2007) ("Public facilities in south-central Arizona remained segregated well into the 1950s… [and residents] remembered that 'Phoenix was just like Mississippi. People were just as bigoted. They had segregation. They had signs in many places, 'Mexicans and Negroes not welcome.'").

[305] *See* Strauss, *supra* note at 122. *Cf.* Nixon v. Herndon, 273 U.S. 536 (1927) (invalidating the all white Democratic Primary in Texas); King v. Chapman, 62 F. Supp. 639 (M.D. Ga. 1945) (same for Georgia).

[306] *Extension of The Voting Rights Act: Hearings Before the Subcomm. on Civ. & Const. Rts of the Comm. on the Judiciary*, H.R., 94th Cong., 1st Sess. 1225–1230 (1975) (Report of the United States Commission on Civil Rights, *The Voting Rights Act: Ten Years After*); Ferguson-Bohnee, *supra* note 110, at 1102.

[307] *Id.* *Cf.* Beare v. Smith, 321 F. Supp. 1100 (S.D. Tex. 1971)(invalidating Texas' re-registration requirement adopted after it became a covered jurisdiction under the Voting Rights Act).

**126.** Geography has long been a proxy for race used to discriminate in a number of states.[308] For example, cities like Galveston and Houston shifted to at-large elections in 1895, as the Democratic Party had to contend with an increasingly competitive Populist Party in the state. Their vote, to the extent that it still existed, was consistently drowned out by the majority white electorate.[309]

**127.** Texas has continued to burden particular voting methods that disproportionately target minorities in large urban centers. During the 2020 election cycle, Governor Abbott of Texas issued an Executive Order that limited each county to only one ballot drop-off location, regardless of the county's size or population. Practically, this meant that some of the biggest counties in Texas had one drop box to accommodate hundreds of thousands of voters. Harris County alone has over 4 million people.[310] In 2022, an attempt by the Arizona legislature to restrict drop boxes, similar to efforts in Texas, narrowly failed by one vote in the Arizona senate. This law would have required all drop boxes to be monitored 24/7, either by election staff or through video surveillance; notably, an amendment that would have barred all drop boxes also failed to pass.[311]

[308] For example, the county unit system in Georgia, common until the 1960s, ensured that white rural voters had an outsized voice in state elections relative to more diverse urban areas because the system allotted votes by counties with little regard for population differences; as a result, the white rural vote in sparsely populated counties was decisive in a disproportionate number of elections. Scott E. Buchanan, *County Unit System*, NEW GEORGIA ENCYCLOPEDIA (last edited Aug. 21, 2020), https://www.georgiaencyclopedia.org/articles/counties-cities-neighborhoods/county-unit-system/ [perma].

More recently, SB 202 continues the pattern in Georgia, reminiscent of the county unit system, of using geographic location as a liability for minority voters—by, for example, limiting the availability of drop boxes and prohibiting "linewarming," both of which ease the burden of long lines typical in low income neighborhoods that, for the last decade, have had fewer polling places and longer wait times. *See* Gerard P. Cachon & Dawson Kaaua, *Democracy on the Line: Polling Place Closures in Georgia and the Wait Time to Vote* (May 26, 2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4329036 [perma] (arguing that, between 2012 and 2016, polling place closures substantially added to wait times in low-income neighborhoods). *See also* Stephen Fowler, *Why Do Nonwhite Georgia Voters Have to Wait in Line for Hours? Too Few Polling Places*, NPR, Oct. 17, 2020 (noting that "the reduction in polling places has taken place across racial lines" but had racially disparate effects in the 2020 election cycle); Complaint, United States v. Georgia, 21-CV-02575 (N.D. Ga. 2021) at 20 ("[A]ccording to one report, about two thirds of the polling places that remained open late during the June 2020 primary election to accommodate waiting voters were in majority-minority neighborhoods").

Arizona has mimicked this behavior with polling place closures that also disproportionately affect minority communities. *See The Great Poll Closure*, *supra* note 263.

[309] Patrick G. Williams, *Beyond Redemption: Texas Democrats After Reconstruction* 84 (2007) ("…in 1895—prompted, it seems, by the city's business community—lawmakers revised the charters of not only Galveston by Houston, as well as the general laws for municipal incorporation, to mandate at-large alderman elections….Certain occupational and ethnic groups often concentrated in specific districts, and politicians who might command majorities in those neighborhoods but not citywide would thereafter be excluded from municipal government. Under the at-large system, Galveston, whose wards had continued for two decades after the end of Reconstruction to elect black and white working-class aldermen, all but eliminated African American representation in its governing bodies and reduced white laborer's electoral clout as well.").

[310] *See* Jolie McCullough, *Texas counties will be allowed only one drop-off location for mail-in ballots, state Supreme Court rules*, Tex. Tribune, Oct. 27, 2020; *see also QuickFacts: Harris County, Tex.*, U.S. Census Bureau, https://www.census.gov/quickfacts/harriscountytexas [perma].

[311] *See Arizona Senate rejects bill banning unsupervised drop-off ballot boxes*, AP, May 23, 2022.

**128.** Arizona's pattern of passing laws that disproportionately affect areas with concentrated minority populations is similar. For example, Arizona's 2004 proof-of-citizenship requirement had a disproportionate impact on younger voters living on or near college campuses, which meant that 18 to 24-year-olds in diverse major population centers close to the University of Arizona (Tucson) and Arizona State University (Tempe) were more likely to be barred from voting in state and local elections because they lacked the relevant documentation.[312] While Arizona does not collect racial information on its voters, the nature of the law (proof-of-citizenship) and its disproportionate effect in geographic areas with large minority populations (Tucson/Tempe) became proxies for targeting both younger voters who skew Democratic as well as minority voting populations.[313] Prior to a 2018 consent decree requiring Arizona to register all voters for federal elections without requiring documentary proof of citizenship, the state's policy of rejecting applicants who used the state voter registration form to register for federal elections, even though documentary proof of citizenship is not required, led to the disenfranchisement of 26,000 voters in Maricopa County alone.[314]

**129.** Arizona also has a number of counties in which minorities are geographically concentrated and/or remote, making it easier for facially race neutral voting restrictions to have a disproportionate impact on these communities than if these populations were more dispersed. As the next section shows, the use of facially race-neutral voting restrictions like SB 1485 can have a disproportionate impact on minority voters geographically concentrated in Maricopa County, where 60% of the state's voters live, because difficulties with in-person voting—from poll worker shortages to reductions in polling place locations to concerns about potential violence at the polls—have become more common in the county since 2013 (and, in some cases, since the 2020 election).[315]

**130.** By using geography as a proxy for identifying minority voters, SB 1485 essentially operates as a purge by removing inactive voters biennially from their preferred voting mechanism (vote by mail) and forcing them into a less convenient and more fraught alternative (in-person voting). This process will disproportionately impact minority voters in Maricopa County. For similar reasons, Native Americans, many of whom are concentrated on reservations in

[312] Jen Fifield and Kae Petrine, *Arizona's federal-only voters are concentrated on college campuses, data show*, Votebeat, Dec. 18, 2023 ("Most precincts that have at least one federal-only voter have fewer than a few dozen total. But of the dozen outliers with more than 300 federal-only voters, all but one are located at least partly on a college campus, the data show.").

[313] *Id.* (stating that "in trial testimony [in *Mi Familia Vota v. Fontes*], Michael McDonald, a political science professor at the University of Florida, told the judge that his analysis found that federal-only voters live in communities that are more diverse, compared to full-ballot voters. The average community for a registered voter in Arizona is 62.9 percent non-Hispanic white, he said, but the average community of a federal-only voter is 47.3 percent non-Hispanic white. Also, naturalized citizens may be more likely to be targeted for investigation under the new laws, and McDonald's analysis found that naturalized citizens are more diverse than the overall voting population in Arizona.").

[314] Complaint, *LULAC v. Reagan*, 17-cv-04102-DGC (D. Ariz. Nov. 17, 2017) (noting that "at least 26,000 voters in Maricopa County alone have been disenfranchised by these policies. Moreover, based on a sample of over 2,000 rejected State Form registrations for lack of DPOC across eight counties, less than fifteen percent of the rejected voters successfully re-registered after receiving notice of the rejection of their registrations.").

[315] *See, e.g.*, *Man Sentenced for Threatening Maricopa County Election Official and Then-Attorney General of Arizona*, U.S. Dep't of Justice, Aug. 29, 2023. *See also Voting Rights in Arizona*, *An Advisory Memorandum*, *supra* note 214, at 5 (noting that "on one occasion, a poll worker threatened to call the police because a voter appeared at the wrong polling location").

rural counties, are also uniquely burdened by SB 1485 because their location and distance from polling locations often makes it difficult for them to register and vote in person.

### 1. Maricopa County as a Case Study in Geographic Targeting

**131.** Minority groups in Arizona are small and geographically concentrated, which allows for disproportionate targeting of their communities, even with restrictions that are enacted statewide. For example, Maricopa County is, according to a recent report from its Election Department, "the second largest voting jurisdiction in the United States…[w]ith more than 2.6 million registered voters…[representing] more than 60 percent of Arizona's registered voters."[316] The county has steadily diversified, both racially and politically. In 2000, Maricopa County was 77.3% white; 24.8% Hispanic; 3.7% African American; and 1.8% Native American. By the 2020 census, only 53% of its population identified as white and much of its population growth was due to minority groups, which had grown to 32.1% Hispanic; 6.8% African American; 4.9% Asian; and 2.9% Native American.[317] Given that most of the state's minority population is concentrated in the big urban centers in this county—one of the fastest growing in the country—both statewide voting restrictions that have a racially discriminatory impact and, as shown below, efforts to disenfranchise minority voters in the name of preventing voter fraud, could potentially alter statewide election outcomes.

**132.** Notably, a number of legislators claimed that SB 1485 and similar proposed legislation were important election integrity measures necessary after the 2020 election which, with a particular focus on Maricopa County, served as ground zero for disputes over voting in the state.[318] Following Joe Biden's win in the state in 2020, the head of the Arizona Republican Party filed a lawsuit seeking to overturn the election results.[319] While there was no evidence of systemic voter fraud in that election cycle, recent efforts have focused on uncovering fraud

---

[316] Maricopa Cnty. Elects. Dep't & Off. of the Recorder, *Correcting the Record: Maricopa County's In-Depth Analysis of the Senate Inquiry* 2 (Jan. 2022), https://elections.maricopa.gov/asset/jcr:a9e03750-0a8f-4162-859f-1d46ac54b485/Correcting%20The%20Record%20-%20January%202022%20Report.pdf [perma] (hereinafter, "*Correcting the Record*").

[317] *QuickFacts: Maricopa County, Arizona*, U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/maricopacountyarizona/PST045223 [perma].

[318] *See, e.g.*, Ariz. H.R. Deb. (April 20, 2021) (comment of Rep. Shawnna Bolick) ("This bill has the effect of empowering our election officials to comply with federal laws. Accurate voter rolls are vital, I believe, in the effort to combat voter fraud, and we needed to ensure the integrity of the election process."); Ariz. S. Deb. (May 11, 2021) (final Senate vote) (comment of Sen. Vince Leach) ("We are sending a bad signal to the voters of Arizona, many on both sides of the aisle, and our friends in the independent column, look at our elections as being troubled. I don't know if I would go so far as to say fraudulent, but certainly troubled. We have a right, we have a duty, we have a responsibility to defend and protect the voting system in Arizona."). *See* Ariz. H.R. Debate (April 20, 2021) (comment of Rep. Daniel Hernandez) (accusing Republican legislators of trying to "have it both ways" and noting that "this is either a purely technical bill to try and clean up our lists, or this has to continue to perpetuate this belief that there was fraud in our election in 2020, just because one party did not get their desired results in that election."). Rep. Hernandez challenged the voter fraud narrative by pointing to election results in Maricopa County, noting that, "You [Republicans] maintain the majority in the legislature; you kept the majority of the Maricopa County supervisors in office, and yet those elections were fine. The other elections for the U.S. Senate and for president, however, were somehow problematic." *Id.*

[319] *See* Howard Fischer, *Head of Arizona GOP asks court to throw out Biden's presidential win in the state: Arizona Republican Party chairwoman files suit seeking to overturn Joe Biden's win here*, Ariz. Daily Star, Nov. 28, 2020, at B07; *Rather than broaden appeal, GOP seeks to shrink Arizona's electorate*, Ariz. Daily Star, Feb. 28, 2001, at B1.

in the largest, and most diverse, county to justify the need for more statewide election restrictions.[320]

**133.** The growing number of voting restrictions are also in response to the increasing presence of independent voters, whose numbers rival Republican and Democratic voters in the state.[321] The existence of such a significant number of independent voters, who have either constituted a slim majority of all voters or were slightly behind the Republican Party in registrations in recent elections, have put competitive pressure on Arizona Republicans to impose electoral burdens on minorities and minority-preferred candidates. Suppressing the votes of minority voters who might skew Democratic may be easier for the Republican Party than working to attract independent voters who have high rates of dissatisfaction with both major parties,[322] and whose preferences shift from one election to the next.[323]

**134.** For much of the last two decades, the voters who selected "Other" as their party affiliation have been sizable enough to deny either major political party a guaranteed outcome in any election cycle, yet Republicans had been dominant in Maricopa County for most of this period until recently. In 2000, Republicans had a decisive edge in voter registration, claiming 48.1% of registrations as compared to 33.5% by the Democrats and 17.5% of voters who registered as "Other."[324] By 2010, the Republican advantage had dropped to 37.9% while 29.2% of voters registered as Democrat and 31.8% of voters registered as "Other," almost double from 2000.[325] In 2020, the county reported that 31.3% of its voters registered as Democrat; 35.2% registered as Republicans but 32.3% of the county's voters identify their party affiliation as "Other" or independent.[326] As of October 2024, Republicans led Democrats in voter registration in Maricopa County 35.45% to 28.59%, but 34.34% of the county's voters identify their party affiliation as "Other," which was at the time the largest (non)political affiliation in the state.[327]

---

[320] *See* Dartunorro Clark, *Cyber Ninjas, company that led Arizona GOP election 'audit,' is shutting down*, NBC News, Jan 6, 2022 ("State Senate Republicans hired Cyber Ninjas to conduct an election audit of ballots in Maricopa County, the state's most populous county, after Biden flipped the state to blue for the first time in decades — beating former President Donald Trump by more than 10,400 votes."). *But see Correcting the Record*, *supra* note 316 (refuting the audit by Cyber Ninjas as false and misleading); Jonathan J. Cooper, *Former Arizona AG sat on records refuting 2020 election fraud*, AP, Feb. 22, 2023 (stating that former Arizona Attorney General Brnovich suppressed "findings by his investigators who concluded there was no basis for allegations that the 2020 election was marred by widespread fraud").

