# EXHIBIT 2
# December 11, 2025, Tolson Deposition Transcript Excerpts

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Mi Familia Vota, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>Adrian Fontes, in his official capacity as Arizona Secretary of State; et al.,<br><br>Defendants,<br><br>and<br><br>RNC and NRSC,<br><br>Defendant Intervenors. | No. 2:21-cv-01423-DWL |

VIDEOCONFERENCE DEPOSITION OF DEAN FRANITA TOLSON, J.D.

Los Angeles, California

December 11, 2025

Prepared by:
CINDY MAHONEY, RPR, RMR
Certified Court Reporter
Certificate No. 50680

CERTIFIED TRANSCRIPT

# I N D E X


| WITNESS | PAGE |
|---|---|
| DEAN FRANITA TOLSON, J.D. | |
| EXAMINATION BY MR. NOMKIN | 6 |
| EXAMINATION BY MR. LANGHOFER | 133 |
| EXAMINATION BY MR. RUBIN | 241 |
| FURTHER EXAMINATION BY MR. LANGHOFER | 245 |


## EXHIBITS MARKED


| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 75 | Curriculum Vitae of Franita Tolson | 11 |
| Exhibit 76 | Expert Report of Franita Tolson, J.D. | 15 |
| Exhibit 77 | State of Arizona 2023 Elections Procedures Manual | 22 |
| Exhibit 78 | Sep 21, 1971, The Arizona Republic download | 65 |
| Exhibit 79 | Chapter 15, Senate Bill 1072 | 101 |
| Exhibit 80 | Feb 16, 2021, azcentral article titled "Bill to cut Arizona's permanent early-voting list fails, leading to drama in state Senate" | 118 |
| Exhibit 81 | August 30, 2022, letter FT_000001 (Confidential - For Counsel Only) | 132 |

EXHIBITS MARKED

| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 82 | Franita Tolson, OneDemos Consulting, LLC, invoices FT_000090 - 000095 (Confidential) | 132 |

REQUESTS

Page 18 Line 24

Page 105 Line 22

INSTRUCTIONS NOT TO ANSWER

Page 31 Line 24

PREVIOUSLY MARKED EXHIBITS

Exhibit 10 Page 125

THE VIDEOCONFERENCE DEPOSITION OF DEAN FRANITA TOLSON, J.D., commenced at 8:10 a.m. PST on December 11, 2025, at Los Angeles, California, before Cindy Mahoney, RPR, RMR (via videoconference), Arizona Certified Court Reporter No. 50680.

* * *

APPEARANCES:

For the Plaintiffs:
MAYER BROWN LLP
By: Lee H. Rubin, Esq.
Sam K. Revlin, Esq.
Julyana Dawson, Esq. (via videoconference)
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, California 94306
650-331-2000
Lrubin@mayerbrown.com
Skrevlin@mayerbrown.com
Jdawson@mayerbrown.com

-and-

FREE SPEECH FOR PEOPLE
By: Courtney Hostetler, Esq.
(Via videoconference)
1320 Centre Street
Suite 405
Newton, Massachusetts 02459
617-249-3015
Chostetler@freespeechforpeople.org

For the Defendant Secretary of State Adrian Fontes:
ARIZONA SECRETARY OF STATE'S OFFICE
By: Luke Douglas, Esq.
(Via videoconference)
1700 West Washington Street
Floor 7
Phoenix, Arizona 85007
602-542-4285
Ldouglas@azsos.gov

APPEARANCES CONTINUED:

For the Defendant Attorney General Kristin K. Mayes:
OFFICE OF THE ARIZONA ATTORNEY GENERAL
KRISTIN K. MAYES, ATTORNEY GENERAL:
By: Joshua G. Nomkin, Esq.
Joshua M. Whitaker, Esq.
(Both via videoconference)
2005 North Central Avenue
Phoenix, Arizona 85004
602-542-3333
Joshua.nomkin@azag.gov
Joshua.whitaker@azag.gov

For the Defendant Intervenors:
STATECRAFT PLLC
By: Kory Langhofer, Esq.
(Via videoconference)
649 North Fourth Avenue
Suite B
Phoenix, Arizona 85003
602-362-0036
Kory@statecraftlaw.com

