**KRISTIN K. MAYES**
**ATTORNEY GENERAL**
(Firm State Bar No. 14000)

Hayleigh S. Crawford (No. 032326)
Joshua M. Whitaker (No. 032724)
Kathryn E. Boughton (No. 036105)
Joshua G. Nomkin (No. 039213)
Office of the Arizona Attorney General
2005 N. Central Avenue
Phoenix, AZ 85004-1592
(602) 542-3333
Hayleigh.Crawford@azag.gov
Joshua.Whitaker@azag.gov
Kathryn.Boughton@azag.gov
Joshua.Nomkin@azag.gov
ACL@azag.gov

*Attorneys for Defendant*
*Attorney General Kristin K. Mayes*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Mi Familia Vota; et al.,<br><br>Plaintiffs,<br><br>v.<br><br>Adrian Fontes, in his official capacity as Arizona Secretary of State; et al.,<br><br>Defendants,<br><br>and<br><br>RNC and NRSC,<br><br>Defendant-Intervenors. | No. 2:21-cv-01423-DWL<br><br>**ATTORNEY GENERAL'S MOTION FOR SUMMARY JUDGMENT** |

Plaintiffs claim that discriminatory purpose motivated the Legislature to enact S.B. 1485, a 2021 law that changed the Permanent Early Voting List to the Active Early Voting List. But, even viewing evidence in the light most favorable to Plaintiffs, summary judgment must be entered for two reasons. First, Plaintiffs lack evidence that the law will imminently injure them or their members in a concrete and particularized way, so they lack standing. Second, no reasonable factfinder would conclude that Plaintiffs have shown that the Legislature passed S.B. 1485 for a discriminatory purpose.

## BACKGROUND

### I. Arizona's history of voting by mail.

Arizona Revised Statutes Title 16, Chapter 4, Article 8 governs mail voting. Before 1991, the opportunity to vote by mail (then known as absentee voting) was limited to specific categories of voters, including those "physically unable to go to the polls" or "sixty-five years of age or older." *See* A.R.S. § 16-541 (1984). In 1991, the Legislature expanded this opportunity to "[a]ny qualified elector." S.B. 1320, 1991 Ariz. Sess. Laws ch. 51, § 1 (1st Reg. Sess.) (amending A.R.S. § 16-541); *see also id.* § 2 (amending A.R.S. § 16-544). At that time, a voter seeking to vote by mail could submit a "signed request" to a county recorder for an absentee ballot using an application form prescribed by the Legislature. *See* A.R.S. § 16-542(A) (West Supp. 1991). The requestor would sign, swear that she was indeed the voter, and swear that she would not vote in the same election in another state. *See* A.R.S. § 16-544(A) (1984).

In 1997, the Legislature replaced the term "absentee" voting with "early" voting. *See* S.B. 1003, 1997 Ariz. Sess. Laws ch. 5, § 16 (2nd Spec. Sess.) (renaming Title 16, Chapter 4, Article 8). By that time, a voter seeking to vote by mail could make a "verbal or signed request" for an early ballot, and a verbal request required confirmation of "identity." *See* A.R.S. § 16-542(A) (1996). The Legislature no longer prescribed a specific application form. Instead, when casting an early ballot, the voter was required to sign an envelope, swearing that she was indeed the voter and would not vote in the same

election in another state. *See* S.B. 1003, 1997 Ariz. Sess. Laws ch. 5, §§ 22, 25 (2nd Spec. Sess.) (repealing A.R.S. § 16-544 and revising A.R.S. § 16-547).

In 2007, the Legislature created the Permanent Early Voting List, adding another way to get an early ballot. *See* H.B. 2106, 2007 Ariz. Sess. Laws. ch. 183 (1st Reg. Sess.). Under the law, "[a]ny voter" could join the List by submitting a "written request" including certain personal information. *Id.* § 5 (adding A.R.S. § 16-544). Eligible voters would "be sent an early ballot by mail automatically," unless (1) the voter requested removal, (2) the voter's registration became inactive or canceled,[1] or (3) a notice sent by the county recorder was "returned undeliverable" and the county recorder could not contact the voter. *Id.*

## II. The challenged law.

The Legislature's 2021 law, S.B. 1485, changed the Permanent Early Voting List to the Active Early Voting List. It added a fourth way for List removal, based on inactivity and failure to respond to a notice.

