Lauren Elliott Stine (AZ# 025083)
Coree E. Neumeyer (AZ# 025787)
QUARLES & BRADY LLP
One Renaissance Square
Two North Central Avenue, Suite 600
Phoenix, AZ 85004-2391
(602) 229-5200
Lauren.Stine@quarles.com
Coree.Neumeyer@quarles.com

Lee H. Rubin (Admitted PHV)
MAYER BROWN LLP
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
(650) 331-2000
lrubin@mayerbrown.com

*Additional counsel listed on last page*

*Attorneys for Plaintiffs*

Courtney Hostetler (Admitted PHV)
John Bonifaz (Admitted PHV)
Ben Clements (Admitted PHV)
FREE SPEECH FOR PEOPLE
48 N. Pleasant St, Suite 304
Amherst, MA 01002
(617) 249-3015
jbonifaz@freespeechforpeople.org
chostetler@freespeechforpeople.org
bclements@freespeechforpeople.org

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Mi Familia Vota, et al., | Case No. 2:21-cv-01423-PHX-DWL |
| Plaintiffs, | |
| v. | |
| Adrian Fontes, in his official capacity as Arizona Secretary of State; et al., | **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT ARIZONA ATTORNEY GENERAL KRISTIN MAYES'S MOTION FOR SUMMARY JUDGMENT** |
| Defendants, | |
| and | |
| RNC and NRSC, | |
| Defendant-Intervenors. | |

**INTRODUCTION**

The Ninth Circuit has made clear that for a claim of intentional discrimination, "any indication of discriminatory motive . . . may suffice to raise a question that can only be resolved by a factfinder," and "very little such evidence is necessary" to defeat summary judgment. *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1158–59 (9th Cir. 2012). Plaintiffs easily clear that bar. The record contains evidence of (i) SB 1485's disparate impact on voters of color, (ii) Arizona's departure from decades of legislative support and expansion of mail-voting after minority voters succeeded in electing their preferred candidate, (iii) pretextual justifications for the law, (iv) Arizona's well-documented history of discrimination in voting legislation, and (v) contemporaneous statements from the bill's supporters suggesting a discriminatory purpose—evidence that, on summary judgment, must be viewed in the light most favorable to Plaintiffs. The State's motion does not engage with most of this record; it ignores the unfavorable evidence and asks the Court to draw factual inferences in its favor. That is not how summary judgment works. The State's standing arguments fare no better and are foreclosed by binding circuit precedent recognizing organizational standing where, as here, a challenged law forces plaintiffs to divert resources and frustrates their core mission. The motion should be denied.

**BACKGROUND**

**A.    Factual Background**

Arizona has long been a national leader in mail voting.[1] The Legislature first authorized no-excuse absentee voting in 1991, allowing any qualified elector to obtain a ballot by mail without identifying a particular reason for doing so. *See* 1991 Ariz. Sess. Laws Ch. 308 § 6; *see also* Plaintiffs' Separate Statement of Additional Facts (SSOF) ¶ 52. In 2007, the Legislature took the further step of creating the Permanent Early Voting List (PEVL), which any voter could join by written request and through which voters would automatically receive an early ballot for each election going forward. *Id.* Arizona was one

---

[1] Plaintiffs have set forth a detailed account of the relevant facts in their Statement of Facts, accompanying this response.  Plaintiffs summarize the necessary background here.

of only a handful of states to offer such a list to all voters. SSOF ¶ 53. Over the years that followed, Arizona repeatedly expanded access to early voting—authorizing on-site early voting locations, allowing third parties to distribute PEVL request forms, and otherwise refining the system to make voting by mail easier and more accessible. SSOF ¶ 55. By the 2020 general election, nearly 90% of Arizonans cast early ballots, and approximately 68% of voters were on the PEVL. SSOF ¶ 56.

The Legislature's consistent expansion of mail voting came to an abrupt halt after the 2020 election. In 2020, Arizona voted for a Democratic presidential candidate for the first time since 1996, due to the critical support of voters of color. SSOF ¶¶ 61–62. In the face of these results, the Legislature reversed course and began to curtail mail voting— starting with SB 1485. This law replaced the PEVL with a new Active Early Voting List (AEVL)[2] and, for the first time, made a voter's continued enrollment on the list contingent on the voter's recent voting history. *See* 2021 Ariz. Sess. Laws ch. 359, § 6. Under SB 1485, if a voter on the AEVL fails to cast an early ballot in two consecutive election cycles, the county recorder must "send a notice" to the voter. *Id.* Unless the voter affirmatively responds to that notice and confirms a desire to remain on the list, the voter is removed from the AEVL and will no longer automatically receive an early ballot by mail. *Id.* To vote by mail in any subsequent election, the removed voter must either re-enroll on the AEVL or separately request an early ballot from the county recorder before each election. *Id.*

B.     **Procedural Background**

Plaintiffs are four nonprofit civic-engagement organizations—Mi Familia Vota, Arizona Coalition for Change, Living United for Change in Arizona, and League of Conservation Voters, Inc. d/b/a Chispa AZ—whose core missions include registering, mobilizing, and supporting Arizona voters, with  particular focus on voters of color and other historically underrepresented communities. SSOF ¶¶ 1–3. Plaintiffs brought this suit challenging SB 1485 on three grounds. After the Court's decision on the State's motion to dismiss, Doc. 154, Counts Two and Three remain: Plaintiffs allege that SB 1485 is unlawful

---

[2] Plaintiffs refer to the PEVL and its successor AEVL collectively as the Early Voting List (EVL).

