**KRISTIN K. MAYES**
**ATTORNEY GENERAL**
(Firm State Bar No. 14000)

Hayleigh S. Crawford (No. 032326)
Joshua M. Whitaker (No. 032724)
Kathryn E. Boughton (No. 036105)
Joshua G. Nomkin (No. 039213)
Office of the Arizona Attorney General
2005 N. Central Avenue
Phoenix, AZ 85004-1592
(602) 542-3333
Hayleigh.Crawford@azag.gov
Joshua.Whitaker@azag.gov
Kathryn.Boughton@azag.gov
Joshua.Nomkin@azag.gov
ACL@azag.gov

*Attorneys for Defendant*
*Attorney General Kristin K. Mayes*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Mi Familia Vota; et al., | No. 2:21-cv-01423-DWL |
| Plaintiffs, | |
| v. | **ATTORNEY GENERAL'S REPLY** |
| | **IN SUPPORT OF MOTION FOR** |
| Adrian Fontes, in his official capacity as Arizona Secretary of State; et al., | **SUMMARY JUDGMENT** |
| Defendants, | |
| and | |
| RNC and NRSC, | |
| Defendant-Intervenors. | |

Having failed to identify anyone who will be harmed by S.B. 1485, Plaintiffs argue that they have standing because the law will harm them as organizations. But to survive summary judgment on that theory, Plaintiffs need evidence that the law "directly affect[s] and interfere[s] with" their "core business activities." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (hereafter "*Alliance*"). Plaintiffs do not present such evidence, so this Court lacks jurisdiction to proceed. And on the merits, no reasonable factfinder would find discriminatory purpose here.

## ARGUMENT

### I.  Plaintiffs lack standing to challenge S.B. 1485 on behalf of members.

The Attorney General's motion explained (at 6–7) why Plaintiffs lack standing to challenge S.B. 1485 on behalf of their members. In response, Plaintiffs offer no evidence or argument otherwise, instead conceding (at 7 n.4) they "do not assert" such standing. Thus, to the extent Plaintiffs previously asserted claims on behalf of members (*see* Doc. 1 at ¶¶ 11, 14, 18), the Court should grant summary judgment for the defense on such claims. *See* Fed. R. Civ. P. 56(a) (allowing summary judgment on "part of" claims).

### II.  Plaintiffs lack standing to challenge S.B. 1485 as organizations.

S.B. 1485 regulates people, not organizations. Yet Plaintiffs identify no one harmed by the law. This lack of evidence makes sense given how mild the law is. Under S.B. 1485, even a voter on the Early Voting List who fails to vote an early ballot for two consecutive election cycles would still have options for voting an early ballot. She could:

- Respond to a Confirmation Notice in 90 days to stay on the List. A.R.S. § 16-544(L).
- Ignore the Confirmation Notice and rejoin the List later. A.R.S. § 16-544(B).
- Decline to rejoin the List and request an early ballot later. A.R.S. § 16-542(A).

Thus, it is no wonder that Plaintiffs identify no voter who considers herself harmed.

So instead Plaintiffs argue that, as nonprofit organizations, *they* are harmed by the law. But because the law does not regulate Plaintiffs, their standing is "substantially more difficult to establish." *Alliance*, 602 U.S. at 382 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)). Plaintiffs' evidence falls short of what is required.

1

### A.    Plaintiffs do not provide evidence that S.B. 1485 "directly interferes" with their core business activities.

Plaintiffs argue (at 3) that S.B. 1485 "directly interferes" with their "core voter-mobilization work."  This argument rests on a misunderstanding of caselaw.  A correct analysis requires review of the Supreme Court's explanation in *Alliance*, which itself summarized an earlier case:  *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982).

In *Havens*, an organization (HOME) had been providing counseling and referral services to people who sought housing.  *See Alliance*, 602 U.S. at 395.  But an apartment complex owner (Havens Realty) intentionally gave "false information about apartment availability" to HOME's Black employees—a practice known as racial steering.  *Id.*  This misdeed was not just inconvenient for HOME.  It "perceptibly impaired HOME's ability to provide counseling and referral services."  *Id.* (quoting *Havens*, 455 U.S. at 379).