[321] D. Hunter Schwarz, *Independent voters now outnumber Republicans in Arizona*, Deseret News, Aug. 11, 2023.

[322] Ashlie Rodriguez, *Make Elections Fair Arizona works to make voting as an Independent equal*, Fox 10 Phoenix, June 24, 2024 (quoting ASU professor Thom Reilly, who noted that "People perceive the parties as becoming polarized. More people are leaving, particularly young people… You don't know how Independents will vote. They are unpredictable, and so this group of voters are increasingly deciding elections.").

[323] Schwarz, *supra* note 321 ("The rising number of unaffiliated Arizona voters speaks to widespread dissatisfaction with the major political parties in a tightly contested swing state, and mirrors national trends. Data from Pew Research Center last year found 27% of Americans have an unfavorable view of both the Democratic and Republican parties, a record high since they began polling on the question in 1994.").

[324] *See* Ariz. Sec. of. State, *State of Arizona Registration Report, 2000 General Election – November 7, 2000* (Oct. 30, 2010), https://apps.azsos.gov/election/voterreg/2000-11-01.pdf [perma].

[325] *See* Ariz. Sec. of. State, *State of Arizona Registration Report, 2010 General Election – November 2, 2010* (Oct. 22, 2010), https://apps.azsos.gov/election/voterreg/2010-10-22.pdf [perma].

[326] *See* Ariz. Sec. of. State, *State of Arizona Registration Report, 2020 General Election – November 3, 2020* (Oct. 27, 2020), https://apps.azsos.gov/election/VoterReg/2020/state_voter_registration_2020_general.pdf [perma].

[327] *See* Ariz. Sec. of State, *Voter Registration Statistics, 2024 General Election – November 05, 2024*, https://apps.azsos.gov/election/VoterReg/2024/State_Voter_Registration_October_2024.pdf [perma]. *See also* Renee Romo, *Independents, with a lowercase I, are now Arizona's biggest voter group*, Cronkite News, Aug. 31, 2023.

**135.** Recent elections have reinforced how closely divided the state and the county are, politically. Those registered as "Other" dropped to 33.95% in the July 2024 primary election, exceeding the 29.10% of Democratic registrations but trailing Republicans who comprise 35.41% of registrations statewide.[328] In Maricopa County, the numbers were 837,009 to 851,227 "Other" affiliation versus Republican with Democrats coming in third in registrations with 692,294 during the July 2024 election.[329] In the November 2024 general election, 917,074 voters registered as Republican, with 888,445 voters registered as "Other" and 739,701 as Democrats.[330]

**136.** This political diversity has had a tremendous impact on election outcomes in the county (and therefore the state). For example, Republican U.S. Senator John McCain won Maricopa County with over 60% of the vote in 2010,[331] but Republicans steadily lost their edge over the course of the decade (despite having an advantage in voter registration). Republican Jeff Flake won his U.S. Senate seat with slightly ~~less~~more than 50% of the vote in 2012 and McCain was reelected in 2016 with 54% of the vote in Maricopa County (down 6% from 6 years earlier).[332] By 2018 and 2020, U.S. Senators Krysten Sinema (Democrat/Independent since 2022) and Mark Kelly (Democrat) defeated their Republican opponents, with both getting slightly over 50% of the vote in Maricopa County.[333] In 2024, while the Republican candidate for president received a majority of votes in Maricopa County, Ruben Gallego (Democrat) defeated his Republican opponent in a race for U.S. Senate with over 51% of the vote in Maricopa County.[334]

**137.** Presidential elections have also trended into more competitive territory in the county. In 2012, the Republican ticket of Mitt Romney and Paul Ryan won Maricopa County over the Obama/Biden Democratic slate 54% to 43%;[335] in 2016, the Republican Trump/Pence

[328] *See* Ariz. Sec. of State, *Voter Registration Statistics*, https://azsos.gov/elections/results-data/voter-registration-statistics [perma].
[329] *See* Ariz. Sec. of State, *Arizona Registration Report, Primary Election – July 30, 2024*, https://apps.azsos.gov/election/VoterReg/2024/State_Voter_Registration_July_2024.pdf.
[330] *See* Ariz. Sec. of State, *Arizona Registration Report, State of Arizona Registration Report – January 2, 2025*, https://apps.azsos.gov/election/VoterReg/2025/State_Voter_Registration_January_2025.pdf.
[331] Ariz. Sec. of State, *Maricopa County General Election Summary Report: Final Official Results* (Nov. 2, 2010), https://elections.maricopa.gov/asset/jcr:d8ce7787-3569-4127-a89e-902708ccbc2f/11-02-2010%20Final%20Summary%20Report.pdf.
[332] Ariz. Sec. of State, *Maricopa County Summary Report: Final Official Results* (Nov. 6, 2012), https://elections.maricopa.gov/asset/jcr:96330beb-6c3d-43b9-b91c-ba21f75b6ee0/11-06-2012%20Final%20Summary%20Report.pdf; Ariz. Sec. of State, *Maricopa County Summary Report: Final Official Results* (Nov. 8, 2016), https://elections.maricopa.gov/asset/jcr:1126eed2-298b-4c1f-9683-f704b6f5ea20/11-08-2016%20Final%20Summary%20Report%20NOV%202016.pdf.
[333] Ariz. Sec. of State, *Maricopa County General Election Summary Report: Final Official Results* (Nov. 3, 2020), https://elections.maricopa.gov/asset/jcr:e2f15812-99c3-4bf5-8c40-49a8401b2bc3/11-03-2020-1%20Final%20Official%20Summary%20Report%20NOV2020.pdf; Ariz. Sec. of State, *Maricopa County Summary Report: Final Official Results* (Nov. 6, 2018), https://elections.maricopa.gov/asset/jcr:f9c43854-dc05-46c4-ac47-4467f599476b/11-06-2018%20Final%20Official%20Summary%20Report%20NOV%202018.pdf.
[334] Ariz. Sec. of State, *Maricopa County Summary Report: Final Official Results* (Nov. 18, 2024), https://elections.maricopa.gov/asset/jcr:26aa3adb-bac8-424b-ae32-ea50e9e5577a/11-05-2024-1%20Final%20Official%20Summary%20Report.pdf.
[335] Ariz. Sec. of State, *Maricopa County Summary Report: Final Official Results* (Nov. 6, 2012), https://elections.maricopa.gov/asset/jcr:96330beb-6c3d-43b9-b91c-ba21f75b6ee0/11-06-2012%20Final%20Summary

presidential ticket defeated Democrats Clinton/Kaine in Maricopa County 47% to 44%.[336] In 2020, the Democratic Biden/Harris ticket edged out Trump/Pence in the county, 49% to 47%.[337] Although the Republican ticket of President Donald Trump and J.D. Vance won over 51% of the vote in Maricopa County in 2024, that percentage was nevertheless lower than the winning percentage of the Republican ticket in 2012.[338]

**138.** Thus, Maricopa County has emerged as the natural focal point for election integrity claims given, over the last two decades: 1) its growing racial diversity,[339] 2) the close partisan split between Republicans and Democrats,[340] and 3) a large number of independent voters. In the wake of the 2020 election, the Republican leadership of the Arizona legislature hired the so-called "Cyber Ninjas" to do an audit of the Maricopa County election system, based on the faulty premise that the 2020 election was stolen from President Donald Trump. Of the 282 people who allegedly voted in the 2020 election using a deceased person's name, 281 of them were current voters (who obviously were not deceased at the time of the election).[341] Similarly, claims by election deniers that over 6,000 dead people voted in Arizona's elections were dismissed by investigators from the Attorney General's office.[342] As one commentator

https://elections.maricopa.gov/asset/jcr:96330beb-6c3d-43b9-b91c-ba21f75b6ee0/11-06-2012%20Final%20Summary%20Report.pdf.

[336] Ariz. Sec. of State, *Maricopa County Summary Report: Final Official Results* (Nov. 8, 2016), https://elections.maricopa.gov/asset/jcr:1126eed2-298b-4c1f-9683-f704b6f5ea20/11-08-2016%20Final%20Summary%20Report%20NOV%202016.pdf [perma].

[337] Ariz. Sec. of State, *Maricopa County Final Official Results* (Nov. 3, 2020), https://elections.maricopa.gov/asset/jcr:e2f15812-99c3-4bf5-8c40-49a8401b2bc3/11-03-2020-1%20Final%20Official%20Summary%20Report%20NOV2020.pdf [perma].

[338] Ariz. Sec. of State, *Maricopa County Summary Report: Final Official Results* (Nov. 18, 2024), https://elections.maricopa.gov/asset/jcr:26aa3adb-bac8-424b-ae32-ea50e9e5577a/11-05-2024-1%20Final%20Official%20Summary%20Report.pdf; Ariz. Sec. of State, *Maricopa County Summary Report: Final Official Results* (Nov. 6, 2012), https://elections.maricopa.gov/asset/jcr:96330beb-6c3d-43b9-b91c-ba21f75b6ee0/11-06-2012%20Final%20Summary%20Report.pdf.

[339] *See* Mike Schneider, *Arizona county had largest white, Black, Hispanic growth*, AP (June 30, 2022, 12:44 P.M.), https://apnews.com/article/covid-health-texas-dallas-california-6e3525473bf834bbb6a2874c6de30524 [perma] (noting that "Metro Phoenix's Maricopa County had among the biggest population growth in white, Black, American Indian and Hispanic residents last year, as well as the biggest increase overall of any U.S. county").

[340] Garrett Archer, *Democrats briefly outpacing Republican registrations in Maricopa County*, ABC15 Arizona, Aug. 28, 2024 (noting that "in the 38 days prior to Biden's exit, Republicans were outregistering Democrats by almost two to one. Between June 13 and June 21, Maricopa recorded 14,101 Republican registrations and 8,322 Democratic ones. From July 21 to August 28, Democrats outpaced Republicans 9,508 to 7,928.").

[341] Stipulation of Facts at 3, *Mi Familia Vota v. Fontes*, No. CV-21-01423-PHX-DWL (Nov. 12, 2024) ("Following the 2020 General Election, the Arizona Senate hired a Florida Corporation, Cyber Ninjas, Inc., to review and evaluate the results of the 2020 General Election in Maricopa County. To the best of the Secretary's knowledge, the Cyber Ninjas had no prior experience in auditing ballots. The audit did not find evidence of voter fraud."); *see also* Jerod Macdonald-Evoy, *Brnovich: Senate 'audit' dead wrong in its claims that deceased voters cast 2020 ballots*, Ariz. Mirror, Aug. 1, 2022 (quoting then Arizona Attorney General Mark Brnovich who noted that, "After spending hundreds of hours reviewing these allegations, our investigators were able to determine that only one of the 282 on the list was deceased at the time of the election…[a]ll other persons listed as deceased were found to be current voters."); *Republicans want you removed from Arizona's voter rolls*, Ariz. Republic, Feb. 27, 2023, at A3. *See also* Eric Bradner, *'We're done. This is the end of the 2020 election': Maricopa County officials rebut error-plagued review*, CNN, Jan. 6, 2022 (93-page report from the Maricopa County Recorder's Office finding that 76 of the 77 claims made by the Cyber Ninjas was misleading or incorrect); *Correcting the Record*, supra note 316, at 62 ("Cyber Ninjas claims to have identified 282 ballots illegally cast by voters that were deceased but did not provide a data set to support these conclusions. The County cannot research Cyber Ninjas' claims but has undergone an independent analysis of deceased voter records. The figures cited in Cyber Ninjas' conclusion are not supported by documented records of deceased voters in Maricopa County.").

[342] Garrett Archer, *Attorney General investigation rejects nearly all allegations of dead voters in 2020*, ABC15 Arizona, Aug. 1, 2022 (noting that "allegations of widespread deceased voters from the Senate Audit and other complaints received by the

observed, "The months-long post-election 'audit' Republican legislators ordered for Maricopa County in early 2021 ultimately added more votes to Joe Biden's victory total in the 2020 presidential race. But over the past two years the razor-thin Republican majority in the Arizona state legislature has nonetheless insisted that, despite all evidence and court cases to the contrary, the 2020 election was rigged and stolen."[343]

**139.** While the post-election audit challenge in Maricopa County was ultimately unsuccessful, these claims of fraud and election denialism can have a deleterious effect on the voting rights of minorities across the state. For example, the board of supervisors in Cochise County refused to certify their 2022 midterm election results, initially claiming that the county's voting machines were insecure.[344] The board ultimately certified the results after their actions were successfully challenged in court, and two county supervisors have been indicted for their refusal to certify in November 2022.[345] Cochise County is extremely diverse—35.9% Latino; 4.4% African American; 1.9% Native American; and 2.2% Asian American—and these voters would have been casualties in a larger fight over election outcomes in the state.[346]

**140.** The board later admitted that they refused to certify in protest over how the voting process was unfolding in Maricopa County.[347] Notably, Republican Kari Lake lost the 2022 gubernatorial election to Democrat Kathy Hobbs, the first Democrat to win the governorship since 2002, by less than 18,000 votes. Refusing to concede and claiming that the election was fraudulent, Lake has challenged the election outcome numerous times since 2022, centering all of her efforts on voting in Maricopa County.[348]

(noting that "allegations of widespread deceased voters from the Senate Audit and other complaints received by the Election Integrity Unit are insufficient and not corroborated.").

[343] Mark Hedin, *Will Arizona voters defeat GOP voting restrictions*?, The Bay State Banner, Sept. 7, 2022, https://www.baystatebanner.com/2022/09/07/will-arizona-voters-defeat-gop-voting-restrictions/ [perma].

[344] Alice Chapman, *Arizona County's Refusal to Certify Vote Shows Why Election Denial Is Still a Threat*, Brennan Ctr. for Just. (Dec. 2, 2022), https://www.brennancenter.org/our-work/analysis-opinion/arizona-countys-refusal-certify-vote-shows-why-election-denial-still [perma].