TRANSCRIPT OF PROCEEDINGS

DEAN FRANITA TOLSON, J.D.,
the witness herein, being first duly sworn,
was examined and testified as follows:

EXAMINATION

BY MR. NOMKIN:
Q. Good morning, Dean Tolson.
A. Good morning.
Q. My name is Joshua Nomkin. I represent Arizona Attorney General Kristin Mayes.
THE COURT REPORTER: You're cutting out. Did you say Kristin Mayes?
MR. NOMKIN: Kristin Mayes.
BY MR. NOMKIN:
Q. And as we were discussing, please just let me know if you have issues hearing my microphone. I'll do my best to address them.
(Technical difficulties; an off-the-record discussion ensued.)
BY MR. NOMKIN:
Q. Good morning again, Dean Tolson. It's good to meet you.
A. Good morning. Nice to meet you as well.

A. I guess I'm a little confused about the word "design."

Do you mind asking the question a different way?

Q. Let me show you your expert report one more time.

A. Okay.

Q. I'm showing you paragraph 1.

A. All right.

Q. Will you please review the last sentence in that paragraph.

A. Okay.

Q. Would you agree that your report makes claims about what SB 1485 was designed to do?

A. Yes. My report tries to provide a narrative to put SB 1485 in important historical context in order to show the impact it will likely have on minority communities.

Q. Your report, at paragraph 1 at the end, says that SB 1485 was designed to burden the voting rights of these voters by forcing them away from vote-by-mail into a potentially more burdensome in-person voting process; right?

A. Yes.

Q. I'll stop sharing the screen for now, but, again, please let me know if you want to look at it.

BY MR. NOMKIN:
Q. How do you determine whether a state engages in colorblind targeting?
A. So as a part of my process, I try to take a full view of the state's historical practices, and I also engage with things that the state has done in modern day to try to figure out if there are certain patterns that emerge with respect to the time of the voting restrictions, whether or not it's targeting minority groups based on, you know, where they live, and then finally, if the state has singled out a particular voting method in order to make it more burdensome for minority groups to participate in that voting method.
Q. Are timing, geography, and voting method the only three things you would look at when developing an opinion on colorblind targeting?
A. Well, there's a lot that goes into those different categories. But those are the categories that I focus on. There are a lot of different subparts.
Q. But that's what you focused on in this case?
A. Yes.
Q. When undertaking an analysis of colorblind targeting, are there other issues that you focus on that don't fall into those three categories that you might use to research your conclusions?

MR. RUBIN: Are you asking generally or in this case?

MR. NOMKIN: As a general matter.

THE WITNESS: As a general matter, there may be other things that are relevant, you know, that inform my thinking that don't necessarily fit neatly into those three categories. But I do think that those things tend to be part of the more general narrative that I present in my report even if it doesn't fit comfortably, because I -- you know, part of this is painting a broad picture of the, you know, political sort of ecosystem in Arizona; right? So there may be things that happen that don't fit neatly in those categories that's still relevant to painting that picture.

BY MR. NOMKIN:

Q. What are the other categories of things that you would look at?

A. That question is a little vague because it's not really specific; right? Like, I can't, off the top of my head, think of anything where I'm like, this is a thing I would look at; right? But if something comes up, even if it doesn't, you know, fit in that category, it may still be relevant to sort of telling a story about Arizona history so that the fact finder has a complete picture. Because I feel like my report is to provide context.

Q. Is colorblind targeting a standard term in your field?
A. I don't know if it's -- to the extent that your question is about whether or not it's a term that everyone uses, I think that it's an approach that I developed over time in the course of doing this work. And so it has -- I guess I'm not quite sure how to answer that question. It's --
Q. Have you seen -- I'm sorry. Will you please repeat that?
A. Oh, no, I was just saying it's a theory; right? So in my area of scholarship, people present theories. It's a theory.
Q. Do other scholars use colorblind targeting as a theory?
A. I don't think the colorblind targeting approach is widely known yet. I have an article coming out in Harvard Law Review next year that will discuss it. But I wouldn't say it -- it's something that I have developed relatively recently.
Q. Are you aware of any other scholars who have used it?
A. No.
Q. Are you aware of any --
A. There are scholars -- I'm sorry.

MR. RUBIN: She was still answering your question.