Under S.B. 1485, a voter's failure "to vote an early ballot in all elections for two consecutive election cycles" opens the potential for removal from the Early Voting List. 2021 Ariz. Sess. Laws ch. 359, § 6 (1st Reg. Sess.) (amending A.R.S. § 16-544). Specifically, if for two consecutive election cycles a voter does not vote an early ballot in the "regular primary and regular general election for which there was a federal race" or "a city or town candidate primary or first election and a city or town candidate second, general or runoff election," then the county recorder must "send a notice" (hereafter "Confirmation Notice") to the voter. *Id.* (amending A.R.S. § 16-544(H)(4), (K), (L)). The county recorder may also contact the voter "by telephone call, text message or email." *Id.* (amending A.R.S. § 16-544(L)). The Confirmation Notice informs the voter that to remain on the Early Voting List, she can "confirm in writing" her desire to remain and

---

[1] A voter's registration may be canceled for a variety of reasons, including when election officials discover that the voter is not eligible to vote. *See* A.R.S. § 16-165(A).

"return the completed notice" to the county recorder within ninety days. *Id.* If a voter "receives" the Confirmation Notice but "fails to respond" within ninety days, she is removed from the Early Voting List. *Id.* (amending A.R.S. § 16-544(M)).

That said, a voter removed from the Early Voting List may rejoin the List by written request—the same way she previously joined the List. *See* A.R.S. § 16-544(B). In addition, even a removed voter who declines to rejoin the List remains free to make a verbal or signed request for an early ballot. *See* A.R.S. § 16-542(A).

In signing S.B. 1485, the Governor stated that the law "ensures our voting lists remain verified and accurate, will free up resources for local election officials, and strengthen trust among many citizens in our election system." Attorney General's Statement of Facts ("SOF") ¶ 54.[2]

S.B. 1485 has not yet caused any voter to be removed from the Early Voting List. This is because the 2024 and 2026 election cycles are the first cycles that are relevant under the law. The first set of Confirmation Notices required under S.B. 1485 will be sent "by January 15, 2027," to voters on the Early Voting List who voted by early ballot "in zero eligible elections in the 2024 and 2026 election cycles." SOF ¶ 6.

**III. Procedural history.**

In 2021, four organizational Plaintiffs sued, challenging S.B. 1485. (Doc. 1.) According to the Complaint: Living United for Change in Arizona (hereafter "LUCHA") is a "membership-based organization" that has engaged in voter registration and education. (*Id.* at ¶ 9.) League of Conservation Voters Inc. d/b/a Chispa AZ (hereafter "Chispa AZ") has "members and volunteers" and "organizes voter education and political participation programs." (*Id.* at ¶ 12.) Mi Familia Vota has "members" and has

---

[2] This Court often suspends Local Rule of Civil Procedure 56.1 in part, including ordering parties not to file separate statements of facts. *E.g.*, *Nickolas v. Bank of N.Y. Mellon*, No. CV-19-00166-PHX-DWL, 2019 WL 1130093, at *2 (D. Ariz. Mar. 12, 2019). Undersigned counsel did not see this language in the Court's case management orders in this case and therefore has attempted to comply with the local rule while also not including unnecessary information in the separate statement of facts. (*See* Docs. 85, 305.)

"organized voter registration drives, conducted get-out-the-vote activities, and helped Arizonans cure deficiencies in their ballots." (*Id.* at ¶¶ 15, 16.) Arizona Coalition for Change has a goal "to register people to vote" and conducts "get-out-the-vote campaigns, voter education programs, and trainings." (*Id.* at ¶ 19.)

This Court dismissed Plaintiffs' claim that S.B. 1485 imposes an "undue burden" on the right to vote. (Doc. 154 at 35–41.) The Court observed that voters who are removed from the Early Voting List "can be reinstated" simply by rejoining, that S.B. 1485 "at most affects (but does not eliminate) the ability of Arizona residents to use an alternative voting method—voting by mail—that is not constitutionally required," and that "thirty states have no [Early Voting List] for anyone." (*Id.* at 37–39 (internal quotation marks omitted).) This Court also judicially noticed "materials establishing that the cost of mailing each early ballot is $2 to $3," so "S.B. 1485 may result in a savings of up to $450,000 per election cycle" for "printing and mailing ballots." (*Id.* at 40.)

The Court declined to dismiss Plaintiffs' "purposeful discrimination" challenge to S.B. 1485 under the U.S. Constitution and the Voting Rights Act Section 2. (*Id.* at 59.)