2

because the Arizona Legislature acted with a discriminatory purpose in passing it, in violation of the Fourteenth and Fifteenth Amendments (Count Two) and Section 2 of the Voting Rights Act (Count Three). Doc. 1 ¶¶ 136–145.

In denying the State's motion to dismiss the intentional-discrimination claims, the Court explained that Plaintiffs had plausibly alleged that SB 1485 was motivated by a discriminatory purpose, reasoning that Plaintiffs had "plausibly alleged that SB 1485 does, in fact, have a disparate impact on certain racial groups," Doc. 154 at 53; that public statements by the bill's proponents, when construed in Plaintiffs' favor, "express[ed] the discriminatory trope that minorities are uneducated voters," *id.* at 56; and that the sequence of events leading up to the bill's passage—including the Arizona Senate's decision to retain Cyber Ninjas to "audit" the 2020 election in Maricopa County in the absence of any legitimate evidence of fraud—supported an inference of discrimination, *id.* at 57–58; SSOF ¶ 71.

## LEGAL STANDARD

The court shall grant summary judgment only if "[a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (citation omitted). The Court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference[s] in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018). Summary judgment is wholly improper "where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno*, 771 F.3d at 1125.

## ARGUMENT

### I.    Plaintiffs Have Standing To Challenge SB 1485

Plaintiffs have standing because SB 1485 directly interferes with each organization's core voter-mobilization work—including helping Arizonans register, sign up for the EVL, request and cast mail ballots, and navigate the steps required to keep their place on that list.

"Organizations are entitled to sue on their own behalf for injuries they have sustained." *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 987 (9th Cir. 2025) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982)). An organizational plaintiff establishes standing "if the organization [shows] that a defendant's actions 'affected and interfered with [its] core business activities.'" *Id.* (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 369 (2024)). A plaintiff can make that showing, for example, by demonstrating that it had to "hire additional staff," "expand its office space," "conduct[] additional fundraising efforts," and "divert staff resources away from other projects" to continue carrying out its core activities. *Id.* at 988.

Plaintiffs readily satisfy that standard. Each Plaintiff is a non-profit organization whose mission centers on helping Arizonans participate in the political process, with a particular focus on voters of color and other historically underrepresented communities. SSOF ¶ 1. Voter mobilization—supporting registration through casting a ballot—is the core activity of each organizational Plaintiff. *Id.* ¶ 2. In federal-election years, each Plaintiff dedicates a substantial percentage of its budget to that work. *Id.* Supporting voting by mail—and, in particular, helping Arizonans sign up for and exercise their rights under the EVL—is a longstanding component of each Plaintiff's voter-mobilization program, because EVL enrollment makes it easier for Arizonans to vote. *Id.* ¶ 3. Plaintiffs train staff and volunteers to assist voters in signing up for the EVL, develop and distribute materials walking voters through the process, and integrate EVL sign-up into their voter-registration drives—efforts so successful that, in 2020, more than 90% of the Arizonans MFV helped register also signed up for the EVL. *Id.* ¶¶ 4–5.

SB 1485 directly interferes with these core activities. For one, SB 1485 will require Plaintiffs to re-do the work they have already done to enroll voters on the EVL. SSOF ¶ 6. Further, each Plaintiff must now divert money, personnel, time, and resources away from other programming in order to continue its voter-mobilization work in the face of the new removal law. *Id.* To do so, each Plaintiff is hiring or dedicating additional staff and conducting additional outreach to educate voters about how to avoid removal from the EVL

and how to respond to the new confirmation notices, and will launch new campaigns to identify and re-enroll voters who have been purged. *Id.* ¶¶ 7, 10–14, 16–20. Each Plaintiff has also had to develop new, more resource-intensive ways to support voters who are removed from the EVL—including helping them request a one-time mail ballot, arranging transportation to in-person voting locations, and educating them about the mechanics of casting a ballot outside the EVL framework. *Id.* ¶ 8. Plaintiffs operate on finite budgets, and every dollar, hour, and staff position consumed by their SB 1485 response is one subtracted from their voter-mobilization and civic-engagement work. *Id.* ¶ 9. That is the kind of "concrete and demonstrable injury to [an] organization's activities—with [a] consequent drain on [its] resources"—that establishes Article III standing. *Immigrant Defs.*, 145 F.4th at 987–88.