*That* is what gave HOME standing to sue Havens Realty.  In other words, Havens Realty's misdeed "directly affected and interfered with HOME's core business activities." *Id.*  HOME was like "a retailer who sues a manufacturer for selling defective goods to the retailer."  *Id.*  HOME's *ability* to provide its usual services had been compromised.

And the Supreme Court has cautioned that "*Havens* was an unusual case," so the Court "has been careful not to extend the *Havens* holding beyond its context."  *Id.* at 396.

Here, Plaintiffs describe their core business activity (at 3–4) as "[v]oter mobilization," which includes helping voters join the Early Voting List.  Admittedly, perhaps S.B. 1485 could affect the *manner* in which Plaintiffs conduct these activities.  For example, now that S.B. 1485 has passed, Plaintiffs may wish to explain the law to voters as they are help voters join the Early Voting List.  In addition, perhaps S.B. 1485 could affect the *frequency* with which Plaintiffs conduct their activities.  For example, if a voter on the Early Voting List fails to vote an early ballot in 2024 and 2026, fails to respond to a Confirmation Notice in early 2027, and then is removed from the List and wishes to rejoin, Plaintiffs might help such a voter rejoin the List.

But none of this is *direct interference* with Plaintiffs' core business activities.  The

2

law has not "perceptibly impaired [Plaintiffs'] ability to provide" voter support services. *Alliance*, 602 U.S. at 395 (quoting *Havens*, 455 U.S. at 379). Unlike a housing counseling organization that is given false information about housing availability, or a retailer that is given defective goods from a manufacturer, Plaintiffs can still provide their services to voters just as well as before—including helping people join the Early Voting List.

Plaintiffs' arguments miss this point. For starters, Plaintiffs predict (at 4) that S.B. 1485 "will require" them to "re-do" their work to help voters join the Early Voting List. But this prediction does not confer standing for three reasons. ***First***, S.B. 1485 does not "require" anything of Plaintiffs. The law does not regulate them. To the extent Plaintiffs wish to help voters rejoin the Early Voting List, that is Plaintiffs' choice. Any associated injury is "self-inflicted." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013). ***Second***, Plaintiffs' prediction refers to hypothetical voters who joined the Early Voting List with Plaintiffs' help *and* will fail to vote an early ballot in two consecutive election cycles *and* will fail to respond to a Confirmation Notice *and* will seek Plaintiffs' help to rejoin the List. Plaintiffs' assertion that S.B. 1485 will require them to assist such voters rests on a "speculative chain of possibilities" too attenuated to survive summary judgment. *Clapper*, 568 U.S. at 414 & n.5; *see also Tenn. Conf. of NAACP v. Lee*, 139 F.4th 557, 565–69 (6th Cir. 2025) (finding similar evidence insufficiently specific for organization challenging voter registration policy to survive summary judgment). ***Third***, even if S.B. 1485 will someday lead to a situation where a voter wishes to rejoin the Early Voting List and seeks Plaintiffs' help, this would not *interfere* with Plaintiffs' services. Rather, it would be an opportunity for Plaintiffs to *provide* their services. By analogy, imagine a law that loosens a public safety requirement and causes more people to be injured and go to a hospital, including people that the hospital previously treated. The hospital would not have standing to challenge the law just because it must re-treat patients. *See Alliance*, 602 U.S. at 391–93 (discussing similar analogies). So too here.

In addition, Plaintiffs say (at 4–5) that they "must now divert" resources to voter mobilization work, including "educat[ing]" voters about S.B. 1485 and "identify[ing]"

and "support[ing]" voters who will be removed from the Early Voting List. But these claims do not confer standing. *First*, Plaintiffs are wrong to say they "must" do this. Again, S.B. 1485 does not regulate Plaintiffs. If they wish to spend resources educating, identifying, and supporting voters, that is "self-inflicted." *Clapper*, 568 U.S. at 418. Organizations cannot gain standing by "choosing to spend money fixing a problem that otherwise would not affect" them. *Satanic Temple v. Labrador*, 149 F.4th 1047, 1054 (9th Cir. 2025) (citation modified). *Second*, spending resources to educate people about a law does not confer standing. *See Alliance*, 602 U.S. at 394 (rejecting standing theory based on "public education" expenditures). *Third*, Plaintiffs' prediction that they must spend resources identifying and supporting voters who will someday be removed from the Early Voting List is too speculative and non-specific to withstand summary judgment. *See Clapper*, 568 U.S. at 414 & n.5; *Tenn. Conf. of NAACP*, 139 F.4th at 565–69. *Fourth*, even if Plaintiffs will spend resources educating, identifying, and supporting voters, that does not mean S.B. 1485 *directly interferes* with their core business activities. At most, Plaintiffs' evidence suggests that S.B. 1485 may affect the manner and frequency of their services, not that the law has "perceptibly impaired [their] ability to provide" services. *Alliance*, 602 U.S. at 395 (quoting *Havens*, 455 U.S. at 379).