[345] Aaron Blake, *Why new Ariz. indictments are key in the fight against election subversion*, Wash. Post (Nov. 30, 2023), https://www.washingtonpost.com/politics/2023/11/30/why-new-ariz-indictments-are-key-fight-against-election-subversion.

[346] *QuickFacts: Cochise County, Arizona*, U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/cochisecountyarizona/PST045223

[347] Blake, *supra* note 345. *See also* Will Wilder, *Arizona Is the Epicenter of the Fight for Voting Rights Today*, Brennan Ctr. for Just. (Jun. 2, 2022), https://www.brennancenter.org/our-work/analysis-opinion/arizona-epicenter-fight-voting-rights-today [perma] ("Despite some lawmakers' promises to not rely on the Maricopa audit as justification for further changes to state voting laws, Arizona is among the national leaders in the sheer number of restrictive bills introduced this year. In addition to bills restricting voting access, Arizona leads the nation in the number of election interference bills that have been introduced in 2022.").

[348] *Kari Lake's 3rd trial to begin after unsuccessful lawsuit challenging her loss in 2022 Arizona governor's race*, PBS, Sept. 21, 2023, https://www.pbs.org/newshour/politics/kari-lakes-3rd-trial-to-begin-after-unsuccessful-lawsuit-challenging-her-loss-in-2022-arizona-governors-race [perma] (noting that Lake's first trial challenged ballot printers at polling places in Maricopa County; Lake's second trial challenged mail-in ballots in Maricopa County; and Lake's third trial seeks to review ballot envelopes signed by 1.3 million early voters in Maricopa County).

**141.** In Arizona, claims of fraud continue to animate arguments that tougher election restrictions are needed. In reality, these restrictions are a response to higher participation from minority voters in recent competitive election cycles. In the 2020 election, 78% of all active voters in Maricopa County were on the permanent early voting list; notably, over 250,000 voters in the county were added to the list between January and November 2020 because of concerns over COVID-19.[349] During the August 2020 Primary election, 93.94% of the ballots cast were from voters on the permanent early voting list (an increase of 13% over 2018 and 16% over 2016).[350]

**142.** It is likely that SB 1485 would have a discriminatory effect on minority voters, given that the largest populations of which are located in Maricopa County and the fact that most voters in the county vote by mail.[351] In a 2022 study, the Brennan Center found that, after the passage of SB 1485, minority voters were more likely to be removed from the early voting list than white voters.[352] Of the 3 million voters on the active early voting list, approximately 340,000 are at risk of being removed post-SB 1485 (or, approximately, 11.6 percent of permanent early voters statewide). Indeed, as Professor Herron noted, within Maricopa County, vulnerability to removal from the active early voting list varies substantially by voter race/ethnicity. Professor Herron stated that White registered voters in Maricopa County are the race/ethnicity group least vulnerable race/ethnicity group subject to removal from the active early voting list. The removal percentage for White voters is roughly 5.5 percent, which is approximately one-third of the corresponding Hispanic removal percentage of roughly 16.61 percent.[353]

**143.** The racial disparities within the category of voters likely to be removed has the potential to be stark. Half of these voters are nonwhite, despite constituting only 31 percent of the early voting list. According to the Brennan Center, "Latino voters make up just 17 percent of the permanent early voters who aren't at risk of being dropped but more than a third of those who might fall off of the list."[354] Thus, Latino voters are almost three times as likely as white voters to be removed from the list. The number of Native American, African American, and Asian American voters facing removal are also high relative to their small share of the state population—23% of Native American voters on reservations, 14.8% of African American voters, and 11.7% of Asian voters face removal under SB 1485.[355] Thus, Maricopa County, with the large number of voters from each of these groups concentrated within its

[349] Office of Maricopa Cnty. Recorder Adrian Fontes & the Maricopa Cnty. Elects. Dep't, *Early Voting Plan: November General Election* 5 (Nov. 3, 2020), https://recorder.maricopa.gov/pdf/GENERAL%20ELECTION%202020_Early%20Voting%20Plan_FINAL.pdf.
[350] *Id.* at 6.
[351] *Id.*
[352] Kevin Morris & Peter Miller, *Nonwhite Voters at Higher Risk of Being Dropped from Arizona's Mail Ballot List*, Brennan Ctr. for Just. (Aug. 11, 2022), *https*://www.brennancenter.org/our-work/analysis-opinion/nonwhite-voters-higher-risk-being-dropped-arizonas-mail-ballot-list [perma].
[353] Herron, *supra* note 19, at 97.
[354] Morris & Miller, *supra* note 352.
[355] *See* Hedin, *supra* note 343. *See also* Cole Lauterbach, *Arizona lawmaker defends early voting list overhaul from national criticism*, The Ctr Square, Aug. 22, 2022, https://www.thecentersquare.com/arizona/article_80e6f23c-2019-11ed-a27c-1722c13713e1.html [perma].

borders, stands to be disproportionately impacted by SB 1485, an effect that could potentially swing future elections.

### 2. Counties with Native American Reservations as Case Studies for Geographic Targeting

**144.** In addition to Maricopa and Pima Counties, four other counties in Arizona (Apache, Coconino, Navajo, and Yuma) contain large portions of the state's Native American population.[356] While there are reservations located in various parts of Arizona, three of these four counties—Coconino, Navajo, and Yuma[357]—are not only home to federally recognized Indian reservations but, notably, the most land to be designated as such in the United States. The Navajo Nation, Fort Apache, and Zuni Indian Reservations occupy most of Apache and Navajo Counties, and the Navajo, Hualapai, and Hopi nations currently make up 30% of the population of Coconino County.

**145.** Thus, it is no surprise that these counties, some of which found themselves covered under the 1965 Voting Rights Act, have been on the front lines for voting rights litigation and challenges since the 1960s. Indeed, the use of gerrymandered districts and voter restrictions like literacy tests have had a particularly harmful effect in Apache, Navajo, Coconino, and Yuma counties because Native Americans have a higher literacy rate than other groups and have been concentrated on remote reservations, the locations of which helped facilitate discrimination against them.[358]

**146.** The state has long used geographic remoteness as a cudgel against Native American voters.[359] Some tribal members choose to vote in person because of the unreliability of mail service;[360] however, strict enforcement of the state's voter identification law (Proposition 200), which required specific forms of identification with an address as well as proof of citizenship to vote, made it difficult for these individuals to cast ballots.[361] Native American voters often

---

[356] David Meek, *U.S. Counties with Largest Native American Populations*, Ariz. Report (last updated Feb. 22, 2019), https://arizonareport.com/maricopa-county-largest-native-american-population [perma].

[357] Sitting on the border of Baja California in Mexico, Yuma County is also Arizona's largest majority-Hispanic county at 65.2% as of 2023. *See Quickfacts: Yuma County, AZ*, https://www.census.gov/quickfacts/yumacountyarizona.

[358] *See* Read on Arizona, *Strategic Literacy Action Plan* 2013-2023 (working draft), at 3, 6-7, https://www.azed.gov/sites/default/files/2019/10/ROA%20Strategic%20Plan%20FINAL.pdf?id=5d9f64ff03e2b31b5cda6d2e (noting that, as of 2011, 65% of Native American fourth graders fell below basic reading levels and, in 2015 to 2016, only "Navajo and Coconino counties saw a decrease in proficiency scores" and "Native American students scored consistently lower than African American students and Hispanic students").

[359] *Voting Rights and Election Administration in Ariz.*, *supra* note 218 (statement of Patty Ferguson-Bohnee) ("In order to understand Native American voting challenges, one must recognize the vast differences and experiences, opportunities and realities facing on-reservation voters. Isolating conditions such as such as language, socioeconomic disparities, lack of access to transportation, lack of residential addresses, lack of access to mail, the digital divide, and distance are just some of the factors that impede access to the polls and participation in the political process.").

[360] *See* Halpern, *supra* note 221 ("Early voting by mail helps Native voters, but post-office boxes can cost money that people may not have, and, in communities where there are not enough boxes to go around, residents sometimes have no choice but to get their mail delivered to towns that are hours away. There are only eleven post offices and sixteen additional sites that provide postal services across the entire Navajo reservation in Arizona. By contrast, West Virginia has seven hundred and twenty-five.").

[361] *See* Dolores Tropiano, *Native Vote works to ensure the right to vote for Arizona's Native Americans*, ASU News, Oct. 18, 2024 ("Proposition 200… prevented participation at the polls for some Native Americans and led to the famous case of

live in communities with nontraditional addresses, and the community's tribal identification cards lack residential address information. Though the proof of citizenship requirement was later ruled invalid, in part,[362] as a result, many Native American voters were turned away from the polls during the 2012 and 2016 elections.[363]

**147.** In the Spring of 2019, Arizona passed SB 1072 and SB 1090, which expanded the scope of the state's voter identification law and required that voters produce a photo identification and sign their name to vote in person.[364] In addition, the adoption of H.~~R~~B. 2023, which prohibited ballot collection by non-family members, made it difficult for remote reservation communities to collect ballots to accommodate the unreliability of mail delivery, given that only 26% of these voters live on a USPS route,[365] and the fact that voting in person had now become more complicated with SB 1072 and SB 1090.[366] With SB 1485 as an additional hurdle to voting, a Native American voter who chooses to vote in person in one election, rather than early by mail, would be on track for removal should they fail to vote by mail in a subsequent election. Because voting in person and voting by mail can each pose logistical challenges for Native American voters on remote reservations,[367] the ability of the voter to decide the voting mechanism that works best in any given election cycle is crucial. SB 1485 deprives this group of that choice. In a letter to the state legislature during debates over SB 1485, the Intertribal Council made exactly this point:

> Senate Bill 1485 is concerning because it creates the possibility of a tribal member being removed from the permanent early voting list if he or she chooses to vote in person or misses elections during a four-year period.

---

2024 ("Proposition 200… prevented participation at the polls for some Native Americans and led to the famous case of Agnes Laughter. The Navajo elder, who had been voting for 30 years, was turned away at the polls because she had no driver's license and, being born in a hogan — a traditional Navajo dwelling — didn't have a birth certificate.").

362 *See supra* ¶¶ 79-81

363 *See* Tropiano, *supra* note 361, at 17 (statement of the Hon. Stephen Roe Lewis) (discussing how Native American voters in Pinal County were turned away at the polls because of the state's voter identification law). *See also Voting Rights in Arizona, An Advisory Memorandum*, *supra* note 214, at 8 ("In 2012, poll workers failed to accept alternative forms of ID from Native American voters, despite the state providing a special procedure for Native American voters to prove their identity.").

364 *Id.* at 65 (statement of Alex Gulotta, Ariz. State Director for All Voting is Local). *See also Early Voting Plan: November General Election*, *supra* note 349, at 7 ("Due to a change in law during the 2019 legislative session, voters voting early in-person will be required to show identification the same way that is required on Election Day at a voting location.").

365 *Voting Rights and Election Administration in Ariz.*, *supra* note 218 (statement of Alex Gulotta).

366 *Id.* (statement of Hon. Stephen Roe Lewis) (noting the impact of the ballot harvesting law on the Gila River community and the Navajo Nation). Professor Ferguson-Bohnee similarly demonstrated the effect of these restrictions on the Kaibab Paiute Tribe:

> One of the most egregious examples of lack of access to in-person early voting involves the Kaibab Paiute Tribe. Kaibab Paiute residents must travel over 280 miles one way to participate in early voting. These voters do not have a polling location on or near the reservation on Election Day. In fact, Mohave County moved the Tribe's polling location to Colorado City; and when the Tribe requested a polling location on the reservation for Election Day voting, it denied it, citing ADA compliance issues.

*Id.*

367 *Voting Rights in Arizona, An Advisory Memorandum*, *supra* note 214, at 28 (noting that "Native American voters residing in reservations, some spanning thousands of square miles, have few polling locations available to them.); *Id.* at 9 (stating that "a ban on ballot collection may pose a disproportionate burden on Native American voters due to their proximity to a mailbox").

> With the uncertainty caused by difficult and unreliable mail service on Indian reservations and in rural parts of the state, tribal members whose ballots are delayed in arriving, or who are concerned about the mail delivering the ballots by Election Day, should not be penalized for choosing to vote in person.[368]

**148.** In short, geographically concentrated minority communities are easier to single out for voting discrimination than if the members of those communities are more dispersed, particularly when the state can impose regulations that burden specific characteristics that define this centrally located population such as, with the Native American population, their remote location and socioeconomic disadvantages.

### C. SB 1485 as Colorblind Targeting: The Historical Importance of Selectively Restricting Specific Voting Methods

**149.** SB 1485 has to be understood as a part of a broader scheme for burdening minority voting rights. In the last decade, Arizona made in-person voting more difficult by, for example, reducing the number of polling places and making it difficult for minority voters to receive the language and accessibility services in those that remain.[369] Voting by mail became a viable alternative for many of these voters, but now, SB 1485 has targeted this voting mechanism with greater restrictions.

**150.** History has shown that targeting specific voting methods has been successful in minimizing minority political influence. For example, the most widely used discriminatory device in Arizona for decades was its literacy test and English-only ballots, both of which had negative impacts on Native American and Hispanic voters who struggled with literacy.[370] These challenges persist today. In 2000, Arizona banned bilingual education and was cited, in 2005, for failing to provide adequate English-language instruction in its public schools.[371] In 2011, 42% of fourth graders in Arizona did not meet basic reading level standards, and minority populations were disproportionately impacted with 58% of Hispanic students and 65% of Native American students failing to meet this threshold.[372] Thus, Arizona's continual failure to comply with the requirements of Section 203 of the Voting Rights Act is not an accident,[373] but rather, is an attempt to burden a particular voting method (in-person voting)

---

[368] Letter from Shan Lewis on behalf of the Intertribal Association of Arizona to Karen Fann, President of the Arizona State Senate, et al, May 10, 2001 (on file with author).

[369] Ray Alonzo, *This is how voting by mail will look in Arizona in November*, Cronkite News, Sept. 22, 2020 (noting that vote-by-mail surged because of the reduction in polling places).

[370] Tucker, et. al., *supra* note 154, at 285 (noting that, as of 1948, "an estimated 80–90% of the Indian population was illiterate").

[371] *Id.* at 294 (noting that, "According to some estimates, Arizona has under-funded ELL education by as much as 90% for decades, resulting in tens of thousands of voting-age citizens who are LEP and illiterate. Language barriers also remain in place because of lengthy waiting periods for ESL and adult ELL programs.").