THE WITNESS: I apologize. There are scholars, though, who talk about the different sort of pieces of this in thinking through a history of discrimination.

So it's not remarkable in the sense of, you know, scholars have definitely noticed that, you know -- for example, that timing matters in terms of voter restrictions; right? So there are different elements of this floating around the literature, but the colorblind targeting approach is a recently relative -- is a relative recent vintage.

BY MR. NOMKIN:

Q. So to your knowledge, no other scholar has used a colorblind targeting approach that incorporates geography, timing, and voting method?

A. No.

Q. Has a court adopted the use of colorblind targeting?

A. No.

Q. How does the colorblind targeting methodology differ from the standard described in Arlington Heights?

MR. RUBIN: Objection. Calls for a legal conclusion.

Answer if you can.

THE WITNESS: The colorblind targeting approach is somewhat similar to Arlington Heights in the -- in the fact that it is trying to sort of elicit discriminatory motive by looking at patterns. But it does not focus on the exact same sort of elements as Arlington Heights, although those elements are relevant to the colorblind targeting analysis.

Like -- so, for example, the history of discrimination, which is an important part of the Arlington Heights framework, is arguably important in the context of colorblind targeting.

But the colorblind targeting framework is designed to try to figure out if there's a pattern of behavior over time. So it takes a much longer time span, and it tries to find a thorough line in a way that I'm not sure the Arlington Heights framework is designed to do or has to do because it -- Arlington Heights is about drawing a legal conclusion; whereas, colorblind targeting is about documenting patterns.

BY MR. NOMKIN:

Q. Page 3 of your report contains a section called "Summary of Major Findings."

Do you have it in front of you?

A. Yes.

to the sentence that says, "In the wake of the decision, almost every county in the state reduced the number of polling places . . ."

A. I have no knowledge about who those -- what -- who made those -- if the county made those decisions in consultation with anyone.

Q. Would you agree that it doesn't require an act of legislature to close or open a polling place?

MR. RUBIN: Objection. Calls for legal conclusion.

THE WITNESS: I don't have any knowledge of that.

BY MR. NOMKIN:

Q. Without understanding the relevant decision-making body, how does a -- how does the closure of polling locations illustrate what the Arizona legislature might intend?

A. Counties can engage in official action as well. It doesn't have to -- it's not about whether or not I understand the relevant decision-making process. Even in this case, I don't -- I didn't see anything about county officials conferring with the state legislature about whether or not to close polling locations, and those conversations may or may not have happened. It's beyond -- it's sort of beyond the scope of the materials

that I have. But counties can also engage in official acts that informs the question of discriminatory intent or motivation.

Q. So the colorblind targeting analysis isn't limited to the questions of what's before the legislature; right?

A. It's not. My report canvasses a century and a half of history that involves state decisions, that involves local decisions. It's all about showing patterns across time. And it includes decisions by relevant local -- relevant decision-makers, but it also includes -- I talk about the Ku Klux Klan in my report, right, because that's relevant to understanding the politics in Arizona.

Q. Are you familiar with the Citizens Clean Election Commission?

A. The Citizens Clean Election Commission? Not off the top of my head.

Q. Your report doesn't mention the Citizens Clean Election Commission?

A. Yeah.

Q. Okay. Let's turn to Opinion Number 4.

A. Okay.

Q. Your fourth opinion is that Arizona used colorblind targeting when passing SB 1485; right?

A. Yes.

targeting framework, that matters.

BY MR. NOMKIN:

Q. Why doesn't the notice matter in SB 1485 that's provided to voters who are removed from the early voting list?

A. The voters who may not receive the notice because of unreliable mail service or voters who might not understand the notice because of language difficulties; right? Like, one of the key things in sort of drawing the parallel between the hypothetical we just walked through and the current situation is that I was clear that the affidavit option was adopted in part because of concerns about that law's impact on minority communities. There's no parallel here to that.

Q. How does one assess the concerns about an impact on minority communities without running through the colorblind targeting framework?

MR. RUBIN: Objection. Vague.

THE WITNESS: I don't understand the question.

BY MR. NOMKIN:

Q. I guess, like, I'm wondering whether it's circular to say -- you know, the question -- the important question is a legislature's intent, but the way that we understand the legislature's intent is by putting it

through the colorblind targeting analysis. And in the context of an affidavit, using the hypothetical that we just described, whether -- how -- how would it be possible to assess the intent of the legislature which says that law is good but SB 1485 is bad under the -- under the colorblind targeting framework?