**LEGAL STANDARD**

Summary judgment is appropriate "where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Lee v. City of Los Angeles*, 908 F.3d 1175, 1182 (9th Cir. 2018) (citation omitted). A factual dispute is "genuine" only if a "reasonable" factfinder could find for the nonmoving party. *FDIC v. Henderson*, 940 F.2d 465, 473 (9th Cir. 1991) (citation omitted). The "moving defendant may shift the burden of producing evidence to the nonmoving plaintiff merely by 'showing'—that is, pointing out through argument—the absence of evidence to support plaintiff's claim." *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000). "If the plaintiff is unable to sufficiently adduce evidence" from which a reasonable factfinder could conclude "the plaintiff has satisfied his burden of proof," summary judgment is warranted. *Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist.*, 17 F.4th 950, 959 (9th Cir. 2021) (citation omitted).

## ARGUMENT

### I. Plaintiffs lack standing to challenge S.B. 1485.

#### A. Plaintiffs must present specific evidence to survive summary judgment, especially when challenging a law that does not regulate them.

Standing has three elements. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). First, Plaintiffs must suffer an "injury in fact" that is (a) "concrete and particularized" and (b) "actual or imminent, not conjectural or hypothetical." *Id.* (citation modified). Second, Plaintiffs' injury must be "fairly traceable" to the conduct they are challenging, "not the result of the independent action of some third party not before the court." *Id.* (citation modified). Third, it must be "likely" that Plaintiffs' injury "will be redressed by a favorable decision." *Id.* at 561 (citation modified).

Plaintiffs "bear[ ] the burden of establishing these elements." *Id.* Each element "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* In response to a motion for summary judgment, Plaintiffs must present specific facts with "evidence." *Id.*; *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411–12 (2013) (applying same logic); *California v. Texas*, 593 U.S. 659, 675 (2021) (same).

Moreover, because Plaintiffs are challenging the constitutionality of a law, the kind of facts they must present depends on whether they are "an object of" the law. *Lujan*, 504 U.S. at 561. Here, they are not. S.B. 1485 imposes duties on county recorders with respect to certain voters. *See* A.R.S. § 16-544(K), (L). Plaintiffs are neither county recorders nor voters. (*See* Doc. 1 at ¶¶ 9–20.) Rather, Plaintiffs are organizations challenging a law that regulates "*someone else*," so "much more is needed" for them to show that the law injures them. *Lujan*, 504 U.S. at 562; *see also Clapper*, 568 U.S. at 414 (expressing "reluctance to endorse standing theories that rest on speculation about the decisions of independent actors"); *California*, 593 U.S. at 675 (reiterating that standing is "substantially more difficult to establish" in such cases) (citation modified).

### B. Plaintiffs lack representational (a.k.a. associational) standing to challenge S.B. 1485 on behalf of their members.

Three Plaintiffs challenge S.B. 1485 on behalf of their members—a theory known as representational (or associational) standing. Specifically, LUCHA, Chispa AZ, and Mi Familia Vota allege that S.B. 1485 will "negatively affect" "members" who are voters. (Doc. 1 at ¶¶ 11, 14, 18.) To sue on behalf of members, each organization must show: (a) their members would have standing to sue in their own right; (b) the interests they seek to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013).

Here, the first element is fatal. To satisfy this element, LUCHA, Chispa AZ, and Mi Familia Vota must show that "at least one identified member had suffered or would suffer harm" from S.B. 1485. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). To survive a motion for summary judgment, each organization must submit "competent evidence, not mere allegations, to demonstrate that at least one of its members ha[s] standing" to challenge S.B. 1485. *Associated Gen. Contractors of Am., San Diego Chapter, Inc.*, 713 F.3d at 1194. Each organization fails this element in three ways.

***First***, the organizations cannot show that S.B. 1485 will injure voters in a concrete way. A "concrete" injury is one that "actually exist[s]"—it is "real," not "abstract." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) (citation modified). Here, S.B. 1485 will not cause this sort of injury to any voter. Rather, S.B. 1485 will cause county recorders to send some voters—who previously joined the Early Voting List but did not vote an early ballot for two consecutive election cycles—a Confirmation Notice asking whether they wish to remain on the List. A.R.S. § 16-544(L). A voter who gets this notice can avoid being removed from the List by responding within 90 days. A.R.S. § 16-544(K). Even voters who are removed can rejoin later upon written request—the same way they previously joined. A.R.S. § 16-544(B). There is no concrete injury here.