The State's arguments to the contrary fail. It asserts that the Supreme Court "rejected" this theory of organizational standing in *Hippocratic Medicine*, 602 U.S. at 367, and claims that this decision "overruled" prior Ninth Circuit case law on organizational standing. Mot. 8 & n.3. That is wrong twice over. The Ninth Circuit has squarely held that *Hippocratic Medicine* "reinforced the holding in *Havens Realty*" that an organizational plaintiff establishes standing by showing that a defendant's actions "directly affected and interfered with" its core business activities. *Immigrant Defenders*, 145 F.4th at 987.[3] And the Ninth Circuit then held that the immigrant-rights organization there had organizational standing precisely because, in response to the challenged government policy, it was forced to "hire additional staff, expand its office space, conduct additional fundraising efforts, … and divert staff resources away from other projects" in order to continue carrying out its preexisting core mission of providing direct legal representation to noncitizens in removal proceedings. *Id.* at 988. Plaintiffs here establish the same kind of injury.

This case is also nothing like *Hippocratic Medicine*. The plaintiffs there were

---

[3] The State also invokes *Arizona Alliance for Retired Americans v. Mayes*, 117 F.4th 1165, 1177–78 (9th Cir. 2024). *See* Mot. 8 n.3. But that opinion has been vacated, 130 F.4th 1177 (9th Cir. 2025), and "a decision that has been vacated has no precedential authority whatsoever," *Durning v. Citibank, N.A.*, 950 F.2d 1419, 1424 n.2 (9th Cir. 1991) (emphasis omitted).

medical associations whose only "injury" was the cost of "issue-advocacy" work—"expending money to gather information and advocate against the [FDA's] action." *Id.* at 987–88 (quoting *Hippocratic Med.*, 602 U.S. at 394–95). Those plaintiffs did not run any program that the FDA's action directly impeded; they simply objected to the policy and spent money making that objection. *Hippocratic Med.*, 602 U.S. at 394–95. Plaintiffs here, by contrast, do not seek standing to vindicate an abstract policy disagreement with SB 1485. They run concrete, longstanding voter-mobilization programs—training staff, distributing materials, signing voters up for the EVL, and helping them cast ballots—that SB 1485 directly disrupts by introducing a new removal mechanism Plaintiffs must educate around and counteract. SSOF ¶¶ 2–4, 6–9. That is direct interference with Plaintiffs' "core business activities," not "issue-advocacy." *Immigrant Defs.*, 145 F.4th at 987–88. *See also LULAC v. Exec. Off. of the Pres.*, 780 F. Supp. 135, 188–90 (D.D.C. 2025) (finding standing where challenged action impeding plaintiffs' "voter-registration missions," "forc[ing] them to invest resources in additional voter-registration services"); *LULAC v. Exec. Off. of the Pres.*, 808 F. Supp. 3d 29, 58 (similar); *Coal. for Open Democracy v. Scanlan*, 794 F. Supp. 3d 28, 40–41 (D.N.H. 2025) (similar); *N.H. Youth Movement v. Scanlan*, 2025 WL 2336868, at *4 (D.N.H. Aug. 13, 2025) (similar); *accord Freedom Found. v. Int'l Brotherhood of Teamsters Local 117*, 2024 WL 5252228, at *2 (9th Cir. Dec. 31, 2024) (unpublished) (finding standing where defendant unions' rejection of plaintiff's mailers forced plaintiff to "resend" forms it sought to disseminate to union members).

The State next contends that Plaintiffs cannot establish standing because their "choice to divert resources in this way is purely voluntary." Mot. 8 (citing *Clapper*, 568 U.S. at 418). The Ninth Circuit rejected materially the same argument in *Immigrant Defenders*. There, as here, the government argued that the organization had simply "spent its way into standing." *Immigrant Defs.*, 145 F.4th at 987. The court held that the diversion of resources was not voluntary: to "continue advancing its core business activities and longstanding mission," the organization "had to expend resources to counteract and offset the barriers" that the challenged policy "imposed." *Id.* at 988. So too here. Plaintiffs cannot

continue their preexisting work without responding to SB 1485's new requirements, the resulting EVL purges, and the cascading need to assist removed voters in obtaining and casting a ballot through other means. SSOF ¶¶ 6–9. That injury is not self-inflicted.