**B.      Plaintiffs' effort to cabin *Alliance* to its facts is unpersuasive.**

Plaintiffs argue (at 5–6) that the Supreme Court's decision in *Alliance* is "nothing like" this case. But the *Alliance* decision clarified standing principles that govern here. The plaintiffs in *Alliance* argued that "standing exists when an organization diverts its resources in response to a defendant's actions." 602 U.S. at 395. The Supreme Court rejected this view, stating: "That is incorrect." *Id.* The Court explained that, instead, organizations may challenge actions that "directly affect[] and interfere[] with" their "core business activities," akin to "a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.* And the Court clarified that *Havens* was "an unusual case," which the Court has been "careful not to extend." *Id.* at 396. These principles apply here.

4

### C.    Plaintiffs' reliance on *Immigrant Defenders* is misplaced.

Plaintiffs also say (at 5) that they have presented "the same kind of injury" that the Ninth Circuit accepted in *Immigrant Defenders Law Center v. Noem*, 145 F.4th 972 (9th Cir. 2025).  But the kind of injury Plaintiffs present here is much weaker than the one in *Immigrant Defenders*.  And an en banc Ninth Circuit panel may soon clarify the issue.

In *Immigrant Defenders*, a California-based law firm that represents asylum seekers challenged President Trump's reimplementation of a "Remain in Mexico" policy. 145 F.4th at 980–82.  The policy would have forced the firm's clients to remain in Mexico while asylum applications were pending, so the firm submitted evidence of "imminent irreparable harm" including that: (1) "dangerous conditions in Mexico would impede [the firm's] ability to provide representation," (2) the firm "will have to contend with the time limits and restrictions" pursuant to the policy "on when and how its staff can communicate with its clients," and (3) the firm "will have to expend additional resources to reach individuals located in Mexico" and "hire additional staff, purchase international phone plans, and rent confidential meetings spaces in Mexico." *Id.* at 988–89.

Plaintiffs do not present that kind of injury.  S.B. 1485 does not create "dangerous conditions" that impede Plaintiffs' ability to provide services.  Nor does S.B. impose "time limits" or "restrictions" on Plaintiffs' services.  And, while Plaintiffs say they will spend "resources" to educate, identify, and support voters, that is a voluntary choice based on speculative and non-specific concerns.  Thus, *Immigrant Defenders* is inapposite.

Moreover, a pending en banc case may soon clarify how to analyze organizational standing.  In *Immigrant Defenders*, the dissenting judge explained that the Supreme Court's *Alliance* decision "marked a sea change in the doctrine of organizational standing," which "poses a problem for our precedent."  *Id.* at 1001–04 (Nelson, J., dissenting).  The dissenting judge also observed that "the en banc court in *Arizona Alliance* will decide and likely control these issues." *Id.* at 1004.[1]

---

[1] The dissenting judge was referring to *Arizona Alliance for Retired Americans v. Mayes*, an en banc case argued last summer.  *See* https://www.ca9.uscourts.gov/cases/en-banc/.

Other circuits have also recognized that the *Alliance* decision modified precedent in relevant ways. *See, e.g.*, *United States v. Texas*, 173 F.4th 659, 665–66 (5th Cir. 2026) (en banc) (holding that legal services organization lacked standing to challenge a law on the theory that it must "adjust resources in response"); *Wis. Voter All. v. Millis*, 166 F.4th 627, 637–38 (7th Cir. 2026) (holding that election-focused organization did not show direct interference with core business activities when it "still can" perform them).