[372] Read on Arizona, *Strategic Literacy Action Plan* 2013-2023 (working draft), https://www.azed.gov/sites/default/files/2019/10/ROA%20Strategic%20Plan%20FINAL.pdf?id=5d9f64ff03e2b31b5cda6d2e.

[373] *See, e.g.*, *Voting Rights and Election Administration in Ariz.*, *supra* note 218 (statement of Patty Ferguson-Bohnee) (noting that "in 2016, only one of the nine covered jurisdictions subject to Section 203 of the Voting Rights Act for Native American languages translated voter registration information in the covered language").

so that this vehicle to casting a ballot becomes meaningless for minority communities without accommodations for language and/or literacy barriers.

**151.** Exploiting particular characteristics that disproportionately affect minority communities—language, literacy, socioeconomic status, residence—to make it difficult for them to utilize a particular voting method has a long history across the south and the southwest. Recall that Texas shifted to re-registration requirements just as Arizona adopted a similar re-registration requirement after they both became covered jurisdictions under the preclearance regime of the Voting Rights Act. As these examples illustrate, voter registration has always been a fruitful target for restriction, as indicated by Arizona's adoption of its proof of citizenship requirement for voter registration in 2004 (not unlike Texas's strict voter identification law enacted in 2013).

**152.** Georgia followed a similar pattern as Texas, providing a blueprint for Arizona's later disenfranchisement efforts. Georgia, for example, has a "use it or lose it" voter registration statute, one of nine states that remove voters from the rolls for failing to vote within a certain amount of time. Of course, this law bears a striking resemblance to the state's 1949 law that purged voters from the rolls who failed to vote in at least one election unless they renewed their registration. SB 1485, which removes voters from the active early voting roll for failing to vote by mail in two consecutive election cycles, bears a clear resemblance to these Georgia laws.

**153.** It is also notable that, since ~~2013~~2012, Georgia has closed 214 polling places, or close to 10 percent of its polling locations statewide, even though the number of voters in the state has increased by two million since that time.[374] Arizona, which has experienced a similar population growth on a percentage basis, has closed more polling places than Georgia during the same period.[375] Arizona, like Georgia, also prohibits third party ballot collection and only permits certain family members to turn in a person's ballot.

**154.** Given that most minority voters in Arizona live in Maricopa County, it has been easier, in some ways, for both the state legislature and local officials to enact laws or policies that burden a specific voting method and target large population centers. Once Arizona was no longer required to preclear any changes to their voting laws with the federal government after the Supreme Court decision in *Shelby County v. Holder*, minority voters who preferred in-person rather than mail voting had little recourse to challenge decisions that made in-person voting harder.[376] Ahead of the 2016 election, Maricopa County reduced the number of polling places from 200 to 60, leading to lengthy wait times.[377] Most of these reductions were concentrated in minority and low income areas, disproportionately affecting

~~[374] *Strategic Literacy Action Plan*, *supra* note 372, at 4.~~ H.R. 5746; Congressional Record Vol. 168, No. 11.
[375] *The Great Poll Closure*, *supra* note 263 (noting that Arizona led the country in polling place closures ahead of the 2016 election).
[376] *See Shelby County v. Holder*, 570 U.S. 529 (2013).
[377] *Voting Rights in Arizona*, *An Advisory Memorandum*, *supra* note 214, at 6 (noting that "Maricopa County made headlines with reports of frustrated voters who waited for as long as five hours to cast their ballots during the March presidential preference election. At this time, there were 60 polling locations which meant there was roughly one polling location for every 21,000 voters. This was in part due to Maricopa County officials who approved a plan to cut polling locations by 85 percent compared to the 2008 presidential preference election and 70 percent compared to the 2012 presidential preference election.").

Latino voters.[378] According to the Brennan Center's assessment of the 2016 primary election in Maricopa County:

- On average, vote centers across the county closed more than two hours late. Vote centers in Phoenix closed, on average, more than four hours late.
- Latino voters faced disproportionately long wait times. Across heavily Latino census tracts, the average wait time at the closest voting center was more than four hours.
- Vote centers with longer wait times tended to have fewer resources, such as poll workers and electronic poll books, per voter.[379]

**155.** While polling places were reinstated in Maricopa County after litigation,[380] other counties with substantial minority populations have not been so lucky including Yuma County (65.2% Hispanic, the largest majority-Hispanic county in the state);[381] Cochise County (35.9% Latino, 4.4 % African American, 1.9% Native American, 2.2% Asian);[382] Pima County (38% Latino, 4.5% African American, 4.4% Native American, and 3.5% Asian);[383] and Navajo County (43.7% Native American, 11.1% Latino, 1.1% African American, and .08% Asian).[384] These counties are also subject to the language provisions of Section 203 and Section 4(f)(4) of the Voting Rights Act due to their substantial non-English speaking residents. Reducing polling places from almost a quarter in some counties to north of fifty percent in others,[385] especially

---

[378] U.S. Comm'n on Civ. Rts., *An Assessment of Minority Voting Rights Access Across the United States: 2018 Statutory Report* 171-72, https://www.usccr.gov/files/pubs/2018/Minority_Voting_Access_2018.pdf [perma] (hereinafter, *Assessment of Minority Voting Rights*). *See also Feldman v. Arizona*, No. 2:16-CV-01065 (D. Ariz. 2016).

[379] Christopher Famighetti, *Long Voting Lines: Explained*, Brennan Ctr for Just., Nov. 4. 2016, https://www.brennancenter.org/sites/default/files/analysis/Long_Voting_Lines_Explained.pdf [perma].

[380] Despite the addition of polling places in the last few years, voters still face substantial challenges in casting a ballot in person. *See, e.g.*, Summer Hom, *Cochise County faces a shortage of poll workers ahead of Presidential Primary Election in March*, Ariz. Illustrated, Dec. 20, 2023; Sasha Hupka, *After wave of poll workers in 2020, political climate and inflation leaves counties searching for workers in upcoming elections*, Ariz. Republic, July 29, 2022. *See also* Yvonne Wingett Sanchez, *Alleged voter intimidation at Arizona drop box puts officials on watch*, Wash. Post., Oct. 20, 2022. *See also* Caitlin Sievers, *Republicans want to limit voting to 1,000-voter precincts. Arizona would need more than 4,100*, Ariz. Mirror, March 4, 2024.

[381] *See Quickfacts: Yuma County, AZ*, U.S. Census Bureau, https://www.census.gov/quickfacts/yumacountyarizona. *See also* Bud Foster, *Polling places may be phased out*, 13 News, Aug. 29, 2012 (noting that, in the 2012 election, "Yuma County pared down from 45 precinct voting places to 11 vote centers").

[382] *QuickFacts: Cochise County, Arizona*, U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/cochisecountyarizona/PST045223 [perma]. *See Hundreds Wait at Douglas Polling Spot as Ballots Run Out*, AZPM News, Nov. 8, 2016 (noting that "Cochise County had 18 polling places for this election, compared with 49 in the 2012 presidential election.").

[383] *QuickFacts: Pima County, Arizona*, U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/pimacountyarizona/LND110210 [perma]. Pima County was 38% Latino in 2016. *See Assessment of Minority Voting Rights*, *supra* note 378, at 173. *See also* Foster, *supra* note 381 (noting that Pima County reduced "its assigned voting places from 400 to 280 and by the 2014 election cycle, 2016 for sure, the assigned polling place will likely be gone").

[384] *QuickFacts: Navajo County, Arizona*, U.S. Census Bureau, https://www.census.gov/quickfacts/navajocountyarizona

[385] *Voting Rights in Arizona, An Advisory Memorandum*, *supra* note 214, at 2.

in those that have to provide additional services to non-English speaking voters,[386] created significant burdens to minority participation with respect to in-person voting.[387]

**156.** And those polling places that remain are often insufficient to address the language and accessibility barriers faced by many Hispanic and Native American voters. For example, a DOJ investigation of McKinley County, Arizona, which contains a large Native American population, noted a number of barriers that undermined the accessibility of polling places for Navajo voters with disabilities.[388] Other polling places that use audio to accommodate voters who speak Navajo, an oral language, routinely have machines that either do not work, glitch, or use poorly transcribed audio.[389]

**157.** The reduction in polling places, and the inaccessibility of those that remain, is a textbook example of how the confluence of timing (contested 2016 and 2020 elections), geography (predominantly minority neighborhoods/counties), and voting method (polling places used for in-person voting) can align in ways that defy arguments that Arizona did not intend to make voting harder for people of color.

**158.** Giving the difficulties of voting in-person during recent election cycles as well as the onset of the COVID-19 pandemic in 2020, which shifted voter preferences away from in-person voting nationwide,[390] it is no surprise that around 80% of the state's electorate—approximately 68% of which were on the permanent early voting list—received a mail-in ballot for the 2020 elections.[391] SB 1485 sought to take advantage of this trend by turning the state's permanent early voting list into an active early voting list that would shift voters back to the less accessible and more difficult method of in-person voting.

**159.** Under SB 1485, voters face removal unless they cast mail-in ballots in two consecutive election cycles. Voters who are removed from the active early voting list are—unless they go through the extra steps of getting back on the list or separately requesting a mail-in ballot—filtered back into in-person voting, a form of voting that (especially with the reduction of polling places and the pandemic) had become significantly disfavored among

---

[386] *Voting Rights and Election Administration in Ariz.*, *supra* note 218 (statement of Hon. Stephen Roe Lewis).

[387] Kalyani Saxena, *How the Navajo Nation Helped Flip Arizona for Democrats*, NPR, Nov. 13, 2020 (discussing how members of the Navajo Nation travelled 10 miles on horseback to reach polling stations in Kayenta, Arizona).

[388] Native American Disability Law Center, *The Fundamental Principle of a Participatory Democracy: Equal Access for Navajos with Disabilities* 2 (May 2013), https://www.ndrn.org/wp-content/uploads/2019/10/Polling-Accessibility-Report-00000005.pdf [perma] (noting that "[t]hirty percent of Navajos between the ages of 21 and 54 have a disability" and "over the age of 64, 70% have a disability").

[389] *See* Sam Levine, *'Disenfranchised and demobilized': Native Americans face ballot box barriers in Arizona*, The Guardian, Nov. 30, 2024 (noting that the Navajo Nation "has been concerned about the way ballots have been translated into Navajo" and despite being required by the Voting Rights Act, translations have "glitch (describing an instance in which "the machine that offered the audio translation wasn't working"). These violations persist, with litigation filed because of improprieties in the 2024 elections. *See Navajo Nation Files Second Lawsuit Against Apache County to Protect Navajo Voting Rights*, Navajo News Online, Nov. 14, 2024.

[390] McGhee, et. al., *supra* note 264.

[391] Morris & Miller, *supra* note 352; Gomez, *supra* note 252. *See also* Ariz. H.R. Deb. (March 16, 2021) (House Democratic Caucus) (comments of Rep. Athena Salman) ("But let's be real, when you live in a state where over 80% of the voters prefer this method of voting, it will effectively block them from being able to vote in the future unless they proactively get signed up again on the permanent early vote list, which they should've never been kicked off to begin with.").

some minority voters by the 2020 election. Indeed, for those Native American voters who alternate between in person or mail-in voting because of the unreliability of the mail service, or those who choose mail-in voting exclusively because of the distance of polling locations, SB 1485 forces them into a specific voting mechanism with little regard for their personal circumstances. [392]

**160.** Put simply, SB 1485 forces voters away from their preferred voting method to a method that is potentially more burdensome, consistent with the state's long history of making voting harder for its minority communities. For example, Arizona amended its election laws in 1970, requiring all voters to register annually, for exactly the same reason that motivated the passage of SB 1485: to increase the likelihood that voters who don't vote consistently, or in the same manner, will be disenfranchised. SB 1485 accomplishes this goal by forcing these individuals into a non-preferred mechanism of voting, a burden ~~the~~that disproportionately falls on minority voters in major population centers as well as Native American voters on reservations.[393] As Professor Ferguson-Bohnee noted in her 2019 congressional testimony:

> Many [Native American] voters must travel long distances off-reservation to register to vote, in some cases 95 miles one way. Further, in 2016, only one of the nine covered jurisdictions subject to Section 203 of the Voting Rights Act for Native American languages translated voter registration information in the covered language. And while online voter registration is possible for off-reservation voters, this option is limited for on-reservation voters [where]…less than half of the homes on Tribal lands have reliable broadband access. …[E]ven if a voter has internet access, the State does not allow Tribal IDs [or IDs with nontraditional addresses] to be used to register to vote online.[394]

**161.** With the implementation of SB 1485, approximately 22% percent Native American voters who live on tribal lands and choose to vote by mail are at risk of removal from the early voting list and will be forced to vote in person in less-than-ideal circumstances.[395] Unfortunately, Native Americans are twice as likely to face removal from the new active voting list when compared to the potential statewide removal rate of approximately 11.6%.[396] The unreliability of mail service also makes it less likely that Native American voters will receive the notice from county recorders about their removal, leaving many of them to travel long distances necessary to cast a ballot in person. Being a part of a *permanent* rather than an *active* early voting list alleviated many of these concerns.

[392] As a point of comparison, Georgia's 2021 voting law, SB 202, limits drop boxes, imposes new ID requirements for absentee voting, bans mobile voting, and makes vote by mail more difficult (among other provisions). The law imposes more stringent requirements to cast an absentee ballot and limits access to drop boxes; both are mechanisms that thousands of minorities used to cast ballots in the 2020 elections, especially after some voters waited for hours during the June 2020 primaries to cast an in-person ballot (waits that were exacerbated by the post-*Shelby County* closing of polling places). SB 202 is currently being challenged in court in a number of cases that have now been consolidated. *See New Georgia Project v. Raffensperger*, No. 21-mi-55555-JPB (N.D. Ga. 2021).
[393] *See, e.g.*, *The Great Poll Closure*, *supra* note 263 (noting how many of the poll closures disproportionately impacted majority minority communities).
[394] *Voting Rights and Election Administration in Ariz.*, *supra* note 218 (statement of Patty Ferguson-Bohnee).
[395] *See* Hedin, *supra* note 343. *See also* Lauterbach, *supra* note 355.
[396] Morris & Miller, *supra* note 352.