A. It's just a piece -- it's a piece of it; right? So the colorblind targeting framework is useful for trying to understand questions of intent in the context of facially race-neutral laws; right? It's an invitation to look at patterns of behavior in order to try to ascertain intent when you might not have smoking-gun evidence or any other, you know, really persuasive, you know, direct evidence, like the -- a legislator saying, "I'm passing this law in order to discriminate against minority voters"; right?

So in some ways the colorblind targeting framework is actually consistent with many of the factors that, of course, look into Arlington Heights' framework; right? I look at the sequence of events. I look at the history. You know, I look at these different factors in order to draw conclusions about legislative behavior. So this is just a piece of it.

And earlier in our conversations we talked about the fact that you can have a situation where, you

know, more than one thing can be true at a time; right? Like, it is entirely possible that the Arizona legislature hypothetically could have passed a law that expanded access to voting between 2018 and 2023, but then they have all of these other laws that restrict access; right?

So I wouldn't ignore the law that expands access because I'm trying to tell a story about the laws that restrict access. That's part of the puzzle. That's a piece of it; right? So it's about creating a narrative.

So in some ways this is why I'm uncomfortable with hypotheticals, that I feel like it's speculative. And it's hard for me to answer because that context matters in thinking through whether or not these laws raise concerns that should -- that honestly offend the Constitution; right?

None of this is in isolation. But it is also true that this framework is not designed to force the state to be in a situation where it can never change its voting laws.

Q. Okay. Let's turn to another aspect of your report.

A. Okay.

Q. Parts of your report also describe the process leading to SB 1485's passage as departing from normal procedures for passing legislation; is that right?

BY MR. NOMKIN:

Q. Are you aware that SB 1485 included legislative findings?

A. Yes.

Q. I'm going to show you the text of SB 1485, which has already been introduced as Exhibit 10.

Can you see it?

A. Yes.

Can you make it a little bit bigger?

Q. Yeah, definitely.

I'll scroll down also to the part where it has the legislative findings here.

A. Okay. Thank you.

Q. Are you able to see it?

A. Yes.

Q. Your report doesn't cite these findings; correct?

A. Section 7? Where you directed me to?

Q. Correct.

A. No, it doesn't.

Q. The first finding is that integrity in all elections in the state is a matter of statewide concern. Your report doesn't contest this legislative finding; correct?

A. Doesn't mention it, so I don't think you can say it contests it.

Q. So it doesn't contest it?
A. It doesn't mention it.
Q. Could you give me a yes-or-no answer?
A. But that suggests that my report agrees with this because it doesn't mention it; right?
MR. RUBIN: He's asking: Do you agree with the --
THE WITNESS: You want to know if I agree with this?
BY MR. NOMKIN:
Q. No.
My question is: Does your report contest that integrity in all -- in all elections in the state is a matter of statewide concern?
A. No, my report does not contest that.
Q. The second finding is that people who are on the early voting list and who repeatedly fail to vote with ballots that are mailed out increases the likelihood of fraudulent use of those unvoted ballots. Your report does not contest this finding; correct?
A. It does not.
MR. RUBIN: Just hold on -- if you would, just hold on 30 seconds. I just have to grab something. I'm sorry.
Sorry about that, Josh. Go ahead.

STATE OF ARIZONA )
COUNTY OF MARICOPA )

BE IT KNOWN that the foregoing deposition was taken by me pursuant to stipulation of counsel; that I was then and there a Certified Court Reporter in the State of Arizona, and by virtue hereof authorized to administer an oath; that the witness before testifying was duly sworn by me to testify to the whole truth; that signature was not requested; that the questions propounded by counsel and the answers of the witness thereto were taken down by me in shorthand and thereafter transcribed into typewriting under my direction; that the foregoing pages are a full, true and accurate transcript of all the proceedings had upon the taking of deposition, all done to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to nor employed by any parties hereto; nor am I in any way interested in the outcome thereof.

Dated at Phoenix, Arizona, this 30th day of December, 2025.

Cindy Mahoney

CINDY MAHONEY, RPR, RMR NO. 50680