***Second***, even if getting removed from the Early Voting List were a concrete injury, it is not actual or imminent. The imminence requirement for standing helps "ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Clapper*, 568 U.S. at 409 (citation modified). Here, LUCHA, Chispa AZ, and Mi Familia Vota cannot show that S.B. 1485 will imminently injure any specific voter. No one knows yet which voters will be sent a Confirmation Notice, much less which voters will end up getting removed from the Early Voting List for failing to respond. The earliest year in which any voter will be removed is 2027. SOF ¶ 6. Such removals will be limited to voters who (1) were on the Early Voting List during both the 2024 and 2026 election cycles but did not vote an early ballot in either cycle, (2) receive a Confirmation Notice in 2027, and (3) do not timely respond. A.R.S. § 16-544(K), (L). It is unknown which voters will meet the first two conditions, as the 2026 election cycle is not complete. SOF ¶ 7. And it is unknown which voters will meet the third condition, because that will vary depending on voters' individual responses.

***Third***, even if LUCHA, Chispa AZ, and Mi Familia Vota could show that S.B. 1485 will cause a concrete and imminent injury to *some* voters, they cannot identify any of *their own members* who will suffer it. This failure is fatal, because an organization may not sue based on a "statistical probability that some of those members are threatened with concrete injury." *Summers*, 555 U.S. at 497–98. For example, it is not enough for an organization to submit a declaration that "does not name any specific members of [the organization] who would be harmed" by S.B. 1485. *Associated Gen. Contractors of Am., San Diego Chapter, Inc.*, 713 F.3d at 1195.

For these reasons, to the extent LUCHA, Chispa AZ, and Mi Familia Vota are asserting claims on behalf of their members, such claims fail at summary judgment.

**C. Plaintiffs lack direct organizational standing to challenge S.B. 1485.**

All four Plaintiffs also challenge S.B. 1485 in their capacity as organizations—a theory known as direct organizational standing. They allege that, as a result of S.B. 1485,

they will "divert" resources from other activities "to ensure that voters" can "navigate the restrictions" the law will impose on the "right to vote." (Doc. 1 at ¶¶ 10, 13, 17, 20.)

The Supreme Court rejected a similar theory in *Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 393–96 (2024). In that case, organizations claimed standing to challenge a rule because they "divert[ed]" resources "in response" to the rule. *Id.* at 395. They said that the rule "caused" them to conduct studies to "better inform their members and the public," as well as to spend resources on "public advocacy and public education." *Id.* at 394. The Supreme Court dismissed this standing theory as "incorrect," explaining that it rested on a misreading of precedent. *Id.* at 395–96 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)).

Accordingly, to the extent Plaintiffs are challenging S.B. 1485 as organizations, they "must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *Id.* at 393–94. Plaintiffs cannot make this showing for four reasons.

***First***, under the Supreme Court's decision in *Alliance for Hippocratic Medicine*, Plaintiffs must present evidence that S.B. 1485 "directly affect[s] and interfere[s] with [their] core business activities" to establish the kind of organizational standing they claim. 602 U.S. at 395. They cannot. Even their complaint does not allege that interference.[3]

***Second***, even if Plaintiffs could establish organizational standing based on diversion of resources in some contexts, here the purpose of their diversion of resources is to ensure that voters can "navigate" the law. (Doc. 1 at ¶¶ 10, 13, 17, 20.) Plaintiffs' choice to divert resources in this way is purely voluntary. It is a "self-inflicted injur[y]" that is "not fairly traceable to" S.B. 1485. *Clapper*, 568 U.S. at 418.

---

[3] The impact of *Alliance for Hippocratic Medicine* on Ninth Circuit case law on organizational standing is the subject of a pending en banc case. After the Supreme Court's decision in *Alliance for Hippocratic Medicine*, a Ninth Circuit panel held that the Supreme Court had "overruled" prior contrary Ninth Circuit case law. *Ariz. All. for Retired Ams. v. Mayes*, 117 F.4th 1165, 1177–78 (9th Cir. 2024). The Ninth Circuit vacated that opinion and is considering the issue en banc. 130 F.4th 1177 (9th Cir. 2025).

***Third***, to the extent Plaintiffs will divert resources because they think S.B. 1485 will restrict voters' right to vote, they misunderstand the law. Voters on the Early Voting List who receive a Confirmation Notice can respond within 90 days to avoid being removed. A.R.S. § 16-544(K), (L). And voters who are removed can rejoin later upon request, like how they first joined. A.R.S. § 16-544(B). Even voters who decline to rejoin can submit a verbal or signed request for an early ballot. A.R.S. § 16-542(A).