Finally, the State argues that Plaintiffs lack standing because, in her view, SB 1485 will not "restrict voters' right to vote": voters on the EVL can respond to a notice to avoid removal, and voters who are removed can later request to rejoin the list. Mot. 9. Even taking her characterization of the statute at face value, that argument is irrelevant to organizational standing. Plaintiffs' injury does not depend on whether SB 1485 ultimately prevents any individual voter from casting a ballot; the injury is that Plaintiffs must now divert significant resources from other programming to ensure that Arizona voters understand the new confirmation notice process, respond in time, and—if removed—are reached, re-enrolled, and supported in casting a ballot through alternative means. SSOF ¶¶ 6–9. The State nowhere disputes that fundamental point, and that is all *Immigrant Defenders* and *Havens Realty* require. *Immigrant Defs.*, 145 F.4th at 987–88.[4] And in any event, the State's own expert admits that SB 1485 will impact voters, concluding that "up to 3% of citizens of voting age in Arizona may experience a change in their cost of voting." SSOF ¶ 21.

**II.      There Is A Genuine Dispute Of Material Fact As To Whether The Legislature Was Motivated By Discriminatory Purpose In Enacting SB 1485**

Summary judgment should be denied because the record evidence establishes a genuine dispute whether the Legislature was animated in part with a discriminatory purpose in enacting SB 1485.

**A.      *Arlington Heights* Precludes Summary Judgment Where There Is "Any Indication" Of Discriminatory Motive**

The Ninth Circuit has held that "[w]hen a plaintiff opts to rely on the *Arlington Heights* factors to demonstrate discriminatory intent through direct or circumstantial evidence, the plaintiff need provide very little such evidence . . . to raise a genuine issue of fact." *Pacific Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1159 (9th Cir. 2013). "*Any indication* of discriminatory motive may suffice to raise a question that

---

[4] The State also argues that Plaintiffs lack associational standing. Mot. 6–7. Plaintiffs do not assert associational standing here.

can only be resolved by a factfinder." *Mi Familia Vota v. Hobbs*, 608 F. Supp. 3d 827, 82 (D. Ariz. 2022) (emphasis added) (quoting *Pac. Shores*, 730 F.3d at 1156). Plaintiffs need not show that discriminatory purpose was the "sole[]" or even a "primary" motive for SB 1485; they need only show that discriminatory purpose was "a motivating factor." *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977). To assess whether a plaintiff has made that showing, courts consider (1) disparate racial impact; (2) historical background; (3) the sequence of events leading to the challenged action; (4) departures from normal procedures; and (5) legislative or administrative history. *Arce v. Douglas*, 793 F.3d 968, 978 (9th Cir. 2015) (citing *Arlington Heights*, 429 U.S. at 266).

**B.      A Reasonable Factfinder Could Conclude That SB 1485 Was Enacted In Part With A Discriminatory Purpose**

Plaintiffs offer far more than the "very little" evidence *Pacific Shores* requires to survive summary judgment. The record easily permits a reasonable factfinder to conclude that discriminatory purpose was a motivating factor behind SB 1485.

**1.      SB 1485's Undisputed Disparate Impact On Non-White Voters Supports An Inference Of Discriminatory Intent**

Under *Arlington Heights*, the disparate racial impact of SB 1485 is an "important starting point" for the discriminatory-purpose inquiry, 429 U.S. 266, and the evidence here readily supports that SB 1485 will have a disparate racial impact. Both sides' experts agree that SB 1485 will disproportionately burden non-White Arizona voters; they dispute only the magnitude of that disparity and the methodology used to measure it. SSOF ¶ 22. Plaintiffs' expert, Dr. Michael Herron, concludes that Native American AEVL members are more than three times as vulnerable to removal as White AEVL members and Hispanic AEVL members are more than twice as vulnerable to removal as White AEVL members. *See* SSOF ¶¶ 23–24; *see also id.* ¶¶ 40–41. Black and Asian AEVL members are also more vulnerable to removal. *See* SSOF ¶ 25. The disparities are even larger in Maricopa County, where Hispanic AEVL members are more than three times as vulnerable as White AEVL members. *See* SSOF ¶ 26; *see also id.* ¶¶ 27–34, 36 (describing robustness testing and other consistent findings). The State's expert, Dr. Justin Grimmer, reaches the same directional

conclusion. He agrees that citizens of voting age from each racial group could face a change in their cost of voting and—like Plaintiffs' expert—finds a disparity in the impact among racial groups. *See* SSOF ¶¶ 21, 38.