### III.   No reasonable factfinder would find discriminatory purpose here.

On the merits, Plaintiffs cannot overcome "the presumption of good faith" to justify "the intrusive potential of judicial intervention into the legislative realm." *Miller v. Johnson*, 515 U.S. 900, 916–17 (1995).   Plaintiffs (1) offer historical events unconnected to S.B. 1485's enacting Legislature, (2) disregard the Legislature's express rationales, (3) mischaracterize legislative history, (4) offer cherry-picked (sometimes inadmissible) statements from legislators, and (5) offer speculative evidence of disparate impact that the Legislature was not even aware of.   They have not provided admissible evidence from which a reasonable factfinder could conclude that the Legislature was motivated to enact S.B. 1485 *because of* a discriminatory effect. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).   Thus, Plaintiffs' claims are "subject to an unfavorable summary disposition." *Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist.*, 17 F.4th 950, 959 (9th Cir. 2021) (citation modified).

### A.   The reasonably contemporaneous historical background of S.B. 1485 does not support an inference of discrimination.

As the Attorney General's motion explained (at 10–11), S.B. 1485 typifies the Legislature's ongoing desire to balance election integrity concerns with voter access to the Early Voting List.   Contrary to Plaintiffs' characterization (at 11), this not a "myopic view."   Rather, Arizona law "generally makes it quite easy for residents to vote." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 661 (2021).

Plaintiffs' historical evidence does not support a contrary inference.   First, Plaintiffs cite (at 10–11) Section 5 preclearance objections from decades ago.   These

"official actions taken long ago" are not "evidence of current intent." *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987). And the mere existence of preclearance objections proves nothing, especially not about the Legislature. For example, Plaintiffs cite (at 11) "objections to the State's redistricting plans," but since 2000 those plans have been made by an Independent Redistricting Commission under Arizona's Constitution. *See* Ariz. Const. art. IV, pt. 2, § 1. Here, "all that matters" is the intent of the Legislature that passed S.B. 1485. *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1140–41 (9th Cir. 2023).

Plaintiffs also cite (at 11) actions of county recorders who closed polling locations before the 2016 election, leading to long wait times. But those closure decisions were budgetary choices by county officials, not the Legislature. *See* House Comm. on Elections (Mar. 28, 2016), https://www.azleg.gov/videoplayer/?eventID=2016031171 at 1:04:53–1:05:22. In fact, members of the Legislature criticized these decisions and held a hearing to demand accountability. *See id.* at 35:56–36:28.

Next, Plaintiffs say (at 11) that a federal court recently found that an Arizona law regarding voting eligibility checks violated the Civil Rights Act of 1964. Plaintiffs do not support this claim with admissible evidence, citing only paragraphs in Dean Tolson's report that are not about that court decision. *See* Pls.' SSOF ¶ 51 (citing ¶¶ 11 and 147 of Dean Tolson's report). To the extent Plaintiffs meant to cite the decision in *Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929 (D. Ariz. 2024), that court's finding was based on a conflict between an Arizona statute and a federal statute, not discriminatory intent. *Id.* at 995–96. And the Arizona statute at issue was enacted *after* S.B. 1485, so it is not background. *See* H.B. 2492, 55th Leg. 2nd Reg. Sess. (2022); *see also Veasey v. Abbott*, 830 F.3d 216, 234 (5th Cir. 2016) (en banc) (post-enactment events are of little weight).

Plaintiffs' few isolated examples do not permit an inference that the Legislature enacted S.B. 1485 against a reasonably contemporaneous background of discrimination. Indeed, under Plaintiffs' view, every law passed by the Legislature could be similarly "condemn[ed]" "in the manner of original sin." *Abbott v. Perez*, 585 U.S. 579, 603 (2018) (citation modified). That cannot be right.

7

**B.    The circumstances of S.B. 1485's passage do not support an inference of discrimination.**

There is no genuine dispute about the regularity of S.B. 1485's sequence of events, legislative history, and procedure or substance. *See Carrillo-Lopez*, 68 F.4th at 1140.

**Sequence of events.**  As the Attorney General's motion explained (at 13–14), the Legislature enacted S.B. 1485 to protect election integrity, increase public confidence, and reduce administrative costs by not mailing ballots to people who repeatedly do not vote by early ballot.  These are valid rationales that can be "essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).

Plaintiffs suggest (at 12) that it was "baseless" for the Legislature to protect election integrity without "measurable" fraud.  But as the Attorney General's motion pointed out (at 12), there was "measurable" fraud before S.B. 1485.  And it is undisputed that the bill's legislative history includes constituent concerns about lack of confidence in the Early Voting List's integrity.  *See* AG SOF ¶ 53; Pls.' CSOF ¶ 53.