### D. Placing SB 1485 in Broader Political Context: Colorblind Targeting in Arizona, 2018-2023

**162.** SB 1485 was not the only restrictive bill introduced in the Arizona legislature which, in 2021 and 2022, led the nation in the number of proposed bills that would restrict voting.[397] The years 2018-2022 marked a historic shift in the political complexion of the state, so increased efforts to restrict the vote are expected. As mentioned prior, Republicans in Arizona had lost much of their advantage in voter registration by 2018 and had to contend with a more closely divided state House, which went from 35R-25D in 2016 to 31R-29D in 2018. Thus, SB 1485 should not be understood as a voter suppression tool that stands in isolation. Instead, it is a part of a systematic and persistent effort on the part of the state legislature to burden those voting mechanisms preferred by minority voters in the face of increasing electoral threat.

**163.** As early as 2019, the state legislature sought to impose greater restrictions on early and mail-in voting. SB 1072 and SB 1046 both sought to restrict early voting, the former by imposing new voter ID requirements on early voters and the latter by preventing those who are on the permanent early voting list from voting early in-person.[398] Similarly, HB 2196 would have required those voters on the permanent early voting list who choose to vote in person to scan their ballots and show identification, just as if they had opted to vote in person as an initial matter (rather than by mail).[399] SB 1072 was enacted (and several other bills proposed, including SB 1046 and HB 2196) after voters on the permanent early voting list dropped off their ballots in significant numbers at early voting centers in Maricopa County.[400] According to one report, 14% of the voters who cast ballots early in the 2018 general election dropped off their ballots on Election Day (or about 168,000 people out of 1.2 million voters).[401] As with most of these restrictions, its supporters justified these proposed restrictions based on claims of preserving election integrity.

**164.** The number of proposed voting restrictions skyrocketed after the 2020 election. For example, HB 2792 would have prohibited election officials from sending mail-in ballots to any voter who is not on the permanent early voting list. Election officials who violate this provision could be convicted of a felony. Governor Ducey vetoed this bill in May 2021, but he signed several others restricting voting (including SB 1485).[402] In an effort to impose even more restrictions on vote-by-mail, SB 1003, signed by Ducey in April 2021, requires all mail-in ballots with missing signatures to be cured by 7pm on Election Day; failure to do results in the ballot being thrown out.[403] A second law, HB 2794, enacted in May 2021,

---

[397] Laura Gómez, *Arizona leads nation in proposals to suppress votes, groups say*, Ariz. Mirror (Feb. 17, 2021, 8:44 A.M), *https*://azmirror.com/blog/arizona-leads-nation-in-proposals-to-suppress-votes-groups-say [perma]; Wilder, *supra* note 347.
[398] Brennan Ctr. For Just., *Voting Laws Roundup 2019* (updated July 10, 2019), https://www.brennancenter.org/our-work/research-reports/voting-laws-roundup-2019 [perma].
[399] H.B. 2196, 54th Legis., 1st Reg. Sess. (Ariz. 2019).
[400] Jeremy Duda, *Ugenti-Rita seeks new limits on early voting*, Ariz. Mirror (Jan. 17, 2019), https://azmirror.com/2019/01/17/ugenti-rita-seeks-new-limits-on-early-voting [perma].
[401] *Id.*
[402] Bill History for H.B. 2792, Ariz. St. Legis., https://apps.azleg.gov/BillStatus/BillOverview/75988?Sessionid=123 [perma].
[403] S.B. 1003, 55th Legis., 1st Reg. Sess. (Ariz. 2021), https://www.democracydocket.com/wp-content/uploads/2021/04/SB1003S.pdf [perma].

~~prohibited~~restricted election-related deadlines from being adjusted~~, regardless of whether the adjustment is court ordered~~.[404] This law was enacted in response to a judicial decision that extended the voter registration deadline for the November 2020 general election, at the height of the COVID-19 pandemic.

**165.** It is in this environment that SB 1485 was enacted in 2021. Notably, the legislation was not designed to correct any problems with vote-by-mail, but was enacted despite the absolute success of this voting mechanism.[405] Even more notable is that SB 1485 faced resistance within the Republican caucus when it was first proposed in the state senate, further illustrating that this bill was enacted for reasons other than those articulated. One Republican senator, Senator Paul Boyer, voted with all of the senate Democrats to block the bill, leading the sponsor of SB 1485, Senator Michelle Ugenti-Rita, to retaliate by recalling Senator Boyer's legislation expanding the state's school voucher program voted out of the Senate the day before.[406] This sequence of events—in which a bill that had successfully passed the Senate was recalled in retaliation against a Republican senator for failing to support SB 1485—speaks to the fact that SB 1485 was enacted in a process that departed from normal procedural circumstances.[407]

**166.** Despite this controversy, there were a number of additional attempts to further circumscribe mail-in voting. For example, legislators proposed SB 1593, which would have reduced the number of days that early voters had to review their ballots, from 27 days to 22. This bill would have also set an earlier deadline by which ballots must be postmarked, to the Thursday before Election Day. Under this proposal, if a voter fails to return their early ballot, they can vote in person using a regular ballot provided that they return their mail-in ballot at the same time; otherwise, the law would have forced these voters to cast a provisional ballot.[408] Similarly, SB 1713 would have required voters to include their date of birth as well as the last four digits of 1) their driver's license number; 2) social security number; or 3) voter identification number on the affidavit included with early ballots, yet another hurdle designed to cause confusion among voters and lead to higher rejection rates for early ballots.[409] Notably, this bill, along with an earlier version of SB 1485, failed by one- and two-vote margins, respectively.[410]

**167.** In 2021, another bill, SCR 1006, was a proposed ballot initiative that would have empowered the legislature to choose the state's presidential electors, presumably another check against an increasingly diverse electorate. Indeed, Joe Biden's 2020 win in the state led eleven fake

---

[404] Bill History for H.B. 2794, Ariz. St. Legis., Ariz. St. Leg., ~~https://apps.azleg.gov/BillStatus/BillOverview/75988?Sessionid=123~~https://www.azleg.gov/legtext/55leg/1r/bills/hb2794h.pdf [perma].
[405] *See* Christopher Conover, *Arizona's long history with voting by mail*, AZPM News, Aug. 21, 2020.
[406] Andrew Oxford, *Bill to cut Arizona's permanent early-voting list fails, leading to drama in the state Senate*, Ariz. Republic, Feb. 16, 2021.
[407] *See* Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 267 (1977)(noting that "[d]epartures from the normal procedural sequence also might afford evidence that improper purposes are playing a role").
[408] *Rather than broaden appeal, GOP seeks to shrink Arizona's electorate*, Ariz. Daily Star, Feb. 28, 2021, at B1.
[409] Jeremy Duda, *Business group pressures AZGOP lawmakers to abandon voter suppression bills*, Ariz. Mirror (Apr. 5, 2021), https://azmirror.com/2021/04/05/business-group-pressures-azgop-lawmakers-to-abandon-voter-suppression-bills/ [perma link].
[410] *Id.* ("The bill failed on a 29-31 vote, with two Republicans joining the entire Democratic caucus in voting against it.").

electors to convene at the state Republican Party headquarters in Phoenix, Arizona in December 2020, claiming to be the state's legitimate electoral slate.[411] This ballot initiative would have empowered the legislature to endorse any slate, regardless if the selection aligns with the results of the popular vote in the state or not.

**168.** Efforts to force voters back into the more burdensome in-person voting process rather than vote-by-mail continued into 2022. In July 2022, Arizona enacted HB 2492 which, contrary to a 2018 consent decree that limited proof of citizenship requirements to registration for state and local elections,[412] imposed this requirement on voters seeking to cast ballots in presidential elections. The Rules Committee of the Arizona House of Representatives voted in favor of this provision despite concerns by its counsel that the NVRA preempted HB 2492's documentary proof of citizenship requirement, a determination later vindicated in federal court.[413]

**169.** The Arizona Supreme Court similarly blocked a 2022 effort by the Republican Party to outlaw vote-by-mail altogether. The state Republican Party filed a lawsuit seeking to overturn a 1991 state law that allowed no excuse early voting, arguing that mail-in voting (or more specifically, the possibility that voters can fill out their ballots anywhere) violated a state constitutional provision requiring "secrecy in voting."[414] This attack on vote-by-mail persisted despite the fact that, during the 2022 midterm elections, 8 out of 10 voters used this means to cast their ballot, and 90% of Arizona voters prefer to have no excuse early voting as an option.[415]

**170.** Indeed, it is clear that legislative enactments and litigation seeking to restrict access to the ballot are not aligned with the electorate's inclination to ensure that voting remains accessible. In the 2022 midterms, voters rejected a ballot measure backed by the state legislature that would have imposed two new strict voter identification requirements.[416] This ballot measure followed the state's second (the aforementioned HB 2492) and third (HB 2243) attempts to impose a burdensome proof of citizenship requirement for presidential elections, an effort that the U.S. Supreme Court, in *Arizona v. Inter Tribal Council of Arizona*, had earlier found was preempted by the National Voter Registration Act.[417]

**171.** In September 2023, a federal district court blocked HB 2492 from going into effect, finding that this documentary proof-of-citizenship law—like its predecessor—was preempted by the

---

[411] Andrew Kaczynski, *Arizona fake electors led vocal campaign to overturn the 2020 election – they're now part of a 'robust' state investigation*, CNN (Nov. 10, 2023) ("Much attention has been drawn to fake elector schemes in Georgia and Michigan where local and state authorities charged some participants for election crimes this past summer. But in no other state were there fake electors more active in publicly promoting the scheme than in Arizona.").
[412] See text accompanying footnote 216, *supra.*
[413] *Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 970 (D. Ariz. 2024). *See also Ariz. v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013)(holding that Arizona's documentary proof of citizenship requirement to register in federal elections violated the NVRA).
[414] Howard Fischer, *Arizona Supreme Court will allow early voting to continue despite GOP challenge*, Ariz. Capitol Times, June 2, 2023.
[415] Howard Fischer, *GOP attempt to outlaw early AZ voting fails*, Ariz. Daily Star, June 3, 2023, at A001.
[416] Ariz. S. Con. Res. 1012 (2022).
[417] *See Ariz. v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013). *See also* Mary Jo Pitzl, *Feds target new AZ law on voter registration: Rule requires showing proof of citizenship*, Ariz. Republic, July 7, 2022, at A1.

NVRA.[418] Similarly, HB 2243, enacted in 2022, requires counties to cancel any voter's registration if the county recorder "has reason to believe [they] are not United States citizens…"[419] In September 2023, a federal court also blocked this law, finding that it (along with HR 2492), was preempted by the National Voter Registration Act.[420] HB 2492 and HB 2243 followed a previous unsuccessful attempt, HB 2043, to burden the voting rights of younger voters by making registration difficult for this demographic.[421]

**172.** Since 2022, the state legislature's efforts to circumscribe the mechanisms of voting available to the electorate have not abated.[422] In 2023, Governor Hobbs vetoed five bills that would have made voting more difficult, including three that would make voting by mail harder. SB 1595 would have required voters to drop off their mail-in ballots by 7pm on the Friday before Election Day rather than on Election Day as the law currently permits. This bill, if enacted, would have required the voters who miss this deadline to present an ID and sign a poll book, or if lacking an ID, use a provisional ballot, just like they would if voting in person.[423]

**173.** A similar proposal vetoed by Governor Hobbs, SB 1105, would have required early ballots returned on Election Day to be tabulated on-site, a burdensome imposition on voters who would have to stand in line to have their ballot counted.[424] Another rejected bill, SB 1135, would have eliminated a voter's ability to return a ballot on Election Day altogether, forcing them to "spoil" the ballot and then vote using a regular in-person ballot.[425] Like SB 1485, all of these bills burden one voting mechanism and push voters into a less favored mechanism. By imposing significant burdens on vote by mail, these proposed bills were designed to push people into a significantly more burdensome in-person voting process.[426]

**174.** Other proposals from the 2023 legislative term would have made the process of in-person voting even more fraught and burdensome, particularly for voters of color. For example, HB 2305, which was vetoed by Governor Hobbs, would have allowed partisan election observers to view the signature verification process. Poll workers who obstructed their ability to

[418] *Mi Familia Vota v. Fontes*, 691 F. Supp. 3d 929, 1077 (D. Ariz. 2023).
[419] H.B. 2243, 55th Legis., 2d Reg. Sess. (Ariz. 2022).
[420] Campaign L. Ctr., *Victory: Court Strikes Down Discriminatory Provisions of Anti-Voter Arizona Law* (Sept. 20, 2023), https://campaignlegal.org/press-releases/victory-court-strikes-down-discriminatory-provisions-anti-voter-arizona-law [perma].
[421] HB 2043, 54th Legis., 2d Reg. Sess. (Ariz. 2020). HB 2043, introduced in 2020, would have prohibited a "high school, college or university identification card" from being used as a legitimate form of voter identification to cast a ballot, even after the voter has established proof of citizenship. *Id.*
[422] *See* Jonathan J. Cooper, *Arizona certifies 2022 election despite GOP complaints*, AP, Dec. 6, 2022.
[423] *Voting Laws Roundup: 2023 in Review*, Brennan Ctr. for Just. (Jan. 18, 2024), https://www.brennancenter.org/our-work/research-reports/voting-laws-roundup-2023-review#footnote2_802g937 [perma]. *See* Howard Fischer, *Dropping off ballot on Election Day could end*, Ariz. Daily Star, 20 March 2023, at B001 (noting that 290,000 residents of Maricopa County took their early ballots directly to the polls).
[424] SB 1105, 56th Legis., 1st Reg. Sess. (Ariz. 2023), *vetoed.*
[425] SB 1135, 56th Legis., 1st Reg. Sess. (Ariz. 2023), *vetoed.*
[426] SB 1105 "would [have] require[d] early ballots returned on Election Day to be tabulated on-site, a burdensome imposition on voters who would have to stand in line." Caitlin Sievers, *Critics: Republican election proposals confusing, contradictory, unnecessary*, Ariz. Mirror (Jan. 31, 2023), https://azmirror.com/2023/01/31/critics-republican-election-proposals-confusing-contradictory-unnecessary/.