***Fourth***, even since before *Alliance for Hippocratic Medicine*, organizations cannot challenge a law just because they update their existing activities to account for a legal update. In other words, organizations have never had standing based on resource expenditures for "continuing ongoing activities." *Friends of the Earth v. Sanderson Farms, Inc.*, 992 F.3d 939, 942 (9th Cir. 2021); *see also, e.g.*, *Fair Elections Ohio v. Husted*, 770 F.3d 459, 459–60 (6th Cir. 2014) (explaining that "it is not an injury to instruct election volunteers about absentee voting procedures when the volunteers are being trained in voting procedures already").

For these reasons, to the extent Plaintiffs are asserting claims on behalf of themselves as organizations, their claims fail at summary judgment.

## II. No reasonable factfinder would conclude that Plaintiffs have shown that the Legislature was motivated by discriminatory purpose.

Summary judgment is also necessary because Plaintiffs cannot meet the standard of proof described in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). *See Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 687 (2021); *see also Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989, 1038 (9th Cir. 2020) (en banc) (applying that standard to Section 2 purposeful discrimination claims), *rev'd on other grounds*, 594 U.S. 647 (2021).

### A. Plaintiffs must present evidence that the Legislature enacted S.B. 1485 because of, not merely in spite of, a disparate impact.

S.B. 1485 does not make "an express classification on the basis of race," so the Court should not presume invalidity. *See United States v. Carrillo-Lopez*, 68 F.4th 1133,

1139 (9th Cir. 2023). Rather, at trial, Plaintiffs will have the burden of proving that "discriminatory purpose was a motivating factor for the legislation." *Id.*

To answer that question, this Court may consider factors such as (1) the "historical background" of S.B. 1485, (2) the "specific sequence of events leading up to" S.B. 1485, (3) the "legislative or administrative history" of S.B. 1485, (4) "[d]epartures" from procedural or substantive norms in the enactment of S.B. 1485, and (5) the "impact" of S.B. 1485. *Vill. of Arlington Heights*, 429 U.S. at 266–68. The first four factors are the "most important evidence of legislative intent." *Carrillo-Lopez*, 68 F.4th at 1140. The fifth factor, while "not irrelevant," is "generally not dispositive, and there must be other evidence of a discriminatory purpose." *Id.* at 1141 (citation modified).

Moreover, evidence "must be considered in light of the strong 'presumption of good faith' on the part of legislators." *Id.* at 1140 (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). When determining whether to permit "trial to proceed," this Court must consider not only the "presumption of good faith that must be accorded legislative enactments," but also "the intrusive potential of judicial intervention into the legislative realm." *Miller*, 515 U.S. at 916–17.

"To defeat summary judgment, Plaintiffs must present evidence based upon which any reasonable fact-finder could conclude that [the Legislature] acted 'at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.'" *Darensburg v. Metro. Transp. Comm'n*, 636 F.3d 511, 523 (9th Cir. 2011) (quoting *Pers. Adm'r v. Feeney*, 442 U.S. 256, 279 (1979)). In other words, to "survive summary judgment," Plaintiffs must show that S.B. 1485 "not only had a discriminatory impact, but that it was enacted with an intent or purpose to discriminate against members of a protected class." *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1260–61 (9th Cir. 2016).

**B. The historical background of S.B. 1485 shows that the Legislature has balanced the desirability of voting by mail with election integrity.**

In 1991, the Legislature expanded the opportunity to vote by mail. Before then, voting by mail was limited to specific groups such as voters who could not vote in person

or who were at least 65 years old; but in 1991 the Legislature made the option available to "any qualified elector." *See* S.B. 1320, 1991 Ariz. Sess. Laws ch. 51, §§ 1, 2 (1st Reg. Sess.) (amending A.R.S. §§ 16-541 and 16-544).

Still, the Legislature included limits to promote election integrity. For example, a voter seeking to vote by mail could submit a "signed request." *See* A.R.S. § 16-542(A) (West Supp. 1991). The Legislature prescribed an application form for the requestor to sign and swear that she was the voter and would not vote elsewhere too. *See* 1991 Ariz. Sess. Laws ch. 51 § 2 (amending A.R.S. 16-544). Similarly, by 1997, a voter seeking to vote by mail could make a "verbal or signed request" to the county recorder, and a verbal request required confirmation of "identity." *See* A.R.S. § 16-542(A) (1996). While the Legislature no longer prescribed an application form, the Legislature required that the ballot include an envelope for the person to sign and swear that she was the voter and would not vote elsewhere too. *See* S.B. 1003, 1997 Ariz. Sess. Laws ch. 5, §§ 22, 25 (2d Spec. Sess.) (repealing A.R.S. § 16-544 and revising A.R.S. § 16-547).