The State relies on *Brnovich v. Democratic National Committee*, 594 U.S. 647 (2021) for the proposition that this evidence of disparate impact is not meaningful because Dr. Herron "does not predict a high disparity in absolute terms." Mot. 17. That argument fails. The discussion in *Brnovich* that the State invokes—concerning the size of statistical disparities a plaintiff must show—arose in the Court's analysis of the Section 2 results test—i.e., whether the challenged voting rules render the political process not "equally open" to minority voters. *See* 594 U.S. at 678–84. *Brnovich* did not establish, in that discussion or elsewhere, any threshold for the magnitude of disparate impact required, along with other considerations, to support an inference of intentional discrimination under *Arlington Heights*. Nor would such a "minimum threshold" make sense, because the *Arlington Heights* inquiry asks a fundamentally different question: whether the Legislature acted "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Disparate racial impact is probative evidence of discriminatory purpose, *Arlington Heights*, 429 U.S. at 266, and is especially probative where, as here, the Legislature was on notice that the law would disproportionately burden non-white voters, *see* SSOF ¶ 39, disregarded those concerns, and enacted the law anyway under a rationale the record shows to be pretextual. That inference is reinforced by the immediate political context—SB 1485 was passed on the heels of the 2020 presidential election in which voters of color provided the decisive margin for the statewide winner. SSOF ¶¶ 62, 97–100. Taken together, this evidence is more than sufficient for a reasonable factfinder to conclude that the predicted racial impact of SB 1485 was not an unfortunate side effect of an otherwise neutral policy, but a motivating consideration for the Legislature that enacted it.

The State also faults Dr. Herron for making predictions about which voters will be "vulnerable" to removal, not which voters will be removed from the Early Voting List, and

9

for relying on data about voter behavior in 2022 rather than 2024 and 2026. Mot. 16–17. But those arguments only support the State's summary judgment motion if the Court draws inferences against Plaintiffs. Drawing inferences in Plaintiffs' favor, as the Court must at this stage, a reasonable factfinder could infer that a racial disparity in *vulnerability* to removal will translate into a substantial racial disparity in *actual* removals. The pool of voters at risk under SB 1485 is itself disproportionately non-White, and the State has identified no reason why the removal mechanism in the statute would somehow neutralize that built-in skew. A reasonable factfinder could likewise infer that voter behavior across multiple Arizona election cycles from 2018 through 2022—the most recent comprehensive data available to Dr. Herron when he prepared his report—is probative of voter behavior in 2024 and 2026, particularly absent any record evidence that the underlying patterns having meaningfully shifted. And whether Dr. Herron's methodological choices establish disparate impact is exactly the kind of inquiry that should be probed through live testimony and cross-examination at trial. *See SFFA v. Harvard College*, 346 F. Supp. 3d 174, 195 (D. Mass. 2018) ("The credibility of the expert witnesses in making these critical modeling and analytical choices is best evaluated at the upcoming bench trial.").

**2.    The State Disputes Plaintiffs' Expert Testimony On The Historical Background Of SB 1485**

In addition, the record evidence establishes a history of voting discrimination that supports an inference of intentional discrimination and, at a minimum, demonstrates that there is a genuine factual dispute as to this factor. Plaintiffs' expert, Dean Franita Tolson, prepared a comprehensive report tracing Arizona's persistent pattern of restricting the franchise for voters of color. *See* SSOF ¶ 42. While that pattern has roots pre-statehood, the most probative evidence comes from the past several decades, during which Arizona repeatedly has enacted facially race-neutral voting rules that have burdened Latino, Native American, and Black voters in the wake of growing minority political power. *Id.* ¶¶ 43–46, 102–04.

The post-VRA record alone is extensive. More than 80% of the Section 5

10

preclearance objections Arizona faced under the VRA occurred between 1982 and 2006, with objections to the State's redistricting plans in every decennial cycle in which Arizona was subject to preclearance. SSOF ¶ 47.  In 1988, the Department of Justice successfully sued Apache, Navajo, and Coconino Counties—and the State itself—for abridging Native American voting rights. SSOF ¶ 48. The case concluded in 1989 when the parties agreed to a consent decree that a federal court was forced to update in 1993 because the counties continued to violate the law, *id.*, and in 1994 the State denied preclearance for additional Superior Court judgeships after concluding that countywide elections would dilute Native American voting strength. SSOF ¶ 49. After *Shelby County v. Holder*, 570 U.S. 529 (2013), Arizona counties closed 212 polling locations before the 2016 election—Maricopa County alone cut its polling places from 200 to 60, producing wait times exceeding four hours in heavily Latino census tracts. SSOF ¶ 50. And just last year, a federal court held that Arizona's policy of checking the eligibility of only those individuals suspected of being non-citizens violated the Civil Rights Act of 1964. SSOF ¶ 51.

The State does not engage with any of this evidence. The State's historical-background discussion begins in 1991 and recounts only the Legislature's incremental changes to mail-voting procedures. Mot. 11–12. That myopic view of the record invites reversible error. In *Mi Familia Vota v. Fontes*, 129 F.4th 691 (9th Cir. 2025), the Ninth Circuit vacated the district court's findings—made after a bench trial—that Arizona did not act with discriminatory intent in enacting a pair of voter registration laws. While the district court "'acknowledged that Arizona does have a long history of discriminating against people of color' and gave examples of the state's past discrimination,"—citing the same examples discussed by Plaintiffs' expert here—it "failed to meaningfully address the significance of that history," deeming the laws "too old to be determinative." *Id.* at 725. The Ninth Circuit held that this was error, and that the Court should have considered the evidence "in its totality." *Id.*; *see also Veasey v. Abbott*, 830 F.3d 216, 257 (5th Cir. 2016) ("[E]ven long-ago acts of official discrimination give context to the analysis.").