Plaintiffs argue (at 16) that these justifications are "post-hoc" and "unworthy of credence."  But as the Attorney General has explained (at 12–14), these justifications were articulated *prior* to enactment, so they are not post-hoc.  Nor are they contrived. Election integrity and voter confidence are valid purposes that S.B. 1485 serves.  *See Purcell*, 549 U.S. at 4.  And while fraud is not widespread, it exists.  *See, e.g.*, AG SOF ¶¶ 19–21.[2]  Moreover, the Legislature heard testimony from which it could conclude S.B. 1485 would improve the Early Voting List.  *See* AG SOF ¶¶ 26–31.

Plaintiffs also cite (at 13) the Arizona's Senate hiring of Cyber Ninjas to audit Maricopa County's 2020 results.  But the timing of the Cyber Ninjas audit shows that it is not evidence of legislative intent behind S.B. 1485.  The Legislature was already

---

[2] Plaintiffs assert (at 16–17) that the Attorney General's declarant on this issue, a prosecutor named Mr. Lawson, could not identify at his deposition a specific prosecution that would have been prevented by S.B. 1485.  But he explained that this is because, when he was prosecuting voter fraud, whether the defendant had failed to vote an early ballot in two consecutive election cycles was "not something I would have been paying attention to."  Pls.' Ex. 10 at 95:3–96:5, 101:2–102:12.

8

considering a precursor to S.B. 1485 in 2019. *See* AG SOF ¶¶ 11–16. And as Plaintiffs note (at 13), the Cyber Ninjas report did not issue until "late 2021"—after S.B. 1485 had passed. So the audit results are not germane to the enacting Legislature's intent.

Plaintiffs also challenge (at 17) the cost-saving aspect of S.B. 1485, claiming that Maricopa County did not expect significant cost-savings. Yet the cited testimony simply shows that Maricopa County did not know the budget impact. *See* Pls.' SSOF ¶ 93 (citing Pls.' Ex. 7 at 89:1–89:18). Plaintiffs do not dispute that mailing ballots costs money. *See* AG SOF ¶¶ 8–9; Pls.' CSOF ¶¶ 8–9. If S.B. 1485 helps counties avoid mailing ballots that would otherwise go unused, that will save money, even if the amount is unknown.

**Legislative history**. Plaintiffs dismiss (at 15–16) legislators' contemporaneous statements showing non-discriminatory rationales for S.B. 1485. Instead they focus on two other statements to infer discriminatory purpose. But no such inference is reasonable.

First, Plaintiffs highlight (at 15) a statement by Representative Kavanagh to a news outlet. *See* Pls.' CSOF ¶ 41. At the pleading stage, this Court reasoned that part of this statement could resemble a discriminatory trope. But at summary judgment, Plaintiffs must offer admissible evidence. Fed. R. Civ. P. 56(c)(2). They do not. Instead they offer an inadmissible hearsay quotation in a news article. Fed. R. Evid. 802. By contrast, Rep. Kavanagh's *admissible* statements offered by the Attorney General indicate an intent to protect election integrity and save money. *See* AG SOF ¶¶ 41-42.

Next, Plaintiffs cite (at 16) a statement by Representative Toma, in 2024, that he "agree[d] that there were unsupported theories about fraudsters manipulating election results." Pls.' SSOF ¶ 83 & Ex. 17. This statement from 2024 shows nothing about what the Legislature intended in 2021. To the extent this statement is relevant at all, it shows only that Representative Toma did not think there was *so much* fraud that it changed election *results*. That does not mean the Legislature was not motivated by voter concerns and weakened confidence in elections. *See, e.g.*, AG SOF ¶¶ 26-31 (concerns related to mail-in ballots). Neither statement cited by Plaintiffs prevents summary judgment.

**Procedural norms**. Plaintiffs do not provide evidence that S.B. 1485's enactment

9

was abnormal in a manner that suggests discriminatory purpose.  Plaintiffs first argue (at 14) that the Legislature shortened the "public-comment periods for S.B. 1485 and the flood of other election bills following the 2020 election."  This argument is based on testimony from a county recorder who opposed the bill and stated that the amount of legislative activity in 2021 made it difficult for election officials to keep track.  *See* Pls.' Ex. 15 at 107:8-16.  Yet even she acknowledged that the busy pace of 2021 was not exclusive to that legislative session, and her comments about these legislative patterns were "pure speculation on [her] part."  *Id.* at 108:2-8.  And regardless, the Legislature understandably has discretion to limit the length of public comment when a lot of legislative business must get done.  So, if the Legislature was facing "a flood of other election bills" as Plaintiffs say, shortening public comment would make sense as an administrative matter.  It does not suggest a discriminatory purpose behind S.B. 1485.