"reasonably, comfortably, and clearly" view this process could have potentially faced felony charges.[427]

**175.** Historically, poll watchers in Arizona have used their access to threaten and intimidate minority voters to deter them from voting, especially in competitive election cycles. In the 1960s, for example, the Republican Party's "Ballot Security Program" was an attempt to intimidate African American and Hispanic voters waiting in line to vote in Phoenix and other predominantly minority areas.[428] Thus, the conception of poll watchers as innocent overseers, tasked with ensuring a fair election, cannot be divorced from their historical role, especially in Arizona, of policing the boundaries of the white electorate to keep minorities out.

**176.** There were other proposed bills that harkened back to the state's long history of voter discrimination. For example, in February 2023, Republicans proposed SB 1566, which would require Arizona voters to re-register to vote every 10 years.[429] This bill was virtually identical to the state's 1970 requirement that had a disproportionate effect on minority voters. Seeking to pick up where their unsuccessful 2022 lawsuit left off, in February 2024, Republicans proposed a bill—HB 2876—that would have scrapped the state's vote-by-mail system altogether, requiring voters who are not elderly, disabled, or out of precinct to provide a reason for not voting in person.[430]

**177.** In many ways, HB 2876, which seeks to finish the job that SB 1485 started by forcing a return to in-person voting,[431] is a fitting bookend to the last two decades of nonstop efforts to circumscribe minority voting rights. Many proposed restrictions focused on limiting vote-by-mail, a testament to the fact that this voting method continues to facilitate broad participation among minority voters.[432] For these reasons, SB 1485 must not only be considered in the broader historical context of Arizona's past of racial discrimination in voting, but also in its contemporary context in which these attacks often mirror the past.

Franita Tolson

Dean Franita Tolson

[427] *Voting Laws Roundup*, *supra* note 423.
[428] Melcher, *supra* note 89, at 208.
[429] *Republicans want you removed from Arizona's voter rolls*, Ariz. Republic, Feb. 27, 2023.
[430] Bill History for HB 2876, Ariz. St. Legis., https://apps.azleg.gov/BillStatus/BillOverview/81512?SessionId=128.
[431] Caitlin Sievers, *Republicans want to roll back the clock 30 years and end no-excuse early voting*, AZ Mirror, Feb. 15, 2024 (noting that "The act would force a return to a precinct model in which there are more voting locations, but each voter would only have the opportunity to cast their vote at their designated precinct location."). *See also* Caitlin Sievers, *Critics: Republican election proposals confusing, contradictory, unnecessary*, AZ Mirror, Jan. 31, 2023 (detailing SB 1095, which "would require early ballot envelopes to include a written warning that ballots dropped in a ballot drop box or mailed after the Friday before the election could cause delayed election results").
[432] Caitlin Sievers, *Critics: Republican election proposals confusing, contradictory, unnecessary*, AZ Mirror (Jan. 31, 2023).

## VII. Bibliography

**Cases:**

*Abbott v. Perez*, 585 U.S. 579 (2018).

*Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 303 (2015).

*Apache County v. United States*, 256 F. Supp. 903 (D.D.C. 1966).

*Apache County High Sch. No. 90 v. United States*, No. 77-1815 (D.D.C. June 12, 1980).

*Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015).

*Arizona v. Reno*, 887 F. Supp. 318 (D.D.C. 1995).

*Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013).

*Arizonans for Fair Representation v. Symington*, 828 F. Supp. 684 (D. Ariz. 1992).

*Arizona Republican Party v. Hobbs*, No. CV-22-0048-SA (Ariz. 2022).

*Arizona State Legislature v. Arizona Independent Redistricting Commission*, 576 U.S. 787 (2015).

*Arizona State Senate v. Arizonans for Fair Representation*, 507 U.S. 980 (1993).

*Barnhardt v. Meridian Municipal Separate School District*, 394 F.2d 454 (5th Cir. 1968).

*Barnhardt v. Meridian Municipal Separate School District*, No. 4:65-cv-01300-HTW-LGI (S.D. Miss. Aug. 4, 2023).

*Beare v. Smith*, 321 F. Supp. 1100 (S.D. Tex. 1971).

*Brnovich v. Democratic National Comm.*, 594 U.S. 647 (2021).

*Cooper v. Harris*, 581 U.S. 285 (2017).

*Democratic National Comm. v. Hobbs*, 948 F.3d 989 (9th Cir. 2020).

*Doe v. Horne*, 115 F.4th 1083 (9th Cir. 2024).

*Ely v. Klahr*, 403 U.S. 108 (1971).

*Goddard v. Babbitt*, 536 F. Supp. 538, 540 (D. Ariz. 1982).

*Goodluck v. Apache County*, 417 F. Supp. 13 (D. Ariz. 1975).

*Greater New Orleans Fair Housing Action Center v. St. Bernard Parish*, 641 F. Supp. 2d 563 (E.D. La. 2009).

*Harrison v. Laveen*, 67 Ariz. 337 (1948).

*Hunt v. Cromartie*, 526 U.S. 533, 541 (1999).

*King v. Chapman*, 62 F. Supp. 639 (M.D. Ga. 1945).

*Klahr v. Goddard*, 254 F. Supp. 997 (D. Ariz. 1966).

*Klahr v. Goddard*, 250 F. Supp. 537 (D. Ariz. 1967).

*Klahr v. Williams*, 339 F. Supp. 922 (D. Ariz. 1972).

*Klahr v. Williams*, 313 F. Supp. 148 (D. Ariz. 1970).

*Klahr v. Williams*, 303 F. Supp. 224 (D. Ariz. 1969).

*League of United Latin Am. Citizens v. Reagan*, 17-cv-04102-DGC (D. Ariz. Nov. 17, 2017).

*League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006).

*Loving v. Virginia*, 388 U.S. 1 (1967).

*Naim v. Naim*, 350 U.S. 985 (1955).

*Navajo Nation v. Reagan (Hobbs)*, 18-CV-08329 (D. Ariz. 2018).

*New Georgia Project v. Raffensperger*, No. 21-mi-55555-JPB (N.D. Ga. 2021).

*Nixon v. Herndon*, 273 U.S. 536 (1927).

*North Carolina State Conference of the NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016).

*Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929 (D. Ariz. 2024).

*Mi Familia Vota v. Fontes*, CV-22-00509-PHX-SRB, 2023 WL 8183070 (D. Ariz. Feb. 16, 2023).

*Or. v. Mitchell*, 400 U.S. 112, 117 (1972).

*Pace v. Alabama*, 106 U.S. 583 (1882).

*Perez v. Sharp*, 198 P.2d 17 (Cal. 1948).

*Porter v. Hall*, 34 Ariz. 308, 323 (1928).

*Reynolds v. Sims*, 377 U.S. 533 (1964).

*Rogers v. Lodge*, 458 U.S. 613 (1982).

*Scott v. Georgia*, 39 Ga. 321 (1869).

*Shirley v. Superior Court*, 109 Ariz. 510 (1973).

*Smith v. Allwright*, 321 U.S. 649 (1944).

*Strauder v. West Virginia*, 100 U.S. 303 (1879).

*Terry v. Adams*, 345 U.S. 461 (1953).

*Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015).

*Thornburg v. Gingles*, 478 U.S. 30 (1986).

*United States v. Arizona*, No. 88-cv-1989 (D. Ariz. May 22, 1989).

*United States v. Cochise County*, No. 4:06-CV-00304 (D. Ariz. Oct. 12, 2006).

*Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977).

*Washington v. Davis*, 426 U.S. 229 (1976).

*Wesberry v. Sanders*, 376 U.S. 1 (1964).

**Constitutions, Statutes, Bills, and Legislative Materials:**

Organic Act of Arizona, 37 Cong. ch. 56, 12 Stat. 664 (1863).

Ariz. Const. art. VII, § 2 (1912).

Ariz. H.R. Deb. (March 16, 2021).

Ariz. H.R. Deb. (April 20, 2021).

Ariz. Rev. Stat., Title XX, Chap. III, § 11 (1901).

Ariz. Rev. Stat., Title XLV, Chap. 1, § 6 (1901).

Ariz. Rev. Stat. Ann. §§ 63-107, 108 (1939).

Ariz. Rev. Stat. Ann. § 16- 101 (1956)

Ariz. Rev. Stat. Ann. § 16-122 (2015).

Ariz. Rev. Stat. Ann. § 16-1005(H)–(I) (2016).

Ariz. Stat., Chap. XXX, § 3 (1865).

Ariz. Stat., Chap. X, §§ 1, 3 (1867).

Ariz. Stat., Chap. XXIV, § 6 (1871).

Ariz. S. Con. Res. 1012 (2022).

Ariz. S. Deb. (May 11, 2021).

Bill History for H.B. 2792, Ariz. St. Legis., https://apps.azleg.gov/BillStatus/BillOverview/75988?Sessionid=123 [perma].

Bill History for HB 2876, Ariz. St. Legis., https://apps.azleg.gov/BillStatus/BillOverview/81512?SessionId=128.

Bill History for H.B. 2794, Ariz. St. Legis., Ariz. St. Leg., https://apps.azleg.gov/BillStatus/BillOverview/75988?Sessionid=123 [perma].

HB 2043, 54th Legis., 2d Reg. Sess. (Ariz. 2020).

H.B. 2196, 54th Legis., 1st Reg. Sess. (Ariz. 2019).

SB 1105, 56th Legis., 1st Reg. Sess. (Ariz. 2023).

SB 1135, 56th Legis., 1st Reg. Sess. (Ariz. 2023).

S.B. 1003, 55th Legis., 1st Reg. Sess. (Ariz. 2021), https://www.democracydocket.com/wp-content/uploads/2021/04/SB1003S.pdf [perma].

Voting Rights Act of 1965, Pub. L. No. 89-110, 79 Stat. 437 § 5 (codified as amended at 52 U.S.C. § 10101).

*Amendments to the Voting Rights Act of 1965*, *Hearings before the Subcommittee on Constitutional Rights of the Senate Judiciary Committee*, 91st Cong. 216 (1969).

*Voting Rights Act extension: Hearings on H.R. 4249 and H.R. 5538 and similar proposals Before the Subcommittee No. 5 of the House Judiciary Committee*, 91st Cong., 1st Sess. (1969).

*Extension of the Voting Rights Act: Hearings Before the Subcomm. On Civ. & Const. Rts of the Comm. On the Judiciary*, H.R., 94th Cong., 1st Sess. (1975).

*Continuing Need for Section 203's Provisions for Limited English Proficient Voters: Hearing Before the S. Comm. on the Judiciary*, 109th Cong. (2006).

*Voting Rights and Election Administration in Ariz.: Hearing Before the Subcomm. On Elections of the H. Comm. On H. Admin.*, 116th Cong., 1st Sess. (2019).

**Books, Journal Articles, Reports, and Dissertations:**

Joseph A. Aistrup, *The Southern Strategy Revisited* (1996).

Sue Wilson Abbey, *The KKK in Arizona* 15 (1973).

Salvador Acosta, *Crossing Borders, Erasing Boundaries: Interethnic Marriages in Tucson, 1854-1930* (2010) (Ph.D. dissertation, University of Arizona).

Ariz. Advisory Comm., *Voting Rights in Arizona*, *An Advisory Memorandum of the Arizona Advisory Committee to the U.S. Commission on Civil Rights* (July 2018).

Peter Bellwood et al., *The Austronesians: Historical and Comparative Perspectives* (2006).

David R. Berman, *George Hunt: Arizona's Crusading Seven-Term Governor* (2015).

———, *Arizona Politics and Government: The Quest for Autonomy, Democracy and Development* (1998).

Earl Black & Merle Black, *The Rise of Southern Republicans* (2002).

Daniel Black, *Black and Black: On Our Resilience and Brilliance in America* (2023).

Douglas A. Blackmon, *Slavery by Another Name: The Re-Enslavement of Black Americans from the Civil War to World War II* (2008).

Jonathan Brater et al., *Purges: A Growing Threat to the Right to Vote*, Brennan Center for Justice (2018), https://www.brennancenter.org/media/235/download/Report_Purges_Growing_Threat.pdf?inline=1.

Brennan Center for Justice, *Voting Laws Roundup: 2023 in Review* (Jan. 18, 2024), https://www.brennancenter.org/our-work/research-reports/voting-laws-roundup-2023-review#footnote2_802g937 [perma].

———, *Voting Laws Roundup 2019* (updated July 10, 2019), https://www.brennancenter.org/our-work/research-reports/voting-laws-roundup-2019 [perma].

———, *Voting Rights & Elections Series: Proof of Citizenship* (2006).

James R. Browning, *Anti-Miscegenation Laws in the United States*, 1 Duke Bar J. 26, 27 (1951).

Scott E. Buchanan, County Unit System, New Georgia Encyclopedia (Aug. 21, 2020), https://www.georgiaencyclopedia.org/articles/counties-cities-neighborhoods/county-unit-system/.

Gerard P. Cachon & Dawson Kaaua, *Democracy on the Line: Polling Place Closures in Georgia and the Wait Time to Vote* (May 26, 2023), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4329036 [perma].

Kristina M. Campbell, *Rising Arizona: The Legacy of the Jim Crow Southwest on Immigration Law and Policy After 100 Years of Statehood*, 24 Berk. La Raza L.J. 1 (2014).

David J. Cantelme, *Redistricting and Voting in Arizona*, 57 Ariz. Att'y 26 (2020).

Amy de Haan, *The 1912 Initiative Campaign for Women's Suffrage*, 45 J. Ariz. Hist. 375 (2004).

*Democratic and Republican Platform Planks*, 47 Current History 236 (1964).

Roger D. Hardaway, *Unlawful Love: A History of Arizona's Miscegenation Law*, 27 J. Ariz. Hist. 377 (1986).

John S. Huntington, *Far-Right Vanguard: The Radical Roots of Modern Conservatism* (2021).

Phillip I. Earl, *Nevada's Miscegenation Laws and the Marriage of Mr. and Mrs. Bridges*, 37 Nev. Hist. Soc. Q. 1 (1994).

Christopher Famighetti, *Long Voting Lines: Explained*, Brennan Ctr for Just., Nov. 4. 2016, https://www.brennancenter.org/sites/default/files/analysis/Long_Voting_Lines_Explained.pdf [perma].

David Farber, *The Rise and Fall of Modern American Conservatism: A Short History* (2010).

Catalina Feder & Michael G. Miller, *Voter Purges After* Shelby, 48 Am. Pols. Res. 687 (2020).