In 2007, the Legislature made it even easier to vote by mail. The Legislature created a Permanent Early Voting List that any voter could join, and such voters would be automatically sent a ballot by mail rather than needing to ask each election. *See* H.B. 2106, 2007 Ariz. Sess. Laws. Ch. 183 (1st Reg. Sess.) (adding A.R.S. § 16-544).

Here too, the Legislature included measures to promote election integrity. For example, a voter seeking to join the Early Voting List could submit a "written request" including her name, address, birth date, and signature. *Id.* § 5 (adding A.R.S. § 16-544). In addition, voters would be removed from the List if, for example, the voter's registration became "inactive … or canceled" or if a county recorder's notice was "returned undeliverable" and the county recorder could not contact the voter. *Id.* (adding A.R.S. § 16-544(H))

Given these and other innovations, by 2021 it was relatively easy for registered voters in Arizona to vote by mail, compared with other States. SOF ¶ 10. As the Supreme Court summarized, Arizona law "generally makes it quite easy for residents to vote"

given the availability of voting by mail and the option to join the Permanent Early Voting List. *See Brnovich*, 594 U.S. at 661.

### C. The sequence of events and legislative history underlying S.B. 1485 show that the Legislature was concerned with election integrity, voter confidence, and cost saving.

#### 1. Precursor to S.B. 1485 in 2019.

In 2019, Arizona State Senator Ugenti-Rita sponsored a bill resembling what became S.B. 1485 two years later. The 2019 bill would have removed a voter from the Early Voting List "if the voter fails to vote using an early ballot in either the primary election or the general election for two consecutive primary and general elections for which there was a federal, statewide or legislative race on the ballot." *See* S.B. 1188, 54th Leg., 1st Reg. Sess. (Ariz. 2019) (Senate Engrossed). The bill also provided that county recorders "may" send a notice to voters facing removal, informing them that they could remain on the List by returning the notice within 30 (not 90) days. *Id.*

Supporters of the bill explained that it would maintain list accuracy and reduce costs. SOF ¶¶ 14–16. Although the Senate passed the bill, it was held in the House and did not pass. *See* SOF ¶ 12.[4]

#### 2. Allegations of illegal voting and integrity issues before S.B. 1485 passed in 2021.

In the decade or so before S.B. 1485 passed in 2021, the Arizona Attorney General prosecuted two-dozen cases in which an individual voted in both Arizona and a different state in a single election using a mail-in ballot. SOF ¶ 20.[5]

In addition, after the November 2020 election, the Senate conducted what it called the "Maricopa County Forensic Election Audit." SOF ¶ 22. In a Senate Judiciary hearing preceding the Audit, Senator Farnsworth asked an Assistant Attorney General about

---

[4] This Court may "take judicial notice of legislative history materials" like these. *Arce v. Douglas*, 793 F.3d 968, 978 n.4 (9th Cir. 2015).

[5] This information does not include prosecutions by county attorneys, who may enforce Arizona voting laws for county and municipal elections. *See* A.R.S. § 16-1021.

reforming the Permanent Early Voting List because of complaints that "if people move or if kids move out of state and the[ ] parents continue to get those ballots, those are easily voted," explaining that "I know that there was at least one case where there was an allegation of that." SOF ¶ 26. The Assistant Attorney General responded that "it is imperative that we have clean rolls" and that many "of the allegations that we have related to illegal voting are for people that maybe have moved out of state, or … again, … deceased voters." SOF ¶ 28; *see also* SOF ¶¶ 27, 29, 31 (similar).

Senator Farnsworth stated that it "sounds to me like" the Assistant Attorney General agreed, "in kind of a roundabout way," that Senator Ugenti-Rita's 2019 bill about the Early Voting List would have been good policy. SOF ¶ 30.

**3. Legislative and Governor statements about S.B. 1485.**

When considering S.B. 1485, supporters similarly described their intent to protect election integrity and reliability, increase public confidence, and reduce administrative burdens and costs. *See, e.g.*, *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191, 197 (2008) (plurality op.) (describing interest in integrity and confidence); *Dudum v. Arntz*, 640 F.3d 1098, 1116 (9th Cir. 2011) (describing interests in cost-saving).