**3.      The Circumstances Of SB 1485's Passage Permit A Reasonable Inference**

11

**Of Discriminatory Purpose**

A reasonable factfinder could also infer discrimination from three other *Arlington Heights* factors: the specific sequence of events preceding enactment, departures from the Legislature's normal procedures, and contemporaneous statements by key legislators.

> a.   *The sequence of events leading to SB 1485 supports an inference of discriminatory purpose.*

The specific sequence of events preceding SB 1485 is itself evidence of invidious intent because the Legislature's sudden reversal of longstanding policy rested on nothing more than "thin and one-sided evidence" that had already been debunked when the bill was enacted. *Gonzalez v. Douglas*, 269 F. Supp. 3d 948, 968–69 (D. Ariz. 2017).

As described above, over the three decades before SB 1485, the Arizona Legislature had steadily expanded access to early and mail voting—authorizing no-excuse absentee voting in 1991, creating the Permanent Early Voting List in 2007, and adopting a series of refinements designed to make mail voting easier for "[a]ny qualified elector." *See* SSOF ¶¶ 52–53, 55–56. Those efforts were embraced across the political spectrum. *See* SSOF ¶ 54. After long lines at polling locations in 2016, the Republican-led Secretary of State's Office encouraged voters to register for the PEVL, in part, to reduce wait times. *See* SSOF ¶ 57. And in 2020, the Democrat-led Office recommended that Arizonans vote by mail and ran advertising campaigns—including ads targeting Native American communities— encouraging PEVL enrollment. *See* SSOF ¶ 58. By 2023, nearly 80% of Maricopa County registrants were on the PEVL, and in 2024, 2.6 million of the roughly 3.5 million ballots cast in the state were cast by mail. *See* SSOF ¶¶ 59–60.

The Legislature's about face came only after the 2020 election, when voters of color overwhelmingly supported the winning presidential candidate, and Arizona was decided by 10,457 votes out of over 3.3 million. *See* SSOF ¶¶ 61–62. What followed was a cascade of baseless fraud allegations that Arizona's own law enforcement and election officials have repeatedly and definitively rejected. The Secretary of State's office found no measurable evidence of fraud, *see* SSOF ¶¶ 63–64, and none connected to the PEVL, *see* SSOF ¶ 65;

12

no post-election lawsuit substantiated any fraud allegations including in connection with the PEVL, *see* SSOF ¶ 67 ("[No investigations] substantiated the allegation of material voter fraud or material inaccuracy."), and election officials identified fewer than 200 cases of potential fraud out of more than three million ballots cast, with only four charged, SSOF ¶ 68, and no known convictions related to the PEVL, *see* SSOF ¶ 66. The Office of the Attorney General itself concluded, after more than 10,000 hours of investigation, that prosecutable fraud is exceedingly rare, including fraud related to the PEVL. *See* SSOF ¶ 69. In short, the State had *no measurable evidence* of fraud before passing SB 1485.

Despite the absence of evidence, the Arizona Senate hired Cyber Ninjas Inc.—a Florida firm with no prior election-audit experience—to "audit" Maricopa County's 2020 results and determine if there had been fraud. As this Court noted previously in denying the State's motion to dismiss, there was "no legitimate evidence supporting the need for an audit," *see* Doc. 154, at 57–58 (citing Doc. 1 ¶ 58); *see also* SSOF ¶ 97. Indeed, the Secretary of State's Office opposed the audit as unnecessary. *See* SSOF ¶ 71. Nevertheless, the audit moved forward, with Cyber Ninjas releasing a findings report in late 2021. *See* SSOF ¶ 72. Thereafter, the Attorney General's Office concluded that the Cyber Ninjas report was "largely . . . not valid information" based on "poor [] information," and the audit led to no criminal charges, let alone charges connected to the PEVL. *See* SSOF ¶ 73. As this Court previously recognized, the Legislature's retention of Cyber Ninjas "could give a reasonable factfinder some pause" because the decision to hire them "with no evidence of fraud against the counsel of state experts was . . . 'a change in ordinary procedure that indicated some invidious motive was at work.'" Doc. 154, at 57–58.