Plaintiffs next claim (at 14) that the Legislature "ignored" the feedback of county recorders.  But the record plainly shows that S.B. 1485 was amended to address recorders' feedback.  *See, e.g.*, Mar. 30, 2021 email "Re: SB1485-AACo Moving to Neutral," attached as **AG Exhibit 24**.[3]  And, contrary to Plaintiffs' claim (at 14), the Arizona Association of County Recorders did not oppose S.B. 1485.  Rather, it took a neutral position on the bill after it was amended to address county recorders feedback.  *See id.*

Finally, Plaintiffs cite (at 14–15) one legislator's decision to support the bill after initially voicing concern that it did not protect election integrity enough (*see* AG SOF ¶¶ 49–50, 52–53).  But legislators often change positions on bills.  No reasonable factfinder would infer that the Legislature was motivated by discrimination because a single legislator initially believed that the bill did not go far enough.

### C. Plaintiffs' evidence of potential disparate impact is speculative, and they do not show that the Legislature was aware of it.

Plaintiffs' political science expert (Dr. Herron) predicts that, under S.B. 1485, members of certain racial or ethnic groups will be more likely to receive Confirmation

---

[3] The Yavapai County Recorder produced this email in discovery on February 9, 2022.

Notices. But as the Attorney General's motion explained (at 16–17), Dr. Herron does not know how members of these groups acted or will act in the 2024 and 2026 election cycles (which are the cycles that will determine who receives a Confirmation Notice), nor does he know how voters will respond to the Notices. Plaintiffs' response (at 9–10) does not dispute these shortcomings. *Compare* AG SOF ¶¶ 67–74 *with* Pls.' CSOF ¶¶ 67–74.

Plaintiffs say (at 8) that the defense expert (Dr. Grimmer) "agree[s] that S.B. 1485 will disproportionately burden" non-White voters. This is wrong. Dr. Grimmer opined that Dr. Herron's predictions about S.B. 1485 are based on a flawed method and unsupported assumptions. *See* AG Ex. 19 at ¶¶ 9, 11–16 (summarizing views). Dr. Grimmer offered a prediction that is *less flawed* than Dr. Herron's, but he still recognized the speculative nature of the inquiry and thus opined only on how S.B. 1485 "could" or "may" affect voters. *Id.* at ¶¶ 10, 90–94. Indeed, he made clear that he was using old historical data and making assumptions, so he only predicted "who *could* experience a change in their cost of voting due to SB 1485." *Id.* at ¶¶ 83–84 (emphasis added).

More importantly, Plaintiffs do not show that the Legislature was *aware* of these political science predictions. Indeed, they admit that Dr. Herron offers no opinion on legislative intent. *Compare* AG SOF ¶¶ 76–79 *with* Pls.' CSOF ¶¶ 76–79. Evidence of potential impact does not show legislative intent if the Legislature was unaware of the evidence. *See, e.g.*, *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 938–40 (11th Cir. 2023) (holding that district court clearly erred in finding discriminatory purpose when there was "no substantial evidence that the Legislature foresaw that the challenged provisions would have a disparate impact"); *Lindsay v. City of Philadelphia*, 863 F. Supp. 220, 224–25 (E.D. Pa. 1994) (granting summary judgment when there was no evidence that lawmakers "knew or should have known" of impact).

## CONCLUSION

The Court should grant summary judgment to the defense.

11

RESPECTFULLY SUBMITTED this 8th day of June, 2026.

**KRISTIN K. MAYES**
**ATTORNEY GENERAL**

By: */s/* Joshua M. Whitaker

    Hayleigh S. Crawford
    Joshua M. Whitaker
    Kathryn E. Boughton
    Joshua G. Nomkin
    Office of the Arizona Attorney General
    2005 N. Central Ave.
    Phoenix, Arizona 85004-1592
    Telephone: (602) 542-3333