Patty Ferguson-Bohnee, *The History of Indian Voting Rights in Arizona: Overcoming Decades of Voter Suppression*, 47 Ariz. St. L.J. 1099 (2015).

Adrian Fontes, Secretary of State, *State of Arizona 2023 Elections Procedures Manual.*

Office of Maricopa County Recorder Adrian Fontes & the Maricopa County Elections Department, *Correcting the Record: Maricopa County's In-Depth Analysis of the Senate Inquiry* (Jan. 2022), available at https://elections.maricopa.gov/asset/jcr:a9e03750-0a8f-4162-859f-1d46ac54b485/Correcting%20The%20Record%20-%20January%202022%20Report.pdf [perma].

———, *Early Voting Plan: November General Election* 5 (Nov. 3, 2020), https://recorder.maricopa.gov/pdf/GENERAL%20ELECTION%202020_Early%20Voting%20Plan_FINAL.pdf.

Paul Frymer, *Debating the Causes of Party Polarization in America*, 99 Calif. L. Rev. 335, 341 (2011).

Brian Gratton & Emily Klancher Merchant, *An Immigrant's Tale: The Mexican American Southwest 1850 to 1950*, 39 Soc. Sci. Hist. 521 (2015).

Lisa Handley, *Voting Patterns by Race/Ethnicity in Recent Congressional and State Legislative Elections in Arizona*, https://irc.az.gov/sites/default/files/nrewsroom/Handley%2520report_Voting%2520Patterns%2520by%2520RaceEthnicity%2520in%2520Recent%2520State%2520Legislative%2520Elections%2520in%2520Arizona.pdf.

Michael Herron, Expert Report, *Mi Familia Vota v. Hobbs*, CV-21-01423-PHX-DWL (D. Ariz.).

William S. Kiser, Borderlands of Slavery (2017).

Rudolph M. Lapp, *Blacks in the Gold Rush California* (1977).

Leadership Conference Educucation Fund, *Democracy Diverted: Polling Place Closures and the Right to Vote* (2019), https://civilrightsdocs.info/pdf/reports/Democracy-Diverted.pdf.

———, *The Great Poll Closure* (2016), https://civilrightsdocs.info/pdf/reports/2016/poll-closure-report-web.pdf.

Eric McGhee, et. al, *Vote-by-Mail and Voter Turnout in the Pandemic Election*, Pub. Pol'y Inst. of Ca., 5 (Apr. 2021), https://www.ppic.org/wp-content/uploads/vote-by-mail-and-voter-turnout-in-the-pandemic-election-april-2021.pdf [perma].

David Meek, *U.S. Counties with Largest Native American Populations*, Ariz. Report (last updated Feb. 22, 2019), https://arizonareport.com/maricopa-county-largest-native-american-population [perma].

Eric V. Meeks, Protecting the "White Citizen Worker": Race, Labor, and Citizenship in South-Central Arizona, 1929–1945, 48 J. Sw. 91 (2006).

Eric V. Meeks, *Border Citizens: The Making of Indians, Mexicans, and Anglos in Arizona* (2007).

Mary Melcher, *Black and Whites Together: Interracial Leadership in the Phoenix Civil Rights Movemen*t, 32 J. Ariz. Hist. 125 (1991).

Melissa Milewski, *Litigating Across the Color Line: Civil Cases Between Black and White Southerners from the End of Slavery to Civil Rights* (2018).

Kevin Morris & Peter Miller, *Nonwhite Voters at Higher Risk of Being Dropped from Arizona's Mail Ballot List*, Brennan Center for Justice (Aug. 11, 2022), *https*://www.brennancenter.org/our-work/analysis-opinion/nonwhite-voters-higher-risk-being-dropped-arizonas-mail-ballot-list [perma].

Native American Disability Law Center, *The Fundamental Principle of a Participatory Democracy: Equal Access for Navajos with Disabilities* (May 2013),

https://www.ndrn.org/wp-content/uploads/2019/10/Polling-Accessibility-Report-00000005.pdf [perma].

Linda C. Noel, *'I am an American': Anglos, Mexicans, Nativos, and the National Debate over Arizona and New Mexico Statehood*, 80 Pac. Hist. Rev. 430 (2011).

Daniel A. Novak, *The Wheel of Servitude: Black Forced Labor after Slavery* (1978).

Mary Dale Palsson, *The Arizona Constitutional Convention of 1910: The Election of Delegates in Pima County*, 16 Ariz. and the W. 111 (1974).

Nyla Provost, *A History of Anti-Miscegenation Laws in the United States*, 16 Hist. in the Making 75 (2023).

Mark E. Pry, *Statehood Politics and Territorial Development: The Arizona Constitution of 1891*, 35 J. Ariz. Hist. 397 (1994).

Roger L. Ransom & Richard Sutch, *Debt Peonage in the Cotton South after the Civil War*, 32 J. Econ. Hist. 641 (1972).

Ross R. Rice, *The 1958 Election in Arizona*, 12 W. Pol. Q. 266, 266 (1959).

Andrés Reséndez, *North American Peonage*, 7 J. Civ. War Era 597 (2017).

Judge Robert L. Rodgers, *Confederate States Organized Arizona in 1862*, 28 S. Hist. Soc. Papers 222 (1900).

Thomas E. Sheridan, *Los Tucsonenses: The Mexican Community in Tucson, 1854-1941* (1986).

Fred Shelley, Kimberly J. Zerr, & Adrienne M. Proffer, *The Civil Rights Movement and Recent Electoral Realignment in the South*, 47 Se. Geographer 13, 18 (2007).

Jasleen Singh & Sara Carter, *States Have Added Nearly 100 Restrictive Laws Since SCOTUS Gutted the Voting Rights Act 10 Years Ago*, Brennan Ctr. for Just., June 23, 2023, https://www.brennancenter.org/our-work/analysis-opinion/states-have-added-nearly-100-restrictive-laws-scotus-gutted-voting-rights.

Southern Poverty Law Center, *SPLC: Federation for American Immigration Reform* (July 1, 2024), https://www.splcenter.org/fighting-hate/extremist-files/group/federation-american-immigration-reform [perma].

William L. Strauss, *The 1960 Election in Arizona*, 14 W. Pol. Q. 305, 305 (1961).

Timothy N. Thurber, *Republicans and Race: The GOP's Frayed Relationship with African Americans, 1945–1974* (2013).

James Thomas Tucker, et. al, *Voting Rights in Arizona: 1982-2006*, 17 S. Cal. Rev. L. & Soc. Just. 283 (2008).

Franita Tolson, *In Congress We Trust?: Enforcing Voting Rights from the Founding to the Jim Crow Era* (forthcoming 2026).

Franita Tolson, *In Whom Is the Right of Suffrage? The Reconstruction Acts as Sources of Constitutional Meaning*, 169 U. Pa. L. Rev. 211 (2021).

U.S. Comm'n on Civil Rights, *The Voting Rights Act: Ten Years After* (1975).

U.S. Comm'n on Civ. Rts., *An Assessment of Minority Voting Rights Access Across the United States: 2018 Statutory Report*, https://www.usccr.gov/files/pubs/2018/Minority_Voting_Access_2018.pdf [perma].

Nicholas A. Valentino & David O. Sears, *Old Times There are not Forgotten: Race and Partisan Realignment in the Contemporary South*, 49 Am. J. Pol. Sci. 672 (2005).

Matthew C. Whitaker, *The Rise of Black Phoenix: African-American Migration, Settlement, and Community Development in Maricopa County, Arizona 1868-1930*, 85 J. Negro Hist. 197 (2000).

Patrick G. Williams, *Beyond Redemption: Texas Democrats After Reconstruction* (2007).

Nancy Beck Young, *Two Suns of the Southwest: Lyndon Johnson, Barry Goldwater, and the 1964 Battle Between Liberalism and Conservatism* (2019).

**Newspapers and Media:**

Garrett Archer, *Democrats briefly outpacing Republican registrations in Maricopa County*, ABC15 Arizona, Aug. 28, 2024.

———, *Attorney General investigation rejects nearly all allegations of dead voters in 2020*, ABC15 Arizona, Aug. 1, 2022.

*Arizona Vote Recount Soon*, L.A. Times, Dec. 8, 1926.

*Arizona Senate rejects bill banning unsupervised drop-off ballot boxes*, AP, May 23, 2022.

*Attention Voters*, Ariz. Rep., Dec. 2, 1970.

*Barry Goldwater? No! No! Colored GOP'ers nix report*, Afro-American, July 18, 1964.

*Barry Goldwater for President*, L.A. Times, Oct. 4, 1964.

*Bitter Arizona Campaign Ends*, L.A. Times, Sept. 7, 1926.

Aaron Blake, *Why new Ariz. indictments are key in the fight against election subversion*, Wash. Post (Nov. 30, 2023).

Eric Bradner, *'We're done. This is the end of the 2020 election': Maricopa County officials rebut error-plagued review*, CNN, Jan. 6, 2022.

Ximena Bustillo, *Native voters could swing Arizona. Both parties want their votes*, NPR, Oct. 14, 2024.

Campaign L. Ctr., *Victory: Court Strikes Down Discriminatory Provisions of Anti-Voter Arizona Law* (Sept. 20, 2023), https://campaignlegal.org/press-releases/victory-court-strikes-down-discriminatory-provisions-anti-voter-arizona-law [perma].

———, *Arizona Governor Signs Bill Limiting Freedom to Vote Early* (May 11, 2021), https://campaignlegal.org/update/arizona-governor-signs-bill-law-limiting-freedom-vote-early.

Alice Chapman, *Arizona County's Refusal to Certify Vote Shows Why Election Denial Is Still a Threat*, Brennan Ctr. for Just. (Dec. 2, 2022), https://www.brennancenter.org/our-work/analysis-opinion/arizona-countys-refusal-certify-vote-shows-why-election-denial-still [perma].

Jonathan J. Cooper, *Former Arizona AG sat on records refuting 2020 election fraud*, AP, Feb. 22, 2023.

———, *Arizona certifies 2022 election despite GOP complaints*, AP, Dec. 6, 2022.

Christopher Conover, *Arizona's long history with voting by mail*, AZPM News, Aug. 21, 2020.

*Dangers of Bloc Voting*, Ariz. Republic, Nov. 13, 1964.

Dartunorro Clark, *Cyber Ninjas, Company That Led Arizona GOP Election 'Audit,' Is Shutting Down*, NBC News, Jan. 6, 2022.

Richard de Uriarte, *The Independent Voter Is…One Cool Cat; The 'De-Aligned' Are Wielding Increasing Clout*, Ariz. Republic, July 8, 2001.

*Deprived Right, Letter to the Editor*, Ariz. Republic, Nov. 25, 1968.

Editorial, *Whistling A New Redistricting Tune: Job too important to leave to politicians*, Ariz. Republic, April 6, 2000.

Jeremy Duda, *Business group pressures AZGOP lawmakers to abandon voter suppression bills*, Ariz. Mirror, Apr. 5, 2021.

———, *Ugenti-Rita seeks new limits on early voting*, Ariz. Mirror, Jan. 17, 2019.

Edward E. Dunbar, *Letter to the Editor*, *Arizona and Sonora*, N.Y. Times, Jan. 14, 1859.

*E.S. Clark Answers Governor's Letter By Offering to Present Evidence of Voting Irregularities*, Ariz. Republic, Dec. 19, 1926.

Jen Fifield & Kae Petrine, *Arizona's federal-only voters are concentrated on college campuses, data show,* Votebeat, Dec. 18, 2023.

Jen Fifield, *Arizonans left off voter rolls just before primary because of problems with their forms*, Ariz. Mirror, July 29, 2024.

Howard Fischer, *GOP attempt to outlaw early AZ voting fails*, Ariz. Daily Star, June 3, 2023.

———, *Arizona Supreme Court will allow early voting to continue despite GOP challenge*, Ariz. Capitol Times, June 2, 2023.

———, *Republicans helped Arizona champion voting by mail. Now they want it gone.*, Ariz. Mirror, June 13, 2022.

———, *Head of Arizona GOP asks court to throw out Biden's presidential win in the state: Arizona Republican Party chairwoman files suit seeking to overturn Joe Biden's win here*, Ariz. Daily Star, Nov. 28, 2020.

———, *Arizona Republican Party contends some voting was illegal*, Ariz. Daily Star, Nov. 7, 2018.

———, *Voters Without ID Must be Tallied, Judge Says*, Ariz. Daily Star, Nov. 2, 2006.

Felicia Fonseca & Angeliki Kastanis, *Native American votes helped secure Biden's win in Arizona*, AP, Nov. 19, 2020.

Bud Foster, *Polling places may be phased out*, 13 News, Aug. 29, 2012.

William H. Frey, *New voter turnout data from 2022 shows some surprises, including lower turnout for youth, women, and Black Americans in some states*, Brookings, May 18, 2023.

*Fighting for a Voice: Native Americans' Right to Vote in Arizona*, Ariz. Hist. Soc.(Jul. 15, 2020).

George Gallup, *The Gallup Poll: Republicans Gain Labor Votes But Lose Heavily With Negroes*, Ariz. Republic, Oct. 16, 1966.

Ben Giles, *Arizona Republicans Enact Sweeping Changes to State's Early Voting List*, NPR, May 11, 2021.

Gloria Rebecca Gomez, *Nearly 90% of Arizona Voters Use Early Ballots*, Ariz. Mirror, Feb. 8, 2022.

Laura Gómez, *Arizona leads nation in proposals to suppress votes, groups say*, Ariz. Mirror, Feb. 17, 2021.

Sue Halpern, *The Political Attack on the Native American Vote*, The New Yorker, Nov. 4, 2022.

Mark Hedin, *Will Arizona voters defeat GOP voting restrictions*?, The Bay State Banner, Sept. 7, 2022.

Sasheen Hollow Horn, *Nation joins Arizona redistricting process*, Navajo Times, June 14, 2001.

Summer Hom, *Cochise County faces a shortage of poll workers ahead of Presidential Primary Election in March*, AZPM News, Dec. 20, 2023.

Billy House, *Arizona Republicans Plan to Fight Redistricting Lawsuits*, Ariz. Republic, Oct. 12, 2003.

*Hundreds Wait at Douglas Polling Spot as Ballots Run Out*, AZPM News, Nov. 8, 2016.