*First*, the Legislature passed S.B. 1485 to protect election integrity. The enacted law stated that "[t]he Legislature finds and determines the integrity in all elections in this state is a matter of statewide concern." S.B. 1485 § 7. It "declare[d] that a person who requests to be on the active early voting list and who repeatedly fails to vote with the ballots that are mailed out by the county recorder increases the likelihood of fraudulent use of those unvoted ballots, and that the maintenance of an accurate active early voting list is therefore essential to maintaining the integrity of this state's elections." *Id.*

The sponsor of S.B. 1485 echoed that purpose during the legislative process. She explained that the bill "is a responsible and sensible way to address our permanent early voting list and make sure that those that are on it are truly those that are participating in the system," rather than "sending out ballots to individuals who are either not living here anymore, you know, out-of-jurisdiction, or sadly, deceased," and the bill would help make

"sure that our lists are up-to-date." SOF ¶ 33; *see also* SOF ¶¶ 41, 42, 45, 46 (similar).

*Second*, proponents of S.B. 1485 sought to build public confidence in elections, including by reducing the number of perceived errors. Senator Ugenti-Rita testified that she was "familiar with an example of a ballot that has been sent to a registered voter who has been deceased for 10 years, and they were just sent their primary and general election mail-in ballots." SOF ¶ 34. So, in her words, removals are "not happening enough to alleviate concern that there are ballots being sent to deceased people." SOF ¶ 35. The bill, Senator Ugenti-Rita said, would "reinforce[ ] voting by mail because you do want to make sure you have a process that people are confident in." SOF ¶ 36; *see also* SOF ¶¶ 43, 47, 49, 50, 53 (similar)

*Third*, legislators also indicated their support because they believed the bill would reduce costs and improve administration. As Senator Gowan put it, "the issue here is if we're talking about costs, we're talking about mailing. And that costs a lot of money to mail, and for people not to be involved." SOF ¶ 37; *see also* SOF ¶¶ 39, 41, 42 (similar).

The Governor reinforced the same themes when signing S.B. 1485, explaining that the law "is a measure that ensures our voting lists remain verified and accurate, will free up resources for local election officials, and strengthen trust among many citizens in our election system." SOF ¶ 54.

Proponents' statements show the reasonable objectives of S.B. 1485. *See Ohio Democratic Party v. Husted*, 834 F.3d 620, 635 (6th Cir. 2016) (recognizing legitimacy of "preventing voter fraud, increasing voter confidence … and easing administrative burdens"). Although opponents of the law argued otherwise, "the concerns expressed by political opponents during the legislative process are not reliable evidence of legislative intent." *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 940 (11th Cir. 2023).

**4. Allegations of illegal voting after S.B. 1485 passed in 2021.**

Events occurring after the passage of S.B. 1485 are unlikely to shed light on the enacting Legislature's intent. *See Veasey v. Abbott*, 830 F.3d 216, 234 (5th Cir. 2016)

(faulting district court for placing "inappropriate reliance upon the type of post-enactment testimony which courts routinely disregard as unreliable") (plurality). Still, the Attorney General notes that in 2021 and 2022, the Attorney General's Office prosecuted six cases in which individuals sought to cast a deceased voter's mailed ballot during the 2020 election. SOF ¶ 60. And it prosecuted one case in which a parent cast an out-of-state child's mailed ballot without the child's permission. SOF ¶ 61.

**D. The passage of S.B. 1485 was substantively and procedurally normal.**

Substantively, S.B. 1485 continued the Legislature's efforts to balance mail-voting accessibility, election integrity, and voter confidence. For example, in 1991, the Legislature had allowed "[a]ny qualified elector" to cast an absentee ballot, but the statutes also required a "signed request" for the requestor to swear that she was indeed the voter and would not vote in the same election in another state. *See* S.B. 1320, 1991 Ariz. Sess. Laws ch. 51, § 1 (1st Reg. Sess.); A.R.S. § 16-544(A) (1984). And in 2007, the Legislature created the Permanent Early Voting List, while also requiring a written request containing a signature, which the County Recorder would compare with the voter's registration form. H.B. 2106, 2007 Ariz. Sess. Laws. ch. 183, § 5 (1st Reg. Sess.) (adding A.R.S. § 16-544(B), (C)). The Legislature passed S.B. 1485 for similar values.

Procedurally, the passage of S.B. 1485 reflected a partisan bill's movement through the Legislature. Because an earlier similar bill failed, legislators transferred content of the earlier bill to S.B. 1485 via a "strike-everything" amendment—like the over-120 other strike-everything amendments adopted during the 2021 session. SOF ¶¶ 64, 65. In addition, legislators amended the bill to make it easier for voters to remain on the Early Voting List, including (1) adding more elections in which voters could participate to avoid receiving a Confirmation Notice; (2) specifying that county recorders "may additionally" notify such voters by phone, text, or email; and (3) lengthening the time for voters to respond to Confirmation Notices from thirty to ninety days. SOF ¶ 66 & Ex. 17. So, although debate about S.B. 1485 was spirited, there are not "[d]epartures from the normal procedural sequence" that "afford evidence that improper purposes"

motivated the Legislature. *Vill. of Arlington Heights*, 429 U.S. at 267.