The State ignores the Senate's retention of Cyber Ninjas in the absence of any evidence of fraud just as it did at the pleading stage. *See id.* It recharacterizes the passage of SB1485 as a measured legislative response to "election integrity" concerns, pointing to a 2019 precursor bill and two dozen pre-2020 prosecutions for double-voting. Mot. 12–15. That narrative cannot be reconciled with the record. The State's own witness conceded that neither any pre-2020 prosecutions nor post-2020 cases were connected to the PEVL, *see*

SSOF ¶ 70, and that SB 1485 would not have prevented any of the prosecutions the State points to, *see* SSOF ¶¶ 74–75. Nor can the State insulate SB 1485 by invoking a 2019 precursor bill. In fact, the opposite inference can be drawn: the proposed 2019 version restricting the PEVL did not pass, and the Legislature's decision to resurrect the idea in 2021 came only after the 2020 election. A reasonable factfinder could conclude that it was the success of the minority-supported candidate that changed the legislative outcome in 2021, and the Legislature's willingness to act on "thin and one-sided evidence" it knew to be unreliable is probative of an unstated motivation, *Gonzalez*, 269 F. Supp. 3d at 968–69.

> b.    *The Legislature's departures from its normal procedures in enacting SB 1485 support an inference of discriminatory purpose.*

A reasonable factfinder could also conclude that the legislative process that produced SB 1485 departed from Arizona's normal "sausage making" in ways that are probative of discriminatory intent. *March for Our Lives Idaho v. McGrane*, 749 F. Supp. 3d 1128, 1143 (D. Idaho 2024); *see Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 15 (4th Cir. 2023). Four features of the "procedural sequence" support that inference.

First, the Legislature shortened the public-comment periods for SB 1485 and the flood of other election bills following the 2020 election, materially reducing the opportunity for voters and election experts to engage with proposed legislation. *See* SSOF ¶ 76. A rushed legislative process can support an inference of discriminatory intent, even if the Legislature does not "break its own rules to engage in unusual procedures." *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 228 (4th Cir. 2016). Second, the bill sponsor ignored the feedback of experts. *See* SSOF ¶¶ 77–78. Fifteen county recorders—the officials charged with administering Arizona's elections—informed the bill sponsor, both when SB 1485 was being considered and also when similar bills were being considered in prior years, that the draft bill's language was unclear and unworkable. *Id.* Third, the Arizona Association of County Recorders—the bipartisan association of the officials who would implement SB 1485—formally opposed the bill, yet the Legislature enacted it over their opposition. SSOF ¶ 79. Fourth, a supporter of the bill voted against and then for the bill, only after reassured

14

that the Legislature was reviewing other election-related matters. SSOF ¶¶ 80–81.

The State simply states that SB 1485's passage was "substantively and procedurally normal," emphasizing that the strike-everything amendment used to move the bill was one of more than 120 such amendments in the 2021 session and that the Legislature adopted amendments to make the bill marginally less restrictive. Mot. 15–16; Pls.' Controverting Statement of Facts (CSOF) ¶¶ 80–81. Those debating points may properly be raised at trial, but they certainly do not establish the absence of a genuine factual dispute that discrimination was afoot. The use of a strike-everything amendment, which enabled the Legislature to delete the text of a prior bill and insert the text of SB 1485 to circumvent a bill introduction deadline, says nothing about whether the Legislature truncated public comment, ignored the feedback of the officials who would implement the law, or proceeded over the formal opposition of the county recorders' association. And the State offers no record evidence that any of those departures reflects the Legislature's "normal procedural sequence." *Arlington Heights*, 429 U.S. at 267. At minimum, a reasonable factfinder could view the record in Plaintiffs' favor and conclude that this "procedural sequence" is probative of discriminatory intent.

    *c.*    *Contemporaneous statements by legislators support an inference that discriminatory purpose motivated SB 1485.*

The contemporaneous statements of legislators and officials support a reasonable inference that SB 1485 was motivated by a discriminatory purpose. As this Court held at the pleading stage, these statements, "in concert with Plaintiffs' other well-pleaded allegations, provides plausible support for Plaintiffs' overall claim." Doc. 154 at 57.

Most notably, then-Representative John Kavanagh stated that the intent of SB 1485 was to reduce the voting population based on the "quality" of voters. Doc. 154, at 56; *see also* CSOF ¶ 41. This Court previously found that this statement "could be viewed … as expressing the discriminatory trope that minorities are uneducated voters." Doc. 154, at 56. In addition, at least one other legislator testified under oath in separate litigation that, despite considering SB 1485 and other legislation purportedly to address voter fraud, he was only

aware of "unsupported theories" of fraud related to his races in 2020 and 2022. *See* SSOF ¶ 83. And the Legislature passed SB 1485 with knowledge it would disproportionately affect minority voters. *See* Doc. 154, at 56; SSOF ¶ 82. Taken together, a reasonable factfinder could infer SB 1485 was motivated in part by a discriminatory purpose.