Sasha Hupka, *After wave of poll workers in 2020, political climate and inflation leaves counties searching for workers in upcoming elections*, Ariz. Republic, July 29, 2022.

Jenny Jarvie, *Biden is projected to win Georgia. Here's how he flipped the Southern battleground*, LA Times, Nov. 13, 2020.

Andrew Kaczynski, *Arizona fake electors led vocal campaign to overturn the 2020 election – they're now part of a 'robust' state investigation*, CNN (Nov. 10, 2023).

Jon Kamman & Robbie Sherwood, *Redistrict Plan Unveiled; Proposal Would Boost Minority Clout*, Ariz. Republic, Aug. 9, 2001.

Jon Kamman, *State's New Democrats' Stronger; Younger, Centrist Group Called Party's Strength*, Ariz. Republic, Aug. 13, 2000.

*Kari Lake's 3rd trial to begin after unsuccessful lawsuit challenging her loss in 2022 Arizona governor's race*, PBS, Sept. 21, 2023.

Sheryl Kornman, *Prop. 200 splits Az. On Proof of citizenship benefits*, Tucson Citizen, Oct. 28, 2004.

*Kyl Apparently Cruising to Victory, But Kolbe Might Be Facing a Scare*, Roll Call, May 15, 2000.

Maria La Ganga, *Long a Republican Bulwark, a Growing Arizona is in Play*, L.A. Times, Sept. 16, 2004.

George Lardner Jr. & Al Kamen, *1971 Rehnquist Account is Challenged by 3 Men*, Wash. Post, July 25, 1986

Cole Lauterbach, *Arizona lawmaker defends early voting list overhaul from national criticism*, The Ctr Square, Aug. 22, 2022, https://www.thecentersquare.com/arizona/article_80e6f23c-2019-11ed-a27c-1722c13713e1.html [perma].

David Lawrence, *Election Stilled Racial Vote Myth*, Ariz. Republic, Nov. 24, 1960.

Rachel Leingang, *What has and hasn't changed about voting in Arizona ahead of the primary*, Ariz. Mirror, July 11, 2022.

Sam Levine, '*Disenfranchised and demobilized': Native Americans face ballot box barriers in Arizona*, The Guardian, Nov. 30, 2024.

Ashley Lopez, Bret Jaspers and Sergio Martinez-Beltran, *After Democrats Surged in 2018, Republican-Run States Eye New Curbs on Voting*, NPR, April 22, 2019.

Joseph A. Luftus, *Vote Gives G.O.P. Control of 25 Governorships*, N.Y. Times, Nov. 10, 1966.

Jerod Macdonald-Evoy, *Brnovich: Senate 'audit' dead wrong in its claims that deceased voters cast 2020 ballots*, Ariz. Mirror, Aug. 1, 2022.

*Man Sentenced for Threatening Maricopa County Election Official and Then-Attorney General of Arizona*, U.S. Dep't of Justice, Aug. 29, 2023.

*Marston turns down citizens who lack proof*, Ariz. Republic, Dec 11, 1970.

*Maricopa County among top population growth in white, Black, Native, and Hispanic residents last year*, 12News, Jun. 30, 2022.

Mike McCloy, *Pair of Hispanic Staffers Hired to Assist Redistricting Panel*, Ariz. Republic, Mar. 21, 2001.

Jolie McCullough, *Texas counties will be allowed only one drop-off location for mail-in ballots, state Supreme Court rules*, Tex. Tribune, Oct. 27, 2020.

E.J. Montini, *Separate, Unequal Views of Adviser to Proposition 200*, Ariz. Republic, Aug. 17, 2004.

*Navajo Nation Files Second Lawsuit Against Apache County to Protect Navajo Voting Rights*, Navajo News Online, Nov. 14, 2024.

*Not to be Trusted: Arizona's Claim to Statehood Said to Be Unreliable*, Chicago Daily Tribune, Feb. 11, 1894.

*Nonpartisan Panel is Vital Redistricting Can't Be Left to the Legislature*, Ariz. Republic, Jan. 30, 2000.

Dan Nowicki, *Goldwater's last race a cautionary tale*, Ariz. Republic, Nov. 9, 2008.

Andrew Oxford, *Bill to cut Arizona's permanent early-voting list fails, leading to drama in the state Senate*, Ariz. Republic, Feb. 16, 2021.

David Parrish, *Arizona Edging Away from Conservatism*, Ariz. Republic, Nov. 9, 2000.

Princeton University, *Gerrymandering Project*, https://gerrymander.princeton.edu/info/.

*Political whacking takes toll in Pinal*, Ariz. Republic, May 5, 2000.

Brandon Quester, *Rejected ballots document continued problems in Arizona's elections*, Arizona Center for Investigative Reporting, https://azcir.org/rejected-ballots-documentcontinued-problems-in-arizonas-elections/.

*Rather than broaden appeal, GOP seeks to shrink Arizona's electorate*, Ariz. Daily Star, Feb. 28, 2001.

*Republicans recording gains in countywide reregistration*, Ariz. Republic, Oct 2, 1971.

*Republicans want you removed from Arizona's voter rolls*, Ariz. Republic, Feb. 27, 2023

James Ricci, *Kerry Backers Target Arizona; Democratic activists in California are traveling by bus to the historically Republican state, hoping to rally support for their candidate*, L.A. Times, Oct. 18, 2004.

Ashlie Rodriguez, *Make Elections Fair Arizona works to make voting as an Independent equal*, Fox 10 Phoenix, June 24, 2024.

Renee Romo, *Independents, with a lowercase I, are now Arizona's biggest voter group*, Cronkite News, Aug. 31, 2023.

Yvonne Wingett Sanchez, *Alleged voter intimidation at Arizona drop box puts officials on watch*, Wash. Post., Oct. 20, 2022.

Rhonda Bodfield Sander, *Tucson loses clout; redistricting completed*, Ariz. Daily Star, Oct. 15, 2001.

———, *Hispanics hope for 2nd Ariz. seat in Congress*, Ariz. Daily Star, Apr. 7, 2001.

Kalyani Saxena, *How the Navajo Nation Helped Flip Arizona for the Democrats*, NPR, Nov. 13, 2020.

Mike Schneider, *Arizona county had largest white, Black, Hispanic growth*, AP, June 30, 2022.

D. Hunter Schwarz, *Independent voters now outnumber Republicans in Arizona*, Deseret News, Aug. 11, 2023.

Chip Scutari, *Minorities Doubt Redistricting Success*, Ariz. Republic, Oct 16, 2001.

———, *Panel Adopts Final Draft of Legislative Map*, Ariz. Republic, Aug. 18, 2001, at A1.

Robbie Sherwood, *Top Minority Quits Redistricting Panel; Some Hispanics Say Official Forced Out*, Ariz. Republic, July 10, 2001.

Caitlin Sievers, *Republicans want to limit voting to 1,000-voter precincts. Arizona would need more than 4,100*, Ariz. Mirror, March 4, 2024.

———, *More than 75% of voters use early ballots. Every AZ House Republican voted to take that away*, Ariz. Mirror, March 1, 2024.

———, *Republicans Want to Roll Back the Clock 30 Years and End No-Excuse Early Voting*, Ariz. Mirror, Feb. 15, 2024.

———, *Critics: Republican election proposals confusing, contradictory, unnecessary*, AZ Mirror, Jan. 31, 2023.

*Some Facts Concerning the Territory: Points from the Official Report of the Present Acting Governor*, San Francisco Chronicle, Oct. 3, 1890.

Ray Stern, *Arizona Has a History of Its Voting Laws Coming Under Federal Scrutiny*, Ariz. Republic, Aug. 23, 2022.

———, *'We See Through the Sham': Arizona Election Proposals Remind Some of Harassment of Black Voters in 1960s*, Ariz. Republic, Feb. 16, 2022.

Jessica Swarner, *A Timeline of Arizona's Long History of Early Voting*, The Copper Courier, Oct. 13, 2020.

Ali Swenson, *Arizona expects to be back at the center of election attacks. Its top officials are going on offense*, AP, March 23, 2024.

*Text of Goldwater Speech on Rights*, N.Y. Times, June 19, 1964.

*Toward Equality*, Ariz. Republic, Oct. 27, 1960.

*Trump's incredible shrinking Arizona Republican Party: Earning the support of swing voters is clear path to victory*, Ariz. Republic, May 31, 2020.

*US election: How have the seven swing states voted in the past?*, Al Jazeera, Nov. 5, 2024.

Courtney Vinopal, *How Mexican American voters helped turned Arizona blue*, PBS, Nov. 4, 2020.

Corina Vanek, *Arizona's Black population growing, but earnings and business opportunities lag, report says*, Phoenix Bus. J., Mar. 26, 2021.

*Voter Challenges Held Un-American*, Ariz. Republic, Nov. 15, 1962.

Stephanie Weaver, *Arizona, long considered a GOP stronghold, could be a swing state in 2020 presidential election, experts say*, FOX10, Oct. 9, 2020.

Will Wilder, *Arizona Is the Epicenter of the Fight for Voting Rights Today*, Brennan Ctr. for Just. (Jun. 2, 2022), https://www.brennancenter.org/our-work/analysis-opinion/arizona-epicenter-fight-voting-rights-today [perma].

**Election Results and Census Data:**

Arizona Secretary of State, *State of Arizona Registration Report, 2000 General Election – November 7, 2000* (Oct. 30, 2010), https://apps.azsos.gov/election/voterreg/2000-11-01.pdf [perma].

———, *State of Arizona Registration Report, 2010 General Election – November 2, 2010* (Oct. 22, 2010), https://apps.azsos.gov/election/voterreg/2010-10-22.pdf [perma].

———, *State of Arizona Registration Report, 2020 General Election – November 3, 2020* (Oct. 27, 2020), https://apps.azsos.gov/election/VoterReg/2020/state_voter_registration_2020_general.pdf [perma].

———, *Voter Registration Statistics*, https://azsos.gov/elections/results-data/voter-registration-statistics [perma].

———, *Arizona Registration Report, Primary Election – July 30, 2024*, https://apps.azsos.gov/election/VoterReg/2024/State_Voter_Registration_July_2024.pdf.

———, *Arizona Registration Report, State of Arizona Registration Report – January 2, 2025*, https://apps.azsos.gov/election/VoterReg/2025/State_Voter_Registration_January_2025.pdf.

———, *Maricopa County General Election Summary Report: Final Official Results* (Nov. 2, 2010), https://elections.maricopa.gov/asset/jcr:d8ce7787-3569-4127-a89e-902708ccbc2f/11-02-2010%20Final%20Summary%20Report.pdf.

———, *Maricopa County Summary Report: Final Official Results* (Nov. 6, 2012), https://elections.maricopa.gov/asset/jcr:96330beb-6c3d-43b9-b91c-ba21f75b6ee0/11-06-2012%20Final%20Summary%20Report.pdf.

———, *Maricopa County Summary Report: Final Official Results* (Nov. 8, 2016), https://elections.maricopa.gov/asset/jcr:1126eed2-298b-4c1f-9683-f704b6f5ea20/11-08-2016%20Final%20Summary%20Report%20NOV%202016.pdf.

———, *Maricopa County General Election Summary Report: Final Official Results* (Nov. 3, 2020), https://elections.maricopa.gov/asset/jcr:e2f15812-99c3-4bf5-8c40-49a8401b2bc3/11-03-2020-1%20Final%20Official%20Summary%20Report%20NOV2020.pdf.

———, *Maricopa County Summary Report: Final Official Results* (Nov. 6, 2018), https://elections.maricopa.gov/asset/jcr:f9c43854-dc05-46c4-ac47-4467f599476b/11-06-2018%20Final%20Official%20Summary%20Report%20NOV%202018.pdf.

———, *Maricopa County Summary Report: Final Official Results* (Nov. 18, 2024), https://elections.maricopa.gov/asset/jcr:26aa3adb-bac8-424b-ae32-ea50e9e5577a/11-05-2024-1%20Final%20Official%20Summary%20Report.pdf.

———, *Maricopa County Summary Report: Final Official Results* (Nov. 6, 2012), https://elections.maricopa.gov/asset/jcr:96330beb-6c3d-43b9-b91c-ba21f75b6ee0/11-06-2012%20Final%20Summary%20Report.pdf.

———, *Maricopa County Summary Report: Final Official Results* (Nov. 8, 2016), https://elections.maricopa.gov/asset/jcr:1126eed2-298b-4c1f-9683-f704b6f5ea20/11-08-2016%20Final%20Summary%20Report%20NOV%202016.pdf [perma].

———, *Maricopa County Final Official Results* (Nov. 3, 2020), https://elections.maricopa.gov/asset/jcr:e2f15812-99c3-4bf5-8c40-49a8401b2bc3/11-03-2020-1%20Final%20Official%20Summary%20Report%20NOV2020.pdf [perma].

———, *Maricopa County Summary Report: Final Official Results* (Nov. 18, 2024), https://elections.maricopa.gov/asset/jcr:26aa3adb-bac8-424b-ae32-ea50e9e5577a/11-05-2024-1%20Final%20Official%20Summary%20Report.pdf.

———, *Maricopa County Summary Report: Final Official Results* (Nov. 6, 2012), https://elections.maricopa.gov/asset/jcr:96330beb-6c3d-43b9-b91c-ba21f75b6ee0/11-06-2012%20Final%20Summary%20Report.pdf.

*Arizona Election Results 2016*, POLITICO (Dec. 13, 2016), https://www.politico.com/2016-election/results/map/president/arizona/ [perma].

Pima County, Summary Results Report, General Election (Nov. 3, 2020), https://oldcms.pima.gov/UserFiles/Servers/Server_6/File/Government/elections/Election%20Results/General%202020%20Results.pdf.

*QuickFacts: Cochise County, Arizona*, U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/cochisecountyarizona/PST045223 [perma]..

*QuickFacts: Harris County, Tex.*, U.S. Census Bureau, https://www.census.gov/quickfacts/harriscountytexas [perma].

*QuickFacts: Maricopa County*, *Arizona*, U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/maricopacountyarizona/PST045223 [perma].

*QuickFacts: Navajo County, Arizona*, U.S. Census Bureau, https://www.census.gov/quickfacts/navajocountyarizona.

*QuickFacts: Pima County, Ariz*, U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/pimacountyarizona/LND110210 [perma].

*Quickfacts: Yuma County, AZ*, https://www.census.gov/quickfacts/yumacountyarizona.