**E. Whether S.B. 1485 will have a disparate impact is unknown, but even under Plaintiffs' predictions, the magnitude of impact and extent of disparity will be limited.**

Whether S.B. 1485 will have a disproportionate impact on racial or ethnic groups is unknown. The 2024 and 2026 election will determine which voters on the Early Voting List will be sent the first round of Confirmation Notices. SOF ¶ 6. But the 2026 cycle is not complete, so it is unknown which voters will be sent a Confirmation Notice in 2027. SOF ¶ 7. And even if one could identify which voters on the Early Voting List will be sent Confirmation Notices in 2027, it is unknown which of them will fail to respond within 90 days.

Plaintiffs nevertheless hired a political scientist (Dr. Herron) to try to predict whether S.B. 1485 will have a disproportionate impact on certain racial or ethnic groups. He predicts that it will. SOF ¶ 69. A defense expert (Dr. Grimmer) has identified what he views as flaws in Dr. Herron's opinions. SOF ¶ 80. The Attorney General does not ask the Court to decide at this stage whether Dr. Grimmer is more credible than Dr. Herron. But, even if this Court temporarily credits Dr. Herron's predictions about disparate impact for summary judgment purposes, his predictions are limited in ways that prevent a reasonable factfinder from inferring discriminatory purpose.

***First***, Dr. Herron makes predictions about which voters will be, in his words, "vulnerable" to removal from the Early Voting List—not which voters will be *removed* from the Early Voting List. SOF ¶¶ 68, 69. This is because Dr. Herron recognizes the distinction between a voter receiving a Confirmation Notice after failing to vote an early ballot in two consecutive election cycles (a situation that Dr. Herron describes as being "vulnerable" to removal) and actually being removed from the Early Voting List for failing to respond to the Confirmation Notice within 90 days. SOF ¶ 68.

***Second***, Dr. Herron's predictions are based on data about voter behavior—such as which voters cast early ballots—in 2022 and earlier. SOF ¶¶ 70, 71, 74. His predictions

are not based on voter behavior in 2024 or 2026, the election cycles that will determine which voters will receive a Confirmation Notice in 2027. SOF ¶¶ 6, 70, 71, 74. This limit matters because voter behavior may change significantly across election cycles depending on, for example, current candidates and policy issues. *See* SOF ¶¶ 72, 73.[6]

***Third***, although Dr. Herron predicts that certain racial or ethnic groups will be more "vulnerable" to removal from the Early Voting List, he does not predict a high disparity in absolute terms. As the Supreme Court has explained, courts should avoid creating a "distorted picture" by "dividing one percentage by another"—for example, saying that "blacks are three times as likely as whites to lack qualifying ID" when the vast majority of both blacks and whites have qualifying ID. *Brnovich*, 594 U.S. at 680 (citation omitted). Here, for example, Dr. Herron does not predict that the majority of voters in any racial or ethnic group will be "vulnerable" to removal from the Early Voting List. SOF ¶ 75.

***Fourth***, Dr. Herron's predictions are about what he believes will occur, not what the *Legislature* believed would occur. He did not review the legislative history of S.B. 1485 and is not opining on what the Legislature believed or intended. SOF ¶¶ 76–78.

For these reasons, Dr. Herron's predictions are not evidence that the Legislature acted "because of," not merely "in spite of," a disparate impact. *Feeney*, 442 U.S. at 279.

## CONCLUSION

Plaintiffs cannot show a genuine issue of material fact and Defendants are entitled to judgment as a matter of law. This Court should enter summary judgment.

---

[6] Dr. Herron's predictions also rest on serious methodological flaws, which Dr. Grimmer will explain at trial if summary judgment is denied.

RESPECTFULLY SUBMITTED this 15 day of April, 2026.

**KRISTIN K. MAYES**
**ATTORNEY GENERAL**

By: *<u>/s/Joshua G. Nomkin</u>*

Hayleigh S. Crawford
Joshua M. Whitaker
Kathryn E. Boughton
Joshua G. Nomkin
Office of the Arizona Attorney General
2005 N. Central Ave.
Phoenix, Arizona 85004-1592
Telephone: (602) 542-3333