The State seeks to rely selectively on legislator statements that support its proffered rationales. *See* Mot. 13–14. But that approach cannot carry the State's summary judgment burden. The State does not engage with then-Representative Kavanagh's "quality" remark or Representative Toma's statement at all. She instead points only to floor statements by SB 1485's supporters invoking election integrity, voter confidence, and cost savings, Mot. 15–16; SSOF ¶¶ 15, 35, 37, 49, 53. To prevail on summary judgment, however, the State must show that the record as a whole, viewed in plaintiffs' favor, forecloses any reasonable inference of discriminatory purpose. Though the State may wish that this evidence—some of which the Court has already determined is probative of discriminatory purpose—did not exist, the State's failure to address it raises a genuine factual issue that needs to be resolved at trial.

   d.  *The State's proffered non-discriminatory rationales are unworthy of credence.*

A reasonable factfinder could also conclude that the State's three rationales for SB 1485—election integrity, voter confidence, and cost savings—are post-hoc justifications "unworthy of credence" and "probative of discrimination." *Reeves*, 530 U.S. at 147.

At the outset, the State's election integrity rationale is dubious as there is *no* evidence that SB 1485 will reduce voter fraud. *See supra*, at 13–15. The testimony of county election officials confirms as much. SSOF ¶ 84 ("there is no reason to think that there is any material Early Ballot fraud wrongdoing in Maricopa County"). The State's fraud-prevention rationale is further contradicted by the State's own witnesses. The State's 30(b)(6) designee testified that the Office has "no reason to believe that the PEVL specifically results in a high level of voter fraud." *See* SSOF ¶ 85. The State, through Todd Lawson's declaration, attempts to implicitly link voter fraud prosecution to the PEVL. *See* SSOF ¶ 88. But in his deposition, Mr. Lawson testified that the state could not identify any specific voter on the

PEVL who was prosecuted for mail-ballot fraud. *See* SSOF ¶¶ 86, 89. The Lawson declaration similarly implies that SB 1485 would prevent fraud. *See* SSOF ¶ 90. But, Mr. Lawson could not identify any prosecution that SB 1485 would have prevented. *See* SSOF ¶¶ 86, 91. The State concedes that the likelihood of fraud prevention under SB 1485 is "not very much." *See* SSOF ¶ 87. And Mr. Lawson acknowledged that mail voting is, in significant respects, *safer* than in-person voting—mail-ballot signature verification is more likely to catch fraud than poll-book sign-in. *See* SSOF ¶ 92; *see also* SSOF ¶¶ 94–96. Taking account of this evidence, a factfinder could readily conclude that a fraud-prevention rationale is pretextual.

The State's "voter confidence" and "cost-savings" rationales are similarly thin. The record contains only perfunctory and offhand statements from the bill's supporters: Senator Ugenti-Rita justified SB 1485 on the basis of "conventional wisdom," CSOF ¶ 15; Senator Gowan invoked vague concerns that "mailing … costs a lot of money," CSOF ¶ 37; and Senator Townsend pointed to "a multitude of emails" from constituents, CSOF ¶ 49. But the Maricopa County Recorder—whom the State cites as supporting SB 1485—testified that the Governor's Office supported the bill in part to "try[] to balance getting something passed … with not unduly catering to the falsehood that the 2020 election was subject to significant fraud or inaccuracy." *See* SSOF ¶ 101. And Arizona's biggest county, Maricopa County, does not expect to save any money as a result of implementation. *See* SSOF ¶ 93. A factfinder could give those offhand and conflicting justifications "little credence," and, "together with the elements of the prima facie case . . . [find] intentional discrimination." *Reeves*, 530 U.S. at 147–48.

## CONCLUSION

The Court should deny the Attorney General's motion for summary judgment and set this case for trial.

Dated: May 15, 2026

Respectfully submitted,

*/s/ Lee H. Rubin*

Lauren Elliott Stine (AZ# 025083)
Coree E. Neumeyer (AZ# 025787)
**QUARLES & BRADY LLP**
One Renaissance Square
Two North Central Avenue, Suite 600
Phoenix, AZ 85004-2391
(602) 229-5200
Lauren.Stine@quarles.com
Coree.Neumeyer@quarles.com

Courtney Hostetler (Admitted PHV)
John Bonifaz (Admitted PHV)
Ben Clements (Admitted PHV)
**FREE SPEECH FOR PEOPLE**
48 N. Pleasant St, Suite 304
Amherst, MA 01002
(617) 249-3015
chostetler@freespeechforpeople.org
jbonifaz@freespeechforpeople.org
bclements@freespeechforpeople.org

Lee H. Rubin (Admitted PHV)
**MAYER BROWN LLP**
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
(650) 331-2000
lrubin@mayerbrown.com

Daniel T. Fenske (Admitted PHV)
**MAYER BROWN LLP**
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600
dfenske@mayerbrown.com

Rachel J. Lamorte (Admitted PHV)
**MAYER BROWN LLP**
1999 K Street NW
Washington, DC 20006
(202) 362-3000
rlamorte@mayerbrown.com

*Attorneys for Plaintiffs*